**2023-1612**

# United States Court of Appeals for the Federal Circuit

CLOUDFLARE, INC.,

*Appellant,*

— v. —

SABLE NETWORKS, INC.,

*Appellee.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2021-00909*

## BRIEF FOR APPELLANT

ANTHONY M. GARZA
STEVEN CALLAHAN
**CHARHON CALLAHAN ROBSON & GARZA, PLLC**
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
(214) 521-6400
agarza@ccrglaw.com
scallahan@ccrglaw.com

*Counsel for Appellant*

DATE FILED: JUNE 30, 2023

**U.S. Patent No. 8,243,593, claims 9-12, 17, and 18**

9. A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

    maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and

    computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

10. The method of claim 9, wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably.

11. The method of claim 10, further comprising:

    determining, based at least partially upon the badness factor, a penalty to impose on the flow.

12. The method of claim 11, further comprising:

    enforcing the penalty on the flow.

17. The method of claim 12, wherein determining the penalty comprises:

    determining an increased drop rate to impose on one or more information packets belonging to the flow.

18. The method of claim 17, wherein enforcing the penalty comprises:

    imposing the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2023-1612 |
| **Short Case Caption** | Cloudflare, Inc. v. Sable Networks, Inc. |
| **Filing Party/Entity** | Cloudflare, Inc. |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 6/30/2023

Signature: /s/ Anthony M. Garza

Name: Anthony M. Garza

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| Cloudflare, Inc. | | Morgan Stanley |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Farella Brown + Martel LLP | James L. Day | Daniel Callaway |
| Winston Liaw | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................. vi

STATEMENT OF RELATED CASE ........................................................... 1

JURISDICTIONAL STATEMENT ............................................................. 3

INTRODUCTION ................................................................................. 4

STATEMENT OF THE ISSUES................................................................ 6

STATEMENT OF CASE ........................................................................ 7

    I.    The claim structure of the patent ............................................... 7

    II.    Cloudflare's IPR petition misplaced the arguments for dependent claims 17-18 and 37-38........................................... 11

    III.    Sable's preliminary response argued that claims 17-18 and 37-38 were not invalid because *Copeland* failed to disclose a "badness factor," showing that Sable understood Cloudflare's error .................................. 14

    IV.    The Board recognized that claims 17-18 and 37-38 should not have been placed in the ground-one, *Yung*-only section.................................................................. 15

    V.    The parties disputed whether the Board could correct Cloudflare's error .................................................... 17

    VI.    Between the oral argument and the Board's decision, this Court issued *Apple v. MPH* ...................................... 18

    VII.    The Board refused to correct Cloudflare's obvious error after concluding that the error was not "typographical" .......... 19

SUMMARY OF ARGUMENT ................................................................ 22

ARGUMENT ................................................................................... 22

    I.    Statement of standard of review ............................................. 22

II.    Administrative agencies are often subject to statutes and rules that control whether an agency can correct errors ........... 23

III.    The Patent Office, exercising discretion, may correct errors in the absence of statutory authority ............................. 26

IV.    As in *Bennett* and *Stoddard*, the Board enjoys broad, implicit authority to recognize and correct errors in IPR petitions ................................................................................. 28

V.    The Board failed to apply the correct legal standard in evaluating Cloudflare's error.................................................. 30

VI.    In the alternative, the Court should correct the error and remand to the Board for determination ................................... 34

CONCLUSION ............................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A. F. Stoddard & Co. v. Dann*,
 564 F.2d 556 (D.C. Cir. 1977)..........................................................27, 28, 29

*Am. Signature, Inc. v. United States*,
 598 F.3d 816 (Fed. Cir. 2010) ................................................................23, 24

*AMC Multi-Cinema, Inc. v. Fall Line Patents, LLC*,
 No. 2021-1051, 2021 WL 4470062 (Fed. Cir. Sept. 30, 2021)....................34

*Amkor Tech., Inc. v. Tessera, Inc.*,
 No. IPR2013-00242, 2013 WL 6907729 (PTAB Aug. 29, 2013) ...............31

*Apple Inc. v. MPH Techs. Oy*,
 No. 2021-1355, 2022 WL 4103286 (Fed. Cir. Sept. 8, 2022)..........18, 19, 35

*Artesian Home Prods. v. Gutterglove, Inc.*,
 No. IPR2018-00015 (PTAB May 31, 2018) ................................................31

*Bartenwerfer v. Buckley*,
 143 S. Ct. 665 (2023)...................................................................................33

*Biotec Biologische Naturverpackungen GmbH v. Biocorp, Inc.*,
 249 F.3d 1341 (Fed. Cir. 2001) .......................................................29, 33, 34

*Helfgott & Karas, P.C. v. Dickinson*,
 209 F.3d 1328 (Fed. Cir. 2000) ............................................................24, 25

*Hoffer v. Microsoft Corp.*,
 405 F.3d 1326 (Fed. Cir. 2005) ..................................................................35

*In re Bennett*,
 766 F.2d 524 (Fed. Cir. 1985) (en banc) ............................................ *passim*

*In re Magnum Oil Tools Int'l, Ltd.*,
 829 F.3d 1364 (Fed. Cir. 2016) ..................................................................17

*In re Serenkin*,
 479 F.3d 1359 (Fed. Cir. 2007) ..................................................................25

*In re Warsaw Orthopedic, Inc.*,
 832 F.3d 1327 (Fed. Cir. 2016) ..................................................................22

*Ivantis, Inc. v. Glaukos Corp.*,
No. IPR2018-01147 (PTAB Dec. 6, 2018) ...................................................31

*Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*,
927 F.3d 1232 (Fed. Cir. 2019) .......................................................................33

*Microsoft Corp. v. IPA Techs., Inc.*,
No. 2021-1412, 2022 WL 989403 (Fed. Cir. Apr. 1, 2022) .................. 22-23

*PGS Geophysical AS v. Iancu*,
891 F.3d 1354 (Fed. Cir. 2018) .......................................................................19

*Sirona Dental Sys. GmbH v. Institut Straumann AG*,
892 F.3d 1349 (Fed. Cir. 2018) .......................................................................19

*Soc. Sec. Bd. v. Nierotko*,
327 U.S. 358 (1946) ...........................................................................................22

*Superior Fireplace Co. v. Majestic Prod. Co.*,
270 F.3d 1358 (Fed. Cir. 2001) ..............................................................25, 26

*Unified Patents Inc. v. Universal Secure Registry LLC*,
No. IPR2018-00067, 2018 WL 1358695
(PTAB Mar. 14, 2018)................................................................................31, 36

*Varian Med. Sys., Inc. v. Best Medical Int'l, Inc.*,
No. IPR2020-00075, 2020 WL 2096403 (PTAB May 1, 2020).................32

**Statutes & Other Authorities:**

19 C.F.R. § 351.224 ...........................................................................................23

19 C.F.R. § 351.224(f) ......................................................................................24

19 U.S.C. § 1675(h) ...........................................................................................23

28 U.S.C. § 1295(a)(4)(A) ...................................................................................3

35 U.S.C. § 6(b)(4) ...............................................................................................3

35 U.S.C. § 141 .....................................................................................................3

35 U.S.C. § 251 ..............................................................................25, 26, 30

35 U.S.C. § 252 ...................................................................................................25

35 U.S.C. § 255 ......................................................... 17, 25, 26, 30

35 U.S.C. § 311 ................................................................. 3

35 U.S.C. § 311-319 ......................................................... 28

35 U.S.C. § 318 ................................................................ 3

37 C.F.R. § 42.1(b) .......................................................... 29

37 C.F.R. § 42.5(a) .......................................................... 29

37 C.F.R. § 42.5(b) .......................................................... 29

37 C.F.R. § 42.5(c) .......................................................... 29

37 C.F.R. § 42.104(c) ............................................. 28, 32, 33

PCT Rule 91.1 .................................................................. 24

PCT Rule 91.1(c) .............................................................. 24

## <u>STATEMENT OF RELATED CASE</u>

No court has heard any appeal from the underlying PTAB proceedings. Sable asserted claims from the same patent (U.S. Patent No. 8,243,593) in *Sable Networks, Inc. v. Cloudflare Inc.*, No. 6:21-CV-261 (W.D. Tex.) (Albright, J.), (currently pending) and in the following district-court cases (which have all been dismissed):

- *Sable Networks Inc. v. Check Point Software Techs. Ltd.*, No. 1:21-CV-201 (D. Del.);

- *Sable Networks, Inc. v. Fortinet, Inc.*, No. 5:20-CV-109 and 5:20-CV-196 (E.D. Tex.);

- *Sable Networks, Inc. v. Palo Alto Networks, Inc.*, No. 5:20-CV-111 (E.D. Tex.);

- *Sable Networks, Inc. v. Hewlett Packard Enter. Co.*, No. 5:20-CV-120 (E.D. Tex.);

- *Sable Networks, Inc. v. Splunk, Inc.*, No. 5:21-CV-40 (E.D. Tex.);

- *Sable Networks, Inc. v. Dell Techs. Inc.*, No. 6:20-CV-569 (W.D. Tex.);

- *Sable Networks, Inc. v. Juniper Networks, Inc.*, No. 6:20-CV-524 (W.D. Tex.);

- *Sable Networks, Inc. v. Nokia Corp.*, No. 6:20-CV-808 (W.D. Tex.);

- *Sable Networks, Inc. v. Riverbed Tech., Inc.*, No. 6:21-CV-175 (W.D. Tex.);

- *Sable Networks, Inc. v. SonicWall Inc.*, No. 6:21-CV-190 (W.D. Tex.); and

- *Sable Networks, Inc. v. Forcepoint LLC*, No. 6:21-CV-241 (W.D. Tex.).

Counsel for Cloudflare knows of no other case pending in this Court or any other court that will directly affect or be affected by the Court's decision here.

## <u>JURISDICTIONAL STATEMENT</u>

The PTAB had jurisdiction over this *inter partes* review under <u>35 U.S.C. §§ 6(b)(4)</u> and <u>311</u>. The Board issued its final written decision under <u>35 U.S.C. § 318</u> on October 18, 2022, and denied rehearing on January 9, 2023. Cloudflare timely filed its notice of appeal on March 10, 2023. ECF No. 1. This Court has jurisdiction under <u>35 U.S.C. § 141</u> and <u>28 U.S.C. § 1295(a)(4)(A)</u>.

## **INTRODUCTION**

*Inter partes* reviews are creatures of statute and regulation, but no statutory and regulatory scheme addresses every contingency. The IPR statute is silent on the Board's power to correct errors in IPR petitions, and the implementing regulations do not address the Board's power to correct obvious errors or errors the Board raises *sua sponte*.

Here, Cloudflare's IPR petition included an obvious error, which the Board noted *sua sponte*. Despite Cloudflare's request, the Board refused to correct the error, finding that the error was not "typographical" and that correcting the error would be tantamount to amending the petition. *See* Appx36, Appx38 n.24. The Board did not weigh the relative equities of the parties' positions, consider whether the error was unintentional, or determine if correcting the error would prejudice Sable. The Board concluded that the uncorrected petition did not support a finding of unpatentability for four challenged dependent claims.

Under this Court's caselaw, however, the Board enjoys a broad, implicit power to correct filings, including the power to correct obvious mistakes. Correcting an obvious mistake in the Petition—even if the mistake is not typographical—does not "add a contention to the Petition," Appx38, and does not otherwise offend the IPR statute. The Board should have determined (i) if the

error was obvious or otherwise correctable (instead of focusing on whether the error was "typographical"), and (ii) if equity supported correcting the obvious error (instead of determining whether the uncorrected petition supported the obviousness claim). Cloudflare requests that the Court vacate the Board's decision, confirm the Board's broad power to correct obvious errors in an IPR petition, and remand for further proceedings.

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether, when considering an IPR petition, the Board may correct obvious errors or errors raised *sua sponte* by the Board, even though no statute or regulation explicitly authorizes such correction.

2.      Whether the Board applied the correct legal standard when refusing to correct the error in Cloudflare's petition.

3.      Whether the Board abused its discretion in refusing to correct the error in Cloudflare's petition.

## STATEMENT OF CASE

### I.    The claim structure of the patent

U.S. Patent No. 8,243,593 has eight independent claims (1-5, 9, 25, and 29) and 36 dependent claims. Appx71-73. This appeal turns on how the dependent claims relate to these independent claims. *Id.* Four of the independent claims (claims 2-5) have no dependent claims. Claims 1 and 25 each have three dependent claims, and all three directly depend on the independent claim. *Id.* As depicted below, dependent claims 6-8 depend directly on independent claim 1, and dependent claims 26-28 depend directly on claim 25. *Id.* The dependency is shown by an indented bullet appearing under its related independent claim:

Independent Claim 1
- DC 6
- DC 7
- DC 8

Independent Claim 25
- DC 26
- DC 27
- DC 28

The claims that depend on independent claims 9 and 29 have a more complicated structure. Six claims directly depend on claim 9—claims 10, 19, 20, 22, 23, and 24, *id.*:

Independent Claim 9
- DC 10
- DC 19
- DC 20
- DC 22
- DC 23
- DC 24

However, nine additional claims indirectly depend on claim 9. To start with, dependent claim 11 depends on dependent claim 10, and dependent claim 21 depends on dependent claim 20, Appx72, as shown with further indented bullets:

Independent Claim 9
- DC 10
  - DC 11
- DC 19
- DC 20
  - DC 21
- DC 22
- DC 23
- DC 24

Next, dependent claim 12 depends on dependent claim 11, *id.*:

Independent Claim 9
- DC 10
  - DC 11
    - DC 12
- DC 19
- DC 20
  - DC 21
- DC 22
- DC 23
- DC 24

Five more claims (13-17) depend on dependent claim 12, *id.*:

Independent Claim 9
- DC 10
  - DC 11
    - DC 12
      - DC 13
      - DC 14
      - DC 15
      - DC 16
      - DC 17
- DC 19
- DC 20
  - DC 21
- DC 22
- DC 23
- DC 24

Finally, dependent claim 18 depends on dependent claim 17, *id.*:

Independent Claim 9
- DC 10
  - DC 11
    - DC 12
      - DC 13
      - DC 14
      - DC 15
      - DC 16
      - DC 17
        - DC 18
- DC 19
- DC 20
  - DC 21
- DC 22
- DC 23
- DC 24

Claim 29 and its dependents have a similar dependency structure—six claims directly depend on independent claim 29, while nine additional claims indirectly depend on independent claim 29. Appx73. The dependencies of the patent claims are summarized in the figure below:

10



## II.   Cloudflare's IPR petition misplaced the arguments for dependent claims 17-18 and 37-38

The IPR petition at issue, Appx74, challenged the validity of all eight independent claims on three different grounds. Cloudflare challenged:

- Independent claims 1, 2, 4, 5, and 25 based on *Yung*[1] alone (ground 1), Appx104-127;

---

[1] U.S. Patent 7,664,048, Appx1209.

- Independent claims 9 and 29 based on *Yung* and *Copeland*[2] (ground 2), Appx130-139; and

- Independent claim 3 based on *Yung* and *Four-Steps Whitepaper*[3] (ground 3), Appx148-155.

The petition tackled each ground in separate subsections (§§ VII(A)-(C)), but each subsection proceeded in the same manner. The subsections first identified why each independent claim was invalid in view of the prior art,[4] and then, in separate subsections, addressed claims that depend on those independent claims. The petition concluded with a ground-four section addressing eight dependent claims (8, 14-16, 28, 34-36) based on a combination of *Yung*, *Copeland*, and *Ye*.[5] Appx156-162.

Cloudflare misplaced two of its dependent-claim subsections. The arguments addressing dependent claims 17-18 and 37-38 (§§ VII(A)(8)-(9), Appx129-130) should have been placed in the ground-two, *Yung*-and-*Copeland* section (§ VII(B)) addressing their associated independent claims (independent claims 9 and 29). Instead, those arguments were incorrectly placed in the

---

[2] U.S. Patent No. 7,185,368, Appx1272.

[3] "Four Steps to Application Performance Across the Network with Packeteer's PacketShaper®," Appx1237.

[4] *See* §§ VII(A)(2)-(5), Appx103-127 (ground 1, independent claims 1-2, 4-5, 25); §§ VII(B)(3)-(4), Appx130-139 (ground 2, independent claims 9, 29); §§ VII(C)(3), Appx148-155 (ground 3, independent claim 3).

[5] U.S. Patent No. 7,295,516, Appx1296.

ground-one, *Yung*-only section (§ VII(A)) addressing independent claims 1-2, 4-5, and 25. Appx129-130. This mistake propagated to other portions of the petition summarizing Cloudflare's ground-one and ground-two arguments. *See* Appx88 (summary chart of ground-one and ground-two arguments); Appx104 (heading for ground-one arguments); Appx105 (concluding statement for ground-one arguments).

The arguments for dependent claims 17-18 and 37-38, as they appear in the ground-one, *Yung*-only section, are obvious errors. The call-out box following the heading for dependent claims 17 and 37, for example, states that the claims depend on claims 12 and 32. Appx129. But claims 12 and 32 only appear in the ground-two, *Yung*-and-*Copeland* section. Appx130. *Yung*, alone, cannot invalidate claim 17 because the claim it depends on (claim 12) is invalidated only by a combination of *Yung* and *Copeland*. Further, if the heading and arguments addressing claims 17-18 and 37-38 were cut and pasted into the ground-two section (which include claims 12 and 32 and their associated independent claims), the arguments make perfect sense—i.e., the arguments explain why *Yung* (one of the ground-two references) discloses the additional limitations in all four dependent claims (17-18 and 37-38). Appx129-130.

The list below shows a literal interpretation of the challenges lodged in the petition for independent claim 9 and its dependents. Because the arguments

13

for independent claim 9 rely on two references—*Yung* and *Copeland*, each of the dependent-claim arguments should rely on *at least* those two references.

<u>Independent Claim 9</u> (*Yung* and *Copeland*)
- DC 10 (*Yung* and *Copeland*)
  - DC 11 (*Yung* and *Copeland*)
    - DC 12 (*Yung* and *Copeland*)
      - DC 13 (*Yung* and *Copeland*)
      - DC 14 (*Yung*, *Copeland*, and *Ye*)
      - DC 15 (*Yung*, *Copeland*, and *Ye*)
      - DC 16 (*Yung*, *Copeland*, and *Ye*)
      - DC 17 (***Yung* alone**)
        - DC 18 (***Yung* alone**)
- DC 19 (*Yung* and *Copeland*)
- DC 20 (*Yung* and *Copeland*)
  - DC 21 (*Yung* and *Copeland*)
- DC 22 (*Yung* and *Copeland*)
- DC 23 (*Yung* and *Copeland*)
- DC 24 (*Yung* and *Copeland*)

Appx88. Dependent claims 17-18 stand out. Asserting that dependent claims 17-18, which each depend on claims 9-12, do *not* need to rely on *Copeland*, in view of the nested dependency structure, is an obvious error.

**III.  Sable's preliminary response argued that claims 17-18 and 37-38 were not invalid because *Copeland* failed to disclose a "badness factor," showing that Sable understood Cloudflare's error**

Sable's preliminary response, Appx200, raised six primary, substantive arguments. Appx201-202. Sable's third argument attacked Cloudflare's ground-two, *Yung*-and-*Copeland* combination, arguing that *Copeland* did not

disclose the "badness factor" required for independent claims 9 and 29.[6] In this section (§ III(C)(1)), Sable noted that **Copeland's** failure to disclose a badness factor (i) should cause the Board to "deny institution on ground 2[,]" Appx244, and (ii) shows that claims 17-18 and 37-38 are not obvious, Appx240 (at heading C), *see also* Appx202 (same heading).[7] This argument (that *Copeland*'s failure to disclose a badness factor undercut Cloudflare's obviousness arguments as to claims 17-18 and 37-38) shows that Sable understood that Cloudflare's arguments for claims 17-18 and 37-38 should have relied on *Yung* and *Copeland*, not on *Yung* alone.[8]

## IV. The Board recognized that claims 17-18 and 37-38 should not have been placed in the ground-one, *Yung*-only section

The Board also recognized Cloudflare's obvious error. In its Order Granting Institution, the Board noted that Cloudflare failed to demonstrate that *Yung* alone rendered claims 17-18 and 37-38 obvious, because Cloudflare relied

---

[6] Sable wrote: "The Petition concedes that Yung does not disclose these 'badness factor' limitations. The Petition relies on Copeland to try to fill this gap." Appx241.

[7] Sable's heading states: "The Petition Fails To Sufficiently Demonstrate That The **Yung Combinations** Disclose Or Render Obvious The Calculation Of A Badness Factor As Claimed (**Ground I, Claims 17-18, 37-38**; Ground II, Claims 9-13, 19-24, 29-33, 39-44; Ground IV, Claims 14-16, 34-36).") (emphases added).

[8] Sable argued otherwise at oral argument. Appx666 ("I mean we looked at this petition hard. And we thought that they had misunderstood the claims. We didn't think that they'd made a typo, or put it in the wrong section.").

on the combination of *Copeland* and *Yung* to address their associated independent claims (9 and 29). Appx356. The Board next recognized that (i) Cloudflare made a "sufficient showing" that the dependent-claim limitations in claims 17-18 and 37-38 were disclosed by *Yung*, and (ii) the remaining limitations would have been obvious over the combination of *Yung* and *Copeland*. Appx357. On this basis, the Board recognized that "the inclusion of claims 17, 18, 37, and 38 in the *Yung*-only ground may be a typographical error," and questioned "whether [the Board] should consider the Petition to include a contention that the subject matter of claims 17, 18, 37, and 38 would have been obvious over the combination of *Yung* and *Copeland*." *Id.*[9]

Shortly thereafter, Cloudflare e-mailed Sable, confirming the misplaced arguments for claims 17-18 and 37-38. Appx2940 ("Sections VII.A.8 (addressing claims 17 and 37) and VII.A.9 (addressing claims 18 and 38) should have been located in Section VII.B because they depend from claims addressed in that section of the Petition (i.e., Ground 2 based on *Yung* and *Copeland*).").

---

[9] The Board made a similar statement while granting a motion to join the petition six months later. Appx3225 ("In the 909 Institution Decision, we also queried whether dependent claims 17, 18, 37, and 38 should be included in the *Yung-Copeland* ground (rather than the *Yung* ground).").

### V.    The parties disputed whether the Board could correct Cloudflare's error

In its Response, Appx471, Sable argued that the Board was "not empowered to correct" Cloudflare's error. Appx491-492. For support, Sable cited no case addressing the Board's power to correct IPR petitions, but instead focused on whether the Board could consider arguments outside of the petition. Appx491-492 (citing *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016)). *Magnum* does not address the Board's power to consider arguments in a *corrected* petition.

At oral argument, the Board heard extensive argument on whether Cloudflare's error was correctable. Appx656-676, Appx687-692. The Board requested guidance on when the Board can correct errors in a petition. Appx672 ("JUDGE DIRBA: . . . . So, I think we can all agree, the petition includes an error. Whether that's a typographical error, or another error of the sort that we could or should correct is the question that we're discussing."), Appx676, Appx687. Sable recognized that this Court has not limited the Board's power to correct an IPR petition, but nevertheless urged the Board to recognize a narrow power to correct IPR petitions, arguing that the PTAB should use the standard governing certificates of correction (found at 35 U.S.C. § 255) as a guide. Appx673. Cloudflare argued that the Board should correct the petition and find the challenged claims invalid because, applying common sense and logic, it was

17

clear that Cloudflare's petition was internally inconsistent and in error. Appx656-658.

## VI.    Between the oral argument and the Board's decision, this Court issued *Apple v. MPH*

The day after the Board held oral argument, this Court issued *Apple Inc. v. MPH Technologies Oy*, No. 2021-1355, 2022 WL 4103286 (Fed. Cir. Sept. 8, 2022). That case began with an error like Cloudflare's—Apple's petition analyzed dependent claims 6 and 7 under a two-reference ground (Ground 1, *Ishiyama* and *Murakawa*), while the petition analyzed corresponding independent claim 5 under a three-reference ground (Ground 2, *Ishiyama*, *Murakawa*, and *Ahonen*). *See* IPR2019-00820, Petition at 4.[10] Unlike here, however, (i) the Board did not raise the error *sua sponte* in the Order granting institution, *id.*, Paper 10 at 40-41,[11] and (ii) Apple did not ask the Board to correct the error, and instead argued that the petition, as drafted, adequately disclosed the arguments for dependent claims 6-8, *id.*, Reply at 22-26.[12] As a result, the Board's

---

[10] The *Apple* IPR Papers referenced in this paragraph are also found in that case's Federal Circuit appellate record. *Apple*, No. 2021-1355, ECF No. 31 ("*Apple* CAFC Appendix") at 3266.

[11] *Apple* CAFC Appendix at 3473-74.

[12] *Apple* CAFC Appendix at 3741-45.

Order did not consider whether the errors in Apple's petition were correctable, as Cloudflare argues here. *Id.* at 49-55.[13]

On appeal to this Court, Apple again failed to assert that its error was correctable, and instead argued that the Petition adequately disclosed the arguments. *See*, *e.g.*, *Apple*, No. 2021-1355, ECF No. 23 at 2-3. As a result, the *Apple* Court did not consider whether the errors in Apple's petition were correctable, and instead held that the Board "properly declined to consider" *Ahonen* when determining the obviousness of dependent claims 6-8. *Apple*, 2022 WL 4103286, at *7.

## VII.   The Board refused to correct Cloudflare's obvious error after concluding that the error was not "typographical"

In its decision, the Board rightly noted the Petition's primacy in determining the scope of the proceeding, relying on *Sirona Dental*, *PGS Geophysical*, and *Magnum*. Appx35 n.22 ("We determine whether the Petition raised this contention because it is the Petition, not our discretion, that guides the proceeding.").[14] But none of those cases addresses whether, and when, errors in a petition are *correctable* or *should be corrected* by the Board.

---

[13] *Apple* CAFC Appendix at 106-12.

[14] The footnote cites *Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir. 2018); *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018); and *Magnum*, 829 F.3d at 1381.

Case: 23-1612    Document: 11    Page: 30    Filed: 06/30/2023

The Board's analysis proceeded in two parts. The Board first found that Cloudflare's error was not typographical and denied Cloudflare's request for leave to file a motion to correct the Petition. Appx36, Appx38 n.24. Despite its expansive questions at oral argument addressing the legal standard governing the Board's power to correct a petition,[15] in its Order, the Board considered only whether the error was "typographical"—the Board did not consider whether Cloudflare's error was obvious, how to determine if Cloudflare's error was otherwise correctable, or whether Sable would suffer prejudice by the correction. The Board then analyzed Cloudflare's uncorrected petition and found that the Petition "never expressly contends that [claims 17-18 and 37-38] would have been obvious in light of the combination of *Yung* and *Copeland[.]*" Appx36. But had the Board *corrected* the placement of the sections of the petition addressing claims 17-18 and 37-38 (i.e., by moving those sections under the ground-two, *Yung*-and-*Copeland* heading), the Petition would have included just that contention, leading to a different result. The Board further found that

---

[15] *See* Appx672 (noting that "the question" was whether Cloudflare's error was "typographical" "or another error of the sort that we could or should correct"); Appx658, Appx667 (questioning whether standard for determining error is subjective or objective); Appx675-676 (questioning whether the Board has discretion to correct the error); Appx666 (questioning Sable's awareness of the error); Appx671 (questioning evidence needed to show correctable error); Appx668-669 (questioning Sable about prejudice resulting from correcting the error); Appx687 (asking Sable "what . . . the standard is that we need to apply when determining whether or not this is a correctable error, or not").

*Apple* was "directly on point" and "includes the same factual scenario." Appx37-38.

The Board's decision did not address whether the Board could correct obvious errors in a petition. While the Board did not expressly hold that it lacked the power to correct non-typographical errors, the Board did not analyze whether Cloudflare's error was unintentional, obvious, clerical, or otherwise correctable; whether correcting Cloudflare's obvious error would prejudice Sable; whether Sable received adequate notice; or whether it would otherwise be unfair to correct Cloudflare's error. Instead, the Board stated that a motion to correct was tantamount to *amending* the petition to add a contention, showing a fundamental misunderstanding of the Board's power to correct IPR petitions. *See* Appx38 n.24.

On Cloudflare's motion for rehearing, relying heavily on *Apple*, the Board again focused on the lack of a "typographical" error, noting that "the pieces were there to [argue that the dependent claims would be invalidated by *Yung* and *Copeland*], but [Cloudflare] failed to put those pieces together. [Cloudflare's] arguments . . . do not convince us of error in our decision to not put the pieces together on [Cloudflare's] behalf." Appx52-54.

21

## SUMMARY OF ARGUMENT

The statutes governing IPRs do not limit the Board's power to correct errors in an IPR petition. As in *In re Bennett*, the Court should find that the Board enjoys a robust power to correct errors in an IPR petition. 766 F.2d 524 (Fed. Cir. 1985) (en banc). The Court should remand so that the Board can determine (i) if Cloudflare's error was obvious or otherwise correctable, and (ii) if the Board should exercise its discretion to correct the error. In the alternative, the Court should (i) find that the Board abused its discretion in failing to correct Cloudflare's obvious error and (ii) remand for the Board to reconsider Cloudflare's invalidity challenges under the corrected petition.

## ARGUMENT

### I.    Statement of standard of review

The extent of the Board's power to correct petitions under the IPR statute is a question of law for the Court. *See Soc. Sec. Bd. v. Nierotko*, 327 U.S. 358, 369 (1946) ("An agency may not finally decide the limits of its statutory power. That is a judicial function."). The Court reviews the Board's legal conclusions *de novo* and its factual findings for substantial evidence. *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1329 (Fed. Cir. 2016). The Court reviews "the Board's judgments concerning what arguments have been adequately presented in a petition and other pleadings for abuse of discretion." *Microsoft Corp. v.*

*IPA Techs., Inc.*, No. 2021-1412, 2022 WL 989403, at *2 (Fed. Cir. Apr. 1, 2022).

## II.    Administrative agencies are often subject to statutes and rules that control whether an agency can correct errors

Federal courts often consider whether and when an administrative agency can correct a mistake. The decisions often depend on the precise wording of the statutory and regulatory regime governing the agency's statutory or regulatory power to correct. Four such examples appear below.

**Correcting anti-dumping determinations.** In *American Signature*, this Court determined that the Commerce Department did not have the power to *sua sponte* correct a final anti-dumping determination that had under-calculated the duty owed by a particular importer (ASI) when Commerce had acted in an untimely manner. *Am. Signature*, *Inc. v. United States*, 598 F.3d 816, 821 (Fed. Cir. 2010). To reach that conclusion, the Court found:

- Commerce's ability to correct the determination was cabined by 19 U.S.C. § 1675(h) ("correction of ministerial errors"), which required Commerce to "establish procedures for the correction of ministerial errors in final determinations within a reasonable time." *Id.* at 823-24 & n. 11.

- Commerce had implemented regulations governing the correction of ministerial errors at 19 C.F.R. § 351.224.[16] *Id.* at 824. Those regulations

---

[16] The regulations defined "ministerial error" as "an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error

"set forth various time limits for the correction of errors at the request of a party to the proceeding, but do not deal explicitly with *sua sponte* error correction by Commerce." *Id.* at 826. Nevertheless, the Court found that the statute and regulation "clearly permit" the *sua sponte* correction of a ministerial error. *Id.*

- Commerce's correction was untimely. Although the statute allowed corrections within "a reasonable time," Commerce interpreted its own regulations as requiring correction within 30 days. *Id.* at 826-27. Because Commerce did not correct the error within that timeframe, the error "cannot now be corrected." *Id.* at 828.

**Correcting demands for international preliminary examination.** In *Helfgott*, this Court found that the PTO should have corrected an applicant's demand for international preliminary examination that included incorrect applicants, an incorrect title, and an incorrect agent's file-reference number. *Helfgott & Karas, P.C. v. Dickinson*, 209 F.3d 1328, 1330 (Fed. Cir. 2000). The Court found that the PTO was required to follow PCT Rule 91.1, entitled "Rectification of Obvious Mistakes in the International Application and Other Documents." *Id.* at 1335 ("That Rule (which is legally binding on the Commissioner) allows correction of 'obvious errors' in a filing.").[17] The Court disagreed with

---

which the Secretary considers ministerial." *See* 19 C.F.R. § 351.224(f). *American Signature* appeared to assume, without deciding, that the subject miscalculation qualified as a ministerial error. 598 F.3d at 825 (case "turns on" whether Commerce acted within a reasonable time).

[17] Rule 91.1(c) defined obvious mistakes as "obvious . . . that . . . something else was intended than what appears in the document concerned and that nothing else could have been intended than the proposed rectification."

the PTO's contention that "only the PTO is authorized to point out and suggest obvious errors[,]" and instead found that Helfgott could point out obvious errors and suggest obvious changes. *Id.* at 1336.

**Correcting issued patents through reissue.** Corrections to patents via reissue must comply with 35 U.S.C. § 251, which allows the PTO to correct "error . . . by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent[.]" In *Serenkin*, the Court found that a "deliberate action" or a "conscious choice" by an inventor or attorney during prosecution was not a correctable "error" under § 251. *In re Serenkin*, 479 F.3d 1359, 1362-63 (Fed. Cir. 2007).[18]

**Correcting issued patents through a certificate of correction.** Corrections to patents via a certificate of correction must comply with 35 U.S.C. § 255, which empowers the PTO to correct errors "of a clerical or typographical nature, or of minor character[.]" In *Superior Fireplace*, this Court held that the term "clerical or typographical nature" (i) did *not* exclude all errors that broadened the scope of the claim, but (ii) in light of §§ 251-252 (which explicitly address broadening corrections), if correcting a clerical or typographical error

---

[18] "Serenkin's attorney acquiesced to the PCT examiner's requirement of making a choice between the original international filing date and the drawings. He made a conscious decision to select the latter. . . . Serenkin cannot now rely on the reissue statute . . . in order to undo the consequences of his attorney's deliberate choice." *Id.* at 1363.

would broaden the scope of the claim, § 255 implicitly requires that "it [be] clearly evident from the specification, drawings, and prosecution history how the error should appropriately be corrected." *Superior Fireplace Co. v. Majestic Prod. Co.*, 270 F.3d 1358, 1372 (Fed. Cir. 2001).

## III.  The Patent Office, exercising discretion, may correct errors in the absence of statutory authority

This Court, sitting *en banc*, considered the situation where the Patent Office does *not* have explicit statutory authority to correct errors, in the context of errors found in a reissue application. *Bennett*, 766 F.2d at 526-28. While 35 U.S.C. § 251 governs when a patent may be corrected through reissue, the statute does *not* provide guidance on when the PTO may correct an applicant's reissue application.

In *Bennett*, this Court found that the PTO could correct a mistake in a reissue application, even without explicit statutory authority to do so. *Id.* at 528. The *Bennett* applicant sought reissue of a utility patent 15 months after the patent had issued, well within the two-year statutory deadline. *Id.* at 525. Fifteen months thereafter, however, after the two-year deadline had passed, the PTO informed the applicant that the reissue application was defective for failure to include the signature of the inventor rather than the assignee. *Id.* The PTO found the error in the reissue application was uncorrectable, "citing the absence of statutory authorization to the PTO to correct the defect." *Id.* at 526.

This Court reversed. This Court reviewed provisions of patent law that "enable correction of errors," and found that an implicit power to correct was crucial in equitably implementing a "complex" statute:

> These relief provisions attempt to strike a balance between the need for consistency in administration of a complex statute, even if consistency occasionally results in forfeiture of substantive rights, and the need for fairness, which may place on the administering body the occasional burden of exercising discretion to avoid an unjust result. . . .
>
> **It is not in the public interest to bar all possibility of legal or equitable relief, when such is sought to correct a harmless error.** Thus we consider the reality of the practice at issue, guided by legislative and judicial precedent, and mindful of the interest of justice.

*Id.* at 527 (emphasis added). The Court ultimately found that the PTO erred in refusing to allow the applicant to correct the defective execution of the reissue application that was filed within the two-year statutory deadline. *Id.* at 528.

In *A. F. Stoddard & Co. v. Dann*, 564 F.2d 556 (D.C. Cir. 1977), the D.C. Circuit reached a similar conclusion in the context of correcting the inventorship in a patent application. The *Stoddard* court recognized that administrative agencies have the "obligation to carry out their duties under their authorizing statutes[.]" *Id.* at 566. Thus, when a power to correct is not *expressly* specified, the *Stoddard* court opined that agencies may be expected to refuse to "step[] beyond the bounds of the statutes by which [they are] governed." *Id.* But the D.C. Circuit nevertheless found an *implicit* power to correct a sole inventorship

27

listed in a patent application, even though the statute (at that time) did not expressly authorize it. *Id.* at 564, 566; *see also id.* at 565 (the statute was "equally devoid of any express prohibition thereagainst."); *Bennett*, 766 F.2d at 528 (*Stoddard* holding later codified in 1982 amendment of the patent statute).

## IV.    As in *Bennett* and *Stoddard*, the Board enjoys broad, implicit authority to recognize and correct errors in IPR petitions

IPR petitions are not governed by any error-correction statutes. The IPR statutory scheme (found at 35 U.S.C. §§ 311-319) does not address or limit the Board's power to correct obvious errors in an IPR petition. The Board's implementing regulations recognize a limited power to correct a petition's "clerical or typographical mistake[s]" on motion, 37 C.F.R. § 42.104(c), but do not otherwise address the Board's power to correct errors raised *sua sponte* or to correct obvious errors.

Absent a limiting statute, the Board has broad, implicit authority to correct errors in IPR petitions. As stated in *Bennett*, the patent statutes evince an "attempt to strike a balance between the need for consistency in administration of a complex statute, even if consistency occasionally results in forfeiture of substantive rights, and the need for fairness, which may place on the administering body the occasional burden of exercising discretion to avoid an unjust result." *Bennett*, 766 F.2d at 527; *see also Stoddard*, 564 F.2d at 565-66 & n.12 (noting that the patent statutes and regulations allow for reviving abandoned

applications, missed-fee payments, and correction of defects in oaths and declarations). Further, the regulations implementing the IPR statute allow the Board to promote fairness, when appropriate, over absolute consistency. For example, the Board's regulations include a broad power to waive any of its regulations or act in the absence of regulations, 37 C.F.R. § 42.5 (a)-(b), a commensurately broad power to excuse "late actions," 37 C.F.R. § 42.5(c), and provide that the regulations should be construed "to secure the just, speedy and inexpensive resolution of every proceeding[,]" 37 C.F.R. § 42.1(b).

As with patent applications (*Stoddard*) and reissue applications (*Bennett*), IPR petitions sometimes include errors, despite petitioners' best efforts. In determining whether to correct such errors, the Board must exercise its discretion, balancing the need for consistency with the interest of fairness and avoiding unjust results. *Bennett*, 766 F.2d at 527. The standard for recognizing error for "documents in general" is whether it is "apparent to [an] interested reader than an error was made, such that it would be unfair to enforce the error." *Biotec Biologische Naturverpackungen GmbH v. Biocorp, Inc.*, 249 F.3d 1341, 1348 (Fed. Cir. 2001). In light of *Bennett*, *Stoddard*, and the lack of a governing error-correction statute, the Board has the power to correct obvious errors in a petition after considering whether it is fair to do so under the circumstances (such as considering notice and prejudice). *See Bennett*, 766 F.2d at 527.

## V.     The Board failed to apply the correct legal standard in evaluating Cloudflare's error

Here, in determining whether to allow Cloudflare's motion to correct, the Board considered only whether Cloudflare's error was "typographical." Appx35-36. But the Board's power to correct is not cabined by any statute (such as 35 U.S.C. § 255) that limits correctable errors to typographical errors. The Board's failure to consider whether Cloudflare's error was obvious or otherwise correctable, Appx38 n. 24, is an error of law. When Congress intended to limit the power to correct, it did so explicitly. *Compare* 35 U.S.C. §§ 251, 255. Neither the IPR statute nor the IPR regulations prohibit the Board from correcting an obvious error (like the one here) or correcting errors *sua sponte*.

The Board further erred, as a matter of law, by equating Cloudflare's proposed correction with "add[ing] a contention to the Petition during a trial." Appx38 at n.24. In *Bennett*, the Court reversed the PTO for a similar conclusion—that correcting a reissue petition after the two-year deadline offended the statute even though the original, uncorrected petition was timely filed. 766 F.2d at 526. The same principle applies here. If the Board had corrected Cloudflare's IPR petition, as requested, the arguments would not have been "added" during trial—they would have been restored to the original IPR petition.

Because the Board found that it could not correct Cloudflare's error, the Board failed to consider the second step of the analysis—weighing the fairness

30

of allowing Cloudflare's proposed correction under the circumstances. The Board instead analyzed the uncorrected petition and found that the petition did not adequately disclose that claims 17-18 and 37-38 were obvious under *Yung* and *Copeland*. Appx37-38. The Board erred as a matter of law by failing to weigh the fairness of correcting Cloudflare's obvious error.

The Board's decision here is no outlier—the Board regularly limits its power to correct IPR petitions. The Board allows correction of typographical and clerical errors, but refuses correction of "self-evident" errors, "substantive" errors, or errors of "magnitude":

- *Amkor Tech., Inc. v. Tessera, Inc.*, No. IPR2013-00242, 2013 WL 6907729, at *3 (PTAB Aug. 29, 2013) (holding that the inadvertent citation to *Nakano* in a section addressing *Kaburagi* and *Oldham* was the "type of typographical error that potentially could be corrected by a motion to correct[,]" but refusing to correct other errors, noting that "[e]ven if the [petition's] error is self-evident, [the patent owner] cannot be expected to respond to analysis and arguments not before it.").

- *Unified Patents Inc. v. Universal Secure Registry LLC*, No. IPR2018-00067, 2018 WL 1358695, at *1-2 (PTAB Mar. 14, 2018) (contrasting "clerical [errors]" that may be corrected with "substantive" changes that cannot, and allowing correction of a clerical error in the petition).

- *Ivantis, Inc. v. Glaukos Corp.*, No. IPR2018-01147, at *13 (PTAB Dec. 6, 2018) (refusing to allow petitioner to correct its petition to reflect the correct prior-art reference, noting that "the nature of the error and magnitude of Petitioner's proposed corrections go beyond what is contemplated by our Rules as a clerical or typographical error").

- *Artesian Home Prods. v. Gutterglove, Inc.*, No. IPR2018-00015, at *1-3 (PTAB May 31, 2018) (refusing the petitioner's proposed corrections as "substantive corrections and not typographical corrections[,]" and noting

that petitioner "did not point to any statute or rule that allows for the requested substantive correction to grounds in the Petition.").

To justify these decisions, the Board often relies on 37 C.F.R. § 42.104(c) (allowing the Board to consider a motion to correct typographical and clerical errors in a petition).[19] But § 42.104(c) does *not* address or limit the Board's power to correct obvious errors or *sua sponte* raise the possibility of an error—the regulation instead only (i) acknowledges that the statute implicitly grants the Board the power to correct error, and (ii) authorizes a motion to correct particular errors (typographical and clerical errors). Nevertheless, the Board has relied on § 42.104(c) to define the extent of its power to correct IPR petitions. *See Varian Med. Sys., Inc. v. Best Medical Int'l, Inc.*, No. IPR2020-00075, 2020 WL 2096403, at *2-3 (PTAB May 1, 2020) (refusing to allow Petitioner to replace duplicate power of attorney designated as a "petition" in the PTAB's filing system, noting that § 42.104(c) only authorized the correction of errors "in a petition," not the correction of a completely incorrect filing).

Even if the regulation purported to limit the types of errors that the Board could correct in an IPR petition (which it does not), such a regulation would be inconsistent with the statute and this Court's rulings. The patent statutes only

---

[19] "A motion may be filed that seeks to correct a clerical or typographical mistake in the petition. The grant of such a motion does not change the filing date of the petition." 37 C.F.R. § 42.104(c).

limit the types of errors the Patent Office can correct in certain circumstances, such as the statute governing the reissue of patents and the statute governing certificates of correction. The Board cannot carry over those statutory limits to a separate context (IPRs) through regulation. *See Bartenwerfer v. Buckley*, 143 S. Ct. 665, 673 (2023) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, we generally take the choice to be deliberate.") (citations and quotations omitted). Indeed, in *Mayne Pharma*, this Court found that § 42.104(c) does *not* constrain the Board's ability to correct other types of unnamed errors. *Mayne Pharma Int'l Pty. Ltd. v. Merck Sharp & Dohme Corp.*, 927 F.3d 1232, 1240 (Fed. Cir. 2019) (upholding Board's decision to correct a non-typographical, non-clerical error—"[W]e are unpersuaded that § 42.104(c) provides the exclusive means for correcting a petition.").

Here, the Board did not use the correct legal standard to analyze whether to correct Cloudflare's error. Instead of determining whether the error was obvious or otherwise correctable, e.g., "apparent to [an] interested reader that an error was made,"[20] the Board considered only if the error was "typographical." Appx35-36. Instead of weighing the fairness of the proposed correction, the Board analyzed whether the uncorrected petition disclosed the arguments.

---

[20] *See Biotec*, 249 F.3d at 1348.

Appx36-38. Because the record supports a finding that the error is obvious and correctable,[21] the Court should vacate the Board's decision, remand, and direct the Board to consider whether Cloudflare's error is correctable, whether the Board should exercise its discretion to correct the error, and ultimately, whether the challenged dependent claims are invalid. *See AMC Multi-Cinema, Inc. v. Fall Line Patents, LLC*, No. 2021-1051, 2021 WL 4470062, at *8 (Fed. Cir. Sept. 30, 2021) (remand appropriate to reconsider evidence under correct legal standard).

## VI.   In the alternative, the Court should correct the error and remand to the Board for determination

In the alternative, the Court should find that the Board abused its discretion by failing to correct Cloudflare's obvious error. The record shows that both Sable and the Board recognized and understood Cloudflare's error in placing the dependent claims in the ground-one, *Yung*-only section rather than the ground-two, *Yung*-and-*Copeland* section.[22] The error was thus both obvious and correctable. *See Biotec*, 249 F.3d at 1348. The record further shows that the

---

[21] Both Sable and the Board recognized and understood the error, supporting a finding that the error was obvious (and thus correctable). *See* Appx240, Appx244 (Sable recognizing that Copeland's failure to teach a claim limitation was fatal to Cloudflare's claim 17-18 and 37-38 arguments); Appx356-357, Appx3225 (Board recognizing error); *see also* Appx672 (questioning at oral argument acknowledging error).

[22] *See supra* n. 21.

error was identified by the Board months before Sable filed its response.[23] Cloudflare confirmed the error without delay. Appx2940. Because Sable had every opportunity to address the corrected argument in its response, correcting the error causes no prejudice to Sable. The Board thus abused its discretion by failing to correct the error. *Cf. Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005) (reversing district court for refusing to correct dependent claim that stated that it depended on a claim which did not exist).

The cases cited by the Board for support—including *Apple*—do not address the Board's power to correct petitions or otherwise change the result here. If the petition remains uncorrected, *Apple* counsels that the Board should not read Cloudflare's literal arguments as including a contention that claims 17-18 and 37-38 are invalid under *Yung* and *Copeland*. If the petition is *corrected*, however, *Apple* does not apply, because the arguments for claims 17-18 and 37-38 would appear under the corrected *Yung*-and-*Copeland*, ground-two section.

Further, even if the Board's power to correct IPR petitions were limited to correcting "clerical and typographical errors," the Board nevertheless abused its discretion by finding that Cloudflare's error was not a correctable, clerical

---

[23] Appx319, Appx356-357 (error noted November 2021); Appx471 (response filed March 2022).

error. In a previous decision, the Board determined that "whether a mistake is clerical depends on the nature of the error[.]" *Unified Patents*, <u>2018 WL 1358695</u>, at *2. Here, the petition included the necessary arguments, but placed them under the wrong heading. Under just this factual pattern, the Board previously concluded that such an error is "clerical." *Id.* ("Because the error related only to the location of certain discussion within the Petition and not the content of that discussion, we conclude that the error was a clerical mistake."). Because the record shows that the error was clerical and Sable suffered no prejudice, the Board abused its discretion in refusing to correct the petition.

Because the Board abused its discretion in refusing to correct the petition, the Court should reverse the Board's decision, direct the Board to correct the placement of the arguments addressing claims 17-18 and 37-38 in Cloudflare's petition, and remand for a determination of whether those claims are invalidated by the combination of *Yung* and *Copeland*.

## CONCLUSION

This Court should vacate the portion of the Board's decision addressing claims 17-18 and 37-38, remand, and direct the Board to consider (i) whether Cloudflare's error is correctable, (ii) whether the Board should exercise its discretion to correct the error, and ultimately, (iii) whether the challenged dependent claims are invalid. In the alternative, the Court should (i) find that the Board

abused its discretion in refusing to correct Cloudflare's petition, (ii) direct the Board to correct the placement of the arguments addressing claims 17-18 and 37-38 in Cloudflare's petition, and (iii) remand for a determination of whether those claims are invalidated by the combination of *Yung* and *Copeland*.

Dated: June 30, 2023                    Respectfully submitted,

/s/Anthony M. Garza
ANTHONY M. GARZA
STEVEN CALLAHAN
**CHARHON CALLAHAN
ROBSON & GARZA, PLLC**
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
Telephone: (214) 521-6400
Telecopier: (214) 764-8392

*Counsel for Cloudflare, Inc.*

# ADDENDUM

# TABLE OF CONTENTS
# ADDENDUM

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 42 | Final Written Decision | 10/18/2023 | Appx1 |
| 46 | Decision Denying Petitioner's Request for Rehearing of Final Written Decision | 01/09/2023 | Appx49 |
| 1001 | U.S. Patent No. 8,243,593 | | Appx61 |

Trials@uspto.gov                                                    Paper 42
Tel: 571-272-7822                                      Entered: October 18, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE
———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
———————

CLOUDFLARE, INC. and
SPLUNK INC.
Petitioner,

v.

SABLE NETWORKS, INC.,
Patent Owner.

———————

IPR2021-00909[1]
Patent 8,243,593 B2

———————

Before STACEY G. WHITE, GARTH D. BAER, and
JULIET MITCHELL DIRBA, *Administrative Patent Judges.*

DIRBA, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Non-Disclaimed Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

_____

[1]  Splunk, Inc., which filed a petition in IPR2022-00228, has been joined as
a petitioner in this proceeding.

IPR2021-00909
Patent 8,243,593 B2

On November 19, 2021, we instituted an *inter partes* review of claims 1–44 of U.S. Patent No. 8,243,593 B2 (Ex. 1001, "the '593 patent"). Paper 16 ("Inst. Dec."). After institution, claims 1, 2, 4–8, 14–16, 25–28, and 34–36 of the '593 patent were statutorily disclaimed (*see* Ex. 2006), so this Decision does not address the patentability of those claims. Having considered the full record at trial, we determine that Petitioner has shown that claims 3, 9–13, 19–24, 29–33, and 39–44 of the '593 patent are unpatentable under 35 U.S.C. § 103(a), and we determine that Petitioner has not shown that claims 17, 18, 37, and 38 of the '593 patent are unpatentable.

I. BACKGROUND

*A. History of this Proceeding*

On May 7, 2021, Cloudflare, Inc. and SonicWall Inc.[2] filed a Petition requesting *inter partes* review of claims 1–44 of the '593 patent. Paper 1 ("Pet."). Petitioner submitted a declaration from Dr. Kevin Jeffay in support. *See* Ex. 1003. Sable Networks, Inc.[3] ("Patent Owner") filed a Preliminary Response. Paper 8. The parties also filed an authorized pre-institution reply and sur-reply to address discretionary denial under 35 U.S.C. § 314. Papers 9, 11. After reviewing the preliminary record, we determined that Cloudflare had demonstrated a reasonable likelihood that it would prevail in establishing the unpatentability of at least one challenged claim, and we instituted an *inter partes* review of all challenged claims on all grounds asserted in the Petition. Inst. Dec. 57.

_____

[2] SonicWall Inc. was subsequently terminated from this proceeding following a settlement with Patent Owner. Paper 15 (Termination Order).

[3] Patent Owner also identifies Sable IP, LLC as a real party in interest. Paper 5, 1.

IPR2021-00909
Patent 8,243,593 B2

After institution, Patent Owner filed a statutory disclaimer under 35 U.S.C. § 253(a) of claims 1, 2, 4–8, 14–16, 25–28, and 34–36 of the '593 patent. Ex. 2006; *see also* Paper 29 (Updated Mandatory Notice); *accord* Paper 32, 4 (determining that the identified claims have been disclaimed). This disclaimer effectively eliminates these claims from the '593 patent, leaving the patent as if those claims never existed. *See Sanofi-Aventis U.S., LLC v. Dr. Reddy's Labs., Inc.*, 933 F.3d 1367, 1373 (Fed. Cir. 2019). As a result, we determine (and the parties agree) that claims 1, 2, 4–8, 14–16, 25–28, and 34–36 are no longer part of this proceeding. *See* PO Resp. 11–12; Pet. Reply 1.

Meanwhile, Splunk Inc.[4] filed a petition for *inter partes* review and a motion for joinder in IPR2022-00228, requesting that Splunk be joined as a petitioner in this proceeding. Paper 32 (Joinder Order), 1. After considering the parties' papers, we instituted trial in IPR2022-00228, granted Splunk's motion, and added Splunk as a petitioner to this proceeding. *Id.* at 5–8. As a result, this Decision uses "Petitioner" to refer to Cloudflare and Splunk.

During the trial, Patent Owner filed a Response (Paper 30, "PO Resp."), Petitioner filed a Reply (Paper 33, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 36, "PO Sur-reply").

An oral hearing in this proceeding was held on September 7, 2022, and a transcript of the hearing is included in the record. Paper 41 ("Tr."). Petitioner objects to Patent Owner's demonstratives (Paper 40), and for the reasons explained below, that objection is dismissed as moot.

---

[4] Splunk also identifies Critical Start Inc. as a real party in interest. IPR2022-00228, Paper 2 (Petition), 76.

IPR2021-00909
Patent 8,243,593 B2

### B. Related Matters

The parties indicate that the '593 patent has been asserted in several district court lawsuits, including *Sable Networks, Inc. v. Splunk Inc.*, 5:21-cv-00040 (E.D. Tex.), *Sable Networks, Inc. v. Cloudflare, Inc.*, 6:21-cv-00261 (W.D. Tex.), *Sable Networks, Inc. v. SonicWall Inc.*, 6:21-cv-00190 (W.D. Tex.). Pet. xii–xiii; Paper 5, 1–3.

### C. Non-Disclaimed Challenged Claims

Claims 3, 9–13, 17–24, 29–33, and 37–44 are the claims currently challenged in this proceeding.[5] Of these, claims 3, 9, and 29 are independent. Claim 9 is illustrative of the claimed subject matter:

> 9.    A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:
>
> maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and
>
> computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

Ex. 1001, 11:63–12:8.

---

[5]  The Petition challenged all 44 claims of the '593 patent (*see* Pet.); however, during the trial, Patent Owner filed a statutory disclaimer (Ex. 2006), which eliminated claims 1, 2, 4–8, 14–16, 25–28, and 34–36 from the scope of this proceeding (*see supra* § I.A),

4

IPR2021-00909
Patent 8,243,593 B2

### D. The Grounds

Petitioner asserts the following challenges to the patentability of claims 3, 9–13, 17–24, 29–33, and 37–44 (Pet. 1; *see also infra* § II.F):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 17, 18, 37, 38 | 103(a)[6] | Yung[7] |
| 9–13, 19–24, 29–33, 39–44 | 103(a) | Yung, Copeland[8] |
| 3 | 103(a) | Yung, Four-Steps Whitepaper[9] |

### E. Summary of the '593 Patent

The '593 patent is titled "Mechanism for Identifying and Penalizing Misbehaving Flows in a Network," and the application that led to this patent was filed on December 22, 2004. Ex. 1001, codes (54), (22).

The Specification begins by explaining that "peer-to-peer (P2P) traffic on the Internet has grown immensely in recent years . . . despite the fact that the number of P2P users is quite small." Ex. 1001, 1:7–13. As a result, this traffic uses a disproportionate amount of bandwidth, so it is viewed by Internet service providers as "abusive/misbehaving traffic that should be controlled and penalized." *Id.* at 1:14–18. Previously, P2P traffic could be

---

[6]  The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. § 103 effective March 16, 2013. Because the challenged patent was filed before March 16, 2013, we refer to the pre-AIA version of § 103.

[7]  US 7,664,048 B1, filed Nov. 24, 2003, issued Feb. 16, 2010 (Ex. 1005).

[8]  US 7,185,368 B2, filed Nov. 30, 2001, issued Feb. 27, 2007 (Ex. 1007).

[9]  "Four Steps to Application Performance Across the Network with Packeteer's PacketShaper®," *retrieved from* https://web.archive.org/web/20030317051910/http:/packeteer.com/PDF_files/4steps.pdf (Ex. 1006).

5

IPR2021-00909
Patent 8,243,593 B2

identified by port numbers or signatures, but the '593 patent explains that protocols evolved to evade these identification techniques. *Id.* at 1:19–45.

The '593 patent addresses this problem by identifying P2P traffic (and other "misbehaving information packet flows"[10]) using its "observed behavior," which "cannot be hidden." Ex. 1001, 1:46–67. Specifically, the Specification describes a method that: (1) maintains "behavioral statistics" for a flow, (2) determines whether the flow is "exhibiting undesirable behavior" based on the statistics, and (3) if so, enforces a penalty on the flow. *Id.* at 2:1–51; *see also id.* at Fig. 3. The "behavioral statistics" of a flow include, for example:

> a total byte count (sum of all of the bytes in all of the packets of the flow that have been processed up to the current time), a life duration (how long the flow has been in existence since inception), a flow rate (derived by dividing the total byte count by the life duration of the flow), and an average packet size (derived by dividing the total byte count by the total number of packets in the flow that have been processed).

*Id.* at 2:6–13; *see id.* at Fig. 4, 7:20–29 (describing example flow block storing behavioral statistics). The method may involve computing a "badness factor," which "provides an indication as to whether the flow is exhibiting undesirable behavior" and may also indicate "the degree to which the flow is misbehaving." *Id.* at 2:20–26; *see id.* at 7:54–65 (exemplary badness factor calculation). The penalty that is enforced on the flow may be "an increased drop rate," which may have the effect of correcting the flow's

---

[10] "For purposes of the present invention, a flow is a series of packets that are related in some manner." Ex. 1001, 5:16–17. The header of a packet is used to associate it with a particular flow. *Id.* at 5:17–24; *see id.* at 7:3–13.

6

IPR2021-00909
Patent 8,243,593 B2

behavior. *Id.* at 2:27–51; *see id.* at 9:52–10:3 (explaining how dropping a packet can correct a flow's behavior).

## II. ANALYSIS OF PATENTABILITY

### A. Legal Standards

In an *inter partes* review, the petitioner has the burden of proving unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e). That burden never shifts to the patentee. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The legal question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of obviousness or nonobviousness.[11] *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966). One seeking to establish obviousness based on more than one reference also must articulate sufficient reasoning with rational underpinnings to combine teachings. *See KSR*, 550 U.S. at 418.

_____

[11] The record does not include allegations or evidence of objective indicia of obviousness or nonobviousness.

7

IPR2021-00909
Patent 8,243,593 B2

### B. The Level of Ordinary Skill in the Art

Our reviewing court has explained that "the level of skill in the art is a prism or lens through which a judge, jury, or the Board views the prior art and the claimed invention." *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (citing *Al-Site Corp. v. VSI International, Inc.*, 174 F.3d 1308, 1324, (Fed. Cir. 1999)). "This reference point prevents these factfinders from using their own insight or, worse yet, hindsight, to gauge obviousness." *Id.*

Petitioner asserts that the level of ordinary skill in the art corresponds to "an undergraduate degree (or equivalent) in electrical engineering, computer science, or comparable subject" and "3–5 years of academic or industry experience in computer networking or comparable industry experience." Pet. 11 (citing Ex. 1003 ¶ 27). In the Institution Decision, we adopted this articulation of the level of ordinary skill. Inst. Dec. 15. At trial, neither party disputed our preliminary finding. *See* PO Resp.; Pet. Reply.

We remain persuaded that this articulation of the level of skill in the art is supported by the '593 patent, the asserted prior art, and Dr. Jeffay's testimony. *See* Inst. Dec. 15 (citing Ex. 1003 ¶ 27). Accordingly, we determine that the level of ordinary skill in the art corresponds to an undergraduate degree (or equivalent) in electrical engineering, computer science, or comparable subject and 3–5 years of academic or industry experience in computer networking or comparable industry experience.

### C. Claim Construction

We interpret claim terms using "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under the principles set forth by

IPR2021-00909
Patent 8,243,593 B2

our reviewing court, the "words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

### 1. Means-plus-function limitations

Petitioner contends the challenged claims include means-plus-function limitations that should be interpreted under 35 U.S.C. § 112 ¶ 6, and for each, Petitioner identifies a construction for use in this proceeding. Pet. 11–14.[12] Petitioner submits that no other terms require construction for purposes of this proceeding. *Id.* at 12.

In the Institution Decision, we agreed with Petitioner that the identified limitations are means-plus-function limitations. Inst. Dec. 16 (citing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (en banc) (holding that "use of the word 'means' creates a presumption that § 112, ¶ 6 applies")). We also stated that we were persuaded that Petitioner had correctly identified the recited functions and the components in the Specification that perform those functions. *Id.* at 16–17. As a result, we preliminarily adopted the following constructions:

| Limitation | Function | Structure |
|---|---|---|
| "means for maintaining a set of behavioral statistics for the flow…" (claim 29) | maintaining a set of behavioral statistics for the flow | MFM 210 implemented on processors |

---

[12] The Petition also contends that claims 25 and 27 include means-plus-function limitations that should be interpreted under 35 U.S.C. § 112 ¶ 6 (Pet. 11–14); however, those claims have been disclaimed and are no longer part of this proceeding, so we do not address those limitations here.

IPR2021-00909
Patent 8,243,593 B2

| Limitation | Function | Structure |
|---|---|---|
| "means for computing…a badness factor for the flow" (claim 29) | computing a badness factor for a flow | MFM 210 implemented on processors |
| "means for determining…a penalty to impose on the flow" (claim 31) | determining a penalty to impose on a flow | MFM 210 implemented on processors |
| "means for enforcing…[a/the] penalty on the flow" (claim 32) | enforcing a penalty on the flow | MFM 210 implemented on processors |
| "means for determining an increased drop rate to impose on one or more information packets belonging to the flow" (claim 37) | determining an increased drop rate to impose on one or more information packets belonging to a flow | MFM 210 implemented on processors |
| "means for imposing [an/the] increased drop rate on the flow" (claim 38) | imposing an increased drop rate on a flow | MFM 210 implemented on processors |
| "means for receiving a particular information packet belonging to the flow" (claims 43 and 44) | receiving a particular information packet belonging to a flow | MFM 210 implemented on processors |
| "means for determining whether to forward the particular information packet to a destination" (claim 43) | determining whether to forward a particular information packet to a destination | MFM 210 implemented on processors |
| "means for updating […] the set of behavioral statistics to reflect processing of the particular information packet" (claims 43 and 44) | updating the set of behavioral statistics to reflect processing of the particular information packet | MFM 210 implemented on processors |

*Id.* at 17–18.

10

IPR2021-00909
Patent 8,243,593 B2

At trial, neither party disputes any of our preliminary claim constructions. *See* PO Resp.; Pet. Reply; *see also* Inst. Dec. 18 (instructing the parties to "directly address any claim construction adopted in [the Institution Decision] if the party contends we should not adopt that construction in the final written decision"). Accordingly, for the reasons explained above and in the Institution Decision, we adopt these undisputed constructions for purposes of this Decision.

### 2. "a badness factor for the flow"

Patent Owner contends that claims 9 and 29 both "recite computing a 'badness factor' for ***each*** flow." PO Resp. 23. According to Patent Owner, these claims should be construed to include this requirement because the Specification only describes embodiments that compute a badness factor "for each flow regardless of whether the flow is misbehaving." PO Resp. 23 (citing Ex. 1001, 6:25–31, 7:51–52, 8:12–17); *see also* PO Sur-reply 17–18 (arguing "there is not a single embodiment hinting that the badness factor is computed for only some flows").

However, as we previously explained, Patent Owner's argument is not commensurate with language of the claim:

> In particular, claim 9 recites a method for processing *a flow* that includes computing a badness factor for *the flow*. Ex. 1001, 11:63–8. Patent Owner identifies (and we perceive) no limitation that requires a badness factor to be computed for *each flow*.

Inst. Dec. 44 (addressing substantially similar argument presented in preliminary response); *see also* Ex. 1001, 13:32–44 (claim 29). During trial, Patent Owner neither responds to this analysis nor points to a claim limitation that allegedly includes this requirement.

11

IPR2021-00909
Patent 8,243,593 B2

Instead, Patent Owner points to the Specification, but this also fails to support Patent Owner's contention. Although claims are read in view of the Specification (*Phillips*, 415 F.3d at 1315), they are not limited to the embodiments disclosed in it (*id.* at 1323). Patent Owner identifies (and we perceive) no passage in the Specification that could be read as redefining this claim phrase or disavowing part of its scope. *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365, 1367 (Fed. Cir. 2012). In fact, the passages cited by Patent Owner are directed to the handling of a *single flow*, and none expressly indicates that an identical method must be used for each flow processed. *See* Ex. 1001, 6:25–31, 7:51–52, 8:12–17. Thus, we determine that the Specification does not justify importing the limitation proposed by Patent Owner into the claims.

Accordingly, having reviewed the intrinsic record, we disagree with Patent Owner's contention that claims 9 and 29 require computing a badness factor for each flow or all flows; rather, this claim limitation may be satisfied by computing a badness factor for a single flow.

### 3. Other constructions

The parties do not propose constructions for any other terms or phrases. *See* Pet. 11–14; PO Resp. Based on the record before us, we do not find it necessary to provide express claim constructions for any other terms or phrases. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

12

IPR2021-00909
Patent 8,243,593 B2

### D. Summary of Asserted Prior Art References

#### 1. Yung (Ex. 1005)

Yung is titled "Heuristic Behavior Pattern Matching of Data Flows in Enhanced Network Traffic Classification." Ex. 1005.

Yung classifies data flows by comparing them to "known application behavior patterns." Ex. 1005, Abstract. According to Yung, its technique allows for classification of encrypted, compressed, or proprietary network traffic. *Id.* at 5:43–6:1; *see id.* at 4:43–60 (noting that peer-to-peer applications employ encryption and compression to obscure identification). For each flow, Yung stores a data block object (also called a flow object) that includes "various attributes of the flow," such as "packet count, byte count, first packet time, last packet time, etc." *Id.* at 8:5–11, 17:42–52, 25:8–11. Yung uses the data block object to classify the data flow. *E.g.*, *id.* at 24:13–18, 24:27–51. Yung may also enforce bandwidth utilization controls on the flow, such as a discard policy that causes packets to be dropped. *E.g.*, *id.* at 19:53–58, 20:13–15, 24:63–25:1.

Figure 3 (reproduced below) is a block diagram of an exemplary bandwidth management device 130 that implements Yung's techniques. Ex. 1005, 6:21–23, 16:8–10.

13

IPR2021-00909
Patent 8,243,593 B2



Fig._3

Figure 3 (above) shows bandwidth management device 130 that includes packet processor 131, flow control module 132, and traffic classification engine 137. Yung explains that packet processor 131 detects new data flows and "construct[s] data structures including attributes characterizing the data flow." *Id.* at 16:15–17, 17:42–49. Flow control module 132 "enforce[s] bandwidth utilization controls on data flows traversing bandwidth management device 130." *Id.* at 16:17–19. Traffic classification engine 137 "analyze[s] data flow attributes and identif[ies] traffic classes corresponding to the data flows." *Id.* at 16:20–22.

Figure 7 (reproduced below) includes a flow chart of an exemplary method of bandwidth management device 130. Ex. 1005, 23:16–20.

14

IPR2021-00909
Patent 8,243,593 B2



Fig._7

As shown above, in Figure 7, packet processor 131 receives a data packet

(step 202), determines whether a control block object already exists

corresponding to the data flow (step 204), and if not, constructs a control

block object for the flow (step 212). *Id.* at 23:23–30, Fig. 7. A traffic class

may be identified (step 214), and ultimately, the packet is passed to flow

15

IPR2021-00909
Patent 8,243,593 B2

control module, which enforces appropriate bandwidth utilization controls on the data packet (step 222). *Id.* at 24:13–18, 24:63–25:1, Fig. 7. Finally, "packet processor 131 also records or updates various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.)" (step 224). *Id.* at 25:8–11, Fig. 7.

### 2. *Copeland (Ex. 1007)*

Copeland describes a "system for detecting intrusions in computer communication networks" by collecting and analyzing statistics for flows traversing the network. Ex. 1007, Abstract, 3:18–35. If a flow appears suspicious, Copeland assigns a "concern index value" to the flow. *Id.* at Abstr., 3:32–35.

In particular, Copeland collects "information about and statistics associated with each flow" and stores this data in a flow data structure corresponding to that flow. Ex. 1007, 7:38–45, 16:12–30. The flow data structure includes, for example, the number of bytes, the number of packets, and time information (such as the time of the first packet and time of the last packet). *Id.* at 7:49–54, 16:37. Copeland analyzes the data to determine if the flow appears to be legitimate traffic or possible suspicious activity. *Id.* at 7:55–57. If a flow appears suspicious, Copeland assigns a concern index (CI) value that "[has] been derived heuristically from extensive network traffic analysis." *Id.* at 7:57–62. In Figure 6, Copeland provides a table with an exemplary set of concern index values for various events. *Id.* at 7:64–67, 18:19–20. Petitioner annotates this table to show that Copeland describes using the number of packets as a concern index value. Pet. 51. Petitioner's annotation is reproduced below.

16

IPR2021-00909
Patent 8,243,593 B2

**TABLE I**

| NAME | POTENTIAL INTRUDER | RESPONSE | CI VALUE |
|------|-------------------|----------|----------|
| POTENTIAL TCP PROBE | TCP PACKETS | RESET PACKETS | NUMBER OF PACKETS |
| POTENTIAL UDP PROBE | UDP PACKEST | ICMP PORT UNAVAILABLEPCKETS | NUMBER OF ICMP PORT UNAVAILABLE PACKETS |
| HALF-OPEN ATTACK | HIGH NUMBER AND RATE OF SYNS | SYN-ACKS | 5000+501 PER SYN-ACK |
| TCP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | RESETS | 8000+1010 PER PORT OVER 4 |
| UDP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | NOTHING OR ICMP PORT UNAVAILABLE | 8000+1010 PER PORT OVER 4 |

**FLOW-BASED CI VALUES**

Copeland's Figure 6 illustrates concern index values for client/server flows. Ex. 1007, 4:8–9. As shown above, Petitioner annotates the first row of the table in Figure 6: in the "NAME" column, Petitioner places a red box around the first entry, which states "POTENTIAL TCP PROBE," and Petitioner places a green box in the same row of the "CI VALUE" column, where the entry states "NUMBER OF PACKETS."

### 3. Four-Steps Whitepaper (Ex. 1006)

The Four-Steps Whitepaper is a technical product overview for the PacketShaper® product line from Packeteer, Inc. Ex. 1006, 1. This document describes a bandwidth-management strategy that: (1) classifies network traffic; (2) analyzes traffic; (3) controls traffic; and (4) reports results. *Id.* at 2. In the second step, PacketShaper collects measurements regarding traffic flows, including "[t]hroughput in units of bytes, packets, transactions, connections," "[c]ounts and percentages of retransmitted, received, tossed, dropped, and good TCP packets," and "[c]ounts and percentages of TCP connections that were denied by a policy." *Id.* at 18.

17

IPR2021-00909
Patent 8,243,593 B2

### E. Obviousness Ground Based on Yung and Copeland

Petitioner contends that the subject matter of claims 9–13, 19–24, 29–33, and 39–44 would have been obvious over the combination of Yung and Copeland. Pet. 43–61.

Patent Owner argues that Petitioner fails to show a "badness factor" for each flow, which Patent Owner contends is required by the independent claims (PO Resp. 16–24), and fails to articulate a sufficient rationale to combine Yung and Copeland (*id.* at 24–28).[13]

#### 1. Independent claim 9

> *"A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising . . . ."*

Petitioner contends that Yung discloses the preamble of claim 9. Pet. 48 (citing *id.* at 19–21 (discussing preamble of claim 1)). In particular, Petitioner points to Figure 7 of Yung, which depicts a "method directed to enforcing bandwidth utilization controls on data flows." *Id.* at 19 (quoting Ex. 1005, 6:35–36). Petitioner contends that this method processes a flow, such as TCP/IP network data traffic, which is composed of a plurality of packets. *Id.* at 19–20 (citing Ex. 1005, 2:58–61, 8:3–5, 11:60–62, 12:30–35, 24:13–18, 24:63–25:1, Fig. 7; Ex. 1003 ¶ 120). Petitioner further contends

---

[13] Patent Owner has forfeited any arguments for patentability not raised in Patent Owner Response (Paper 30), even if the argument was raised in the Preliminary Response (Paper 8). Paper 17 (Scheduling Order), 8 (cautioning Patent Owner that "any arguments not raised in the response may be deemed waived"); *see also In re NuVasive, Inc.*, 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding patent owner waived an argument addressed in the preliminary response by not raising it in the patent owner response).

IPR2021-00909
Patent 8,243,593 B2

that the method is implemented by a machine (e.g., a bandwidth management device or a gateway). *Id.* at 21 (citing Ex. 1005, 6:8–11, 7:12–18, 15:44–47, Fig. 2).

Patent Owner does not dispute these contentions. *See* PO Resp.

We are persuaded that Yung discloses the preamble of this claim.[14] Yung describes a method for processing a flow that includes a series of data packets. *E.g.*, Ex. 1005, Abstr., 12:30–35, 24:13–18, Fig. 7; *see also id.* at 2:58–61.

> *"maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion"*

Petitioner contends that Yung discloses this limitation. Pet. 48 (citing *id.* at 21–30 (discussing limitations in claim 1); Ex. 1003 ¶ 207). In particular, Petitioner asserts that "Yung tracks 'various measurement values in [a] control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.),'" and Petitioner maps these values to the claimed "behavioral statistics for the flow." *Id.* at 25–26 (quoting Ex. 1005, 25:8–11; citing *id.* at 8:5–11, 9:5–8, 11:36–38, 12:4–6, 17:42–49, 25:8–11). Petitioner also asserts that Yung's packet processor 131 receives a data packet, passes it to the flow control module, and then updates the control block object's measurement values. *Id.* at 28–29 (quoting Ex. 1005, 25:8–11; citing *id.* at 25:11–15, Fig. 7 (steps 202, 222, 224)); *see id.* at 21–23

---

[14] Because Petitioner has shown that the recitations in the preamble are satisfied by Yung, we need not determine whether the preamble is limiting. *See Nidec Motor*, 868 F.3d at 1017.

IPR2021-00909
Patent 8,243,593 B2

(addressing creation of the control block object). Petitioner further asserts that Yung updates statistics for "each packet" because Yung provides aggregate statistics for the flow, such as total byte count and total packet count. *Id.* at 29 (citing Ex. 1003 ¶¶ 151–152; Ex. 1005, 25:11–15). Moreover, according to Petitioner, Yung continuously tracks these statistics, regardless of the presence of absence of congestion, and in any event, it would have been obvious to do so to allow for traffic classification in all situations. *Id.* at 27 (citing Ex. 1005, Abstr., 9:21–25, 25:11–15, Fig. 7; Ex. 1003 ¶¶ 147–148); *see also id.* at 30.

Patent Owner does not dispute these contentions. *See* PO Resp.

We are persuaded that Yung discloses this limitation. Yung's packet processor 131 receives a data packet, identifies (or constructs) a corresponding control block object, and passes the packet to a rate control module that enforces bandwidth utilization controls on the data packet flow. Ex. 1005, 23:23–30, 24:11–13, 24:63–25:1, Fig. 7. Packet processor 131 then "records or updates various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.)." *Id.* at 25:8–11, Fig. 7 (step 224). We are persuaded that an ordinary artisan would have understood Yung to update these values for "each" packet "regardless of the presence or absence of congestion," as required by the claim. *See* Ex. 1003 ¶¶ 147–148, 151–153; *see also id.* ¶ 207. In particular, Dr. Jeffay testifies that "Yung would not be able to leverage/provide the aggregate statistics (e.g., total byte count, total packet count) if the statistics were not updated as each packet belonging to said flow is processed" or were stored "only when congestion arises." *Id.* ¶¶ 148,

20

IPR2021-00909
Patent 8,243,593 B2

151 (emphasis omitted).  We credit Dr. Jeffay's testimony on this point because he provides a logical explanation that is supported by the reference.

> *"computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior"*

Petitioner contends that Copeland discloses this limitation.  Pet. 49–51.  Specifically, Petitioner points to Copeland's "concern index" (CI)—a value assigned to a flow that appears to be suspicious—as the claimed "badness factor."  *Id.* at 49 (citing Ex. 1007, 3:31–35, 18:15–19, 26:22–27).  Petitioner asserts that "Copeland's CI value indicates whether the flow exhibits 'suspicious activity,'" which is undesirable behavior.  *Id.* at 49–50 (quoting Ex. 1007, 7:55–61; citing *id.* at 18:4–13; Ex. 1003 ¶ 212).  Petitioner further asserts that Copeland computes the CI value based on statistics associated with a flow, noting that the CI value may be set to the number of packets, for example, as shown by the first row of Table I in Figure 6.  *Id.* at 50 (citing Ex. 1007, 7:40–42, 10:45–47, Figs. 1, 6; Ex. 1003 ¶ 213).

Patent Owner presents several arguments regarding this limitation.  *See* PO Resp. 16–24.  First, Patent Owner argues that Petitioner fails to show the claimed "badness factor."  *Id.* at 16–20.  Patent Owner asserts that Petitioner's evidence on this point is insufficient and that Dr. Jeffay's testimony is entitled to no weight because he fails to substantiate his opinion.  *Id.* at 17, 19–20 (citing Ex. 1003 ¶ 210; Ex. 2007, 35:17–36:15).  In addition, Patent Owner asserts that Petitioner's showing is deficient because, in a parallel district court proceeding, Petitioner contends that the term "badness factor" is indefinite and "Petitioner cannot maintain that a

21

IPR2021-00909
Patent 8,243,593 B2

claim is both indefinite and rendered obvious." *Id.* at 18 (citing Ex. 2009, 28–32; *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010)).

Patent Owner also argues that Copeland fails to disclose the claimed "badness factor." PO Resp. 20–22. Patent Owner argues that "Copeland's concern index is for 'suspicious activity' [indicative of an intruder] in contrast to legitimate traffic," where the claimed "'badness factor' is concerned with 'undesirable' behavior or 'misbehavior' associated with P2P traffic, which . . . is ***not*** necessarily suspicious or non-suspicious." *Id.* at 20–21 (citing Ex. 1001, 1:10–18, 2:18–21; Ex. 1007, Abstr., 1:45–48). Further, Patent Owner asserts that "Copeland's 'concern index' is concerned with suspicious behavior of a host, not undesirable behavior of a flow," which "is a different criterion than badness." *Id.* at 21–22.

In addition, Patent Owner contends that Copeland only assigns a concern index to suspicious flows, but claim 9 "recite[s] computing a 'badness factor' for ***each*** flow." PO Resp. 22–23 (citing Ex. 1007, 7:57–61, 8:1–5, 10:46–7, 14:49–55, 17:58–61, Fig. 6).

Having considered the parties' arguments and evidence, we are persuaded that Copeland discloses this limitation. Copeland analyzes a flow's statistics (including start time, end time, number of bytes, and number of packets) "to determine if the flow appears to be legitimate traffic or possible suspicious activity" and computes a concern index for the flow if it appears suspicious. *E.g.*, Ex. 1007, 3:31–35, 7:38–67, 16:36–17:5. We find that Copeland's concern index qualifies as a "badness factor for the flow . . . [that] provides an indication of whether the flow is exhibiting undesirable behavior," as required by claim 9. *E.g.*, Ex. 1007, 3:31–40, 4:30–33, Fig. 1

22

IPR2021-00909
Patent 8,243,593 B2

(identifying "'bad' flow(s)"). As Dr. Jeffay explains, an ordinary artisan would have understood that suspicious activity (such as a probe or network attack) is undesirable behavior. Ex. 1003 ¶¶ 211–212. We also find that Copeland teaches computing a concern index "based at least partially upon the set of behavioral statistics" because, for example, it uses the number of packets to compute the concern index. Ex. 1007, 7:64–67, Fig. 6 (setting concern index to number of packets); *see also* Ex. 1003 ¶ 213.

We disagree with Patent Owner's arguments that Petitioner fails to make a sufficient showing for the claimed "badness factor." *See* PO Resp. 16–20. Patent Owner challenges the sufficiency of one conclusion sentence from Dr. Jeffay's testimony (*see* PO Resp. 17, 19–20), but we credit Dr. Jeffay's testimony (including that conclusion) because the surrounding sentences provide a detailed and logical explanation that is consistent with the cited reference. *See* Ex. 1003 ¶¶ 208–214; *see also* Pet. Reply 2–3.[15] Also, Petitioner's indefiniteness argument from another proceeding does not undermine Petitioner's showing here. *See* PO Resp. 18–19; Pet. Reply 4–7. In this proceeding, Petitioner contends that Copeland discloses the claimed "badness factor" (*see* Pet. 49–51), and in district court litigation, Petitioner contends that this term is indefinite because its *scope* is not sufficiently clear (Ex. 2009, 28–29 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir.

---

[15] Moreover, even without Dr. Jeffay's testimony, we would have found that Copeland's concern index qualifies as a "badness factor" based on Copeland's disclosure. *See, e.g.*, Ex. 1007, 3:31–40, 4:30–38, 7:38–67, 16:36–17:5, Fig. 1 (identifying "'bad' flow(s)"), Fig. 6 (concern index).

IPR2021-00909
Patent 8,243,593 B2

2005))). These positions are not in conflict,[16] and Patent Owner's reliance on *Enzo* is misplaced. *See Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1355 n.5 (Fed. Cir. 2020) (distinguishing *Enzo* from a situation involving *IPXL*-type indefiniteness); *see also* Pet. Reply 5 n.5 (explaining that *Enzo* was based on prior indefiniteness standard). Moreover, we can (and do) evaluate Petitioner's contentions in this proceeding because, whether or not the scope of the term "badness factor" is ambiguous, Copeland discloses it. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 813 (Fed. Cir. 2021) ("[I]t is not always impossible to adjudicate a prior-art challenge, one way or the other, just because some aspect of a claim renders the claim indefinite.").

In addition, Patent Owner's arguments that Copeland fails to teach the claimed "badness factor" (*see* PO Resp. 20–22) are unavailing. As we explained, the salient question "is whether Copeland's concern index discloses the claimed 'badness factor'—in other words, whether . . . Copeland's suspicious activity is 'undesirable' behavior, not whether the claimed 'undesirable' behavior is suspicious." Inst. Dec. 44. Patent Owner does not address this question, focusing instead on whether the claimed "badness factor" is "necessarily suspicious" (PO Resp. 20–21), but this argument is inapposite. In particular, even though we agree that the claimed "badness factor" is not "necessarily suspicious," this does not help Patent Owner. At most, Patent Owner shows the scope of the claim is *broader* than

---

[16] Similarly, Dr. Jeffay's testimony that an ordinary artisan would not "understand what the bounds of the term mean" (Ex. 2007, 35:17–36:7 (*quoted by* PO Resp. 19)) does not conflict with his testimony that Copeland discloses this limitation.

24

IPR2021-00909
Patent 8,243,593 B2

Copeland's disclosure because the claimed "badness factor" does not need to be associated with suspicious activity. But the issue is not whether the "badness factor" qualifies as a concern index, but instead whether the concern index qualifies as a "badness factor." We find that it does. Copeland's concern index provides an indication of whether a flow is exhibiting undesirable behavior (*cf.* PO Resp. 20–21 ("Copeland's concern index is thus concerned with identifying malicious activity such as an external intruder.")), and it does not matter that this undesirable behavior is also suspicious. Moreover, Patent Owner's argument that "Copeland's 'concern index' is concerned with suspicious behavior of a host" (PO Resp. 21–22) is also unavailing. While Copeland *also* associates a concern index with a host (*e.g.*, Ex. 1007, 7:18–21), Petitioner relies upon its disclosure of a concern index assigned to a flow (*e.g.*, *id.* at Abstr. ("A concern index value is *assigned to each flow* that appears suspicious." (emphasis added))).

Finally, Patent Owner's argument that Copeland only assigns the concern index to suspicious flows, not "***each*** flow" (*see* PO Resp. 22–23; PO Sur-reply 17–20) is unavailing. As explained above (*see supra* § II.C.2), the claim includes no requirement that the "badness factor" be computed for each and every flow, and "a prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention." *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003).

### Rationale to Combine Yung and Copeland

Petitioner contends that a person of ordinary skill in the art would have been motivated to incorporate Copeland's flow-based CI value into

25

IPR2021-00909
Patent 8,243,593 B2

Yung's bandwidth management device.  Pet. 45–48.  Petitioner notes that Yung expressly contemplates incorporating "other factors" into its process, and Petitioner argues that an ordinary artisan "would have sought to classify traffic behaving suspiciously or disruptively."  *Id.* at 45 (citing Ex. 1005, 10:43–58, 11:59–60; Ex. 1003 ¶¶ 198–200).  According to Petitioner, an ordinary artisan would have recognized that incorporating Copeland's technique would enhance Yung's ability to identify and control unauthorized traffic such as network attacks and probes, which were known concerns, while obviating the need for an administrator to understand the intricate nature of network attacks.  *Id.* at 45–47 (citing Ex. 1005, 2:31–34, 4:43–47, 19:58–61; Ex. 1007, 8:33–44; Ex. 1003 ¶¶ 199–202); *see also id.* at 49 (asserting that "Copeland tracks behavioral statistics about network flows (e.g., start time, end time, number of bytes, and packet count)" (citing Ex. 1007, 16:45–60)).  Petitioner also asserts that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the references.  *Id.* at 47–48 (citing Ex. 1003 ¶¶ 203–204; Ex. 1005, 7:5–1, Figs. 2–3; Ex. 1007, Figs. 1–2).

Patent Owner argues that Petitioner's rationale to combine the references is insufficient.  PO Resp. 24–28.  Patent Owner contends that the Petition is premised on an erroneous assumption that Yung expressly motivates the combination by saying that it "can incorporate other factors." *Id.* at 24–26 (quoting Ex. 1005, 11:59–60; citing Pet. 45–46; Ex. 1005, 10:43–58; Ex. 1003 ¶ 196; Ex. 1007, 3:45–54, Abstr.; Ex. 2007, 38:11–18). Patent Owner further contends that Copeland's flow data structure fields are "obtained from packet headers, not flow-based behavioral statistics." *Id.* at 26–27 (citing Ex. 1007, 16:45–60, 15:50–55; Ex. 2007, 40:19–41:10, 42:12–

26

IPR2021-00909
Patent 8,243,593 B2

43:3). Finally, Patent Owner contends that the Petition fails to address the fact that "Copeland and Yung are directed to two very different inventions." *Id.* at 27–28 (citing Ex. 1007, 3:38–39, 3:45–47; Ex. 1005, 2:24–27).

Having considered the parties' arguments and evidence, we are persuaded that a person of ordinary skill in the art would have been motivated to combine Copeland's flow-based CI value into Yung's bandwidth management device. *See* Pet. 45–48; *KSR*, 550 U.S. at 420 ("[A]ny need or problem known in the field of endeavor at the time of invention . . . can provide a reason for combining the elements in the manner claimed.").

Yung seeks to limit the bandwidth used by "bandwidth-intensive applications, such as peer-to-peer applications . . . and/or other unauthorized applications" (Ex. 1005, 4:43–47; *see also id.* at 2:31–34), and to that end, Yung describes particular techniques or factors for classifying a flow, while noting that other factors can also be used (*id.* at 10:43–58, 11:59–60). Copeland seeks to prevent a type of unauthorized use—specifically, intruders—and it analyzes flows to determine if they have the characteristics of probes or attacks. Ex. 1007, 4:30–33. Both Yung and Copeland analyze traffic flows and track flow statistics, such as the number of bytes and the packet count. *See* Ex. 1005, 25:8–11; Ex. 1007, 8:33–44, 16:45–60.

Dr. Jeffay testifies that "[n]etwork attacks and intrusions were a recognized problem during the relevant time frame," and a person of ordinary skill in the art would have been concerned by these attacks, including the flooding attacks addressed by Copeland. Ex. 1003 ¶¶ 199–200; *see also* Ex. 1007, 1:64–65. He further testifies that an ordinary artisan would have recognized that incorporating Copeland's CI value would

27

IPR2021-00909
Patent 8,243,593 B2

enhance Yung's device's ability to identify and control certain types of traffic (Ex. 1003 ¶ 198), he testifies that the ordinary artisan would have recognized the combination's benefits (*id.* ¶¶ 201–202), and he testifies that the ordinary artisan would have had a reasonable expectation of success (*id.* ¶ 203). In addition, Dr. Jeffay provides additional details regarding the specific alterations that would be required to combine the references, and he explains that these changes would be within the level of skill of a person of ordinary skill in the art. *Id.* ¶¶ 203–204. We credit Dr. Jeffay's testimony because it is logical, detailed, and supported by cited evidence. In addition, we perceive no evidence contradicting his testimony on these points.

We disagree with Patent Owner's argument that Petitioner's rationale to combine Yung and Copeland is premised on an erroneous assumption that Yung expressly motivates the combination. *See* PO Resp. 24–25 (arguing that the "alleged motivation to combine Yung and Copeland stems (entirely) from Yung's statement that its 'application behavior pattern can incorporate other factors as well'"). Petitioner contends that an ordinary artisan would have been motivated to make the combination "based on Yung's express disclosure" (Pet. 45; *see* Ex. 1003 ¶ 196), and Petitioner *also* contends that an ordinary artisan would have been motivated to combine Copeland with Yung to solve a known problem (Pet. 45–47; *see* Ex. 1003 ¶¶ 198–202). *See also* Pet. Reply 9–10. As explained above, we find the latter rationale persuasive.[17] Also, contrary to Patent Owner's assessment (*see* PO Resp. 25

---

[17] Patent Owner chose not to address this rationale, despite our previous explanation of and reliance upon it. *See* Inst. Dec. 41–42 (summarizing rationale), 45–46 (explaining why it shows a reasonable likelihood of success). For clarification, we do not find that: Yung expressly suggests the combination, or Yung's reference to "other factors" alone would have

28

IPR2021-00909
Patent 8,243,593 B2

& n.6), Dr. Jeffay's deposition testimony confirms our understanding of Petitioner's contentions. *See* Ex. 2007, 38:11–18 (agreeing with Patent Owner's summary of paragraph 196 and clarifying that "the full picture of the motivation to combine is developed over the following several pages" of the declaration).

Moreover, Patent Owner's contentions that Copeland collects data from packet headers (*see* PO Resp. 25–27) are unavailing. In particular, we disagree with Patent Owner's assumption that "behavioral statistics" cannot be based on information obtained from packet headers. *See id.* Patent Owner does not propose a construction for the term "behavioral statistics" that would prohibit using any information from a packet header, and we discern no support for such a construction. *Cf.* Ex. 1001, 5:15–21 (using packet's header to identify corresponding flow), 6:10–24 (imposing no such requirement on the behavioral statistics), 10:33–34 (different claim requiring "payload-content-agnostic behavioral statistics"). Indeed, as we previously explained (*see* Inst. Dec. 46), Copeland's statistics include the number of bytes and packets for a flow, and the '593 patent states that these are behavioral statistics. Ex. 1007, 3:18–35, 16:56–57; Ex. 1001, 7:18–29, Fig. 4; *see also* Ex. 2007, 42:12–20 (testifying that an ordinary artisan "would understand that Copeland is using behavioral statistics").[18] As a

_____

motivated an ordinary artisan. *See* Pet. 45. Instead, we find that an ordinary artisan would have been motivated to add Copeland to Yung to solve a known problem. *See id.* at 45–47.

[18] We disagree with Patent Owner's allegation that Dr. Jeffay "retreated from [his] initial position" during his deposition (PO Resp. 27); instead, Dr. Jeffay provided additional testimony regarding an ordinary artisan's understanding of Copeland (*see* Ex. 2007, 42:21–43:8). However, we do not rely on the additional testimony because it advances a contention different

IPR2021-00909
Patent 8,243,593 B2

result, we find that Copeland's statistics (such as the number of bytes and packets for a flow) qualify as "behavioral statistics."

In addition, Patent Owner's argument that "Copeland's concern index (CI) value is not a behavioral attribute" (PO Resp. 25–26; PO Sur-reply 21) is misplaced because Petitioner maps Copeland's concern index to the claimed "badness factor," not to the "behavioral statistics" required by the claim (*see* Pet. 49–51).

Finally, Patent Owner's argument that Copeland and Yung are directed to different inventions (*see* PO Resp. 26–28) is unavailing.[19] Although Yung and Copeland identify different goals, this difference does not undercut Petitioner's rationale to combine these references. Indeed, these references are not limited to their invention, but are prior art for all they disclose. *See KSR*, 550 U.S. at 420–21 (explaining that an ordinary artisan would not ignore a reference simply because its "primary purpose" was different); *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006) ("[T]he teaching of [a reference] is not limited to the specific invention disclosed.").

*Conclusion*

As explained above, Petitioner has shown that each limitation of independent claim 9 is disclosed by either Yung or Copeland. In addition,

_____

than the Petition. *Compare* Pet. 50 (contending Copeland discloses use of behavioral statistics), *with* Ex. 2007, 42:21–43:8 (contending "there's nothing in Copeland to prevent you from using behavioral statistics").

[19] In the Institution Decision, we responded to an identical argument by stating that "Patent Owner does not sufficiently explain why the differences it identifies are relevant to Petitioner's proposed combination." Inst. Dec. 47 (citing Prelim. Resp. 42); *compare* PO Resp. 27–28, *with* Prelim. Resp. 42. Patent Owner did not provide any additional explanation in its Response.

IPR2021-00909
Patent 8,243,593 B2

Petitioner has shown that a person of ordinary skill in the art would have been motivated to combine Yung and Copeland, as proposed.

Accordingly, we conclude that Petitioner has shown, by a preponderance of the evidence, that the subject matter of claim 9 would have been obvious over Yung and Copeland.

### 2. Independent claim 29

Independent claim 29 includes means-plus-function limitations that recite functions commensurate with the limitations of independent claim 9. *Compare* Ex. 1001, 13:32–44 (claim 29), *with id.* at 11:63–12:8 (claim 9).

Petitioner contends that the subject matter of independent claim 29 would have been obvious over Yung and Copeland, and in support, Petitioner relies largely on its prior analysis for claim 9. *See* Pet. 51–52. Petitioner further contends that Yung's traffic monitoring module 75 performs the recited functions. *Id.* at 52 (citing Ex. 1005, 6:58–66).

Patent Owner responds with the same arguments discussed above for claim 9 (*see supra* § II.E.1); however, these arguments are unavailing for the reasons explained above.

Having considered the record, we are persuaded by Petitioner's undisputed arguments that Yung discloses the preamble[20] of claim 29 and the claimed "means for maintaining a set of behavioral statistics for the flow," for the reasons explained above. *See supra* § II.E.1 (discussing claim 9); Ex. 1005, 6:58–66. We are also persuaded that the combination of Yung

---

[20] Because Petitioner has shown that the recitations in the preamble are satisfied by Yung, we need not determine whether the preamble is limiting. *See Nidec Motor*, 868 F.3d at 1017.

31

IPR2021-00909
Patent 8,243,593 B2

and Copeland discloses the claimed "means for computing . . . a badness factor for the flow," and a person of ordinary skill in the art would have been motivated to combine these references as Petitioner proposes. *See supra* § II.E.1.

Accordingly, we conclude that Petitioner has shown, by a preponderance of the evidence, that the subject matter of claim 29 would have been obvious over Yung and Copeland.

### 3. Dependent claims 10–13, 19–24, 30–33, and 39–44

Claims 10–13 and 19–24 depend from independent claim 9. Ex. 1001, 12:9–19, 12:29–13:4. Claims 30–33 and 39–44 depend from independent claim 29. *Id.* at 13:45–55, 14:9–52.

Petitioner contends that the subject matter of these claims would have been obvious over the Yung-Copeland combination. Pet. 53–61. Patent Owner does not dispute these contentions.[21] *See* PO Resp. Having considered the record, we are persuaded that Petitioner has shown that each additionally-recited limitation of claims 10–13, 19–24, 30–33, and 39–44 is taught or suggested by the Yung-Copeland combination. Moreover, for the reasons explained above, we are persuaded that an ordinary artisan would have been motivated to combine these references as proposed. *See supra* § II.E.1.

---

[21] Patent Owner has forfeited any arguments directed specifically to these claims. *See* Paper 17, 8 ("Patent Owner is cautioned that any arguments not raised in the response may be deemed waived."); *see also In re NuVasive*, 842 F.3d at 1381.

32

IPR2021-00909
Patent 8,243,593 B2

As for claims 10 and 30, we are persuaded by Petitioner's undisputed arguments (*see* Pet. 53) that Copeland's concern index indicates a degree to which the flow is behaving undesirably. *E.g.*, Ex. 1007, 21:50–60, Fig. 6.

As for claims 11–12 and 31–32, we are persuaded by Petitioner's undisputed arguments. *See* Pet. 53–54 (citing *id.* at 33–34 (addressing claim 1)). Yung describes using bandwidth utilization controls to control a flow (and penalize it) (*e.g.*, Ex. 1005, 16:2–7, 19:52–20:18; Ex. 1003 ¶ 168), and Copeland determines whether to drop packets based on the concern index associated with a flow (and other flows associated with the same host) (*e.g.*, Ex. 1007, 19:15–30; Ex. 1003 ¶¶ 221–222).

As for claims 13 and 33, we are persuaded by Petitioner's undisputed arguments (*see* Pet. 54–55 (citing *id.* at 41 (addressing claim 6))) that dropping a flow's packets would cause the flow's concern index to drop, thereby causing the badness factor to improve (*see* Ex. 1003 ¶¶ 225–226).

As for claims 19–22 and 39–42, we are persuaded by Petitioner's undisputed arguments. *See* Pet. 55–58. Yung's control block object stores a byte count, first packet time, and last packet time for the flow (*e.g.*, Ex. 1005, 8:9–12; *see also* Ex. 1003 ¶¶ 227–228), and it would have been obvious to calculate the rate of information transfer from the flow, given Yung's description of rate policies, and average packet sizes, to reduce false identification of outliers in Yung's heuristic analysis (Ex. 1005, 7:60–65, 14:62–66, 18:56–60, 19:53–61, 19:64–66; Ex. 1003 ¶¶ 229–234).

As for claims 23–24 and 43–44, we are persuaded by Petitioner's undisputed arguments. *See* Pet. 58–61. Yung's packet processor 131 receives a data packet, passes the packet to flow control module 132 (which enforces bandwidth utilization controls, such as rate and discard policies,

IPR2021-00909
Patent 8,243,593 B2

allowing it to determine whether to forward or drop the packet), and then in response to that determination, updates the appropriate values in the control block object associated with the flow. Ex. 1005, 20:10–15, 23:23–26, 24:63–25:1, 25:8–11, Figs. 2, 7; *see also* Ex. 1003 ¶¶ 237–238, 241.

Accordingly, we conclude that Petitioner has shown, by a preponderance of the evidence, that the subject matter of claims 10–13, 19–24, 30–33, and 39–44 would have been obvious over Yung and Copeland.

### F. Obviousness Ground Based on Yung Alone

Petitioner contends that the subject matter of claims 17, 18, 37, and 38 would have been obvious over Yung alone. Pet. 1, 42–43. Patent Owner contends that Petitioner fails to show that these claims would have been obvious over Yung. PO Resp. 12–14.

We agree with Patent Owner. *Accord* Inst. Dec. 38–39. Claims 17 and 18 depend (indirectly) from independent claim 9, and claims 37 and 38 depend (indirectly) from independent claim 29. Ex. 1001, 12:9–16, 12:29–39, 13:45–52, 14:9–20. Thus, each of these dependent claims includes the requirements of the respective independent claim, including the limitation requiring "computing . . . a badness factor for the flow." *Id.* at 12:5–6, 13:41–42. Petitioner fails to show that Yung teaches or suggests this limitation. *See* Pet. 42–43, 49–51. Consequently, Petitioner fails to demonstrate, by a preponderance of the evidence, that Yung alone renders obvious the subject matter recited in dependent claims 17, 18, 37, or 38.

But, given the nature of the Petition's defect regarding these claims, the Institution Decision "question[ed] whether [the Board] should consider the Petition to include a contention that the subject matter of claims 17, 18, 37, and 38 would have been obvious over the combination of Yung and

IPR2021-00909
Patent 8,243,593 B2

Copeland." Inst. Dec. 38–39. At trial, Patent Owner argues that the Board cannot and should not consider the Petition to include such a contention (PO Resp. 13–16; PO Sur-reply 3–15), and Petitioner argues the opposite (Pet. Reply 26–29).

Having considered these arguments, we decline to read the Petition to include a contention that claims 17, 18, 37, and 38 would have been obvious in light of Yung and Copeland.[22]

The Petition consistently contends that claims 17, 18, 37, and 38 would have been obvious in light of Yung alone. The summary table includes these claims in the Yung-only ground (Pet. 1); the organizational structure includes these claims in that ground (*id.* at ii–iii); and the substantive discussion of the claims refers to Yung and to other claims included in the Yung-only ground (*id.* at 42–43 (citing *id.* at 41–42)). Petitioner fails to identify (and we do not perceive) *any* portion of the Petition that can be read as affirmatively stating that these claims would

---

[22] We determine whether the Petition raised this contention because it is the Petition, not our discretion, that guides the proceeding. *E.g.*, *Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir. 2018) ("It would . . . not be proper for the Board to deviate from the grounds in the petition and raise its own obviousness theory . . . ."); *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018) (The "petitioner's contentions . . . define the scope of the litigation all the way from institution through to conclusion." (quoting *SAS Institute, Inc. v. Iancu*, 138 S.Ct. 1348, 1357 (2018))); *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) ("[T]he Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond."). Although we can use "common sense and logic to understand the contentions presented in a petition despite typographical errors" (Pet. Reply 28; *see also* PO Sur-reply 13), we cannot add contentions to a petition.

35

IPR2021-00909
Patent 8,243,593 B2

have been obvious in light of Yung and Copeland. *See* Pet.; Pet. Reply 26–29. Consequently, we do not agree with Petitioner's contention that the omission of Copeland was a "typographical error." Pet. Reply 26–27. The problem is not an isolated typographical error (or two), but rather one that pervades the Petition.

Also, we are not persuaded by Petitioner's argument that the Petition "includes every argument necessary to show that claims 17, 18, 37, and 38 are obvious over the combination of Yung and Copeland." Pet. Reply 28. Although the Petition alleges all of the *facts* that would be necessary for such a contention, it does not allege the necessary conclusion. Ultimately, the Petition never expressly contends that these claims would have been obvious in light of the combination of Yung and Copeland, so we decline to interpret the Petition as including such a contention.[23]

Two Federal Circuit decisions are instructive. In *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330 (Fed. Cir. 2020), the petition included two contentions: (1) the claims were anticipated by a reference (SMIL 1.0), and (2) the claims would have been obvious over SMIL 1.0 "in light of the *general knowledge* of the [skilled artisan]." *Id.* at 1333–34 (alteration in original). To support the second contention, the petition pointed to an expert declaration and a second reference (Hua) to show that a claimed element was well-known in the art and that a skilled artisan would have been motivated to combine that element with SMIL 1.0. *Id.* at 1334. The Board instituted review on the petition's two grounds and, "for clarity," also

---

[23] Although Petitioner notified Patent Owner of its position shortly after the Institution Decision (*see* Pet. Reply 27 (citing Ex. 1102)), that notification is not probative of the contents of the Petition (*see* PO Resp. 16 n.5).

IPR2021-00909
Patent 8,243,593 B2

instituted on the ground that the claims "would have been obvious over SMIL 1.0 and Hua based on the arguments and evidence presented in the [p]etition." *Id.* The Federal Circuit held that this was error because petitioner "did not advance [a combination of SMIL 1.0 and Hua] in its petition." *Id.* at 1336. "Although the Board is not limited by the exact language of the petition, the Board does not 'enjoy[ ] a license to depart from the petition and institute a *different* inter partes review of his own design.'" *Id.* (second alteration in original) (citing *Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir. 2018); *SAS Inst. Inc. v. Iancu*, 138 S.Ct. 1348, 1356 (2018)).

Also, the Federal Circuit's recent non-precedential decision in *Apple Inc. v. MPH Technologies Oy* is directly on point. 2022 WL 4103286 (Fed. Cir. Sept. 8, 2022) (non-prec). In that proceeding, the petition contended that claim 5 of U.S. Patent No. 7,937,581 would have been obvious over three references (Ishiyama, Murakawa, and Ahonen), but the petition contended that some of claim 5's dependent claims (claims 6 and 7) would have been obvious over only two of those references (Ishiyama and Murakawa). *Id.* at *3. The Board agreed with petitioner that claim 5 would have been obvious over the three-reference combination, but concluded that petitioner failed to meet its burden on claims 6 and 7 because Ahonen was not included in the ground challenging those claims. *Id.* Citing *Koninklijke Philips*, the Federal Circuit held that the Board "properly declined to consider Ahonen" in its evaluation of claims 6 and 7, explaining that "[t]he Board did not err by declining to consider arguments that [the petitioner] did not make." *Id.* at *7.

37

IPR2021-00909
Patent 8,243,593 B2

The instant proceeding includes the same factual scenario. The Petition alleges that independent claims 9 and 29 would have been obvious over two references (Yung and Copeland), but the Petition contends that some of their dependent claims (claims 17, 18, 37, and 38) would have been obvious over only one of those references (Yung). We decline to evaluate a combination of references that was not advanced in the Petition, and so we decline to consider whether claims 17, 18, 37, and 38 would have been obvious over Yung and Copeland.[24]

Accordingly, we determine that Petitioner has not shown, by a preponderance of the evidence, that the subject matter of claims 17, 18, 37, or 38 would have been obvious over Yung.

### G. Obviousness Ground Based on Yung and Four-Steps Whitepaper

Petitioner contends that the subject matter of independent claim 3 would have been obvious over Yung and the Four-Steps Whitepaper. Pet. 61–68. Patent Owner responds that Petitioner fails to show that the Four-Steps Whitepaper qualifies as prior art. PO Resp. 28–45.

#### 1. Prior Art Status of the Four-Steps Whitepaper

The Four-Steps Whitepaper is dated September 2002. Ex. 1006, 1. Petitioner contends that the Four-Steps Whitepaper was on Packeteer's website before the filing of the '593 patent, and in support, Petitioner introduces testimony that the document was archived by the Wayback

---

[24] Petitioner's request for leave to file a motion to correct the Petition (*see* Pet. Reply 29 n.16) is denied because Petitioner cannot add a contention to the Petition during a trial.

IPR2021-00909
Patent 8,243,593 B2

Machine on March 17, 2003.  Pet. 15–16 (citing Ex. 1006, i–ii).[25]  Patent Owner does not allege any deficiency in this aspect of Petitioner's showing.  *See* PO Resp. 28–45.  Having considered the evidence, we are persuaded that the Four-Steps Whitepaper (Exhibit 1006) was available on Packeteer's website at least as of March 17, 2003, which is more than a year before the filing of the '593 patent.  *Accord* Inst. Dec. 49 (same finding).

In the Institution Decision, we questioned whether Petitioner had shown that the Four-Steps Whitepaper was "publicly accessible," as also required.  Inst. Dec. 49–52; *see In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009) ("In order to qualify as a printed publication within the meaning of § 102, a reference must have been sufficiently accessible to the public interested in the art." (quotations omitted)); *see also Samsung Elecs. Co. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1369 (Fed. Cir. 2019) ("A reference is considered publicly accessible if 'persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'" (quoting *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 772 (Fed. Cir. 2018)).  We informed the parties that we would determine

---

[25]  We authorized Petitioner's to submit a replacement for Exhibit 1006 that included a declaration from Christopher Butler in place of the original declaration, which was provided by Elizabeth Rosenberg.  *See* Paper 23 (Order).  Although Patent Owner complains that this was procedurally improper, it identifies no basis for that position.  *See* PO Resp. 36–38 & n.7.  The two declarations are identical in all relevant respects.  Patent Owner argues that Petitioner failed to show that Ms. Rosenberg was "unavailable" as defined by the Federal Rules of Evidence (*see* Fed. R. Evid. 804(a)), but that rule is inapplicable because Petitioner did not seek to *introduce* Ms. Rosenberg's testimony over a hearsay objection, but rather sought to *replace* it.  Moreover, we note that Patent Owner unilaterally canceled the deposition of Mr. Butler (Ex. 1103) and does not contest the substance of his testimony.

39

IPR2021-00909
Patent 8,243,593 B2

whether the Four-Steps Whitepaper qualifies as a printed publication with the benefit of the full record. Inst. Dec. 52.

At trial, Patent Owner contends that Petitioner fails to meet its burden to show public accessibility (PO Resp. 28–45), and Petitioner responds with additional explanation and evidence (Pet. Reply 14–26).[26] Having considered the full record at trial, we are persuaded that Petitioner has shown, by a preponderance of the evidence, that the Four-Steps Whitepaper was publicly accessible at least as of March 17, 2003.

On this record, we find that the Four-Steps Whitepaper was intended to promote Packeteer's PacketShaper product. The Four-Steps Whitepaper is a "Technical Product Overview" for PacketShaper, it touts the advantages of the product, and it concludes by inviting the reader to order the product. Ex. 1006, 1, 3, 30. In addition, we credit Margi Spitzer's testimony regarding the purpose and nature of this document. *See* Ex. 1098. Ms. Spitzer authored the Four-Steps Whitepaper and was involved in distributing

---

[26] In its papers, Patent Owner did not contend that this evidence was untimely (*see* PO Sur-reply), but at the oral hearing Patent Owner asserted that Petitioner's evidence should have been submitted before the Response (Tr. 47:21–48:12). Patent Owner's new argument was untimely and will not be considered. *See Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364, 1369 (Fed. Cir. 2018) (noting that the "Board was obligated to dismiss [an] untimely argument . . . raised for the first time during oral argument").

However, even if Patent Owner had timely made this argument, it would not have been persuasive, for the reasons explained by Petitioner. *See* Pet. Reply 24 (addressing propriety of evidence at the Reply stage); *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1370 n.6 (Fed. Cir. 2021) (responding to argument that a petitioner's evidence was "untimely submitted on reply" by explaining that "[a] petitioner may provide evidence of public accessibility of a reference after the petition stage if the patent owner raises a challenge to public accessibility").

40

IPR2021-00909
Patent 8,243,593 B2

this document to potential customers. *Id.* ¶¶ 3–5, 7–8. Ms. Spitzer testifies that the document "was a big part of Packeteer's marketing of the PacketShaper product." *Id.* ¶ 6. She also testifies that, although the first page includes a copyright notice requiring Packeteer's "express written consent" for certain activities (Ex. 1006, 1), anyone could download the document from Packeteer's website "without using any access credentials like a password and without getting advanced permission from Packeteer." Ex. 1098 ¶¶ 9–10.

Moreover, we find that a person of ordinary skill in the art would have been able to locate the Four-Steps Whitepaper on Packeteer's website with reasonable diligence. Dr. Jeffay testifies that "Packeteer was an industry leader," and that PacketShaper would have been known to an ordinary artisan at the time of the invention. Ex. 1003 ¶¶ 41–43. We credit this testimony because: it is based in part on Dr. Jeffay's personal knowledge[27] (*see* Ex. 2007, 46:4–21, 48:2–19); and it is corroborated by Yung's reference to PacketShaper (*see* Ex. 1005, 4:47–51) and other entities' references to Packeteer and PacketShaper (*see* Exs. 1082–1083, 1086–1090, 1092). As a result, we are persuaded that an ordinary artisan would have been familiar with Packeteer and its products. In addition, Dr. Jeffay testifies that an ordinary artisan "could have easily found Packeteer whitepapers and other materials about [the PacketShaper] on the Packeteer website including the Four-Steps Whitepaper." Ex. 1093 ¶ 2. In support, Dr. Jeffay explains that

---

[27] Dr. Jeffay also relies on Exhibits 1031 and 1032 for his testimony (*see* Ex. 1003 ¶¶ 41–42), but for the reasons previously explained, we cannot say that these exhibits sufficiently support these conclusions (*see* Inst. Dec. 50–51). However, given the other evidence cited by Petitioner, we need not (and do not) rely on those exhibits in this Decision.

41

IPR2021-00909
Patent 8,243,593 B2

he accessed an archived version of the Packeteer website from February 2003 and navigated from the Packeteer home page to the PacketShaper product page, which includes a prominent link to the Four-Steps Whitepaper under "White Papers." *Id.* ¶¶ 3–8 (citing Ex. 1081). We credit this testimony because it is supported by a detailed explanation and documentary evidence.

We have also considered Patent Owner's contrary arguments and evidence (*see* PO Resp. 40–41),[28] but on balance, we are persuaded that the Four-Steps Whitepaper was publicly accessible via Packeteer's website on or before March 17, 2003. Patent Owner's declarant, Erin McCracken, testifies that the Wayback Machine states that it archived the Four-Steps Whitepaper on several dates, but she received an error message when attempting to access each version other than the March 17, 2003 version. Ex. 2008 ¶¶ 6–7. However, as Petitioner notes (*see* Pet. Reply 25), Ms. McCracken only attempted to access archives of this document made *after* March 17, 2003. Consequently, Ms. McCracken's evidence on this point is less probative than (and does not directly contradict) Petitioner's evidence, which relies on the March 17, 2003 archive of this document.

In addition, Ms. McCracken identifies a discrepancy between the archive date for the Packeteer homepage and the Four-Steps Whitepaper. *See* Ex. 2008 ¶ 5. Specifically, the Whitepaper was archived on March 17,

---

[28] Patent Owner also argues that Mr. Butler's declaration does not "establish that the Four-Steps Whitepaper was publicly available." PO Resp. 38 (referencing Ex. 1006, i–ii); *see also id.* at 28–39. Although we agree, this argument is misplaced because Petitioner primarily relies on different evidence to show that an ordinary artisan would have been able to locate the document with reasonable diligence.

IPR2021-00909
Patent 8,243,593 B2

2003, but the Packeteer homepage was not archived on that date. Ex. 1006, iiv; Ex. 2008 ¶ 5. Instead, Dr. Jeffay uses a February 16, 2003 archive of Packeteer's home page to show that an ordinary artisan could have navigated to the Whitepaper.[29] *See* Ex. 1093 ¶ 3; *see also* Ex. 1097 ¶ 8 (testifying that the home page was archived on February 16, 2003). Although the evidence is not perfect, we find it far more likely than not that the Four-Steps Whitepaper was accessible on Packeteer's website at least as of March 17, 2003. In particular, the Four-Steps Whitepaper is dated September 2002 (Ex. 1006, 1), and Ms. Spitzer testifies that this document was made available on the Packeteer website that month (Ex. 1098 ¶¶ 5, 9). Petitioner also submits a declaration listing straightforward steps for navigating to this document from the Packeteer homepage on several dates between September 2002 and February 2003. *See* Ex. 1097 ¶¶ 2–8. As a result, we find the one-month discrepancy between the two archive dates to be relatively insignificant in this case. Moreover, in this proceeding, we need not put a fine point on which of these dates is more credible, as the critical date is more than twenty months after both of them. *See* Ex. 1001, code (22) (identifying December 22, 2004 filing date).

In sum, we find that the Four-Steps Whitepaper was intended to reach the general public to promote Packeteer's PacketShaper product, and we find that an ordinary artisan exercising reasonable diligence would have been able to access the Whitepaper from Packeteer's website on or before March 17, 2003. Accordingly, we determine that the Four-Steps Whitepaper was

---

[29] Mr. Butler explains that the Wayback Machine traverses links by accessing the corresponding page "with the closest available date to the initial file containing the hyperlink." Ex. 1006, i (¶ 3).

IPR2021-00909
Patent 8,243,593 B2

publicly accessible as of that date.  *See*, *e.g.*, *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021) (stating that document designed to promote business is "strong evidence" of public accessibility); *Voter Verified, Inc. v. Premier Election Sols., Inc.*, 698 F.3d 1374, 1380–81 (Fed. Cir. 2012) (affirming finding that an article was publicly accessible where evidence demonstrated that the website including the article was known to the relevant community and the article could be found on the website with reasonable diligence).

### *2. Independent Claim 3*

Petitioner contends that the subject matter of claim 3 would have been obvious over Yung and the Four-Steps Whitepaper.  Pet. 61–68.  Patent Owner does not dispute Petitioner's substantive contentions regarding this claim.  *See* PO Resp.  Having considered the record, we are persuaded that Petitioner has shown, by a preponderance of the evidence, that claim 3 would have been obvious over Yung and the Four-Steps Whitepaper.

In particular, we are persuaded by Petitioner's undisputed arguments that Yung discloses most of the claim limitations.  *See* Pet. 64–68 (citing *id.* at 25–26, 30–34).[30]  Yung's bandwidth monitoring device 130 includes a memory that stores a control block object that includes a flow's behavioral attributes and identifies its traffic class and policy parameters.  *E.g.*, Ex. 1005, 7:25–28, 16:42–45, 17:42–52, 23:26–30.  Yung's device classifies a flow based on a heuristic comparison of the flow's behavioral attributes to

---

[30] Although Petitioner cites to the discussion of element 1.6 (*see* Pet. 34–35), this is a typographical error intended to reference element 1.5, which recites a limitation commensurate with the identified limitation from claim 3 (*see id.* at 33–34).  We have corrected the typographical error in our citation.

44

IPR2021-00909
Patent 8,243,593 B2

known application behavior patterns (*e.g.*, Ex. 1005, 7:7–11, 10:62–67, 15:23–26, 24:27–41), and it enforces bandwidth utilization controls on the flow, such as a discard policy that drops packets (*e.g.*, *id.* at 16:2–7, 19:52–20:18, 24:63–25:1). *See also* Ex. 1003 ¶¶ 156–157, 164–168 (further explaining why an ordinary artisan would have understood claim language to be disclosed by Yung).

In addition, we are persuaded by Petitioner's undisputed arguments that the Four-Steps Whitepaper discloses the remaining limitation. *See* Pet. 66–67. The Four-Steps Whitepaper states that the PacketShaper product maintains a count of the dropped and non-dropped packets of a flow. Ex. 1006, 18.

Finally, we are persuaded by Petitioner's undisputed arguments that a person of ordinary skill in the art would have been motivated to combine these references. *See* Pet. 62–63. Yung identifies PacketShaper as an exemplary bandwidth management device, and Yung is assigned to Packeteer, the company responsible for that product. *See* Ex. 1005, code (73), 4:47–51. The Four-Steps Whitepaper provides additional information regarding PacketShaper's functionality (*see* Ex. 1006), and the proposed combination of these references would have been within the skill of an ordinary artisan (Ex. 1003 ¶ 249; *see id.* ¶¶ 246–248). As a result, we find that a person of ordinary skill in the art would have been motivated to combine these references.

Accordingly, we conclude that Petitioner has shown, by a preponderance of the evidence, that the subject matter of claim 3 would have been obvious over Yung and the Four-Steps Whitepaper.

IPR2021-00909
Patent 8,243,593 B2

### III.    OBJECTION TO DEMONSTRATIVES

Petitioner objects to slide 12 of Patent Owner's hearing demonstratives, arguing that it presents a new argument not found in the record. Paper 40.

We dismiss this objection as moot. Demonstratives are neither evidence nor a mechanism for making new arguments. *See* Paper 39 (Order Setting Oral Hearing), 3–4. In this Final Written Decision, we only rely on the arguments properly presented in the parties' briefs and the evidence of record, not on the demonstratives. Moreover, even considering the allegedly new arguments presented by Patent Owner on slide 12, the outcome here would not change.

### IV. CONCLUSION[31]

Based on the evidence presented with the Petition, the evidence introduced during the trial, and the parties' respective arguments, Petitioner has shown by a preponderance of the evidence that claims 3, 9–13, 19–24, 29–33, and 39–44 are unpatentable, and Petitioner has not shown that claims 17, 18, 37, and 38 are unpatentable. Claims 1, 2, 4–8, 14–16, 25–28, and 34–36 were statutorily disclaimed and are not addressed in this Decision.

---

[31] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*, 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

46

IPR2021-00909
Patent 8,243,593 B2

In summary:

| Claim(s) | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 17, 18, 37, 38 | 103(a) | Yung | | 17, 18, 37, 38 |
| 9–13, 19–24, 29–33, 39–44 | 103(a) | Yung, Copeland | 9–13, 19–24, 29–33, 39–44 | |
| 3 | 103(a) | Yung, Four-Steps Whitepaper | 3 | |
| **Overall Outcome** | | | 3, 9–13, 19–24, 29–33, 39–44 | 17, 18, 37, 38 |

V.  ORDER

Accordingly, it is

ORDERED that claims 3, 9–13, 19–24, 29–33, and 39–44 of U.S. Patent No. 8,243,593 B2 are determined to be unpatentable;

FURTHER ORDERED that claims 17, 18, 37, and 38 of the '593 patent are not determined to be unpatentable;

FURTHER ORDERED that Petitioner's Objection to Patent Owner's Demonstratives (Paper 40) is *dismissed* as moot; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

47

IPR2021-00909
Patent 8,243,593 B2

FOR PETITIONER:

James L. Day
Daniel Callaway
Winston Liaw
FARELL BRAUM + MARTEL LLP
jday@fbm.com
dcallaway@fbm.com
wliaw@fbm.com

David C. Dotson
DUANE MORRIS LLP
dcdotson@duanemorris.com

Alex S. Yap
Mehran Arjomand
Rose S. Lee
MORRISON & FOERSTER LLP
ayap@mofo.com
marjomand@mofo.com
roselee@mofo.com

FOR PATENT OWNER:

Kenneth J. Weatherwax
Parham Hendifar
Patrick Maloney
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com

Trials@uspto.gov                              Paper 46
571-272-7822                    Entered: January 9, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

CLOUDFLARE, INC. and
SPLUNK INC.
Petitioner,
v.
SABLE NETWORKS, INC.,
Patent Owner.

_____

IPR2021-00909[1]
Patent 8,243,593 B2

_____

Before KRISTEN L. DROESCH, STACEY G. WHITE, and
GARTH D. BAER, *Administrative Patent Judges*.

WHITE, *Administrative Patent Judge.*

DECISION
Denying Petitioner's Request on Rehearing of Final Written Decision
*37 C.F.R. § 42.71(d)*

_____

[1] Splunk, Inc., which filed a petition in IPR2022-00228, has been joined as
a petitioner in this proceeding.

IPR2021-00909
Patent 8,243,593 B2

## I.   INTRODUCTION

Cloudflare, Inc. and Splunk Inc. ("Petitioner") filed a Request for Rehearing (Paper 44, "Request" or "Req. Reh'g") of our Final Written Decision (Paper 42, "Final Decision" or "Dec.") in which we determined that Petitioner did not demonstrate[2] that claims 17, 18, 37, and 38 of U.S. Patent No. 8,243,593 B2 (Ex. 1001, "the '593 patent") are unpatentable. For the reasons explained below, we deny Petitioner's Request for Rehearing.

## II.   DISCUSSION

On request for rehearing, "[t]he burden of showing a decision should be modified lies with the party challenging the decision." 37 C.F.R. § 42.71(d). "The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, reply, or a sur-reply." *Id.* We have reviewed Petitioner's Request and carefully considered all of the arguments presented. We are not persuaded that we misapprehended or overlooked any arguments or evidence, and thus, we decline to modify the Decision.

In the Decision on Institution, we stated that the Petition alleged that dependent claims 17, 18, 37, and 38 would have been obvious over the Yung reference alone. Paper 16 ("Inst. Dec."), 38 (citing Paper 1 ("Petition" or "Pet.") 1 (table of grounds), 42–43 (addressing these dependent claims). We noted that claims 17 and 18 depend indirectly from independent claim 9 and

---

[2] We also determined that Petitioner had demonstrated that claims 3, 9–13, 19–24, 29–33, and 39–44 of the '593 were unpatentable, but that portion of the Final Decision is not at issue here. *See* Dec. 47.

2

IPR2021-00909
Patent 8,243,593 B2

claims 37 and 38 depend indirectly from independent claim 29. *Id.* (citing Ex. 1001, 12:9–16, 12:29–30, 12:33, 13:45–52, 14:9–10, 14:14). Thus, each of these dependent claims includes the requirements of the respective independent claims, including limitations requiring "computing . . . a badness factor for the flow." Dec. 32 (citing Ex. 1001, 12:5–6, 13:41–42). Claims 9 and 29 were alleged and found to be unpatentable over the teachings of Yung and Copeland and the "computing . . . a badness factor" recited in claims 9 and 29 was alleged to have been taught by Copeland. *See* Inst. Dec. 38; *see also* Dec. 18–32. In the Institution Decision, we raised the possibility that "the inclusion of claims 17, 18, 37, and 38 in the Yung-only ground may be a typographical error." Inst. Dec. 39. We then invited the parties to address whether we should consider whether claims 17, 18, 37, and 38 would have been obvious over Yung and Copeland. *Id.*

The parties accepted our invitation and briefed the question as to whether these dependent claims should be considered against the teachings of Yung and Copeland. *See* Paper 30 ("PO Resp."), 13–16; Paper 33 ("Reply"), 26–29; Paper 36 ("PO Sur-Reply"), 3–15. In addition, this issue was discussed at the oral hearing. Paper 41, 21:17–24:7; 25:1–41:12. In the Final Written Decision, we addressed this issue and "decline[d] to evaluate a combination of references that was not advanced in the Petition, and so we decline[d] to consider whether claims 17, 18, 37, and 38 would have been obvious over Yung and Copeland." Dec. 38.

On Rehearing, Petitioner asserts that we erred in refusing to consider whether claims 17, 18, 37, and 38 would have been obvious over Yung and Copeland due to our alleged misapprehension of two Federal Circuit decisions: *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330 (Fed. Cir.

3

IPR2021-00909
Patent 8,243,593 B2

2020) and *Apple Inc. v. MPH Technologies Oy*, 2022 WL 4103286 (Fed.

Cir. Sept. 8, 2022) (non-precedential).  Req. Reh'g 2.  Petitioner asserts that

> [i]n both Federal Circuit decisions, the Board was asked to
> modify or create a new ground of unpatentability rather than
> applying the grounds as expressly recited.  In contrast here, the
> Board is asked to correct a typographical error that was first
> raised in the institution decision and immediately
> acknowledged as such by Petitioners at the outset of the trial
> phase.

*Id.* at 2.  We disagree with Petitioner's assertion of a typographical error.

In its Reply, Petitioner asserted that it had "inadvertently included the

arguments addressing dependent claims 17, 18, 37, and 38 under Ground 1

(Yung alone) rather than Ground 2 (Yung and Copeland)."  Reply 26.

Petitioner maintains that assertion in its Rehearing Request, stating that we

need only "resolve an obvious and admitted typographical error that placed

two paragraphs in the wrong section of the petition."  Req. Reh'g 4.  In the

Final Written Decision, however, we determined that

> [t]he Petition consistently contends that claims 17, 18, 37, and
> 38 would have been obvious in light of Yung alone.  The
> summary table includes these claims in the Yung-only ground
> (Pet. 1); the organizational structure includes these claims in
> that ground (*id*. at ii–iii);  and the substantive discussion of the
> claims refers to Yung and to other claims included in the Yung-
> only ground (*id*. at 42–43 (citing *id*. at 41–42)).  Petitioner fails
> to identify (and we do not perceive) *any* portion of the Petition
> that can be read as affirmatively stating that these claims would
> have been obvious in light of Yung and Copeland.  *See* Pet.;
> Pet. Reply 26–29.  Consequently, we do not agree with
> Petitioner's contention that the omission of Copeland was a
> "typographical error."  Pet. Reply 26–27.  The problem is not
> an isolated typographical error (or two), but rather one that
> pervades the Petition.

4

IPR2021-00909
Patent 8,243,593 B2

Dec. 35–36. As such, we were not persuaded that the Petition contained a typographical error. We determined that the Petition repeatedly and expressly challenged claims 17, 18, 37, and 38 over Yung alone. Nothing in Petitioner's Request for Rehearing persuades us that that determination was in error.

In addition, we are not persuaded by Petitioner's arguments on rehearing regarding the cited case law. The *Apple* case is particularly instructive. In *Apple,* the petitioner asserted that claim 5 was unpatentable over Ishiyama, Murakawa, **and Ahonen**. *Apple*, 2022 WL 4103286, at *3 (emphasis added). Claims 6 and 7 depend from claim 5 and were alleged to have been obvious over Ishiyama and Murakawa. *Id.* The Federal Circuit held that the Board "properly declined to consider Ahonen" in its evaluation of claims 6 and 7, explaining that "[t]he Board did not err by declining to consider arguments that [the petitioner] did not make." *Id*. at *7.

On Rehearing, Petitioner asserts that the instant case is distinguishable because "[t]he parties in . . . *Apple* never did what Petitioner[] did in this case, i.e., request resolution of an obvious typographical error in a manner that makes sense as a matter of logic and patent law based on the contentions recited in the petition itself." Req. Reh'g 5. According to Petitioner, "[l]ogic dictates that because claim 17 includes every limitation of claim 12, then the portion of the petition showing how the prior art discloses claim 12 must also apply to claim 17." *Id.* at 6. Petitioner further argues that because claim 17 "begins by reciting '[t]he method of claim 12 . . . ,'" we should interpret that as "explicitly referring to the petition's argument addressing claim 12." *Id.* This argument fails because every dependent claim includes a reference to the claim it depends from, and by Petitioner's logic we should

5

IPR2021-00909
Patent 8,243,593 B2

always include allegations made against a base claim in the patentability analysis of a dependent claim.  In *Apple*, however, the Federal Circuit refused to follow similar logic noting that "Apple only raised Ahonen in Ground 2, which challenged claims 3 and 5 of the '581 patent.  Even though claims 6–8 depend from claim 5, Apple did not include Ahonen in Grounds 1 and 3 challenging those claims, nor did it address or reference Ahonen in its substantive analysis."  *Apple*, 2022 WL 4103286, at *7 (internal citations omitted).  Here, we were similarly faced with a Petition that did not include Copeland in the ground challenging claims 17, 18, 37, and 38, nor did it address or reference Copeland in its substantive analysis of those dependent claims.  In both *Apple* and the instant case, the pieces were there to make an argument, but Petitioner failed to put those pieces together.  Petitioner's arguments on rehearing do not convince us of error in our decision to not put the pieces together on Petitioner's behalf.  As such, we are not persuaded of error in our determinations.

### III.  CONCLUSION

We have reviewed and considered the arguments in Petitioner's Rehearing Request and conclude that Petitioner has not carried its burden of demonstrating that the Board misapprehended or overlooked any matters in rendering the Final Written Decision.  37 C.F.R. § 42.71(d).  Thus, Petitioner's challenge does not meet the standard set forth for a request for rehearing.

The Request for Rehearing is *denied*.

6

IPR2021-00909
Patent 8,243,593 B2

In summary:

Outcome of Decision on Rehearing:

| Claim(s) | 35 U.S.C. § | References / Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 17, 18, 37, 38 | 103(a) | Yung | | 17, 18, 37, 38 |
| 9–13, 19–24, 29–33, 39–44 | 103(a) | Yung, Copeland | 9–13, 19–24, 29–33, 39–44 | |
| 3 | 103(a) | Yung, Four-Steps Whitepaper | 3 | |
| **Overall Outcome** | | | 3, 9–13, 19–24, 29–33, 39–44 | 17, 18, 37, 38 |

Final Outcome of Final Written Decision after Rehearing

| Claim(s) | 35 U.S.C. § | References / Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 17, 18, 37, 38 | 103(a) | Yung | | 17, 18, 37, 38 |
| 9–13, 19–24, 29–33, 39–44 | 103(a) | Yung, Copeland | 9–13, 19–24, 29–33, 39–44 | |
| 3 | 103(a) | Yung, Four-Steps Whitepaper | 3 | |
| **Overall Outcome** | | | 3, 9–13, 19–24, 29–33, 39–44 | 17, 18, 37, 38 |

7

IPR2021-00909
Patent 8,243,593 B2

For PETITIONER:
James L. Day
Daniel Callaway
Winston Liaw
FARELL BRAUM + MARTEL LLP
jday@fbm.com
dcallaway@fbm.com
wliaw@fbm.com

David C. Dotson
DUANE MORRIS LLP
dcdotson@duanemorris.com

Alex S. Yap
Mehran Arjomand
Rose S. Lee
MORRISON & FOERSTER LLP
ayap@mofo.com
marjomand@mofo.com
roselee@mofo.com

For PATENT OWNER:
Kenneth J. Weatherwax
Parham Hendifar
Patrick Maloney
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
endifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com

8



US008243593B2

(12) **United States Patent**   (10) **Patent No.:** US 8,243,593 B2
Natchu                            (45) **Date of Patent:** Aug. 14, 2012

(54) **MECHANISM FOR IDENTIFYING AND PENALIZING MISBEHAVING FLOWS IN A NETWORK**

(75) Inventor: **Vishnu Natchu**, Santa Clara, CA (US)

(73) Assignee: **Sable Networks, Inc.**, Santa Clara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1098 days.

(21) Appl. No.: **11/022,599**

(22) Filed: **Dec. 22, 2004**

(65) **Prior Publication Data**

US 2006/0133280 A1     Jun. 22, 2006

(51) **Int. Cl.**
| | |
|---|---|
| *G01R 31/08* | (2006.01) |
| *G06F 11/00* | (2006.01) |
| *G08C 15/00* | (2006.01) |
| *H04J 1/16* | (2006.01) |
| *H04J 3/14* | (2006.01) |
| *H04L 1/00* | (2006.01) |
| *H04L 12/26* | (2006.01) |

(52) **U.S. Cl.** ...................................... **370/229**

(58) **Field of Classification Search** ........... 370/229–236
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,167,041 | A * | 12/2000 | Afanador | 370/353 |
| 6,252,848 | B1 * | 6/2001 | Skirmont | 370/229 |
| 6,310,881 | B1 * | 10/2001 | Zikan et al. | 370/401 |
| 6,934,250 | B1 * | 8/2005 | Kejriwal et al. | 370/229 |
| 7,113,990 | B2 * | 9/2006 | Scifres et al. | 709/224 |
| 2002/0032717 | A1 * | 3/2002 | Malan et al. | 709/105 |
| 2005/0141426 | A1 * | 6/2005 | Hou | 370/235 |
| 2005/0226149 | A1 * | 10/2005 | Jacobson et al. | 370/229 |
| 2010/0110889 | A1 * | 5/2010 | Yazaki et al. | 370/230 |

* cited by examiner

*Primary Examiner* — Xavier Szewai Wong
(74) *Attorney, Agent, or Firm* — West & Associates, A PC; Stuart J. West; Shaun N. Sluman

(57) **ABSTRACT**

A mechanism is disclosed for identifying and penalizing misbehaving flows in a network. In one implementation, a set of behavioral statistics are maintained for each flow. These behavioral statistics are updated as information packets belonging to a flow are processed. Based upon these behavioral statistics, a determination is made as to whether a flow is exhibiting undesirable behavior. If so, a penalty is imposed on the flow. In one implementation, this penalty causes packets belonging to the flow to have a higher probability of being dropped than packets belonging to other flows that do not exhibit undesirable behavior. In one implementation, in addition to penalizing the flow, this penalty also has the effect of correcting the flow's behavior such that the flow exhibits less undesirable behavior after the penalty than before. By correcting the flow's behavior, the penalty makes it possible for the flow to become a non-misbehaving flow.

**44 Claims, 5 Drawing Sheets**



Cloudflare - Exhibit 1001, page 1



*Fig. 1*

Cloudflare - Exhibit 1001, page 2

Appx62

Appx63

Cloudflare - Exhibit 1001, page 3



*Fig. 2*



*Fig. 3*

Cloudflare - Exhibit 1001, page 4

Appx64

402

FLOW ID

BEHAVIORAL STATISTICS

- TOTAL (T) BYTE COUNT
- LIFE (L) DURATION SINCE INCEPTION
- RATE (R) OF INFORMATION FLOW
- NUMBER (N) OF PACKETS PROCESSED
- AVERAGE (A) PACKET SIZE
- BADNESS FACTOR (B)
- TIMESTAMP
- OTHER

OTHER FLOW INFORMATION

*Fig. 4*

Cloudflare - Exhibit 1001, page 5

$$BADNESS\ FACTOR = MIN \begin{cases} 16 & MAXIMUM\ BADNESS\ FACTOR \\ 1 & DEFAULT\ BADNESS\ FACTOR \\ \dfrac{T}{T_{THRESHOLD}} & TOTAL\ BYTE\ COUNT\ COMPONENT \\ \dfrac{L}{L_{THRESHOLD}} & DURATION\ COMPONENT \\ \dfrac{R}{R_{THRESHOLD}} & RATE\ COMPONENT \\ \dfrac{A\text{-}A\ THRESHOLD}{MTU\text{-}A\ THRESHOLD} & AVERAGE\ PACKET\ SIZE\ COMPONENT \end{cases}$$

*Fig. 5*

Cloudflare - Exhibit 1001, page 6

Appx66

US 8,243,593 B2

1

# MECHANISM FOR IDENTIFYING AND PENALIZING MISBEHAVING FLOWS IN A NETWORK

## BACKGROUND

With the advent of file sharing applications such as KaZaA, Gnutella, BearShare, and Winny, the amount of peer-to-peer (P2P) traffic on the Internet has grown immensely in recent years. In fact, it has been estimated that P2P traffic now represents about 50-70 percent of the total traffic on the Internet. This is so despite the fact that the number of P2P users is quite small compared to the number of non P2P users. Thus, it appears that most of the bandwidth on the Internet is being consumed by just a minority of the users. For this and other reasons, P2P traffic is viewed by ISP's (Internet service providers) and others as being abusive/misbehaving traffic that should be controlled and penalized.

In order to control P2P traffic, however, it first needs to be identified. Earlier generations of P2P protocols used fixed TCP port numbers for their transmissions. For example, Fast-Track used TCP port 1214. This made P2P traffic easy to identify. Current P2P protocols, however, no longer have to use fixed port numbers. Rather, they can be configured to use random dynamic port numbers so that P2P traffic can now be masqueraded as other types of traffic, such as HTTP web browsing and unspecified TCP traffic. As a result, the current P2P protocols have rendered the port-based identification techniques ineffective.

Another technique that has been used to identify P2P traffic involves the use of signatures. Specifically, it was observed that some P2P protocols inserted distinct information into their data packets. Using this distinct information as a signature, it was possible to identify packets that were assembled using those P2P protocols. This technique has several problems. First, it usually is effective for only a relatively short period of time. As the P2P protocols evolve and mutate (which they do on a fairly constant basis), their signatures change. Once that happens, the previous signatures are no longer valid, and the technique will have to be changed to recognize the new signatures. Another and more serious problem is that the P2P protocols are now evolving to the point that they either leave no signature or they obfuscate their signatures (e.g. by encryption). This makes it extremely difficult if not impossible to identify P2P traffic using signatures.

Overall, P2P protocols have gotten quite sophisticated, and the more sophisticated they become, the more difficult it is to identify P2P traffic. Unless P2P traffic can be identified, it cannot be effectively controlled.

## SUMMARY

In accordance with one embodiment of the present invention, there is provided a mechanism for effectively identifying and penalizing misbehaving information packet flows in a network. This mechanism may be applied to any type of network traffic including, but certainly not limited to, P2P traffic. In one embodiment, misbehaving flows are identified based upon their observed behavior. Unlike the prior approaches, they are not identified based upon ancillary factors, such as port numbers and signatures. Because misbehaving flows are identified based upon their observed behavior, and because their behavior cannot be hidden, misbehaving flows cannot avoid detection. Thus, regardless of which protocols they use, or how those protocols try to hide/obfuscate their nature, misbehaving flows can be identified. Once identified/detected, they can be controlled and/or penalized.

2

In one embodiment, a flow is processed as follows. One or more information packets belonging to the flow are received and processed. As the information packets are processed, a set of behavioral statistics are maintained for the flow. These behavioral statistics reflect the empirical behavior of the flow. In one embodiment, the behavioral statistics include a total byte count (sum of all of the bytes in all of the packets of the flow that have been processed up to the current time), a life duration (how long the flow has been in existence since inception), a flow rate (derived by dividing the total byte count by the life duration of the flow), and an average packet size (derived by dividing the total byte count by the total number of packets in the flow that have been processed). These behavioral statistics are updated as information packets belonging to the flow are processed; thus, they provide an up to date reflection of the flow's behavior.

Based at least partially upon the behavioral statistics, a determination is made as to whether the flow is exhibiting undesirable behavior. In one embodiment, this determination may be made by computing a badness factor for the flow. This badness factor is computed based, at least partially, upon the behavioral statistics, and this badness factor provides an indication as to whether the flow is exhibiting undesirable behavior. In one embodiment, the badness factor also provides an indication of the degree to which the flow is misbehaving.

If the flow is exhibiting undesirable behavior, then a penalty may be enforced on the flow. In one embodiment, the penalty to be enforced is determined based, at least partially, upon the badness factor. This penalty may be an increased drop rate. When enforced on the flow, this increased drop rate causes the information packets belonging to the flow to have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior. Thus, more packets may be dropped from the flow than from other non-misbehaving flows. In one embodiment, this penalty is enforced on the flow only if a congestion condition is encountered. Thus, if there is no congestion, the flow (even if it is exhibiting undesirable behavior) is not penalized.

In one embodiment, enforcing the penalty on the flow has the effect of correcting the flow's behavior. That is, enforcing the penalty causes the badness factor of the flow to improve (e.g. decrease). As a result, by application of the penalty, a currently misbehaving flow can be turned into a non-misbehaving flow in the future. Once the flow is no longer misbehaving, it is no longer subject to penalty. In this manner, a misbehaving flow can be identified, penalized, and even rehabilitated in accordance with one embodiment of the present invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows an overview of a network in which one embodiment of the present invention may be implemented.

FIG. **2** is a block diagram of a router in which one embodiment of the present invention may be implemented.

FIG. **3** is an operational flow diagram showing the operation of a misbehaving flow manager (MFM) in accordance with one embodiment of the present invention.

FIG. **4** is a diagram of a sample flow block in accordance with one embodiment of the present invention.

FIG. **5** shows one possible function for computing a badness factor for a flow in accordance with one embodiment of the present invention.

Cloudflare - Exhibit 1001, page 7

US 8,243,593 B2

3

## DETAILED DESCRIPTION OF EMBODIMENT(S)

### Network Overview

With reference to FIG. 1, there is shown an overview of a network 100 in which one embodiment of the present invention may be implemented. As shown, the network 100 comprises a plurality of routers 102 interconnected to each other by trunks or links in such a way that each router 102 has multiple possible paths to every other router 102. For example, information from router 102a may reach router 102d by going through routers 102b and 102c, or routers 102e and 102f, and information from router 102c may reach router 102a by going through router 102b or router 102e. Interconnecting the routers 102 in this way provides flexibility in determining how information from one router 102 is delivered to another, and makes it possible to route around any failures that might arise. For the sake of simplicity, only a few routers 102 are shown in FIG. 1; however, it should be noted that network 100 may be much more complex if so desired, comprising more routers 102, more connections between the routers 102, and other components.

In addition to being coupled to each other, each router 102 may further be coupled to various machines (not shown), such as clients and servers, from which information originates and to which information is destined. By going through the routers 102, each of these machines may send information to any of the other machines in the network 100.

Information is conveyed from one router 102 to another via a physical link or trunk. Depending on the type of network, this link or trunk may be an optical medium (e.g. an optical fiber), a coaxial cable, or some other type of medium. For purposes of the present invention, network 100 may use any type of transport medium.

### Router Overview

FIG. 2 shows a block diagram of a sample router 102 that may be used to implement one or more of the routers 102 in network 100. As shown in FIG. 2, the router 102 comprises a plurality of line cards 202 for coupling the router 102 to one or more of the other routers 102 in the network 100. For example, assuming that the router 102 in FIG. 2 is router 102b in network 100, line card 202d may couple router 102b to router 102f, line card 202c may couple router 102b to router 102c, line card 202b may couple router 102b to router 102e, and line card 202a may couple router 102b to router 102a. Overall, the line cards 202 act as the router's 102 interfaces to the rest of the network 100. In one embodiment, the trunks coupled to the line cards 202 are bi-directional; thus, each line card 202 may receive information from another router, or send information to another router. Put another way, each line card 202 is capable of acting as an ingress line card (to receive information from another router) or an egress line card (to send information to another router). Whether a particular line card 202 is acting as an ingress or an egress line card at any particular time depends upon the flow of network traffic.

To couple the line cards 202 to each other within the router 102, there is provided an internal switching fabric 204. In one embodiment, the switching fabric 204 comprises a plurality of interconnected fabric cards 206. Basically, the switching fabric 204 provides a mechanism for coupling any line card 202 to any other line card 202 within the router 102 so that information can be transported from any ingress line card 202 to any egress line card 202. By transporting information from an ingress line card 202 to an egress line card 202, the switch-

4

ing fabric 204 routes information through the router 102 and sends it on its way to the next hop (i.e. the next router). Information is thus received and routed by the router 102.

To increase the flexibility of the router 102 and to facilitate the process of failure recovery, each line card 202, in one embodiment, has multiple connections to the switching fabric 204. In addition, the switching fabric 204 provides multiple routes for connecting each line card connection to every other line card connection. With such a setup, each line card 202 has multiple routes to every other line card 202 in the router 102. For example, one possible route from line card 202d to line card 202a may pass through fabric card 206c, while another route may pass through fabric card 206b. By providing multiple routes between the various line cards 202, the switching fabric 204 makes it possible to route around any internal failures that may arise.

In addition to the line cards 202 and the switching fabric 204, the router 102 further comprises an application processor 208. In one embodiment, the application processor 208 determines the forwarding paths, and hence, the egress line cards, that can be used to forward information to any particular destination address. Put another way, given a destination address, the application processor 208 determines which line card 202 or line cards are most suitable to act as the egress line card to forward information to that destination address. For example, suppose that the router 102 in FIG. 2 is router 102b in network 100, and that the destination is a machine coupled to router 102d. Suppose further that line card 202c is coupled to router 102c and line card 202d is coupled to router 102f. In such a case, because the most direct routes to router 102d are through either router 102c or 102f, the most suitable egress line cards for forwarding information to the destination router 102d are probably line cards 202c and 202d. Accordingly, the application processor 208 designates these line cards 202c, 202d as potential egress line cards for destination router 102d, with one being designated as the primary egress line card and the other being the alternate.

Once the egress line card determinations are made by the application processor 208 for each destination address, they are communicated to each of the line cards 202 in the router 102. In turn, each line card 202 stores the information into a forwarding table residing on the line card 202. Thereafter, when a line card 202 acts as an ingress line card and receives a set of information, it can use the forwarding table to determine the appropriate egress line card 202 to which to forward the information. Because the egress line card information is predetermined and stored in the forwarding table, the ingress line card simply has to perform a table lookup to determine the proper egress line card. No on-the-fly calculation needs to be performed. Since table lookup operations can be carried out very quickly, the process of determining the proper egress line card requires relatively little time.

### Information Routing

In one embodiment, information is routed from router to router, and from line card 202 to line card 202, in the form of information packets. Each packet represents a set of information that is sent by a source to a destination. To enable it to be properly routed, a packet typically comprises a header portion. The header portion contains information that is used by the line cards 202 to determine the next hop for the packet. Depending upon the routing protocol used, the information contained in the header portion may differ. In one embodiment, the header portion comprises the following sets of information: (1) a source address (i.e. the network address of the entity sending the packet); (2) a source port number; (3) a

Cloudflare - Exhibit 1001, page 8

US 8,243,593 B2

| 5 | 6 |

destination address (i.e. the network address of the entity that is to receive the packet); (4) a destination port number; and (5) an indication of the routing protocol that is to be used. These sets of information may be referred to as the "five tuple". Using this header information, an ingress line card 202 can determine to which egress line card 202 the packet should be routed.

In addition to the header portion, a packet also comprises a payload. The payload comprises the actual data that the source is trying to send to the destination. In addition to the actual data, the payload may also include other information, such as information inserted by other protocols (e.g. P2P protocols). This additional information may be needed by the destination to properly process the packet.

In one embodiment, one or more packets may be grouped into a flow. For purposes of the present invention, a flow is a series of packets that are related in some manner. In one embodiment, packets are grouped into a flow if they share a sufficient amount of header information. More specifically, in one embodiment, packets belong to the same flow if they have the five tuple in common. Thus, if two or more packets have the same source address, the same source port number, the same destination address, the same destination port number, and the same protocol, they are grouped into the same flow. Usually, barring some failure that requires rerouting, all of the packets belonging to a flow are received by the same ingress line card 202 and forwarded to the same egress line card 202. By grouping packets into flows, it is possible to aggregate individual packets in a meaningful way to enable a higher level understanding of the traffic flowing through the router 102 to be derived.

The flows that pass through a router 102 may represent many different types of traffic. For example, the flows may contain web browsing traffic, TCP traffic, P2P traffic, etc. As noted previously, some traffic is more abusive/misbehaving than others. P2P traffic, for example, is often considered to be abusive. Other types of traffic may also be considered abusive. To make the best use of available resources, and to best control the traffic that passes through the router 102, it is desirable for the router 102 to be able to identify abusive/misbehaving traffic, and to penalize and even rehabilitate that traffic. In one embodiment, the line cards 202 of router 102 have been enhanced to give the router 102 such capability. More specifically, the line cards 202 have been adapted to include a misbehaving flow manager (MFM) 210 for keeping track of flows, determining whether the flows are exhibiting undesirable behavior, and enforcing a penalty on the flows if they are exhibiting undesirable behavior.

For purposes of the present invention, the MFM 210 of the line cards 202 may be implemented in any desired manner. For example, the functionality of the MFM 210 may be realized by having one or more processors on a line card 202 execute one or more sets of instructions. Alternatively, the MFM 210 may be implemented using hardwired logic components (e.g. in the form of one or more ASIC's on a line card 202). These and other implementations are within the scope of the present invention.

Functional Overview of MFM on Line Card

With reference to FIGS. 2 and 3, a functional overview of the operation of an MFM 210 in accordance with one embodiment of the present invention will now be described. In the following discussion, it will be assumed that the MFM 210 is on a line card 202 that is acting as an egress line card (i.e. the line card is receiving packets from an ingress line card and sending packets out to another router). However, it should be noted that the MFM 210 on a line card may process flows in the same manner even when the line card 202 is acting as an ingress line card (i.e. the line card is receiving packets from another router and sending them to an egress line card).

Initially, an MFM 210 receives and processes one or more packets belonging to a flow. Processing a packet may, but does not necessarily, involve forwarding the packet to another router. As the packets of a flow are processed, a set of behavioral statistics are maintained (block 302 of FIG. 3) for the flow. These behavioral statistics reflect the empirical behavior of the flow. In one embodiment, the behavioral statistics include a total byte count (sum of all of the bytes in all of the packets of the flow that have been processed up to the current time), a life duration (how long the flow has been in existence since inception), a flow rate (derived by dividing the total byte count by the life duration of the flow), and an average packet size (derived by dividing the total byte count by the total number of packets in the flow that have been processed). These behavioral statistics are stored by the line card 202 in a flow block associated with the flow, and are updated as information packets belonging to the flow are processed; thus, these behavioral statistics provide an up to date reflection of the flow's behavior.

Based upon the behavioral statistics, the MFM 210 determines (block 304) whether the flow is exhibiting undesirable behavior. In one embodiment, this determination is made by computing a badness factor for the flow. This badness factor is computed based upon the behavioral statistics of the flow, and provides an indication as to whether the flow is exhibiting undesirable behavior. In one embodiment, the badness factor also provides an indication of the degree to which the flow is misbehaving.

If the flow is exhibiting undesirable behavior, then the MFM 210 enforces (block 306) a penalty on the flow. In one embodiment, the penalty to be enforced is determined based upon the badness factor. This penalty may be an increased drop rate. When enforced on the flow, this increased drop rate causes the information packets belonging to the flow to have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior. Thus, more packets may be dropped from the flow than from other non-misbehaving flows. In one embodiment, the MFM 210 enforces this penalty on the flow only if a congestion condition is encountered. If there is no congestion, the flow (even if it is exhibiting undesirable behavior) is not penalized.

In one embodiment, enforcing the penalty on the flow has the effect of correcting the flow's behavior. That is, enforcing the penalty causes the badness factor of the flow to improve (e.g. decrease). As a result, by application of the penalty, a currently misbehaving flow can be turned into a non-misbehaving flow in the future. Once the flow is no longer misbehaving, it is no longer subject to penalty. In this manner, an MFM 210 on a line card 202 can identify, penalize, and even rehabilitate a misbehaving flow.

Sample Operation

The above discussion provides a high level overview of the operation of an MFM 210. To facilitate a complete understanding of the invention, a specific sample operation of an MFM 210 in accordance with one embodiment of the present invention will now be described. In the following discussion, it will be assumed that line card 202d of FIG. 2 is acting as an egress line card, and that line card 202b is acting as an ingress line card, which is sending packets to the egress line card

Cloudflare - Exhibit 1001, page 9

US 8,243,593 B2

7

202*d*. The following discussion describes the operation of the MFM 210*d* on the egress line card 202*d*.

Initially, MFM 210*d* receives a packet from the ingress line card 202*b*. In processing this packet, the MFM 210*d* determines whether the packet belongs to an existing flow. In one embodiment, the MFM 210*d* makes this determination by processing the five tuple contained in the header portion of the packet (e.g. using a hashing function) to derive a flow ID. The MFM 210*d* then determines whether this flow ID is associated with a flow block that is already stored (e.g. in a memory, not shown) on the egress line card 202*d*. If so, then the packet is part of an existing flow. If not, then the packet is the first packet of a new flow.

In the present example, it will be assumed that the packet is the first packet of a new flow. In such a case, the MFM 210*d* creates a new flow block for the new flow. A sample flow block 402 in accordance with one embodiment of the present invention is shown in FIG. 4. As shown, the flow block 402 comprises the flow ID (derived by processing the five tuple), and a set of behavioral statistics. The behavioral statistics include a total (T) byte count (sum of all of the bytes in all of the packets of the flow that have been processed up to the current time), a life duration (L) (how long the flow has been in existence since inception), a flow rate (R) (derived by dividing T by L), a number (N) of packets processed up to the current time, an average (A) packet size (derived by dividing T by N), a badness factor (B), and a timestamp of when the flow block 402 was created. The behavioral statistics may include other sets of information as well. In addition to the above information, the flow block 402 may also include any other information pertinent to the flow. In one embodiment, when the flow block 402 is initially created, the timestamp value is updated with the current time, and the badness factor is set to a default value of 1. The other behavioral statistics are set to 0. The flow block 402 is then stored on the egress line card 202*d* for future reference.

After creating the flow block 402, the MFM 210*d* determines whether to forward the packet to the router to which the egress line card 202*d* is coupled. If the link is currently experiencing congestion, the packet may be dropped. In the current example, it will be assumed that the link is not congested; hence, the MFM 210*d* forwards the packet to the external router. After doing so, the MFM 210*d* updates the behavioral statistics to reflect the packet that was just forwarded. More specifically, the MFM 210*d* updates T to include the forwarded packet's byte count, updates L by computing the difference between the current time and the timestamp, updates R by dividing the updated T by the updated L, updates N to include the forwarded packet, and updates A by dividing the updated T by the updated N.

In addition, the MFM 210*d* also computes a badness factor for the flow. For purposes of the present invention, the badness factor may be computed using any desired methodology based upon any desired criteria. In one possible specific embodiment, the badness factor is computed in accordance with the function shown in FIG. 5, which takes the minimum of six possible values. One possible value is 16, which represents the maximum possible badness factor for any flow. Another possible value is 1, which is the default badness factor for a flow. Other possible values are the quotient of $T/T_{threshold}$, the quotient of $L/L_{threshold}$, the quotient of $R/R_{threshold}$, and the quotient of $(A-A_{threshold})/(MTU-A_{threshold})$. For purposes of this function, the constants $T_{threshold}$, $L_{threshold}$, $R_{threshold}$, MTU, and $A_{threshold}$ are assigned by an administrator of the router 102. These values can be adjusted to tune the MFM 210*d* for optimal performance.

8

The quotients $T/T_{threshold}$, $L/L_{threshold}$, $R/R_{threshold}$, and $(A-A_{threshold})/(MTU-A_{threshold})$ represent the total byte count component, the duration component, the rate component, and the average packet size component, respectively, of the function. These components are included in the function because it has been found that they provide a measure of whether a flow is misbehaving. For example, it has been found that P2P traffic flows generally have high byte counts, relatively long life, relatively high rates, and relatively large average packet sizes. These characteristics are also found in other types of abusive/misbehaving flows. Thus, these components are manifestations of misbehavior. By taking these components into account in the computation of the badness factor, it is possible to derive a badness factor that provides an indication of whether a flow is misbehaving. In one embodiment, a badness factor value larger than 1 indicates a misbehaving flow. In addition to providing an indication of whether a flow is misbehaving, the badness factor also provides an indication of the degree to which the flow is misbehaving. Thus, a flow with a badness factor of 1.8 is misbehaving to a greater degree than a flow with a badness factor of 1.2.

The function shown in FIG. 5 is just one possible way of computing the badness factor. The function may be changed, augmented, or even replaced. For example, the administrator of the router 102 may configure the MFM 210*d* to not take one or more of the components into account. For example, the administrator may determine that the duration component is not very indicative of a misbehaving flow, and hence, may configure the MFM 210*d* to ignore this component. In such a case, the MFM 210*d* will not use this component in computing the badness factor. Also, a different and even more sophisticated function, one that comprises one or more logical expressions, for example, may be used to compute the badness factor. These and other functions may be implemented. In addition, components other than and/or in addition to those components shown in FIG. 5 may be taken into account in computing the badness factor. Overall, for purposes of the present invention, the badness factor may be computed in any desired way, using any desired methodology and any desired criteria.

After the MFM 210*d* computes the badness factor, it stores the badness factor into the flow block 402. The behavioral characteristics of the flow are thus updated to reflect the packet that was just forwarded. The MFM 210*d* is now ready to process another packet. The next time the MFM 210*d* receives a packet belonging to the same flow, it will recognize that the packet is part of an existing flow; thus, it will not create a new flow block. Instead, it will access the existing flow bock 402 and use and/or update the information contained therein. In the current example, it will be assumed that the MFM 210*d* receives many more packets belonging to the flow, and forwards and processes them in the manner described above. Thus, the behavioral statistics are repeatedly updated to give rise to a set of relatively mature statistics (which include a relatively mature badness factor) for the flow. In one embodiment, the MFM 210*d* takes the badness factor of a flow into account only when a congestion condition is encountered (e.g. the outgoing link is experiencing congestion). If there is no such congestion, the MFM 210*d* will not enforce a penalty on the flow, regardless of the flow's badness value.

Suppose now that the MFM 210*d* receives another packet belonging to the flow, but that this time, the egress line card 202*d* is experiencing a congestion condition on the outgoing link. In such a case, the MFM 210*d* may wish to enforce a penalty on the flow, and the packet may need to be dropped. To determine whether to enforce a penalty on the flow, the

Cloudflare - Exhibit 1001, page 10

US 8,243,593 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

MFM **210***d* accesses the badness factor stored in the flow block **402** associated with the flow. If the badness factor is less than or equal to a threshold value (which in the current example is 1), then no penalty will be enforced on the flow. Hence, the packet will be subject to the non-misbehaving flow drop rate, which in one embodiment is 0.1 (which means that the packet has a 10% chance of being dropped). However, if the badness factor is greater than the threshold value, then the MFM **210***d* will impose a penalty on the flow. In one embodiment, this penalty takes the form of an increased drop rate. This increased drop rate causes the packet to be subjected to a higher probability of being dropped than packets belonging to flows that are either not misbehaving or are less misbehaving.

In one embodiment, the magnitude of the increased drop rate is determined based upon the value of the badness factor. For purposes of the present invention, any formula/function may be used to determine the increased drop rate. In one embodiment, the increase drop rate rises rapidly relative to the badness factor. Thus, by the time the badness factor reaches **2**, the increased drop rate is already 0.5 (which means that the packet has a 50% probability of being dropped). By the time the badness factor is 3, the increased drop rate is 0.7, and by the time the badness factor is 5, the increased drop rate is over 0.8. This rapid increase in drop rate serves to penalize misbehaving flows early before they become too serious a problem. Of course, slower rising drop rates may be used if so desired.

After the drop rate is determined (whether it is the default drop rate or an increased drop rate), it is enforced by the MFM **210***d*. More specifically, the MFM **210***d* applies the appropriate probability in determining whether to drop the packet. If, after applying the appropriate drop rate, the packet is not dropped, then the line card **202***d* forwards the packet to the external router. After that is done, the MFM **210***d* updates the behavioral statistics of the flow in the manner described above to reflect the forwarded packet.

On the other hand, if the MFM **210***d* decides to drop the packet, then the egress line card **202***d* will not forward the packet to the external router. In such a case, the MFM **210***d* will update the behavioral statistics, but it will do so in a slightly different manner than that described above. Specifically, since the packet was not forwarded, the total byte count T, the number of packets N, and the average packet size A do not change; hence, these values will not be updated. However, the life duration L of the flow (derived by taking the difference between the current time and the timestamp) has changed; thus, it will be updated. Since the rate R depends on L, it will also be updated. In addition, the badness factor will be recomputed. In this manner, the behavioral statistics are updated even when a packet is dropped.

An interesting point to note in the above drop situation is that while the total byte count T has not changed, the life duration L has increased. Since the rate R is derived by dividing T by L, this means that the rate R has decreased as a result of dropping the packet. Since R has decreased, the quotient $R/R_{threshold}$ has also decreased. Because the quotient $R/R_{threshold}$ is one of the components used to determine the badness factor, this decrease could lead to a decrease in the badness factor. Thus, by dropping a packet, the badness factor may be reduced (e.g. decreased). As noted above, the penalty imposed on a misbehaving flow is an increased drop rate. By making it more likely that a packet from the misbehaving flow will be dropped, which in turn will cause more packets from the flow to be dropped, the MFM **210***d* can cause the badness factor of the flow to improve. Thus, the imposition of a penalty on a misbehaving flow has the effect of improving the behavior of the flow. In this manner, not only does the MFM **210***d* detect and penalize misbehaving flows, it can also rehabilitate them.

In the example discussed above, a penalty is enforced on a misbehaving flow only when a congestion condition is encountered. As an alternative, a penalty may be enforced on a misbehaving flow even when there is no congestion. That is, any time a flow has a badness factor that indicates undesirable flow behavior, the MFM **210***d* can impose an increased drop rate on the flow, and can enforce that drop rate on packets of the flow, regardless of whether there is congestion. That way, the MFM **210***d* can manage and control abusive/misbehaving traffic even in the absence of any traffic congestion. This and other modifications and enhancements are within the scope of the present invention.

At this point, it should be noted that although the invention has been described with reference to one or more specific embodiments, it should not be construed to be so limited. Various modifications may be made by those of ordinary skill in the art with the benefit of this disclosure without departing from the spirit of the invention. Thus, the invention should not be limited by the specific embodiments used to illustrate it but only by the scope of the issued claims and the equivalents thereof.

What is claimed is:

**1**. A machine-implemented method for processing a single flow, the flow comprising a plurality of packets, and the method comprising:

creating a flow block as the first packet of a flow is processed by a single router;

said flow block being configured to store payload-content-agnostic behavioral statistics pertaining to said flow, regardless of the presence or absence of congestion;

said router updating said flow block with the payload-content-agnostic behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by said router, regardless of the presence or absence of congestion;

said router heuristically determining whether said flow exhibits undesirable behavior by comparing at least one of said payload-content-agnostic behavioral statistics to at least one pre-determined threshold value; and

upon determination by said router that said flow exhibits undesirable behavior, enforcing, relative to at least one packet, a penalty;

wherein the preceding steps are performed on said router without requiring use of inter-router data.

**2**. A non-transitory computer-readable medium having computer-executable instructions for performing a method to process a single flow, the flow comprising a plurality of packets, and the method comprising:

creating a flow block as the first packet of a flow is processed by a single router;

said flow block being configured to store payload-content agnostic behavioral statistics about said flow, regardless of the presence or absence of congestion;

said router updating said flow block with the flow's behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by said router, regardless of the presence or absence of congestion;

said router heuristically determining whether said flow is exhibiting undesirable behavior by comparing at least one of said behavioral statistics to at least one pre-determined threshold value; and

Cloudflare - Exhibit 1001, page 11

US 8,243,593 B2

11                                                    12

upon determination by said router that said flow is exhibiting undesirable behavior, enforcing, relative to at least one packet belonging to said flow, a penalty;

wherein the preceding steps are performed on said router without requiring use of inter-router data.

**3.** An article of manufacture comprising:

a non-transitory computer-readable medium having stored thereon a data structure;

a first field containing data representing a flow block;

a second field containing data representing payload-content-agnostic behavioral statistics about dropped and non-dropped packets of a flow;

a third field containing data representing pre-determined behavior threshold values;

a fourth field containing data representing the results of a heuristic determination of whether said flow exhibits undesirable behavior determined by comparing said behavioral statistics to said pre-determined threshold values;

a fifth field containing data representing at least one penalty to be enforced against at least one packet upon determination that said flow exhibits undesirable behavior.

**4.** A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed;

determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior, regardless of the presence or absence of congestion; and

in response to a determination that the flow is exhibiting undesirable behavior, enforcing a penalty on the flow.

**5.** A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion;

determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior; and

in response to a determination that the flow is exhibiting undesirable behavior, enforcing a penalty on the flow.

**6.** The method of claim **1**, wherein enforcing the penalty has an effect of correcting the flow's behavior such that the flow exhibits less undesirable behavior.

**7.** The method of claim **1**, wherein enforcing the penalty comprises:

imposing an increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

**8.** The method of claim **1**, wherein the penalty is enforced when a congestion condition is encountered.

**9.** A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based

on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and

computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

**10.** The method of claim **9**, wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably.

**11.** The method of claim **10**, further comprising:

determining, based at least partially upon the badness factor, a penalty to impose on the flow.

**12.** The method of claim **11**, further comprising: enforcing the penalty on the flow.

**13.** The method of claim **12**, wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior, thereby, causing the badness factor of the flow to improve.

**14.** The method of claim **12**, wherein the penalty is enforced on the flow when a congestion condition is encountered.

**15.** The method of claim **12**, wherein no penalty is enforced on the flow unless a congestion condition is encountered, regardless of how undesirably the flow is behaving.

**16.** The method of claim **12**, wherein the penalty is determined and enforced on the flow even when no congestion condition is encountered.

**17.** The method of claim **12**, wherein determining the penalty comprises:

determining an increased drop rate to impose on one or more information packets belonging to the flow.

**18.** The method of claim **17**, wherein enforcing the penalty comprises:

imposing the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

**19.** The method of claim **9**, wherein the set of behavioral statistics comprises a measure T of how much total information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time.

**20.** The method of claim **9**, wherein the set of behavioral statistics comprises a measure L of how long the flow has been in existence up to a current point in time.

**21.** The method of claim **20**, wherein the set of behavioral statistics comprises a rate R of information transfer for the flow, wherein R is derived by dividing T by L.

**22.** The method of claim **9**, wherein the set of behavioral statistics comprises an average size for the information packets belonging to the flow.

**23.** The method of claim **9**, wherein maintaining the set of behavioral statistics comprises:

receiving a particular information packet belonging to the flow;

determining whether to forward the particular information packet to a destination; and

in response to a determination to forward the particular information packet to the destination, updating the set of behavioral statistics to reflect processing of the particular information packet.

**24.** The method of claim **9**, wherein maintaining the set of behavioral statistics comprises:

receiving a particular information packet belonging to the flow; and

Cloudflare - Exhibit 1001, page 12

US 8,243,593 B2

13

updating the set of behavioral statistics to reflect processing of the particular information packet, regardless of whether the particular information packet is discarded or forwarded to a destination.

**25.** A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising:

  means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion;

  means for determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior; and

  means for enforcing, in response to a determination that the flow is exhibiting undesirable behavior, a penalty on the flow.

**26.** The MFM of claim **25**, wherein enforcing the penalty has an effect of correcting the flow's behavior such that the flow exhibits less undesirable behavior.

**27.** The MFM of claim **25**, wherein the means for enforcing the penalty comprises:

  means for imposing an increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

**28.** The MFM of claim **25**, wherein the penalty is enforced when a congestion condition is encountered.

**29.** A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising:

  means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and

  means for computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

**30.** The MFM of claim **29**, wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably.

**31.** The MFM of claim **30**, further comprising:

  means for determining, based at least partially upon the badness factor, a penalty to impose on the flow.

**32.** The MFM of claim **31**, further comprising: means for enforcing the penalty on the flow.

**33.** The MFM of claim **32**, wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior, thereby, causing the badness factor of the flow to improve.

14

**34.** The MFM of claim **32**, wherein the penalty is enforced on the flow when a congestion condition is encountered.

**35.** The MFM of claim **32**, wherein no penalty is enforced on the flow unless a congestion condition is encountered, regardless of how undesirably the flow is behaving.

**36.** The MFM of claim **32**, wherein the penalty is determined and enforced on the flow even when no congestion condition is encountered.

**37.** The MFM of claim **32**, wherein the means for determining the penalty comprises:

  means for determining an increased drop rate to impose on one or more information packets belonging to the flow.

**38.** The MFM of claim **37**, wherein the means for enforcing the penalty comprises:

  means for imposing the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

**39.** The MFM of claim **29**, wherein the set of behavioral statistics comprises a measure T of how much total information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time.

**40.** The MFM of claim **29**, wherein the set of behavioral statistics comprises a measure L of how long the flow has been in existence up to a current point in time.

**41.** The MFM of claim **40**, wherein the set of behavioral statistics comprises a rate R of information transfer for the flow, wherein R is derived by dividing T by L.

**42.** The MFM of claim **29**, wherein the set of behavioral statistics comprises an average size for the information packets belonging to the flow.

**43.** The MFM of claim **29**, wherein the means for maintaining the set of behavioral statistics comprises:

  means for receiving a particular information packet belonging to the flow;

  means for determining whether to forward the particular information packet to a destination; and

  means for updating, in response to a determination to forward the particular information packet to the destination, the set of behavioral statistics to reflect processing of the particular information packet.

**44.** The MFM of claim **29**, wherein the means for maintaining the set of behavioral statistics comprises:

  means for receiving a particular information packet belonging to the flow; and

  means for updating the set of behavioral statistics to reflect processing of the particular information packet, regardless of whether the particular information packet is discarded or forwarded to a destination.

\* \* \* \* \*

Cloudflare - Exhibit 1001, page 13

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1612

**Short Case Caption:** Cloudflare, Inc. v. Sable Networks, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes 6,813 words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/30/2023

Signature: /s/ Anthony M. Garza

Name: Anthony M. Garza

Save for Filing