**2023-1612**

# United States Court of Appeals for the Federal Circuit

CLOUDFLARE, INC.,

*Appellant,*

— v. —

SABLE NETWORKS, INC.,

*Appellee.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2021-00909*

## JOINT APPENDIX

DANIEL P. HIPSKIND
**BERGER & HIPSKIND LLP**
9538 Brighton Way, Suite 320
Beverly Hills, California 90210
Telephone: 323-886-3430
dph@bergerhipskind.com

KENNETH J. WEATHERWAX
**LOWENSTEIN & WEATHERWAX LLP**
1016 Pico Blvd.
Santa Monica, California 90405
Telephone: 310-307-4503
weatherwax@lowensteinweatherwax.com

*Counsel for Appellee*

DATE FILED: OCTOBER 28, 2023

ANTHONY M. GARZA
STEVEN CALLAHAN
**CHARHON CALLAHAN ROBSON & GARZA, PLLC**
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
(214) 521-6400
agarza@ccrglaw.com
scallahan@ccrglaw.com

*Counsel for Appellant*

# TABLE OF CONTENTS
# JOINT APPENDIX

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 42 | Final Written Decision | 010/18/2023 | Appx1 |
| 46 | Decision Denying Petitioner's Request for Rehearing of Final Written Decision | 01/09/2023 | Appx49 |
| | Certified List | | Appx57 |
| 1001 | U.S. Patent No. 8,243,593 | | Appx61 |
| IPR2021-00909 | | | |
| 01 | Petition for *Inter Partes* Review of U.S. Patent No. 8,243,593 | 05/07/2021 | Appx74 |
| 08 | Patent Owner's Preliminary Response | 08/23/2021 | Appx200 |
| 16 | Decision - Institute *Inter Partes* Review | 11/19/2021 | Appx319 |
| 30 | Patent Owner's Response to Petition | 03/14/2022 | Appx471 |
| 33 | Petitioners' Reply | 06/06/2022 | Appx528 |
| 35 | Petitioner's Updated List of Exhibits | 06/06/2022 | Appx581 |
| 36 | Patent Owner's Sur-Reply | 07/05/2022 | Appx584 |
| 41 | Oral Hearing Transcript | 09/28/2022 | Appx636 |
| 44 | Petitioners' Request for Rehearing | 11/17/2022 | Appx695 |
| 1003 | Declaration of Kevin Jeffay, Ph.D. in Support of Petition for *Inter Partes* Review of U.S. Patent No. 8,243,593 | | Appx1037 |
| 1005 | U.S. Patent No. 7,664,048 ("Yung") | | Appx1209 |
| 1006 | "Four Steps to Application Performance Across the Network with Packeteer's PacketShaper®," archived by web.archive.org on March 17, 2003, with Affidavit of Elizabeth Rosenberg attached | | Appx1237 |

| Paper/Exhibit No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| | ("Four-Steps Whitepaper") | | |
| 1007 | U.S. Patent No. 7,185,368 ("Copeland") | | Appx1272 |
| 1008 | U.S. Patent No. 7,295,516 ("Ye") | | Appx1296 |
| 1102 | Email from Petitioner's counsel to Patent Owner's counsel, dated December 2, 2021 | | Appx2940 |
| 2001 | The n -Dimensional Superswitch \| WIRED | | Appx3019 |
| IPR-2022-00228 | | | |
| 32 | Decision Granting Institution of Inter Partes Review *35 U.S.C. § 314* Granting Petitioner's Motion for Joinder *35 U.S.C. § 315(c); 37 C.F.R. § 42.122* | | Appx3225 |

Trials@uspto.gov                                        Paper 42
Tel: 571-272-7822                          Entered: October 18, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

CLOUDFLARE, INC. and
SPLUNK INC.
Petitioner,

v.

SABLE NETWORKS, INC.,
Patent Owner.

———————

IPR2021-00909[1]
Patent 8,243,593 B2

———————

Before STACEY G. WHITE, GARTH D. BAER, and
JULIET MITCHELL DIRBA, *Administrative Patent Judges.*

DIRBA, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Non-Disclaimed Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

---

[1]  Splunk, Inc., which filed a petition in IPR2022-00228, has been joined as a petitioner in this proceeding.

IPR2021-00909
Patent 8,243,593 B2

On November 19, 2021, we instituted an *inter partes* review of claims 1–44 of U.S. Patent No. 8,243,593 B2 (Ex. 1001, "the '593 patent"). Paper 16 ("Inst. Dec."). After institution, claims 1, 2, 4–8, 14–16, 25–28, and 34–36 of the '593 patent were statutorily disclaimed (*see* Ex. 2006), so this Decision does not address the patentability of those claims. Having considered the full record at trial, we determine that Petitioner has shown that claims 3, 9–13, 19–24, 29–33, and 39–44 of the '593 patent are unpatentable under 35 U.S.C. § 103(a), and we determine that Petitioner has not shown that claims 17, 18, 37, and 38 of the '593 patent are unpatentable.

## I. BACKGROUND

### A. History of this Proceeding

On May 7, 2021, Cloudflare, Inc. and SonicWall Inc.[2] filed a Petition requesting *inter partes* review of claims 1–44 of the '593 patent. Paper 1 ("Pet."). Petitioner submitted a declaration from Dr. Kevin Jeffay in support. *See* Ex. 1003. Sable Networks, Inc.[3] ("Patent Owner") filed a Preliminary Response. Paper 8. The parties also filed an authorized pre-institution reply and sur-reply to address discretionary denial under 35 U.S.C. § 314. Papers 9, 11. After reviewing the preliminary record, we determined that Cloudflare had demonstrated a reasonable likelihood that it would prevail in establishing the unpatentability of at least one challenged claim, and we instituted an *inter partes* review of all challenged claims on all grounds asserted in the Petition. Inst. Dec. 57.

---

[2] SonicWall Inc. was subsequently terminated from this proceeding following a settlement with Patent Owner. Paper 15 (Termination Order).

[3] Patent Owner also identifies Sable IP, LLC as a real party in interest. Paper 5, 1.

IPR2021-00909
Patent 8,243,593 B2

After institution, Patent Owner filed a statutory disclaimer under
35 U.S.C. § 253(a) of claims 1, 2, 4–8, 14–16, 25–28, and 34–36 of the '593
patent. Ex. 2006; *see also* Paper 29 (Updated Mandatory Notice); *accord*
Paper 32, 4 (determining that the identified claims have been disclaimed).
This disclaimer effectively eliminates these claims from the '593 patent,
leaving the patent as if those claims never existed. *See Sanofi-Aventis U.S.,
LLC v. Dr. Reddy's Labs., Inc.*, 933 F.3d 1367, 1373 (Fed. Cir. 2019). As a
result, we determine (and the parties agree) that claims 1, 2, 4–8, 14–16, 25–
28, and 34–36 are no longer part of this proceeding. *See* PO Resp. 11–12;
Pet. Reply 1.

Meanwhile, Splunk Inc.[4] filed a petition for *inter partes* review and a
motion for joinder in IPR2022-00228, requesting that Splunk be joined as a
petitioner in this proceeding. Paper 32 (Joinder Order), 1. After considering
the parties' papers, we instituted trial in IPR2022-00228, granted Splunk's
motion, and added Splunk as a petitioner to this proceeding. *Id.* at 5–8. As
a result, this Decision uses "Petitioner" to refer to Cloudflare and Splunk.

During the trial, Patent Owner filed a Response (Paper 30, "PO
Resp."), Petitioner filed a Reply (Paper 33, "Pet. Reply"), and Patent Owner
filed a Sur-reply (Paper 36, "PO Sur-reply").

An oral hearing in this proceeding was held on September 7, 2022,
and a transcript of the hearing is included in the record. Paper 41 ("Tr.").
Petitioner objects to Patent Owner's demonstratives (Paper 40), and for the
reasons explained below, that objection is dismissed as moot.

---

[4] Splunk also identifies Critical Start Inc. as a real party in interest.
IPR2022-00228, Paper 2 (Petition), 76.

Appx3

IPR2021-00909
Patent 8,243,593 B2

### B. Related Matters

The parties indicate that the '593 patent has been asserted in several district court lawsuits, including *Sable Networks, Inc. v. Splunk Inc.*, 5:21-cv-00040 (E.D. Tex.), *Sable Networks, Inc. v. Cloudflare, Inc.*, 6:21-cv-00261 (W.D. Tex.), *Sable Networks, Inc. v. SonicWall Inc.*, 6:21-cv-00190 (W.D. Tex.).  Pet. xii–xiii;  Paper 5, 1–3.

### C. Non-Disclaimed Challenged Claims

Claims 3, 9–13, 17–24, 29–33, and 37–44 are the claims currently challenged in this proceeding.[5]  Of these, claims 3, 9, and 29 are independent.  Claim 9 is illustrative of the claimed subject matter:

9.    A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and

computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

Ex. 1001, 11:63–12:8.

---

[5]  The Petition challenged all 44 claims of the '593 patent (*see* Pet.); however, during the trial, Patent Owner filed a statutory disclaimer (Ex. 2006), which eliminated claims 1, 2, 4–8, 14–16, 25–28, and 34–36 from the scope of this proceeding (*see supra* § I.A),

IPR2021-00909
Patent 8,243,593 B2

### D. The Grounds

Petitioner asserts the following challenges to the patentability of claims 3, 9–13, 17–24, 29–33, and 37–44 (Pet. 1; *see also infra* § II.F):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 17, 18, 37, 38 | 103(a)[6] | Yung[7] |
| 9–13, 19–24, 29–33, 39–44 | 103(a) | Yung, Copeland[8] |
| 3 | 103(a) | Yung, Four-Steps Whitepaper[9] |

### E. Summary of the '593 Patent

The '593 patent is titled "Mechanism for Identifying and Penalizing Misbehaving Flows in a Network," and the application that led to this patent was filed on December 22, 2004. Ex. 1001, codes (54), (22).

The Specification begins by explaining that "peer-to-peer (P2P) traffic on the Internet has grown immensely in recent years . . . despite the fact that the number of P2P users is quite small." Ex. 1001, 1:7–13. As a result, this traffic uses a disproportionate amount of bandwidth, so it is viewed by Internet service providers as "abusive/misbehaving traffic that should be controlled and penalized." *Id.* at 1:14–18. Previously, P2P traffic could be

---

[6] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. § 103 effective March 16, 2013. Because the challenged patent was filed before March 16, 2013, we refer to the pre-AIA version of § 103.

[7] US 7,664,048 B1, filed Nov. 24, 2003, issued Feb. 16, 2010 (Ex. 1005).

[8] US 7,185,368 B2, filed Nov. 30, 2001, issued Feb. 27, 2007 (Ex. 1007).

[9] "Four Steps to Application Performance Across the Network with Packeteer's PacketShaper®," *retrieved from* https://web.archive.org/web/20030317051910/http://packeteer.com/PDF_files/4steps.pdf (Ex. 1006).

IPR2021-00909
Patent 8,243,593 B2

identified by port numbers or signatures, but the '593 patent explains that protocols evolved to evade these identification techniques. *Id.* at 1:19–45.

The '593 patent addresses this problem by identifying P2P traffic (and other "misbehaving information packet flows"[10]) using its "observed behavior," which "cannot be hidden." Ex. 1001, 1:46–67. Specifically, the Specification describes a method that: (1) maintains "behavioral statistics" for a flow, (2) determines whether the flow is "exhibiting undesirable behavior" based on the statistics, and (3) if so, enforces a penalty on the flow. *Id.* at 2:1–51; *see also id.* at Fig. 3. The "behavioral statistics" of a flow include, for example:

> a total byte count (sum of all of the bytes in all of the packets of the flow that have been processed up to the current time), a life duration (how long the flow has been in existence since inception), a flow rate (derived by dividing the total byte count by the life duration of the flow), and an average packet size (derived by dividing the total byte count by the total number of packets in the flow that have been processed).

*Id.* at 2:6–13; *see id.* at Fig. 4, 7:20–29 (describing example flow block storing behavioral statistics). The method may involve computing a "badness factor," which "provides an indication as to whether the flow is exhibiting undesirable behavior" and may also indicate "the degree to which the flow is misbehaving." *Id.* at 2:20–26; *see id.* at 7:54–65 (exemplary badness factor calculation). The penalty that is enforced on the flow may be "an increased drop rate," which may have the effect of correcting the flow's

---

[10] "For purposes of the present invention, a flow is a series of packets that are related in some manner." Ex. 1001, 5:16–17. The header of a packet is used to associate it with a particular flow. *Id.* at 5:17–24; *see id.* at 7:3–13.

6

IPR2021-00909
Patent 8,243,593 B2

behavior. *Id.* at 2:27–51; *see id.* at 9:52–10:3 (explaining how dropping a packet can correct a flow's behavior).

## II. ANALYSIS OF PATENTABILITY

### A. Legal Standards

In an *inter partes* review, the petitioner has the burden of proving unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e). That burden never shifts to the patentee. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The legal question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of obviousness or nonobviousness.[11] *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966). One seeking to establish obviousness based on more than one reference also must articulate sufficient reasoning with rational underpinnings to combine teachings. *See KSR*, 550 U.S. at 418.

---

[11] The record does not include allegations or evidence of objective indicia of obviousness or nonobviousness.

IPR2021-00909
Patent 8,243,593 B2

### B. The Level of Ordinary Skill in the Art

Our reviewing court has explained that "the level of skill in the art is a prism or lens through which a judge, jury, or the Board views the prior art and the claimed invention." *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (citing *Al-Site Corp. v. VSI International, Inc.*, 174 F.3d 1308, 1324, (Fed. Cir. 1999)). "This reference point prevents these factfinders from using their own insight or, worse yet, hindsight, to gauge obviousness." *Id.*

Petitioner asserts that the level of ordinary skill in the art corresponds to "an undergraduate degree (or equivalent) in electrical engineering, computer science, or comparable subject" and "3–5 years of academic or industry experience in computer networking or comparable industry experience." Pet. 11 (citing Ex. 1003 ¶ 27). In the Institution Decision, we adopted this articulation of the level of ordinary skill. Inst. Dec. 15. At trial, neither party disputed our preliminary finding. *See* PO Resp.; Pet. Reply.

We remain persuaded that this articulation of the level of skill in the art is supported by the '593 patent, the asserted prior art, and Dr. Jeffay's testimony. *See* Inst. Dec. 15 (citing Ex. 1003 ¶ 27). Accordingly, we determine that the level of ordinary skill in the art corresponds to an undergraduate degree (or equivalent) in electrical engineering, computer science, or comparable subject and 3–5 years of academic or industry experience in computer networking or comparable industry experience.

### C. Claim Construction

We interpret claim terms using "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under the principles set forth by

IPR2021-00909
Patent 8,243,593 B2

our reviewing court, the "words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

### 1. Means-plus-function limitations

Petitioner contends the challenged claims include means-plus-function limitations that should be interpreted under 35 U.S.C. § 112 ¶ 6, and for each, Petitioner identifies a construction for use in this proceeding. Pet. 11–14.[12] Petitioner submits that no other terms require construction for purposes of this proceeding. *Id.* at 12.

In the Institution Decision, we agreed with Petitioner that the identified limitations are means-plus-function limitations. Inst. Dec. 16 (citing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (en banc) (holding that "use of the word 'means' creates a presumption that § 112, ¶ 6 applies")). We also stated that we were persuaded that Petitioner had correctly identified the recited functions and the components in the Specification that perform those functions. *Id.* at 16–17. As a result, we preliminarily adopted the following constructions:

| Limitation | Function | Structure |
|---|---|---|
| "means for maintaining a set of behavioral statistics for the flow…" (claim 29) | maintaining a set of behavioral statistics for the flow | MFM 210 implemented on processors |

---

[12] The Petition also contends that claims 25 and 27 include means-plus-function limitations that should be interpreted under 35 U.S.C. § 112 ¶ 6 (Pet. 11–14); however, those claims have been disclaimed and are no longer part of this proceeding, so we do not address those limitations here.

9

IPR2021-00909
Patent 8,243,593 B2

| Limitation | Function | Structure |
|---|---|---|
| "means for computing…a badness factor for the flow" (claim 29) | computing a badness factor for a flow | MFM 210 implemented on processors |
| "means for determining…a penalty to impose on the flow" (claim 31) | determining a penalty to impose on a flow | MFM 210 implemented on processors |
| "means for enforcing…[a/the] penalty on the flow" (claim 32) | enforcing a penalty on the flow | MFM 210 implemented on processors |
| "means for determining an increased drop rate to impose on one or more information packets belonging to the flow" (claim 37) | determining an increased drop rate to impose on one or more information packets belonging to a flow | MFM 210 implemented on processors |
| "means for imposing [an/the] increased drop rate on the flow" (claim 38) | imposing an increased drop rate on a flow | MFM 210 implemented on processors |
| "means for receiving a particular information packet belonging to the flow" (claims 43 and 44) | receiving a particular information packet belonging to a flow | MFM 210 implemented on processors |
| "means for determining whether to forward the particular information packet to a destination" (claim 43) | determining whether to forward a particular information packet to a destination | MFM 210 implemented on processors |
| "means for updating […] the set of behavioral statistics to reflect processing of the particular information packet" (claims 43 and 44) | updating the set of behavioral statistics to reflect processing of the particular information packet | MFM 210 implemented on processors |

*Id.* at 17–18.

10

IPR2021-00909
Patent 8,243,593 B2

At trial, neither party disputes any of our preliminary claim constructions. *See* PO Resp.; Pet. Reply; *see also* Inst. Dec. 18 (instructing the parties to "directly address any claim construction adopted in [the Institution Decision] if the party contends we should not adopt that construction in the final written decision"). Accordingly, for the reasons explained above and in the Institution Decision, we adopt these undisputed constructions for purposes of this Decision.

### 2. "a badness factor for the flow"

Patent Owner contends that claims 9 and 29 both "recite computing a 'badness factor' for ***each*** flow." PO Resp. 23. According to Patent Owner, these claims should be construed to include this requirement because the Specification only describes embodiments that compute a badness factor "for each flow regardless of whether the flow is misbehaving." PO Resp. 23 (citing Ex. 1001, 6:25–31, 7:51–52, 8:12–17); *see also* PO Sur-reply 17–18 (arguing "there is not a single embodiment hinting that the badness factor is computed for only some flows").

However, as we previously explained, Patent Owner's argument is not commensurate with language of the claim:

> In particular, claim 9 recites a method for processing *a flow* that includes computing a badness factor for *the flow*. Ex. 1001, 11:63–8. Patent Owner identifies (and we perceive) no limitation that requires a badness factor to be computed for *each flow*.

Inst. Dec. 44 (addressing substantially similar argument presented in preliminary response); *see also* Ex. 1001, 13:32–44 (claim 29). During trial, Patent Owner neither responds to this analysis nor points to a claim limitation that allegedly includes this requirement.

11

Appx11

IPR2021-00909
Patent 8,243,593 B2

Instead, Patent Owner points to the Specification, but this also fails to support Patent Owner's contention. Although claims are read in view of the Specification (*Phillips*, 415 F.3d at 1315), they are not limited to the embodiments disclosed in it (*id.* at 1323). Patent Owner identifies (and we perceive) no passage in the Specification that could be read as redefining this claim phrase or disavowing part of its scope. *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365, 1367 (Fed. Cir. 2012). In fact, the passages cited by Patent Owner are directed to the handling of a *single flow*, and none expressly indicates that an identical method must be used for each flow processed. *See* Ex. 1001, 6:25–31, 7:51–52, 8:12–17. Thus, we determine that the Specification does not justify importing the limitation proposed by Patent Owner into the claims.

Accordingly, having reviewed the intrinsic record, we disagree with Patent Owner's contention that claims 9 and 29 require computing a badness factor for each flow or all flows; rather, this claim limitation may be satisfied by computing a badness factor for a single flow.

### 3. Other constructions

The parties do not propose constructions for any other terms or phrases. *See* Pet. 11–14; PO Resp. Based on the record before us, we do not find it necessary to provide express claim constructions for any other terms or phrases. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

IPR2021-00909
Patent 8,243,593 B2

### D. Summary of Asserted Prior Art References

#### 1. Yung (Ex. 1005)

Yung is titled "Heuristic Behavior Pattern Matching of Data Flows in Enhanced Network Traffic Classification." Ex. 1005.

Yung classifies data flows by comparing them to "known application behavior patterns." Ex. 1005, Abstract. According to Yung, its technique allows for classification of encrypted, compressed, or proprietary network traffic. *Id.* at 5:43–6:1; *see id.* at 4:43–60 (noting that peer-to-peer applications employ encryption and compression to obscure identification). For each flow, Yung stores a data block object (also called a flow object) that includes "various attributes of the flow," such as "packet count, byte count, first packet time, last packet time, etc." *Id.* at 8:5–11, 17:42–52, 25:8–11. Yung uses the data block object to classify the data flow. *E.g., id.* at 24:13–18, 24:27–51. Yung may also enforce bandwidth utilization controls on the flow, such as a discard policy that causes packets to be dropped. *E.g., id.* at 19:53–58, 20:13–15, 24:63–25:1.

Figure 3 (reproduced below) is a block diagram of an exemplary bandwidth management device 130 that implements Yung's techniques. Ex. 1005, 6:21–23, 16:8–10.

13



## Fig._3

Figure 3 (above) shows bandwidth management device 130 that includes packet processor 131, flow control module 132, and traffic classification engine 137. Yung explains that packet processor 131 detects new data flows and "construct[s] data structures including attributes characterizing the data flow." *Id.* at 16:15–17, 17:42–49. Flow control module 132 "enforce[s] bandwidth utilization controls on data flows traversing bandwidth management device 130." *Id.* at 16:17–19. Traffic classification engine 137 "analyze[s] data flow attributes and identif[ies] traffic classes corresponding to the data flows." *Id.* at 16:20–22.

Figure 7 (reproduced below) includes a flow chart of an exemplary method of bandwidth management device 130. Ex. 1005, 23:16–20.

14

IPR2021-00909
Patent 8,243,593 B2



Fig._7

As shown above, in Figure 7, packet processor 131 receives a data packet (step 202), determines whether a control block object already exists corresponding to the data flow (step 204), and if not, constructs a control block object for the flow (step 212). *Id.* at 23:23–30, Fig. 7. A traffic class may be identified (step 214), and ultimately, the packet is passed to flow

15

IPR2021-00909
Patent 8,243,593 B2

control module, which enforces appropriate bandwidth utilization controls on the data packet (step 222). *Id.* at 24:13–18, 24:63–25:1, Fig. 7. Finally, "packet processor 131 also records or updates various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.)" (step 224). *Id.* at 25:8–11, Fig. 7.

### 2. *Copeland (Ex. 1007)*

Copeland describes a "system for detecting intrusions in computer communication networks" by collecting and analyzing statistics for flows traversing the network. Ex. 1007, Abstract, 3:18–35. If a flow appears suspicious, Copeland assigns a "concern index value" to the flow. *Id.* at Abstr., 3:32–35.

In particular, Copeland collects "information about and statistics associated with each flow" and stores this data in a flow data structure corresponding to that flow. Ex. 1007, 7:38–45, 16:12–30. The flow data structure includes, for example, the number of bytes, the number of packets, and time information (such as the time of the first packet and time of the last packet). *Id.* at 7:49–54, 16:37. Copeland analyzes the data to determine if the flow appears to be legitimate traffic or possible suspicious activity. *Id.* at 7:55–57. If a flow appears suspicious, Copeland assigns a concern index (CI) value that "[has] been derived heuristically from extensive network traffic analysis." *Id.* at 7:57–62. In Figure 6, Copeland provides a table with an exemplary set of concern index values for various events. *Id.* at 7:64–67, 18:19–20. Petitioner annotates this table to show that Copeland describes using the number of packets as a concern index value. Pet. 51. Petitioner's annotation is reproduced below.

16

IPR2021-00909
Patent 8,243,593 B2

**TABLE I**

| NAME | POTENTIAL INTRUDER | RESPONSE | CI VALUE |
|------|--------------------|----------|----------|
| POTENTIAL TCP PROBE | TCP PACKETS | RESET PACKETS | NUMBER OF PACKETS |
| POTENTIAL UDP PROBE | UDP PACKEST | ICMP PORT UNAVAILABLEPCKETS | NUMBER OF ICMP PORT UNAVAILABLE PACKETS |
| HALF-OPEN ATTACK | HIGH NUMBER AND RATE OF SYNS | SYN-ACKS | 5000+501 PER SYN-ACK |
| TCP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | RESETS | 8000+1010 PER PORT OVER 4 |
| UDP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | NOTHING OR ICMP PORT UNAVAILABLE | 8000+1010 PER PORT OVER 4 |

**FLOW-BASED CI VALUES**

Copeland's Figure 6 illustrates concern index values for client/server flows.
Ex. 1007, 4:8–9. As shown above, Petitioner annotates the first row of the
table in Figure 6: in the "NAME" column, Petitioner places a red box
around the first entry, which states "POTENTIAL TCP PROBE," and
Petitioner places a green box in the same row of the "CI VALUE" column,
where the entry states "NUMBER OF PACKETS."

### 3. Four-Steps Whitepaper (Ex. 1006)

The Four-Steps Whitepaper is a technical product overview for the
PacketShaper® product line from Packeteer, Inc. Ex. 1006, 1. This
document describes a bandwidth-management strategy that: (1) classifies
network traffic; (2) analyzes traffic; (3) controls traffic; and (4) reports
results. Id. at 2. In the second step, PacketShaper collects measurements
regarding traffic flows, including "[t]hroughput in units of bytes, packets,
transactions, connections," "[c]ounts and percentages of retransmitted,
received, tossed, dropped, and good TCP packets," and "[c]ounts and
percentages of TCP connections that were denied by a policy." Id. at 18.

17

IPR2021-00909
Patent 8,243,593 B2

### E. Obviousness Ground Based on Yung and Copeland

Petitioner contends that the subject matter of claims 9–13, 19–24, 29–33, and 39–44 would have been obvious over the combination of Yung and Copeland.  Pet. 43–61.

Patent Owner argues that Petitioner fails to show a "badness factor" for each flow, which Patent Owner contends is required by the independent claims (PO Resp. 16–24), and fails to articulate a sufficient rationale to combine Yung and Copeland (*id.* at 24–28).[13]

### 1. Independent claim 9

> "A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising . . . ."

Petitioner contends that Yung discloses the preamble of claim 9.  Pet. 48 (citing *id.* at 19–21 (discussing preamble of claim 1)).  In particular, Petitioner points to Figure 7 of Yung, which depicts a "method directed to enforcing bandwidth utilization controls on data flows."  *Id.* at 19 (quoting Ex. 1005, 6:35–36).  Petitioner contends that this method processes a flow, such as TCP/IP network data traffic, which is composed of a plurality of packets.  *Id.* at 19–20 (citing Ex. 1005, 2:58–61, 8:3–5, 11:60–62, 12:30–35, 24:13–18, 24:63–25:1, Fig. 7; Ex. 1003 ¶ 120).  Petitioner further contends

---

[13]  Patent Owner has forfeited any arguments for patentability not raised in Patent Owner Response (Paper 30), even if the argument was raised in the Preliminary Response (Paper 8).  Paper 17 (Scheduling Order), 8 (cautioning Patent Owner that "any arguments not raised in the response may be deemed waived"); *see also In re NuVasive, Inc.*, 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding patent owner waived an argument addressed in the preliminary response by not raising it in the patent owner response).

IPR2021-00909
Patent 8,243,593 B2

that the method is implemented by a machine (e.g., a bandwidth management device or a gateway). *Id.* at 21 (citing Ex. 1005, 6:8–11, 7:12–18, 15:44–47, Fig. 2).

Patent Owner does not dispute these contentions. *See* PO Resp.

We are persuaded that Yung discloses the preamble of this claim.[14] Yung describes a method for processing a flow that includes a series of data packets. *E.g.*, Ex. 1005, Abstr., 12:30–35, 24:13–18, Fig. 7; *see also id.* at 2:58–61.

> *"maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion"*

Petitioner contends that Yung discloses this limitation. Pet. 48 (citing *id.* at 21–30 (discussing limitations in claim 1); Ex. 1003 ¶ 207). In particular, Petitioner asserts that "Yung tracks 'various measurement values in [a] control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.),'" and Petitioner maps these values to the claimed "behavioral statistics for the flow." *Id.* at 25–26 (quoting Ex. 1005, 25:8–11; citing *id.* at 8:5–11, 9:5–8, 11:36–38, 12:4–6, 17:42–49, 25:8–11). Petitioner also asserts that Yung's packet processor 131 receives a data packet, passes it to the flow control module, and then updates the control block object's measurement values. *Id.* at 28–29 (quoting Ex. 1005, 25:8–11; citing *id.* at 25:11–15, Fig. 7 (steps 202, 222, 224)); *see id.* at 21–23

---

[14] Because Petitioner has shown that the recitations in the preamble are satisfied by Yung, we need not determine whether the preamble is limiting. *See Nidec Motor*, 868 F.3d at 1017.

IPR2021-00909
Patent 8,243,593 B2

(addressing creation of the control block object). Petitioner further asserts that Yung updates statistics for "each packet" because Yung provides aggregate statistics for the flow, such as total byte count and total packet count. *Id.* at 29 (citing Ex. 1003 ¶¶ 151–152; Ex. 1005, 25:11–15). Moreover, according to Petitioner, Yung continuously tracks these statistics, regardless of the presence of absence of congestion, and in any event, it would have been obvious to do so to allow for traffic classification in all situations. *Id.* at 27 (citing Ex. 1005, Abstr., 9:21–25, 25:11–15, Fig. 7; Ex. 1003 ¶¶ 147–148); *see also id.* at 30.

Patent Owner does not dispute these contentions. *See* PO Resp.

We are persuaded that Yung discloses this limitation. Yung's packet processor 131 receives a data packet, identifies (or constructs) a corresponding control block object, and passes the packet to a rate control module that enforces bandwidth utilization controls on the data packet flow. Ex. 1005, 23:23–30, 24:11–13, 24:63–25:1, Fig. 7. Packet processor 131 then "records or updates various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.)." *Id.* at 25:8–11, Fig. 7 (step 224). We are persuaded that an ordinary artisan would have understood Yung to update these values for "each" packet "regardless of the presence or absence of congestion," as required by the claim. *See* Ex. 1003 ¶¶ 147–148, 151–153; *see also id.* ¶ 207. In particular, Dr. Jeffay testifies that "Yung would not be able to leverage/provide the aggregate statistics (e.g., total byte count, total packet count) if the statistics were not updated as each packet belonging to said flow is processed" or were stored "only when congestion arises." *Id.* ¶¶ 148,

20

IPR2021-00909
Patent 8,243,593 B2

151 (emphasis omitted). We credit Dr. Jeffay's testimony on this point because he provides a logical explanation that is supported by the reference.

> *"computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior"*

Petitioner contends that Copeland discloses this limitation. Pet. 49–51. Specifically, Petitioner points to Copeland's "concern index" (CI)—a value assigned to a flow that appears to be suspicious—as the claimed "badness factor." *Id.* at 49 (citing Ex. 1007, 3:31–35, 18:15–19, 26:22–27). Petitioner asserts that "Copeland's CI value indicates whether the flow exhibits 'suspicious activity,'" which is undesirable behavior. *Id.* at 49–50 (quoting Ex. 1007, 7:55–61; citing *id.* at 18:4–13; Ex. 1003 ¶ 212). Petitioner further asserts that Copeland computes the CI value based on statistics associated with a flow, noting that the CI value may be set to the number of packets, for example, as shown by the first row of Table I in Figure 6. *Id.* at 50 (citing Ex. 1007, 7:40–42, 10:45–47, Figs. 1, 6; Ex. 1003 ¶ 213).

Patent Owner presents several arguments regarding this limitation. *See* PO Resp. 16–24. First, Patent Owner argues that Petitioner fails to show the claimed "badness factor." *Id.* at 16–20. Patent Owner asserts that Petitioner's evidence on this point is insufficient and that Dr. Jeffay's testimony is entitled to no weight because he fails to substantiate his opinion. *Id.* at 17, 19–20 (citing Ex. 1003 ¶ 210; Ex. 2007, 35:17–36:15). In addition, Patent Owner asserts that Petitioner's showing is deficient because, in a parallel district court proceeding, Petitioner contends that the term "badness factor" is indefinite and "Petitioner cannot maintain that a

21

IPR2021-00909
Patent 8,243,593 B2

claim is both indefinite and rendered obvious." *Id.* at 18 (citing Ex. 2009, 28–32; *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010)).

Patent Owner also argues that Copeland fails to disclose the claimed "badness factor." PO Resp. 20–22. Patent Owner argues that "Copeland's concern index is for 'suspicious activity' [indicative of an intruder] in contrast to legitimate traffic," where the claimed "'badness factor' is concerned with 'undesirable' behavior or 'misbehavior' associated with P2P traffic, which . . . is ***not*** necessarily suspicious or non-suspicious." *Id.* at 20–21 (citing Ex. 1001, 1:10–18, 2:18–21; Ex. 1007, Abstr., 1:45–48). Further, Patent Owner asserts that "Copeland's 'concern index' is concerned with suspicious behavior of a host, not undesirable behavior of a flow," which "is a different criterion than badness." *Id.* at 21–22.

In addition, Patent Owner contends that Copeland only assigns a concern index to suspicious flows, but claim 9 "recite[s] computing a 'badness factor' for ***each*** flow." PO Resp. 22–23 (citing Ex. 1007, 7:57–61, 8:1–5, 10:46–7, 14:49–55, 17:58–61, Fig. 6).

Having considered the parties' arguments and evidence, we are persuaded that Copeland discloses this limitation. Copeland analyzes a flow's statistics (including start time, end time, number of bytes, and number of packets) "to determine if the flow appears to be legitimate traffic or possible suspicious activity" and computes a concern index for the flow if it appears suspicious. *E.g.*, Ex. 1007, 3:31–35, 7:38–67, 16:36–17:5. We find that Copeland's concern index qualifies as a "badness factor for the flow . . . [that] provides an indication of whether the flow is exhibiting undesirable behavior," as required by claim 9. *E.g.*, Ex. 1007, 3:31–40, 4:30–33, Fig. 1

22

IPR2021-00909
Patent 8,243,593 B2

(identifying "'bad' flow(s)"). As Dr. Jeffay explains, an ordinary artisan would have understood that suspicious activity (such as a probe or network attack) is undesirable behavior. Ex. 1003 ¶¶ 211–212. We also find that Copeland teaches computing a concern index "based at least partially upon the set of behavioral statistics" because, for example, it uses the number of packets to compute the concern index. Ex. 1007, 7:64–67, Fig. 6 (setting concern index to number of packets); *see also* Ex. 1003 ¶ 213.

We disagree with Patent Owner's arguments that Petitioner fails to make a sufficient showing for the claimed "badness factor." *See* PO Resp. 16–20. Patent Owner challenges the sufficiency of one conclusion sentence from Dr. Jeffay's testimony (*see* PO Resp. 17, 19–20), but we credit Dr. Jeffay's testimony (including that conclusion) because the surrounding sentences provide a detailed and logical explanation that is consistent with the cited reference. *See* Ex. 1003 ¶¶ 208–214; *see also* Pet. Reply 2–3.[15] Also, Petitioner's indefiniteness argument from another proceeding does not undermine Petitioner's showing here. *See* PO Resp. 18–19; Pet. Reply 4–7. In this proceeding, Petitioner contends that Copeland discloses the claimed "badness factor" (*see* Pet. 49–51), and in district court litigation, Petitioner contends that this term is indefinite because its *scope* is not sufficiently clear (Ex. 2009, 28–29 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir.

---

[15] Moreover, even without Dr. Jeffay's testimony, we would have found that Copeland's concern index qualifies as a "badness factor" based on Copeland's disclosure. *See, e.g.*, Ex. 1007, 3:31–40, 4:30–38, 7:38–67, 16:36–17:5, Fig. 1 (identifying "'bad' flow(s)"), Fig. 6 (concern index).

23

IPR2021-00909
Patent 8,243,593 B2

2005))).  These positions are not in conflict,[16] and Patent Owner's reliance
on *Enzo* is misplaced.  *See Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
948 F.3d 1342, 1355 n.5 (Fed. Cir. 2020) (distinguishing *Enzo* from a
situation involving *IPXL*-type indefiniteness); *see also* Pet. Reply 5 n.5
(explaining that *Enzo* was based on prior indefiniteness standard).
Moreover, we can (and do) evaluate Petitioner's contentions in this
proceeding because, whether or not the scope of the term "badness factor" is
ambiguous, Copeland discloses it.  *See Intel Corp. v. Qualcomm Inc.*, 21
F.4th 801, 813 (Fed. Cir. 2021) ("[I]t is not always impossible to adjudicate
a prior-art challenge, one way or the other, just because some aspect of a
claim renders the claim indefinite.").

In addition, Patent Owner's arguments that Copeland fails to teach the
claimed "badness factor" (*see* PO Resp. 20–22) are unavailing.  As we
explained, the salient question "is whether Copeland's concern index
discloses the claimed 'badness factor'—in other words, whether . . .
Copeland's suspicious activity is 'undesirable' behavior, not whether the
claimed 'undesirable' behavior is suspicious."  Inst. Dec. 44.  Patent Owner
does not address this question, focusing instead on whether the claimed
"badness factor" is "necessarily suspicious" (PO Resp. 20–21), but this
argument is inapposite.  In particular, even though we agree that the claimed
"badness factor" is not "necessarily suspicious," this does not help Patent
Owner.  At most, Patent Owner shows the scope of the claim is *broader* than

---

[16]  Similarly, Dr. Jeffay's testimony that an ordinary artisan would not
"understand what the bounds of the term mean" (Ex. 2007, 35:17–36:7
(*quoted by* PO Resp. 19)) does not conflict with his testimony that Copeland
discloses this limitation.

Appx24

IPR2021-00909
Patent 8,243,593 B2

Copeland's disclosure because the claimed "badness factor" does not need to be associated with suspicious activity. But the issue is not whether the "badness factor" qualifies as a concern index, but instead whether the concern index qualifies as a "badness factor." We find that it does. Copeland's concern index provides an indication of whether a flow is exhibiting undesirable behavior (*cf.* PO Resp. 20–21 ("Copeland's concern index is thus concerned with identifying malicious activity such as an external intruder.")), and it does not matter that this undesirable behavior is also suspicious. Moreover, Patent Owner's argument that "Copeland's 'concern index' is concerned with suspicious behavior of a host" (PO Resp. 21–22) is also unavailing. While Copeland *also* associates a concern index with a host (*e.g.*, Ex. 1007, 7:18–21), Petitioner relies upon its disclosure of a concern index assigned to a flow (*e.g.*, *id.* at Abstr. ("A concern index value is *assigned to each flow* that appears suspicious." (emphasis added))).

Finally, Patent Owner's argument that Copeland only assigns the concern index to suspicious flows, not "***each*** flow" (*see* PO Resp. 22–23; PO Sur-reply 17–20) is unavailing. As explained above (*see supra* § II.C.2), the claim includes no requirement that the "badness factor" be computed for each and every flow, and "a prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention." *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003).

### Rationale to Combine Yung and Copeland

Petitioner contends that a person of ordinary skill in the art would have been motivated to incorporate Copeland's flow-based CI value into

25

Appx25

Yung's bandwidth management device.  Pet. 45–48.  Petitioner notes that
Yung expressly contemplates incorporating "other factors" into its process,
and Petitioner argues that an ordinary artisan "would have sought to classify
traffic behaving suspiciously or disruptively."  *Id.* at 45 (citing Ex. 1005,
10:43–58, 11:59–60; Ex. 1003 ¶¶ 198–200).  According to Petitioner, an
ordinary artisan would have recognized that incorporating Copeland's
technique would enhance Yung's ability to identify and control unauthorized
traffic such as network attacks and probes, which were known concerns,
while obviating the need for an administrator to understand the intricate
nature of network attacks.  *Id.* at 45–47 (citing Ex. 1005, 2:31–34, 4:43–47,
19:58–61; Ex. 1007, 8:33–44; Ex. 1003 ¶¶ 199–202); *see also id.* at 49
(asserting that "Copeland tracks behavioral statistics about network flows
(e.g., start time, end time, number of bytes, and packet count)" (citing
Ex. 1007, 16:45–60)).  Petitioner also asserts that a person of ordinary skill
in the art would have had a reasonable expectation of success in combining
the references.  *Id.* at 47–48 (citing Ex. 1003 ¶¶ 203–204; Ex. 1005, 7:5–1,
Figs. 2–3; Ex. 1007, Figs. 1–2).

Patent Owner argues that Petitioner's rationale to combine the
references is insufficient.  PO Resp. 24–28.  Patent Owner contends that the
Petition is premised on an erroneous assumption that Yung expressly
motivates the combination by saying that it "can incorporate other factors."
*Id.* at 24–26 (quoting Ex. 1005, 11:59–60; citing Pet. 45–46; Ex. 1005,
10:43–58; Ex. 1003 ¶ 196; Ex. 1007, 3:45–54, Abstr.; Ex. 2007, 38:11–18).
Patent Owner further contends that Copeland's flow data structure fields are
"obtained from packet headers, not flow-based behavioral statistics."  *Id.* at
26–27 (citing Ex. 1007, 16:45–60, 15:50–55; Ex. 2007, 40:19–41:10, 42:12–

IPR2021-00909
Patent 8,243,593 B2

43:3).  Finally, Patent Owner contends that the Petition fails to address the fact that "Copeland and Yung are directed to two very different inventions." *Id.* at 27–28 (citing Ex. 1007, 3:38–39, 3:45–47; Ex. 1005, 2:24–27).

Having considered the parties' arguments and evidence, we are persuaded that a person of ordinary skill in the art would have been motivated to combine Copeland's flow-based CI value into Yung's bandwidth management device.  *See* Pet. 45–48; *KSR*, 550 U.S. at 420 ("[A]ny need or problem known in the field of endeavor at the time of invention . . . can provide a reason for combining the elements in the manner claimed.").

Yung seeks to limit the bandwidth used by "bandwidth-intensive applications, such as peer-to-peer applications . . . and/or other unauthorized applications" (Ex. 1005, 4:43–47; *see also id.* at 2:31–34), and to that end, Yung describes particular techniques or factors for classifying a flow, while noting that other factors can also be used (*id.* at 10:43–58, 11:59–60). Copeland seeks to prevent a type of unauthorized use—specifically, intruders—and it analyzes flows to determine if they have the characteristics of probes or attacks.  Ex. 1007, 4:30–33.  Both Yung and Copeland analyze traffic flows and track flow statistics, such as the number of bytes and the packet count.  *See* Ex. 1005, 25:8–11; Ex. 1007, 8:33–44, 16:45–60.

Dr. Jeffay testifies that "[n]etwork attacks and intrusions were a recognized problem during the relevant time frame," and a person of ordinary skill in the art would have been concerned by these attacks, including the flooding attacks addressed by Copeland.  Ex. 1003 ¶¶ 199–200; *see also* Ex. 1007, 1:64–65.  He further testifies that an ordinary artisan would have recognized that incorporating Copeland's CI value would

27

IPR2021-00909
Patent 8,243,593 B2

enhance Yung's device's ability to identify and control certain types of traffic (Ex. 1003 ¶ 198), he testifies that the ordinary artisan would have recognized the combination's benefits (*id.* ¶¶ 201–202), and he testifies that the ordinary artisan would have had a reasonable expectation of success (*id.* ¶ 203). In addition, Dr. Jeffay provides additional details regarding the specific alterations that would be required to combine the references, and he explains that these changes would be within the level of skill of a person of ordinary skill in the art. *Id.* ¶¶ 203–204. We credit Dr. Jeffay's testimony because it is logical, detailed, and supported by cited evidence. In addition, we perceive no evidence contradicting his testimony on these points.

We disagree with Patent Owner's argument that Petitioner's rationale to combine Yung and Copeland is premised on an erroneous assumption that Yung expressly motivates the combination. *See* PO Resp. 24–25 (arguing that the "alleged motivation to combine Yung and Copeland stems (entirely) from Yung's statement that its 'application behavior pattern can incorporate other factors as well'"). Petitioner contends that an ordinary artisan would have been motivated to make the combination "based on Yung's express disclosure" (Pet. 45; *see* Ex. 1003 ¶ 196), and Petitioner *also* contends that an ordinary artisan would have been motivated to combine Copeland with Yung to solve a known problem (Pet. 45–47; *see* Ex. 1003 ¶¶ 198–202). *See also* Pet. Reply 9–10. As explained above, we find the latter rationale persuasive.[17] Also, contrary to Patent Owner's assessment (*see* PO Resp. 25

---

[17] Patent Owner chose not to address this rationale, despite our previous explanation of reliance upon it. *See* Inst. Dec. 41–42 (summarizing rationale), 45–46 (explaining why it shows a reasonable likelihood of success). For clarification, we do not find that: Yung expressly suggests the combination, or Yung's reference to "other factors" alone would have

28

& n.6), Dr. Jeffay's deposition testimony confirms our understanding of Petitioner's contentions. *See* Ex. 2007, 38:11–18 (agreeing with Patent Owner's summary of paragraph 196 and clarifying that "the full picture of the motivation to combine is developed over the following several pages" of the declaration).

Moreover, Patent Owner's contentions that Copeland collects data from packet headers (*see* PO Resp. 25–27) are unavailing. In particular, we disagree with Patent Owner's assumption that "behavioral statistics" cannot be based on information obtained from packet headers. *See id.* Patent Owner does not propose a construction for the term "behavioral statistics" that would prohibit using any information from a packet header, and we discern no support for such a construction. *Cf.* Ex. 1001, 5:15–21 (using packet's header to identify corresponding flow), 6:10–24 (imposing no such requirement on the behavioral statistics), 10:33–34 (different claim requiring "payload-content-agnostic behavioral statistics"). Indeed, as we previously explained (*see* Inst. Dec. 46), Copeland's statistics include the number of bytes and packets for a flow, and the '593 patent states that these are behavioral statistics. Ex. 1007, 3:18–35, 16:56–57; Ex. 1001, 7:18–29, Fig. 4; *see also* Ex. 2007, 42:12–20 (testifying that an ordinary artisan "would understand that Copeland is using behavioral statistics").[18] As a

_____

motivated an ordinary artisan. *See* Pet. 45. Instead, we find that an ordinary artisan would have been motivated to add Copeland to Yung to solve a known problem. *See id.* at 45–47.

[18] We disagree with Patent Owner's allegation that Dr. Jeffay "retreated from [his] initial position" during his deposition (PO Resp. 27); instead, Dr. Jeffay provided additional testimony regarding an ordinary artisan's understanding of Copeland (*see* Ex. 2007, 42:21–43:8). However, we do not rely on the additional testimony because it advances a contention different

IPR2021-00909
Patent 8,243,593 B2

result, we find that Copeland's statistics (such as the number of bytes and packets for a flow) qualify as "behavioral statistics."

In addition, Patent Owner's argument that "Copeland's concern index (CI) value is not a behavioral attribute" (PO Resp. 25–26; PO Sur-reply 21) is misplaced because Petitioner maps Copeland's concern index to the claimed "badness factor," not to the "behavioral statistics" required by the claim (*see* Pet. 49–51).

Finally, Patent Owner's argument that Copeland and Yung are directed to different inventions (*see* PO Resp. 26–28) is unavailing.[19] Although Yung and Copeland identify different goals, this difference does not undercut Petitioner's rationale to combine these references. Indeed, these references are not limited to their invention, but are prior art for all they disclose. *See KSR*, 550 U.S. at 420–21 (explaining that an ordinary artisan would not ignore a reference simply because its "primary purpose" was different); *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006) ("[T]he teaching of [a reference] is not limited to the specific invention disclosed.").

*Conclusion*

As explained above, Petitioner has shown that each limitation of independent claim 9 is disclosed by either Yung or Copeland. In addition,

---

than the Petition. *Compare* Pet. 50 (contending Copeland discloses use of behavioral statistics), *with* Ex. 2007, 42:21–43:8 (contending "there's nothing in Copeland to prevent you from using behavioral statistics").

[19] In the Institution Decision, we responded to an identical argument by stating that "Patent Owner does not sufficiently explain why the differences it identifies are relevant to Petitioner's proposed combination." Inst. Dec. 47 (citing Prelim. Resp. 42); *compare* PO Resp. 27–28, *with* Prelim. Resp. 42. Patent Owner did not provide any additional explanation in its Response.

30

IPR2021-00909
Patent 8,243,593 B2

Petitioner has shown that a person of ordinary skill in the art would have been motivated to combine Yung and Copeland, as proposed.

Accordingly, we conclude that Petitioner has shown, by a preponderance of the evidence, that the subject matter of claim 9 would have been obvious over Yung and Copeland.

### 2. Independent claim 29

Independent claim 29 includes means-plus-function limitations that recite functions commensurate with the limitations of independent claim 9. *Compare* Ex. 1001, 13:32–44 (claim 29), *with id.* at 11:63–12:8 (claim 9).

Petitioner contends that the subject matter of independent claim 29 would have been obvious over Yung and Copeland, and in support, Petitioner relies largely on its prior analysis for claim 9. *See* Pet. 51–52. Petitioner further contends that Yung's traffic monitoring module 75 performs the recited functions. *Id.* at 52 (citing Ex. 1005, 6:58–66).

Patent Owner responds with the same arguments discussed above for claim 9 (*see supra* § II.E.1); however, these arguments are unavailing for the reasons explained above.

Having considered the record, we are persuaded by Petitioner's undisputed arguments that Yung discloses the preamble[20] of claim 29 and the claimed "means for maintaining a set of behavioral statistics for the flow," for the reasons explained above. *See supra* § II.E.1 (discussing claim 9); Ex. 1005, 6:58–66. We are also persuaded that the combination of Yung

---

[20] Because Petitioner has shown that the recitations in the preamble are satisfied by Yung, we need not determine whether the preamble is limiting. *See Nidec Motor*, 868 F.3d at 1017.

31

IPR2021-00909
Patent 8,243,593 B2

and Copeland discloses the claimed "means for computing . . . a badness factor for the flow," and a person of ordinary skill in the art would have been motivated to combine these references as Petitioner proposes. *See supra* § II.E.1.

Accordingly, we conclude that Petitioner has shown, by a preponderance of the evidence, that the subject matter of claim 29 would have been obvious over Yung and Copeland.

### 3. Dependent claims 10–13, 19–24, 30–33, and 39–44

Claims 10–13 and 19–24 depend from independent claim 9. Ex. 1001, 12:9–19, 12:29–13:4. Claims 30–33 and 39–44 depend from independent claim 29. *Id.* at 13:45–55, 14:9–52.

Petitioner contends that the subject matter of these claims would have been obvious over the Yung-Copeland combination. Pet. 53–61. Patent Owner does not dispute these contentions.[21] *See* PO Resp. Having considered the record, we are persuaded that Petitioner has shown that each additionally-recited limitation of claims 10–13, 19–24, 30–33, and 39–44 is taught or suggested by the Yung-Copeland combination. Moreover, for the reasons explained above, we are persuaded that an ordinary artisan would have been motivated to combine these references as proposed. *See supra* § II.E.1.

---

[21] Patent Owner has forfeited any arguments directed specifically to these claims. *See* Paper 17, 8 ("Patent Owner is cautioned that any arguments not raised in the response may be deemed waived."); *see also In re NuVasive*, 842 F.3d at 1381.

32

IPR2021-00909
Patent 8,243,593 B2

As for claims 10 and 30, we are persuaded by Petitioner's undisputed arguments (*see* Pet. 53) that Copeland's concern index indicates a degree to which the flow is behaving undesirably. *E.g.*, Ex. 1007, 21:50–60, Fig. 6.

As for claims 11–12 and 31–32, we are persuaded by Petitioner's undisputed arguments. *See* Pet. 53–54 (citing *id.* at 33–34 (addressing claim 1)). Yung describes using bandwidth utilization controls to control a flow (and penalize it) (*e.g.*, Ex. 1005, 16:2–7, 19:52–20:18; Ex. 1003 ¶ 168), and Copeland determines whether to drop packets based on the concern index associated with a flow (and other flows associated with the same host) (*e.g.*, Ex. 1007, 19:15–30; Ex. 1003 ¶¶ 221–222).

As for claims 13 and 33, we are persuaded by Petitioner's undisputed arguments (*see* Pet. 54–55 (citing *id.* at 41 (addressing claim 6))) that dropping a flow's packets would cause the flow's concern index to drop, thereby causing the badness factor to improve (*see* Ex. 1003 ¶¶ 225–226).

As for claims 19–22 and 39–42, we are persuaded by Petitioner's undisputed arguments. *See* Pet. 55–58. Yung's control block object stores a byte count, first packet time, and last packet time for the flow (*e.g.*, Ex. 1005, 8:9–12; *see also* Ex. 1003 ¶¶ 227–228), and it would have been obvious to calculate the rate of information transfer from the flow, given Yung's description of rate policies, and average packet sizes, to reduce false identification of outliers in Yung's heuristic analysis (Ex. 1005, 7:60–65, 14:62–66, 18:56–60, 19:53–61, 19:64–66; Ex. 1003 ¶¶ 229–234).

As for claims 23–24 and 43–44, we are persuaded by Petitioner's undisputed arguments. *See* Pet. 58–61. Yung's packet processor 131 receives a data packet, passes the packet to flow control module 132 (which enforces bandwidth utilization controls, such as rate and discard policies,

Appx33

IPR2021-00909
Patent 8,243,593 B2

allowing it to determine whether to forward or drop the packet), and then in response to that determination, updates the appropriate values in the control block object associated with the flow. Ex. 1005, 20:10–15, 23:23–26, 24:63–25:1, 25:8–11, Figs. 2, 7; *see also* Ex. 1003 ¶¶ 237–238, 241.

Accordingly, we conclude that Petitioner has shown, by a preponderance of the evidence, that the subject matter of claims 10–13, 19–24, 30–33, and 39–44 would have been obvious over Yung and Copeland.

### F. Obviousness Ground Based on Yung Alone

Petitioner contends that the subject matter of claims 17, 18, 37, and 38 would have been obvious over Yung alone. Pet. 1, 42–43. Patent Owner contends that Petitioner fails to show that these claims would have been obvious over Yung. PO Resp. 12–14.

We agree with Patent Owner. *Accord* Inst. Dec. 38–39. Claims 17 and 18 depend (indirectly) from independent claim 9, and claims 37 and 38 depend (indirectly) from independent claim 29. Ex. 1001, 12:9–16, 12:29–39, 13:45–52, 14:9–20. Thus, each of these dependent claims includes the requirements of the respective independent claim, including the limitation requiring "computing . . . a badness factor for the flow." *Id.* at 12:5–6, 13:41–42. Petitioner fails to show that Yung teaches or suggests this limitation. *See* Pet. 42–43, 49–51. Consequently, Petitioner fails to demonstrate, by a preponderance of the evidence, that Yung alone renders obvious the subject matter recited in dependent claims 17, 18, 37, or 38.

But, given the nature of the Petition's defect regarding these claims, the Institution Decision "question[ed] whether [the Board] should consider the Petition to include a contention that the subject matter of claims 17, 18, 37, and 38 would have been obvious over the combination of Yung and

34

IPR2021-00909
Patent 8,243,593 B2

Copeland." Inst. Dec. 38–39. At trial, Patent Owner argues that the Board cannot and should not consider the Petition to include such a contention (PO Resp. 13–16; PO Sur-reply 3–15), and Petitioner argues the opposite (Pet. Reply 26–29).

Having considered these arguments, we decline to read the Petition to include a contention that claims 17, 18, 37, and 38 would have been obvious in light of Yung and Copeland.[22]

The Petition consistently contends that claims 17, 18, 37, and 38 would have been obvious in light of Yung alone. The summary table includes these claims in the Yung-only ground (Pet. 1); the organizational structure includes these claims in that ground (*id.* at ii–iii); and the substantive discussion of the claims refers to Yung and to other claims included in the Yung-only ground (*id.* at 42–43 (citing *id.* at 41–42)). Petitioner fails to identify (and we do not perceive) *any* portion of the Petition that can be read as affirmatively stating that these claims would

─────────────────────

[22] We determine whether the Petition raised this contention because it is the Petition, not our discretion, that guides the proceeding. *E.g.*, *Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir. 2018) ("It would . . . not be proper for the Board to deviate from the grounds in the petition and raise its own obviousness theory . . . ."); *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018) (The "petitioner's contentions . . . define the scope of the litigation all the way from institution through to conclusion." (quoting *SAS Institute, Inc. v. Iancu*, 138 S.Ct. 1348, 1357 (2018))); *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) ("[T]he Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond."). Although we can use "common sense and logic to understand the contentions presented in a petition despite typographical errors" (Pet. Reply 28; *see also* PO Sur-reply 13), we cannot add contentions to a petition.

IPR2021-00909
Patent 8,243,593 B2

have been obvious in light of Yung and Copeland.  *See* Pet.; Pet. Reply 26–29.  Consequently, we do not agree with Petitioner's contention that the omission of Copeland was a "typographical error."  Pet. Reply 26–27.  The problem is not an isolated typographical error (or two), but rather one that pervades the Petition.

Also, we are not persuaded by Petitioner's argument that the Petition "includes every argument necessary to show that claims  17, 18, 37, and 38 are obvious over the combination of Yung and Copeland."  Pet. Reply 28.  Although the Petition alleges all of the *facts* that would be necessary for such a contention, it does not allege the necessary conclusion.  Ultimately, the Petition never expressly contends that these claims would have been obvious in light of the combination of Yung and Copeland, so we decline to interpret the Petition as including such a contention.[23]

Two Federal Circuit decisions are instructive.  In *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330 (Fed. Cir. 2020), the petition included two contentions:  (1) the claims were anticipated by a reference (SMIL 1.0), and (2) the claims would have been obvious over SMIL 1.0 "in light of the *general knowledge* of the [skilled artisan]."  *Id.* at 1333–34 (alteration in original).  To support the second contention, the petition pointed to an expert declaration and a second reference (Hua) to show that a claimed element was well-known in the art and that a skilled artisan would have been motivated to combine that element with SMIL 1.0.  *Id.* at 1334.  The Board instituted review on the petition's two grounds and, "for clarity," also

---

[23]  Although Petitioner notified Patent Owner of its position shortly after the Institution Decision (*see* Pet. Reply 27 (citing Ex. 1102)), that notification is not probative of the contents of the Petition (*see* PO Resp. 16 n.5).

IPR2021-00909
Patent 8,243,593 B2

instituted on the ground that the claims "would have been obvious over SMIL 1.0 and Hua based on the arguments and evidence presented in the [p]etition." *Id.* The Federal Circuit held that this was error because petitioner "did not advance [a combination of SMIL 1.0 and Hua] in its petition." *Id.* at 1336. "Although the Board is not limited by the exact language of the petition, the Board does not 'enjoy[ ] a license to depart from the petition and institute a *different* inter partes review of his own design.'" *Id.* (second alteration in original) (citing *Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir. 2018); *SAS Inst. Inc. v. Iancu*, 138 S.Ct. 1348, 1356 (2018)).

Also, the Federal Circuit's recent non-precedential decision in *Apple Inc. v. MPH Technologies Oy* is directly on point. 2022 WL 4103286 (Fed. Cir. Sept. 8, 2022) (non-prec). In that proceeding, the petition contended that claim 5 of U.S. Patent No. 7,937,581 would have been obvious over three references (Ishiyama, Murakawa, and Ahonen), but the petition contended that some of claim 5's dependent claims (claims 6 and 7) would have been obvious over only two of those references (Ishiyama and Murakawa). *Id.* at \*3. The Board agreed with petitioner that claim 5 would have been obvious over the three-reference combination, but concluded that petitioner failed to meet its burden on claims 6 and 7 because Ahonen was not included in the ground challenging those claims. *Id.* Citing *Koninklijke Philips*, the Federal Circuit held that the Board "properly declined to consider Ahonen" in its evaluation of claims 6 and 7, explaining that "[t]he Board did not err by declining to consider arguments that [the petitioner] did not make." *Id.* at \*7.

37

Appx37

IPR2021-00909
Patent 8,243,593 B2

The instant proceeding includes the same factual scenario. The Petition alleges that independent claims 9 and 29 would have been obvious over two references (Yung and Copeland), but the Petition contends that some of their dependent claims (claims 17, 18, 37, and 38) would have been obvious over only one of those references (Yung). We decline to evaluate a combination of references that was not advanced in the Petition, and so we decline to consider whether claims 17, 18, 37, and 38 would have been obvious over Yung and Copeland.[24]

Accordingly, we determine that Petitioner has not shown, by a preponderance of the evidence, that the subject matter of claims 17, 18, 37, or 38 would have been obvious over Yung.

### G. Obviousness Ground Based on Yung and Four-Steps Whitepaper

Petitioner contends that the subject matter of independent claim 3 would have been obvious over Yung and the Four-Steps Whitepaper. Pet. 61–68. Patent Owner responds that Petitioner fails to show that the Four-Steps Whitepaper qualifies as prior art. PO Resp. 28–45.

#### 1. Prior Art Status of the Four-Steps Whitepaper

The Four-Steps Whitepaper is dated September 2002. Ex. 1006, 1. Petitioner contends that the Four-Steps Whitepaper was on Packeteer's website before the filing of the '593 patent, and in support, Petitioner introduces testimony that the document was archived by the Wayback

---

[24] Petitioner's request for leave to file a motion to correct the Petition (*see* Pet. Reply 29 n.16) is denied because Petitioner cannot add a contention to the Petition during a trial.

IPR2021-00909
Patent 8,243,593 B2

Machine on March 17, 2003.  Pet. 15–16 (citing Ex. 1006, i–ii).[25]  Patent
Owner does not allege any deficiency in this aspect of Petitioner's showing.
*See* PO Resp. 28–45.  Having considered the evidence, we are persuaded
that the Four-Steps Whitepaper (Exhibit 1006) was available on Packeteer's
website at least as of March 17, 2003, which is more than a year before the
filing of the '593 patent.  *Accord* Inst. Dec. 49 (same finding).

In the Institution Decision, we questioned whether Petitioner had
shown that the Four-Steps Whitepaper was "publicly accessible," as also
required.  Inst. Dec. 49–52; *see In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir.
2009) ("In order to qualify as a printed publication within the meaning of §
102, a reference must have been sufficiently accessible to the public
interested in the art." (quotations omitted)); *see also Samsung Elecs. Co. v.
Infobridge Pte. Ltd.*, 929 F.3d 1363, 1369 (Fed. Cir. 2019) ("A reference is
considered publicly accessible if 'persons interested and ordinarily skilled in
the subject matter or art, exercising reasonable diligence, can locate it.'"
(quoting *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765,
772 (Fed. Cir. 2018)).  We informed the parties that we would determine

---

[25]  We authorized Petitioner's to submit a replacement for Exhibit 1006 that
included a declaration from Christopher Butler in place of the original
declaration, which was provided by Elizabeth Rosenberg.  *See* Paper 23
(Order).  Although Patent Owner complains that this was procedurally
improper, it identifies no basis for that position.  *See* PO Resp. 36–38 & n.7.
The two declarations are identical in all relevant respects.  Patent Owner
argues that Petitioner failed to show that Ms. Rosenberg was "unavailable"
as defined by the Federal Rules of Evidence (*see* Fed. R. Evid. 804(a)), but
that rule is inapplicable because Petitioner did not seek to *introduce* Ms.
Rosenberg's testimony over a hearsay objection, but rather sought to *replace*
it.  Moreover, we note that Patent Owner unilaterally canceled the deposition
of Mr. Butler (Ex. 1103) and does not contest the substance of his testimony.

39

whether the Four-Steps Whitepaper qualifies as a printed publication with the benefit of the full record. Inst. Dec. 52.

At trial, Patent Owner contends that Petitioner fails to meet its burden to show public accessibility (PO Resp. 28–45), and Petitioner responds with additional explanation and evidence (Pet. Reply 14–26).[26] Having considered the full record at trial, we are persuaded that Petitioner has shown, by a preponderance of the evidence, that the Four-Steps Whitepaper was publicly accessible at least as of March 17, 2003.

On this record, we find that the Four-Steps Whitepaper was intended to promote Packeteer's PacketShaper product. The Four-Steps Whitepaper is a "Technical Product Overview" for PacketShaper, it touts the advantages of the product, and it concludes by inviting the reader to order the product. Ex. 1006, 1, 3, 30. In addition, we credit Margi Spitzer's testimony regarding the purpose and nature of this document. *See* Ex. 1098. Ms. Spitzer authored the Four-Steps Whitepaper and was involved in distributing

---

[26] In its papers, Patent Owner did not contend that this evidence was untimely (*see* PO Sur-reply), but at the oral hearing Patent Owner asserted that Petitioner's evidence should have been submitted before the Response (Tr. 47:21–48:12). Patent Owner's new argument was untimely and will not be considered. *See Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364, 1369 (Fed. Cir. 2018) (noting that the "Board was obligated to dismiss [an] untimely argument . . . raised for the first time during oral argument").

However, even if Patent Owner had timely made this argument, it would not have been persuasive, for the reasons explained by Petitioner. *See* Pet. Reply 24 (addressing propriety of evidence at the Reply stage); *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1370 n.6 (Fed. Cir. 2021) (responding to argument that a petitioner's evidence was "untimely submitted on reply" by explaining that "[a] petitioner may provide evidence of public accessibility of a reference after the petition stage if the patent owner raises a challenge to public accessibility").

IPR2021-00909
Patent 8,243,593 B2

this document to potential customers.  *Id.* ¶¶ 3–5, 7–8.  Ms. Spitzer testifies that the document "was a big part of Packeteer's marketing of the PacketShaper product."  *Id.* ¶ 6.  She also testifies that, although the first page includes a copyright notice requiring Packeteer's "express written consent" for certain activities (Ex. 1006, 1), anyone could download the document from Packeteer's website "without using any access credentials like a password and without getting advanced permission from Packeteer."  Ex. 1098 ¶¶ 9–10.

Moreover, we find that a person of ordinary skill in the art would have been able to locate the Four-Steps Whitepaper on Packeteer's website with reasonable diligence.  Dr. Jeffay testifies that "Packeteer was an industry leader," and that PacketShaper would have been known to an ordinary artisan at the time of the invention.  Ex. 1003 ¶¶ 41–43.  We credit this testimony because:  it is based in part on Dr. Jeffay's personal knowledge[27] (*see* Ex. 2007, 46:4–21, 48:2–19); and it is corroborated by Yung's reference to PacketShaper (*see* Ex. 1005, 4:47–51) and other entities' references to Packeteer and PacketShaper (*see* Exs. 1082–1083, 1086–1090, 1092).  As a result, we are persuaded that an ordinary artisan would have been familiar with Packeteer and its products.  In addition, Dr. Jeffay testifies that an ordinary artisan "could have easily found Packeteer whitepapers and other materials about [the PacketShaper] on the Packeteer website including the Four-Steps Whitepaper."  Ex. 1093 ¶ 2.  In support, Dr. Jeffay explains that

---

[27] Dr. Jeffay also relies on Exhibits 1031 and 1032 for his testimony (*see* Ex. 1003 ¶¶ 41–42), but for the reasons previously explained, we cannot say that these exhibits sufficiently support these conclusions (*see* Inst. Dec. 50–51).  However, given the other evidence cited by Petitioner, we need not (and do not) rely on those exhibits in this Decision.

41

IPR2021-00909
Patent 8,243,593 B2

he accessed an archived version of the Packeteer website from February 2003 and navigated from the Packeteer home page to the PacketShaper product page, which includes a prominent link to the Four-Steps Whitepaper under "White Papers." *Id.* ¶¶ 3–8 (citing Ex. 1081). We credit this testimony because it is supported by a detailed explanation and documentary evidence.

We have also considered Patent Owner's contrary arguments and evidence (*see* PO Resp. 40–41),[28] but on balance, we are persuaded that the Four-Steps Whitepaper was publicly accessible via Packeteer's website on or before March 17, 2003. Patent Owner's declarant, Erin McCracken, testifies that the Wayback Machine states that it archived the Four-Steps Whitepaper on several dates, but she received an error message when attempting to access each version other than the March 17, 2003 version. Ex. 2008 ¶¶ 6–7. However, as Petitioner notes (*see* Pet. Reply 25), Ms. McCracken only attempted to access archives of this document made *after* March 17, 2003. Consequently, Ms. McCracken's evidence on this point is less probative than (and does not directly contradict) Petitioner's evidence, which relies on the March 17, 2003 archive of this document.

In addition, Ms. McCracken identifies a discrepancy between the archive date for the Packeteer homepage and the Four-Steps Whitepaper. *See* Ex. 2008 ¶ 5. Specifically, the Whitepaper was archived on March 17,

---

[28] Patent Owner also argues that Mr. Butler's declaration does not "establish that the Four-Steps Whitepaper was publicly available." PO Resp. 38 (referencing Ex. 1006, i–ii); *see also id.* at 28–39. Although we agree, this argument is misplaced because Petitioner primarily relies on different evidence to show that an ordinary artisan would have been able to locate the document with reasonable diligence.

IPR2021-00909
Patent 8,243,593 B2

2003, but the Packeteer homepage was not archived on that date. Ex. 1006, iiv; Ex. 2008 ¶ 5. Instead, Dr. Jeffay uses a February 16, 2003 archive of Packeteer's home page to show that an ordinary artisan could have navigated to the Whitepaper.[29] *See* Ex. 1093 ¶ 3; *see also* Ex. 1097 ¶ 8 (testifying that the home page was archived on February 16, 2003). Although the evidence is not perfect, we find it far more likely than not that the Four-Steps Whitepaper was accessible on Packeteer's website at least as of March 17, 2003. In particular, the Four-Steps Whitepaper is dated September 2002 (Ex. 1006, 1), and Ms. Spitzer testifies that this document was made available on the Packeteer website that month (Ex. 1098 ¶¶ 5, 9). Petitioner also submits a declaration listing straightforward steps for navigating to this document from the Packeteer homepage on several dates between September 2002 and February 2003. *See* Ex. 1097 ¶¶ 2–8. As a result, we find the one-month discrepancy between the two archive dates to be relatively insignificant in this case. Moreover, in this proceeding, we need not put a fine point on which of these dates is more credible, as the critical date is more than twenty months after both of them. *See* Ex. 1001, code (22) (identifying December 22, 2004 filing date).

In sum, we find that the Four-Steps Whitepaper was intended to reach the general public to promote Packeteer's PacketShaper product, and we find that an ordinary artisan exercising reasonable diligence would have been able to access the Whitepaper from Packeteer's website on or before March 17, 2003. Accordingly, we determine that the Four-Steps Whitepaper was

---

[29] Mr. Butler explains that the Wayback Machine traverses links by accessing the corresponding page "with the closest available date to the initial file containing the hyperlink." Ex. 1006, i (¶ 3).

IPR2021-00909
Patent 8,243,593 B2

publicly accessible as of that date. *See, e.g.*, *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021) (stating that document designed to promote business is "strong evidence" of public accessibility); *Voter Verified, Inc. v. Premier Election Sols., Inc.*, 698 F.3d 1374, 1380–81 (Fed. Cir. 2012) (affirming finding that an article was publicly accessible where evidence demonstrated that the website including the article was known to the relevant community and the article could be found on the website with reasonable diligence).

### 2. *Independent Claim 3*

Petitioner contends that the subject matter of claim 3 would have been obvious over Yung and the Four-Steps Whitepaper. Pet. 61–68. Patent Owner does not dispute Petitioner's substantive contentions regarding this claim. *See* PO Resp. Having considered the record, we are persuaded that Petitioner has shown, by a preponderance of the evidence, that claim 3 would have been obvious over Yung and the Four-Steps Whitepaper.

In particular, we are persuaded by Petitioner's undisputed arguments that Yung discloses most of the claim limitations. *See* Pet. 64–68 (citing *id.* at 25–26, 30–34).[30] Yung's bandwidth monitoring device 130 includes a memory that stores a control block object that includes a flow's behavioral attributes and identifies its traffic class and policy parameters. *E.g.*, Ex. 1005, 7:25–28, 16:42–45, 17:42–52, 23:26–30. Yung's device classifies a flow based on a heuristic comparison of the flow's behavioral attributes to

---

[30] Although Petitioner cites to the discussion of element 1.6 (*see* Pet. 34–35), this is a typographical error intended to reference element 1.5, which recites a limitation commensurate with the identified limitation from claim 3 (*see id.* at 33–34). We have corrected the typographical error in our citation.

44

IPR2021-00909
Patent 8,243,593 B2

known application behavior patterns (*e.g.*, Ex. 1005, 7:7–11, 10:62–67, 15:23–26, 24:27–41), and it enforces bandwidth utilization controls on the flow, such as a discard policy that drops packets (*e.g.*, *id.* at 16:2–7, 19:52–20:18, 24:63–25:1). *See also* Ex. 1003 ¶¶ 156–157, 164–168 (further explaining why an ordinary artisan would have understood claim language to be disclosed by Yung).

In addition, we are persuaded by Petitioner's undisputed arguments that the Four-Steps Whitepaper discloses the remaining limitation. *See* Pet. 66–67. The Four-Steps Whitepaper states that the PacketShaper product maintains a count of the dropped and non-dropped packets of a flow. Ex. 1006, 18.

Finally, we are persuaded by Petitioner's undisputed arguments that a person of ordinary skill in the art would have been motivated to combine these references. *See* Pet. 62–63. Yung identifies PacketShaper as an exemplary bandwidth management device, and Yung is assigned to Packeteer, the company responsible for that product. *See* Ex. 1005, code (73), 4:47–51. The Four-Steps Whitepaper provides additional information regarding PacketShaper's functionality (*see* Ex. 1006), and the proposed combination of these references would have been within the skill of an ordinary artisan (Ex. 1003 ¶ 249; *see id.* ¶¶ 246–248). As a result, we find that a person of ordinary skill in the art would have been motivated to combine these references.

Accordingly, we conclude that Petitioner has shown, by a preponderance of the evidence, that the subject matter of claim 3 would have been obvious over Yung and the Four-Steps Whitepaper.

### III.    OBJECTION TO DEMONSTRATIVES

Petitioner objects to slide 12 of Patent Owner's hearing demonstratives, arguing that it presents a new argument not found in the record. Paper 40.

We dismiss this objection as moot. Demonstratives are neither evidence nor a mechanism for making new arguments. *See* Paper 39 (Order Setting Oral Hearing), 3–4. In this Final Written Decision, we only rely on the arguments properly presented in the parties' briefs and the evidence of record, not on the demonstratives. Moreover, even considering the allegedly new arguments presented by Patent Owner on slide 12, the outcome here would not change.

### IV. CONCLUSION[31]

Based on the evidence presented with the Petition, the evidence introduced during the trial, and the parties' respective arguments, Petitioner has shown by a preponderance of the evidence that claims 3, 9–13, 19–24, 29–33, and 39–44 are unpatentable, and Petitioner has not shown that claims 17, 18, 37, and 38 are unpatentable. Claims 1, 2, 4–8, 14–16, 25–28, and 34–36 were statutorily disclaimed and are not addressed in this Decision.

---

[31] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*, 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2021-00909
Patent 8,243,593 B2

In summary:

| Claim(s) | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 17, 18, 37, 38 | 103(a) | Yung | | 17, 18, 37, 38 |
| 9–13, 19–24, 29–33, 39–44 | 103(a) | Yung, Copeland | 9–13, 19–24, 29–33, 39–44 | |
| 3 | 103(a) | Yung, Four-Steps Whitepaper | 3 | |
| **Overall Outcome** | | | 3, 9–13, 19–24, 29–33, 39–44 | 17, 18, 37, 38 |

## V. ORDER

Accordingly, it is

ORDERED that claims 3, 9–13, 19–24, 29–33, and 39–44 of U.S. Patent No. 8,243,593 B2 are determined to be unpatentable;

FURTHER ORDERED that claims 17, 18, 37, and 38 of the '593 patent are not determined to be unpatentable;

FURTHER ORDERED that Petitioner's Objection to Patent Owner's Demonstratives (Paper 40) is *dismissed* as moot; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

47

Appx47

IPR2021-00909
Patent 8,243,593 B2

FOR PETITIONER:

James L. Day
Daniel Callaway
Winston Liaw
FARELL BRAUM + MARTEL LLP
jday@fbm.com
dcallaway@fbm.com
wliaw@fbm.com

David C. Dotson
DUANE MORRIS LLP
dcdotson@duanemorris.com

Alex S. Yap
Mehran Arjomand
Rose S. Lee
MORRISON & FOERSTER LLP
ayap@mofo.com
marjomand@mofo.com
roselee@mofo.com

FOR PATENT OWNER:

Kenneth J. Weatherwax
Parham Hendifar
Patrick Maloney
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com

Appx48

Trials@uspto.gov                                                      Paper 46
571-272-7822                                           Entered: January 9, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

CLOUDFLARE, INC. and
SPLUNK INC.
Petitioner,
v.
SABLE NETWORKS, INC.,
Patent Owner.

———————

IPR2021-00909[1]
Patent 8,243,593 B2

———————

Before KRISTEN L. DROESCH, STACEY G. WHITE, and
GARTH D. BAER, *Administrative Patent Judges*.

WHITE, *Administrative Patent Judge*.

DECISION
Denying Petitioner's Request on Rehearing of Final Written Decision
*37 C.F.R. § 42.71(d)*

———————

[1] Splunk, Inc., which filed a petition in IPR2022-00228, has been joined as
a petitioner in this proceeding.

IPR2021-00909
Patent 8,243,593 B2

## I.    INTRODUCTION

Cloudflare, Inc. and Splunk Inc. ("Petitioner") filed a Request for Rehearing (Paper 44, "Request" or "Req. Reh'g") of our Final Written Decision (Paper 42, "Final Decision" or "Dec.") in which we determined that Petitioner did not demonstrate[2] that claims 17, 18, 37, and 38 of U.S. Patent No. 8,243,593 B2 (Ex. 1001, "the '593 patent") are unpatentable.  For the reasons explained below, we deny Petitioner's Request for Rehearing.

## II.    DISCUSSION

On request for rehearing, "[t]he burden of showing a decision should be modified lies with the party challenging the decision."  37 C.F.R. § 42.71(d).  "The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, reply, or a sur-reply."  *Id.*  We have reviewed Petitioner's Request and carefully considered all of the arguments presented.  We are not persuaded that we misapprehended or overlooked any arguments or evidence, and thus, we decline to modify the Decision.

In the Decision on Institution, we stated that the Petition alleged that dependent claims 17, 18, 37, and 38 would have been obvious over the Yung reference alone.  Paper 16 ("Inst. Dec."), 38 (citing Paper 1 ("Petition" or "Pet.") 1 (table of grounds), 42–43 (addressing these dependent claims).  We noted that claims 17 and 18 depend indirectly from independent claim 9 and

---

[2] We also determined that Petitioner had demonstrated that claims 3, 9–13, 19–24, 29–33, and 39–44 of the '593 were unpatentable, but that portion of the Final Decision is not at issue here.  *See* Dec. 47.

2

IPR2021-00909
Patent 8,243,593 B2

claims 37 and 38 depend indirectly from independent claim 29. *Id.* (citing Ex. 1001, 12:9–16, 12:29–30, 12:33, 13:45–52, 14:9–10, 14:14). Thus, each of these dependent claims includes the requirements of the respective independent claims, including limitations requiring "computing . . . a badness factor for the flow." Dec. 32 (citing Ex. 1001, 12:5–6, 13:41–42). Claims 9 and 29 were alleged and found to be unpatentable over the teachings of Yung and Copeland and the "computing . . . a badness factor" recited in claims 9 and 29 was alleged to have been taught by Copeland. *See* Inst. Dec. 38; *see also* Dec. 18–32. In the Institution Decision, we raised the possibility that "the inclusion of claims 17, 18, 37, and 38 in the Yung-only ground may be a typographical error." Inst. Dec. 39. We then invited the parties to address whether we should consider whether claims 17, 18, 37, and 38 would have been obvious over Yung and Copeland. *Id.*

The parties accepted our invitation and briefed the question as to whether these dependent claims should be considered against the teachings of Yung and Copeland. *See* Paper 30 ("PO Resp."), 13–16; Paper 33 ("Reply"), 26–29; Paper 36 ("PO Sur-Reply"), 3–15. In addition, this issue was discussed at the oral hearing. Paper 41, 21:17–24:7; 25:1–41:12. In the Final Written Decision, we addressed this issue and "decline[d] to evaluate a combination of references that was not advanced in the Petition, and so we decline[d] to consider whether claims 17, 18, 37, and 38 would have been obvious over Yung and Copeland." Dec. 38.

On Rehearing, Petitioner asserts that we erred in refusing to consider whether claims 17, 18, 37, and 38 would have been obvious over Yung and Copeland due to our alleged misapprehension of two Federal Circuit decisions: *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330 (Fed. Cir.

3

IPR2021-00909
Patent 8,243,593 B2

2020) and *Apple Inc. v. MPH Technologies Oy*, 2022 WL 4103286 (Fed.

Cir. Sept. 8, 2022) (non-precedential). Req. Reh'g 2. Petitioner asserts that

> [i]n both Federal Circuit decisions, the Board was asked to
> modify or create a new ground of unpatentability rather than
> applying the grounds as expressly recited. In contrast here, the
> Board is asked to correct a typographical error that was first
> raised in the institution decision and immediately
> acknowledged as such by Petitioners at the outset of the trial
> phase.

*Id.* at 2. We disagree with Petitioner's assertion of a typographical error.

In its Reply, Petitioner asserted that it had "inadvertently included the

arguments addressing dependent claims 17, 18, 37, and 38 under Ground 1

(Yung alone) rather than Ground 2 (Yung and Copeland)." Reply 26.

Petitioner maintains that assertion in its Rehearing Request, stating that we

need only "resolve an obvious and admitted typographical error that placed

two paragraphs in the wrong section of the petition." Req. Reh'g 4. In the

Final Written Decision, however, we determined that

> [t]he Petition consistently contends that claims 17, 18, 37, and
> 38 would have been obvious in light of Yung alone. The
> summary table includes these claims in the Yung-only ground
> (Pet. 1); the organizational structure includes these claims in
> that ground (*id.* at ii–iii); and the substantive discussion of the
> claims refers to Yung and to other claims included in the Yung-
> only ground (*id.* at 42–43 (citing *id.* at 41–42)). Petitioner fails
> to identify (and we do not perceive) *any* portion of the Petition
> that can be read as affirmatively stating that these claims would
> have been obvious in light of Yung and Copeland. *See* Pet.;
> Pet. Reply 26–29. Consequently, we do not agree with
> Petitioner's contention that the omission of Copeland was a
> "typographical error." Pet. Reply 26–27. The problem is not
> an isolated typographical error (or two), but rather one that
> pervades the Petition.

4

IPR2021-00909
Patent 8,243,593 B2

Dec. 35–36.  As such, we were not persuaded that the Petition contained a
typographical error.  We determined that the Petition repeatedly and
expressly challenged claims 17, 18, 37, and 38 over Yung alone.  Nothing in
Petitioner's Request for Rehearing persuades us that that determination was
in error.

    In addition, we are not persuaded by Petitioner's arguments on
rehearing regarding the cited case law.  The *Apple* case is particularly
instructive.  In *Apple,* the petitioner asserted that claim 5 was unpatentable
over Ishiyama, Murakawa, **and Ahonen**.  *Apple*, 2022 WL 4103286, at *3
(emphasis added).  Claims 6 and 7 depend from claim 5 and were alleged to
have been obvious over Ishiyama and Murakawa.  *Id.*  The Federal Circuit
held that the Board "properly declined to consider Ahonen" in its evaluation
of claims 6 and 7, explaining that "[t]he Board did not err by declining to
consider arguments that [the petitioner] did not make."  *Id*. at *7.

    On Rehearing, Petitioner asserts that the instant case is distinguishable
because "[t]he parties in . . . *Apple* never did what Petitioner[] did in this
case, i.e., request resolution of an obvious typographical error in a manner
that makes sense as a matter of logic and patent law based on the contentions
recited in the petition itself."  Req. Reh'g 5.  According to Petitioner,
"[l]ogic dictates that because claim 17 includes every limitation of claim 12,
then the portion of the petition showing how the prior art discloses claim 12
must also apply to claim 17."  *Id.* at 6.  Petitioner further argues that because
claim 17 "begins by reciting '[t]he method of claim 12 . . . ,'" we should
interpret that as "explicitly referring to the petition's argument addressing
claim 12."  *Id.*  This argument fails because every dependent claim includes
a reference to the claim it depends from, and by Petitioner's logic we should

5

IPR2021-00909
Patent 8,243,593 B2

always include allegations made against a base claim in the patentability analysis of a dependent claim. In *Apple*, however, the Federal Circuit refused to follow similar logic noting that "Apple only raised Ahonen in Ground 2, which challenged claims 3 and 5 of the '581 patent. Even though claims 6–8 depend from claim 5, Apple did not include Ahonen in Grounds 1 and 3 challenging those claims, nor did it address or reference Ahonen in its substantive analysis." *Apple*, 2022 WL 4103286, at *7 (internal citations omitted). Here, we were similarly faced with a Petition that did not include Copeland in the ground challenging claims 17, 18, 37, and 38, nor did it address or reference Copeland in its substantive analysis of those dependent claims. In both *Apple* and the instant case, the pieces were there to make an argument, but Petitioner failed to put those pieces together. Petitioner's arguments on rehearing do not convince us of error in our decision to not put the pieces together on Petitioner's behalf. As such, we are not persuaded of error in our determinations.

### III.    CONCLUSION

We have reviewed and considered the arguments in Petitioner's Rehearing Request and conclude that Petitioner has not carried its burden of demonstrating that the Board misapprehended or overlooked any matters in rendering the Final Written Decision. 37 C.F.R. § 42.71(d). Thus, Petitioner's challenge does not meet the standard set forth for a request for rehearing.

The Request for Rehearing is *denied*.

IPR2021-00909
Patent 8,243,593 B2

In summary:

Outcome of Decision on Rehearing:

| Claim(s) | 35 U.S.C. § | References / Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 17, 18, 37, 38 | 103(a) | Yung | | 17, 18, 37, 38 |
| 9–13, 19–24, 29–33, 39–44 | 103(a) | Yung, Copeland | 9–13, 19–24, 29–33, 39–44 | |
| 3 | 103(a) | Yung, Four-Steps Whitepaper | 3 | |
| **Overall Outcome** | | | 3, 9–13, 19–24, 29–33, 39–44 | 17, 18, 37, 38 |

Final Outcome of Final Written Decision after Rehearing

| Claim(s) | 35 U.S.C. § | References / Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 17, 18, 37, 38 | 103(a) | Yung | | 17, 18, 37, 38 |
| 9–13, 19–24, 29–33, 39–44 | 103(a) | Yung, Copeland | 9–13, 19–24, 29–33, 39–44 | |
| 3 | 103(a) | Yung, Four-Steps Whitepaper | 3 | |
| **Overall Outcome** | | | 3, 9–13, 19–24, 29–33, 39–44 | 17, 18, 37, 38 |

7

IPR2021-00909
Patent 8,243,593 B2

For PETITIONER:
James L. Day
Daniel Callaway
Winston Liaw
FARELL BRAUM + MARTEL LLP
jday@fbm.com
dcallaway@fbm.com
wliaw@fbm.com

David C. Dotson
DUANE MORRIS LLP
dcdotson@duanemorris.com

Alex S. Yap
Mehran Arjomand
Rose S. Lee
MORRISON & FOERSTER LLP
ayap@mofo.com
marjomand@mofo.com
roselee@mofo.com

For PATENT OWNER:
Kenneth J. Weatherwax
Parham Hendifar
Patrick Maloney
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
endifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com

8

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

_____May 1, 2023_____

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

**CLOUDFLARE, INC. and SPLUNK INC.,**
**Petitioner,**

**v.**

**SABLE NETWORKS, INC.,**
**Patent Owner.**

**Case: IPR2021-00909[1]**
**Patent 8,243,593 B2**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*
_____
**Certifying Officer**

---

[1] Splunk, Inc., which filed a petition in IPR2022-00228, was joined as a petitioner in this proceeding.

1

**Prosecution History for IPR2021-00909**

| Date | Document |
|------|----------|
| 05/07/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 8,243,593 |
| 05/07/2021 | Petitioner's Power of Attorney (Cloudflare) |
| 05/07/2021 | Petitioner's Power of Attorney (SonicWall) |
| 05/21/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 05/28/2021 | Patent Owner's Mandatory Notices |
| 05/28/2021 | Patent Owner's Power of Attorney (Sable IP) |
| 05/28/2021 | Patent Owner's Power of Attorney (Sable Networks Inc.) |
| 08/23/2021 | Patent Owner's Preliminary Response |
| 09/09/2021 | Petitioner's Reply to Preliminary Response (Cloudflare) |
| 09/09/2021 | Petitioner's Updated List of Exhibits (Cloudflare) |
| 09/16/2021 | Patent Owner's Sur-Reply |
| 09/20/2021 | Patent Owner's Updated Mandatory Notice |
| 10/01/2021 | Patent Owner's Joint Motion of SonicWall Inc. and Sable Networks, Inc. to Terminate as to SonicWall Inc. |
| 10/01/2021 | Patent Owner's Joint Request of SonicWall Inc. and Sable Networks, Inc. to Treat Settlement Information as Business Confidential and Keep Separate |
| 10/15/2021 | Order: Termination as to One Party / Settlement as to SonicWall Inc. Granting Request to Keep Agreement Confidential, *37 C.F.R. § 42.74* |
| 11/19/2021 | Decision - Institute *Inter Partes* Review |
| 11/19/2021 | Scheduling Order |
| 12/07/2021 | Patent Owner's Objections Pursuant to *37 C.F.R. § 42.64(b)(1)* |
| 01/24/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Daniel P. Hipskind |
| 01/25/2022 | [EXPUNGED – Patent Owner's Notice of Joint Stipulation to Modify Schedule] |
| 02/01/2022 | Patent Owner's Second Notice of Joint Stipulation to Modify Schedule |
| 02/10/2022 | Patent Owner's Third Notice of Joint Stipulation to Modify Schedule |
| 02/11/2022 | Order: Conduct of Proceeding *37 C.F.R. § 42.5* |
| 02/11/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Daniel P. Hipskind |

2

| Date | Document |
|------|----------|
| 02/11/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Erin McCracken |
| 02/16/2022 | Patent Owner's Notice of Deposition of Kevin Jeffay |
| 02/16/2022 | Patent Owner's Notice of Deposition of Chris Butler |
| 03/07/2022 | Decision Granting Patent Owner's Motions for Admission *Pro Hac Vice* of Daniel P. Hipskind and Erin McCracken |
| 03/11/2022 | Patent Owner's Updated Mandatory Notice Information |
| 03/14/2022 | Patent Owner's Response to Petition |
| 03/15/2022 | Patent Owner's Second Updated Mandatory Notice Information |
| 04/04/2022 | Institution Decision and Grant of Joinder, IPR2022-00228 |
| 06/06/2022 | Petitioners' Reply |
| 06/06/2022 | Petitioners' Updated List of Exhibits |
| 06/06/2022 | Petitioner's Updated List of Exhibits |
| 07/05/2022 | Patent Owner's Sur-Reply |
| 07/08/2022 | Petitioners' Request for Oral Argument |
| 07/08/2022 | Patent Owner's Request for Oral Argument |
| 07/14/2022 | Order Setting Oral Argument - *37 C.F.R. § 42.70* |
| 09/02/2022 | Petitioner's Objection to Patent Owner's Demonstrative Exhibits |
| 09/28/2022 | Oral Hearing Transcript |
| 10/18/2022 | PTAB Decision |
| 10/19/2022 | [EXPUNGED - Petitioner's Notice of Deposition of Jon Christensen - incorrect case] |
| 11/17/2022 | Petitioners' Request for Rehearing |
| 11/28/2022 | Panel Change Order - Conduct of the Proceedings, *37 C.F.R. § 42.5* |
| 01/09/2023 | Decision Denying Petitioner's Request for Rehearing of Final Written Decision |
| 03/10/2023 | Petitioner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

3

**Prosecution History for IPR2022-00228**

| Date | Document |
|------|----------|
| 11/24/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 8,243,593 (by Splunk Inc.) |
| 11/24/2021 | Petitioner's Power of Attorney |
| 11/24/2021 | Petitioner's Motion for Joinder to Related Instituted *Inter Partes Review* IPR2021-00909 |
| 12/15/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 12/23/2021 | Patent Owner's Mandatory Notices |
| 12/27/2021 | Patent Owner's Response to Petitioner's Motion for Joinder |
| 01/27/2022 | Petitioner's Reply in Support of Motion for Joinder |
| 03/15/2022 | Patent Owner's Updated Mandatory Notice Information |
| 04/04/2022 | Institution Decision and Grant of Joinder with IPR2021-00909 |
| 10/18/2022 | PTAB Decision |
| 10/18/2022 | [EXPUNGED – PTAB Decision] |
| 11/28/2022 | Panel Change Order - Conduct of the Proceedings, *37 C.F.R. § 42.5* |

4



US008243593B2

(12) **United States Patent**      (10) **Patent No.:**     **US 8,243,593 B2**
  Natchu                           (45) **Date of Patent:**     **Aug. 14, 2012**

(54) **MECHANISM FOR IDENTIFYING AND PENALIZING MISBEHAVING FLOWS IN A NETWORK**

(75) Inventor:   **Vishnu Natchu**, Santa Clara, CA (US)

(73) Assignee:   **Sable Networks, Inc.**, Santa Clara, CA (US)

( * ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1098 days.

(21) Appl. No.: **11/022,599**

(22) Filed:   **Dec. 22, 2004**

(65) **Prior Publication Data**

US 2006/0133280 A1     Jun. 22, 2006

(51) **Int. Cl.**
  *G01R 31/08*     (2006.01)
  *G06F 11/00*     (2006.01)
  *G08C 15/00*     (2006.01)
  *H04J 1/16*     (2006.01)
  *H04J 3/14*     (2006.01)
  *H04L 1/00*     (2006.01)
  *H04L 12/26*     (2006.01)

(52) **U.S. Cl.** ...................................... **370/229**

(58) **Field of Classification Search** .......... 370/229–236
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,167,041 | A * | 12/2000 | Afanador ...................... 370/353 |
| 6,252,848 | B1 * | 6/2001 | Skirmont ...................... 370/229 |
| 6,310,881 | B1 * | 10/2001 | Zikan et al. .................. 370/401 |
| 6,934,250 | B1 * | 8/2005 | Kejriwal et al. .............. 370/229 |
| 7,113,990 | B2 * | 9/2006 | Scifres et al. ............... 709/224 |
| 2002/0032717 | A1 * | 3/2002 | Malan et al. ................. 709/105 |
| 2005/0141426 | A1 * | 6/2005 | Hou ........................... 370/235 |
| 2005/0226149 | A1 * | 10/2005 | Jacobson et al. ............. 370/229 |
| 2010/0110889 | A1 * | 5/2010 | Yazaki et al. ................ 370/230 |

* cited by examiner

*Primary Examiner* — Xavier Szewai Wong
(74) *Attorney, Agent, or Firm* — West & Associates, A PC; Stuart J. West; Shaun N. Sluman

(57)     **ABSTRACT**

A mechanism is disclosed for identifying and penalizing misbehaving flows in a network. In one implementation, a set of behavioral statistics are maintained for each flow. These behavioral statistics are updated as information packets belonging to a flow are processed. Based upon these behavioral statistics, a determination is made as to whether a flow is exhibiting undesirable behavior. If so, a penalty is imposed on the flow. In one implementation, this penalty causes packets belonging to the flow to have a higher probability of being dropped than packets belonging to other flows that do not exhibit undesirable behavior. In one implementation, in addition to penalizing the flow, this penalty also has the effect of correcting the flow's behavior such that the flow exhibits less undesirable behavior after the penalty than before. By correcting the flow's behavior, the penalty makes it possible for the flow to become a non-misbehaving flow.

**44 Claims, 5 Drawing Sheets**



Appx61



*Fig. 1*

Cloudflare - Exhibit 1001, page 2

Appx62



*Fig. 2*

Cloudflare - Exhibit 1001, page 3

Appx63



MAINTAIN BEHAVIORAL
STATISTICS FOR FLOW ⟩302

DETERMINE WHETHER
FLOW IS EXHIBITING
UNDESIRABLE BEHAVIOR ⟩304

ENFORCE PENALTY ON
FLOW IF FLOW IS
EXHIBITING UNDESIRABLE
BEHAVIOR ⟩306

*Fig. 3*

Cloudflare - Exhibit 1001, page 4

Appx64

402

FLOW ID

BEHAVIORAL STATISTICS

- TOTAL (T) BYTE COUNT
- LIFE (L) DURATION SINCE INCEPTION
- RATE (R) OF INFORMATION FLOW
- NUMBER (N) OF PACKETS PROCESSED
- AVERAGE (A) PACKET SIZE
- BADNESS FACTOR (B)
- TIMESTAMP
- OTHER

OTHER FLOW INFORMATION

*Fig. 4*

Cloudflare - Exhibit 1001, page 5

Appx65

$$\text{BADNESS FACTOR} = \text{MIN} \begin{cases} 16 & \text{MAXIMUM BADNESS FACTOR} \\ 1 & \text{DEFAULT BADNESS FACTOR} \\ \dfrac{T}{T_{THRESHOLD}} & \text{TOTAL BYTE COUNT COMPONENT} \\ \dfrac{L}{L_{THRESHOLD}} & \text{DURATION COMPONENT} \\ \dfrac{R}{R_{THRESHOLD}} & \text{RATE COMPONENT} \\ \dfrac{A\text{-}A_{THRESHOLD}}{MTU\text{-}A_{THRESHOLD}} & \text{AVERAGE PACKET SIZE COMPONENT} \end{cases}$$

*Fig. 5*

Cloudflare - Exhibit 1001, page 6

Appx66

US 8,243,593 B2

1

## MECHANISM FOR IDENTIFYING AND PENALIZING MISBEHAVING FLOWS IN A NETWORK

### BACKGROUND

With the advent of file sharing applications such as KaZaA, Gnutella, BearShare, and Winny, the amount of peer-to-peer (P2P) traffic on the Internet has grown immensely in recent years. In fact, it has been estimated that P2P traffic now represents about 50-70 percent of the total traffic on the Internet. This is so despite the fact that the number of P2P users is quite small compared to the number of non P2P users. Thus, it appears that most of the bandwidth on the Internet is being consumed by just a minority of the users. For this and other reasons, P2P traffic is viewed by ISP's (Internet service providers) and others as being abusive/misbehaving traffic that should be controlled and penalized.

In order to control P2P traffic, however, it first needs to be identified. Earlier generations of P2P protocols used fixed TCP port numbers for their transmissions. For example, Fast-Track used TCP port 1214. This made P2P traffic easy to identify. Current P2P protocols, however, no longer have to use fixed port numbers. Rather, they can be configured to use random dynamic port numbers so that P2P traffic can now be masqueraded as other types of traffic, such as HTTP web browsing and unspecified TCP traffic. As a result, the current P2P protocols have rendered the port-based identification techniques ineffective.

Another technique that has been used to identify P2P traffic involves the use of signatures. Specifically, it was observed that some P2P protocols inserted distinct information into their data packets. Using this distinct information as a signature, it was possible to identify packets that were assembled using those P2P protocols. This technique has several problems. First, it usually is effective for only a relatively short period of time. As the P2P protocols evolve and mutate (which they do on a fairly constant basis), their signatures change. Once that happens, the previous signatures are no longer valid, and the technique will have to be changed to recognize the new signatures. Another and more serious problem is that the P2P protocols are now evolving to the point that they either leave no signature or they obfuscate their signatures (e.g. by encryption). This makes it extremely difficult if not impossible to identify P2P traffic using signatures.

Overall, P2P protocols have gotten quite sophisticated, and the more sophisticated they become, the more difficult it is to identify P2P traffic. Unless P2P traffic can be identified, it cannot be effectively controlled.

### SUMMARY

In accordance with one embodiment of the present invention, there is provided a mechanism for effectively identifying and penalizing misbehaving information packet flows in a network. This mechanism may be applied to any type of network traffic including, but certainly not limited to, P2P traffic. In one embodiment, misbehaving flows are identified based upon their observed behavior. Unlike the prior approaches, they are not identified based upon ancillary factors, such as port numbers and signatures. Because misbehaving flows are identified based upon their observed behavior, and because their behavior cannot be hidden, misbehaving flows cannot avoid detection. Thus, regardless of which protocols they use, or how those protocols try to hide/obfuscate their nature, misbehaving flows can be identified. Once identified/detected, they can be controlled and/or penalized.

2

In one embodiment, a flow is processed as follows. One or more information packets belonging to the flow are received and processed. As the information packets are processed, a set of behavioral statistics are maintained for the flow. These behavioral statistics reflect the empirical behavior of the flow. In one embodiment, the behavioral statistics include a total byte count (sum of all of the bytes in all of the packets of the flow that have been processed up to the current time), a life duration (how long the flow has been in existence since inception), a flow rate (derived by dividing the total byte count by the life duration of the flow), and an average packet size (derived by dividing the total byte count by the total number of packets in the flow that have been processed). These behavioral statistics are updated as information packets belonging to the flow are processed; thus, they provide an up to date reflection of the flow's behavior.

Based at least partially upon the behavioral statistics, a determination is made as to whether the flow is exhibiting undesirable behavior. In one embodiment, this determination may be made by computing a badness factor for the flow. This badness factor is computed based, at least partially, upon the behavioral statistics, and this badness factor provides an indication as to whether the flow is exhibiting undesirable behavior. In one embodiment, the badness factor also provides an indication of the degree to which the flow is misbehaving.

If the flow is exhibiting undesirable behavior, then a penalty may be enforced on the flow. In one embodiment, the penalty to be enforced is determined based, at least partially, upon the badness factor. This penalty may be an increased drop rate. When enforced on the flow, this increased drop rate causes the information packets belonging to the flow to have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior. Thus, more packets may be dropped from the flow than from other non-misbehaving flows. In one embodiment, this penalty is enforced on the flow only if a congestion condition is encountered. Thus, if there is no congestion, the flow (even if it is exhibiting undesirable behavior) is not penalized.

In one embodiment, enforcing the penalty on the flow has the effect of correcting the flow's behavior. That is, enforcing the penalty causes the badness factor of the flow to improve (e.g. decrease). As a result, by application of the penalty, a currently misbehaving flow can be turned into a non-misbehaving flow in the future. Once the flow is no longer misbehaving, it is no longer subject to penalty. In this manner, a misbehaving flow can be identified, penalized, and even rehabilitated in accordance with one embodiment of the present invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows an overview of a network in which one embodiment of the present invention may be implemented.

FIG. **2** is a block diagram of a router in which one embodiment of the present invention may be implemented.

FIG. **3** is an operational flow diagram showing the operation of a misbehaving flow manager (MFM) in accordance with one embodiment of the present invention.

FIG. **4** is a diagram of a sample flow block in accordance with one embodiment of the present invention.

FIG. **5** shows one possible function for computing a badness factor for a flow in accordance with one embodiment of the present invention.

Cloudflare - Exhibit 1001, page 7

Appx67

US 8,243,593 B2

| 3 | 4 |

## DETAILED DESCRIPTION OF EMBODIMENT(S)

### Network Overview

With reference to FIG. **1**, there is shown an overview of a network **100** in which one embodiment of the present invention may be implemented. As shown, the network **100** comprises a plurality of routers **102** interconnected to each other by trunks or links in such a way that each router **102** has multiple possible paths to every other router **102**. For example, information from router **102**a may reach router **102**d by going through routers **102**b and **102**c, or routers **102**e and **102**f, and information from router **102**c may reach router **102**a by going through router **102**b or router **102**e. Interconnecting the routers **102** in this way provides flexibility in determining how information from one router **102** is delivered to another, and makes it possible to route around any failures that might arise. For the sake of simplicity, only a few routers **102** are shown in FIG. **1**; however, it should be noted that network **100** may be much more complex if so desired, comprising more routers **102**, more connections between the routers **102**, and other components.

In addition to being coupled to each other, each router **102** may further be coupled to various machines (not shown), such as clients and servers, from which information originates and to which information is destined. By going through the routers **102**, each of these machines may send information to any of the other machines in the network **100**.

Information is conveyed from one router **102** to another via a physical link or trunk. Depending on the type of network, this link or trunk may be an optical medium (e.g. an optical fiber), a coaxial cable, or some other type of medium. For purposes of the present invention, network **100** may use any type of transport medium.

### Router Overview

FIG. **2** shows a block diagram of a sample router **102** that may be used to implement one or more of the routers **102** in network **100**. As shown in FIG. **2**, the router **102** comprises a plurality of line cards **202** for coupling the router **102** to one or more of the other routers **102** in the network **100**. For example, assuming that the router **102** in FIG. **2** is router **102**b in network **100**, line card **202**d may couple router **102**b to router **102**f, line card **202**c may couple router **102**b to router **102**c, line card **202**b may couple router **102**b to router **102**e, and line card **202**a may couple router **102**b to router **102**a. Overall, the line cards **202** act as the router's **102** interfaces to the rest of the network **100**. In one embodiment, the trunks coupled to the line cards **202** are bi-directional; thus, each line card **202** may receive information from another router, or send information to another router. Put another way, each line card **202** is capable of acting as an ingress line card (to receive information from another router) or an egress line card (to send information to another router). Whether a particular line card **202** is acting as an ingress or an egress line card at any particular time depends upon the flow of network traffic.

To couple the line cards **202** to each other within the router **102**, there is provided an internal switching fabric **204**. In one embodiment, the switching fabric **204** comprises a plurality of interconnected fabric cards **206**. Basically, the switching fabric **204** provides a mechanism for coupling any line card **202** to any other line card **202** within the router **102** so that information can be transported from any ingress line card **202** to any egress line card **202**. By transporting information from an ingress line card **202** to an egress line card **202**, the switch-

ing fabric **204** routes information through the router **102** and sends it on its way to the next hop (i.e. the next router). Information is thus received and routed by the router **102**.

To increase the flexibility of the router **102** and to facilitate the process of failure recovery, each line card **202**, in one embodiment, has multiple connections to the switching fabric **204**. In addition, the switching fabric **204** provides multiple routes for connecting each line card connection to every other line card connection. With such a setup, each line card **202** has multiple routes to every other line card **202** in the router **102**. For example, one possible route from line card **202**d to line card **202**a may pass through fabric card **206**c, while another route may pass through fabric card **206**b. By providing multiple routes between the various line cards **202**, the switching fabric **204** makes it possible to route around any internal failures that may arise.

In addition to the line cards **202** and the switching fabric **204**, the router **102** further comprises an application processor **208**. In one embodiment, the application processor **208** determines the forwarding paths, and hence, the egress line cards, that can be used to forward information to any particular destination address. Put another way, given a destination address, the application processor **208** determines which line card **202** or line cards are most suitable to act as the egress line card to forward information to that destination address. For example, suppose that the router **102** in FIG. **2** is router **102**b in network **100**, and that the destination is a machine coupled to router **102**d. Suppose further that line card **202**c is coupled to router **102**c and line card **202**d is coupled to router **102**f. In such a case, because the most direct routes to router **102**d are through either router **102**c or **102**f, the most suitable egress line cards for forwarding information to the destination router **102**d are probably line cards **202**c and **202**d. Accordingly, the application processor **208** designates these line cards **202**c, **202**d as potential egress line cards for destination router **102**d, with one being designated as the primary egress line card and the other being the alternate.

Once the egress line card determinations are made by the application processor **208** for each destination address, they are communicated to each of the line cards **202** in the router **102**. In turn, each line card **202** stores the information into a forwarding table residing on the line card **202**. Thereafter, when a line card **202** acts as an ingress line card and receives a set of information, it can use the forwarding table to determine the appropriate egress line card **202** to which to forward the information. Because the egress line card information is predetermined and stored in the forwarding table, the ingress line card simply has to perform a table lookup to determine the proper egress line card. No on-the-fly calculation needs to be performed. Since table lookup operations can be carried out very quickly, the process of determining the proper egress line card requires relatively little time.

### Information Routing

In one embodiment, information is routed from router to router, and from line card **202** to line card **202**, in the form of information packets. Each packet represents a set of information that is sent by a source to a destination. To enable it to be properly routed, a packet typically comprises a header portion. The header portion contains information that is used by the line cards **202** to determine the next hop for the packet. Depending upon the routing protocol used, the information contained in the header portion may differ. In one embodiment, the header portion comprises the following sets of information: (1) a source address (i.e. the network address of the entity sending the packet); (2) a source port number; (3) a

Cloudflare - Exhibit 1001, page 8

US 8,243,593 B2

5

destination address (i.e. the network address of the entity that is to receive the packet); (4) a destination port number; and (5) an indication of the routing protocol that is to be used. These sets of information may be referred to as the "five tuple". Using this header information, an ingress line card 202 can determine to which egress line card 202 the packet should be routed.

In addition to the header portion, a packet also comprises a payload. The payload comprises the actual data that the source is trying to send to the destination. In addition to the actual data, the payload may also include other information, such as information inserted by other protocols (e.g. P2P protocols). This additional information may be needed by the destination to properly process the packet.

In one embodiment, one or more packets may be grouped into a flow. For purposes of the present invention, a flow is a series of packets that are related in some manner. In one embodiment, packets are grouped into a flow if they share a sufficient amount of header information. More specifically, in one embodiment, packets belong to the same flow if they have the five tuple in common. Thus, if two or more packets have the same source address, the same source port number, the same destination address, the same destination port number, and the same protocol, they are grouped into the same flow. Usually, barring some failure that requires rerouting, all of the packets belonging to a flow are received by the same ingress line card 202 and forwarded to the same egress line card 202. By grouping packets into flows, it is possible to aggregate individual packets in a meaningful way to enable a higher level understanding of the traffic flowing through the router 102 to be derived.

The flows that pass through a router 102 may represent many different types of traffic. For example, the flows may contain web browsing traffic, TCP traffic, P2P traffic, etc. As noted previously, some traffic is more abusive/misbehaving than others. P2P traffic, for example, is often considered to be abusive. Other types of traffic may also be considered abusive. To make the best use of available resources, and to best control the traffic that passes through the router 102, it is desirable for the router 102 to be able to identify abusive/misbehaving traffic, and to penalize and even rehabilitate that traffic. In one embodiment, the line cards 202 of router 102 have been enhanced to give the router 102 such capability. More specifically, the line cards 202 have been adapted to include a misbehaving flow manager (MFM) 210 for keeping track of flows, determining whether the flows are exhibiting undesirable behavior, and enforcing a penalty on the flows if they are exhibiting undesirable behavior.

For purposes of the present invention, the MFM 210 of the line cards 202 may be implemented in any desired manner. For example, the functionality of the MFM 210 may be realized by having one or more processors on a line card 202 execute one or more sets of instructions. Alternatively, the MFM 210 may be implemented using hardwired logic components (e.g. in the form of one or more ASIC's in a line card 202). These and other implementations are within the scope of the present invention.

Functional Overview of MFM on Line Card

With reference to FIGS. 2 and 3, a functional overview of the operation of an MFM 210 in accordance with one embodiment of the present invention will now be described. In the following discussion, it will be assumed that the MFM 210 is on a line card 202 that is acting as an egress line card (i.e. the line card is receiving packets from an ingress line card and sending packets out to another router). However, it should be

6

noted that the MFM 210 on a line card may process flows in the same manner even when the line card 202 is acting as an ingress line card (i.e. the line card is receiving packets from another router and sending them to an egress line card).

Initially, an MFM 210 receives and processes one or more packets belonging to a flow. Processing a packet may, but does not necessarily, involve forwarding the packet to another router. As the packets of a flow are processed, a set of behavioral statistics are maintained (block 302 of FIG. 3) for the flow. These behavioral statistics reflect the empirical behavior of the flow. In one embodiment, the behavioral statistics include a total byte count (sum of all of the bytes in all of the packets of the flow that have been processed up to the current time), a life duration (how long the flow has been in existence since inception), a flow rate (derived by dividing the total byte count by the life duration of the flow), and an average packet size (derived by dividing the total byte count by the total number of packets in the flow that have been processed). These behavioral statistics are stored by the line card 202 in a flow block associated with the flow, and are updated as information packets belonging to the flow are processed; thus, these behavioral statistics provide an up to date reflection of the flow's behavior.

Based upon the behavioral statistics, the MFM 210 determines (block 304) whether the flow is exhibiting undesirable behavior. In one embodiment, this determination is made by computing a badness factor for the flow. This badness factor is computed based upon the behavioral statistics of the flow, and provides an indication as to whether the flow is exhibiting undesirable behavior. In one embodiment, the badness factor also provides an indication of the degree to which the flow is misbehaving.

If the flow is exhibiting undesirable behavior, then the MFM 210 enforces (block 306) a penalty on the flow. In one embodiment, the penalty to be enforced is determined based upon the badness factor. This penalty may be an increased drop rate. When enforced on the flow, this increased drop rate causes the information packets belonging to the flow to have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior. Thus, more packets may be dropped from the flow than from other non-misbehaving flows. In one embodiment, the MFM 210 enforces this penalty on the flow only if a congestion condition is encountered. If there is no congestion, the flow (even if it is exhibiting undesirable behavior) is not penalized.

In one embodiment, enforcing the penalty on the flow has the effect of correcting the flow's behavior. That is, ideally the penalty causes the badness factor of the flow to improve (e.g. decrease). As a result, by application of the penalty, a currently misbehaving flow can be turned into a non-misbehaving flow in the future. Once the flow is no longer misbehaving, it is no longer subject to penalty. In this manner, an MFM 210 on a line card 202 can identify, penalize, and even rehabilitate a misbehaving flow.

Sample Operation

The above discussion provides a high level overview of the operation of an MFM 210. To facilitate a complete understanding of the invention, a specific sample operation of an MFM 210 in accordance with one embodiment of the present invention will now be described. In the following discussion, it will be assumed that line card 202d of FIG. 2 is acting as an egress line card, and that line card 202b is acting as an ingress line card, which is sending packets to the egress line card

Cloudflare - Exhibit 1001, page 9

US 8,243,593 B2

7
8

$202d$. The following discussion describes the operation of the MFM $210d$ on the egress line card $202d$.

Initially, MFM $210d$ receives a packet from the ingress line card $202b$. In processing this packet, the MFM $210d$ determines whether the packet belongs to an existing flow. In one embodiment, the MFM $210d$ makes this determination by processing the five tuple contained in the header portion of the packet (e.g. using a hashing function) to derive a flow ID. The MFM $210d$ then determines whether this flow ID is associated with a flow block that is already stored (e.g. in a memory, not shown) on the egress line card $202d$. If so, then the packet is part of an existing flow. If not, then the packet is the first packet of a new flow.

In the present example, it will be assumed that the packet is the first packet of a new flow. In such a case, the MFM $210d$ creates a new flow block for the new flow. A sample flow block $402$ in accordance with one embodiment of the present invention is shown in FIG. 4. As shown, the flow block $402$ comprises the flow ID (derived by processing the five tuple), and a set of behavioral statistics. The behavioral statistics include a total (T) byte count (sum of all of the bytes in all of the packets of the flow that have been processed up to the current time), a life duration (L) (how long the flow has been in existence since inception), a flow rate (R) (derived by dividing T by L), a number (N) of packets processed up to the current time, an average (A) packet size (derived by dividing T by N), a badness factor (B), and a timestamp of when the flow block $402$ was created. The behavioral statistics may include other sets of information as well. In addition to the above information, the flow block $402$ may also include any other information pertinent to the flow. In one embodiment, when the flow block $402$ is initially created, the timestamp value is updated with the current time, and the badness factor is set to a default value of 1. The other behavioral statistics are set to 0. The flow block $402$ is then stored on the egress line card $202d$ for future reference.

After creating the flow block $402$, the MFM $210d$ determines whether to forward the packet to the router to which the egress line card $202d$ is coupled. If the link is currently experiencing congestion, the packet may be dropped. In the current example, it will be assumed that the link is not congested; hence, the MFM $210d$ forwards the packet to the external router. After doing so, the MFM $210d$ updates the behavioral statistics to reflect the packet that was just forwarded. More specifically, the MFM $210d$ updates T to include the forwarded packet's byte count, updates L by computing the difference between the current time and the timestamp, updates R by dividing the updated T by the updated L, updates N to include the forwarded packet, and updates A by dividing the updated T by the updated N.

In addition, the MFM $210d$ also computes a badness factor for the flow. For purposes of the present invention, the badness factor may be computed using any desired methodology based upon any desired criteria. In one possible specific embodiment, the badness factor is computed in accordance with the function shown in FIG. 5, which takes the minimum of six possible values. One possible value is 16, which represents the maximum possible badness factor for any flow. Another possible value is 1, which is the default badness factor for a flow. Other possible values are the quotient of $T/T_{threshold}$, the quotient of $L/L_{threshold}$, the quotient of $R/R_{threshold}$, and the quotient of $(A-A_{threshold})/(MTU-A_{threshold})$. For purposes of this function, the constants $T_{threshold}$, $L_{threshold}$, $R_{threshold}$, MTU, and $A_{threshold}$ are assigned by an administrator of the router $102$. These values can be adjusted to tune the MFM $210d$ for optimal performance.

The quotients $T/T_{threshold}$, $L/L_{threshold}$, $R/R_{threshold}$, and $(A-A_{threshold})/(MTU-A_{threshold})$ represent the total byte count component, the duration component, the rate component, and the average packet size component, respectively, of the function. These components are included in the function because it has been found that they provide a measure of whether a flow is misbehaving. For example, it has been found that P2P traffic flows generally have high byte counts, relatively long life, relatively high rates, and relatively large average packet sizes. These characteristics are also found in other types of abusive/misbehaving flows. Thus, these components are manifestations of misbehavior. By taking these components into account in the computation of the badness factor, it is possible to derive a badness factor that provides an indication of whether a flow is misbehaving. In one embodiment, a badness factor value larger than 1 indicates a misbehaving flow. In addition to providing an indication of whether a flow is misbehaving, the badness factor also provides an indication of the degree to which the flow is misbehaving. Thus, a flow with a badness factor of 1.8 is misbehaving to a greater degree than a flow with a badness factor of 1.2.

The function shown in FIG. 5 is just one possible way of computing the badness factor. The function may be changed, augmented, or even replaced. For example, the administrator of the router $102$ may configure the MFM $210d$ to not take one or more of the components into account. For example, the administrator may determine that the duration component is not very indicative of a misbehaving flow, and hence, may configure the MFM $210d$ to ignore this component. In such a case, the MFM $210d$ will not use this component in computing the badness factor. Also, a different and even more sophisticated function, one that comprises one or more logical expressions, for example, may be used to compute the badness factor. These and other functions may be implemented. In addition, components other than and/or in addition to those components shown in FIG. 5 may be taken into account in computing the badness factor. Overall, for purposes of the present invention, the badness factor may be computed in any desired way, using any desired methodology and any desired criteria.

After the MFM $210d$ computes the badness factor, it stores the badness factor into the flow block $402$. The behavioral characteristics of the flow are thus updated to reflect the packet that was just forwarded. The MFM $210d$ is now ready to process another packet. The next time the MFM $210d$ receives a packet belonging to the same flow, it will recognize that the packet is part of an existing flow; thus, it will not create a new flow block. Instead, it will access the existing flow bock $402$ and use and/or update the information contained therein. In the current example, it will be assumed that the MFM $210d$ receives many more packets belonging to the flow, and forwards and processes them in the manner described above. Thus, the behavioral statistics are repeatedly updated to give rise to a set of relatively mature statistics (which include a relatively mature badness factor) for the flow. In one embodiment, the MFM $210d$ takes the badness factor of a flow into account only when a congestion condition is encountered (e.g. the outgoing link is experiencing congestion). If there is no such congestion, the MFM $210d$ will not enforce a penalty on the flow, regardless of the flow's badness value.

Suppose now that the MFM $210d$ receives another packet belonging to the flow, but that this time, the egress line card $202d$ is experiencing a congestion condition on the outgoing link. In such a case, the MFM $210d$ may wish to enforce a penalty on the flow, and the packet may need to be dropped. To determine whether to enforce a penalty on the flow, the

Cloudflare - Exhibit 1001, page 10

US 8,243,593 B2

9 / 10

MFM **210***d* accesses the badness factor stored in the flow block **402** associated with the flow. If the badness factor is less than or equal to a threshold value (which in the current example is 1), then no penalty will be enforced on the flow. Hence, the packet will be subject to the non-misbehaving flow drop rate, which in one embodiment is 0.1 (which means that the packet has a 10% chance of being dropped). However, if the badness factor is greater than the threshold value, then the MFM **210***d* will impose a penalty on the flow. In one embodiment, this penalty takes the form of an increased drop rate. This increased drop rate causes the packet to be subjected to a higher probability of being dropped than packets belonging to flows that are either not misbehaving or are less misbehaving.

In one embodiment, the magnitude of the increased drop rate is determined based upon the value of the badness factor. For purposes of the present invention, any formula/function may be used to determine the increased drop rate. In one embodiment, the increase drop rate rises rapidly relative to the badness factor. Thus, by the time the badness factor reaches **2**, the increased drop rate is already 0.5 (which means that the packet has a 50% probability of being dropped). By the time the badness factor is 3, the increased drop rate is 0.7, and by the time the badness factor is 5, the increased drop rate is over 0.8. This rapid increase in drop rate serves to penalize misbehaving flows early before they become too serious a problem. Of course, slower rising drop rates may be used if so desired.

After the drop rate is determined (whether it is the default drop rate or an increased drop rate), it is enforced by the MFM **210***d*. More specifically, the MFM **210***d* applies the appropriate probability in determining whether to drop the packet. If, after applying the appropriate drop rate, the packet is not dropped, then the line card **202***d* forwards the packet to the external router. After that is done, the MFM **210***d* updates the behavioral statistics of the flow in the manner described above to reflect the forwarded packet.

On the other hand, if the MFM **210***d* decides to drop the packet, then the egress line card **202***d* will not forward the packet to the external router. In such a case, the MFM **210***d* will update the behavioral statistics, but it will do so in a slightly different manner than that described above. Specifically, since the packet was not forwarded, the total byte count T, the number of packets N, and the average packet size A do not change; hence, these values will not be updated. However, the life duration L of the flow (derived by taking the difference between the current time and the timestamp) has changed; thus, it will be updated. Since the rate R depends on L, it will also be updated. In addition, the badness factor will be recomputed. In this manner, the behavioral statistics are updated even when a packet is dropped.

An interesting point to note in the above drop situation is that while the total byte count T has not changed, the life duration L has increased. Since the rate R is derived by dividing T by L, this means that the rate R has decreased as a result of dropping the packet. Since R has decreased, the quotient $R/R_{threshold}$ has also decreased. Because the quotient $R/R_{threshold}$ is one of the components used to determine the badness factor, this decrease could lead to a decrease in the badness factor. Thus, by dropping a packet, the badness factor may be improved (e.g. decreased). As noted above, the penalty imposed on a misbehaving flow is an increased drop rate. By making it more likely that a packet from the misbehaving flow will be dropped, which in turn will cause more packets from the flow to be dropped, the MFM **210***d* can cause the badness factor of the flow to improve. Thus, the imposition of a penalty on a misbehaving flow has the effect of improving

the behavior of the flow. In this manner, not only does the MFM **210***d* detect and penalize misbehaving flows, it can also rehabilitate them.

In the example discussed above, a penalty is enforced on a misbehaving flow only when a congestion condition is encountered. As an alternative, a penalty may be enforced on a misbehaving flow even when there is no congestion. That is, any time a flow has a badness factor that indicates undesirable flow behavior, the MFM **210***d* can impose an increased drop rate on the flow, and can enforce that drop rate on packets of the flow, regardless of whether there is congestion. That way, the MFM **210***d* can manage and control abusive/misbehaving traffic even in the absence of any traffic congestion. This and other modifications and enhancements are within the scope of the present invention.

At this point, it should be noted that although the invention has been described with reference to one or more specific embodiments, it should not be construed to be so limited. Various modifications may be made by those of ordinary skill in the art with the benefit of this disclosure without departing from the spirit of the invention. Thus, the invention should not be limited by the specific embodiments used to illustrate it but only by the scope of the issued claims and the equivalents thereof.

What is claimed is:

1. A machine-implemented method for processing a single flow, the flow comprising a plurality of packets, and the method comprising:

creating a flow block as the first packet of a flow is processed by a single router;

said flow block being configured to store payload-content-agnostic behavioral statistics pertaining to said flow, regardless of the presence or absence of congestion;

said router updating said flow block with the payload-content-agnostic behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by said router, regardless of the presence or absence of congestion;

said router heuristically determining whether said flow exhibits undesirable behavior by comparing at least one of said payload-content-agnostic behavioral statistics to at least one pre-determined threshold value; and

upon determination by said router that said flow exhibits undesirable behavior, enforcing, relative to at least one packet, a penalty;

wherein the preceding steps are performed on said router without requiring use of inter-router data.

2. A non-transitory computer-readable medium having computer-executable instructions for performing a method to process a single flow, the flow comprising a plurality of packets, and the method comprising:

creating a flow block as the first packet of a flow is processed by a single router;

said flow block being configured to store payload-content agnostic behavioral statistics about said flow, regardless of the presence or absence of congestion;

said router updating said flow block with the flow's behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by said router, regardless of the presence or absence of congestion;

said router heuristically determining whether said flow is exhibiting undesirable behavior by comparing at least one of said behavioral statistics to at least one pre-determined threshold value; and

Cloudflare - Exhibit 1001, page 11

US 8,243,593 B2

| 11 | 12 |

upon determination by said router that said flow is exhibiting undesirable behavior, enforcing, relative to at least one packet belonging to said flow, a penalty;

wherein the preceding steps are performed on said router without requiring use of inter-router data.

**3**. An article of manufacture comprising:

a non-transitory computer-readable medium having stored thereon a data structure;

a first field containing data representing a flow block;

a second field containing data representing payload-content-agnostic behavioral statistics about dropped and non-dropped packets of a flow;

a third field containing data representing pre-determined behavior threshold values;

a fourth field containing data representing the results of a heuristic determination of whether said flow exhibits undesirable behavior determined by comparing said behavioral statistics to said pre-determined threshold values;

a fifth field containing data representing at least one penalty to be enforced against at least one packet upon determination that said flow exhibits undesirable behavior.

**4**. A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed;

determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior, regardless of the presence or absence of congestion; and

in response to a determination that the flow is exhibiting undesirable behavior, enforcing a penalty on the flow.

**5**. A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion;

determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior; and

in response to a determination that the flow is exhibiting undesirable behavior, enforcing a penalty on the flow.

**6**. The method of claim **1**, wherein enforcing the penalty has an effect of correcting the flow's behavior such that the flow exhibits less undesirable behavior.

**7**. The method of claim **1**, wherein enforcing the penalty comprises:

imposing an increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

**8**. The method of claim **1**, wherein the penalty is enforced when a congestion condition is encountered.

**9**. A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and

computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

**10**. The method of claim **9**, wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably.

**11**. The method of claim **10**, further comprising:

determining, based at least partially upon the badness factor, a penalty to impose on the flow.

**12**. The method of claim **11**, further comprising: enforcing the penalty on the flow.

**13**. The method of claim **12**, wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior, thereby, causing the badness factor of the flow to improve.

**14**. The method of claim **12**, wherein the penalty is enforced on the flow when a congestion condition is encountered.

**15**. The method of claim **12**, wherein no penalty is enforced on the flow unless a congestion condition is encountered, regardless of how undesirably the flow is behaving.

**16**. The method of claim **12**, wherein the penalty is determined and enforced on the flow even when no congestion condition is encountered.

**17**. The method of claim **12**, wherein determining the penalty comprises:

determining an increased drop rate to impose on one or more information packets belonging to the flow.

**18**. The method of claim **17**, wherein enforcing the penalty comprises:

imposing the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

**19**. The method of claim **9**, wherein the set of behavioral statistics comprises a measure T of how much total information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time.

**20**. The method of claim **9**, wherein the set of behavioral statistics comprises a measure L of how long the flow has been in existence up to a current point in time.

**21**. The method of claim **20**, wherein the set of behavioral statistics comprises a rate R of information transfer for the flow, wherein R is derived by dividing T by L.

**22**. The method of claim **9**, wherein the set of behavioral statistics comprises an average size for the information packets belonging to the flow.

**23**. The method of claim **9**, wherein maintaining the set of behavioral statistics comprises:

receiving a particular information packet belonging to the flow;

determining whether to forward the particular information packet to a destination; and

in response to a determination to forward the particular information packet to the destination, updating the set of behavioral statistics to reflect processing of the particular information packet.

**24**. The method of claim **9**, wherein maintaining the set of behavioral statistics comprises:

receiving a particular information packet belonging to the flow; and

Cloudflare - Exhibit 1001, page 12

US 8,243,593 B2

13

updating the set of behavioral statistics to reflect processing of the particular information packet, regardless of whether the particular information packet is discarded or forwarded to a destination.

25. A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising:

means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion;

means for determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior; and

means for enforcing, in response to a determination that the flow is exhibiting undesirable behavior, a penalty on the flow.

26. The MFM of claim 25, wherein enforcing the penalty has an effect of correcting the flow's behavior such that the flow exhibits less undesirable behavior.

27. The MFM of claim 25, wherein the means for enforcing the penalty comprises:

means for imposing an increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

28. The MFM of claim 25, wherein the penalty is enforced when a congestion condition is encountered.

29. A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising:

means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and

means for computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

30. The MFM of claim 29, wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably.

31. The MFM of claim 30, further comprising:

means for determining, based at least partially upon the badness factor, a penalty to impose on the flow.

32. The MFM of claim 31, further comprising: means for enforcing the penalty on the flow.

33. The MFM of claim 32, wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior, thereby, causing the badness factor of the flow to improve.

14

34. The MFM of claim 32, wherein the penalty is enforced on the flow when a congestion condition is encountered.

35. The MFM of claim 32, wherein no penalty is enforced on the flow unless a congestion condition is encountered, regardless of how undesirably the flow is behaving.

36. The MFM of claim 32, wherein the penalty is determined and enforced on the flow even when no congestion condition is encountered.

37. The MFM of claim 32, wherein the means for determining the penalty comprises:

means for determining an increased drop rate to impose on one or more information packets belonging to the flow.

38. The MFM of claim 37, wherein the means for enforcing the penalty comprises:

means for imposing the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

39. The MFM of claim 29, wherein the set of behavioral statistics comprises a measure T of how much total information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time.

40. The MFM of claim 29, wherein the set of behavioral statistics comprises a measure L of how long the flow has been in existence up to a current point in time.

41. The MFM of claim 40, wherein the set of behavioral statistics comprises a rate R of information transfer for the flow, wherein R is derived by dividing T by L.

42. The MFM of claim 29, wherein the set of behavioral statistics comprises an average size for the information packets belonging to the flow.

43. The MFM of claim 29, wherein the means for maintaining the set of behavioral statistics comprises:

means for receiving a particular information packet belonging to the flow;

means for determining whether to forward the particular information packet to a destination; and

means for updating, in response to a determination to forward the particular information packet to the destination, the set of behavioral statistics to reflect processing of the particular information packet.

44. The MFM of claim 29, wherein the means for maintaining the set of behavioral statistics comprises:

means for receiving a particular information packet belonging to the flow; and

means for updating the set of behavioral statistics to reflect processing of the particular information packet, regardless of whether the particular information packet is discarded or forwarded to a destination.

* * * * *

Cloudflare - Exhibit 1001, page 13

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

CLOUDFLARE, INC. AND SONICWALL INC.
Petitioners

v.

SABLE NETWORKS, INC.
Patent Owner

_____

Case IPR2021-00909
Patent No. 8,243,593

_____

**PETITION FOR *INTER PARTES* REVIEW**

## TABLE OF CONTENTS

List of Exhibits ................................................................................ vii

Mandatory Notices Under 37 C.F.R. § 42.8 ................................... xii

    Real Party-in-Interest (37 C.F.R. § 42.8(b)(1)) .......................... xii

    Related Matters (37 C.F.R. § 42.8(b)(2)) .................................. xii

    Lead and Back-Up Counsel (37 C.F.R. § 42.8(b)(3)) ............... xiii

    Service Information (37 C.F.R. § 42.8(b)(4)) ........................... xiii

I.    Introduction ................................................................................. 1

II.    Grounds for Standing .................................................................. 1

III.    Technical Background .................................................................. 1

IV.    The Challenged Patent ................................................................ 6

    A.    Overview of the '593 Patent .................................................. 6

    B.    Prosecution History .............................................................. 9

    C.    Person of Ordinary Skill in the Art ..................................... 11

V.    Claim Construction ................................................................... 11

    A.    "means for maintaining a set of behavioral statistics for the flow…" (claims 25 and 29) .................................................. 12

    B.    "means for determining…whether the flow is exhibiting undesirable behavior" (claim 25) .................................... 12

    C.    "means for enforcing…[a/the] penalty on the flow" (claims 25 and 32) ............................................................. 12

    D.    "means for computing…a badness factor for the flow" (claim 29) ........................................................................ 13

    E.    "means for determining…a penalty to impose on the flow" (claim 31) ........................................................................ 13

    F.    "means for determining an increased drop rate to impose on one or more information packets belonging to the flow" (claim 37) ....... 13

    G.    "means for imposing [an/the] increased drop rate on the flow" (claims 27 and 38) .............................................. 13

i

    H.     "means for receiving a particular information packet belonging to the flow" (claims 43 and 44) ............................................14

    I.     "means for determining whether to forward the particular information packet to a destination" (claim 43) ...................14

    J.     "means for updating […] the set of behavioral statistics to reflect processing of the particular information packet" (claims 43 and 44) ...........................................................................14

VI.   Overview of the Prior Art ................................................................15

VII.  Grounds of Unpatentability ............................................................16

    A.    Ground 1:  Claims 1, 2, 4-7, 17, 18, 25-27, 37, and 38 Are Obvious over Yung ....................................................................17

        1. Overview: Yung Discloses a System for Classifying and Controlling Flows Using Behavioral Statistics ...........................17

        2. Independent Claim 1 ..................................................................19

            a.     Yung Discloses the Preamble of Claim 1 ......................19

            b.     Yung Discloses the "Creating" Limitation ...................21

            c.     Yung Stores Payload-Content-Agnostic Behavioral Statistics Regardless of the Presence or Absence of Congestion ..............................................................25

            d.     Yung Discloses the "Updating" Limitation ..................28

            e.     Yung Discloses the "Determining" Limitation .............30

            f.     Yung Discloses the "Enforcing" Limitation .................33

            g.     Yung Discloses Performing the Steps on a Router Without Requiring Use of Inter-Router Data ...............34

        3. Independent Claim 2 ..................................................................36

            a.     Yung Discloses the Preamble of Claim 2 ......................36

            b.     Yung Discloses the Limitations of Claim 2 .................37

         4. Independent Claims 4 and 5 ......................................................37

         5. Independent Claim 25 ................................................................39

            a.     Yung Discloses the Preamble of Claim 25 ....................39

            b.     Yung Discloses the "Means for Maintaining" Limitation ...................................................................39

       c.     Yung Discloses the "Means for Determining" Limitation .................................................................40

       d.     Yung Discloses the "Means for Enforcing" Limitation. ...............................................................40

   6.  Dependent Claims 6 and 26 .......................................................41

   7.  Dependent Claims 7 and 27 .......................................................41

   8.  Dependent Claims 17 and 37 .....................................................42

   9.  Dependent Claims 18 and 38 .....................................................42

B.    Ground 2: Claims 9-13, 19-24, 29-33, and 39-44 Are Obvious over Yung and Copeland ....................................................................43

   1.  Overview: Yung Discloses a System for Classifying and Controlling Flows Using Behavioral Statistics, and Copeland Calculates a Flow-Based Concern Index ......................43

   2.  Motivation to Combine .................................................................45

   3.  Independent Claim 9 ....................................................................48

       a.     Yung Discloses the Preamble of Claim 9 .....................48

       b.     Yung Discloses the "Maintaining" Limitation .............48

       c.     Yung in View of Copeland Discloses the "Computing" Limitation ...............................................49

   4.  Independent Claim 29 ..................................................................51

       a.     Yung Discloses the Preamble of Claim 29 ...................51

       b.     Yung Discloses the "Means for Maintaining" Limitation ......................................................................52

       c.     Yung Discloses the "Means for Computing" Limitation ......................................................................52

   5.  Dependent Claims 10 and 30 .....................................................53

   6.  Dependent Claims 11 and 31 .....................................................53

   7.  Dependent Claims 12 and 32 .....................................................54

   8.  Dependent Claims 13 and 33 .....................................................54

   9.  Dependent Claims 19 and 39 .....................................................55

   10. Dependent Claims 20 and 40 .....................................................55

11. Dependent Claims 21 and 41 .......................................................56

12. Dependent Claims 22 and 42 .......................................................57

13. Dependent Claims 23 and 43 .......................................................58

14. Dependent Claims 24 and 44 .......................................................59

C.    Ground 3: Claim 3 Is Obvious over Yung and Four-Steps Whitepaper .......................................................................................61

1.  Overview: Yung Discloses a System for Classifying and Controlling Flows Using Behavioral Statistics, and Four-Steps Whitepaper Discloses Tracking Dropped Packets ..............61

2.  Motivation to Combine ................................................................62

3.  Independent Claim 3 ...................................................................64

a.    Yung Discloses the Preamble of Claim 3 .....................64

b.    Yung Discloses a Medium Storing a Data Structure ...........................................................................64

c.    Yung Discloses the "First Field" ...................................66

d.    Yung in View of Four-Steps Whitepaper Discloses the "Second Field" ........................................66

e.    Yung Discloses the "Third Field" .................................67

f.    Yung Discloses the "Fourth Field" ...............................67

g.    Yung Discloses the "Fifth Field" ..................................68

D.    Ground 4: Claims 8, 14-16, 28, and 34-36 Are Obvious over Yung and Copeland in View of Ye ...................................................69

1.  Overview: Yung-Copeland Discloses a System for Classifying Flows Using Behavioral Statistics, and Ye Describes a Congestion Condition ............................................69

2.  Motivation to Combine ................................................................70

3.  Dependent Claims 8, 14, 28, and 34 ...........................................72

4.  Dependent Claims 15 and 35 .......................................................74

5.  Dependent Claims 16 and 36 .......................................................75

VIII.  Discretionary Denial Would Be Inappropriate and Inequitable ...................75

IX.    Conclusion ................................................................................................80

## <u>TABLE OF AUTHORITIES</u>

### Federal Court Decisions

*Intri-Plex Technologies v. NHK International Corp.*,
  3:17-cv-01097-EMC (N.D. Cal.)..........................................................................78

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2015) (en banc) ....................................................11, 12

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ........................................................................11

### Patent Trial and Appeal Board Decisions

*Apple Inc. v. Fintiv, Inc.*,
  IPR2020-00019, Paper 15 (PTAB May 13, 2020) .............................................77

*Apple Inc. v. Fintiv, Inc.*,
  IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020).....................................*passim*

*Apple Inc. v. Parus Holdings, Inc.*,
  IPR2020-00686, Paper 9 (PTAB Sept. 23, 2020).............................................77

*HP, Inc. v. Neodron, Ltd.*,
  IPR2020-00459, Paper 17 (PTAB Sept. 14, 2020)................................78, 79, 80

*Mylan Pharmaceuticals Inc. v. Sanofi-Aventis Deutschland GmbH*,
  IPR2018-01680, Paper 22 (PTAB Apr. 3, 2019) ..............................................78

*NHK Spring Co. v. Intri-Plex Techs., Inc.*,
  IPR2018-00752, Paper 8 (PTAB Sept. 12, 2018)...................................76, 78, 79

*Sand Revolution II, LLC v. Continental Intermodal Group – Trucking
  LLC*, IPR2019-01393, Paper 24 (PTAB June 16, 2020) .............................77, 78

*Valve Corp. v. Electronic Scripting Product, Inc.*,
  IPR2019-00062, Paper 11 (PTAB Apr. 2, 2019) .........................................75, 76

*VMWare, Inc. v. Intellectual Ventures I LLC*,
  IPR2020-00470, Paper 13 (PTAB Aug. 18, 2020)................................77, 79, 80

## Federal Statutes

35 U.S.C.

    § 102 .................................................................................................15, 16

    § 112 ......................................................................................................11

    § 315 ......................................................................................................78

## Federal Rules and Regulations

37 C.F.R. § 42.100(b) ...........................................................................11

vi

Appx80

### LIST OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1001 | U.S. Patent No. 8,243,593 (the "'593 Patent") |
| 1002 | Prosecution history of U.S. Application No. 11/022,599, which led to the issuance of the '593 Patent ("File History") |
| 1003 | Declaration of Kevin Jeffay, Ph.D. in Support of Petition for *Inter Partes* Review of U.S. Patent No. 8,243,593 |
| 1004 | *Curriculum Vitae* of Kevin Jeffay |
| 1005 | U.S. Patent No. 7,664,048 ("Yung") |
| 1006 | "Four Steps to Application Performance Across the Network with Packeteer's PacketShaper®," archived by web.archive.org on March 17, 2003, with Affidavit of Elizabeth Rosenberg attached ("Four-Steps Whitepaper") |
| 1007 | U.S. Patent No. 7,185,368 ("Copeland") |
| 1008 | U.S. Patent No. 7,295,516 ("Ye") |
| 1009 | U.S. Patent Publication No. 2004/0090923 ("Kan") |
| 1010 | Gerber, A., et al., "P2P, the Gorilla in the Cable," Proceedings of National Cable & Telecommunications Association, NCTA, 2003 ("Gerber") |
| 1011 | U.S. Patent No. 7,225,271 ("DiBiasio") |
| 1012 | U.S. Patent No. 7,561,515 ("Ross") |
| 1013 | Ben-Nun, M., "Taming the Peer to Peer Monster Using Service Control," Fall Technical Forum (2003) ("Ben-Nun") |
| 1014 | U.S. Patent No. 6,839,321 ("Chiruvolu") |
| 1015 | U.S. Patent No. 7,088,678 ("Freed") |
| 1016 | "NetEnforcer$^{TM}$, QoS/SLA Enforcement for Service Providers," |

| Exhibit | Description |
|---|---|
| | Allot Communications (2001) |
| 1017 | "PacketShaper® Features for PacketWise 5.2," Packeteer, Inc. |
| 1018 | U.S. Patent No. 7,366,101 ("Varier") |
| 1019 | Andrikopoulos, I., Pavlou, G., "Supporting Differentiated Services in MPLS Networks," 1999 Seventh International Workshop on Quality of Service, including Declaration from Rachel J. Watters, Librarian and Director of Wisconsin TechSearch ("Andrikopoulos") |
| 1020 | U.S. Patent No. 7,385,924 ("Riddle-924") |
| 1021 | U.S. Patent No. 7,660,248 ("Duffield") |
| 1022 | Sen, S., *et al.*, "Accurate, Scalable In-Network Identification of P2P Traffic Using Application Signatures," Proceedings of the 13th International Conference on World Wide Web (2004) ("Sen") |
| 1023 | U.S. Patent No. 7,313,100 ("Turner") |
| 1024 | U.S. Patent Publication No. 2002/0186661 ("Santiago") |
| 1025 | U.S. Patent Publication No. 2003/0118029 ("Maher") |
| 1026 | U.S. Patent No. 7,296,288 ("Hill") |
| 1027 | U.S. Patent No. 6,904,529 ("Swander") |
| 1028 | U.S. Patent No. 6,385,170 ("Chiu") |
| 1029 | U.S. Patent No. 6,934,256 ("Jacobson") |
| 1030 | U.S. Patent No. 7,342,929 ("Bremler-Barr") |
| 1031 | PacketShaper® System Datasheet |
| 1032 | Boniforti, C., "Securing a University's Bandwidth with PacketShaper," SANS Institute (2003) ("Boniforti") |

| Exhibit | Description |
|---------|-------------|
| 1033 | Braden, R., Postel, J., "RFC 1009 – Requirements for Internet Gateways" (1987) ("Braden") |
| 1034 | Roughan, M., *et al.*, "Class-of-Service Mapping for QoS: A Statistical Signature-based Approach to IP Traffic Classification," Proceedings of the 4th ACM SIGCOMM Conference on Internet Measurement (2004) ("Roughan") |
| 1035 | U.S. Patent No. 7,027,393 ("Cheriton") |
| 1036 | U.S. Patent No. 7,433,304 ("Galloway") |
| 1037 | U.S. Patent No. 6,115,357 ("Packer") |
| 1038 | Szigeti, T., "QoS Best Practices," Cisco Systems (2004) ("Szigeti") |
| 1039 | U.S. Patent No. 6,412,000 to Riddle *et al.* ("Riddle-000") |
| 1040 | Long L., *et al.*, "Differential Congestion Notification: Taming the Elephants," Proceedings of the 12th IEEE International Conference on Network Protocols (Oct. 2004) ("Long") |
| 1041 | Parris M., *et al.*, "Lightweight Active Router-Queue Management for Multimedia Networking," Multimedia Computing and Networking" (Jan. 1999) ("Parris") |
| 1042 | U.S. Patent Publication No. 2002/0023168 ("Bass") |
| 1043 | U.S. Application Publication No. 2002/0097719 ("Chaskar") |
| 1044 | Bernaille, L., et al, "Traffic Classification on the Fly," ACM SIGCOMM Computer Communication Review (2006) ("Bernaille") |
| 1045 | U.S. Patent No. 7,782,793 ("Olesinski") |
| 1046 | U.S. Patent No. 8,693,348 ("Wei") |
| 1047 | Karagiannis, T., et al, "Transport Layer Identification of P2P Traffic," IMC 04: Proceedings of the 4th ACM SIGCOMM |

| Exhibit | Description |
|---------|-------------|
| | conference on Internet measurement, October 2004 ("Karagiannis") |
| 1048 | Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, United States District Court for the Western District of Texas dated May 8, 2020 |
| 1049 | Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, United States District Court for the Western District of Texas dated June 18, 2020 |
| 1050 | Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, United States District Court for the Western District of Texas dated July 2, 2020 |
| 1051 | Seventh Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, United States District Court for the Western District of Texas dated August 6, 2020 |
| 1052 | Eighth Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, United States District Court for the Western District of Texas dated September 21, 2020 |
| 1053 | Ninth Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, United States District Court for the Western District of Texas dated October 14, 2020 |
| 1054 | Tenth Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, United States District Court for the Western District of Texas dated November 18, 2020 |
| 1055 | Eleventh Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, |

x

| Exhibit | Description |
|---|---|
|  | United States District Court for the Western District of Texas dated December 10, 2020 |
| 1056 | Twelfth Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, United States District Court for the Western District of Texas dated January 7, 2021 |
| 1057 | Thirteenth Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, United States District Court for the Western District of Texas dated February 2, 2021 |
| 1058 | Fourteenth Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic, United States District Court for the Western District of Texas dated March 17, 2021 |
| 1059 | U.S. Patent No. 6,038,216 ("Packer-216") |
| 1060 | Declaration of Daniel C. Callaway in Support of Petition for *Inter Partes* Review |

## MANDATORY NOTICES UNDER 37 C.F.R. § 42.8

### Real Party-in-Interest (37 C.F.R. § 42.8(b)(1))

The real parties-in-interest are petitioners Cloudflare, Inc. and SonicWall Inc. (collectively, "Petitioners") and SonicWall US Holdings Inc., which is the parent corporation of SonicWall Inc. No unnamed entity is funding, controlling, or directing this petition or has the opportunity to control or direct this petition or Petitioners' participation in any resulting *inter partes* review. Petitioners understand and believe that the '593 Patent is owned by Sable Networks, Inc. ("Patent Owner").

### Related Matters (37 C.F.R. § 42.8(b)(2))

Petitioners are aware of the following pending district court matters involving the '593 Patent: *Sable Networks, Inc. and Sable IP, LLC v. Splunk, Inc. and Splunk Services LLC*, Case No. 5:21-cv-00040 (E.D. Tex.); *Sable Networks, Inc. and Sable IP, LLC v. Cloudflare, Inc.*, Case No. 6:21-cv-00261 (W.D. Tex.); *Sable Networks, Inc. and Sable IP, LLC v. Forcepoint LLC*, Case No. 6:21-cv-00241 (W.D. Tex.); *Sable Networks, Inc. and Sable IP, LLC v. Check Point Software Technologies, Ltd. and Check Point Software Technologies, Inc.*, Case No. 1:21-cv-00201-LPS (D. Del.); *Sable Networks, Inc. and Sable IP, LLC v. Riverbed Technology, Inc.*, Case No. 6:21-cv-00175 (W.D. Tex.); and *Sable*

*Networks, Inc. and Sable IP, LLC v. SonicWall, Inc.*, Case No. 6:21-cv-00190 (W.D. Tex.).

**Lead and Back-Up Counsel (37 C.F.R. § 42.8(b)(3))**

Petitioners appoint James L. Day (Reg. No. 72,681) of Farella Braun + Martel LLP as lead counsel and appoint Daniel Callaway (Reg. No. 74,267) and Winston Liaw (Reg. No. 78,766) of Farella Braun + Martel LLP and David C. Dotson (Reg. No. 59,472) of Duane Morris LLP as back-up counsel.

**Service Information (37 C.F.R. § 42.8(b)(4))**

Service of any documents to lead and back-up counsel can be made via hand-delivery to Farella Braun + Martel LLP, 235 Montgomery Street, 17th Floor, San Francisco, California, 94104.  Petitioners consent to electronic service to the following email addresses:  jday@fbm.com, dcallaway@fbm.com, wliaw@fbm.com, dcdotson@duanemorris.com, and calendar@fbm.com.

xiii

Appx87

## I.    INTRODUCTION

Cloudflare, Inc. and SonicWall Inc. ("Petitioners") petition for *inter partes* review of claims 1-44 ("challenged claims") of U.S. Patent No. 8,243,593 (the "'593 Patent") assigned to Sable Networks, Inc. ("Patent Owner").  The challenged claims are directed to identifying and controlling network traffic using behavioral statistics of packets in the flows, which was known in the art as evidenced by this petition and the supporting declaration of Kevin Jeffay, Ph.D. (EX1003).  The challenged claims are unpatentable as obvious based on the following grounds:

| Ground | Claims | Prior Art |
|--------|--------|-----------|
| 1 | 1, 2, 4-7, 17, 18, 25-27, 37, 38 | Yung (EX1005) |
| 2 | 9-13, 19-24, 29-33, 39-44 | Yung and Copeland (EX1007) |
| 3 | 3 | Yung and Four-Steps Whitepaper (EX1006) |
| 4 | 8, 14-16, 28, 34-36 | Yung, Copeland, and Ye (EX1008) |

## II.    GROUNDS FOR STANDING

Petitioners certify that the '593 Patent is available for *inter partes* review and that Petitioners are not barred or estopped from requesting review.

## III.    TECHNICAL BACKGROUND

By the early 2000s, the ever-increasing popularity of online applications and services brought significantly increased network traffic on the Internet and other

computer networks. The Internet provided an "exploding amount of remote information" to users worldwide and enabled a variety of new applications (e.g., e-mail, e-commerce, file-transfer, remote database access, etc.) that added load to existing networks already strained by increasing levels of network traffic. EX1042, ¶¶[0019]-[0020]. The problem of quickly-growing demand for the limited existing bandwidth was exacerbated by the widespread emergence of peer-to-peer (P2P) applications (EX1010, 1-2; EX1013, 1-2), growing use of voice-over-IP (VOIP) systems (EX1011, 1:62-2:21), and increase in denial-of-service attacks against network infrastructures (EX1012, 1:12-18). *See also* EX1003, ¶¶32-37.

Because existing networks had finite capacity for ever-increasing network traffic, it became necessary to monitor network performance and to employ corrective measures when performance fell. EX1009, ¶[0004]. Various techniques were developed to identify network traffic and handle it appropriately in an effort to efficiently allocate existing bandwidth. EX1021, 2:43-3:6; EX1003, ¶¶38-40. For example, a network administrator might prioritize database transactions over external web-browsing or ensure low latency for interactive applications and high throughput for file downloads. EX1021, 1:9-29.

One way to understand network traffic was to identify (i.e., classify) network "flows." The concept of a flow would have been well-known to a person

of ordinary skill in the art. EX1003, ¶40. A flow is essentially a sequence of related packets; for example, packets sent from the same application or packets sent on the same network connection. *Id.*; *see also* EX1001, 5:15-19 (describing a flow as "a series of packets that are related in some manner" and stating that "packets are grouped into a flow if they share a sufficient amount of header information"). Network elements, such as routers, track network flows using flow tables to record the existence of the flow and to capture information about it. EX1043, ¶¶[0002]-[0006], [0013].

By 2004, when the '593 Patent was filed, various prior art approaches had been developed for classifying flows. Given a flow classification, an administrator could apply rules to take action on the packets of the flow to adhere to desired policies (e.g., priority, security, rate control, etc.). EX1003, ¶45. For example, network congestion and delays could be addressed by "shaping" network traffic, which could include dropping packets or using other quality of service (QoS) measures (e.g., prioritizing certain flows, re-routing flows, etc.). EX1014, 1:6-32; EX1029, 2:21-40.

Industry participants offered various products (i.e., network appliances) providing traffic management capabilities. EX1003, ¶¶41-43; EX1016; EX1017. For example, Packeteer, Inc. was an industry leader and offered a network appliance called PacketShaper® that allowed network administrators to "control

traffic to ensure that latency-sensitive, customer-critical applications get the bandwidth they need to perform at their peak."  EX1031, 3; *see also id.*, 1 ("Seventy-four percent of the world's largest companies rely on Packeteer® innovation to solve their WAN application performance problems."); EX1032 ("Securing a University's Bandwidth with PacketShaper").  For reasons of trust and scalability of administration and management, however, traffic management functionality was typically implemented in network routers.  EX1021, 3:19-24; *see also* EX1029, 2:21-40; EX1020, 16:37-40; EX1023, 2:41-54; EX1015, 1:58-2:3; EX1018, Abstract; EX1028, Abstract; EX1030, 20:9-12; EX1036, 21:1-7; EX1037, 5:3-6; EX1003, ¶44.

Network practitioners recognized, by the early 2000s, that better classification techniques (i.e., improved mechanisms for identifying the type of traffic represented by particular network flows) would lead to wider adoption of QoS-based traffic shaping.  EX1021, 2:31-39.  It had become particularly important to accurately identify peer-to-peer traffic because it had come to monopolize a large portion of available network bandwidth.  EX1022, 512; *see also* EX1003, ¶45.

Some traffic classification techniques examined packet header information, such as the port number, or scanned packet payloads (i.e., data carried by the packet) in an effort to identify a "signature" for a particular type of network traffic.

4

EX1022, 512; EX1045, 1:31-42; EX1046, 1:42-50; EX1005, 4:51-55; EX1001, 1:19-45; EX1003, ¶46.  Because some applications, such as peer-to-peer applications, sought to avoid identification through encryption, dynamic port-hopping, and other means, traffic classification techniques were developed that focused on the flow's behavioral statistics and empirically observable flow data. EX1021, Abstract; EX1045, 2:51-3:30; EX1007, Abstract; EX1047, 121-122; EX1034, 139-140 §4.2; EX1005, Abstract; EX1003, ¶47.  For example, some prior art techniques considered packet sizes, number of packets, inter-packet arrival delay, and so forth in classifying network flows.  EX1045, 6:29-35 ("Beside flow duration, traffic flows can be characterized based on statistical traffic flow parameters such as: average/median packet size, packet size variance, root-means-square packet size, largest packet sampled so far, shortest packet sampled so far, average/median inter-packet arrival delay, inter-packet arrival delay variance, bytes per flow, packets per flow, etc."); EX1021, 6:28-32, 7:18-20 ("A simple example is the statistics of the inter-arrival times between packets in flows."); EX1047, 134 ("We also want to consider additional heuristics that use knowledge of specific packet sizes that may reflect control traffic of P2P protocols.").  These approaches did not rely on packet headers or payload contents.  EX1047, 121-122 ("We develop a systematic methodology for P2P traffic profiling by identifying flow patterns and characteristics of P2P behavior, without examination of user

5

payload."). Instead, they applied heuristics to map measured statistics onto established classes (e.g., P2P). *Id.*, 125 ("These two simple heuristics efficiently classify most pairs as P2P or nonP2P.").

After classifying the flow as a particular type of traffic, network traffic management devices could enforce policies on packets in the flow as appropriate. EX1025, ¶¶[0008]-[0009], [0059]; EX1005, 24:27-25:8. For instance, packets could be prioritized, delayed, or dropped depending on the type of traffic and the particular rules adopted by network administrators. Flow identification and management of this type could be implemented in various network devices including IP routers, as noted above. EX1003, ¶48.

## IV.   THE CHALLENGED PATENT

### A.   Overview of the '593 Patent

The '593 Patent is entitled "Mechanism for Identifying and Penalizing Misbehaving Flows in a Network." EX1001. It describes identifying network data flows based on behavioral statistics and penalizing "misbehaving" flows such as peer-to-peer traffic. *Id.*, Abstract, 1:53-2:51. As others in the industry had already recognized (e.g., EX1021, 2:31-39; EX1045, 1-31:42), then-existing systems were inadequate for classifying traffic as applications became more sophisticated and elusive. EX1001, 1:7-49. The named-inventor addressed the problem—again as others in the industry already had (e.g., EX1021, 6:23-7:40; EX1045, 6:18-35)—by

6

identifying flows based on their observed, empirical behavior.  EX1001, 1:58-59,

2:4-5.  The specification explains that "because their behavior cannot be hidden,

misbehaving flows cannot avoid detection…regardless of which protocols they

use, or how those protocols try to hide/obfuscate their nature…."  *Id.*, 1:61-66.

"Once identified/detected, they can be controlled and/or penalized."  *Id.*, 1:66-67.

The '593 Patent describes a "misbehaving flow manager (MFM) 210 for

keeping track of flows, determining whether the flows are exhibiting undesirable

behavior, and enforcing a penalty on the flows if they are exhibiting undesirable

behavior."  EX1001, 5:44-48.  The misbehaving flow manager empirically tracks

behavioral statistics such as byte count, life duration, flow rate, average packet

size, etc. and stores these statistics in a "flow block."  *Id.*, 2:4-5, 2:63-64, 6:5-20,

Fig. 4.

7

**'593 Patent, Fig. 4**

As each packet in the flow is processed, the behavioral statistics in the flow block are updated to "provide an up to date reflection of the flow's behavior." *Id.*, 6:20-24.

Legacy systems classified flows using heuristic methods, and it was typical to calculate gradients, ranges, or other quantitative indicators of a degree of misbehavior. *See, e.g.*, EX1007, Abstract; EX1030, 7:2-5. Similarly, the '593 Patent computes a "badness factor" used to determine whether a flow exhibits undesirable behavior and indicating a degree of misbehavior. EX1001, 2:18-24, 6:25-33. Figure 5 illustrates one function for computing the badness factor considering flow rate, duration, total bytes, and average packet size as compared to

8

thresholds. *Id.*, 2:65-67, 7:51-67.



**'593 Patent, Fig. 5**

After identifying an undesirable flow, the misbehaving flow manager applies standard techniques for flow control (e.g., increasing drop rate). EX1001, 2:28-30, 6:34-43, 9:7-14. The flow manager then updates the statistics to reflect the processing. *Id.*, 7:37-45.

### B. Prosecution History

The application that issued as the '593 Patent was filed on December 22, 2004. In an initial office action, the examiner rejected all application claims based on U.S. Patent No. 6,310,881 ("Zikan") alone or in combination with other references. EX1002, 57-62. After unsuccessfully attempting to distinguish the cited prior art, the applicant filed an RCE and added three additional claims on April 13, 2010. *Id.*, 120, 125-135.

9

In another office action, the examiner rejected all of the application claims based on U.S. Patent No. 6,934,256 ("Jacobson") alone or in combination with other references. EX1002, 156-164. In response, the applicant amended the claims, added an additional claim, and attempted to distinguish Jacobson by, among other things, arguing that "Jacobson does <u>not</u> teach 'maintaining a set of behavioral statistics for the flow…based on each information packet.'" *Id.*, 187 (emphasis in original). In a Final Rejection, the examiner rejected all application claims as obvious based on Jacobson combined with several prior art references including U.S. Publication No. 2002/0032717 ("Malan"). *Id.*, 210-220. The applicant filed another RCE on September 2, 2011, arguing that "Jacobson is not analogous prior art" and does not "mention the concept of a 'set of behavioral statistics is updated based on ***<u>each</u>*** information packet belonging to the flow, as ***<u>each</u>*** information packet…is processed, ***regardless of the presence or absence of congestion***.'" *Id.*, 237, 240-41 (emphasis in original). The applicants also argued that Malan did not disclose a "set of behavioral statistics [that] is updated…***regardless of the presence or absence of congestion***." *Id.*, 241 (emphasis in original).

On April 3, 2012, the examiner issued a Notice of Allowability, noting under "Reason to Allow" only: "See applicant's amendments and responses filed on 2nd September 2011." EX1002, 257. The '593 Patent issued on July 25, 2012.

The Examiner did not review or cite any of the prior art references asserted in this petition.

### C.      Person of Ordinary Skill in the Art

A person of ordinary skill in the art ("POSA") with regard to the '593 Patent would have had an undergraduate degree (or equivalent) in electrical engineering, computer science, or comparable subject and at least 3-5 years of academic or industry experience in computer networking or comparable industry experience. EX1003, ¶27.

## V.      CLAIM CONSTRUCTION

Claims should be given "their ordinary and customary meaning" as understood by a POSA at the time of the claimed invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1313 (Fed. Cir. 2015) (en banc); 37 C.F.R. §42.100(b).

The challenged claims include 10 limitations that, for purposes of this proceeding, should be interpreted under 35 U.S.C. §112(6). *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). Despite having numerous means-plus-function limitations, the only structures[1] in the '593 Patent that perform the claimed functions of the misbehaving flow manager ("MFM 210") are: (1) "one or more processors on a line card 202 [that] execute one or more sets

---

[1]    Exemplary structures are identified for purposes of this proceeding only.

of instructions" or (2) "hardwired logic components (e.g., in the form of one or more ASIC's on a line card 202)."  EX1001, 5:49-57, Fig. 2; *see also* EX1003, ¶79.  The remaining terms of the '593 Patent, for purposes of this proceeding, should be given their plain and ordinary meaning under *Phillips*.

### A.    "means for maintaining a set of behavioral statistics for the flow…" (claims 25 and 29)

Function:  Maintaining a set of behavioral statistics for a flow.

Structure:  MFM 210 is implemented on "processors" that perform this function in the manner described in the '593 Patent.  EX1001, 6:5-24, 5:49-57; EX1003, ¶80.

### B.    "means for determining…whether the flow is exhibiting undesirable behavior" (claim 25)

Function:  Determining whether a flow is exhibiting undesirable behavior.

Structure:  MFM 210 is implemented on "processors" that perform this function in the manner described in the '593 Patent.  EX1001, 6:25-33, 5:49-57; EX1003, ¶81.

### C.    "means for enforcing…[a/the] penalty on the flow" (claims 25 and 32)

Function:  Enforcing a penalty on a flow.

Structure:  MFM 210 is implemented on "processors" that perform this function in the manner described in the '593 Patent.  EX1001, 6:34-47, 5:49-57; EX1003, ¶82.

**D.    "means for computing…a badness factor for the flow" (claim 29)**

<u>Function</u>:  Computing a badness factor for a flow.

<u>Structure</u>:  MFM 210 is implemented on "processors" that perform this function in the manner described in the '593 Patent.  EX1001, 6:25-33, 7:57-8:37, 5:49-57; EX1003, ¶83.

**E.    "means for determining…a penalty to impose on the flow" (claim 31)**

<u>Function</u>:  Determining a penalty to impose on a flow.

<u>Structure</u>:  MFM 210 is implemented on "processors" that perform this function in the manner described in the '593 Patent.  EX1001, 6:34-47, 5:49-57; EX1003, ¶84.

**F.    "means for determining an increased drop rate to impose on one or more information packets belonging to the flow" (claim 37)**

<u>Function</u>:  Determining an increased drop rate to impose on one or more information packets belonging to a flow.

<u>Structure</u>:  MFM 210 is implemented on "processors" that perform this function in the manner described in the '593 Patent.  EX1001, 6:35-38, 5:49-57; EX1003, ¶85.

**G.    "means for imposing [an/the] increased drop rate on the flow" (claims 27 and 38)**

<u>Function</u>:  Imposing an increased drop rate on a flow.

<u>Structure</u>:  MFM 210 is implemented on "processors" that perform this

13

function in the manner described in the '593 Patent.  EX1001, 6:37-42, 5:49-57; EX1003, ¶86.

## H.    "means for receiving a particular information packet belonging to the flow" (claims 43 and 44)

Function:  Receiving a particular information packet belonging to a flow.

Structure:  MFM 210 is implemented on "processors" that perform this function in the manner described in the '593 Patent.  EX1001, 6:5-8, 5:49-57; EX1003, ¶87.

## I.    "means for determining whether to forward the particular information packet to a destination" (claim 43)

Function:  Determining whether to forward a particular information packet to a destination.

Structure:  MFM 210 is implemented on "processors" that perform this function in the manner described in the '593 Patent.  EX1001, 7:37-43, 5:49-57; EX1003, ¶88.

## J.    "means for updating […] the set of behavioral statistics to reflect processing of the particular information packet" (claims 43 and 44)

Function:  Updating the set of behavioral statistics to reflect processing of the particular information packet.

Structure: MFM 210 is implemented on "processors" that perform this function in the manner described in the '593 Patent.  EX1001, 7:42-50, 5:49-57; EX1003, ¶89.

14

## VI.   OVERVIEW OF THE PRIOR ART

The '593 Patent's earliest claimed priority date is December 22, 2004.

EX1001, cover.  Each of the following references constitutes prior art:

**Yung** (EX1005) is a U.S. patent entitled "Heuristic Behavior Pattern

Matching of Data Flows in Enhanced Network Traffic Classification."  It was filed

on November 24, 2003, and issued to Packeteer, Inc. on February 16, 2010.

Therefore, Yung constitutes prior art to the '593 Patent under at least 35 U.S.C.

§ 102(e).

**Copeland** (EX1007) is a U.S. patent entitled "Flow-Based Detection of

Network Intrusions."  It was filed on November 1, 2001, and published on June 5,

2003, making Copeland prior art under 35 U.S.C. § 102(a), (b), and (e).

**Four-Steps Whitepaper** (EX1006) is a paper entitled "Four Steps to

Application Performance Across the Network with Packeteer's PacketShaper®"

dated September 2002 and published on Packeteer's website no later than March

2003.  The Four-Steps Whitepaper is a true and accurate copy of the pdf available

on the website as of March 17, 2003, as confirmed by the Authenticating Affidavit

of Internet Archive's Record Request Processor Elizabeth Rosenberg.  EX1006, i-

ii.  As she explains, the publication is obtained using Internet Archive's

(https://archive.org/index.php) Wayback Machine (https://archive.org/web/), which

allows users to search a particular website by its URL address in a web archive

(i.e., a digital library of Internet websites) maintained by Internet Archive. *Id.* The archive of a web page is compiled using software programs, called crawlers, that automatically capture and store copies of websites as they existed at the time of their capture. *Id.*

The Four-Steps Whitepaper is stamped with a URL reflecting that the publication was archived from the Packeteer website on March 17, 2003. *Id.*, iv. This website offered technical manuals and documentation for Packeteer's traffic-management products, including PacketShaper®. Packeteer was a publicly traded company and a known leader in this industry. EX1031, 1; EX1032, 6-7. Interested members of the public had access to the Four-Steps Whitepaper over 21 months before the earliest claimed priority date of the '593 Patent. Thus, it is prior art under 35 U.S.C. §102 (a) and (b).

**Ye** (EX1008) is a U.S. patent entitled "Early Traffic Regulation Techniques to Protect Against Network Flooding." It was filed on November 13, 2001, and issued on November 13, 2007. Therefore, Ye constitutes prior art under at least 35 U.S.C. § 102(e).

## VII. GROUNDS OF UNPATENTABILITY

Claims 1-44 are unpatentable for at least the reasons below. EX1003, ¶¶116-276.

**A.    <u>Ground 1</u>:  Claims 1, 2, 4-7, 17, 18, 25-27, 37, and 38 Are Obvious over Yung**

**1.    <u>Overview</u>: Yung Discloses a System for Classifying and Controlling Flows Using Behavioral Statistics**

Yung describes classifying network traffic flows by analyzing their behavioral attributes and comparing them to known application behavior patterns. EX1005, 6:1-5.  Like the '593 Patent, Yung recognized that "typical mechanisms that classify network traffic analyze explicitly presented or readily discoverable attributes of individual packets against an application signature, such as a combination of protocol identifiers, port numbers and text strings."  *Id.*, 5:55-59. Yung's enhanced network classification functionality extends to traffic that is encrypted or otherwise obscured.  *Id.*, 5:56-6:1.

Yung's Figure 1 illustrates a basic network environment in which "traffic monitoring device 30" (also referred to as "bandwidth management device 130") operates.  EX1005, 7:29-32, 7:45-46.

17



**Yung, Fig. 1**

As in the '593 Patent, Yung's traffic monitoring device 30 "classif[ies] data flows based on a heuristic comparison of certain ***observed behavioral attributes of the data flows*** relative to a set of at least one known application behavior pattern." *Id.*, 7:7-11 (emphasis added). The device enforces bandwidth-utilization controls on identified flows to control unruly, bandwidth-intensive applications (e.g., peer-to-peer applications) and otherwise optimize network application performance. *Id.*, 4:43-50, 16:2-8, 24:63-25:1.

Yung discloses, teaches, or suggests to a POSA every limitation of claims 1, 2, 4-7, 17, 18, 25-27, 37, and 38 as discussed below.

18

### 2. Independent Claim 1

#### a. Yung Discloses the Preamble of Claim 1

> [1.P] A machine-implemented method for processing a single flow, the flow comprising a plurality of packets, and the method comprising:

Yung discloses the preamble.  EX1003, ¶¶117-121.  Yung discloses a *method for processing a single flow.*[2]  *Id.*, ¶¶117-118.  Figure 7 depicts a "method directed to enforcing bandwidth utilization controls on data flows."  EX1005, 6:35-36, Fig. 7.  The method processes *a single flow* by identifying "a traffic class corresponding to the flow (214) [in red below]" and "enforc[ing]…bandwidth utilization controls on the data packet flow [in blue below]."  *Id.*, 24:13-18, 24:63-25:1.

---

[2]   For clarity, claim language from the '593 Patent appears in *italics*.



**Yung Fig. 7 (annotated)**

Yung processes a *flow comprising a plurality of packets*. EX1003, ¶120.

For instance, Yung discloses techniques for managing TCP/IP network data traffic,

explaining that the Transport Control Protocol (TCP) "is responsible for ensuring

at the transmitting host that message data is divided into packets to be sent, and for

reassembling, at the receiving host, the packets back into the complete message."

EX1005, 2:58-61. Yung's enhanced network device analyzes and manages

network data flows composed of such a *plurality of packets*. *See, e.g., id.*, 8:3-5,

11:60-62, 12:30-35.

20

The method is *machine-implemented*. EX1003, ¶119. Yung's "enhanced traffic classification functionality…in one embodiment, can be integrated into a bandwidth management device 130…." EX1005, 15:44-47, Fig. 2. Further, Yung's disclosed functionality "can be integrated into a variety of network devices that classify network traffic, such as firewalls, gateways, proxies, packet capture devices…network traffic monitoring and/or bandwidth management devices…." *Id.*, 7:12-18; *see also id.*, 6:8-11 (Yung "can be incorporated into a variety of network devices, such as traffic monitoring devices, packet capture devices, firewalls, and bandwidth management devices.").

### b.    Yung Discloses the "Creating" Limitation

[1.1] creating a flow block as the first packet of a flow is processed by a single router;

Yung discloses this limitation. EX1003, ¶¶122-140. Yung's "[p]acket processor 131" in the bandwidth management device "is operative to detect new data flows and construct data structures including attributes characterizing the data flow." EX1005, 16:15-18. These data structures, termed a "flow object" or a "control block object," constitute the claimed *flow block*. *See, e.g.*, *id.*, 8:2-12, 23:23-30; EX1003, ¶¶122-123.

Yung creates the *flow block* (i.e., "control block object" or "flow object") *as the first packet of a flow is processed* as illustrated in Figure 7. First, "[p]acket

processor 131 receives a data packet (FIG. 7, 202) [in red below] and determines

whether flow database 135 contains an existing control block object corresponding

to the data flow (204) [in blue]…." EX1005, 23:23-26.



**Yung, Fig. 7 (annotated)**

"If no control block object corresponds to the data packet, packet processor 131

constructs a [new] control block object including attributes characterizing the data

flow, such as source address, destination address, service type, etc. (212) [in green

above]." *Id.*, 23:26-30; *see also id.*, 8:2-14, Fig. 4 (similar description of

processing a packet to create a "flow object"). Yung discloses *creating a flow block as the first packet of a flow is processed* because for each packet received, Yung *processes* the packet by determining whether a flow block exists (i.e., whether the packet is *the first packet of a flow*), and if no flow block exists a new one is created. *See id.*, 23:23-30, 6:21-23; EX1003, ¶¶123-125.

Yung also discloses to a POSA that this processing can be performed *by a single router*. EX1003, ¶¶126-139. "The functionality of traffic monitoring device 30 can be integrated into *a variety of network devices that classify network traffic*, such as firewalls, *gateways*, proxies, packet capture devices…, network traffic monitoring and/or *bandwidth management devices*, that are typically located at strategic points in computer networks." EX1005, 7:12-18 (emphasis added); *see also id.*, 6:8-11. As a POSA would have known, routers are among the most common "network devices" (*id.*, 6:50-53) and, by the time of Yung, they could "classify network traffic." EX1003, ¶128. Additionally, Yung's functionality can be integrated in a "gateway," which a POSA would have known is a *router*. *Id.*, ¶131; EX1033, 2 ("a gateway is an IP-level router"). Indeed, a gateway performs the function of a router tying one network to another; or as Yung states it, gateways are routers (i.e., "network devices") that are "located at strategic points in computer networks." *Id.* Further, Yung's disclosed flow management functionality can be integrated in "bandwidth management devices," and Yung

23

confirms that routers are bandwidth management devices. EX1005, 3:27-28

("[r]outers…provide for some level of bandwidth management"); *see also*

EX-1003, ¶127. A POSA would have understood well before the Yung patent that

routers contained mechanisms to monitor, classify, and shape flows transiting the

router. EX1003, ¶¶132-138.[3] Thus, Yung discloses—and renders obvious to a

POSA—that the enhanced bandwidth management functionality, including packet

processor 131, can be integrated in *a single router*. EX1003, ¶139.

Further, a POSA would have understood Yung's disclosure to suggest

applying Yung's improved classification techniques to routers. EX1003, ¶¶132-

139. A POSA would have understood that routers were commonly operated to

detect/recognize flows, classify data flows using behavioral attributes, and

measure/monitor aggregate and/or per-traffic variables and statistics. *Id.*; *see also*

EX1018, Abstract; EX1020, 16:37-40; EX1021, 3:19-24; EX1023, 2:41-54;

EX1028, Abstract; EX1030, 20:9-12. Replacing prior-art techniques with Yung's

improved classification techniques would have allowed routers to perform Yung's

---

[3]  Yung cites and incorporates by reference Packer-216 (EX1059), which in 1996

  described an explicit data rate control technique that could be implemented in a

  programmable router. EX1005, 20:2-6; EX1059, 4:13-15; *see also* EX1003,

  ¶¶129-130, 132-138.

24

improved bandwidth-management techniques without any significant modification to network architectures. EX1003, ¶139. The results of such a modification would have been predictable because prior-art routers already performed classification and bandwidth management. *Id.*

Thus, Yung discloses and suggests to a POSA that the enhanced bandwidth management functionality, including packet processor 131, can be implemented in *a single router*. EX1003, ¶140.

### c. Yung Stores Payload-Content-Agnostic Behavioral Statistics Regardless of the Presence or Absence of Congestion

[1.2] said flow block being configured to store payload-content-agnostic behavioral statistics pertaining to said flow regardless of the presence or absence of congestion;

Yung discloses this limitation. EX1003, ¶¶141-149. As discussed in [1.1], Yung's packet processor 131 creates a *flow block* Yung calls a "flow object" (or "control block object"). Yung's *flow block* stores behavioral attributes of flows. EX1005, 8:5-11. For example, Yung tracks "various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.)." *Id.*, 25:8-11. These measurement values represent the claimed *statistics*. Yung therefore discloses a *flow block* storing *statistics pertaining to said flow*.

These *statistics* are *behavioral* because they empirically reflect a flow's

25

conduct by including "measurement values…that characterize the flow (e.g., last packet time, packet count, byte count, etc.)." EX1005, 9:5-8, 25:8-11. The flow object may also include information about "inter-flow timing" and the "timing of last packets in the inbound and outbound directions, speed information, apparent round trip time, etc." *Id.*, 11:36-38, 12:4-6, 17:42-49. Yung's disclosure tracks closely with the '593 Patent's examples of behavioral statistics. EX1001, 7:20-29; *see also* EX1003, ¶141.

Yung's statistics are *payload-content-agnostic* because they are generated without reference to the packet payload contents. EX1003, ¶¶143-145. Because Yung can classify traffic with encrypted packets or obfuscated application signatures, Yung necessarily does not require access to the payload; Yung instead uses observable statistics tracked without packet-payload analysis. EX1005, 5:53-6:11. For instance, Yung measures packet size, packet count, number of bytes, etc. *Id.*, 9:5-8, 10:53-65, 12:14-17, 15:6-9, 25:40-42. This approach relies on statistics *agnostic* to packet payload contents. *See, e.g.*, *id.*, 14:60-15:22; EX1003, ¶¶145-146. Indeed, Yung contrasts its approach with traffic-classification mechanisms that examine packet payloads. EX1005, 6:5-8 ("[T]he enhanced classification mechanisms described herein operate seamlessly with other Layer 7 traffic classification mechanisms that operate on attributes of the packets themselves."). Thus, Yung's flow object stores *payload-content-agnostic behavioral statistics*.

26

Finally, Yung maintains statistics *regardless of the presence or absence of congestion*. Yung's traffic classification system stores statistics about flows and imposes policies upon those flows. EX1005, Abstract. Yung's "traffic discovery module 84 can monitor data flows in real time to discover traffic classes." *Id.*, 9:21-25. Yung does not limit tracking statistics to certain times, periods, or conditions, and Figure 7 includes no conditional logic restricting the statistics. EX1003, ¶¶147-148; EX1005, Fig. 7. Instead, Yung's measurement engine "records data associated with the packet to allow for analysis of bandwidth utilization and other network statistics on a traffic class, access link, and/or partition level." *Id.*, 25:11-15. To do so, Yung tracks statistics continuously and *regardless of any presence or absence of congestion*. EX1003, ¶148. This contrasts with systems operating only when network congestion occurs. *See, e.g.*, EX1014, 3:16-20. In addition, a POSA would have found it obvious to use Yung's system to collect and store statistics *regardless of the presence or absence of congestion* to allow for classification of traffic in all situations. EX1003, ¶148.

27

### d.    Yung Discloses the "Updating" Limitation

> [1.3] said router updating said flow block with the payload-content-agnostic behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by said router, regardless of the presence or absence of congestion;

Yung discloses this limitation.  EX1003, ¶¶150-154.  Yung discloses *updating said flow block with the payload-content-agnostic behavioral statistics of each packet belonging to said flow.*  As shown below, in step 202, "packet processor 131 receives a data packet" (in red) and constructs a new flow block (in green) or retrieves an existing flow block (in blue).  After passing the packet to the flow control module in 222 (in orange), packet processor 131 in step 224 (in purple) then "updates various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.)" EX1005, 25:8-11.

28



**Yung, Fig. 7 (annotated)**

Yung updates the statistics *as each packet belonging to said flow is processed*, because Yung updates measurement values in a control block object (or flow object) for every packet in the flow. EX1005, 25:11-15. Moreover, updating statistics *for each packet* is necessary: Yung cannot skip or sample packets in forming these metrics because Yung could not leverage/provide the aggregate statistics (e.g., total byte count, total packet count) if the statistics were not updated *as each packet belonging to said flow is processed*. EX1003, ¶¶151-152.

For the reasons discussed in [1.2], Yung updates the statistics in its control block object *regardless of the presence or absence of congestion*. Yung does not restrict its updating of statistics to specific times, periods, or conditions, as needed to maintain accurate network statistics. EX1005, 25:11-15, Fig. 7.

For the reasons discussed above in [1.1], Yung discloses *said router* performing the *updating said flow block* as *said flow is processed by said router*, as recited in [1.3].

### e.    Yung Discloses the "Determining" Limitation

> [1.4] said router heuristically determining whether said flow exhibits undesirable behavior by comparing at least one of said payload-content-agnostic behavioral statistics to at least one pre-determined threshold value; and

Yung discloses this limitation. EX1003, ¶¶155-163. Yung *heuristically determin[es]* because it classifies data flows "based on a **heuristic** comparison of certain observed behavioral attributes of the data flows relative to a set of at least one known application behavior pattern." EX1005, 7:7-11 (emphasis added), 9:39-44, 10:29-39. Indeed, Yung is titled "**Heuristic** Behavior Pattern Matching of Data Flows in Enhanced Network Traffic Classification." *Id.*, cover (emphasis added).

Yung also applies its heuristic traffic-classification techniques to determine *whether said flow exhibits undesirable behavior*. Yung allows administrators to

30

enforce per-flow, bandwidth-utilization controls based on traffic class. EX1005, 19:53-58. A traffic class is a set of matching rules grouping data flows having shared characteristics. *Id.*, 20:20-24. For example, Yung describes controlling "unruly, bandwidth-intensive applications, such as peer-to-peer applications," that consume excessive bandwidth (i.e., *undesirable behavior*). *Id.*, 4:43-47. And a POSA would recognize that "unruly, bandwidth-intensive applications" exhibit "*undesirable behavior.*" EX1003, ¶¶156-157. Thus, Yung discloses *determining whether said flow exhibits undesirable behavior.*

Yung performs its heuristic classification techniques *by comparing at least one of said payload-content-agnostic behavioral statistics to at least one pre-determined threshold value.* As discussed above in [1.2], Yung stores *payload-content-agnostic behavioral statistics* used to classify data flows. EX1005, 7:46-49. Yung states that its traffic classification "uses a variety of threshold values…to classify flows." *Id.*, 15:23-40. Yung further notes that "a traffic class has at least one attribute defining the criter[ia] against which data flow attributes are analyzed for the purpose of determining a matching traffic class." *Id.*, 9:54-57. These "criter[ia]" are the claimed *at least one threshold value.*

For example, one classification technique is "Packet Size Matching." EX1005, 10:53-57. Yung leverages a tendency of peer-to-peer applications to exhibit a consistent packet-size pattern—i.e., "where the first packet is a given size

31

or at least within a narrow size range." *Id.*, 10:57-61. "By observing this behavior,

a knowledge base including these heuristic findings can be used to compile one or

more application behavior pattern(s) for use in classifying data flows." *Id.*, 10:62-

65. Yung's Figure 5D illustrates a method of analyzing flows' packets against

suspected application patterns using a single criterion of packet size by comparing

"the size of the current packet" to the "packet size or size range in the suspected

application behavior pattern." *Id.*, 14:60-15:5. In such an approach, the *threshold

value* is the "packet size" or the bounds (beginning and end points) of the "size

range." EX1003, ¶¶159-160.

As another example, Yung describes an application classification technique

in which the "application behavior pattern may include required time values or

ranges for the timing between packets in a given flow." EX1005, 11:60-62. In

such an approach to classifying traffic the *threshold value* is the "required time

values or ranges for the timing." *Id.*; EX1003, ¶161.

Yung's thresholds are also *pre-determined*. Yung provides an administrator

interface that "allows a network administrator to view and configure one or more

parameters associated with the behavior pattern matching functionality." EX1005,

16:55-58. Examples of such configurable parameters (i.e., *pre-determined

threshold values*), are packet size, time values or ranges, etc., as described above.

EX1003, ¶162.

Finally, as discussed in [1.3], a POSA would have understood that Yung's heuristic methodology for *determining whether said flow exhibits undesirable behavior* would be performed by *said router*.  EX1003, ¶163.

#### f.    Yung Discloses the "Enforcing" Limitation

[1.5] upon determination by said router that said flow exhibits undesirable behavior, enforcing, relative to at least one packet, a penalty;

As discussed above in [1.4] (and below regarding claims 7 and 27), Yung discloses the claimed *determination…that said flow exhibits undesirable behavior*. Yung further discloses upon making this determination, *enforcing, relative to at least one packet, a penalty*.  Yung discloses this limitation.  EX1003, ¶¶164-169.

The '593 Patent repeatedly refers to an increased drop rate as an exemplary *penalty*.  EX1001, 2:31-32, 6:37-38, 8:65-66, 9:9-10.  Similarly, Yung's "[b]andwidth management device 130 is operative to classify data flows and, depending on the classification, enforce respective bandwidth utilization controls on the data flows," including a "discard policy."  EX1005, 16:2-7, 20:13-15. Particular bandwidth utilization controls may be applied via administrator interface 150, which allows an administrator to configure "per-flow bandwidth utilization controls."  *Id.*, 19:52-61.

Yung describes a policy imposing a control mechanism (i.e., a *penalty*) on packets of classified flows.  EX1005, 19:52-61.  Akin to the '593 Patent's

"increased drop rate," Yung's discard policy causes flow control module 132 to discard or drop data packets or flows associated with a particular traffic class.[4] *Id.*, 20:13-15. The discard policy is a *penalty* enforced against a flow that *exhibits undesirable behavior.* EX1003, ¶168. This *penalty* is enforced *relative to at least one packet* because the policy only acts upon the packets of flows matching the policy as opposed to all packets. *Id.*, ¶169.

### g. Yung Discloses Performing the Steps on a Router Without Requiring Use of Inter-Router Data

[1.6] wherein the preceding steps are performed on said router without requiring use of inter-router data.

Although the '593 Patent does not provide a definition for *inter-router data* or explain the term, a POSA would understand the term in the context of the '593 Patent to mean data exchanged between routers such as, for example, routing information. EX1003, ¶170. As discussed in [1.3], a POSA would have understood that the claimed steps would be performed by *said router.* In addition, Yung's *payload-content-agnostic behavioral statistics* do not require any *inter-router data. Id.*, ¶171. Rather, Yung's traffic classification occurs *without*

---

[4] Yung also provides other control options including a priority policy, a rate policy, and "other controls/policies (e.g., redirection, security, access control, etc.)." EX1005, 19:61-20:1, 20:39-50.

*requiring use of inter-router data.* As illustrated in Figure 2, Yung's bandwidth

management device 130 may connect to a single router (i.e., router 22). EX1005,

7:29-32.



**Yung, Fig. 2 (annotated)**

In such an arrangement, Yung's bandwidth management device 130 operates

*without requiring use of inter-router data.* EX1003, ¶171. If Yung's classification

and control techniques are implemented directly on a router, then the functions

would similarly be performed *without requiring use of inter-router data* because

the disclosed functions are performed on that router locally. *Id.*

35

### 3.    Independent Claim 2

### a.    Yung Discloses the Preamble of Claim 2

> [2.P] A non-transitory computer-readable medium having computer-executable instructions for performing a method to process a single flow, the flow comprising a plurality of packets, and the method comprising:

For the reasons described above regarding [1.P], Yung discloses *processing a single flow* and *the flow comprising a plurality of packets*. Further, Yung discloses a "traffic monitoring device 30" (in red below) that "includes persistent memory 76, such as a hard disk drive or other suitable memory device." EX1005, 7:25-28.



**Yung, Fig. 1 (annotated)**

36

This traffic monitoring device "enforc[es] bandwidth utilization controls on data flows." *Id.*, 6:35-36. Thus, Yung describes a *non-transitory computer-readable medium having computer-executable instructions for performing a method*. EX1003, ¶¶173-176

### b.    Yung Discloses the Limitations of Claim 2

After the preamble, claim 2's limitations are very similar to claim 1 with limited differences (e.g., claim 2 does not require that the *behavioral statistics* be payload-content-agnostic as in claim 1). EX1003, ¶¶56, 173. For the reasons discussed in [1.1]-[1.6], Yung discloses [2.1]-[2.6] respectively. *Id.*, ¶¶177-178.

### 4.    Independent Claims 4 and 5

[4.P/5.P] A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

[4.1/5.1] maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed [regardless of the presence or absence of congestion];

[4.2/5.2] determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior, [regardless of the presence or absence of congestion]; and

[4.3/5.3] in response to a determination that the flow is exhibiting undesirable behavior, enforcing a penalty on the flow.

For the reasons discussed above in [1.P]-[1.5], Yung discloses the

limitations of claims 4 and 5. EX1003, ¶¶179-184. As in [1.1] and [1.3], Yung

discloses *maintaining a set of behavioral statistics for the flow* in a control block

object (flow object) and further discloses that the statistics are *updated based on*

*each information packet belonging to the flow, as each information packet*

*belonging to the flow is processed.* As in [1.4], Yung discloses *determining, based*

*at least partially upon the set of behavioral statistics, whether the flow is exhibiting*

*undesirable behavior.* Further, as discussed in [1.2] and [1.3], Yung discloses

analyzing each incoming packet to classify its flow (i.e., *determining whether the*

*flow is exhibiting undesirable behavior*) and updating the control block object with

behavioral statistics for the flow (i.e., *maintaining a set of behavioral statistics for*

*the flow*) without regard to *the presence or absence of congestion.* Yung classifies

packets and tracks statistics continually—not only within certain times, periods, or

upon certain conditions—and Yung's Figure 7 includes no conditional logic

restricting its classification and management functionality. EX1003, ¶182;

EX1005, 23:23-26, 25:8-11, Fig. 7. Finally, as in [1.5], Yung discloses *enforcing a*

*penalty on the flow* when it is determined *that the flow is exhibiting undesirable*

*behavior.*

38

### 5.    Independent Claim 25

#### a.    Yung Discloses the Preamble of Claim 25

> [25.P] A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising:

Yung discloses "traffic monitoring module 75" (including "packet processor 82") that "generally refers to the functionality implemented by traffic monitoring device 30." EX1005, 6:58-66. The bandwidth management device allows an administrator to "limit the bandwidth being consumed by unruly, bandwidth-intensive applications, such as peer-to-peer applications" (i.e., *misbehaving flows*). *Id.*, 4:43-47. Yung describes a *misbehaving flow manager*. And for the reasons described above regarding [1.P], Yung discloses the remainder of [25.P]. EX1003, ¶¶185-186.

#### b.    Yung Discloses the "Means for Maintaining" Limitation

> [25.1] means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion;

Yung discloses this limitation. EX1003, ¶¶187-188. Yung discloses a *means for maintaining a set of behavioral statistics for the flow*. The '593 Patent refers only to MFM 210 as the *means* of implementation, and MFM 210 "may be

39

implemented in any desired manner [and] may be realized by having one or more processors on a line card 202 execute one or more sets of instructions." EX1001, 5:49-53. Yung's "traffic monitoring module 75," which includes a "central processing unit" and "packet processor 82," is analogous to MFM 210 because it "is a combination of hardware and…software modules implementing the functionality described herein." EX1005, 6:59-66. Yung discloses the remainder of [25.1] for the reasons discussed above in [1.1]-[1.3].

### c. Yung Discloses the "Means for Determining" Limitation

[25.2] means for determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior; and

For the reasons discussed in [1.4], and because Yung's "traffic monitoring module 75" performs the same functions as the '593 Patent's "processors," Yung discloses this limitation. EX1003, ¶189.

### d. Yung Discloses the "Means for Enforcing" Limitation.

[25.3] means for enforcing, in response to a determination that the flow is exhibiting undesirable behavior, a penalty on the flow.

For the reasons discussed in [1.5], and because Yung's "traffic monitoring module 75" performs the same functions as the '593 Patent's "processors," Yung discloses this limitation. EX1003, ¶190.

40

### 6.     Dependent Claims 6 and 26

> [6/26] [The method of claim 1/The MFM of claim 25], wherein enforcing the penalty has an effect of correcting the flow's behavior such that the flow exhibits less undesirable behavior.

Yung discloses these limitations. EX1003, ¶¶191-192. For the reasons discussed above regarding [1.5], Yung discloses *enforcing the penalty*. Moreover, Yung's flow control techniques have *an effect of correcting the flow's behavior such that the flow exhibits less undesirable behavior*. EX1005, 19:53-20:18. For example, Yung describes a rate policy that can "set limits on total bandwidth that [a] flow can consume." *Id.*, 20:10-13. For flows violating a configured policy by consuming excessive bandwidth, the rate policy drops the flow's consumption to a configured (i.e., *less undesirable*) maximum level, decreasing that flow's consumption. *Id.*; EX1003, ¶192. When enforced, the policies achieve Yung's goal of optimizing application performance across the network. EX1005, 16:2-7.

### 7.     Dependent Claims 7 and 27

> [7/27] [The method of claim 1/The MFM of claim 25], [wherein/wherein the means for] enforcing the penalty comprises: [imposing/means for imposing] an increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

Yung discloses these limitations. EX1003, ¶193. Yung describes a "discard

policy" that "causes flow control module 132 to discard or drop data packets or flows associated with a particular traffic class." EX1005, 20:13-15. The "discard policy" can be "per-flow bandwidth utilization controls [that] allow for control of individual data flows." *Id.*, 19:55-58. A flow having a "discard policy" applied to it will have *a higher probability of being dropped* than *information packets belonging to other flows* that do not have a discard policy applied. EX1003, ¶193.

### 8.    Dependent Claims 17 and 37

[17/37] [The method of claim 12/The MFM of claim 32], wherein [determining/the means for determining] the penalty comprises: [determining/means for determining] an increased drop rate to impose on one or more information packets belonging to the flow.

For the reasons discussed above regarding claims 7 and 27, and because Yung's "traffic monitoring module 75" performs the same functions as the '593 Patent's "processors," Yung discloses claims 17 and 37. EX1003, ¶194.

### 9.    Dependent Claims 18 and 38

[18/38] [The method of claim 17/The MFM of claim 37], wherein [enforcing/the means for enforcing] the penalty comprises: [imposing/means for imposing] the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

For the reasons discussed above regarding claims 7 and 27, and because

Yung's "traffic monitoring module 75" performs the same functions as the '593

Patent's "processors," Yung discloses claims 18 and 38.  EX1003, ¶195.

### B.    Ground 2: Claims 9-13, 19-24, 29-33, and 39-44 Are Obvious over Yung and Copeland

#### 1.    Overview: Yung Discloses a System for Classifying and Controlling Flows Using Behavioral Statistics, and Copeland Calculates a Flow-Based Concern Index

As discussed above, Yung discloses a system for classifying flows according

to behavioral statistics.  Similarly, Copeland concerns the collection and analysis

of flow statistics to identify flows behaving suspiciously.  EX1007, Abstract.

Copeland tracks flow-based information and statistics (highlighted below).  *Id.*,

7:40-54, 16:37-17:5 (providing an exemplary flow data structure).



**Copeland, Fig. 1 (highlighted)**

43

Copeland determines, based on the collected information and statistics, whether a flow is legitimate traffic or suspicious activity. *Id.*, 3:32-35.

Copeland calculates a "concern index" ("CI") value for flows based upon an "assessment of the significance of the threat of the particular traffic or flow." EX1007, 7:55-61, 10:45-47. Copeland's Figures 6 and 7 illustrate approaches to calculating the CI value. *Id.*, 18:14-29.

**TABLE I**

| NAME | POTENTIAL INTRUDER | RESPONSE | CI VALUE |
|---|---|---|---|
| POTENTIAL TCP PROBE | TCP PACKETS | RESET PACKETS | NUMBER OF PACKETS |
| POTENTIAL UDP PROBE | UDP PACKEST | ICMP PORT UNAVAILABLEPCKETS | NUMBER OF ICMP PORT UNAVAILABLE PACKETS |
| HALF-OPEN ATTACK | HIGH NUMBER AND RATE OF SYNS | SYN-ACKS | 5000+501 PER SYN-ACK |
| TCP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | RESETS | 8000+1010 PER PORT OVER 4 |
| UDP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | NOTHING OR ICMP PORT UNAVAILABLE | 8000+1010 PER PORT OVER 4 |

FLOW-BASED CI VALUES

*FIG. 6*

**TABLE II**

| NAME | POTENTIAL INTRUDER | RESPONSE | CI VALUE |
|---|---|---|---|
| BAD FLAGS | TCP PACKET WITH UNDEFINED FLAGS | | 200 |
| SHORT UDP | UDP PACKET LESS 2 DATA BYTES | | 200 |
| ADDRESS SCAN | PACKETS TO MORE THAN 8 HOSTS ON SAME SUBNET | NOTHING OR RESETS | 3000 PER DETECT |
| PORT SCAN | PACKETS TO MORE THAN 4 PORTS | RESETS | 1010 PER PORT OVER 4 |

CI EVENT VALUES

*FIG. 7*

**Copeland Figs. 6 and 7**

As discussed in detail below, Yung in view of Copeland discloses all of the limitations of claims 9-13, 19-24, 29-33, and 39-44.

## 2.    Motivation to Combine

A POSA would have been motivated to incorporate Copeland's flow-based CI value into Yung's bandwidth-management device based on Yung's express disclosure. EX1003, ¶¶196-205. Yung provides exemplary application-behavior-pattern-matching techniques and notes that "the application behavior pattern can incorporate other factors as well." EX1005, 10:43-58, 11:59-60. A POSA would have been motivated to seek out "other factors" for classifying traffic. EX1003, ¶197. For example, a POSA would have sought to classify traffic behaving suspiciously or disruptively. *Id.*, ¶¶198-200. Copeland's CI value exemplifies a

45

mechanism for identifying flows behaving in an undesirable fashion that would be employed by Yung's device when classifying and controlling traffic. *Id.*, ¶¶201-202.

A POSA would have recognized that incorporating Copeland's flow-based CI value would enhance Yung's traffic management device's ability to identify and control traffic having undesirable characteristics such as network attacks and probes. *See* EX1007, 8:33-44. Yung notes that "a common use of bandwidth management devices is to limit the bandwidth being consumed by unruly, bandwidth-intensive applications…and/or other unauthorized applications." EX1005, 4:43-47. Network attacks would have concerned a POSA because they could disable network infrastructure and impair network applications. EX1003, ¶¶199-200; *see also* EX1030, 1:35-48. As Yung sought to preserve an efficient allocation of network resources, e.g., bandwidth (EX1005, 2:31-34), a POSA would have recognized that controlling network attacks and probes would further this goal and maintain network viability and application performance. EX1003, ¶200.

By integrating Copeland's flow-based CI value, Yung's administrator would be able to apply a discard policy to flows with high CI values. EX1003, ¶201; *see also* EX1005, 19:58-61. A POSA would have recognized that allowing the administrator to configure the discard policy based on a CI value would obviate the

46

need for the administrator to understand the intricate nature of network attacks. EX1003, ¶201. This would have been a desirable feature for administrators because the attack patterns were dynamic and evolving. *Id.*, ¶202. Such a feature would increase the accuracy of Yung's traffic-classification methods and expand the types of behavior controllable by Yung to include probing related to network attacks. *Compare* EX1005, 4:43-47 *with* EX1007, 8:33-37. Then such behavior could be policed and eliminated using Yung's policies. EX1003, ¶201.

A POSA would have had a reasonable expectation of success in combining Copeland with Yung because both classify traffic using flow-based statistics. *Compare* EX1005, Figs. 2-3 *with* EX1007, Figs. 1-2. A POSA would have achieved the combination with a minor update to Yung's statistic-tracking and analysis infrastructure. EX1003, ¶¶203-204. For example, the software deployed in traffic classification engine 86 (a module of traffic monitoring module 75, which is a combination of hardware and software) would be updated to consider the additional factor of a CI value when classifying data flows. *Id.* As traffic classification engine 86 already "is operative to classify data flows based on one or more attributes associated with the data flows," the framework existed to store various attributes as a basis for classifying flows. EX1005, 7:5-11. By calculating a quantitative flow-based CI value, per Copeland, using Yung's existing statistics, a POSA would have enhanced Yung's interface to allow administrators to specify

47

CI-value-based thresholds and create policies operative when such thresholds are exceeded.  EX1003, ¶204.

### 3.    Independent Claim 9

#### a.    Yung Discloses the Preamble of Claim 9

[9.P] A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

For the reasons discussed above regarding [1.P], Yung discloses [9.P]. EX1003, ¶206.

#### b.    Yung Discloses the "Maintaining" Limitation

[9.1] maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and

For the reasons discussed in [1.1]-[1.3], Yung discloses [9.1].[5]  EX1003, ¶207.

---

[5]    Claim 9's *set of behavioral statistics* does not have any *content-agnostic* modifier.

48

> **c.    Yung in View of Copeland Discloses the "Computing" Limitation**

> [9.2] computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

Copeland discloses *computing…a badness factor for the flow*. EX1003, ¶¶208-214. Like Yung, Copeland tracks behavioral statistics about network flows (e.g., start time, end time, number of bytes, and packet count). EX1007, 16:45-60. Copeland then analyzes "flow statistics [] to determine if the flow appears to be legitimate traffic or possible suspicious activity…[and a] ***value, referred to as a 'concern index' is assigned to each flow that appears suspicious***." *Id.*, 3:31-35 (emphasis added); *see also id.*, 18:15-19, 26:22-27. This flow-based "concern index" (or CI) value represents the claimed *badness factor* (EX1003, ¶210), which the '593 Patent states is "computed based upon the behavioral statistics of the flow" and indicates "whether the flow is exhibiting undesirable behavior" (just as in Copeland). EX1001, 6:28-31. Copeland's Figures 6 and 7 illustrate approaches to calculating the flow-based CI values based on an analysis of flow statistics. EX1007, 18:14-29, Figs. 6-7.

Further, Copeland's CI value *provides an indication of whether the flow is exhibiting undesirable behavior*. EX1003, ¶¶211-212. For example, Copeland's CI value indicates whether the flow exhibits "suspicious activity" (i.e., *undesirable*

49

*behavior*).  EX1007, 7:55-61.  Indeed, Copeland contrasts "suspicious activity" with "legitimate traffic," noting that a "probe is a flow that appears to have one host (a possible intruder) sending packets to gain information."  *Id.*, 7:55-57, 18:4-13.  Probes during attacks are an example of *undesirable behavior*.  EX1003, ¶212.  Copeland's CI value *provides an indication of whether the flow is exhibiting undesirable behavior.*

Finally, Copeland computes its CI value *based at least partially upon the set of behavioral statistics.*  EX1003, ¶213.  Copeland "collects information about and statistics associated with each flow and stores this information about and statistics [] in a database."  EX1007, 7:40-42, Fig. 1.  Copeland calculates the CI value based on these statistics.  *Id.*, 10:45-47 ("[T]he engine 155 associates all packets with a flow [and] analyzes certain statistical data and assigns a concern index value to abnormal activity.").  In Copeland's Figures 6 and 7, for instance, the "CI value" is determined *based at least partially upon* tracked statistics.  For example, in Figure 6, in the context of a "Potential TCP Probe" (in red below), Copeland uses the "number of packets" (in green) as the CI value.

**TABLE I**

| NAME | POTENTIAL INTRUDER | RESPONSE | CI VALUE |
|------|--------------------|----------|----------|
| POTENTIAL TCP PROBE | TCP PACKETS | RESET PACKETS | NUMBER OF PACKETS |
| POTENTIAL UDP PROBE | UDP PACKEST | ICMP PORT UNAVAILABLEPCKETS | NUMBER OF ICMP PORT UNAVAILABLE PACKETS |
| HALF–OPEN ATTACK | HIGH NUMBER AND RATE OF SYNS | SYN-ACKS | 5000+501 PER SYN-ACK |
| TCP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | RESETS | 8000+1010 PER PORT OVER 4 |
| UDP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | NOTHING OR ICMP PORT UNAVAILABLE | 8000+1010 PER PORT OVER 4 |

**FLOW-BASED CI VALUES**

**Copeland Fig. 6 (annotated)**

Thus, Copeland computes its CI value *based at least partially upon the set of behavioral statistics* and thus discloses [9.2].  EX1003, ¶214.

### 4. Independent Claim 29

### a. Yung Discloses the Preamble of Claim 29

[29.P] A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising:

For the reasons discussed above in [25.P], Yung discloses [29.P].  EX1003, ¶215.

51

### b. Yung Discloses the "Means for Maintaining" Limitation

[29.1] means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion;

For the reasons discussed in [1.1]-[1.3], and because Yung's "traffic monitoring module 75" (including a "central processing unit") performs the same functions as the '593 Patent's "processors," Yung discloses [29.1].  EX1005, 6:58-66; EX1003, ¶216.

### c. Yung Discloses the "Means for Computing" Limitation

[29.2] means for computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

For the reasons discussed above in [9.2], and because Yung's "traffic monitoring module 75" performs the same functions as the '593 Patent's "processors," Yung-Copeland discloses [29.2].  EX1003, ¶217.

### 5.    Dependent Claims 10 and 30

> [10/30] [The method of claim 9/The MFM of claim 29], wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably.

Copeland's CI value *indicates a degree to which the flow is behaving undesirably.* EX1003, ¶¶218-219.  For example, Copeland's step 945 calculates "a CI value that corresponds to the detected activity."  EX1007, 21:50-51.  "[S]ome types of…packet activities are much more likely to indicate probing than others," and accordingly "[a]n appropriate CI amount for the determined activity is determined [for the flow]."  *Id.*, 21:50-58, Fig. 6 (listing higher CI value for "TCP Stealth Port" than "Half-Open Attack").

### 6.    Dependent Claims 11 and 31

> [11/31] [The method of claim 10/The MFM of claim 30], further comprising: [determining/means for determining], based at least partially upon the badness factor, a penalty to impose on the flow.

As discussed above regarding [1.5], Yung discloses *determining…a penalty to impose on the flow.*  Yung-Copeland also discloses determining the penalty *based at least partially upon the badness factor.*  EX1003, ¶221.  Yung's traffic shaping device allows administrators to configure policies (e.g., increased drop rate) applicable to classified packets.  EX1005, 19:53-20:18.  Copeland also describes dropping packets from a host when the host's cumulative CI value

53

(aggregating CI values from one or more flows) exceeds a threshold value.

EX1007, 19:15-30.  In Yung-Copeland, an administrator would configure a flow-based *penalty* applicable to flows exceeding a specified CI value, and therefore the *penalty* would be determined *based at least partially upon the badness factor* (i.e., the CI value).  EX1003, ¶¶221-222.

### 7.    Dependent Claims 12 and 32

[12/32] [The method of claim 11/The MFM of claim 31], further comprising: [enforcing/means for enforcing] the penalty on the flow.

For the reasons discuss above in [11] and [1.5], and because Yung's "traffic monitoring module 75" performs the same functions as the '593 Patent's "processors," claims 12 and 32 are obvious over Yung-Copeland.  EX1003, ¶223.

### 8.    Dependent Claims 13 and 33

[13/33] [The method of claim 12/The MFM of claim 32], wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior, thereby, causing the badness factor of the flow to improve.

As discussed above in [6], Yung-Copeland discloses *wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior*.  Yung-Copeland also discloses *thereby causing the badness factor of the flow to improve* upon imposition of the penalty.  EX1003, ¶225.  Yung mentions various ways that "[f]low control module 132 [can] enforce bandwidth utilization controls" including

54

dropping packets entirely.  EX1005, 19:56-60.  Applied in the Yung-Copeland system to a flow exceeding a configured threshold, dropping all packets would cause the CI value (which considers the number of packets) to drop, thus *causing the badness factor of the flow to improve*.  EX1003, ¶¶225-226.

### 9.    Dependent Claims 19 and 39

[19/39] [The method of claim 9/The MFM of claim 29], wherein the set of behavioral statistics comprises a measure T of how much total information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time.

Yung tracks, in the control block object, a byte count reflecting the *total information…contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time*.  EX1005, 8:9-12 ("A flow object can also include other attributes, such as…byte count….").  Additionally, Copeland includes in its flow data structure fields "bytes[2]" and "pkts[2]" (i.e., "bytes sent" and "packets sent").  EX1007, 16:55-58.  Yung-Copeland discloses this limitation.  EX1003, ¶227.

### 10.    Dependent Claims 20 and 40

[20/40] [The method of claim 9/The MFM of claim 29], wherein the set of behavioral statistics comprises a measure L of how long the flow has been in existence up to a current point in time.

Yung tracks, in the control block object, a first-packet time and a last-packet

time thereby storing in the behavioral statistics *a measure L of how long the flow has been in existence up to a current point in time*. EX1005, 8:9-11 ("A flow object can also include other attributes, such as…first packet time, last packet time, etc."). It would have been obvious to a POSA that *how long the flow has been in existence up to a current point in time* would be determined by subtracting the first packet time from the current time. EX1003, ¶228.

### 11.    Dependent Claims 21 and 41

> [21/41] [The method of claim 20/The MFM of claim 40], wherein the set of behavioral statistics comprises a rate R of information transfer for the flow, wherein R is derived by dividing T by L.

Yung-Copeland discloses a *rate R of information transfer for the flow, wherein R is derived by dividing T by L*. EX1003, ¶229. Yung applies "rate policy controls [that control] the rate of data flows, for example, to smooth bursty traffic." EX1005, 19:64-66. And, while Yung does not explicitly describe calculating and storing a *rate of information transfer for a* flow, Yung describes collecting the total information of the flow T and the length of the flow's existence L as discussed above in [9] and [10]. Furthermore, flow rate was a commonly-tracked flow metric and used to enforce bandwidth controls. EX1003, ¶231. For instance, Yung lists a "leaky bucket technique" among the various ways that "[f]low control module 132 can…enforce bandwidth utilization controls." EX1005, 18:56-60.

56

The leaky bucket approach employs a *rate of information transfer*. EX1035, 1:19-42; EX1003, ¶230.

Given that Yung employs the leaky-bucket technique, which requires flow rate, and that Yung tracks both T ("byte count") and L ("first packet time" from the "current time"), it would have been obvious to implement the leaky-bucket technique by calculating a *rate R of information transfer for the flow* by dividing T by L, both of which Yung discloses. EX1003, ¶232.

### 12.    Dependent Claims 22 and 42

[22/42] [The method of claim 9/The MFM of claim 29], wherein the set of behavioral statistics comprises an average size for the information packets belonging to the flow.

Yung notes that "packet size matching" may occur when analyzing flows' behavior patterns. EX1005, 10:53-11:8. Yung observes first, second, and subsequent packets, determines whether the packets are within a narrow size range, and compiles an application behavior pattern using this information. *Id.*, 10:59-65. While Yung does not expressly use the word "*average*," Yung's packet count and byte count collectively comprise the *average size* claimed by the '593 Patent. *Id.*, 25:8-11; EX1003, ¶233. A POSA would have understood that the *average size for the information packets* would be calculated simply by dividing the byte count by the packet count. EX1005, 7:60-65, 8:9-11, 14:64-66, 17:44-49, 23:26-30, 25:8-11; Ex1003, ¶234. A POSA would also have known that averaging the packet size

would reduce false identification of outliers as unruly traffic.  EX1003, ¶234.

### 13.    Dependent Claims 23 and 43

> [23.P/43.P] [The method of claim 9/The MFM of claim 29], wherein [maintaining/the means for maintaining] the set of behavioral statistics comprises:

For the reasons discussed above regarding limitations [1.1]-[1.3], Yung discloses [23.P]/[43.P].  EX1003, ¶235.

> [23.1/43.1] [receiving/means for receiving] a particular information packet belonging to the flow;

Yung discloses *receiving a particular information packet belonging to the flow.* EX1005, 23:23-26 ("[P]acket processor 131 receives a data packet."). Because Yung's "traffic monitoring module" performs the same functions as the '593 Patent's "processors," Yung discloses *means* for performing this function. EX1003, ¶236.

> [23.2/43.2] [determining/means for determining] whether to forward the particular information packet to a destination; and

Yung discloses *determining whether to forward the particular information packet to a destination.*  EX1003, ¶237.  Yung retrieves "utilization or other controls…associated with the traffic class" and enforces "the bandwidth utilization [policy] controls on the data packet flow."  EX1005, 24:63-25:1.  For example, Yung describes a "discard policy" that "causes flow control module 132 to discard

58

or drop data packets." *Id.*, 20:10-15. Yung determines *whether to forward the*

*particular information packet to a destination*, dropping the packet when such a

policy is in place and forwarding when it is not. EX1003, ¶237. Because Yung's

"traffic monitoring module 75" performs the same functions as the '593 Patent's

"processors," Yung discloses *means* for performing this function.

> [23.3/43.3] [in response to a determination to forward the particular
> information packet to the destination, updating/means for updating, in
> response to a determination to forward the particular information packet to
> the destination,] the set of behavioral statistics to reflect processing of the
> particular information packet.

Yung discloses *updating the set of behavioral statistics to reflect processing*

*of the particular information packet*. EX1005, 25:8-15, Fig. 7. Because Yung's

"traffic monitoring module" performs the same functions as the '593 Patent's

"processors," Yung discloses *means* for performing this function. EX1003, ¶238.

### 14.    Dependent Claims 24 and 44

> [24.P/44.P] [The method of claim 9/The MFM of claim 29], wherein
> [maintaining/the means for maintaining] the set of behavioral statistics
> comprises:

For the reasons discussed above regarding limitations [1.1]-[1.3], Yung

discloses [24.P]/[44.P]. EX1003, ¶239.

59

> [24.1/44.1] [receiving/means for receiving] a particular information packet belonging to the flow;

Yung discloses *receiving a particular information packet belonging to the flow*. EX1005, 23:23-26. Because Yung's "traffic monitoring module 75" performs the same functions as the '593 Patent's "processors," Yung discloses *means* for performing this function. EX1003, ¶240.

> [24.2/44.2] [updating/means for updating] the set of behavioral statistics to reflect processing of the particular information packet, regardless of whether the particular information packet is discarded or forwarded to a destination.

Yung discloses *updating the set of behavioral statistics to reflect processing of the particular information packet*. EX1005, 25:61-26:16. Yung also performs the updating *regardless of whether the particular information packet is discarded or forwarded to a destination*. EX1003, ¶241.[6] Yung updates its statistics whether or not the *particular information packet is discarded or forwarded to a destination*. Yung's measurement engine "records data associated with the packet to allow for analysis of bandwidth utilization and other network statistics on a traffic class,

---

[6] This element carries no patentable weight because it recites that the *updating* is performed *regardless* of whether the packet is *discarded or forwarded*.

access link, and/or partition level." EX1005, 25:11-15.  Yung does not restrict its

gathering of statistics to certain times, periods, or conditions, and Yung's Figure 7

includes no conditional logic that would restrict statistical maintenance.  EX1005,

Fig. 7; EX1003, ¶241.

C.     <u>Ground 3:</u> **Claim 3 Is Obvious over Yung and Four-Steps Whitepaper**

1.     <u>Overview:</u> **Yung Discloses a System for Classifying and Controlling Flows Using Behavioral Statistics, and Four-Steps Whitepaper Discloses Tracking Dropped Packets**

Four-Steps Whitepaper describes an approach to securing network

performance using the PacketShaper®, a bandwidth-management solution that

"protects critical traffic, paces bandwidth-greedy traffic, and prevents any single

type of traffic from monopolizing resources." EX1006, 3.  Four-Steps Whitepaper

notes that the PacketShaper® "discovers and classifies applications, analyzes their

performance, enforces policy-based bandwidth allocation, and generates reports on

the results." *Id*.  Four-Steps Whitepaper presents a four-step bandwidth-

management strategy including:  (1) classifying traffic; (2) analyzing behavior;

(3) controlling performance; and (4) reporting results. *Id.*, 4-5.  Four-Steps

Whitepaper discloses tracking numerous metrics about processed flows including:

(1) "throughput in units of bytes, packets, transactions, connections;" (2) "counts

and percentages of retransmitted, received, tossed, dropped, and good TCP

packets;" and (3) "counts and percentages of TCP connections that were denied by

61

a policy." *Id.*, 18.

## 2.  <u>Motivation to Combine</u>

A POSA would have been motivated to combine Yung and Four-Steps

Whitepaper because both describe bandwidth-management devices that classify

and shape traffic, and Yung itself suggests a combination with Four-Steps

Whitepaper.  EX1003, ¶¶242-250.  Four-Steps Whitepaper solves the same

problem as Yung, providing a deployable solution to classify, monitor, and shape

network traffic.  EX1003, ¶245; *compare* EX1006, 3 *with* EX1005, 5:53-6:11.

Four-Steps Whitepaper provides a product overview for the PacketShaper®,

which was a product of Packeteer known to a POSA during the relevant timeframe,

and Yung is a Packeteer patent.  EX1031, 1; EX1032, 6-7.  Indeed, Yung expressly

notes that its teachings can be integrated with PacketShaper®.  EX1005, 4:47-51

("[T]he rich Layer 7 classification functionality of PacketShaper® bandwidth

management devices offered by Packeteer, Inc. of Cupertino, Calif. is an attractive

feature for [a] network administrator, as it allows for accurate identification of a

variety of application types.").

A POSA would have been motivated to incorporate Four-Steps

Whitepaper's metrics into Yung's bandwidth management device to expand the

classification techniques available—e.g., information about dropped packets would

be used to more accurately classify traffic.  EX1003, ¶246.  Yung's administrator

would set thresholds/policies to shape traffic using information about dropped packets—e.g., set a policy for VOIP traffic to ensure that packet loss does not disrupt service. EX1006, 21, 23. These additional metrics would further detail network traffic while providing a manner of reporting on the effectiveness of imposed rate controls. EX1003, ¶246.

Additionally, a POSA would have understood that the Four-Steps Whitepaper further describes the capabilities of a bandwidth management device. EX1006, ¶¶247-248. Yung describes its statistics in an open-ended fashion and already incorporates numerous similar statistics for categorizing, monitoring, and controlling flows. EX1005, 7:60-65, 8:9-11, 14:64-66, 17:44-49, 23:26-30, 25:8-11. A POSA would have combined Yung and Four-Steps Whitepaper with a minimal update to Yung's software that would be well within the skill of a POSA. EX1003, ¶249. The proposed combination would involve nothing more than incorporating a well-known feature, i.e., the metrics described in Four-Steps Whitepaper, into Yung's system that already tracks various similar metrics. *Id*.

A POSA would have been motivated to combine Yung with Four-Steps Whitepaper. EX1003, ¶250.

### 3. Independent Claim 3

#### a. Yung Discloses the Preamble of Claim 3

> [3.P] An article of manufacture comprising:

Yung discloses a "traffic monitoring device 30" also referred to as "bandwidth management device 130."  EX1005, Figs. 1-2.  Yung's bandwidth management device is a tangible commodity (i.e., *article of manufacture*).  EX1003, ¶251.

#### b. Yung Discloses a Medium Storing a Data Structure

> [3.1] a non-transitory computer-readable medium having stored thereon a data structure;

Yung states that traffic monitoring device 30 (in red below) "includes persistent memory 76 [in blue below], such as a hard disk drive or other suitable memory device…." (i.e., *non-transitory computer-readable medium*).  EX1005, 7:25-28; EX1003, ¶252.

64



**Yung, Fig. 1 (annotated)**

Yung stores *a data structure* in persistent memory 76 (also referred to as flow database 135). EX1003, ¶253. Yung "stores control block objects…in flow database 135." EX1005, 17:42-49. Yung's control block objects/flow objects are "data structure[s] including fields whose values characterize various attributes of the flow." *Id.*, 8:5-9, 16:66-17:1.

As discussed further below, Yung's control block object (i.e., *a data structure*) includes the fields recited in [3.2]-[3.6]. EX1003, ¶¶254-263.[7]

---

[7]    Claim 3 does not explicitly state that the fields are in the data structure. Yung discloses claim 3 whether the recited fields must be in the data structure or not.

65

### c.    Yung Discloses the "First Field"

[3.2] a first field containing data representing a flow block;

Yung describes a "control block object" (also "flow object") that "includes attributes characterizing a specific flow between two end systems."  EX1005, 16:66-17:1.  Yung's control block object includes "attributes characterizing the data flow, such as source address, destination address, service type, etc."  *Id.*, 23:26-30.  So, Yung stores a *first field containing data representing a flow block*.  EX1003, ¶¶254-255.

### d.    Yung in View of Four-Steps Whitepaper Discloses the "Second Field"

[3.3] a second field containing data representing payload-content-agnostic behavioral statistics about dropped and non-dropped packets of a flow;

As discussed in [1.2], Yung stores *data representing payload-content-agnostic behavioral statistics*.  EX1005, 18:2-6.  To any extent that Yung does not teach *statistics about dropped and non-dropped packets of a flow*, Four-Steps Whitepaper discloses this limitation.  EX1003, ¶¶256-257.  Four-Steps Whitepaper states that PacketShaper® tracks "[c]ounts and percentages of retransmitted, received, tossed, dropped, and good TCP packets."  EX1006, 18.  As discussed above, a POSA would have been motivated to incorporate these metrics into Yung to classify traffic across a wider spectrum of application behaviors, provide additional control when configuring policies, and offer enhanced reporting

66

capabilities. EX1003, ¶257.

### e.    Yung Discloses the "Third Field"

> [3.4] a third field containing data representing pre-determined behavior threshold values;

For the reasons discussed in [1.4], Yung discloses *pre-determined behavior threshold values*. Regarding a *third field containing data representing* the thresholds, Yung notes that "the traffic classification engine 137 stores in the control block object the policy parameters (e.g., bandwidth utilization control parameters)." EX1005, 24:41-45. The policy parameters "correspond[] to the identified traffic class" (*id.*, 17:49-52) and are used by the traffic classification engine when performing "the behavior pattern matching functionality" (*id.*, 10:39-46). As explained in [1.4], these policy parameters are *threshold values* set by an administrator (i.e., *pre-determined*). EX1003, ¶259.

### f.    Yung Discloses the "Fourth Field"

> [3.5] a fourth field containing data representing the results of a heuristic determination of whether said flow exhibits undesirable behavior determined by comparing said behavioral statistics to said pre-determined threshold values;

For the reasons discussed in [1.4], Yung discloses *a heuristic determination of whether said flow exhibits undesirable behavior determined by comparing said behavioral statistics to said pre-determined threshold values*. Yung's heuristic

67

determination results identify the traffic class of a flow. EX1005, 7:7-11. With respect to a *fourth field containing data representing the results* of this heuristic determination, Yung notes that "the control block object in flow database 135 includes a pointer to the identified traffic class(es)." *Id.*, 24:38-41; *see also* EX1003, ¶261.

### g.    Yung Discloses the "Fifth Field"

> [3.6] a fifth field containing data representing at least one penalty to be enforced against at least one packet upon determination that said flow exhibits undesirable behavior.

For the reasons discussed in [1.6], Yung discloses *at least one penalty to be enforced against at least one packet upon determination that said flow exhibits undesirable behavior.* Regarding a *fifth field containing data representing* the penalty, Yung notes that the control block object stores the policies associated with the traffic classes. EX1005, 24:40-46. When the rate control module imposes a penalty, it "accesses the control block object corresponding to the data flow to retrieve the bandwidth utilization or other controls…associated with the traffic class and enforces [them] on the data packet flow." *Id.*, 24:64-25:1. These control mechanisms impose *penalties* upon flows to shape their behavior. *Id.*, 19:53-20:18; EX1003, ¶263.

68

**D.**    <u>Ground 4</u>**: Claims 8, 14-16, 28, and 34-36 Are Obvious over Yung and Copeland in View of Ye**

**1.**    <u>Overview</u>**: Yung-Copeland Discloses a System for Classifying Flows Using Behavioral Statistics, and Ye Describes a Congestion Condition**

Yung describes enhancing network devices to perform bandwidth management by classifying and controlling flows using behavioral statistics. EX1005, 4:43-51.  Copeland presents an accurate method for detecting attacks. EX1007, 3:18-20.  Ye provides a mechanism for defending against denial-of-service attacks.  EX1008, Abstract.  Ye "monitors, analyzes, and regulates traffic flows at network nodes, e.g., routers, based on the flow's behavior." *Id.*, 2:23-26. Ye compares statistics about current flow rates to corresponding baseline flow rates to identify aggressive flows.  *Id.*, 2:53-61.

Ye's Figure 5 illustrates a packet "forwarding and flow rate control routine." EX1008, 9:12-13.  Control step 504 (in red below) determines "whether the router is currently experiencing congestion sufficient to merit the application of the AFFC [Anti-Flooding Flow-Control] mechanisms." *Id.*, 9:17-22.  Sufficient congestion "is declared when the router encounters a saturation condition which persists for a pre-selected period of time." *Id.*, 9:22-27.

69



**Ye, Fig. 5 (annotated)**

When congestion does not exist, received packets are forwarded without further

processing (in green above). *Id.*, 9:39-43. Where a saturation condition exists,

flow rate reduction controls aggressive traffic flows and remaining packets are

forwarded (in blue above). *Id.*, 12:1-4.

### 2.    Motivation to Combine

A POSA would have been motivated to combine Yung-Copeland-Ye

because all three collect flow-based statistics and classify traffic using those

statistics.  *Compare* EX1005, Abstract *with* EX1008, Abstract; EX1003, ¶¶264-

271.  As discussed above in Section VII.B.2, a POSA would have been motivated

to combine Copeland with Yung.  A POSA would further have been motivated to

incorporate Ye's saturation condition into Yung's bandwidth-management device

to optimize Yung's traffic controls and enhance control over its shaping functions.

EX1003, ¶265.  By incorporating the congestion condition, an administrator could

configure discard policies to act only during heavy traffic/congestion.  *Id.*, ¶¶266-

267.  A POSA would have understood that applying policies only during periods of

congestion would be useful for certain types of traffic, e.g., streaming, online

games, etc.  *See* EX1032, 5-6; EX1003, ¶267.  Such traffic types would be

permissible during non-peak hours when bandwidth is available but would need to

be sacrificed during periods of congestion, when less bandwidth is available, to

protect mission-critical applications.  *See* EX1032, 27; EX1013, 8; EX1003, ¶267.

Additionally, a POSA would have understood that the teachings of Ye

further detail Yung's disclosures.  EX1003, ¶268.  Yung describes its statistics,

parameters, and thresholds in open-ended terms, to which Ye's congestion

condition would be integrated.  *See* EX1005, 7:60-65, 8:9-11, 14:64-66, 17:44-49,

23:26-30, 25:8-11; EX1003, ¶268.

A POSA would have combined Yung-Copeland-Ye with a minimal update

to the infrastructure described in Yung.  EX1003, ¶269.  For example, Yung's

packet processor and rate control module could be updated to consider an additional factor of congestion. *Id.*, ¶270. The software would examine congestion on the device (e.g., by examining CPU utilization, memory usage, or the behavioral statistics tracked in Yung's infrastructure) before enforcing flow control. *Id.*

A POSA would have been motivated to combine Yung-Copeland-Ye. EX1003, ¶271.

### 3. Dependent Claims 8, 14, 28, and 34

> [8/14/28/34] [The method of claim 1/The method of claim 12/The MFM of claim 25/The MFM of claim 32], wherein the penalty is enforced [on the flow] when a congestion condition is encountered.

Ye determines "whether the router is currently experiencing congestion [in red below] sufficient to merit the application of the AFFC mechanisms…." EX1008, 9:16-22. When congestion is encountered, Ye performs control steps 506, 508, etc. (in green below). *Id.*, 9:22-27, 9:44-64, 10:46-11:10.

72



**Ye, Fig. 5 (annotated)**

When a flow is deemed aggressive at step 516, "the forwarding rates of the aggressive flows are regulated [blue above], e.g., by dropping packets from the aggressive flows." *Id.*, 11:7-10. In Yung-Copeland-Ye, Yung's policies would be configured to enforce a *penalty* (e.g., dropping packets) when a sufficient level of congestion is reached—*when a congestion condition is encountered.* EX1003, ¶¶272-273.

### 4.    Dependent Claims 15 and 35

> [15/35] [The method of claim 12/The MFM of claim 32], wherein no penalty is enforced on the flow unless a congestion condition is encountered, regardless of how undesirably the flow is behaving.

Yung-Copeland-Ye discloses that *no penalty is enforced on the flow unless a congestion condition is encountered, regardless of how undesirably the flow is behaving*.[8]  EX1003, ¶274.  Ye discloses avoiding penalizing a packet when no congestion is detected.  EX1008, 9:39-41 ("When control step 504 determines that congestion does not exist, operation proceeds directly to step 527 with the received packets being forwarded without being subject to processing.").  With Ye's congestion condition integrated into Yung, Yung-Copeland-Ye would continue to track flow statistics regardless of congestion but would enforce configured penalties only when a "congestion condition" occurs.  EX1003, ¶274.  Such a policy would not enforce the penalty (e.g., dropping packets) *unless a congestion condition is encountered.  Id.*

---

[8]    Although claim 1 includes the limitation *regardless of the presence or absence of congestion*, it applies only to *storing* and *updating* statistics, which Yung discloses.  Claims 15 and 35 relate to conditional enforcement—i.e., *unless a congestion condition is encountered*.

### 5.    Dependent Claims 16 and 36

> [16/36] [The method of claim 12/The MFM of claim 32], wherein the penalty is determined and enforced on the flow even when no congestion condition is encountered.

Yung discloses determining and enforcing a penalty *on the flow even when no congestion condition is encountered.* EX1005, 24:63-25:1 ("[R]ate control module 132 (222)…enforces the bandwidth utilization controls on the data packet flow."). Yung does not restrict penalty application or limit enforcement to particular circumstances. *Id.*, 19:52-20:18. Yung-Copeland-Ye would retain this default behavior, limiting enforcement to congestion scenarios only when so configured. EX1003, ¶276.

## VIII.  DISCRETIONARY DENIAL WOULD BE INAPPROPRIATE AND INEQUITABLE

The *General Plastic* factors favor institution because Petitioners have not previously petitioned for IPR of the '593 Patent. Palo Alto Networks and others petitioned for IPR of the '593 Patent on October 2, 2020 (IPR2020-01712), but Petitioners have no relationship to those parties. None of them is a co-defendant with Petitioners in the related litigation, nor are Petitioners accused of infringement based on products of the prior petitioners. *Cf. Valve Corp. v. Electronic Scripting Product, Inc.,* IPR2019-00062, Paper 11 at 2 (PTAB Apr. 2, 2019) (precedential) (denying institution where petitioner was accused of infringement based on the

same products as earlier IPR petitioner).  Moreover, the prior IPR terminated before Patent Owner filed any response, preventing any inappropriate "road mapping" based on the earlier-filed IPR.  *Cf. Valve Corp.,* IPR2019-00062, Paper 11 at 13.

Furthermore, the Board should not deny institution based on Patent Owner's pending district court cases as in *NHK Spring Co. v. Intri-Plex Techs., Inc.*, IPR2018-00752, Paper 8 at 20 (PTAB Sept. 12, 2018) (precedential).  There, the Board denied institution because the district-court case was nearing its final stages and would resolve all the issues before the Board.  Not so here; this petition is filed only seven weeks (for Cloudflare) and nine weeks (for SonicWall) after service of the district court complaints.[9]

The *Fintiv* factors also confirm that institution should not be denied.  *Apple*

---

[9]    Unlike *NHK*, there is no basis here for discretionary denial under Section 325(d) because the same or substantially the same art or arguments were not previously addressed by the Patent Office.  The prior art cited here was not cited and is distinct from the art considered during prosecution at least because it teaches a "set of behavioral statistics [that] is updated…regardless of the presence or absence of congestion" that was alleged to be missing from the prior art cited during prosecution.  *See* Section IV.B, above.

76

*v. Fintiv, Inc.*, IPR2020-00019, Paper 11 at 6-16 (PTAB Mar. 20, 2020)

(precedential). No party in the related litigations has requested a stay, making the

first *Fintiv* factor neutral. *See Sand Revolution II, LLC v. Continental Intermodal*

*Group – Trucking LLC*, IPR2019-01393, Paper 24 at 7 (PTAB June 16, 2020)

(informative) (declining to speculate about a district court stay); *Apple Inc. v.*

*Fintiv, Inc.*, IPR2020-00019, Paper 15 at 12 (PTAB May 13, 2020) (finding in the

absence of a stay motion that "[t]his factor does not weigh for or against

discretionary denial"); *VMWare, Inc. v. Intellectual Ventures I LLC*, IPR2020-

00470, Paper 13 at 17 (PTAB Aug. 18, 2020) (same).

The second *Fintiv* factor favors institution because no trial date has been

scheduled in the related litigations. Even if an aggressive trial date is set, the

Board has recognized that district court trial dates, including in the Western

District of Texas, are uncertain given the ongoing COVID-19 pandemic. *See*

*Apple Inc. v. Parus Holdings, Inc.*, IPR2020-00686, Paper 9 at 13 (PTAB Sept. 23,

2020) ("[W]e cannot ignore the substantial uncertainty in the Texas court's

'Predicted Jury Selection/Trial' date given the ongoing pandemic, the fact that the

scheduled trial date is 10 months from now and much can change during this

time."); *Sand Revolution II, LLC*, IPR2019-01393, Paper 24 at 8-10 (recognizing

the uncertainty of scheduled trial dates during the COVID-19 pandemic); EX1048-

EX1058 (monthly orders postponing W.D. Texas trials). In contrast, "the Board

continues to be fully operational" during the pandemic, and "oral hearings continue

to be conducted on schedule." *Sand Revolution II*, IPR2019-01393, Paper 24 at 9.

Even in normal times, district court trial dates frequently change—*NHK*

itself confirms the point. Relying on an expected schedule, the *NHK* panel

concluded that the related litigation's "advanced state" was an "additional factor"

that weighed in favor of discretionary denial. *See NHK Spring Co., Ltd.*, IPR2018-

00752, Paper 8 at 20. Yet the expected schedule relied on by the *NHK* panel

proved misleading. Following the denial of institution, the district court trial date

was delayed by six months relative to the date assumed in the *NHK* decision so that

it followed the deadline for a final written decision had the panel instituted review.

*Intri-Plex Technologies v. NHK International Corp.*, 3:17-cv-01097-EMC (N.D.

Cal.) (docket entries 173, 175); *Mylan Pharmaceuticals Inc. v. Sanofi-Aventis

Deutschland GmbH*, IPR2018-01680, Paper 22 at 17 n.6 (PTAB Apr. 3, 2019).

The third *Fintiv* factor regarding investment in the proceedings strongly

favors institution because the litigations remain in the early stages. The pleadings

are not yet closed, and discovery has not begun—and likely will not begin before

claim construction proceedings conclude. The timing of the petition also favors

institution. *See HP, Inc. v. Neodron, Ltd.*, IPR2020-00459, Paper 17 at 40 (PTAB

Sept. 14, 2020). This petition comes just weeks after service of the complaint,

though the AIA gives defendants 12 months to petition for IPR. 35 U.S.C.

§315(b); *see also VMWare*, IPR2020-00470, Paper 13 at 19; *HP, Inc.*, IPR2020-00459, Paper 17 at 40.

The fourth *Fintiv* factor regarding overlap in issues also favors institution, because Petitioners will not raise invalidity challenges to the '593 Patent in the litigation relying on the grounds or the prior art references (i.e., Yung, Copeland, Four-Steps Whitepaper, and Ye) asserted in this IPR if instituted. Petitioners will so stipulate in the district court case. This factor strongly favors institution because there will be no overlap between the invalidity arguments here and in the related litigation. *See VMWare*, IPR2020-00470, Paper 13 at 20 (stipulating not to rely on same grounds or references in district court "mitigates any concerns of duplicative efforts between the district court and Board, as well as concerns of potentially conflicting decisions").

In connection with the fifth *Fintiv* factor, the Board has noted that "[i]f a petitioner is unrelated to a defendant in an earlier court proceeding, the Board has weighed this fact against exercising discretion to deny institution under *NHK*." IPR2020-00019, Paper 11 at 13-14. Petitioners here are the same parties as the defendants in the related litigations so this factor does not weigh against a discretionary denial, but it should not support discretionary denial either given that the vast majority of IPR petitions are filed by defendants in related litigation and given the stated goal of such proceedings to provide an alternative venue for

79

Appx166

district court litigants to resolve questions of patentability.

Finally, other considerations under the sixth *Fintiv* factor strongly favor institution. For one thing, this petition's clear showing of obviousness supports institution. *Fintiv*, IPR2020-00019, Paper 11 at 14-15; *see also, e.g., VMWare*, IPR2020-00470, Paper 13 at 21-22 (weighing petitioner's showing "that the prior art references cited in the Petition teach or suggest all limitations of the challenged claims" against discretionary denial); *HP Inc.*, IPR2020-00459, Paper 17 at 43 (same). Additionally, the '593 Patent is asserted in six lawsuits in three district courts. *See* pages xii-xiii, above. The patentability of the challenged claims is at issue in multiple lawsuits across different courts and resolution of the issue will likely impact many current and potential defendants. The Board is highly qualified and uniquely positioned to resolve unpatentability in a single, centralized venue rather than having multiple different courts and juries reach multiple—potentially inconsistent—decisions.

## IX.    CONCLUSION

For the above reasons, the Board should institute review and cancel claims 1-44 of the '593 Patent.

Dated:  May 7, 2021                    Respectfully submitted,

   /*James L. Day*/
James L. Day
Registration No. 72,681
*Attorney for Petitioner Cloudflare, Inc.*


   /*David C. Dotson*/
David C. Dotson
Registration No. 59,472
*Attorney for Petitioner SonicWall Inc.*

81

## CLAIM APPENDIX

[1.P] A machine-implemented method for processing a single flow, the flow comprising a plurality of packets, and the method comprising:

[1.1] creating a flow block as the first packet of a flow is processed by a single router;

[1.2] said flow block being configured to store payload-content-agnostic behavioral statistics pertaining to said flow, regardless of the presence or absence of congestion;

[1.3] said router updating said flow block with the payload-content-agnostic behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by said router, regardless of the presence or absence of congestion;

[1.4] said router heuristically determining whether said flow exhibits undesirable behavior by comparing at least one of said payload-content-agnostic behavioral statistics to at least one pre-determined threshold value; and

[1.5] upon determination by said router that said flow exhibits undesirable behavior, enforcing, relative to at least one packet, a penalty;

[1.6] wherein the preceding steps are performed on said router without requiring use of inter-router data.

[2.P] A non-transitory computer-readable medium having computer-executable instructions for performing a method to process a single flow, the flow comprising a plurality of packets, and the method

comprising:

[2.1] creating a flow block as the first packet of a flow is processed by a single router;

[2.2] said flow block being configured to store payload-content agnostic behavioral statistics about said flow, regardless of the presence or absence of congestion;

[2.3] said router updating said flow block with the flow's behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by said router, regardless of the presence or absence of congestion;

[2.4] said router heuristically determining whether said flow is exhibiting undesirable behavior by comparing at least one of said behavioral statistics to at least one pre-determined threshold value; and

[2.5] upon determination by said router that said flow is exhibiting undesirable behavior, enforcing, relative to at least one packet belonging to said flow, a penalty;

[2.6] wherein the preceding steps are performed on said router without requiring use of inter-router data.

[3.P] An article of manufacture comprising:

[3.1] a non-transitory computer-readable medium having stored thereon a data structure;

[3.2] a first field containing data representing a flow block;

[3.3] a second field containing data representing payload-content-

agnostic behavioral statistics about dropped and non-dropped packets of a flow;

[3.4] a third field containing data representing pre-determined behavior threshold values;

[3.5] a fourth field containing data representing the results of a heuristic determination of whether said flow exhibits undesirable behavior determined by comparing said behavioral statistics to said pre-determined threshold values;

[3.6] a fifth field containing data representing at least one penalty to be enforced against at least one packet upon determination that said flow exhibits undesirable behavior.

[4.P] A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

[4.1] maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed;

[4.2] determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior, regardless of the presence or absence of congestion; and

[4.3] in response to a determination that the flow is exhibiting undesirable behavior, enforcing a penalty on the flow.

[5.P] A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

[5.1] maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion;

[5.2] determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior; and

[5.3] in response to a determination that the flow is exhibiting undesirable behavior, enforcing a penalty on the flow.

6. The method of claim 1, wherein enforcing the penalty has an effect of correcting the flow's behavior such that the flow exhibits less undesirable behavior.

7. The method of claim 1, wherein enforcing the penalty comprises: imposing an increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

8. The method of claim 1, wherein the penalty is enforced when a congestion condition is encountered.

[9.P] A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

[9.1] maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of

congestion; and

[9.2] computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

10. The method of claim 9, wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably.

11. The method of claim 10, further comprising: determining, based at least partially upon the badness factor, a penalty to impose on the flow.

12. The method of claim 11, further comprising: enforcing the penalty on the flow.

13. The method of claim 12, wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior, thereby, causing the badness factor of the flow to improve.

14. The method of claim 12, wherein the penalty is enforced on the flow when a congestion condition is encountered.

15. The method of claim 12, wherein no penalty is enforced on the flow unless a congestion condition is encountered, regardless of how undesirably the flow is behaving.

16. The method of claim 12, wherein the penalty is determined and enforced on the flow even when no congestion condition is encountered.

17. The method of claim 12, wherein determining the penalty

comprises: determining an increased drop rate to impose on one or more information packets belonging to the flow.

18. The method of claim 17, wherein enforcing the penalty comprises: imposing the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

19. The method of claim 9, wherein the set of behavioral statistics comprises a measure T of how much total information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time.

20. The method of claim 9, wherein the set of behavioral statistics comprises a measure L of how long the flow has been in existence up to a current point in time.

21. The method of claim 20, wherein the set of behavioral statistics comprises a rate R of information transfer for the flow, wherein R is derived by dividing T by L.

22. The method of claim 9, wherein the set of behavioral statistics comprises an average size for the information packets belonging to the flow.

[23.P] The method of claim 9, wherein maintaining the set of behavioral statistics comprises:

[23.1] receiving a particular information packet belonging to the flow;

[23.2] determining whether to forward the particular information packet to a destination; and

[23.3] in response to a determination to forward the particular information packet to the destination, updating the set of behavioral statistics to reflect processing of the particular information packet.

[24.P] The method of claim 9, wherein maintaining the set of behavioral statistics comprises:

[24.1] receiving a particular information packet belonging to the flow; and

[24.2] updating the set of behavioral statistics to reflect processing of the particular information packet, regardless of whether the particular information packet is discarded or forwarded to a destination.

[25.P] A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising:

[25.1] means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion;

[25.2] means for determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior; and

[25.3] means for enforcing, in response to a determination that the flow is exhibiting undesirable behavior, a penalty on the flow.

26. The MFM of claim 25, wherein enforcing the penalty has an effect of correcting the flow's behavior such that the flow exhibits less

undesirable behavior.

27. The MFM of claim 25, wherein the means for enforcing the penalty comprises: means for imposing an increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

28. The MFM of claim 25, wherein the penalty is enforced when a congestion condition is encountered.

[29.P] A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising:

[29.1] means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and

[29.2] means for computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

30. The MFM of claim 29, wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably.

31. The MFM of claim 30, further comprising: means for determining, based at least partially upon the badness factor, a penalty to impose on the flow.

32. The MFM of claim 31, further comprising: means for enforcing the penalty on the flow.

33. The MFM of claim 32, wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior, thereby, causing the badness factor of the flow to improve.

34. The MFM of claim 32, wherein the penalty is enforced on the flow when a congestion condition is encountered.

35. The MFM of claim 32, wherein no penalty is enforced on the flow unless a congestion condition is encountered, regardless of how undesirably the flow is behaving.

36. The MFM of claim 32, wherein the penalty is determined and enforced on the flow even when no congestion condition is encountered.

37. The MFM of claim 32, wherein the means for determining the penalty comprises: means for determining an increased drop rate to impose on one or more information packets belonging to the flow.

38. The MFM of claim 37, wherein the means for enforcing the penalty comprises: means for imposing the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

39. The MFM of claim 29, wherein the set of behavioral statistics comprises a measure T of how much total information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time.

40. The MFM of claim 29, wherein the set of behavioral statistics comprises a measure L of how long the flow has been in existence up to a current point in time.

41. The MFM of claim 40, wherein the set of behavioral statistics comprises a rate R of information transfer for the flow, wherein R is derived by dividing T by L.

42. The MFM of claim 29, wherein the set of behavioral statistics comprises an average size for the information packets belonging to the flow.

[43.P] The MFM of claim 29, wherein the means for maintaining the set of behavioral statistics comprises:

[43.1] means for receiving a particular information packet belonging to the flow;

[43.2] means for determining whether to forward the particular information packet to a destination; and

[43.3] means for updating, in response to a determination to forward the particular information packet to the destination, the set of behavioral statistics to reflect processing of the particular information packet.

[44.P] The MFM of claim 29, wherein the means for maintaining the set of behavioral statistics comprises:

[44.1] means for receiving a particular information packet belonging to the flow; and

[44.2] means for updating the set of behavioral statistics to reflect

processing of the particular information packet, regardless of whether the particular information packet is discarded or forwarded to a destination.

## CERTIFICATE OF COMPLIANCE

This petition complies with the 14,000 word count limit under 37 C.F.R.

§ 42.24(a)(1)(i).  The petition contains 13,960 words, excluding the parts exempted

by 37 C.F.R. § 42.24(a)(1) (i.e., table of contents, table of authorities, mandatory

notices under § 42.8, certificate of service, word count certificate, and appendix of

exhibits), as determined by the word count feature of Microsoft Word, which was

used to prepare this petition.

  /*James L. Day*/
James L. Day
Registration No. 72,681
Farella Braun + Martel LLP
235 Montgomery Street; 17th Floor
San Francisco, CA  94104

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 7, 2021, I caused a complete and entire copy of

this Petition for *Inter Partes* Review and all supporting exhibits to be served by

express mail, or means at least as fast and reliable as express mail, to the

correspondence address of record for the subject patent as identified on U.S. PAIR:

WEST & ASSOCIATES, A PC
3050 Citrus Circle
Suite 209
Walnut Creek, CA  94598

In addition, courtesy copies were sent by electronic means to the Patent

Owner's litigation counsel at the following addresses:

Dorian S. Berger (dsb@bergerhipskind.com)
Daniel P. Hipskind (dph@bergerhipskind.com)
Elizabeth L. DeRieux (ederieux@capshawlaw.com)


  /James L. Day/
James L. Day
Registration No. 72,681
Farella Braun + Martel LLP
235 Montgomery Street; 17th Floor
San Francisco, CA  94104

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

CLOUDFLARE, INC. AND SONICWALL INC.,
Petitioner,

v.

SABLE NETWORKS, INC.,
Patent Owner

———————

Case IPR2021-00909
Patent 8,243,593

———————

**PATENT OWNER'S PRELIMINARY RESPONSE
TO PETITION FOR INTER PARTES REVIEW**

Case IPR2021-00909
U.S. Pat. No. 8,243,593

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................1

II.  FACTUAL BACKGROUND ...........................................5

     A. The '593 Patent ...................................................5

     B. References Cited In The Petition..............................9

         1. Yung ...........................................................9

         2. Copeland.....................................................11

         3. Four-Steps Whitepaper....................................12

         4. Ye ............................................................13

III. PETITIONER FAILS TO SHOW A REASONABLE LIKELIHOOD THAT
     ANY OF THE CLAIMS ARE DISCLOSED AND/OR RENDERED
     OBVIOUS (ALL GROUNDS, ALL CLAIMS). .............................14

     A. The Petition Fails To Sufficiently Demonstrate That Storing The
        "Behavioral Statistics" For A Flow As Claimed Is Disclosed Or Made
        Obvious By Any Combination (All Grounds, Claims 1–44)..................14

     B. The Petition Fails To Sufficiently Demonstrate That The Yung
        Combinations Disclose Use Of A "Single Router" In The Manner
        Claimed (Ground I, Claims 1, 2, 6-7; Ground IV, Claim 8)..................16

         1. Yung Is Not Shown To Teach The Single Router Limitations...........18

         2. Yung Teaches Away From Use Of A Single Router As Claimed......21

         3. The Art Incorporated And Cited In Yung Also Does Not Disclose The
            Single Router Limitations. .................................................26

         4. The Petition Fails To Sufficiently Explain How Yung Could Or
            Would Be Modified To Perform The Claimed Invention...................32

C. The Petition Fails To Sufficiently Demonstrate That The Yung
Combinations Disclose Or Render Obvious The Calculation Of A
Badness Factor As Claimed (Ground I, Claims 17-18, 37-38; Ground II,
Claims 9-13, 19-24, 29-33, 39-44; Ground IV, Claims 14-16, 34-36). ...34

   1. Copeland Does Not Disclose The Claimed "Badness Factor" For
Each Flow. ..........................................................................................34

   2. The Petition Does Not Sufficiently Establish A Reason For The
POSITA To Have Combined Yung And Copeland As Proposed .......39

D. The Petition Fails To Demonstrate That Young And The Four-Steps
Whitepaper Make Claim 3 Obvious (Ground III, Claim 3). ...................43

   1. Petitioner Fails To Sufficiently Show The Four-Steps That
Whitepaper Was Publicly Accessible Qualified Prior Art. .................43

   2. The Proposed Combination Does Not Disclose A Field Containing
Data Representing Behavioral Statistics About Dropped Packets ......53

   3. The Petition Does Not Show A Reason The POSITA Would Have
Combined Yung And The Four-Steps Whitepaper As Proposed. ......56

E. The Petition Fails To Sufficiently Demonstrate Its Combinations Enforce
Penalties On A Flow As Claimed (Ground I, Claims 1-2, 4-7, 17-18, 25-
27, 37-38; Ground II, Claims 12-13, 32-33; Ground III, Claim 3; Ground
IV, Claims 8, 14-16, 28, 34-36). ............................................................59

F. The Petition Fails To Show That Ye Renders Obvious The Enforcement
Of A Penalty When A "Congestion Condition" Is Encountered As
Claimed (Ground IV, Claims 8, 14-16, 28, 34-36). ................................63

IV. THE BOARD SHOULD DENY INSTITUTION UNDER § 314(a). ..............64

V. CONCLUSION ................................................................................................70

Appx202

initial action of flow classification, whereas the patented invention teaches

identification of misbehaving flows through continued monitoring. *See infra*

§ III.A.

Petitioner relies on Yung alone, or in combinations involving three other

references, to challenge the patent's various claims on four grounds. Each attack

seriously misses the mark in not just the way described above, but numerous others

as well. ***Second***, Ground 1 as to 1, 2, and 6-7, and Ground 4 as to claim 8, fail

because Yung does not disclose still other limitations of the challenged claims,

including use of a "single router" for the recited functionality and enforcing

penalties on misbehaving flows. These arguments also fail for at least the

additional reason that, although Petitioner concedes Yung would have to be

modified to meet the claimed invention, Petitioner fails to explain what

modifications would be required, and why those modifications would have been

obvious. *See infra* § III.B.

***Third***, Grounds 2 and 3, which rely on the correctness of the arguments in

Ground 1, fails for at least one more reason as to claims 9–24 and 29–44: Copeland

in combination with Yung does not disclose the calculation of a "badness factor"

for each flow. Nor does Petitioner establish that a POSITA would have been

2

motivated to combine Yung and Copeland to meet these claim limitations.  *See*

*infra* § III.C.

    ***Fourth***, the claims in every Ground that recite enforcing a penalty against a

flow (claims 1–8, 12–18, 25–28, and 32–38 are also not disclosed or rendered

obvious as to these limitations.  The alleged prior art's alleged penalties against a

flow are neither penal, nor punitive of misbehavior, as the patent claims and

describes.  *See infra* § III.E.[1]

    ***Fifth***, Ground 3, which challenges independent claim 3, and again relies on

the correctness of the flawed arguments in Ground 1, also fails at least because

Petitioner has not carried its burden to establish the Four-Steps Whitepaper was

publicly available so as to constitute a printed prior art publication.  Petitioner's

proposed combination of Yung and the Four-Steps Whitepaper does not disclose

claim 3's limitation of "a second field containing data representing payload-

content-agnostic behavioral statistics about dropped and non-dropped packets of a

--------------------

[1] Thus, the arguments in Sections III.C and III.E of this Preliminary

Response collectively apply to all challenged claims.

necessary modifications would be.  Nor do they offer any explanation of why they

would allegedly have been obvious to a POSITA.

"Expert testimony that does not disclose the underlying facts or data on

which the opinion is based is entitled to little or no weight."  37 C.F.R. § 42.65(a).

Accordingly, the Petition and its alleged supporting evidence are insufficient as a

matter of law to support the alleged obviousness of the modifications.  *See Keurig*

*Green Mountain, Inv. v. Touch Coffee & Beverages, LLC*, IPR2016-01395, Paper

18, 14-15 (PTAB Jan. 4, 2017) (denying IPR and finding expert testimony was

insufficiently supported and entitled to no weight because the expert opined that

modifications to the prior art would have been obvious but "d[id] not explain what

those modifications would have been, much less why they would have been

obvious.").

    **C.**    **The Petition Fails To Sufficiently Demonstrate That The Yung Combinations Disclose Or Render Obvious The Calculation Of A Badness Factor As Claimed (Ground I, Claims 17-18, 37-38; Ground II, Claims 9-13, 19-24, 29-33, 39-44; Ground IV, Claims 14-16, 34-36).**

        **1.**    <u>**Copeland Does Not Disclose The Claimed "Badness Factor" For Each Flow.**</u>

Independent claims 9 and 29 each recite computing a "badness factor for the

flow, wherein the badness factor provides an indication of whether the flow is

exhibiting undesirable behavior." [9.2; 29.2]. Every challenged claim in Ground 2 includes the limitations associated with computing this "badness factor."

The Petition concedes that Yung does not disclose these "badness factor" limitations. Pet. at 49. The Petition relies on Copeland to try to fill this gap. It asserts that Copeland's "flow-based 'concern index' (or CI) value represents the claimed badness factor". *Id.* (citing Ex. 1003 [Jeffay Decl.] ¶ 210). As alleged support for this assertion, the Petition cites no evidence except *ipse dixit* in the accompanying declaration, which asserts: "This concern index (CI) value represents the claimed *badness factor*." Ex. 1003 [Jeffay Decl.] ¶ 210. The Petition fails to substantiate this assertion.

In contrast to the claimed invention's "badness factor," Copeland's concern index is for "suspicious activity" in contrast to legitimate traffic. Ex. 1007 [Copeland] Abstract. Copeland teaches that "flow statistics are analyzed to determine if the flow appears to be legitimate traffic or possible suspicious activity. A ***concern index value is assigned to each flow that appears suspicious***." *Id.* (emphasis added). Copeland's concern index is thus concerned with identifying malicious activity such as an external intruder. This is in keeping with Copeland's teachings as a whole, which describe " an intrusion detection system that … identifies suspicious patterns that may indicate a network attack or system attack or

35

intrusion." *Id.* at 1:45-48; *see also id.* at Abstract ("By assigning a value to each flow that appears suspicious and adding that value to the total concern index of the responsible host, it is possible to ***identify hosts that are engaged in intrusion activity***.") (emphasis added).

In contrast, the '593 patent's "badness factor" is concerned with "undesirable" behavior or "misbehavior" associated with P2P traffic, which is ***not*** necessarily suspicious or non-suspicious. Ex. 1001 ['593 Patent] 1:10-18 ("[I]t has been estimated that P2P traffic now represents about 50-70 percent of the total traffic on the Internet. … Thus, it appears that most of the bandwidth on the Internet is being consumed by just a minority of the users. For this and other reasons, ***P2P traffic is viewed*** by ISP's (Internet service providers) and others ***as being abusive/misbehaving traffic*** that should be controlled and penalized.") (emphasis added); *id.* at 2:18-21 ("Based at least partially upon the behavioral statistics, a determination is made as to whether the flow is exhibiting undesirable behavior. In one embodiment, this determination may be made by computing a badness factor for the flow."). Thus, Copeland's "concern index" is concerned with suspicious behavior of a host, not undesirable behavior of a flow. That is a different criterion than suspiciousness, a criterion which Copeland does not teach to the POSITA.

36

Appx242

Moreover, Copeland's "concern index," unlike claim 9 and 29's "badness factor," is not computed on a per-flow basis.  In Copeland, "*[f]lows with suspicious activity are assigned* a ***predetermined concern index (CI)*** value based upon a heuristically predetermined assessment of the significance of the threat of the particular traffic or flow or suspicious activity."  Ex. 1007 [Copeland] 7:57-61 (emphasis added); *see also id.* at 8:1-5 ("By *assigning a value to each flow that appears suspicious* and ***adding that value to a total CI of the host responsible for the flow***, it is possible to identify hosts that are engaged in intruder activities.") (emphasis added); *id.* at 10:46-47 ("[T]he engine **155** associates all packets with a flow.  It analyzes certain statistical data and *assigns a concern index value to abnormal activity*.") (emphasis added); *id.* at 14:49-55 (a process includes a sequence of computer-executed steps "namely, the detection of intruders based upon C/S flows and other activity deemed heuristically to be a *threat substantial enough to warrant assignment of a concern index value*.") (emphasis added); *id.* at 17:58-61 ("These flows are considered as finished and a logic-tree analysis is done to classify them as either a normal flow, or a potential probe or other *suspicious activity warranting assignment of a concern index value*.") (emphasis added); *id.* at Fig. 6 (assigning predetermined "concern index" values to categories of suspicious activity of potential intruders).  Thus, Copeland only *assigns* "concern index"

37

values to suspicious flows.  In contrast, independent claims 9 and 29 of the '593

patent recite computing a "badness factor" for **each** flow.  [9.2; 29.2].  As the

patent explains in its description of the invention:

> the MFM **210** determines (block **304**) whether the flow is exhibiting
> undesirable behavior.  In one embodiment, this determination is made
> by computing a badness factor for the flow.  This badness factor is
> computed based on the behavioral statistics of the flow and provides an
> indication as to whether the flow is exhibiting undesirable behavior.

Ex. 1001 ['593 Patent]  6:25-31; *see also id.* at 7:51-52 ("[T]he MFM **210***d* also

computes a badness factor for the flow."); *id.* at 8:12-17 ("By taking these

components into account in the computation of the badness factor, it is possible to

derive a badness factor that provides an indication of whether a flow is

misbehaving.  In one embodiment, a badness factor larger than 1 indicates a

misbehaving flow.").  The '593 patent's "badness factor" is calculated for each

flow regardless of whether the flow is misbehaving.

For all these reasons, Copeland is not shown to have a reasonable probability

to teach or suggest "computing … a badness factor for the flow …."  [9.2; 29.2].

For this additional reason, the Board should deny institution on ground 2.

38

Trials@uspto.gov                                                     Paper 16
Tel: 571-272-7822                                    Date: November 19, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————

CLOUDFLARE, INC.,
Petitioner,

v.

SABLE NETWORKS, INC.,
Patent Owner.

—————————

IPR2021-00909
Patent 8,243,593 B2

—————————

Before STACEY G. WHITE, GARTH D. BAER, and
JULIET MITCHELL DIRBA, *Administrative Patent Judges.*

DIRBA, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2021-00909
Patent 8,243,593 B2

On May 7, 2021, Cloudflare, Inc. ("Petitioner") and SonicWall Inc.[1] filed a Petition requesting *inter partes* review of claims 1–44 of U.S. Patent No. 8,243,593 B2 (Ex. 1001, "the '593 patent"). Paper 1 ("Pet."). Sable Networks, Inc.[2] ("Patent Owner") timely filed a Preliminary Response. Paper 8 ("Prelim. Resp."). With our authorization, Petitioner filed a pre-institution Reply (Paper 9 ("Prelim. Reply")), and Patent Owner filed a pre-institution Sur-Reply (Paper 11 ("Prelim. Sur-Reply")).

An *inter partes* review may not be instituted unless "the information presented in the petition . . . and any response . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a).

Having reviewed the parties' papers and the evidence of record, we are not persuaded to discretionarily deny institution, and we determine that Petitioner has shown a reasonable likelihood it will prevail in establishing the unpatentability of at least one challenged claim. Accordingly, we institute an *inter partes* review.

## I. BACKGROUND

### A. Related Matters

The parties indicate that the '593 patent has been asserted in several district court lawsuits, including *Sable Networks, Inc. v. Cloudflare, Inc.*, 6:21-cv-00261 (W.D. Tex.) (the "Litigation") and *Sable Networks, Inc. v.*

---

[1] SonicWall Inc. was subsequently terminated from this proceeding following a settlement with Patent Owner. Paper 15 (Termination Order).

[2] Patent Owner also identifies Sable IP, LLC as a real party in interest. Paper 5, 1.

2

IPR2021-00909
Patent 8,243,593 B2

*SonicWall Inc.*, 6:21-cv-00190 (W.D. Tex.).  Pet. xii–xiii; Paper 5, 1–3.  The parties do not identify any related *inter partes* review proceedings.

### B. The Petition's Asserted Grounds

Petitioner asserts the following grounds of unpatentability (Pet. 1):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 4–7, 17, 18, 25–27, 37, 38 | 103(a)[3] | Yung[4] |
| 9–13, 19–24, 29–33, 39–44 | 103(a) | Yung, Copeland[5] |
| 3 | 103(a) | Yung, Four-Steps Whitepaper[6] |
| 8, 14–16, 28, 34–36 | 103(a) | Yung, Copeland, Ye[7] |

As noted below, we query whether dependent claims 17, 18, 37, and 38 should be included in the Yung-Copeland ground above.  *See infra* § III.E.4.

In support of its contentions, Petitioner relies on the testimony of Dr. Kevin Jeffay.  Ex. 1003.

---

[3]  The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. § 103 effective March 16, 2013. Because the challenged patent was filed before March 16, 2013, we refer to the pre-AIA version of § 103.

[4]  US 7,664,048 B1, filed Nov. 24, 2003, issued Feb. 16, 2010 (Ex. 1005).

[5]  US 7,185,368 B2, filed Nov. 30, 2001, issued Feb. 27, 2007 (Ex. 1007).

[6]  "Four Steps to Application Performance Across the Network with Packeteer's PacketShaper®," *retrieved from* https://web.archive.org/web/20030317051910/http:/packeteer.com/PDF_files/4steps.pdf (Ex. 1006).

[7]  US 7,295,516 B1, filed Nov. 13, 2001, issued Nov. 13, 2007 (Ex. 1008).

3

IPR2021-00909
Patent 8,243,593 B2

### C. Summary of the '593 Patent

The '593 patent is titled "Mechanism for Identifying and Penalizing Misbehaving Flows in a Network," and the application that led to this patent was filed on December 22, 2004. Ex. 1001, codes (54), (22).

The Specification begins by explaining that "peer-to-peer (P2P) traffic on the Internet has grown immensely in recent years . . . despite the fact that the number of P2P users is quite small." Ex. 1001, 1:7–13. As a result, this traffic uses a disproportionate amount of bandwidth, so it is viewed by Internet service providers as "abusive/misbehaving traffic that should be controlled and penalized." *Id.* at 1:14–18. Previously, P2P traffic could be identified by port numbers or signatures, but the '593 patent explains that protocols evolved to evade these identification techniques. *Id.* at 1:19–45.

The '593 patent addresses this problem by identifying P2P traffic (and other "misbehaving information packet flows"[8]) using its "observed behavior," which "cannot be hidden." Ex. 1001, 1:46–67. Specifically, the Specification describes a method that: (1) maintains "behavioral statistics" for a flow, (2) determines whether the flow is "exhibiting undesirable behavior" based on the statistics, and (3) if so, enforces a penalty on the flow. *Id.* at 2:1–51; *see also id.* at Fig. 3. The "behavioral statistics" of a flow include, for example:

> a total byte count (sum of all of the bytes in all of the packets of the flow that have been processed up to the current time), a life duration (how long the flow has been in existence since inception), a flow rate (derived by dividing the total byte count by the life duration of the flow), and an average packet size

---

[8] "For purposes of the present invention, a flow is a series of packets that are related in some manner." Ex. 1001, 5:16–17. The header of a packet is used to associate it with a particular flow. *Id.* at 5:17–24; *see id.* at 7:3–13.

IPR2021-00909
Patent 8,243,593 B2

> (derived by dividing the total byte count by the total number of
> packets in the flow that have been processed).

*Id.* at 2:6–13; *see id.* at Fig. 4, 7:20–29 (describing example flow block

storing behavioral statistics).  The method may involve computing a

"badness factor," which "provides an indication as to whether the flow is

exhibiting undesirable behavior" and may also indicate "the degree to which

the flow is misbehaving."  *Id.* at 2:20–26; *see id.* at 7:54–65 (exemplary

badness factor calculation).  The penalty that is enforced on the flow may be

"an increased drop rate," which may have the effect of correcting the flow's

behavior.  *Id.* at 2:27–51; *see id.* at 9:52–10:3 (explaining how dropping a

packet can correct a flow's behavior).

> Figure 2 (below) shows a router that implements the method:



5

IPR2021-00909
Patent 8,243,593 B2

Ex. 1001, Fig. 2, 2:58–59.  As shown above, Figure 2 illustrates router 102, which includes:  four line cards 202a-d that each connect to another router (not shown), switching fabric 204 that interconnects line cards 202, and application processor 208 that determines forwarding paths.  *Id.* at 3:39–50, 3:59–64, 4:17–20.  Each line card 202 includes "a misbehaving flow manager (MFM) 210 for keeping track of flows, determining whether the flows are exhibiting undesirable behavior, and enforcing a penalty on the flows if they are exhibiting undesirable behavior."  *Id.* at 5:44–48.

*D. Challenged Claims*

Petitioner challenges all 44 claims of the '593 patent.  Of these, claims 1–5, 9, 25, and 29 are independent.  Independent claims 1 and 9 are illustrative for purposes of this Decision:

> 1.    A machine-implemented method for processing a single flow, the flow comprising a plurality of packets, and the method comprising:
>
> creating a flow block as the first packet of a flow is processed by a single router;
>
> said flow block being configured to store payload-content-agnostic behavioral statistics pertaining to said flow, regardless of the presence or absence of congestion;
>
> said router updating said flow block with the payload-content-agnostic behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by said router, regardless of the presence or absence of congestion;
>
> said router heuristically determining whether said flow exhibits undesirable behavior by comparing at least one of said payload-content-agnostic behavioral statistics to at least one pre-determined threshold value; and

6

IPR2021-00909
Patent 8,243,593 B2

> upon determination by said router that said flow exhibits undesirable behavior, enforcing, relative to at least one packet, a penalty;

> wherein the preceding steps are performed on said router without requiring use of inter-router data.

Ex. 1001, 10:28–49.

> 9.     A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

> maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and

> computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

*Id.* at 11:63–12:8.


## II. CONSIDERATION OF DISCRETIONARY DENIAL

Patent Owner argues that we should exercise our discretion under 35 U.S.C. § 314 and deny institution given the status of the Litigation. *See* Prelim. Resp. 64–70; Prelim. Sur-Reply. Petitioner argues that discretionary denial is unwarranted. *See* Pet. 76–80; Prelim. Reply.

### A. Legal Standard for Exercising Discretion under Section 314(a)

Under § 314(a), the Director has discretion to deny institution of an *inter partes* review. *See Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) ("[T]he agency's decision to deny a petition is a matter committed to the Patent Office's discretion."); *SAS Inst., Inc. v. Iancu*, 138

IPR2021-00909
Patent 8,243,593 B2

S. Ct. 1348, 1356 (2018) ("[Section] 314(a) invests the Director with
discretion on the question whether to institute review . . . ." (emphasis
omitted)); *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir.
2016) ("[T]he PTO is permitted, but never compelled, to institute an IPR
proceeding.").

In determining whether to exercise discretion on behalf of the
Director, we are guided by the Board's precedential decision in *NHK Spring
Co. v. Intri-Plex Techs, Inc.*, IPR2018-00752, Paper 8 (PTAB Sept. 12,
2018) (precedential). In *NHK*, the Board found that the "advanced state of
the district court proceeding" was a "factor that weighs in favor of denying"
the petition under § 314(a). *NHK*, Paper 8 at 20. The Board determined that
"[i]nstitution of an *inter partes* review under these circumstances would not
be consistent with 'an objective of the AIA . . . to provide an effective and
efficient alternative to district court litigation.'" *Id.* (citing *Gen. Plastic
Indus. Co., Ltd. v. Canon Kabushuki Kaisha*, IPR2016-01357, Paper 19, 16–
17 (PTAB Sept. 6, 2017) (precedential in relevant part)).

The Board's precedential decision in *Fintiv* sets forth six factors that
we consider when determining whether to use our discretion to deny
institution due to the advanced state of a parallel proceeding. *Apple Inc. v.
Fintiv, Inc.*, IPR2020-00019, Paper 11 at 3 (PTAB Mar. 20, 2020)
(precedential) (Order) ("*Fintiv*"). When determining whether to exercise
discretion to deny institution under *NHK* due to an earlier trial date, we
consider the following factors ("*Fintiv* factors"):

> 1. whether the court granted a stay or evidence exists that
> one may be granted if a proceeding is instituted;

> 2. proximity of the court's trial date to the Board's
> projected statutory deadline for a final written decision;

8

IPR2021-00909
Patent 8,243,593 B2

> 3. investment in the parallel proceeding by the court and the parties;
>
> 4. overlap between issues raised in the petition and in the parallel proceeding;
>
> 5. whether the petitioner and the defendant in the parallel proceeding are the same party; and
>
> 6. other circumstances that impact the Board's exercise of discretion, including the merits.

*Id.* at 6. "These factors relate to whether efficiency, fairness, and the merits support the exercise of authority to deny institution in view of an earlier trial date in the parallel proceeding." *Id.* In evaluating these factors, we take "a holistic view of whether efficiency and integrity of the system are best served by denying or instituting review." *Id.* (citing Patent Trial and Appeal Board Consolidated Trial Practice Guide November 2019 ("CTPG"),[9] 58). We address the *Fintiv* factors below.

### B. Analysis of Fintiv Factors

#### 1. Factor 1: Whether a Stay Exists or Is Likely to Be Granted if a Proceeding Is Instituted

The parties agree that no stay has been requested in the Litigation. Pet. 76–77; Prelim. Resp. 65. Although Patent Owner argues that the district court "has expressly stated on multiple occasions that a stay is disfavored," Patent Owner does not point to any evidence regarding the Litigation specifically. Prelim. Resp. 66.

This factor does not weigh in favor of or against exercising our discretion because no stay has been requested and there is no evidence regarding the likelihood of a stay in the Litigation. *See Apple Inc. v. Fintiv,*

---

[9] *Available at* https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2021-00909
Patent 8,243,593 B2

*Inc.*, IPR2020-00019, Paper 15 at 12 (PTAB May 13, 2020) (informative) (Institution Decision) ("*Fintiv II*") (holding that "[t]his factor does not weigh for or against discretionary denial" when neither party requested a stay); *Sand Revolution II, LLC v. Continental Intermodal Group – Trucking LLC*, IPR2019-01393, Paper 24 at 7 (PTAB June 16, 2020) (informative) ("*Sand Revolution*") ("In the absence of specific evidence, we will not attempt to predict how the district court in the related district court litigation will proceed . . . .").

Accordingly, we determine that this factor is neutral.

### 2. *Factor 2: Proximity of the Court's Trial Date to the Board's Projected Statutory Deadline*

Petitioner argues that "no trial date has been scheduled in the related litigation." Pet. 77. Patent Owner responds that the district court "expects trial to begin January 12, 2023," approximately two months after the final written decision would be due in this proceeding. Prelim. Resp. 67.[10] Petitioner replies that this is merely an estimate based on the court's "Order Governing Proceedings" (OGP). Prelim. Reply 1–2 (citing Ex. 2002; Ex. 2003, 11 & n.11; Ex. 1067). According to Petitioner, the court's OGP creates "at most a placeholder," and the district court has not actually scheduled a trial date for the Litigation. *Id.* at 2. Patent Owner does not dispute this characterization. *See* Prelim. Sur-Reply 2.

---

[10] Petitioner notes that Patent Owner's Exhibit 2002 includes only the most recent email in the identified email chain. *See* Prelim. Reply 1 n.1 (citing Ex. 1061); *compare* Ex. 2002, *with* Ex. 1061. Although we do not rely on the omitted portion of the email chain, we caution Patent Owner not to include unidentified and unexplained redactions in its exhibits.

10

Appx328

IPR2021-00909
Patent 8,243,593 B2

There is no trial date scheduled for the Litigation. The evidence indicates that trial may be scheduled at the conclusion of the upcoming *Markman* hearing. Ex. 2003, 11; Ex. 1067 (parties' proposed scheduling order); *see also* Ex. 1061, 1 (scheduling *Markman* hearing for January 12, 2022). Given the absence of a scheduled trial date, significant uncertainty surrounds when a trial will occur.

Accordingly, we determine this factor weighs against exercising discretion to deny institution.

### 3. *Factor 3: Investment in the Parallel Proceeding by the Court and Parties*

Petitioner argues that this factor strongly favors institution because the Litigation is in the early stages. Pet. 78. Patent Owner argues that there has been relevant activity in the Litigation because the court scheduled a *Markman* hearing for January 12, 2022. Prelim. Resp. 68 (citing Ex. 2002). At the time of the Preliminary Reply, Petitioner's invalidity contentions were due on September 15, 2021, and claim construction proceedings had not begun. Prelim. Reply 3.

The Litigation is in its very early stages. According to the parties' exhibits, Patent Owner has served preliminary infringement contentions, Petitioner has served preliminary invalidity contentions, and the parties have begun identifying their claim construction positions. Ex. 1067, 1–3. However, the *Markman* hearing has not yet occurred, and fact and expert discovery have not yet begun. *Id.* at 3–4; Ex. 1061, 1. Because we consider the investment "at the time of the institution decision," not at some later date (*Fintiv*, Paper 11, 9–10), the *Markman* hearing does not show investment in the parallel proceeding. Accordingly, we determine that the parties and the

11

Appx329

IPR2021-00909
Patent 8,243,593 B2

court have invested minimal resources in the Litigation, which weighs against discretionary denial.

Moreover, the undisputed evidence here shows that Petitioner acted diligently, filing its Petition only seven weeks after service of the complaint and well before preliminary infringement contentions were served. Pet. 76, 78–79; *see also* Ex. 1067. This further weighs against discretionary denial. *See Fintiv*, Paper 11 at 11 (explaining that, in cases where the petitioner acted expeditiously, "this fact has weighed against exercising the authority to deny institution under *NHK*").

Accordingly, this factor weighs strongly against exercising discretion to deny institution.

### 4. Factor 4: Overlap Between Issues Raised in the Petition and in the Parallel Proceeding

In the Petition, Petitioner stipulates that "Petitioners will not raise invalidity challenges to the '593 Patent in the litigation relying on the grounds or the prior art references (i.e., Yung, Copeland, Four-Steps Whitepaper, and Ye) asserted in this IPR if instituted." Pet. 79. Petitioner contends that this "strongly favors institution." *Id.* According to Patent Owner, Petitioner's "narrow stipulation does not eliminate the possibility that substantially similar art and arguments will be raised in the [Litigation]," and thus, this factor "favors denying institution." Prelim. Resp. 68–69.

Petitioner's stipulation here is slightly broader than the stipulation made by the petitioner in *Sand Revolution*. *See* Paper 24 at 11–12. There, the Board found the "stipulation . . . mitigate[d] to some degree the concerns of duplicative efforts between the district court and the Board, as well as

Appx330

IPR2021-00909
Patent 8,243,593 B2

concerns of potentially conflicting decisions," and weighed marginally in favor of institution. *Id.* at 12. Here, Petitioner also stipulates not to raise invalidity challenges relying on the same asserted references, which further mitigates these concerns, even though it does not eliminate the possibility of overlap.

Accordingly, we determine this factor weighs against exercising discretion to deny institution.

### 5. Factor 5: Whether the Petitioner and the Defendant in the Parallel Proceeding Are the Same Party

Although Petitioner is the defendant in the district court action, the final written decision will likely issue before the trial begins. If this were the outcome, the fact that Petitioner is the defendant in the district court case would actually weigh in favor of institution. *See MED-EL Elektromedizinische Geräte Ges.m.b.H v. Advanced Bionics AG*, IPR2020-00190, Paper 15 at 14–15 (PTAB June 3, 2020) (Institution Decision) (explaining that overlap of issues and parties, especially with an uncertain trial date, weighs in favor of institution because petitioner would be estopped in district court from raising the same issues upon issuance of the Board's final written decision).

Accordingly, we determine this factor weighs against exercising discretion to deny institution.

### 6. Factor 6: Other Circumstances that Impact the Board's Exercise of Discretion, Including the Merits

Petitioner contends that the Petition's strong merits weigh in favor of institution. Pet. 80. Petitioner further argues that the challenged patent "is

13

IPR2021-00909
Patent 8,243,593 B2

asserted in six lawsuits in three district courts," where the Board can "resolve unpatentability in a single, centralized venue." *Id.*

Patent Owner contends that this proceeding would be inefficient because "patent claims covering closely related technology and accused products will be litigated by the same parties to a jury." Prelim. Sur-Reply 2; *see also* Prelim. Resp. 66–67. Patent Owner explains that the Litigation involves three other patents that are also directed to "computer networking technologies." Prelim. Sur-Reply 1; Prelim. Resp. 66. According to Patent Owner, Petitioner filed petitions challenging those other patents, but did not challenge some of the asserted claims. Prelim. Resp. 66–67.

The parties' arguments for this factor are unavailing. We do not agree that other patents (even those asserted in the Litigation) or other proceedings (even those involving the challenged patent) are germane to whether we should institute this *inter partes* review, which currently involves only one Petitioner and one challenged patent. In particular, the parties have not persuaded us that those other patents or proceedings are relevant here.[11] Moreover, we find that Petitioner has demonstrated a reasonable likelihood it will prevail, and such a determination weighs neither for nor against the exercise of discretion to deny institution of *inter partes* review.

Accordingly, we determine that this factor is neutral.

---

[11] Contrary to Patent Owner's argument (*see* Prelim. Resp. 66), we consider "the patentability disputes between the parties" that relate to *the challenged patent*, not any and all patentability disputes between the parties. *See Fintiv*, Paper 11 at 9.

14

IPR2021-00909
Patent 8,243,593 B2

### 7. Balancing the Fintiv Factors

We have considered the circumstances and facts before us in view of the *Fintiv* factors. Because our analysis is fact driven, no single factor is determinative of whether we exercise our discretion to deny institution under § 314(a). Further, we take "a holistic view of whether efficiency and integrity of the system are best served by denying or instituting review" when evaluating these factors. *Fintiv*, Paper 11 at 6. Having evaluated all of the factors on this record, we do not exercise our discretion under § 314(a) to deny institution of *inter partes* review.

## III. ANALYSIS

### A. The Level of Ordinary Skill in the Art

Petitioner asserts that the level of ordinary skill in the art corresponds to "an undergraduate degree (or equivalent) in electrical engineering, computer science, or comparable subject" and "3–5 years of academic or industry experience in computer networking or comparable industry experience." Pet. 11 (citing Ex. 1003 ¶ 27).

At this stage, Patent Owner does not address the level of ordinary skill in the art. *See generally* Prelim. Resp.

We are satisfied that Petitioner's proposed definition generally comports with the level of skill necessary to understand and implement the teachings of the '593 patent and the asserted prior art. This definition is also supported by the testimony of Dr. Jeffay. *See* Ex. 1003 ¶ 27. For purposes of this Decision, we adopt Petitioner's proposed level of skill, as articulated above.

15

IPR2021-00909
Patent 8,243,593 B2

To the extent the level of ordinary skill in the art is in dispute or makes a material difference in the obviousness analysis, the parties should brief their respective positions in this regard during trial.

### B. Claim Construction

We interpret claim terms using "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under the principles set forth by our reviewing court, the "words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Petitioner contends the challenged claims include ten means-plus-function limitations that should be interpreted under 35 U.S.C. § 112 ¶ 6 (Pet. 11), and that no other terms require construction for purposes of this proceeding (*id.* at 12). For each means-plus-function limitation, Petitioner identifies a construction for use in this proceeding. *Id.* at 11–14.

At this stage, Patent Owner does not expressly address the construction of any claim terms or phrases. *See generally* Prelim. Resp.

On this record, we agree with Petitioner that the identified limitations—which each recite "means for" performing a particular step—are means-plus-function limitations that should be interpreted under 35 U.S.C. § 112 ¶ 6. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (en banc) (holding that "use of the word 'means' creates a presumption that § 112, ¶ 6 applies"). We are also persuaded that Petitioner correctly identifies the recited functions for these limitations, and

16

Appx334

IPR2021-00909
Patent 8,243,593 B2

we agree that the Specification links the misbehaving flow manager ("MFM 210") with each of the recited functions. *See* Pet. 12–14 (citing Ex. 1001, 6:5–47, 7:37–50, 7:57–8:37). Moreover, as Petitioner observes, the Specification states that MFM 210 can be implemented by "one or more processors on a line card 202 [that] execute one or more sets of instructions" or "hardwired logic components." *See id.* at 11–12 (alteration in original) (citing Ex. 1001, 5:49–57, Fig. 2; Ex. 1003 ¶ 79).

For purposes of this Decision, we apply the constructions identified by Petitioner. These are shown in the table below:

| Limitation | Function | Structure |
|---|---|---|
| "means for maintaining a set of behavioral statistics for the flow…" (claims 25 and 29) | maintaining a set of behavioral statistics for the flow | MFM 210 implemented on processors |
| "means for determining…whether the flow is exhibiting undesirable behavior" (claim 25) | determining whether the flow is exhibiting undesirable behavior | MFM 210 implemented on processors |
| "means for enforcing…[a/the] penalty on the flow" (claims 25 and 32) | enforcing a penalty on the flow | MFM 210 implemented on processors |
| "means for computing…a badness factor for the flow" (claim 29) | computing a badness factor for a flow | MFM 210 implemented on processors |
| "means for determining…a penalty to impose on the flow" (claim 31) | determining a penalty to impose on a flow | MFM 210 implemented on processors |
| "means for determining an increased drop rate to impose on one or more information packets belonging to the flow" (claim 37) | determining an increased drop rate to impose on one or more information packets belonging to a flow | MFM 210 implemented on processors |

17

Appx335

IPR2021-00909
Patent 8,243,593 B2

| Limitation | Function | Structure |
|---|---|---|
| "means for imposing [an/the] increased drop rate on the flow" (claims 27 and 38) | imposing an increased drop rate on a flow | MFM 210 implemented on processors |
| "means for receiving a particular information packet belonging to the flow" (claims 43 and 44) | receiving a particular information packet belonging to a flow | MFM 210 implemented on processors |
| "means for determining whether to forward the particular information packet to a destination" (claim 43) | determining whether to forward a particular information packet to a destination | MFM 210 implemented on processors |
| "means for updating […] the set of behavioral statistics to reflect processing of the particular information packet" (claims 43 and 44) | updating the set of behavioral statistics to reflect processing of the particular information packet | MFM 210 implemented on processors |

Based on the record before us, we do not find it necessary to provide express claim constructions for any other terms or phrases. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

During the trial, the parties should directly address any claim construction adopted in this Decision if the party contends we should not adopt that construction in the final written decision.

*C. Law on Obviousness*

The legal question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the

18

Appx336

IPR2021-00909
Patent 8,243,593 B2

prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness.[12] *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966). One seeking to establish obviousness based on more than one reference also must articulate sufficient reasoning with rational underpinnings to combine teachings. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

### D. Summary of Asserted Prior Art References

#### 1. Yung (Ex. 1005)

Yung is titled "Heuristic Behavior Pattern Matching of Data Flows in Enhanced Network Traffic Classification." Ex. 1005.

Yung classifies data flows by comparing them to "known application behavior patterns." Ex. 1005, Abstract. According to Yung, its technique allows for classification of encrypted, compressed, or proprietary network traffic. *Id.* at 5:43–6:1; *see id.* at 4:43–60 (noting that peer-to-peer applications employ encryption and compression to obscure identification). For each flow, Yung stores a data block object (also called a flow object) that includes "various attributes of the flow," such as "packet count, byte count, first packet time, last packet time, etc." *Id.* at 8:5–11, 17:42–52, 25:8–11. Yung uses the data block object to classify the data flow. *E.g.*, *id.* at 24:13–18, 24:27–51. Yung may also enforce bandwidth utilization controls on the flow, such as a discard policy that causes packets to be dropped. *E.g.*, *id.* at 19:53–58, 20:13–15, 24:63–25:1.

---

[12] The current record does not include allegations or evidence of objective indicia of nonobviousness.

IPR2021-00909
Patent 8,243,593 B2

Figure 3 (reproduced below) is a block diagram of an exemplary bandwidth management device 130 that implements Yung's techniques. Ex. 1005, 6:21–23, 16:8–10.



Fig._3

Figure 3 (above) shows bandwidth management device 130 that includes packet processor 131, flow control module 132, and traffic classification engine 137. Yung explains that packet processor 131 detects new data flows and "construct[s] data structures including attributes characterizing the data flow." *Id.* at 16:15–17, 17:42–49. Flow control module 132 "enforce[s] bandwidth utilization controls on data flows traversing bandwidth management device 130." *Id.* at 16:17–19. Traffic classification engine 137 "analyze[s] data flow attributes and identif[ies] traffic classes corresponding to the data flows." *Id.* at 16:20–22.

IPR2021-00909
Patent 8,243,593 B2

Figure 7 (reproduced below) includes a flow chart of an exemplary method of bandwidth management device 130. Ex. 1005, 23:16–20.



Fig._7

As shown above, in Figure 7, packet processor 131 receives a data packet (step 202), determines whether a control block object already exists corresponding to the data flow (step 204), and if not, constructs a control

21

IPR2021-00909
Patent 8,243,593 B2

block object for the flow (step 212). *Id.* at 23:23–30. A traffic class may be identified (step 214), and ultimately, the packet is passed to flow control module, which enforces appropriate bandwidth utilization controls on the data packet (step 222). *Id.* at 24:13–18, 24:63–25:1. Finally, "packet processor 131 also records or updates various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.)" (step 224). *Id.* at 25:8–11.

### 2. Copeland (Ex. 1007)

Copeland describes a "system for detecting intrusions in computer communication networks" by collecting and analyzing statistics for flows traversing the network. Ex. 1007, Abstract, 3:18–35. If a flow appears suspicious, Copeland assigns a "concern index value" to the flow. *Id.* at Abstract, 3:32–35.

In particular, Copeland collects "information about and statistics associated with each flow" and stores this data in a flow data structure corresponding to that flow. Ex. 1007, 7:38–45, 16:12–30. The flow data structure includes, for example, the number of bytes, the number of packets, and time information (such as the time of the first packet and time of the last packet). *Id.* at 7:49–54, 16:37. Copeland analyzes the data to determine if the flow appears to be legitimate traffic or possible suspicious activity. *Id.* at 7:55–57. If a flow appears suspicious, Copeland assigns a concern index (CI) value that "[has] been derived heuristically from extensive network traffic analysis." *Id.* at 7:57–62. In Figure 6, Copeland provides a table with an exemplary set of concern index values for various events. *Id.* at 7:64–67, 18:19–20. Petitioner annotates this table to show that Copeland describes

22

IPR2021-00909
Patent 8,243,593 B2

using the number of packets as a concern index value. Pet. 51. Petitioner's
annotation is reproduced below.



| NAME | POTENTIAL INTRUDER | RESPONSE | CI VALUE |
|---|---|---|---|
| POTENTIAL TCP PROBE | TCP PACKETS | RESET PACKETS | NUMBER OF PACKETS |
| POTENTIAL UDP PROBE | UDP PACKEST | ICMP PORT UNAVAILABLEPCKETS | NUMBER OF ICMP PORT UNAVAILABLE PACKETS |
| HALF-OPEN ATTACK | HIGH NUMBER AND RATE OF SYNS | SYN-ACKS | 5000+501 PER SYN-ACK |
| TCP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | RESETS | 8000+1010 PER PORT OVER 4 |
| UDP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | NOTHING OR ICMP PORT UNAVAILABLE | 8000+1010 PER PORT OVER 4 |

**TABLE I**

**FLOW-BASED CI VALUES**

As shown above, Petitioner annotates the first row of the table in Figure 6:
in the "NAME" column, Petitioner places a red box around the first entry,
which states "POTENTIAL TCP PROBE," and Petitioner places a green box
in the same row of the "CI VALUE" column, where the entry states
"NUMBER OF PACKETS."

### 3. Four-Steps Whitepaper (Ex. 1006)

The Four-Steps Whitepaper is a technical product overview for the
PacketShaper® product line from Packeteer, Inc. Ex. 1006, 1. This
document describes a bandwidth-management strategy that: (1) classifies
network traffic; (2) analyzes traffic; (3) controls traffic; and (4) reports
results. *Id.* at 2. In the second step, PacketShaper collects measurements
regarding traffic flows, including "[t]hroughput in units of bytes, packets,
transactions, connections," "[c]ounts and percentages of retransmitted,

23

IPR2021-00909
Patent 8,243,593 B2

received, tossed, dropped, and good TCP packets," and "[c]ounts and percentages of TCP connections that were denied by a policy." *Id*. at 18.

### 4. *Ye (Ex. 1008)*

Ye provides a mechanism for defending against denial-of-service attacks. Ex. 1008, Abstract. Ye activates its mechanism when a router senses congestion. *Id.*; *see id.* at 9:16–27, Fig. 5 (step 504). "[C]ongestion sufficient to merit application of . . . [Ye's mechanism] is declared when the router encounters a saturation condition which persists for a pre-selected period of time." *Id.* at 9:22–27. When activated, Ye's mechanism compares statistics about the current flow with a corresponding baseline to determine whether the flow is "aggressive." *Id.* at 10:61–11:7, Fig. 5 (step 516); *see id.* at 11:4–6 (a flow is aggressive if its rate exceeds the baseline rate). If a flow is aggressive, the forwarding rate of the flow is regulated, "e.g., by dropping packets." *Id.* at 11:4–11, Fig. 5 (steps 518, 529).

### E. *Obviousness Ground Based on Yung Alone*

Petitioner contends that the subject matter of claims 1, 2, 4–7, 17, 18, 25–27, 37, and 38 would have been obvious over Yung. Pet. 17–43. Patent Owner contends that Petitioner fails to show three of the requirements of independent claim 1: storing "behavioral statistics for a flow" (Prelim. Resp. 14–16); using a "single router" (*id.* at 16–34); and "enforcing . . . a penalty" on a flow (*id.* at 59–62). Patent Owner contends that Petitioner's showing for the other independent claims is defective for some or all of the same reasons. *Id.* at 14, 16–17, 59–60.

We have considered the parties' arguments and the evidence presented at this stage. For the reasons explained below, we determine that

24

IPR2021-00909
Patent 8,243,593 B2

Petitioner has demonstrated a reasonable likelihood that it will prevail in showing that the subject matter of claims 1, 2, 4–7, and 25–27 would have been obvious over Yung alone.

### 1. Independent Claim 1

#### a. "A machine-implemented method for processing a single flow, the flow comprising a plurality of packets, and the method comprising . . ."

Petitioner contends that Yung discloses the preamble.[13] Pet. 19–21. Petitioner points to Yung's Figure 7, which depicts a "method directed to enforcing bandwidth utilization controls on data flows." *Id.* at 19 (quoting Ex. 1005, 6:35–36). Petitioner contends that this method processes a single flow, which is composed of a plurality of packets. *Id.* at 19–20 (citing Ex. 1005, 2:58–61, 8:3–5, 11:60–62, 12:30–35, 24:13–18, 24:63–25:1, Fig. 7; Ex. 1003 ¶ 120). Petitioner further contends that the method is implemented by a machine (e.g., a bandwidth management device or a gateway). *Id.* at 21 (citing Ex. 1005, 6:8–11, 7:12–18, 15:44–47, Fig. 2).

At this stage, Patent Owner does not dispute Petitioner's arguments, analysis, or evidence for the preamble. *See generally* Prelim. Resp.

Petitioner's assertions and explanations are consistent with and supported by the evidence cited by Petitioner. On this record, we are persuaded that Petitioner has demonstrated a reasonable likelihood that it will prevail in showing that Yung discloses the preamble.

---

[13] Because Petitioner has shown sufficiently that the recitations in the preamble are satisfied by Yung, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

25

> b.  *"creating a flow block as the first packet of a flow is processed by a single router"*

Petitioner contends that Yung discloses or suggests this limitation. Pet. 21–25.  Petitioner asserts that Yung's control block object (which is also called a flow object) teaches the claimed "flow block."  *Id.* at 21 (citing Ex. 1005, 8:2–12, 23:23–30).  Petitioner asserts that Yung's packet processor 131 creates the control block object as the first packet of a flow is processed—after receiving a packet, packet processor 131 constructs a new control block object if none of the existing objects correspond to the packet. *Id.* at 21–23 (citing Ex. 1005, 16:15–18, 23:23–30, Fig. 7 (steps 202, 204, 212); Ex. 1003 ¶¶ 123–125).

In addition, Petitioner contends that Yung teaches or suggests a "single router" as the claim requires.  Pet. 23–25.  Petitioner submits that Yung discloses this requirement because it expressly states that the functionality of the described bandwidth management device can be integrated in a gateway, and a person of ordinary skill in the art would have known that a gateway is a router.  *Id.* at 23 (citing 6:8–11, 7:12–18; Ex. 1003 ¶ 131; Ex. 1033, 2).  Petitioner also submits that an ordinary artisan would have understood that a router is a "network device" that, by the time of Yung, could "classify network traffic."  *Id.* (citing Ex. 1005, 6:50–53; Ex. 1003 ¶ 128).  Further, Petitioner asserts that Yung teaches that its functionality can be integrated in "bandwidth management devices" and routers provide bandwidth management.  *Id.* at 23–24 (citing Ex. 1005, 3:27–28; Ex. 1003 ¶¶ 127, 132–138).  Next, Petitioner contends that Yung also suggests applying its technique to routers, as a person of ordinary skill in the art "would have understood that routers were commonly operated to

IPR2021-00909
Patent 8,243,593 B2

detect/recognize flows, classify data flows using behavioral attributes, and measure/monitor aggregate and/or per-traffic variables and statistics." *Id.* at 24 (citing Ex. 1003 ¶¶ 132–139; Ex. 1018, Abstract; Ex. 1020, 16:37–40; Ex. 1021, 3:19–24; Ex. 1023, 2:41–54; Ex. 1028, Abstract; Ex. 1030, 20:9–12). Petitioner also contends that this modification would not have required "any significant modification to network architectures" and "would have been predictable because prior-art routers already performed classification and bandwidth management." *Id.* at 24–25 (citing Ex. 1003 ¶ 139).

Patent Owner contends that Petitioner fails to establish that Yung teaches or suggests the "single router" limitation. Prelim. Resp. 16–34. First, Patent Owner argues that Yung's Figures 1 and 2 illustrate routers as being different components than Yung's traffic monitoring device. *Id.* at 18–21 (citing Ex. 1005, Figs. 1–2, 6:53–59, 7:29–32). According to Patent Owner, Figure 1 shows that "Yung's traffic monitoring device and traffic monitoring module *sit between* the first network device (i.e., a router, hub, or switch) and second network device (i.e., a router); Yung's traffic monitoring functionality is therefore *not* performed by a router." *Id.* at 20. Next, Patent Owner argues that Yung teaches away from use of a single router because Yung criticizes routers' management of flows, Yung distinguishes a "bandwidth management device" from a router, and Yung teaches placing its techniques in a device that is discrete from a router. *Id.* at 21–23 (citing Ex. 1005, 3:27–28, 3:30–52, 4:2–5); *see also id.* at 23–24 (arguing that Petitioner's Exhibit 1030 further supports this understanding). According to Patent Owner, "traffic classification is processor intensive" and an ordinary artisan would have expected that packet processing would be slowed down by placing this function on the router. *Id.* at 25–26 (citing Ex. 1032, 10).

27

IPR2021-00909
Patent 8,243,593 B2

Third, Patent Owner contends that the other references cited in Yung's specification do not disclose the single router limitation. *Id.* at 26–32 (citing Ex. 1005, 2:1–4, 2:17–19, 20:2–6; Ex. 1059, 3:53–63, Fig. 1; Ex. 1018, Abstract, 20:51–57, Figs. 2A–2D; Ex. 1036, 6:32–34, Fig. 1). Finally, Patent Owner argues that Petitioner fails to provide sufficient support for its rationale to modify Yung because it fails to explain what modifications would be required or why its modification would have been obvious to an ordinary artisan. *Id.* at 32–34 (citing Ex. 1003 ¶ 139).

Having considered the parties' arguments and cited evidence, we are persuaded that Petitioner has shown a reasonable likelihood that it will establish that Yung teaches or suggests this claim limitation.

First, we are persuaded that Yung's packet processor 131, which is part of bandwidth management device 130, creates a flow block (i.e., Yung's control block object) as the first packet of a flow is processed. Ex. 1005, 16:15–18, 23:23–30, Fig. 7 (steps 202, 204, 212); *see id.* at 8:2–12 (creating flow object in traffic monitoring device 30).

In addition, we are sufficiently persuaded that Yung teaches or suggests that its functionality can be integrated into a "single router," as required by claim 1. Yung states:

> The functionality of traffic monitoring device 30 can be integrated into a variety of network devices that classify network traffic, such as firewalls, *gateways*, . . . network traffic monitoring and/or bandwidth management devices, that are typically located at strategic points in computer networks.

Ex. 1005, 7:12–18 (emphasis added). On this record, we are persuaded that an ordinary artisan would have understood this to state that Yung's functionality can be integrated into a router because an ordinary artisan would have known that a gateway qualifies as a router. *See* Ex. 1003 ¶ 131

28

Appx346

IPR2021-00909
Patent 8,243,593 B2

(testifying that an ordinary artisan "reading Yung's description of 'gateway' as a network device capable of implementing its disclosures would have understood that this term covered a 'router'"); Ex. 1033, 2 ("[A] gateway is an IP-level router."). This finding is further supported by the evidence showing that, when Yung was filed, a router was a network device that could classify network traffic. *See* Ex. 1003 ¶ 128. At this stage, Patent Owner does not address this passage of Yung; however, if Patent Owner disagrees with our understanding of this passage (or factual findings regarding it), we encourage Patent Owner to explain its contrary understanding at trial.

We do not agree with several of Patent Owner's arguments for this limitation. First, although Patent Owner correctly observes that Figures 1 and 2 of Yung show a router connected to Yung's monitoring device, rather than a monitoring device in a router (*see* Prelim. Resp. 18–21), these disclosures do not detract from Yung's statement that the monitoring device could be in a gateway (i.e., a type of router) (*see* Ex. 1005, 7:12–18). Further, although Patent Owner assumes that a router cannot be directly connected to another router, this assumption is not supported by sufficient explanation or evidence. *See* Prelim. Resp. 20.

Second, we do not agree that Yung teaches away from incorporating its functionality into a router. *See* Prelim. Resp. 21–26. "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). Yung recognizes that existing routers have limited abilities to manage bandwidth (as noted above), but Yung does not criticize, discredit, or

29

Appx347

otherwise discourage inclusion of its functionality in a router. *See id.* at 554 ("A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use."); *see also Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382–83 (Fed. Cir. 2017).

Finally, although two of Patent Owner's remaining arguments are reasonable, neither casts doubt on Petitioner's contention that Yung teaches or suggests this limitation. In particular, on this record, we agree with Patent Owner's assertion (*see* Prelim. Resp. 22–23) that Yung appears to distinguish a "bandwidth management device" from a router. Ex. 1005, 4:2–5. Also, on this record, we are persuaded that sophisticated bandwidth management and traffic classification typically were handled by a device separate from and different than a router. *See* Prelim. Resp. 21–26.[14] But, as discussed above, Yung expressly states that its functionality could be put in a gateway (Ex. 1005, 7:12–18), and as a result, we are persuaded that Yung teaches or suggests including its traffic classification and bandwidth management functionality in a router, as recited in the claim.

Accordingly, on this record, we are persuaded that Petitioner sufficiently shows that Yung teaches or suggests this limitation, despite Patent Owner's arguments to the contrary.

---

[14] It appears that although a router could provide "some level of bandwidth management" (Ex. 1005, 3:27–28; *see* Ex. 1003 ¶ 127; Ex. 1059, 4:13–15), a router's ability to manage bandwidth or shape traffic was limited at the time (*see* Ex. 1005, 3:20–32, 4:2–5; Ex. 1032, 10; *cf.* Pet 24 (asserting that routers could recognize, classify, and monitor flows, without addressing a router's ability to perform bandwidth management functions)).

IPR2021-00909
Patent 8,243,593 B2

> c. *"said flow block being configured to store payload-content-agnostic behavioral statistics pertaining to said flow, regardless of the presence or absence of congestion"*

Petitioner contends that Yung discloses this limitation and that it would have been obvious in light of Yung. Pet. 25–27. According to Petitioner, Yung's control block object stores "various measurement values . . . that characterize the flow (e.g., last packet time, packet count, byte count, etc.)," and these values represent behavioral statistics about a flow's conduct. *Id.* at 25–26 (quoting Ex. 1005, 25:8–11; citing *id.* at 8:5–11, 9:5–8, 11:36–38, 12:4–6, 17:42–49, 25:8–11). Petitioner asserts that this information is payload-content-agnostic because it is generated without reference to the contents of packets' payloads. *Id.* at 26 (citing Ex. 1005, 5:53–6:11, 9:5–8, 10:53–65, 12:14–17, 14:60–15:22, 25:40–42; Ex. 1003 ¶¶ 143–146). According to Petitioner, Yung continuously tracks statistics, regardless of the presence of absence of congestion, and in any event, it would have been obvious to do so to allow for traffic classification in all situations. *Id.* at 27 (citing Ex. 1005, Abstract, 9:21–25, 25:11–15, Fig. 7; Ex. 1003 ¶¶ 147–148).

Patent Owner argues that Petitioner fails to demonstrate that Yung stores "behavioral statistics." Prelim. Resp. 14–16. According to Patent Owner, Yung's flow object—which Petitioner maps to the claimed flow block (*see* Pet. 21)—"does not store the behavioral statistics for an individual flow." Prelim. Resp. 15. Patent Owner contends that Yung stores "various measurement values . . . on an aggregate and/or per-traffic-class basis," and that Yung does not mention storing this information for individual flows. *Id.* (quoting Ex. 1005, 7:49–51).

31

IPR2021-00909
Patent 8,243,593 B2

On this record, we are sufficiently persuaded that Yung discloses this limitation, notwithstanding Patent Owner's arguments to the contrary. In particular, we are persuaded that Yung's control block object stores payload-content-agnostic behavioral statistics pertaining to the flow. In the embodiments Petitioner relies on, Yung's "control block object correspond[s] to the data flow." Ex. 1005, 23:23–30. The control block object also stores "various measurement values . . . that characterize the flow (e.g., last packet time, packet count, byte count, etc.)." Ex. 1005, 25:8–11. We understand this, in context, to mean that the control block object corresponds to a particular flow.

We do not agree with Patent Owner's arguments to the contrary. First, Patent Owner's argument is not commensurate with the limitations of claim 1. Patent Owner implies that Yung is deficient for failing to "store the behavioral statistics for an individual flow *separate from* statistics for other flows (*see* Prelim. Resp. 15), but claim 1 simply recites "behavioral statistics pertaining to said flow" (Ex. 1001, 10:33–34). Second, Patent Owner relies on a different portion of Yung than Petitioner. *See* Prelim. Resp. 15; Pet. 25–27. In particular, Yung discloses storing measurement values for a particular flow (*see id.* at 23:23–30, 25:8–11) *as well as* storing those values on an aggregate basis (*see* Ex. 1005, 7:49–51), and Petitioner's contentions rely exclusively on the former.

Accordingly, we are persuaded that Petitioner sufficiently shows that Yung discloses this limitation.

> d. *"said router updating said flow block with the payload-content-agnostic behavioral statistics of each packet belonging to said flow, as each packet*

32

IPR2021-00909
Patent 8,243,593 B2

> *belonging to said flow is processed by said router,*
> *regardless of the presence or absence of congestion"*

Petitioner contends that Yung discloses this limitation.  Pet. 28–30.  In particular, Petitioner asserts that after a packet is passed to the flow control module, Yung's packet processor 131 "updates various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.)." *Id.* at 28–29 (quoting Ex. 1005, 25:8–11; citing *id.* at 25:11–15, Fig. 7 (steps 222, 224)).  Petitioner further asserts that Yung updates statistics for "each packet," whether or not there is congestion, because Yung provides aggregate statistics for the flow, such as total byte count and total packet count.  *Id.* at 29–30 (citing Ex. 1003 ¶¶ 151–152; Ex. 1005, 25:11–15, Fig. 7; Pet. 25–27).

At this stage, other than its arguments regarding the requirements of a single router (*see supra* § III.E.1.b) and behavioral statistics (*see supra* § III.E.1.c), Patent Owner does not dispute Petitioner's arguments, analysis, or evidence for this limitation.  *See generally* Prelim. Resp.

Petitioner's assertions and explanations are consistent with and supported by the evidence cited by Petitioner.  On this record, we are persuaded that Petitioner has demonstrated a reasonable likelihood that it will prevail in showing that Yung discloses this limitation.

> e.    *"said router heuristically determining whether said*
>       *flow exhibits undesirable behavior by comparing at*
>       *least one of said payload-content-agnostic behavioral*
>       *statistics to at least one pre-determined threshold*
>       *value"*

Petitioner contends that Yung discloses this limitation.  Pet. 30–33. Petitioner quotes from Yung's statement that flow classification is "based on

IPR2021-00909
Patent 8,243,593 B2

a heuristic comparison of certain observed behavioral attributes of the data flows relative to a set of at least one known application behavior pattern." *Id.* at 30 (emphasis omitted) (quoting Ex. 1005, 7:7–11; citing *id.* at Title, 9:39–44, 10:29–39).  Petitioner contends that Yung's comparison uses threshold values and criteria to classify flows.  *Id.* at 31 (citing Ex. 1005, 9:54–57, 15:23–40).  Petitioner further contends that Yung applies its traffic classification techniques to determine whether a flow exhibits undesirable behavior, noting that Yung seeks to control "unruly, bandwidth-intensive applications, such as peer-to-peer applications."  *Id.* at 30–31 (quoting Ex. 1005, 4:43–47; citing *id.* at 19:53–58, 20:20–24; Ex. 1003 ¶¶ 156–157). In support, Petitioner points to an example in Yung that evaluates the size of packets in a flow because particular applications (such as peer-to-peer file sharing applications) have particular behaviors (such as packet sizes within a particular range). *Id.* at 31–32 (citing Ex. 1005, 10:53–65, 11:60–62, 14:60–15:5, Fig. 5D).

At this stage, other than its arguments regarding the requirements of a single router (*see supra* § III.E.1.b) and behavioral statistics (*see supra* § III.E.1.c), Patent Owner does not dispute Petitioner's arguments, analysis, or evidence for this limitation.  *See generally* Prelim. Resp.

Petitioner's assertions and explanations are consistent with and supported by the evidence cited by Petitioner.  On this record, we are persuaded that Petitioner has demonstrated a reasonable likelihood that it will prevail in showing that Yung discloses this limitation.

34

IPR2021-00909
Patent 8,243,593 B2

>    f.   *"upon determination by said router that said flow
>        exhibits undesirable behavior, enforcing, relative to at
>        least one packet, a penalty"*

Petitioner contends that Yung discloses this limitation. Pet. 33–34 (citing Ex. 1003 ¶¶ 164–169). According to Petitioner, Yung teaches "per-flow bandwidth utilization controls," as well as basing those controls on traffic classification, and Yung's utilization controls include a "discard policy," which drops packets. *Id.* at 33–34 (quoting Ex. 1005, 16:2–7, 19:52–61, 20:13–15; citing *id.* at 16:2–7). Petitioner contends Yung's discard policy is a penalty enforced against at least one packet of a flow exhibiting undesirable behavior. *Id.* at 34 (citing Ex. 1003 ¶¶ 168–169).

Patent Owner argues that Petitioner fails to demonstrate that Yung teaches enforcing a penalty, as required by the claim. Prelim. Resp. 59–62. Patent Owner contends that "Yung's alleged 'penalty' is different in kind, and much more penal, than the penalty disclosed in the '593 patent, which is meant to rehabilitate a flow so that the flow will exhibit less undesirable behavior." *Id.* at 60–61 (citing Ex. 1001, 5:38–42, 6:53–56, 9:67–10:3, 12:17–19; Ex. 1005, 20:13–15). Patent Owner also contends that "Yung does not teach enforcing a penalty on *misbehaving flows*," but instead discards "packets or entire flows that exceed a rate associated with a particular traffic class." *Id.* at 61–62 (citing Ex. 1005, 19:58–64, 20:13–15). Patent Owner further contends that Yung does not determine that a flow is misbehaving, but rather determines that it will not be given priority. *Id.* at 61 (citing Ex. 1005, 24:63–25:1).

On this record, we are sufficiently persuaded that Yung discloses this limitation. Yung teaches that flow control module 132 enforces per-flow bandwidth utilization controls, including a discard policy that drops packets.

Appx353

IPR2021-00909
Patent 8,243,593 B2

Ex. 1005, 19:53–61, 20:13–15. Dr. Jeffay testifies that "a discard policy is a penalty enforced against a flow that exhibits undesirable behavior." Ex. 1003 ¶ 168 (emphases omitted). We credit this testimony, and on this record, we find this testimony to be well supported by Yung's disclosure. Accordingly, we are persuaded that Yung teaches "upon determination by said router that said flow exhibits undesirable behavior, enforcing, relative to at least one packet, a penalty," as recited by claim 1.

We do not agree with Patent Owner's arguments to the contrary. First, claim 1 does not require the enforcement of any particular kind of penalty. As a result, even if we were to agree that Yung's penalty is different than the penalty described in the '593 patent (*see* Prelim. Resp. 60–61), this would not reveal a deficiency in Petitioner's showing. Second, claim 1 does not require "enforcing a penalty on *misbehaving flows*" (Prelim. Resp. 61), but rather recites "enforcing, relative to at least one packet, a penalty" "upon determination . . . that the flow exhibits *undesirable behavior*" (Ex. 1001, 10:45–47). Thus, to the degree Patent Owner faults Yung for not determining that a flow is "misbehaving," as opposed to simply behaving undesirably (*see* Prelim. Resp. 61–62), such an argument is not commensurate with the scope of the claim. Further, to the degree Patent Owner argues that Yung fails to teach "determining whether said flow exhibits undesirable behavior," Patent Owner does not explain its argument.

Accordingly, we are persuaded that Petitioner sufficiently shows that Yung discloses this limitation, despite Patent Owner's arguments to the contrary.

36

> g.  *"wherein the preceding steps are performed on said
> router without requiring use of inter-router data."*

Petitioner contends that Yung discloses this limitation.  Pet. 34–35.
Petitioner asserts that a person of ordinary skill in the art would have
understood Yung to teach or suggest performance of the steps on a single
router, as discussed with respect to an earlier claim limitation.  *Id.* at 34; *see
also id.* at 23–25 (addressing single router requirement).  Also, according to
Petitioner, Yung's behavioral statistics and traffic classification do not
require any inter-router data.  *Id.* at 34–35 (citing Ex. 1003 ¶ 171).

At this stage, other than its arguments regarding the single router
limitation (*see supra* § III.E.1.b), Patent Owner does not dispute Petitioner's
arguments, analysis, or evidence for this limitation.  *See generally* Prelim.
Resp.

Petitioner's assertions and explanations are consistent with and
supported by the evidence cited by Petitioner.  On this record, we are
persuaded that Petitioner has demonstrated a reasonable likelihood that it
will prevail in showing that Yung discloses this limitation.

Thus, Petitioner has shown a reasonable likelihood that it would
prevail in establishing the unpatentability of claim 1 as obvious over Yung.

### 2.  *Independent Claims 2, 4, 5, and 25*

Independent claims 2, 4, 5, and 25 include limitations that are
commensurate with limitations found in independent claim 1, and Petitioner
largely relies on its prior analysis for these claims.  *See* Pet. 36–40.  Other
than its arguments presented regarding claim 1 (*see supra* § III.E.1), Patent
Owner does not dispute Petitioner's arguments, analysis, or evidence for
these claims.  *See generally* Prelim. Resp.

IPR2021-00909
Patent 8,243,593 B2

For the reasons provided above, we are persuaded that Petitioner has shown a reasonable likelihood that it would prevail in establishing the unpatentability of claims 2, 4, 5, and 25 as obvious over Yung.

### 3. Dependent Claims 6, 7, 26, and 27

Claims 6 and 7 depend from independent claim 1, and claims 26 and 27 depend from independent claim 25. Ex. 1001, 11:51–60, 13:20–29.

We find that Petitioner has made an adequate showing that is not specifically challenged by Patent Owner in its Preliminary Response (*see generally* Prelim. Resp.), that Yung discloses the additional limitations of dependent claims 6 and 7 (which depend from independent claim 1) and dependent claims 26 and 27 (which depend from independent claim 25). *See* Pet. 41–42. Accordingly, we conclude that Petitioner also has demonstrated a reasonable likelihood of prevailing in its challenge to those claims as unpatentable over Yung.

### 4. Dependent Claims 17, 18, 37, and 38

Petitioner has not demonstrated a reasonable likelihood it would prevail in establishing the unpatentability of any of dependent claims 17, 18, 37, or 38 as obvious over Yung alone. *See* Pet. 1 (table of grounds), 42–43 (addressing these dependent claims). In particular, claims 17 and 18 both depend indirectly from independent claim 9 (Ex. 1001, 12:9–16, 12:29–30, 12:33), and claims 37 and 38 depend indirectly from independent claim 29 (*id.* at 13:45–52, 14:9–10, 14:14). Petitioner does not demonstrate that Yung teaches or suggests "computing . . . a badness factor for the flow," as required by claim 9, or "means for computing . . . a badness factor for the flow," as required by claim 29. *Cf.* Pet. 49–52 (relying on Copeland for

38

IPR2021-00909
Patent 8,243,593 B2

these limitations).  Thus, Petitioner does not demonstrate that Yung teaches or suggests all limitations of dependent claims 17, 18, 37, and 38.

However, the inclusion of claims 17, 18, 37, and 38 in the Yung-only ground may be a typographical error.  Indeed, Petitioner makes a sufficient showing that the limitations additionally recited by these claims are disclosed by Yung (*see* Pet. 42–43), and as explained below, Petitioner makes a sufficient showing that the remaining limitations would have been obvious over the combination of Yung and Copeland.  *See, e.g.*, Pet. 54 (addressing dependent claims 12 and 32, from which these claims depend).

As a result, we question whether we should consider the Petition to include a contention that the subject matter of claims 17, 18, 37, and 38 would have been obvious over the combination of Yung and Copeland.  We invite the parties to address this issue at trial.

### F. Obviousness Ground Based on Yung and Copeland

Petitioner contends that the subject matter of claims 9–13, 19–24, 29–33, and 39–44 would have been obvious over the combination of Yung and Copeland.  Pet. 43–61.  Patent Owner disagrees, arguing that Petitioner fails to show a "badness factor," as required by the independent claims (Prelim. Resp. 34–38) and fails to articulate a sufficient rationale to combine Yung and Copeland (*id.* at 39–43).

We have considered the parties' arguments and the evidence presented at this stage.  For the reasons explained below, we determine that Petitioner has demonstrated a reasonable likelihood that it will prevail in showing that the subject matter of claims 9–13, 19–24, 29–33, and 39–44 would have been obvious over Yung and Copeland.

39

IPR2021-00909
Patent 8,243,593 B2

### 1. Independent Claim 9

#### a. Petitioner's Contentions

Claim 9 begins: "A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising . . . ." Ex. 1001, 11:63–65. Petitioner contends that Yung discloses the preamble of claim 9 for the reasons discussed above with respect to the preamble of claim 1. Pet. 48 (citing *id.* at 19–21).

Next, claim 9 recites "maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion." Ex. 1001, 11:66–12:4. Petitioner contends that Yung discloses this limitation for the reasons discussed above with respect to the limitations of claim 1 directed to creating and updating a flow block that stores behavioral statistics pertaining to the flow. Pet. 48 (citing *id.* at 21–30). In particular, Petitioner contends that "Yung tracks 'various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.)," and these values teach the claimed "behavioral statistics." *Id.* at 25 (quoting Ex. 1005, 25:8–11).

Claim 9 also recites "computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior." Ex. 1001, 12:5–8. Petitioner contends that Copeland discloses this limitation. Pet. 49–51. Specifically, Petitioner points to Copeland's "concern index" (CI)—a value assigned to a flow that appears to be suspicious—as the claimed "badness factor." *Id.* at 49 (citing Ex. 1007,

40

IPR2021-00909
Patent 8,243,593 B2

3:31–35, 18:15–19, 26:22–27).  Petitioner asserts that "Copeland's CI value indicates whether the flow exhibits 'suspicious activity,'" which is undesirable behavior.  *Id.* at 49–50 (quoting Ex. 1007, 7:55–61; citing *id.* at 18:4–13; Ex. 1003 ¶ 212).  Petitioner further asserts that Copeland computes the CI value based on statistics associated with a flow, noting that the CI value may be set to the number of packets, for example, as shown by the first row of Table I in Figure 6.  *Id.* at 50 (citing Ex. 1007, 7:40–42, 10:45–47, Figs. 1, 6; Ex. 1003 ¶ 213).

Further, Petitioner contends that a person of ordinary skill in the art would have been motivated to incorporate Copeland's flow-based CI value into Yung's bandwidth management device.  Pet. 45–48.  Petitioner notes that Yung expressly contemplates incorporating "other factors" into its process, and Petitioner argues that an ordinary artisan "would have sought to classify traffic behaving suspiciously or disruptively."  *Id.* at 45 (citing Ex. 1005, 10:43–58, 11:59–60; Ex. 1003 ¶¶ 198–200).  According to Petitioner, an ordinary artisan would have recognized that incorporating Copeland's technique would enhance Yung's ability to identify and control unauthorized traffic such as network attacks and probes, which were known concerns, while obviating the need for an administrator to understand the intricate nature of network attacks.  *Id.* at 45–47 (citing Ex. 1005, 2:31–34, 4:43–47, 19:58–61; Ex. 1007, 8:33–44; Ex. 1003 ¶¶ 199–202); *see also id.* at 49 (asserting that "Copeland tracks behavioral statistics about network flows (e.g., start time, end time, number of bytes, and packet count)" (citing Ex. 1007, 16:45–60)).  Petitioner also asserts that a person of ordinary skill in the art would have had a reasonable expectation of success in combining

41

the references. *Id.* at 47–48 (citing Ex. 1003 ¶¶ 203–204; Ex. 1005, 7:5–1, Figs. 2–3; Ex. 1007, Figs. 1–2).

### b. *Patent Owner's Arguments*

At this stage, Patent Owner disagrees with Petitioner on two main issues not previously addressed.[15]

First, Patent Owner argues that Copeland fails to disclose the "badness factor" required by the claims. Prelim. Resp. 34–38. Patent Owner submits that "Copeland's concern index is for 'suspicious activity' [indicative of an intruder] in contrast to legitimate traffic." *Id.* at 35–36 (citing Ex. 1007, Abstract, 1:45–48). Patent Owner argues that the claimed "badness factor," on the other hand, "is concerned with 'undesirable behavior' or 'misbehavior' associated with P2P traffic, which is *not* necessarily suspicious or non-suspicious." *Id.* at 36 (citing Ex. 1001, 1:10–18, 2:18–21). Patent Owner also asserts that "Copeland's 'concern index' is concerned with suspicious behavior of a host, not undesirable behavior of a flow." *Id.* In addition, Patent Owner contends that Copeland only assigns a concern index to suspicious flows, rather than "*each* flow" as allegedly required by the independent claims. *Id.* at 37–38.

Second, Patent Owner argues that the Petitioner's rationale to combine the references is insufficient. Prelim. Resp. 39–43. Patent Owner contends that the Petition is premised on an erroneous assumption that Yung expressly motivates the combination by saying that it "can incorporate other

---

[15] Patent Owner argues that Yung fails to disclose the "behavioral statistics" required by this claim (Prelim. Resp. 14), but we addressed that argument above. *See supra* § III.E.1.c (discussing similar requirement in claim 1).

factors." *Id.* at 39–40 (quoting Ex. 1005, 11:59–60; citing Pet. 45–46; Ex. 1005, 10:43–58; Ex. 1003 ¶ 196; Ex. 1007, 3:45–54, Abstract). Patent Owner further contends that Copeland's flow data structure fields are "obtained from packet headers, not flow-based behavioral statistics." *Id.* at 40–41 (citing Ex. 1007, 16:45–60, 15:50–55). Finally, Patent Owner contends that Copeland teaches away from the combination and, relatedly, that Petitioner fails to address the differences between Yung and Copeland. *Id.* at 41–42 (citing Ex. 1007, 3:8–14, 3:38–39, 3:45–47, 4:26–29; Ex. 1005, 2:24–27, 5:59–64).

### c. *Analysis*

On this record, we are persuaded that Petitioner's assertions and explanations are consistent with and supported by the evidence Petitioner cites. In particular, for the reasons previously explained with respect to claim 1, we are persuaded that Yung discloses the language of the preamble of independent claim 9, as well as its limitation requiring a set of behavioral statistics to be maintained for a flow.

Further, for purposes of this Decision, we are persuaded that Copeland discloses calculating a badness factor, as required. In particular, Copeland analyzes a flow's statistics "to determine if the flow appears to be legitimate traffic or possible suspicious activity" and calculates a concern index for the flow if it appears suspicious. Ex. 1007, 3:31–35; *see also id.* at 7:38–62 (explaining that flow's statistics are stored in a flow database structure), 16:38–12 (describing the flow database structure). Dr. Jeffay testifies that an ordinary artisan would have understood the suspicious activity described by Copeland (e.g., probing and network attacks) to be undesirable behavior (Ex. 1003 ¶¶ 211–212), and we credit this testimony because it is logical and

IPR2021-00909
Patent 8,243,593 B2

consistent with the cited reference.  Further, Copeland discloses that a concern index value may be calculated "for each flow," and that this value may be the "number of packets" in the flow.  Ex. 1007, 18:14–20, Fig. 6.

Patent Owner's contrary arguments are misplaced.  *See* Prelim. Resp. 34–38.  Patent Owner argues that Copeland does not teach the "badness factor" because "undesirable" behavior or "misbehavior" is not necessarily "suspicious" (Prelim. Resp. 36), but this flips the analysis.  The question is whether Copeland's concern index discloses the claimed "badness factor"—in other words, whether the Copeland's suspicious activity is "undesirable" behavior, not whether the claimed "undesirable" behavior is suspicious.  On this record, we determine that Petitioner has sufficiently shown that Copeland's concern index qualifies as a "badness factor" that "provides an indication of whether the flow is exhibiting undesirable behavior," as required by claim 9.  We observe that Patent Owner does not identify any construction of the claim terms that would exclude Copeland's concern index.

Second, Patent Owner's argues that Copeland is deficient because it only assigns the concern index to suspicious flows, not "*each* flow" (Prelim. Resp. 37–38), but this argument is not commensurate with the scope of the claim.  In particular, claim 9 recites a method for processing *a flow* that includes computing a badness factor for *the flow*.  Ex. 1001, 11:63–8.  Patent Owner identifies (and we perceive) no limitation that requires a badness factor to be computed for *each flow*.  In addition, "a prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention."  *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003).

44

IPR2021-00909
Patent 8,243,593 B2

Moreover, on this record, we are persuaded that Petitioner has made a sufficient showing that an ordinary artisan would have been motivated to combine Copeland's flow-based CI value into Yung's bandwidth management device.  *See* Pet. 45–48.

Yung seeks to limit the bandwidth used by "bandwidth-intensive applications, such as peer-to-peer applications . . . and/or other unauthorized applications" (Ex. 1005, 4:43–47; *see also id.* at 2:31–34), and to that end, Yung describes particular techniques or factors for classifying a flow, while noting that other factors can also be used (*id.* at 10:43–58, 11:59–60). Copeland seeks to prevent a type of unauthorized use—specifically, intruders—and it analyzes flows to determine if they have the characteristics of probes or attacks.  Ex. 1007, 4:30–33.  Both Yung and Copeland analyze traffic flows and track flow statistics, such as the number of bytes and the packet count.  *See* Ex. 1005, 25:8–11; Ex. 1007, 8:33–44, 16:45–60.

Dr. Jeffay testifies that "[n]etwork attacks and intrusions were a recognized problem during the relevant time frame," and a person of ordinary skill in the art would have been concerned by these attacks, including the flooding attacks addressed by Copeland.  Ex. 1003 ¶¶ 199– 200; *see also* Ex. 1007, 1:64–65.  He further testifies that an ordinary artisan would have recognized that incorporating Copeland's CI value would enhance Yung's device's ability to identify and control certain types of traffic (Ex. 1003 ¶ 198), he testifies that the ordinary artisan would have recognized the combination's benefits (*id.* ¶¶ 201–202), and he testifies that the ordinary artisan would have had a reasonable expectation of success (*id.* ¶ 203).  In addition, Dr. Jeffay provides additional details regarding the specific alterations that would be required to combine the references and

45

IPR2021-00909
Patent 8,243,593 B2

explains that these changes would be within the level of skill of a person of ordinary skill in the art. *Id.* ¶¶ 203–204. On this record, we credit this testimony because it is logical and supported by cited evidence and because we perceive no evidence contradicting it. Accordingly, we determine that Petitioner has sufficiently shown that a person of ordinary skill in the art would have been motivated to combine Copeland's flow-based CI value into Yung's bandwidth management device. *See KSR*, 550 U.S. at 420 (noting that "any need or problem known in the field of endeavor at the time of invention . . . can provide a reason for combining the elements in the manner claimed").

Thus, we disagree with Patent Owner's assertion that Petitioner's rationale is insufficient. *See* Prelim. Resp. 39–43. Although we agree that Yung's reference to "other factors" does not itself provide an express motivation to combine the references, we disagree with Patent Owner's assessment that Petitioner's alleged motivation "stems (entirely) from [this] statement" in Yung. *Id.* at 39–40 (quoting Ex. 1005, 11:59–60). Moreover, on this record, we do not agree with Patent Owner's assertion that "Copeland is directed to collecting self-reported flow information from packet headers" as opposed to behavioral statistics (*id.* at 40–41) because Copeland stores, for a flow, the number of bytes and the number of packets sent. *See* Ex. 1007, 3:18–35; Ex. 1001, 6:11–14 (stating that "total byte count" is a behavioral statistic). We invite Patent Owner to further explain this argument at trial.

Finally, on this record, we do not agree that Copeland teaches away from the proposed combination. *See* Prelim. Resp. 41–42. Copeland explains that "signature based methods" analyze a stream of transmitted

46

IPR2021-00909
Patent 8,243,593 B2

bytes for certain strings of characters, requiring "[s]ubstantial computing resources." Ex. 1007, 2:13–23. This analysis of the contents of each packet is "impractical[]," so Copeland instead "inspects all inbound and outbound activity and identifies suspicious patterns" by: assigning packets to a flow, collecting statistics for each flow, and analyzing the statistics to determine if the flow is possible suspicious activity. *Id.* at 3:6–35; *see id.* at 4:26–29. Similarly, Yung classifies data flows based on their behavior rather than the contents of the packets. *See* Ex. 1005, 5:53–6:5. Patent Owner does not sufficiently explain why the differences it identifies are relevant to Petitioner's proposed combination. *See* Prelim. Resp. 42.

In sum, we determine that Petitioner has shown a reasonable likelihood that it would prevail in establishing the unpatentability of claim 9 as obvious over Yung and Copeland, notwithstanding Patent Owner's arguments to the contrary.

> ### 2. *Independent Claim 29*
> ###    *Dependent Claims 10–13, 19–24, 30–33, and 39–44*

Independent claim 29 includes limitations commensurate with limitations found in independent claim 9, and Petitioner largely relies on its prior analysis for this claim. *See* Pet. 51–52. Other than its arguments presented regarding claim 9 (*see supra* § III.F.1), Patent Owner does not dispute Petitioner's arguments, analysis, or evidence for this claim. *See generally* Prelim. Resp. We are persuaded, for the reasons provided above, that Petitioner has shown a reasonable likelihood that it would prevail in establishing the unpatentability of claim 29 as obvious over Yung and Copeland.

Appx365

IPR2021-00909
Patent 8,243,593 B2

Moreover, we find that Petitioner has made an adequate showing, unchallenged by Patent Owner in its Preliminary Response (*see generally* Prelim. Resp.), that the Yung-Copeland combination teaches or suggests the additional limitations of dependent claims 10–13 and 19–24 (which depend from independent claim 9) and dependent claims 30–33 and 39–44 (which depend from independent claim 29). *See* Pet. 53–61. Accordingly, we conclude that Petitioner also has demonstrated a reasonable likelihood of prevailing in its challenge to these claims as unpatentable over Yung and Copeland.

### G. Obviousness Ground Based on Yung and Four-Steps Whitepaper

Petitioner contends that the subject matter of independent claim 3 would have been obvious over Yung and the Four-Steps Whitepaper. Pet. 61–68. Patent Owner responds that Petitioner fails to show that the Four-Steps Whitepaper qualifies as prior art (Prelim. Resp. 43–53), fails to provide a reason to combine the references (*id.* at 56–59), and fails to show that the combination teaches or suggests the "second field" required by claim 3 (*id.* at 53–55).

We have determined above that there is a reasonable likelihood that the Petitioner will prevail with respect to most of the claims challenged in the Petition (*see supra* §§ III.E, III.F), and so we institute *inter partes* review as to all claims and all grounds.[16] Accordingly, we will fully evaluate Petitioner's contention that claim 3 is unpatentable at trial, with the benefit

---

[16] *See USPTO Guidance on the Impact of SAS on AIA Trial Proceedings* (April 26, 2018) ("[T]he PTAB will institute as to all claims or none . . . if the PTAB institutes a trial, the PTAB will institute on all challenges raised in the petition.").

IPR2021-00909
Patent 8,243,593 B2

of additional briefing from the parties.  In this Decision, we provide our initial assessment of the disputed issues to provide guidance to the parties.

### 1. *Public Accessibility of the Four-Steps Whitepaper*

Petitioner contends that the Four-Steps Whitepaper was on Packeteer's website before the filing of the '593 patent, and in support, Petitioner introduces a declaration by Professor Elizabeth Rosenberg testifying that the document was archived on March 17, 2003 by the Wayback Machine.  Pet. 15–16 (citing Ex. 1006, i–ii).  Patent Owner does not allege any deficiency in this aspect of Petitioner's showing, and we are persuaded that Petitioner has sufficiently shown that the Four-Steps Whitepaper (Exhibit 1006) was on Packeteer's website on March 17, 2003, which is more than one year before the filing of the '593 patent.

But, in addition to proving a date, Petitioner must also show that the Four-Steps Whitepaper was "publicly accessible" in order to show that it qualifies as prior art.  *See In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009).  "A reference is considered publicly accessible if 'persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'"  *Samsung Elecs. Co. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1369 (Fed. Cir. 2019) (quoting *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 772 (Fed. Cir. 2018)).

At this stage, we question whether Petitioner has sufficiently shown that the Four-Steps Whitepaper was publicly available.  On this point, the Petition states:

> The Four-Steps Whitepaper is stamped with a URL reflecting that the publication was archived from the Packeteer website on March 17, 2003.  This website offered technical manuals and documentation for Packeteer's traffic-management

49

IPR2021-00909
Patent 8,243,593 B2

> products, including PacketShaper®. Packeteer was a publicly
> traded company and a known leader in this industry.

Pet. 16 (citing Ex. 1006, iv; Ex. 1031, 1; Ex. 1032, 6–7).

Patent Owner argues that this fails to show public accessibility. *See* Prelim. Resp. 49–53. Specifically, Patent Owner contends that Petitioner's cited evidence is hearsay[17] and, even if true, it does not show that a person of ordinary skill in the art would have been aware of the Packeteer website generally, or the Four-Steps Whitepaper specifically. *Id.* at 51–52. Further, as to Petitioner's evidence, Patent Owner submits that Exhibit 1031 was published in 2006, after the '593 patent was filed. *Id.* at 53. And, Patent Owner contends that Exhibit 1032 references a different paper than the one included in Exhibit 1006 because the two papers do not include the same quotes. *Id.* at 52–53 (*comparing* Ex. 1032, 8 (quoting "Four Steps Packeteer, p. 5"), *with* Ex. 1006, 5 (not including quote)).

Patent Owner's arguments are reasonable. In particular, we question whether Petitioner introduced sufficient evidence to show that an ordinary artisan would have been able to locate the Four-Steps Whitepaper with reasonable diligence.

Petitioner appears to contend that an ordinary artisan could reasonably have located the Four-Steps Whitepaper because "Packeteer was a publicly traded company and a known leader in this industry," as shown by Exhibits 1031 and 1032 (Pet. 16); however, we cannot say that Petitioner's contention is sufficiently supported by these exhibits. Exhibit 1031 states

---

[17] We defer resolution of this evidentiary objection to trial, and for purposes of this Decision, we assume that the evidence is admissible. To preserve this argument, Patent Owner must timely object and file a motion to exclude.

IPR2021-00909
Patent 8,243,593 B2

that "[s]eventy-four percent of the world's largest companies rely on Packeteer® innovation," indicating that Packeteer was known as a leader in the industry (Ex. 1031, 1; *see also id.* at 7), but this exhibit includes a 2006 copyright date (*id.* at 7), which causes us to question whether Packeteer was known to an ordinary artisan in the relevant timeframe.  Exhibit 1032 identifies PacketShaper as a Packeteer product and states that "a simple introductory paper" was available on the company's website.  Ex. 1032, 6–7.  But, as Patent Owner observes, the referenced paper appears to be a different document.  *See* Prelim. Resp. 52–53.  Specifically, the URL for the introductory paper and the Four-Steps Whitepaper are different (*compare* Ex. 1032, 7, *with* Ex. 1006, iv), and at least one quote is different (*compare* Ex. 1032, 8 (quoting Four Steps Packeteer, 5), *with* Ex. 1006, 5 (not including quote), 19 (including quote)).

Moreover, even if we assume that an ordinary artisan was aware of the company (Packeteer) and its website, we query whether the Petition sufficiently shows that an ordinary artisan would have been able to locate the Four-Steps Whitepaper on that website with reasonable diligence.  For example, Petitioner does not contend that Packeteer's website included an index or search function that would have allowed an ordinary artisan to find this particular Whitepaper.[18]  Moreover, although the Four-Steps Whitepaper is a "Technical Product Overview," suggesting that it was distributed to

_____

[18]  These are relevant inquiries, not strict requirements.  *See Voter Verified, Inc. v. Premier Election Sols., Inc.*, 698 F.3d 1374, 1380 (Fed. Cir. 2012) (affirming finding that an article was publicly accessible, despite lack of indexing, where the evidence demonstrated that the website including the article was well known to the relevant community, included a search tool, and included submissions that could be freely and easily copied).

51

IPR2021-00909
Patent 8,243,593 B2

promote adoption of the product (Ex. 1006, 1, 3), the first page of this document states that it may not be copied or downloaded without Packeteer's "express written consent," casting doubt on whether Packeteer made this document available to the public (*id.* at 1). *Cf. Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021) (explaining that an article was "intended to reach the general public, so that [it] could promote [a particular] business," which was "strong evidence" that the article was publicly accessible (quotations omitted)).

We will determine at trial, with the benefit of the full record, whether Petitioner has shown by a preponderance of the evidence that the Four-Steps Whitepaper qualifies as a printed publication.

### 2. Motivation to Combine Yung and Four-Steps Whitepaper

Patent Owner contends that Petitioner fails to provide a sufficient motivation to combine Yung and the Four-Steps Whitepaper. Prelim. Resp. 56–59. We disagree.

Petitioner contends that a person of ordinary skill in the art would have been motivated to combine these references. Pet. 62–63. In particular, Petitioner argues that Yung suggests the combination because it specifically references the PacketShaper product as an exemplary bandwidth management device, and the Four-Steps Whitepaper provides an overview of this product. *Id.* at 62 (citing Ex. 1005, 4:47–51). Moreover, Petitioner submits that "Yung is a Packeteer patent," and PacketShaper is a Packeteer product. *Id.* Petitioner also alleges that an ordinary artisan would have been motivated to incorporate the data collected in the Four-Steps Whitepaper into Yung's device to more accurately classify traffic and to provide information regarding the device's effectiveness. *Id.* at 62–63 (citing

52

IPR2021-00909
Patent 8,243,593 B2

Ex. 1003 ¶ 246; Ex. 1006, 21, 23).  In addition, Petitioner contends that the combination "would be well within the skill of a [person of ordinary skill in the art]."  *Id.* at 63 (citing Ex. 1003 ¶ 249).

Patent Owner argues that "the fact that Yung and the Four-Steps Whitepaper both describe bandwidth-management devices does not establish a motivation to combine."  Prelim. Resp. 56–57.  Next, Patent Owner acknowledges Yung's reference to PacketShaper, but contends that this does not provide the requisite motivation to combine.  *Id.* at 57–59.  According to Patent Owner, Yung merely states that PacketShaper "may be useful for identifying traffic in certain circumstances" (*id.* at 57), and Petitioner's rationale is "illogical" because Yung's applicants were aware of PacketShaper but did not combine it or the Four-Steps Whitepaper with Yung (*id.* at 58–59).

On this record, we are persuaded that a person of ordinary skill in the art would have been motivated to combine Yung and the Four-Steps Whitepaper.  The rationale Petitioner articulates is logical and supported by the cited evidence.  In particular, Yung is a Packeteer patent, it describes an improved bandwidth management device, and it identifies a Packeteer product (i.e., PacketShaper) as an exemplary bandwidth management device.  *See* Ex. 1005, code (73), 4:47–51.  The Four-Steps Whitepaper provides additional information regarding PacketShaper's functionality.  *See generally* Ex. 1006.  We are persuaded that this sufficiently shows that a person of ordinary skill in the art would have been motivated to combine these references.

Patent Owner's arguments do not reveal a deficiency in Petitioner's showing.  First, we do not agree with Patent Owner's suggestion that

53

IPR2021-00909
Patent 8,243,593 B2

Petitioner merely relies on the fact that both references include bandwidth management devices. *See* Prelim. Resp. 56. Second, we disagree that it is somehow "illogical" to combine these references simply because Yung did not do so (*see id.* at 58–59), and we fail to perceive the logic in Patent Owner's contrary argument.

### 3. Sufficiency of Petitioner's Showing for the "Second Field"

Claim 3 recites "a second field containing data representing payload-content-agnostic behavioral statistics about dropped and non-dropped packets of a flow." Ex. 1001, 11:10–12.

For this limitation, Petitioner relies on its prior contention that Yung discloses payload-content-agnostic behavioral statistics and points to the Four-Steps Whitepaper to disclose "statistics about dropped and non-dropped packets of a flow" "[t]o any extent" this aspect of the limitation is not taught by Yung. Pet. 66 (citing *id.* at 25–27; Ex. 1005, 18:2–6). Specifically, Petitioner asserts that the Four-Steps Whitepaper teaches tracking "[c]ounts and percentages of retransmitted, received, tossed, dropped, and good TCP packets." *Id.* (quoting Ex. 1006, 18).

According to Patent Owner, "as shown in Figure 3 of Yung, if packets of Yung's flow are dropped as a consequence of Yung's discard policy of flow control module 132, information about the dropped packets is not stored in Yung's flow database 135." Prelim. Resp. 55. In addition, Patent Owner argues that the Four-Steps Whitepaper fails to teach this limitation because "counting percentages of packets, even dropped packets, is different from storing payload-content-agnostic behavioral statistics about the packets." *Id.*

54

IPR2021-00909
Patent 8,243,593 B2

We disagree with Patent Owner's arguments.  First, we understand Yung to disclose that control block objects in flow database 135 are updated as each packet in a flow is processed in order to maintain accurate information, as Petitioner contends.  *See* Pet. 27–30; *see also* Ex. 1005, 17:42–49, 24:63–15, 25:11–15; Ex. 1003 ¶¶ 147–148.  Patent Owner does not sufficiently explain its contrary understanding.

Further, Patent Owner's argument regarding the Four-Steps Whitepaper is inapposite because it does not respond to the contentions advanced by the Petition.  Namely, Petitioner relies on Yung, not the Four-Steps Whitepaper, to disclose payload-content-agnostic behavioral statistics (*see* Pet. 66–67), and as explained above, we are persuaded that Yung discloses these claimed aspects (*see supra* § III.E.1.c).  Further, we perceive no deficiencies in Petitioner's contention that the Four-Steps Whitepaper discloses maintaining data about dropped and non-dropped packets of a flow (*see* Ex. 1006, 18), or in Petitioner's rationale to incorporate this data into Yung (*see* Pet. 62–63, 66–67).

### H. Obviousness Ground Based on Yung, Copeland, and Ye

Petitioner contends that the subject matter of dependent claims 8, 14–16, 28, and 34–36 would have been obvious over Yung, Copeland, and Ye. Pet. 69–75.

Patent Owner contends that the Petition is deficient because it fails to show enforcing a penalty when a "congestion condition" is encountered, as these claims require.  Prelim. Resp. 63–64.  To that end, Patent Owner argues that Ye's "saturation condition" does not qualify as a "congestion condition," as required by the claims—according to Patent Owner, the claimed "congestion condition" refers to congestion on the "outgoing link

55

IPR2021-00909
Patent 8,243,593 B2

onto which the router sends packets," where "Ye's 'saturation condition' is when the router itself is overrun" by received packets. *Id.* (citing Ex. 1001, 8:57–59; Ex. 1008, 5:57–60).

We do not agree with Patent Owner's argument.[19]  Ye determines whether a router is experiencing congestion, and Ye's example is a saturation condition that persists for a pre-selected period of time.  Ex. 1008, 9:17–27.  We are persuaded that this teaches a "congestion condition."

Although Patent Owner contends that the term "congestion condition" refers specifically to congestion on the outgoing link, Patent Owner identifies (and we perceive) no support for such a construction of the claim. *See* Prelim. Resp. 63–64.  In its Preliminary Response, Patent Owner points to one sentence in the Specification identifying congestion on the outgoing link as an *example* of a "congestion condition."  Ex. 1001, 8:57–59; *cf. Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373–74 (Fed. Cir. 2014) (holding phrase indefinite because additional detail provided in "e.g." phrase provided an example rather than a definition).  But this lone example is insufficient to support the narrow interpretation advocated by Patent Owner.  *See Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *e.g., Innova/Pure Water, Inc. v. Safar Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("[E]ven where a patent describes only a single

---

[19]  As noted above, we have decided to institute *inter partes* review as to all claims and all grounds, but we address Patent Owner's arguments to provide guidance to the parties.  We will evaluate, at trial, whether Petitioner has shown unpatentability of these claims by a preponderance of the evidence.

56

IPR2021-00909
Patent 8,243,593 B2

embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope." (internal quotation omitted)).

## IV. CONCLUSION

As explained above, we determine that Petitioner has established a reasonable likelihood of prevailing in its challenge to at least one claim of the '593 patent, and we are not persuaded to exercise our discretion to deny institution. Accordingly, we institute an *inter partes* review of all challenged claims on all asserted grounds.

## V. ORDER

It is:

ORDERED that an *inter partes* review is instituted on all of the challenged claims, i.e., claims 1–44 of the '593 patent, on all corresponding grounds of unpatentability as specified in the Petition and identified in the Table in Section I.B. of this Decision; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), *inter partes* review of the '593 patent shall commence on the entry date of this Decision, and notice is hereby given of the institution of a trial.

57

IPR2021-00909
Patent 8,243,593 B2

FOR PETITIONER:

James Day
Daniel Callaway
Winston Liaw
FARELLA BRAUN + MARTEL LLP
jday@fbm.com
dcallaway@fbm.com
wliaw@fbm.com

David Dotson
DUANE MORRIS, LLP
dcdotson@duanemorris.com

FOR PATENT OWNER:

Kenneth Weatherwax
Parham Hendifar
Patrick Maloney
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com

58

Case IPR2021-00909
U.S. Pat. No. 8,243,593

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

CLOUDFLARE, INC. AND SONICWALL INC.,
Petitioner,

v.

SABLE NETWORKS, INC.,
Patent Owner

_____

Case IPR2021-00909
Patent 8,243,593

_____

**PATENT OWNER'S RESPONSE
TO PETITION FOR INTER PARTES REVIEW**

Case IPR2021-00909
U.S. Pat. No. 8,243,593

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................1

II.  FACTUAL BACKGROUND ...............................................4

    A. The '593 Patent.............................................................4

    B. References Cited In The Petition...............................8

       1. Yung ......................................................................8

       2. Copeland...............................................................9

       3. Four-Steps Whitepaper....................................10

III. DISCLAIMED CLAIMS ARE NOT PART OF THIS PROCEEDING. .........11

IV.  PETITIONER FAILS TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT THE CLAIMS CHALLENGED IN GROUND 1 ARE OBVIOUS OVER YUNG (CLAIMS 17, 18, 37, 38, GROUND 1)................12

V.   PETITIONER FAILS TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT YUNG IN VIEW OF COPELAND DISCLOSES OR RENDERS OBVIOUS THE CALCULATION OF A BADNESS FACTOR AS CLAIMED (CLAIMS 9-13, 19-24, 29-33, 39-44, GROUND 2). ..............16

    A. Copeland Does Not Disclose The Claimed "Badness Factor" For Each Flow. ...................................................16

    B. The Petition Does Not Sufficiently Establish A Reason For The POSITA To Have Combined Yung And Copeland As Proposed..........................24

VI.  PETITIONER FAILS TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT THE FOUR-STEPS WHITEPAPER WAS PUBLICLY ACCESSIBLE QUALIFIED PRIOR ART (CLAIM 3, GROUND 3)............28

VII.      CONCLUSION ...............................................45

Appx472

# TABLE OF AUTHORITIES

**Page**

**COURT DECISIONS**

*Blue Calypso, LLC v. Groupon, Inc.*,
   815 F.3d 1331 (Fed. Cir. 2016)............................................................30

*Enzo Biochem, Inc. v. Applera Corp.*,
   599 F.3d 1325 (Fed. Cir. 2010)............................................................18

*In re Cronyn*,
   890 F.2d 1158 (Fed. Cir. 1989).................................................... 30, 31

*In re Klopfenstein*,
   380 F.3d 1345 (Fed. Cir. 2004)............................................................30

*In re Magnum Oil Tools Int'l, Ltd.*,
   829 F.3d 1364 (Fed. Cir. 2016)............................................................15

*PGS Geophysical AS v. Iancu*,
   891 F.3d 1354 (Fed. Cir. 2018)............................................................15

*Sirona Dental Sys. GMBH v. Institut Straumann AG*,
   892 F.3d 1349 (Fed. Cir. 2018)............................................................15

*Suffolk Techs., LLC v. AOL Inc.*,
   752 F.3d 1358 (Fed. Cir. 2014)............................................................30

*Voter Verified, Inc. v. Premier Election Sols., Inc.*,
   698 F.3d 1374 (Fed. Cir. 2012)............................................................30

**AGENCY DECISIONS**

*Adobe Sys. Inc. v. Grecia*,
   IPR2018-00418, Paper 7 (June 21, 2018)............................................33

*Adobe Sys. Inc. v. Grecia*,
    IPR2018-00418, Paper 9 (Sept. 7, 2018) ............................................................33

*Adobe Sys. Inc. v. Grecia*,
    IPR2018-00419, Paper 9 (Sept. 7, 2018) ............................................................31

*Asetek Danmark A/S v. CoolIT Sys., Inc.*,
    IPR2020-00747, Paper 42 (PTAB Sept. 30, 2021) ...........................................12

*Baker Hughes v. LiquidPower Specialty Prods., Inc*.,
    IPR2016-01903, Paper 74 (PTAB Mar. 8, 2019) ..............................................12

*Celltrion, LLC v. Biogen, Inc.*,
    IPR2017-01230, Paper 10 (Oct 12, 2017) ..........................................................31

*Coal. for Affordable Drugs VIII, LLC v. Trustees of the Univ. of Pa.*,
    IPR2015-01836, Paper 58 (PTAB Mar. 6, 2017) ..............................................35

*Elec. Frontier Found. v. Pers. Audio, LLC*,
    IPR2014-00070, Paper 21 (April 18, 2014) ......................................................41

*Facebook, Inc. v. Sound View Innovations, LLC*,
    IPR2017-00985, Paper 17 (Sep. 5, 2017),
    *reh'g denied*, Paper 30, 10 (PTAB Oct. 19, 2017) ..........................................18

*Google LLC v. IPA Techs. Inc.*,
    IPR2018-00384, Paper 11 (July 3, 2018)......................................... 31, 32, 33, 40

*Gracenote, Inc. v. Iceberg Indus. LLC*,
    IPR2013-00551, Paper 6 (Feb. 28, 2014) ..........................................................29

*IBM Corp. v. Rigetti & Co., Inc.*,
    IPR2020-00494, Paper 13 (Aug. 11, 2020) ........................................................15

*Intel Corp. v. Parkervision, Inc.*,
    IPR2020-01302, Paper 35 (PTAB Jan. 21, 2022)..............................................12

*Intel Corp. v. VLSI Tech. LLC*,
    IPR2018-01040, Paper 36 (PTAB Feb. 12, 2020)..............................................12

*Kinetic Techs., Inc. v. Skyworks Sols., Inc.*,
    IPR2014-00529, Paper 8 (Sept. 23, 2014) .........................................................20

iii

Appx474

*Kingston Tech. Co., Inc. v. Memory Techs., LLC,*
    IPR2019-00654, Paper 9 (Aug. 13, 2019) ................................................... 31, 32

*Laird Techs., Inc. v. A.K. Stamping Co. Inc.,*
    IPR2017-02038, Paper 6 (Mar. 14, 2018)................................................... 34, 35

*OpenSky Indus., LLC v. VLSI Techn. LLC,*
    IPR2021-01064, Paper 17 (Dec. 23, 2021)...................................................36

*Power Integrations, Inc. v. Semiconductor Components Indus.*, LLC,
    IPR2017-01975, Paper 9 (Mar. 12, 2018)...................................................42

*Schlumberger Tech. Corp. v. Integrated Drive Sys. LLC,*
    IPR2018-00603, Paper 40 (PTAB Sept. 3, 2019)......................................... 29, 41

*Shenzhen Zhiyi Tech. Co. v. iRobot Corp.,*
    IPR2017-02133, Paper 8 (Mar. 28, 2018)................................................... 34, 39

*Unified Patents Inc. v. Uniloc 2017 LLC,*
    IPR2019-00480, Paper 10 (Aug. 16, 2019) ........................................20

## STATUTES

35 U.S.C. § 102(e) ................................................................................11

35 U.S.C. § 253(a) ................................................................................11

35 U.S.C. § 311(b) ................................................................................29

35 U.S.C. § 316(e) ................................................................................29

## REGULATIONS

37 C.F.R. § 1.321(a)................................................................................11

37 C.F.R. § 42.104(b)(4)................................................................................19

37 C.F.R. § 42.107(e)................................................................................11

iv

**RULES**

Fed. R. Evid. 802(a) ................................................................................ 37, 38

**OTHER AUTHORITIES**

77 Fed. Reg. 48,680 (Aug. 14, 2012) .......................................................11

v

Appx476

| EXHIBIT LIST | |
|---|---|
| 2001 | Josh McHugh, "The *n*-Dimensional SuperSwitch," WIRED (May 1, 2001, 12:00 am) (available at *https://www.wired.com/2001/05/caspian/* (last visited Aug. 16, 2021)) |
| 2002 | Email from Jun Zheng, U.S. District Court for Western District of Texas staff, to counsel for parties, with Subject "Sable Networks, Inc., et al. v. Riverbed Technology, Inc., No. 6:21-cv-00175-ADA and Sable Networks, Inc., et al. v. Cloudflare, Inc., No. 6:21-cv-00261-ADA – Request for Telephone Conference" (Aug. 20, 2021, 9:04 am) |
| 2003 | Scheduling Order, Dkt. 21, *Sable Networks, Inc., et al. v. Cloudflare, Inc.*, No. 6:21-cv-00261-ADA (June 24, 2021) |
| 2004 | Declaration of Daniel P. Hipskind in Support of Motion for *Pro Hac Vice* Admission |
| 2005 | Declaration of Erin McCracken in Support of Motion for *Pro Hac Vice* Admission |
| 2006 | March 4, 2022 Disclaimer in U.S. Patent No. 8,243,593 Under 37 C.F.R. §1.321(a) |
| 2007 | Deposition Transcript of Kevin Jeffay, Ph.D. [Jeffay Transcript] |
| 2008 | Declaration of Erin McCracken [McCracken Declaration] |
| 2009 | Cloudflare, Inc. Opening Claim Construction Brief, Dkt. 29, *Sable Networks, Inc., et al. v. Cloudflare, Inc.*, No. 6:21-cv-00261-ADA (Nov. 12, 2021) [Cloudflare Opening Claim Construction Brief] |

# I.    INTRODUCTION

The grounds raised in the Petition should be rejected because Petitioner fails to demonstrate by a preponderance of the evidence that the challenged claims[1] are unpatentable.

The Petition raises grounds 1, 2, and 3,[2] each of which fails. ***First***, as to ground 1, alleged obvious over Yung alone, the Petition fails to show that claims 17, 18, 37, and 38 of the '593 patent are taught or suggested by Yung. As the Board already stated in the Institution Decision, "Petitioner has not demonstrated a reasonable likelihood it would prevail in establishing the unpatentability of any of dependent claims 17, 18, 37, or 38 as obvious over Yung alone." Institution Decision, 38 (citing Pet., 1 (table of grounds) and 42-43 (addressing these independent claims). These dependent claims depend from independent claims

———————————

[1] As explained below, to streamline this proceeding, Patent Owner has filed a statutory disclaimer of originally challenged claims 1, 2, 4-8, 14-16, 25-28, and 34-36. Claims 3, 9-13, 17-24, 29-33, and 37-44 remain at trial, challenged by one or more of grounds 1, 2 or 3. *See infra* § III.

[2] Ground 4 of the Petition is now moot, as no claims presently in the '593 patent are challenged under that ground. *See infra* § III.

1

that each recite computing a "badness factor for the flow, wherein the badness

factor provides an indication of whether the flow is exhibiting undesirable

behavior." Ex. 1001 ['593 Patent] 9.2; 29.2. As Petitioner concedes, and the

Board confirmed, Yung does not teach or suggest the claimed "badness factor."

Pet., 49; Institution Decision, 38.

     ***Second***, as to ground 2 of the petition, alleged obviousness of claims 9–13,

19–24, 29–33, and 39–44 over Yung and Copeland, Petitioner fails to show by a

preponderance of evidence that Copeland and Yung teach the calculation of a

"badness factor" for each flow as recited in the claims. Every challenged claim in

ground 2 includes the limitations associated with computing this "badness factor."

The Petition concedes that Yung does not disclose these "badness factor"

limitations, relying on Copeland to try to fill this gap and asserting that Copeland's

"flow-based 'concern index' (or CI) value represents the claimed badness factor."

*Id.* (citing Ex. 1003 [Jeffay Decl.] ¶ 210). But the only supposed support for this

contention is the conclusory testimony of Dr. Jeffay, Petitioner's technical opinion

declarant. And at deposition Dr. Jeffay testified that he could not articulate what

the term "badness factor" means. At the same time, he stated that whatever it

means, even though he could not articulate what it means, Copeland would fit that

meaning. This sort of untestable, and indeed impenetrable, opinion testimony is

entitled to no weight for showing alleged unpatentability. As such, Petitioner has

failed to carry its burden of establishing at trial by a preponderance of the evidence that Copeland, alone or in combination, renders obvious the claims challenged in ground 2. Moreover, in any event, Petitioner also fails to establish that the ordinary artisan in the art at the time of the invention would have been motivated to combine Yung and Copeland to meet the claims challenged this ground. *See infra* § V.B.

***Third***, ground 3, which challenges only independent claim 3, fails at least because Petitioner has not carried its burden to establish by a preponderance at trial that the Four-Steps Whitepaper was publicly available as printed publication prior art at the time of the invention. In the Institution Decision, the Board correctly "question[ed] whether Petitioner introduced sufficient evidence to show that an ordinary artisan would have been able to locate the Four-Steps Whitepaper with reasonable diligence." Institution Decision, 50. Among other things, as the Board explained, "even if we assume that an ordinary artisan was aware of the company (Packeteer) and its website," an assumption Patent Owner refutes below, "we query whether the Petition sufficiently shows that an ordinary artisan would have been able to locate the Four-Steps Whitepaper on that website with reasonable diligence." *Id.* at 51. Petitioner knew full well that it had to show that any alleged prior art on which it relies was available as a prior art patent or printed publication. Yet Petitioner has put forth ***no*** evidence showing that the ordinary artisan at the

3

time would have been able to locate the Four-Steps Whitepaper on the Packeteer

website. Nothing has changed, and with Patent Owner's right to introduce

evidence now closed, it is far too late for Petitioner to now attempt to introduce its

first such evidence. Petitioner has therefore fallen far short of its burden to prove

the public accessibility of the Four-Steps Whitepaper. That is fatal to ground 3.

This Response is timely pursuant to the parties' stipulation. Paper 22.

For at least these and other reasons provided herein, Patent Owner

respectfully requests that the Board deny the Petition and confirm the patentability

of the claims.

## II.     FACTUAL BACKGROUND

To assist the Board in a correct understanding of the prior art and the

claimed invention, this Section briefly describes certain background facts of the

patent and the petitioned art references.

### A.     The '593 Patent

U.S. Patent No. 8,243,593, entitled *Mechanism for Identifying and

Penalizing Misbehaving Flows in a Network*, was filed on December 22, 2004. Ex.

1001. The '593 patent is subject to a 35 U.S.C. § 154(b) term extension of 1,098

days.

The original assignee was Caspian Networks, Inc. Dr. Lawrence G.

Roberts—one of the founding fathers of the Internet, best known for his work as

the Chief Scientist of the Advanced Research Projects Agency (ARPA) where he

designed and oversaw the implementation of ARPANET, the precursor to the

internet—founded Caspian Networks in 1998.  At Caspian Networks, Dr. Roberts

developed a new kind of internet router to efficiently route packets over a network,

which was aimed at addressing concerns about network "gridlock."  Further

development work at Caspian led to, among other inventions, the patent-at-issue in

this proceeding.  In a 2001 interview with *Wired* Magazine, for example, Dr.

Roberts discussed the router he was then developing at Caspian Networks—the

Apeiro.   He told *Wired*:

> the Apeiro will...  create new revenue streams for the carriers by solving
> the 'voice and video problem.'  IP voice and video, unlike email and
> static Web pages, breaks down dramatically if there's a delay - as little
> as a few milliseconds - in getting packets from host to recipient."

Ex. 2001.[3]  The Apeiro debuted in 2003.

At its height, Caspian Networks, Inc. raised more than $300 million and

grew to more than 320 employees in the pursuit of developing and

commercializing Dr. Roberts' groundbreaking networking technologies.  Despite

---

[3] John McHugh, *The n-Dimensional Superswitch*, WIRED MAGAZINE

(May 1, 2001).

early success with its technology, Caspian's business ran into shoals when the

telecommunications bubble burst. The legacy of the work at Caspian continues to

exist, however, in the form of the inventions that were created and patented in the

process.

Sable Networks, Inc., the current assignee, was formed by Dr. Sang Hwa

Lee to further develop and commercialize the flow-based networking technologies

developed by Dr. Roberts and his team members at Caspian Networks. Sable

Networks, Inc. has continued its product development efforts based on the patented

technology and has gained commercial success with customers in Japan, South

Korea, and China. Customers of Sable Networks, Inc. have included: SK Telecom,

NTT Bizlink, Hanaro Telecom, Dacom Corporation, USEN Corporation, Korea

Telecom, China Unicom, China Telecom, and China Tietong. The '593 patent is

one of several Caspian Networks patents now assigned to Sable Networks, Inc.

The '593 patent discloses and claims novel methods and systems for

processing a flow of a series of information packets on a single router. These

technologies permit a single router to identify and control less desirable network

traffic. Because the characteristics of data packets in undesirable network traffic

can sometimes be disguised, the '593 patent improves the operation of computer

networks by disclosing technologies that can pierce such a disguise by monitoring

6

the characteristics of flows of data packets rather than ancillary factors such as port numbers or signatures.

As the '593 patent explains, "[w]ith the advent of file sharing applications such as KaZaA, Gnutella, BearShare, and Winny, the amount of peer-to-peer (P2P) traffic on the Internet has grown immensely in recent years. … This is so despite the fact that the number of P2P users is quite small compared to the number of non P2P users. For this and other reasons, P2P traffic is viewed by ISP's (Internet service providers) and others as being abusive/misbehaving traffic that should be controlled and penalized." Ex. 1001 ['593 Patent] 1:7-18. The '593 patent recognizes that to control misbehaving traffic such as P2P traffic, it must be identified. *Id.* at 1:19-20. At the time, "P2P protocols ha[d] gotten quite sophisticated," making it more difficult to identify misbehaving traffic. *Id.* at 1:46-49.

The '593 patent is directed toward "a mechanism for effectively identifying and penalizing misbehaving information packet flows in a network. This mechanism may be applied to any type of network traffic including, but certainly not limited to, P2P traffic." *Id.* at 1:54-58. "Because misbehaving flows are identified based upon their observed behavior, and because their behavior cannot be hidden, misbehaving flows cannot avoid detection." *Id.* at 1:61-64.

7

The '593 patent discloses tracking the behavioral statistics of a flow of data packets that can be used to determine whether the flow is undesirable. "These behavioral statistics reflect the empirical behavior of the flow." *Id.* at 2:4-5. The behavioral statistics are updated as information packets belonging to the flow are processed by a single router. *Id.* at 2:14-17. Based at least in part on the behavioral statistics, "a determination is made as to whether the flow is exhibiting undesirable behavior." *Id.* at 2:18-20. This determination is made by calculating a "badness factor" for each flow, which is computed based on the flow's behavioral characteristics. *Id.* at 2:21-23. "If the flow is exhibiting undesirable behavior, then a penalty may be enforced on the flow.… This penalty may be an increased drop rate." *Id.* at 2:28-31. In one embodiment, for example, enforcing the penalty on a flow rehabilitates the flow by causing its badness factor to improve. *Id.* at 2:42-45. "Once the flow is no longer misbehaving, it is no longer subject to penalty. In this manner, a misbehaving flow can be identified, penalized, and even rehabilitated …." *Id.* at 2:47-50.

### B.    References Cited In The Petition

#### 1.    <u>Yung</u>

U.S. Patent No. 7,664,048 to Yung et al., is entitled *Heuristic Behavior Pattern Matching of Data Flows in Enhanced Network Traffic Classification*. Ex. 1005 ("Yung").

8

Yung is Petitioner's primary cited reference, relied on under 35 U.S.C.

§ 102(e) with respect to all three grounds remaining in the Petition.  In ground 1,

Yung is the sole reference.  The only claims challenged in ground 1 that have not

been disclaimed are claims 17, 18, 37, and 38.  *See infra* § III.  In the Institution

Decision, the Board correctly concluded that "Petitioner has not demonstrated a

reasonable likelihood it would prevail in establishing the unpatentability of any of

dependent claims 17, 18, 37, or 38 as obvious over Yung alone."  Institution

Decision, 38 (citing Pet., 1 (table of grounds) and 42-43 (addressing these

independent claims)).  Because claims 17, 18, 37, and 38 are the only remaining

challenged claims in ground 1 and Yung is ground 1's only alleged prior art,

ground 1 fails and cannot invalidate claims 17, 18, 37, and 38.

### 2.    <u>Copeland</u>

U.S. Patent No. 7,185,368 to Copeland is entitled *Flow-Based Detection of*

*Network Intrusions*.  Ex. 1007 ("Copeland").  Copeland is relied on by Petitioner

as a secondary reference in combination with Yung as alleged prior art under 35

U.S.C. § 102(e) in ground 2 of the Petition.

Copeland teaches "an intrusion detection system that inspects all inbound

and outbound network activity and identifies suspicious patterns that may indicate

a network system attack or intrusion."  Ex. 1007 [Copeland] 1:45-48.  Because

Yung concededly does not disclose calculating a "badness factor" for each flow as

9

claimed, Petitioner relies on Copeland in combination with Yung to supposedly supply this missing limitation. Pet., 49-51. Petitioner alleges that Copeland's "concern index" discloses the '593 patent's "badness factor." *Id.* But given that Petitioner's expert testified at his deposition that he cannot even say what the term "badness factor" means, as explained in Section V.A. below, it is illogical for Petitioner to rely on his testimony as its sole alleged evidence for its allegation that Copeland discloses this limitation, and in fact Petitioner fails to show that it does.

Notably, Copeland's "concern index" is for "suspicious activity" in contrast to legitimate traffic. Ex. 1007 [Copeland] Abstract. By way of comparison, the '593 patent's "badness factor" is concerned with "undesirable" behavior or "misbehavior" associated with P2P traffic which is not necessarily suspicious behavior. Ex. 1001 ['593 Patent] 1:10-18. *See supra* § II.A; *infra* V.A.

### 3. Four-Steps Whitepaper

Exhibit 1006 is a paper entitled "Four Steps to Application Performance Across the Network with Packeteer's PacketShaper®" (the "Four-Steps Whitepaper"). This secondary reference is relied on by Petitioner as alleged prior art under 35 U.S.C. § 102(e) in combination with Yung with respect to ground 3.

As the Board preliminarily found and as explained in detail below, Petitioner has not shown by the requisite preponderance of the evidence that the Four-Steps

Whitepaper was publicly available so as to qualify as a "printed publication" under 35 U.S.C. § 102(e). *See infra* § VI.

## III.     DISCLAIMED CLAIMS ARE NOT PART OF THIS PROCEEDING.

To streamline this proceeding, Patent Owner elected to disclaim challenged claims 1, 2, 4-8, 14-16, 25-28, and 34-36 of the '593 patent.  These claims are not being asserted in the co-pending litigation.  In compliance with 37 C.F.R. § 1.321(a), Patent Owner has filed a statutory disclaimer under 35 U.S.C. § 253(a) of claims 1, 2, 4-8, 14-16, 25-28, and 34-36 (the "Disclaimed Claims").  Ex. 2006. *See* 77 Fed. Reg. 48,680, 48,689 (Aug. 14, 2012) (codified at 37 C.F.R. § 42.107(e)).  This disclaimer was filed only to streamline the proceeding and Patent Owner does not request adverse judgment on the disclaimed claims.  As a matter of law, claims 1, 2, 4-8, 14-16, 25-28, and 34-36, should be treated as though they never existed:

> The Federal Circuit has held that claims disclaimed under § 253(a) should be treated as though they never existed.  *See Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379, 1383 (Fed. Cir. 1998) ("This court has interpreted the term 'considered as part of the original patent' in section 253 to mean that the patent is treated as though the disclaimed claims never existed."); *Guinn v. Kopf*, 96 F.3d 1419, 1422 (Fed. Cir. 1996) ("A statutory disclaimer under 35 U.S.C. § 253 has the effect of canceling the claims from the patent and the patent is viewed as though the disclaimed claims had never existed in the patent."); *see also*

11

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc*., 655 F.3d 1291, 1299 (Fed. Cir. 2011) (holding that the Board's interference jurisdiction under 35 U.S.C. § 291 required "the existence of an interference, and a claim that 'never existed' [due to a statutory disclaimer] cannot form the basis for an interference").

*Baker Hughes v. LiquidPower Specialty Prods., Inc*., IPR2016-01903, Paper 74, 11-12 (PTAB Mar. 8, 2019); *see Intel Corp. v. VLSI Tech. LLC*, IPR2018-01040, Paper 36, 16 (PTAB Feb. 12, 2020) (similar).

Accordingly, claims 1, 2, 4-8, 14-16, 25-28, and 34-36 of the '593 patent are "no longer part of this proceeding." *Intel Corp. v. Parkervision, Inc.*, IPR2020-01302, Paper 35, at 2 (PTAB Jan. 21, 2022) (final written decision explaining that claims the patent owner disclaimed following institution of *inter partes* review were no longer part of the proceeding). *See also Asetek Danmark A/S v. CoolIT Sys., Inc.*, IPR2020-00747, Paper 42, 6 (PTAB Sept. 30, 2021) (determining that a statutory disclaimer removed a disclaimed claim from an *inter partes* review proceeding). Claims 1, 2, 4-7, and 25-27 are therefore eliminated from ground 1 of the Petition. Because claims 8, 14-16, 28, and 34-36 are the only claims subject to ground 4 of the Petition, and are all disclaimed, ground 4 is now moot.

## IV.    PETITIONER FAILS TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT THE CLAIMS CHALLENGED IN GROUND 1 ARE OBVIOUS OVER YUNG (CLAIMS 17, 18, 37, 38, GROUND 1).

12

Appx489

In the Institution Decision, the Board correctly concluded that "Petitioner has not demonstrated a reasonable likelihood it would prevail in establishing the unpatentability of any of dependent claims 17, 18, 37, or 38 as obvious over Yung alone."[4]  Institution Decision, 38 (citing Pet., 1 (table of grounds) and 42-43 (addressing these independent claims).  As the Board explained, "claims 17 and 18 both depend indirectly from independent claim 9 … , and claims 37 and 38 depend indirectly from independent claim 29."  *Id.* (citing Ex. 1001 ['593 Patent]).  Independent claims 9 and 29 each recite computing a "badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior."  Ex. 1001 ['593 Patent] 9.2; 29.2.  The Petition concedes that Yung does not disclose these "badness factor" limitations.  Pet., 49.  Yet, the only ground challenging dependent claims 17, 18, 37, and 38 is ground 1 of the Petition.  Pet., 1, 42-43 (alleging that "Yung discloses claims 17 and 37"; "Yung discloses claims 18 and 38").  And ground 1 is based on Yung alone.  *Id.*

As a result, the Board concluded that "Petitioner does not demonstrate that Yung teaches or suggests 'computing . . . a badness factor for the flow,' as required

---

[4] As explained above, with respect to ground 1, other than claims 17, 18, 37, and 38, the challenged claims have been statutorily disclaimed.

13

by claim 9, or 'means for computing . . . a badness factor for the flow,' as required

by claim 29." Institution Decision, 38-39 (citations omitted). "Thus, Petitioner

does not demonstrate that Yung teaches or suggests all limitations of dependent

claims 17, 18, 37, and 38." *Id.*, 39. The Board was correct, and its analysis must

and should end there. Because Yung does not teach or suggest all limitations of

dependent claims 17, 18, 37, or 38 of the '593 patent, and Yung is the only basis

for ground 1 of the Petition, Petitioner has failed to carry its burden of proving by a

preponderance of the evidence that dependent claims 17, 18, 37, and 38 are

obvious in view of Yung.

Despite the Petition's clear failure to prove the obviousness of claims 17, 18,

37, and 38 of the '593 patent in view of Yung, the Institution Decision continues

on to speculate that perhaps "the inclusion of claims 17, 18, 37, and 38 in the

Yung-only ground may be a typographical error" even though there is no evidence

of any such alleged error. Institution Decision, 39. The Board should not further

consider such a suggestion, and should not so find, as it would violate well

established Federal Circuit precedent. Even if the Board were to conclude,

contrary to the lack of evidence supporting such a conclusion, that Petitioner

intended to challenge claims 17, 18, 37, and 38 under ground 2, but inadvertently

failed to state such anywhere in the petition, this would be a clear example of a

deficiency in the petition that the Supreme Court, the Federal Circuit, and the

14

Board have repeatedly made clear the Board is not empowered to correct.  The

Federal Circuit and Board have repeatedly overruled prior decisions to the

contrary.

The Federal Circuit has explained, "the petitioner's petition … is supposed

to guide the life of the litigation," and the "petitioner's contentions . . . define the

scope of the litigation all the way from institution through to conclusion." *PGS*

*Geophysical AS v. Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018).  Accordingly, in

*In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016), the

Federal Circuit found that the Board erred in making an obviousness argument on

behalf of the petitioner that could have been, but was not, made in the petition.

The Federal Circuit concluded that there is no support for the argument that "the

Board is free to adopt arguments on behalf of petitioners that could have been, but

were not, raised by the petitioner during an IPR."  *Id.* at 1381.  The Board must

apply the Federal Circuit's precedent in this regard, and should do the same here.

*See, e.g.*, *IBM Corp. v. Rigetti & Co., Inc.*, IPR2020-00494, Paper 13 at 34 (Aug.

11, 2020) (decision denying institution of *inter partes* review and explaining "our

role is not to remedy the deficiencies in Petitions that fall short") (citing *Sirona*

*Dental Sys. GMBH v. Institut Straumann AG*, 892 F.3d 1349, 1356 (Fed. Cir.

2018) ("It would … not be proper for the Board to deviate from the grounds in the

petition and raise its own obviousness theory," "institut[ing] a *different* inter partes review of [its] own design") (emphasis in original)).

Accordingly, the Petition must and should be taken at its word, just as any filing by any party in this case should be taken at its word. Claims 17, 18, 37, and 38 are challenged in ground 1, and ground 1 fails as to those claims.

Moreover, any new evidence or argument raised by Petitioner for the first time on Reply seeking to challenge claims 17, 18, 37, and 38 under any other grounds, such as ground 2, that could have been, but were not, raised in the Petition should not be considered. Doing so would constitute a clear error of law.[5]

## V.   PETITIONER FAILS TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT YUNG IN VIEW OF COPELAND DISCLOSES OR RENDERS OBVIOUS THE CALCULATION OF A BADNESS FACTOR AS CLAIMED (CLAIMS 9-13, 19-24, 29-33, 39-44, GROUND 2).

### A.   Copeland Does Not Disclose The Claimed "Badness Factor" For Each Flow.

————————————

[5] In any event, as explained directly below in Section V.A, Copeland does not disclose the claimed "badness factor" limitations. For at least this reason, even had the Petition challenged claims 17, 18, 37, or 38 under ground 2, that ground would have to be rejected on the merits as to those claims. Nevertheless, the Board may not, and should not, correct such deficiencies in the Petition.

Independent claims 9 and 29 each recite computing a "badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior." [9.2; 29.2]. Every challenged claim in ground 2 includes the limitations associated with computing this "badness factor."

The Petition concedes that Yung does not disclose these "badness factor" limitations. Pet., 49. The Petition relies on Copeland to try to fill this gap. *See id.*

The Petition asserts that Copeland's "flow-based 'concern index' (or CI) value represents the claimed badness factor." *Id.* (citing Ex. 1003 [Jeffay Decl.] ¶ 210). As alleged support for this assertion, the Petition cites no evidence except *ipse dixit* in the accompanying declaration, which asserts: "This concern index (CI) value represents the claimed *badness factor*." Ex. 1003 [Jeffay Decl.] ¶ 210. The Petition fails to substantiate this assertion. And the deposition testimony of Petitioner's expert confirms that this is so.

Although Patent Owner recognizes the Board preliminarily found in the Institution Decision, under the low "reasonable likelihood" standard applicable prior to institution, that "Petitioner has sufficiently shown that Copeland's concern index qualifies as a 'badness factor' that 'provides an indication of whether the flow is exhibiting undesirable behavior,' as required by claim 9," Patent Owner respectfully disagrees, and in any event Petitioner has not shown this under the

17

heightened preponderance standard applicable to institution, for at least the
following reasons.

To start, in the parallel district court proceeding, Petitioner is seeking a
construction that the term "badness factor" **is indefinite**.  *See* Ex. 2009
[Cloudflare's Opening Claim Construction Brief] 28-32.  According to Petitioner,
the term is "highly subjective" and not "a term of art."  *Id.* at 29.  Yet, at the same
time, Petitioner argues that the challenged claims containing "badness factor"
limitations are rendered obvious, and Petitioner purports to map Copeland against
the '593 patent's "badness factor."  *See* Pet., 49-51.  However, Petitioner cannot
maintain that a claim is both indefinite and rendered obvious.  *Enzo Biochem, Inc.
v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010) ("As a preliminary matter,
we observe that a claim cannot be both indefinite and anticipated."); *see also
Facebook, Inc. v. Sound View Innovations, LLC*, IPR2017-00985, Paper 17, 13-14
(Sep. 5, 2017) (denying institution, refusing to analyze unpatentability ground
when petitioner simultaneously and "unambiguous[ly]" took different and
"inconsistent" positions on construction and definiteness of challenged claims in
IPR and court under same claim construction standard), *reh'g denied*, Paper 30, 10
(Oct. 19, 2017) (refusing to accept petitioner's position that it may "*simultaneously*
argue *different* claim constructions under the *same* claim construction standard to
the U.S. district court and to us, *without explanation*") (emphases by Board).

18

Therefore, the Petition does not "set forth … where each element of the claim is found in the prior art … relied upon." 37 C.F.R. § 42.104(b)(4).

Indeed, although Petitioner's expert makes the *ipse dixit* assertion that Copeland's "concern index (CI) value represents the claimed *badness factor*," (Ex. 1003 [Jeffay Decl.] ¶ 210), at his deposition, he testified that "a person of ordinary skill in the art would not recognize badness factor as a term of art. And I think – reading the '593 patent, I don't think they would understand what the bounds of the term mean." Ex. 2007 [Jeffay Transcript] 35:17-36:7. Even though Dr. Jeffay opines that the ordinary artisan would not understand the term "badness factor," a position consistent, of course, with Petitioner's claim construction position in the district court litigation, he nonetheless claims that "a person of ordinary skill in the art would understand that ***whatever a badness factor is***, Copeland's recitation of what it refers to as suspicious activity … would certainly qualify as a badness factor." *Id.* at 35:17-36:15 (emphasis added). In other words, on this issue, Dr. Jeffay is nothing more than a mouthpiece for Petitioner's contradictory positions taken here and in the district court proceeding, without a meaningful explanation of those contradictions. *Compare* Pet., 49 ("This flow-based 'concern index' (or CI) value represents the claimed *badness factor*") *with* Ex. 1003 [Jeffay Decl.] ¶ 210 ("This concern index (CI) value represents the claimed *badness factor*."). Dr. Jeffay's testimony on this issue is entitled to no weight here. *See Kinetic Techs.,*

19

*Inc. v. Skyworks Sols., Inc.*, IPR2014-00529, Paper 8, 15 (Sept. 23, 2014) ("Merely repeating an argument from the Petition in the declaration of a proposed expert does not give that argument enhanced probative value.").  That is true regardless whether Dr. Jeffay's regurgitation of Petitioner's attorney argument is rebutted by counter testimony from another declarant; it is simply not entitled to appreciable weight.  *See, e.g.*, *Unified Patents Inc. v. Uniloc 2017 LLC*, IPR2019-00480, Paper 10, 3 (Aug. 16, 2019) ("Just because an expert regurgitates attorney argument does not make the argument either persuasive or worthy of blind acceptance when counter testimony does not exist."). Without any support for the contention that Copeland's concern index teaches or suggests the claimed badness factor, Petitioner has failed to carry its burden with respect to ground 2.

Moreover, any suggestion that may be gleaned from Dr. Jeffay's nonexplanatory testimony, or the Petition's nonexplanatory assertion, that Copeland's concern index somehow is the same as or teaches the claimed invention's "badness factor" has not been shown to have any support in the reference disclosures.  Copeland's concern index is for "suspicious activity" in contrast to legitimate traffic.  Ex. 1007 [Copeland] Abstract.  Copeland teaches that "flow statistics are analyzed to determine if the flow appears to be legitimate traffic or possible suspicious activity.  A ***concern index value is assigned to each flow that appears suspicious***."  *Id.* (emphasis added).  Copeland's concern index is thus

20

concerned with identifying malicious activity such as an external intruder. This

point is in keeping with Copeland's teachings as a whole, which describe "an

intrusion detection system that … identifies suspicious patterns that may indicate a

network attack or system attack or intrusion." *Id.* at 1:45-48; *see also id.* at

Abstract ("By assigning a value to each flow that appears suspicious and adding

that value to the total concern index of the responsible host, it is possible to

***identify hosts that are engaged in intrusion activity*****.") (emphasis added).**

In contrast, the '593 patent's "badness factor" is concerned with

"undesirable" behavior or "misbehavior" associated with P2P traffic, which, unlike

the host activity assigned a concern index value by Copeland, is ***not*** necessarily

suspicious or non-suspicious. Ex. 1001 ['593 Patent] 1:10-18 ("[I]t has been

estimated that P2P traffic now represents about 50-70 percent of the total traffic on

the Internet. … Thus, it appears that most of the bandwidth on the Internet is

being consumed by just a minority of the users. For this and other reasons, ***P2P***

***traffic is viewed*** by ISP's (Internet service providers) and others ***as being***

***abusive/misbehaving traffic*** that should be controlled and penalized.") (emphasis

added); *id.* at 2:18-21 ("Based at least partially upon the behavioral statistics, a

determination is made as to whether the flow is exhibiting undesirable behavior.

In one embodiment, this determination may be made by computing a badness

factor for the flow."). In short, Copeland's "concern index" is concerned with

21

suspicious behavior of a host, not undesirable behavior of a flow.  That is a

different criterion than badness, a criterion which Copeland simply did not teach to

the POSITA at the time of the claimed invention.

Moreover, Copeland's "concern index," unlike claim 9 and 29's "badness

factor," is not computed on a per-flow basis.  In Copeland, "*[f]lows with*

*suspicious activity are assigned* a ***predetermined concern index (CI)*** value based

upon a heuristically predetermined assessment of the significance of the threat of

the particular traffic or flow or suspicious activity."  Ex. 1007 [Copeland] 7:57-61

(emphasis added); *see also id.* at 8:1-5 ("By *assigning a value to each flow that*

*appears suspicious* and ***adding that value to a total CI of the host responsible for***

***the flow***, it is possible to identify hosts that are engaged in intruder activities.")

(emphasis added); *id.* at 10:46-47 ("[T]he engine **155** associates all packets with a

flow.  It analyzes certain statistical data and *assigns a concern index value to*

*abnormal activity*.") (emphasis added); *id.* at 14:49-55 (a process includes a

sequence of computer-executed steps "namely, the detection of intruders based

upon C/S flows and other activity deemed heuristically to be a *threat substantial*

*enough to warrant assignment of a concern index value*.") (emphasis added); *id.* at

17:58-61 ("These flows are considered as finished and a logic-tree analysis is done

to classify them as either a normal flow, or a potential probe or other *suspicious*

*activity warranting assignment of a concern index value*.") (emphasis added); *id.* at

22

Fig. 6 (assigning predetermined "concern index" values to categories of suspicious activity of potential intruders). Thus, Copeland only *assigns* "concern index" values to suspicious flows. In contrast, independent claims 9 and 29 of the '593 patent recite computing a "badness factor" for *each* flow. [9.2; 29.2]. As the patent explains in its description of the invention:

> the MFM **210** determines (block **304**) whether the flow is exhibiting undesirable behavior. In one embodiment, this determination is made by computing a badness factor for the flow. This badness factor is computed based on the behavioral statistics of the flow and provides an indication as to whether the flow is exhibiting undesirable behavior.

Ex. 1001 ['593 Patent] 6:25-31; *see also id.* at 7:51-52 ("[T]he MFM **210***d* also computes a badness factor for the flow."); *id.* at 8:12-17 ("By taking these components into account in the computation of the badness factor, it is possible to derive a badness factor that provides an indication of whether a flow is misbehaving. In one embodiment, a badness factor larger than 1 indicates a misbehaving flow."). The '593 patent's "badness factor" is calculated for each flow regardless of whether the flow is misbehaving.

For all these reasons, Petitioner has failed to carry its burden to show by a preponderance of the evidence that Copeland teaches or suggests "computing … a badness factor for the flow …." [9.2; 29.2].

Accordingly, for this independently sufficient reason, ground 2 of the

Petition fails.

### B.     The Petition Does Not Sufficiently Establish A Reason For The POSITA To Have Combined Yung And Copeland As Proposed.

Ground 2 must be rejected at trial for yet another reason.  Petitioner fails to

prove by a preponderance of the evidence a rationale to combine the references to

meet the claimed invention.

The Petition asserts that claims 9-13, 19-24, 29-33, and 39-44 are obvious

over Yung and Copeland.  Pet., 43.  It argues that a "POSA would have been

motivated to incorporate Copeland's flow-based CI value into Yung's bandwidth-

management device *based on Yung's express disclosure*."  *Id.* at 45 (emphasis

added).  Petitioner cites Yung's specification, arguing that it "provides exemplary

application-behavior-pattern matching techniques and notes that 'the application

behavior pattern can incorporate other factors as well.'"  *Id.* (citing Ex. 1005

[Yung] 10:43-58; 11:59-60).  Based on this, Petitioner argues in conclusory

fashion that a "POSA would have been motivated to seek out 'other factors' for

classifying traffic" such as Copeland's CI value.  Pet., 45-46; *see also* Ex. 1003

[Jeffay Decl.] ¶ 196 ("Yung provides exemplary application-behavior-pattern-

matching techniques but also notes that 'the application behavior pattern can

incorporate other factors as well.' … This would have motivated a POSA to seek

24

out these 'other factors.'") (emphasis added).  In short, Petitioner argues that the

POSITA's alleged motivation to combine Yung and Copeland stems (entirely)

from Yung's statement that its "application behavior pattern can incorporate other

factors as well." *Id.*  This was confirmed by Petitioner's own expert at deposition.

Ex. 2007 [Jeffay Transcript] 38:11-18.[6]

    This generic nondisclosure in Yung does not disclose a motivation to make

the proposed combination.  Contrary to Petitioner's argument, Copeland's concern

———————————————

    [6] The Institution Statement relied on a preliminary premise that is contrary to

the evidence collected at trial.  In granting institution and finding a reasonable

likelihood of success as to ground 2, the Institution Decision preliminarily stated:

"[a]lthough we agree that Yung's reference to 'other factors' does not itself

provide an express motivation to combine the references, ***we disagree with Patent***

***Owner's assessment that Petitioner's alleged motivation 'stems (entirely) from***

***[this] statement' in Yung.***"  Institution Decision, 46 (emphasis added).  Cross-

examination of Petitioner's expert, however, confirmed that Patent Owner's

contrary explanation was and is correct.  Petitioner's alleged motivation to

combine Yung and Copeland as proposed ***does*** "stem[] []entirely[]" from this

statement in Yung.  Ex. 2007 [Jeffay Transcript] 38:11-18.

index (CI) value is not a behavioral attribute of a flow that there is any preponderant evidence that the POSITA would have been motivated to combine with Yung. Copeland teaches that its mechanism

> collects flow data *from packet headers* between two hosts or Internet Protocol (IP) addresses. ***Collecting flow data from packet headers*** associated with a single service where at least one port remains constant allows for more efficient analysis of the flow data. The collected flow data is analyzed to assign a concern index value to the flow based upon a probability that the flow was not normal for data communications.

Ex. 1007 [Copeland] 3:45-54 (emphases added). Copeland further teaches that "[b]y assigning a value to each flow that appears suspicious and adding that value to the total concern index of the responsible host, it is ***possible to identify hosts*** that are engaged in intrusion activity." *Id.* at Abstract (emphasis added). In short, Copeland is directed to collecting self-reported flow information from packet headers to determine whether a host (e.g., a computer) is engaged in intrusion activity (e.g., attempting to take control of another computer or network).

As Petitioner does not dispute, Copeland stores in its flow data structure fields, such as "unsigned long bytes[2]; // bytes sent by ip[0] and ip[1]" and "unsigned long pkts[2]; // packets sent by ip[0] and ip[1]." Ex. 1007 [Copeland] 16:45-60; 15:50-55. But this information is obtained from packet headers, not flow-based behavioral statistics. Copeland's CI value is thus reflective of packet

26

header information, not the behavior of a flow. At his deposition, Petitioner's expert confirmed that Copeland does not disclose collecting flow data from any source other than packet headers. Ex. 2007 [Jeffay Transcript] 40:19-41:10. Although Petitioner's expert testified in a conclusory fashion without any explanation that packet header information somehow represents behavioral statistics, under cross-examination he ultimately retreated from that initial position, testifying merely that "to the extent that someone felt that wasn't the case, I think a person of skill in the art would understand that there's nothing in Copeland to prevent you from using behavioral statistics." *Id.* at 42:12-43:3. Even assuming that this conclusory assertion is true, it does not help Petitioner, who has the burden to **establish** by a preponderance of the evidence that Copeland discloses the challenged limitation, not that "there's nothing in Copeland to **prevent** you from using behavioral statistics" (emphasis added).

In contrast, Yung is focused on traffic monitoring based on flow object behavioral data such as "packet count, byte count, first packet time, last packet time, etc." Ex. 1005 [Yung] 8:5-11. No reason is given for the POSITA to modify Yung in view of Copeland to store information from packet headers, which are not based on flow object behavioral data.

As a whole, and particularly as to their respective disclosures relied upon by Petitioner, Copeland and Yung are directed to two very different inventions.

27

Whereas Copeland discloses an invention directed toward "***identify[ing] hosts*** that are engaged in intruder activity" by "collect[ing] flow data from packet headers between two hosts or Internet Protocol (IP) addresses" (Ex. 1007 [Copeland] 3:38-39; 3:45-47) (emphasis added), Yung discloses an invention directed toward "enhanced network traffic classification mechanisms that allow for ***identification of encrypted data flows***, or data flows where attributes necessary to proper classification are otherwise obscured or unknown." Ex. 1005 [Yung] 2:24-27 (emphasis added). The Petition does not address these differences between Yung and Copeland, and so cannot show that they do not defeat the alleged motivation to combine.

For all these reasons, the Petition fails to demonstrate by a preponderance of the evidence a reason for the POSITA to combine Yung and Copeland to meet the claims.

## VI.     PETITIONER FAILS TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT THE FOUR-STEPS WHITEPAPER WAS PUBLICLY ACCESSIBLE QUALIFIED PRIOR ART (CLAIM 3, GROUND 3).

The Board was right to "question whether Petitioner introduced sufficient evidence to show that an ordinary artisan would have been able to locate the Four-Steps Whitepaper with reasonable diligence," even under the extremely forgiving standard for sufficiency of evidence to support institution. Institution Decision, at

28

50. At the institution stage, Petitioner failed to introduce sufficient evidence to show that a POSITA would have been able to locate the Four-Steps Whitepaper with reasonable diligence prior to the priority date of the '593 patent. Nothing has changed since the Institution Decision. Petitioner has not shown and cannot show by the requisite preponderance of the evidence that a POSITA would have been able to locate the Four-Steps Whitepaper with reasonable diligence such that it would qualify as a printed publication for prior art purposes. *See Schlumberger Tech. Corp. v. Integrated Drive Sys. LLC*, IPR2018-00603, Paper 40, 11-12 (PTAB Sept. 3, 2019) ("Petitioner must demonstrate by a preponderance of the evidence that the challenged claims are unpatentable—including showing that the references relied upon are patents or printed publications.") (citing 35 U.S.C. §§ 311(b), 316(e)). Because Petitioner has failed to meet its burden with respect to the Four-Steps Whitepaper, the Petition fails to demonstrate by a preponderance of the evidence that Petitioner should prevail on ground 3 which relies on that reference. *See Gracenote, Inc. v. Iceberg Indus. LLC*, IPR2013-00551, Paper 6, 32 (Feb. 28, 2014) ("Because we have determined that Petitioner fails to demonstrate a reasonable likelihood of prevailing in showing that Wang is a prior art reference under 35 U.S.C. § 102(e), we determine that Petitioner fails to demonstrate a reasonable likelihood of prevailing in its challenge ....").

29

"Whether a reference qualifies as a 'printed publication' under 35 U.S.C.

§ 102(b) involves a case-by-case inquiry into the facts and circumstances

surrounding the reference's disclosure to members of the public." *In re

Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "A given reference is

'publicly accessible' upon a satisfactory showing that such document has been

disseminated or otherwise made available to the extent that persons interested and

ordinarily skilled in the subject matter or art exercising reasonable diligence, can

locate it." *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1364 (Fed. Cir. 2014)

(emphasis omitted).

With respect to a reference stored on webpages in cyberspace, "[j]ust as

indexing plays a significant role in evaluating whether a reference in a library is

publicly accessible, … indexing, '[w]hether ... through search engines or

otherwise,' … is also an important question for determining if a reference stored

on a given webpage in cyberspace is publicly accessible." *Blue Calypso, LLC v.

Groupon, Inc.*, 815 F.3d 1331, 1349 (Fed. Cir. 2016) (quoting *Voter Verified, Inc.

v. Premier Election Sols., Inc.*, 698 F.3d 1374, 1380 (Fed. Cir. 2012)). Indexing

and cataloging must be prepared in a "meaningful" way, i.e., in relationship to the

subject matter of the references, to allow an interested researcher exercising

reasonable diligence to locate the prior art. *In re Cronyn*, 890 F.2d 1158, 1161

(Fed. Cir. 1989). As the Federal Circuit noted in *Cronyn*, some way to search for

30

the reference based on the reference's subject matter must exist in order for

indexing to be persuasive evidence of public accessibility. *Id.* Accordingly, the

Board has held that a website is not proven to be publicly accessible by "Wayback

Machine" evidence alone because searching the Internet Archive by URL

generally "bears no relationship to the subject" of the reference. *Adobe Sys. Inc. v.

Grecia*, IPR2018-00419, Paper 9, 10 (Sept. 7, 2018).

Accordingly, the Board has repeatedly found declarations from Mr. Butler

and other employees of the Internet Archive insufficient, without more, to carry a

petitioner's burden with respect to demonstrating the public accessibility of a

reference. *See, e.g., Kingston Tech. Co., Inc. v. Memory Techs., LLC*, IPR2019-

00654, Paper 9, 18–22 (Aug. 13, 2019); *Google LLC v. IPA Techs. Inc.*, IPR2018-

00384, Paper 11, 13–15 (July 3, 2018); *Celltrion, LLC v. Biogen, Inc.*, IPR2017-

01230, Paper 10, 11-16 (Oct 12, 2017). For example, in *Kingston*, even applying

the forgiving "reasonable likelihood" standard, the Board denied institution

because the petitioner had not sufficiently shown that a primary reference

constituted a "printed publication." IPR2019-00654, Paper 9, 18–22. The

petitioner argued the reference was a prior art "printed publication" because it bore

a copyright date of May 2003, and allegedly—as asserted by an Affidavit of

Christopher Butler, the Office Manager of the Internet Archive, similar to

Petitioner's evidence here—was available for download on a particular website

31

[the MMCA website] by August 18, 2003. *Id.* at 19–20. The Board disagreed,

holding that, even accepting those facts as true, the petitioner had failed to

demonstrate the reference was publicly accessible as of that date. *Id.* at 21–22.

The Board noted the petitioner "made no assertion or showing that the website of

MMCA was sufficiently indexed such that it would be findable by an internet

search engine." *Id.* at 21. Additionally, the Board noted that the petitioner "d[id]

not assert or provide evidence indicating that the [MMCA] or its website were well

known to one with ordinary skill in the art, or that one with ordinary skill in the art

would have otherwise been aware of, or directed to, the MMCA website to obtain

MMC 3.31." *Id.* at 22. As the Board explained, it was "incumbent" on the

petitioner to explain in the petition how skilled artisans would have arrived at the

MMCA website, but the petitioner had failed to do so. *Id.* The Board thus held the

petitioner had "not sufficiently shown, [even] for the purposes of instituting

review, that MMC 3.31 constitutes a 'printed publication' against the [subject]

patent." *Id.*

In *Google*, the Board likewise held that the archiving of a webpage by the

Internet Archive failed to demonstrate even a reasonable likelihood of establishing,

let alone show by a preponderance of evidence, that the petitioned art reference

was publicly accessible prior to the date of archiving. IPR2018-00384, Paper 11,

13–15. The Board found that, even assuming the reference was "available online

(i.e., technical availability)," the petitioner "fail[ed] to point to any persuasive evidence of public accessibility to the document or [] website." *Id.* at 15.  In particular, applying the law established by *Blue Calypso*, the Board noted that, relative to the critical date, the petitioner "failed to present (1) any evidence that the reference was viewed or downloaded, (2) any testimony evidence that one of ordinary skill in the art would have been independently aware of the webpage, and (3) any evidence that a query of a search engine before the critical date, using any combination of search words, would have led to the reference appearing in the search results." *Id.* at 14–15.

Likewise, in *Adobe Sys. Inc. v. Grecia*, IPR2018-00418, Paper 9 (Sept. 7, 2018), the Board, confirming a denial of institution on rehearing, found the fact "that the Internet Archive electronically archived a copy of [a reference] does not, by itself, mean that [the reference] was sufficiently indexed on the [underlying] website or the Internet Archive."  "Nor does it reveal anything about the search capabilities of the [] website or the Internet Archive, or why one with ordinary skill in the art would have even visited either website to find anything." *Id.*, 9; *see id.*, IPR2018-00418, Paper 7, 11 (June 21, 2018) ("That the Internet Archive captured and archived a copy of [the reference] does not mean, by itself, that [the reference] was sufficiently indexed or catalogued …. Nor does it reveal anything about the search capabilities of the [] website."). *See also Shenzhen Zhiyi Tech. Co. v.*

33

*iRobot Corp.*, IPR2017-02133, Paper 8, 11 (Mar. 28, 2018) ("the fact that the Internet Archive was able to access a document does not establish, without more, that the document was publicly accessible through traditional search engines, like Google or Yahoo, merely that it was accessible to the Internet Archive.").

The Board's decision denying *inter partes* review in *Laird Techs., Inc. v. A.K. Stamping Co. Inc.*, IPR2017-02038, Paper 6, 11-12 (Mar. 14, 2018), is likewise instructive here. There, a reference cited by the petitioner as alleged prior art contained "the logo of 'Laird Technologies' and the web address of www.lairdtech.com." *Id.* at 11. The Board explained that even if it were to assume the reference was available online on the "lairdtech.com" website that did not establish public accessibility because "there [wa]s no testimonial evidence that a person interested in … the content relied upon for the Petitioner's asserted challenges, would be independently aware of the web address of www.lairdtech.com as it appears on the front page of Laird." *Id.* at 12. The Board also stated "there [wa]s no evidence presented to support that the site had a search function which would allow one of ordinary skill in the art to find the Laird document with reasonable diligence once on the site. In other words, Petitioner d[id] not provide sufficient evidence that an ordinarily skilled artisan would have known about the "lairdtech.com" website or its web address. Nor d[id] Petitioner provide evidence that the website and/or the Laird document would have been

34

accessible through routine internet searches." *Id.* Accordingly, the presence of the website address on the reference did not establish the reference was sufficiently accessible to the public to constitute a printed publication within the meaning of 35 U.S.C. § 102(b). *See id.*

*Coalition for Affordable Drugs VIII, LLC v. Trustees of the University of Pennsylvania*, IPR2015-01836, Paper 58 (PTAB Mar. 6, 2017), is also on point. There, in a final written decision, the PTAB found that the Petitioner failed to demonstrate by a preponderance of the evidence that the challenged claims of the at-issue patent were unpatentable. As relevant here, the PTAB found that the petitioner had not met its burden to show that a set of slides supposedly authenticated by an affidavit of Christopher Butler of the Internet Archives was a printed publication for prior art purposes. Mr. Butler's affidavit contained a screenshot from the "Wayback Machine" showing a hyperlink to the slides that purportedly would have appeared on a website in April 2004. However, "there [wa]s no evidence as to what was at the hyperlink in 2004, and the hyperlink is defunct." *Id.* at 21. The PTAB concluded "that Petitioner ha[d] not met its burden of demonstrating by a preponderance of the evidence that the Stein slides constitute a printed publication." *Id.* at 22. *Coalition for Affordable Drugs* thus stands for the proposition that where, as here, a petitioner is relying on a document located through the use of the Wayback Machine as prior art, the petitioner has the

35

burden to show that a POSITA would have navigated to a webpage with a

hyperlink to the document and the hyperlink would have worked such that the

POSITA would have retrieved the document.

Under these legal principles, and as this Board preliminarily found,

Petitioner has failed to establish the Four-Steps Whitepaper was publicly

accessible prior to the December 22, 2004 priority date of the '593 patent.  With its

Petition, Petitioner submitted Ex. 1006A [Four-Steps], an Affidavit of Elizabeth

Rosenberg, a Records Request Processor at the Internet Archive, along with

Exhibit A, a copy of the Four-Steps Whitepaper with a coversheet containing the

following URL: https://web.archive.org/web/20030317051910/http:/

packeteer.com/PDF_files/4steps.pdf.  Without proving Ms. Rosenberg's

unavailability as a witness, and over Patent Owner's objection, Petitioner was

permitted to substitute the Declaration of Christopher Butler for that of Ms.

Rosenberg.  Even aside from the procedural impropriety[7] of allowing Petitioner to

---

[7] *See, e.g.*, *OpenSky Indus., LLC v. VLSI Tech. LLC*, IPR2021-01064, Paper

17, 5 (Dec. 23, 2021) ("Patent Owner argues that Petitioner relies on expert

declarations filed by Intel in another proceeding.  Accordingly, unless cross-

_____

examination is available, those declarations are hearsay in this proceeding."). So too here. Petitioner filed Ex. 1006A with its Petition on May 7, 2021. However, the Rosenberg Declaration has a date of August 17, 2020—even before the district court litigation was filed against Petitioner on March 15, 2021. That is because the Rosenberg Declaration was prepared for and filed in a different IPR proceeding which was subsequently terminated—*Palo Alto Networks v. Sable Networks, Inc.*, IPR2020-01712, Paper 6, EX1006 [Affidavit of Elizabeth Rosenberg dated August 17, 2020, along with Exhibit A, a copy of the Four-Steps Whitepaper] (Oct. 2, 2020). It is apparent that Petitioner simply copied and submitted the previously filed Rosenberg Declaration without inquiring as to Ms. Rosenberg's availability. Patent Owner should not suffer prejudice due to Petitioner's procedural misstep. Moreover, Petitioner did not even establish Ms. Rosenberg's unavailability as a witness within the technical definition of the term. Under Federal Rule of Evidence 802(a), there are specific criteria that must be met for a witness to be considered unavailable. Fed. R. Evid. 802(a). For example, a witness is unavailable if she "cannot be present or testify at the trial or hearing because of death of a then-existing infirmity, physical illness, or mental illness." *Id.*

37

Appx514

substitute one witness's testimony for that of another at this stage of the

proceeding, the Butler Declaration fares no better than the Rosenberg Declaration;

it, too, fails to establish that the Four-Steps Whitepaper was publicly available for

prior art purposes.

Mr. Butler states "Exhibit A are true and accurate copies of browser

printouts of the Internet Archive's records of the archived files for the URLs and

the dates specified in the footer of the printout or an attached coversheet (in the

case of records for which a browser does not provide a ready option to print a URL

in the footer, e.g., in the case of a PDF file)." Ex. 1006B [substituted Four-Steps]

i-ii. Petitioner argues the URL "reflect[s] that the publication was archived from

the Packeteer website on March 17, 2003." Pet., 16 (citing Ex. 1006 [original

Four-Steps] iv).

_____

802(a)(4). The fact that Ms. Rosenberg apparently was promoted to a Donations

Manager of the Internet Archive certainly does not make her unavailable as a

witness within Federal Rule of Evidence 802(a)(4), or any of the other definitions

set forth in the Rule. *See id.* 802(a)(1-5). There was no proper procedural basis for

Petitioner to substitute Mr. Butler's testimony for Ms. Rosenberg's testimony

without any showing of Ms. Rosenberg's unavailability.

38

This is insufficient to demonstrate public availability by a preponderance of evidence.  Even assuming, *arguendo*, it is all true, the fact Internet Archive may have electronically archived a copy of the Four-Steps Whitepaper on March 17, 2003 "does not, by itself, mean that [the Four-Steps Whitepaper] was sufficiently indexed on the [underlying] website or the Internet Archive.  Nor does it reveal anything about the search capabilities of the [] website or the Internet Archive, or why one with ordinary skill in the art would have even visited either website to find anything."  That is so even under the more forgiving standard of proof for institution, let alone the heightened standard applicable to IPR trials.  *E.g., Adobe Sys.*, IPR2018-00418, Paper 9, 9; *see Shenzhen Zhiyi Tech.*, IPR2017-02133, Paper 8, 11 ("the fact that the Internet Archive was able to access a document does not establish, without more, that the document was publicly accessible through traditional search engines, like Google or Yahoo, merely that it was accessible to the Internet Archive.").

Indeed, Petitioner has submitted nothing more than the *pro forma* Butler Declaration to allegedly establish the public accessibility of the Four-Steps Whitepaper.  Petitioner has not submitted "(1) any evidence that the reference was viewed or downloaded, (2) any testimony evidence that one of ordinary skill in the art would have been independently aware of the webpage, [or] (3) any evidence that a query of a search engine before the critical date, using any combination of

39

search words, would have led to the reference appearing in the search results."

*Google*, IPR2018-00384, Paper 11, 14-15.

Accordingly, as this Board panel already noted in the Institution Decision, Petitioner's evidence is not enough. *See* Institution Decision, 51-52. As the panel rightly explained, "even if we assume that an ordinary artisan was aware of the company (Packeteer) and its website," an assumption Patent Owner challenges and that has not been substantiated, as discussed below, "we query whether the Petition sufficiently shows that an ordinary artisan would have been able to locate the Four-Steps Whitepaper on that website with reasonable diligence." *Id.* at 51. The panel appropriately keyed in on the fact that Petitioner did not even attempt to argue in the Petition that "Packeteer's website included an index or search function that would have allowed an ordinary artisan to find this particular Whitepaper." *Id.*

Even assuming, for the sake of argument only, that Petitioner could appropriately introduce entirely new evidence and arguments on Reply to address the fatal infirmities in its Petition, which it should not since all the deficiencies in Petitioner's showing were foreseeable from the very onset of Petitioners' development of its grounds, there would be no point in doing so here. Indeed, as set forth in the Declaration of Erin McCracken (Ex. 2008), on the date the Internet Archive electronically archived a copy of the Four-Steps Whitepaper (March 17, 2003), the Packeteer.com website itself was not electronically archived. Ex. 2008

40

[McCracken Decl.] ¶ 5 (Packeteer.com was only archived on March 21 and 27 in March 2003; it was not archived on March 17, 2003). As a result, there is no way for Petitioner to show, as it had the burden to do, that on March 17, 2003, a POSITA could have navigated to the Packeteer.com website and located the Four-Steps Whitepaper with reasonable diligence. *See Elec. Frontier Found. v. Pers. Audio, LLC*, IPR2014-00070, Paper 21, 22 (April 18, 2014) (finding that a reference was not publicly available where "Petitioner's evidence show[ed] the earliest existing copy of the GotW, located using the 'Wayback Machine,' is dated December 20, 1996. Petitioner fail[ed] to provide any evidence that the GotW document … could be found anywhere other than directly through the URL.").

Moreover, it appears that March 17, 2003 is the only date on which the Internet Archive has archived the version of the Four-Steps Whitepaper on which Petitioner relies. Ex. 2008 [McCracken Decl.] ¶¶ 6-7. Based on this date, the Four-Steps Whitepaper cannot be deemed a printed publication for prior art purposes. Ground 3 of the Petition therefore fails.

There is no way for Petitioner to show by the requisite preponderance of the evidence that prior to the priority date of the '593 patent, the POSITA "could or would have taken [steps] to find … [the Four-Steps White Paper] where it was located on … [Packeteer's] website …." *See Schlumberger Tech.*, Paper 40, 17 (final written decision finding that a declaration from Christopher Butler stating

41

that a reference was available on the internet on a certain date did not establish the

public accessibility of the reference such that it did not qualify as a printed

publication for prior art purposes).

    In addition to all of the above, Petitioner has not shown this document was

***ever intended*** to be freely available to the public. As the Board correctly pointed

out in the Institution Decision, the Four-Steps White Paper on which Petitioner

relies states on its first page "that it may not be copied or downloaded without

Packeteer's 'express written consent' …." Institution Decision, 52. As the Board

explained, this sort of statement further "cast[s] doubt on whether Packeteer made

this document available to the public." *Id.* Indeed, the Board has previously found

that a datasheet was not publicly available, relying in part on a copyright statement

restricting dissemination: "This book or any part or parts thereof, must not be

reproduced in any form without permission of the copyright owner." *Power*

*Integrations, Inc. v. Semiconductor Components Indus., LLC*, IPR2017-01975,

Paper 9, 14 (Mar. 12, 2018) (denying institution of *inter partes* review). Without

any testimony from a Packeteer employee with personal knowledge of the Four-

Steps Whitepaper and whether it was made available to the public during the

relevant time period, the only evidence in the record is the explicit statement on the

first page of the Whitepaper evidencing that its dissemination was restricted. For

this reason too, Petitioner has not shown and cannot show that the Four-Steps

Whitepaper qualifies as a printed publication for prior art purposes.

In the Petition, Petitioner further asserts, based on hearsay, that "Packeteer

was a publicly traded company and a known leader in this industry." Pet., at 16.

To support its assertion, Petitioner relies on Exhibit 1031, a "PacketShaper Family

Datasheet" which states that "Seventy-four percent of the world's largest

companies rely on Packeteer® innovation to solve their WAN application

performance problems." Ex. 1031. Although Petitioner's expert also claims that

"Packeteer was an industry leader," he too relied on Ex. 1031, a 2006 document,

for that proposition. Ex. 2007 [Jeffay Transcript] 45:18-46:10. Likewise,

Petitioner's expert states that "seventy-four percent of the world's largest

companies rely on Packeteer® innovation to solve their WAN application

performance problems." Ex. 1003 [Jeffay Declaration] ¶ 42. But Petitioner again

relies on Ex. 1001 for that proposition. *Id. See also* Ex. 2007 [Jeffay Transcript]

46:22-47:7. However, as the Board already noted in the Institution Decision,

Exhibit 1031 bears a copyright date of 2006—three years after the priority date of

the '593 patent, and so does not demonstrate public availability of the cited art

before the patent's priority date. *See* Institution Decision, 51 ("[T]his exhibit

includes a 2006 copyright date, which causes us to question whether Packeteer was

known to an ordinary artisan in the relevant timeframe.") (citations omitted).

43

Finally, Petitioner's reliance on Exhibit 1032 to establish the alleged public accessibility of the Four-Steps Whitepaper also fails.  Exhibit 1032 is offered to allegedly show that the "Four-Steps Whitepaper provides a product overview for the PacketShaper®, which was a product of Packeteer known to a POSITA during the relevant timeframe, and Yung is a Packeteer patent."  Pet., 62.  But Exhibit 1032 on its face references a different version of the Four-Steps Whitepaper than the reference that was submitted by Petitioner as Exhibit 1006.  *See* Ex. 1032 [Boniforti] 8 (stating that "A partition '…creates a virtual separate pipe for a traffic class' (Four Steps Packeteer, p. 5).")  Page 5 of Exhibit 1006 submitted by Petitioner as the Four-Steps Whitepaper does not contain this phrase, so Exhibit 1032 is quoting an unknown document that is not the same as the Four-Steps Whitepaper.  Accordingly, as the Board already noted in the Institution Decision, and "as Patent Owner observes, the referenced paper [in Exhibit 1032] appears to be a different document.  Specifically, the URL for the introductory paper and the Four-Steps Whitepaper are different … , and at least one quote is different …."  Institution Decision, 51 (citations omitted).  Moreover, Exhibit 1032 itself is a "Global Information Assurance Certification Paper" which states on its first page: "Copyright SANS Institute Autor Retains Full Rights This paper is taken from the GIAC directory of certified professionals.  Reposting is not permitted without express written permission."  Ex. 1032, 1.  Accessing this paper required a paid

44

subscription to the SANS Institute and/or GIAC Certifications.  As a result, Exhibit

1032, which references a different unknown version of the Four-Steps Whitepaper,

and was itself not a publicly available document, does not aid Petitioner in

establishing the public availability of the Whitepaper.

Accordingly, Petitioner has failed to carry its burden to show by a

preponderance the evidence that the Four-Steps Whitepaper was publicly

accessible qualified prior art.  Ground 3 of the Petition which relies on the Four-

Steps Whitepaper therefore fails.

## VII.    CONCLUSION

For at least the foregoing reasons, the Board should deny the Petition and

confirm the patentability of the challenged claims.


Respectfully submitted,


_____/ Kenneth J. Weatherwax / _____
Kenneth J. Weatherwax, Reg. No. 54,528
LOWENSTEIN & WEATHERWAX LLP
Date:  March 14, 2022


45

Case IPR2021-00909
U.S. Pat. No. 8,243,593

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS

This Patent Owner Response (the "POR") consists of 10,313 words,

excluding table of contents, table of authorities, certificate of service, this

certificate, or table of exhibits.  The POR complies with the type-volume limitation

of 14,000 words as mandated in 37 C.F.R. § 42.24.  In preparing this certificate,

counsel has relied on the word count of the word-processing system used to

prepare the paper (Microsoft Word).


Respectfully submitted,

/ Colette Woo /

_____


Date:  March 14, 2022

Case IPR2021-00909
U.S. Pat. No. 8,243,593

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the following documents were served

by electronic service, on the date signed below:

### PATENT OWNER'S RESPONSE

### EXHIBITS 2007-2009

The names and address of the parties being served are as follows:

| | |
|---|---|
| James L. Day | jday@fbm.com |
| Daniel Callaway | dcallaway@fbm.com |
| Winston Liaw | wliaw@fbm.com |
| | calendar@fbm.com |

Respectfully submitted,

/ Colette Woo /

_____

Date:  March 14, 2022

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

CLOUDFLARE, INC. and
SPLUNK INC.,
Petitioners,

v.

SABLE NETWORKS, INC.
Patent Owner.

_____

IPR2021-00909[1]
Patent 8,243,593 B2

_____

**PETITIONERS' REPLY TO PATENT OWNER'S RESPONSE**

---

[1]  Splunk, Inc., which filed a petition in IPR2022-00228, has been joined as a
petitioner in this proceeding.

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    COPELAND'S "CONCERN INDEX" CONSTITUTES A
       "BADNESS FACTOR" AS RECITED IN THE '593 PATENT...................2

       A.    Petitioners' Unrebutted Evidence Establishes That Copeland's
             "Concern Index" Constitutes a "Badness Factor"..................................2

       B.    There Is No Indefiniteness Argument Before the Board .....................4

       C.    Copeland's "Concern Index" Indicates "Undesirable Behavior" .........7

       D.    The Claims Do Not Require Calculating a "Badness Factor" for
             "Each" Flow ........................................................................................8

III.   PETITIONERS' UNREBUTTED EVIDENCE ESTABLISHES
       MOTIVATION TO COMBINE YUNG AND COPELAND ........................9

IV.    THE FOUR-STEPS WHITEPAPER WAS PUBLICLY
       ACCESSIBLE .........................................................................................14

       A.    Petitioners' Supplemental Evidence Further Confirms That the
             Four-Steps Whitepaper Was Publicly Available ................................18

             1.    The Four-Steps Whitepaper Was Publicly Accessible Via
                   the Packeteer Website ................................................................19

             2.    The Four-Steps Whitepaper and the Packeteer Website
                   Were Cited in Prior Art Patents and Publications ...................22

             3.    The Board Should Not Ignore Petitioners' Supplemental
                   Evidence ....................................................................................24

       B.    Patent Owner's Attorney Declaration Does Not Dispute
             Petitioners' Evidence of Public Accessibility ....................................25

V.     CLAIMS 17, 18, 37, AND 38 ARE PART OF GROUND 2 ......................26

VI.    CONCLUSION .........................................................................................29

Appx529

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Federal Court Cases**

*AstraZeneca AB v. Mylan Pharmaceuticals Inc.*,
   19 F.4th 1325 (Fed. Cir. 2021) ..............................................................7

*Blue Calypso, LLC v. Groupon, Inc.*,
   815 F.3d 1331 (Fed. Cir. 2016) ...........................................................23

*Cochlear Bone Anchored Sols. AB v. Oticon Medical LLC*,
   958 F.3d 1348 (Fed. Cir. 2020) .............................................................4

*Enzo Biochem Inc. v. Applera Corp.*,
   599 F.3d 1325 (Fed. Cir. 2010). ............................................................5

*Everstar Merch. Co. Ltd. v. Willis Elec. Co. Ltd.*,
   No. 2021-1882, 2022 WL 1089909 (Fed. Cir. Apr. 12, 2022)...........16

*GoPro, Inc. v. Contour IP Holding LLC*,
   908 F.3d 690 (Fed. Cir. 2018) ......................................................15, 17

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
   340 F.3d 1314 (Fed. Cir. 2003) .............................................................9

*Intel Corp. v. Qualcomm Incorp.*,
   21 F.4th 801 (Fed. Cir. 2021) ................................................................4

*Jazz Pharm., Inc. v. Amneal Pharm., LLC*,
   895 F.3d 1347 (Fed. Cir. 2018) ....................................................17, 26

*In re Carol. F. Klopfenstein*,
   380 F.3d 1345 (Fed. Cir. 2004) ...........................................................26

*KSR Int'l. Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007)..............................................................................13

*In re Magnum Oil Tools Int'l, Ltd.*
   829 F.3d 1364 (Fed. Cir. 2016) ...........................................................27

*Meiresonne v. Google, Inc.*,
    849 F.3d 1379 (Fed. Cir. 2017) .......................................................................13

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ..........................................................................................5

*Samsung Elecs. Am., Inc. v. Prisua Eng'g. Corp.*,
    948 F.3d 1342 (Fed. Cir. 2020) .........................................................................4

*Sirona Dental Sys. GMBH v. Institut Straumann AG*,
    892 F.3d 1349 (Fed. Cir. 2018) .......................................................................27

*SRI Int'l. Inc. v. Internet Sec. Sys., Inc.*,
    511 F.3d 1186 (Fed. Cir. 2008) .......................................................................15

*Suffolk Techs., LLC  v. AOL Inc.*,
    752 F.3d 1358 (Fed. Cir. 2014) .......................................................................16

*Valve Corp. v. Ironburg Inventions Ltd.*,
    8 F.4th 1364 (Fed. Cir. 2021) .................................................16, 17, 22, 24

*VidStream LLC v. Twitter, Inc.*,
    981 F.3d 1060 (Fed. Cir. 2020) .......................................................................24

## Patent Trial and Appeal Board Decisions

*Align Technology v. 3Shape*,
    IPR2020-01087, Paper 38 (PTAB Jan. 19, 2022) ...............................................5

*Amperex Technology v. LG Chem.*,
    IPR2018-00783, Paper 8 (PTAB Sept. 19, 2018)..............................................28

*Axonics v. Medtronic*,
    IPR2020-00713, Paper 42 (PTAB Sept. 22, 2021)............................................28

*Coalition for Affordable Drugs VIII v. Univ. Penn.*,
    IPR2015-01836, Paper 58 (PTAB Mar. 6, 2017).......................................21, 22

*DJI Europe v. Daedalus Blue*,
    IPR2020-01472, Paper 31 (PTAB Feb. 14, 2022)...............................................5

*Dr. Reddy's Laboratories v. Horizon Pharma USA*,
    IPR2018-00272, Paper 35 (PTAB Mar. 28, 2019)..............................................7

Appx531

*Dr. Reddy's Laboratories v. Horizon Pharma USA*,
 IPR2018-00272, Paper 74 (PTAB Sept. 6, 2019)....................................5

*Facebook v. Sound View Innovations*,
 IPR2017-00985, Paper 17 (PTAB Sept. 5, 2017)..................................6

*Fanduel v. Cg Tech. Dev.*,
 IPR2017-00902, Paper 45 (PTAB Oct. 4, 2018)..................................24

*Grünenthal v. Antecip Bioventures II*,
 PGR2018-00092, Paper 24 (PTAB Feb. 24, 2020)...............................17

*IBM v. Rigetti & Co.*,
 IPR2020-00494, Paper 13 (PTAB Aug. 11, 2020)..............................28

*IBM v. Trusted Knight*,
 IPR2020-00323, Paper 37 (June 30, 2021).........................................28

*Japan Radio v. Broadcom*,
 IPR2019-00816, Paper 34 (PTAB Aug. 28, 2020)..............................22

*Netapp v. KOM Software*,
 IPR2019-00606, Paper 37 (PTAB Sept. 23, 2020)..............................28

*Nippon Suisan Kaisha v. Pronova Biopharma Norge*,
 PGR2017-00033, Paper 37, and 12 (PTAB Jan. 16, 2019)................28

*Schlumberger Technology v. Integrated Drive Systems*,
 IPR2018-00603, Paper 40 (PTAB Sept. 3, 2019)................................22

*Target v. Proxicom Wireless*,
 IPR2020-00904, Paper 11 (PTAB Nov. 10, 2020)................................5

*Veeam Software v. Symantec*,
 IPR2013-00142, Paper 11 (PTAB Aug. 7, 2013)................................15

*Zillow Group v. IBM*,
 IPR2020-01655, Paper 8 (PTAB Mar. 15, 2021)..................................5

## Federal Statutes

35 U.S.C. § 102..............................................................................5, 17, 20

35 U.S.C. § 112........................................................................................6

iv

Appx532

## Federal Rules and Regulations

37 C.F.R. § 42.104(b)(3)..............................................................................................6

v

# I.     INTRODUCTION

After institution, Patent Owner voluntarily disclaimed 17 challenged claims. The remaining claims are addressed in Grounds 2 and 3:

| Ground | Challenged Claims | Prior Art |
|:---:|---|---|
| 2 | Independent claim 9 with dependent claims 10-13 and 17-24, and independent claim 29 with dependent claims 30-33 and 37-44[2] | Yung and Copeland |
| 3 | Independent claim 3 | Yung and Four-Steps Whitepaper |

Patent Owner's response largely recycles arguments the Board rejected in its Institution Decision attempting to distinguish Copeland's "concern index" from the claimed "badness factor" and suggesting that there is no motivation to combine Yung and Copeland.  Notably, Patent Owner offers no expert declaration to support its various assertions about what a POSA would or would not have known, understood, or been motivated to do.  In contrast, Petitioners' expert Dr. Jeffay provides detailed and well-supported testimony explaining (1) why Copeland's

---

[2]     As the Institution Decision recognized, due to a typographical error dependent claims 17, 18, 37, and 38 appeared in the petition's section addressing Ground 1 rather than Ground 2 where they logically and clearly belong—and as Cloudflare immediately confirmed to Patent Owner.  *See* Section V, below.

"concern index" discloses the claimed "badness factor" to a POSA, and (2) why a POSA would have been motivated to combine Yung's bandwidth management device with Copeland's "concern index" teachings and how such a person would have done so. The record evidence is not even close.

Regarding Ground 3, Patent Owner relies on flawed evidence in an attorney declaration to argue that the Four-Steps Whitepaper was not publicly accessible. In contrast, Petitioner provides clear evidence showing how a POSA, exercising no more than reasonable diligence, could have obtained the whitepaper from the Packeteer website in the relevant timeframe.

## II. COPELAND'S "CONCERN INDEX" CONSTITUTES A "BADNESS FACTOR" AS RECITED IN THE '593 PATENT

### A. Petitioners' Unrebutted Evidence Establishes That Copeland's "Concern Index" Constitutes a "Badness Factor"

Patent Owner argues that the petition cites "no evidence except the *ipse dixit* in the accompanying declaration" of Dr. Jeffay, quoting a single sentence from the declaration and ignoring Dr. Jeffay's actual testimony. Paper 30 ("POR") at 17. Dr. Jeffay noted that the '593 Patent does not define the term "badness factor" but includes a description and examples in the specification. EX1003 ¶208.[3] He

---

[3]  One of the examples of a "badness factor" is a ratio based on the total byte count. EX1003 ¶208 (citing EX1001, Fig. 5). Similarly, Copeland discloses an

explained that Copeland discloses *computing a badness factor for the flow* as claimed, because it describes analyzing flow statistics to determine if the flow appears to be "legitimate traffic or possible suspicious activity" and assigning a "concern index" value to flows that appear suspicious. EX1003 ¶209 (citing EX1007, 3:31-35, 18:16-17, 26:24-26). Dr. Jeffay then explained that "[j]ust as the *badness factor* in the '593 patent is a calculated value that indicates a level of misbehavior attributable to a flow, Copeland's CI value is assigned to the flow based on the behavior recognized by the system." EX1003, ¶210. Further, he explained that the concern index *provides an indication of whether the flow is exhibiting undesired behavior* as claimed. EX1003, ¶211. Copeland explicitly states that the "concern index" indicates whether the flow exhibits "suspicious activity"—in other words, it is *an indication of whether the flow is exhibiting undesirable behavior.* EX1003, ¶211; *see also id.* (Copeland contrasts such "suspicious activity" with "legitimate traffic"). Dr. Jeffay's opinion is well-reasoned and well-supported by the evidence. EX1003 ¶¶208-214; EX2007, 35:17-38:2.

---

exemplary "concern index" based on total byte count. EX1007, Fig. 6; EX1003 ¶213.

3

Furthermore, Dr. Jeffay's opinion is unrebutted by any contrary evidence. Patent Owner offers only attorney argument in response.

## B.     There Is No Indefiniteness Argument Before the Board

Patent Owner asserts that because Cloudflare has argued in district court that the term "badness factor" is indefinite, Petitioners cannot maintain obviousness arguments for challenged claims including that term.  POR at 18.  Patent Owner's argument is legally incorrect.  The Board can invalidate a claim as obvious even if it is also indefinite.  *See Samsung Elecs. Am. v. Prisua Eng'g*, 948 F.3d 1342, 1355 (Fed. Cir. 2020); *Cochlear Bone Anchored Solutions v. Oticon Medical LLC*, 958 F.3d 1348 (Fed. Cir. 2020) (reversing Board's refusal to conduct prior art invalidity analysis of an indefinite claim).  Indeed, "[t]he indefiniteness of a limitation…precludes a patentability determination *only* when the indefiniteness renders it *logically impossible* for the Board to reach such a decision." *Intel v. Qualcomm*, 21 F.4th 801, 813 (Fed. Cir. 2021).[4]  Patent Owner does not even suggest that it is logically impossible for the Board to adjudicate Petitioners' prior

---

[4]   All emphasis is added unless otherwise indicated.

art challenges on the merits.[5]

The Board regularly reaches the merits even where a petitioner argues that the challenged claims are indefinite in related district court litigation. *See, e.g.*, *DJI Europe v. Daedalus Blue*, IPR2020-01472, Paper 31 at 17, 19 (PTAB Feb. 14, 2022); *Align Technology v. 3Shape*, IPR2020-01087, Paper 38 at 8, 40-41 (PTAB Jan. 19, 2022) (finding claim obvious even though it had already been held indefinite in district court); *Zillow Group v. IBM*, IPR2020-01655, Paper 8 at 12 (PTAB Mar. 15, 2021) (rejecting patent owner's argument that "we may not assess the patentability of claims under § 102 in an *inter partes* review merely because the Petitioner pled that the claims are indefinite in District Court"); *Target v. Proxicom Wireless*, IPR2020-00904, Paper 11 at 12 (PTAB Nov. 10, 2020); *Dr.*

---

[5] Patent Owner cites *Enzo Biochem v. Applera*, in which the court stated that the claims at issue could not be both indefinite and anticipated. 599 F.3d 1325, 1332 (Fed. Cir. 2010). The *Enzo* court's statement was based on the premise that "[i]f a claim is indefinite, the claim, by definition, cannot be construed," which was the legal standard for indefiniteness later overruled in *Nautilus v. Biosig Instruments*, 572 U.S. 898, 901 (2014) (rejecting standard requiring claims to be "amenable to construction" and not "insolubly ambiguous" to be sufficiently definite).

5

*Reddy's Laboratories v. Horizon Pharma USA*, IPR2018-00272, Paper 74 at 12-13 (PTAB Sept. 6, 2019).

Patent Owner's reliance on *Facebook v. Sound View Innovations*, IPR2017-00985, Paper 17 (PTAB Sept. 5, 2017), is misplaced. In that pre-*SAS* proceeding, the Board denied institution of several challenged claims because the petition identified a means-plus-function claim term without also identifying any corresponding structure. *Id*. at 13-14 ("The analysis of Petitioner's arguments regarding claims 1-3 begins and ends with Petitioner's failure to provide constructions of the claim terms including 'controller' under 35 U.S.C. § 112, ¶6…."); *see also* 37 C.F.R. § 42.104(b)(3). Contrary to Patent Owner's argument here, the Board instituted review of several claims in *Facebook* even though the petitioner was simultaneously arguing in district court that those claims were indefinite. IPR2017-00985, Paper 17 at 14 fn.3.

Dr. Jeffay explained during his deposition that while a POSA might not understand the "bounds" of the term, "Copeland's recitation of what it refers to as…measures of suspicious activity would certainly qualify as a badness factor."

6

EX2007 at 36:2-15.[6]  Dr. Jeffay did not form an opinion as to the full scope of

what might qualify as a "badness factor"—and Petitioners have not proposed a

specific definition here—because it was unnecessary to do so.  *Dr. Reddy's*

*Laboratories v. Horizon Pharma USA*, IPR2018-00272, Paper 35 at 6 (PTAB Mar.

28, 2019) ("***[W]e need not necessarily determine the outer boundaries of a claim***

in reaching a conclusion as to whether the asserted prior art anticipates a claim or

renders it obvious."); *AstraZeneca v. Mylan Pharmaceuticals*, 19 F.4th 1325, 1345

(Fed. Cir. 2021) ("Claims must be construed 'only to the extent necessary to

resolve the controversy.'"; citation omitted).  Copeland's "concern index" easily

qualifies as a "badness factor" based on its similarity to the descriptions and

examples in the '593 Patent, as shown by Petitioners' unrebutted evidence.

EX1003, ¶¶208-214; EX2007, 35:17-38:2.

### C.    Copeland's "Concern Index" Indicates "Undesirable Behavior"

Patent Owner argues that Copeland does not teach the claimed "badness

factor" because that term is "concerned with 'undesirable' behavior or

'misbehavior' associated with P2P traffic, which, unlike the host activity assigned

---

[6]    While the term "badness factor" is subjective, Copeland's illustration of the

disclosed invention explicitly identifies "***'Bad' Flow(s)*** & Other Concern Index

Events."  EX1007, Fig. 1.

a concern index value by Copeland, is ***not*** necessarily suspicious or non-suspicious." POR at 21 (emphasis in original). But Patent Owner has not argued here or in district court that the "badness factor" is somehow limited to P2P traffic. EX2009, 28 (arguing the term "badness factor" "do[es] not require construction" and should have its "plain and ordinary meaning"); EX1096, 23-26 (Patent Owner's claim construction brief addressing the term "badness factor" without mentioning P2P traffic). Moreover, as the Institution Decision notes, Patent Owner's argument "flips the analysis." Paper 16 ("ID") at 44. The relevant question is whether Copeland's "concern index" discloses the claimed "badness factor"—*i.e.*, whether Copeland's suspicious activity indicates "undesirable" behavior—not whether the claimed "undesirable" activity associated with the "badness factor" is suspicious.

### D.    The Claims Do Not Require Calculating a "Badness Factor" for "Each" Flow

Patent Owner argues that Copeland's "concern index" cannot constitute the claimed "badness factor" because it "is not computed on a per-flow basis." POR at 22. While Patent Owner cites passages in Copeland that suggest the "concern index" is only calculated for suspicious flows, it simply ignores Copeland's explicit statement that "a value called the 'concern index' is calculated or otherwise determined for ***each flow*** …." EX1007, 18:15-19.

8

In any event, as noted in the Institution Decision, Patent Owner's argument that the claimed "badness factor" must be assigned to "*each* flow…is not commensurate with the scope of the claim."  ID at 44 (emphasis in original).  Patent Owner argues that claims 9 and 29 recite such a limitation but identifies no particular claim language and instead quotes the patent specification stating that a "badness factor" is computed for "*the* flow."  POR at 23.  Nowhere does the '593 Patent state that a "badness factor" is calculated for "*each* flow" as Patent Owner asserts.[7]

## III.    PETITIONERS' UNREBUTTED EVIDENCE ESTABLISHES MOTIVATION TO COMBINE YUNG AND COPELAND

Petitioners explained, based on specific evidence, the motivation to incorporate Copeland's flow-based "concern index" teachings into Yung's bandwidth management device.  Pet. at 45-48; EX1003 ¶¶196-205.  Yung expressly contemplates incorporating "other factors" into its process, and a POSA would have sought to classify traffic behaving suspiciously or disruptively.  Pet. at 45; EX1003 ¶¶196-198.  A POSA would have recognized that incorporating

---

[7]    As also noted in the Institution Decision, prior art "that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention."  *Hewlett-Packard v. Mustek Systems*, 340 F.3d. 1314, 1326 (Fed. Cir. 2003).

Copeland's "concern index" would enhance Yung's ability to identify and control unauthorized traffic including network attacks and probes, which were well-known concerns, while obviating the need for an administrator to understand the complex nature of network attacks. Pet. at 45-47; EX1003 ¶¶199-202. Further, Petitioners supplied detailed evidence explaining how a POSA would have combined Copeland and Yung with a reasonable expectation of success. Pet. at 47-48; EX1003 ¶¶203-204.

Patent Owner argues that the motivation to combine Yung and Copeland "stems (entirely) from Yung's statement that its 'application behavior pattern can incorporate other factors as well.'" POR at 25; *see also* ID at 46 (rejecting the same argument). Patent Owner claims that Petitioners' expert witness confirmed this in deposition. But Patent Owner selectively cites only part of Dr. Jeffay's answer concerning a single paragraph in his declaration, while omitting the rest of his answer stating that "***the full picture of the motivation to combine is developed over the following several pages.***" EX2007, 38:11-20; *see also* EX1003 ¶¶197-205. Patent Owner's counsel then elicited from Dr. Jeffay even more support for his opinion that a POSA would have been motivated to combine Yung and Copeland. EX2007, 38:21-40:11; *see also id.*, 14:10-19:18. The motivation to combine stretches considerably beyond Yung's statement, as Petitioners' evidence shows.

10

Patent Owner also argues that there is no motivation to combine because "Copeland is directed to collecting self-reported flow information from packet headers" rather than behavioral statistics. POR at 26-27. This argument fails, as the Board noted in the Institution Decision, because Copeland describes storing flow "statistics" including the number of bytes and the number of packets in a flow, both of which are examples of "behavioral statistics" identified in the '593 Patent. EX1007, 3:18-35, 16:65-17:2; *see also* EX1001, 6:11-14 (stating that "total byte count" is a behavioral statistic), Fig. 4 (identifying number of packets as a behavioral statistic).

Patent Owner asserts that Dr. Jeffay confirmed in his deposition that "Copeland does not disclose collecting flow data from any source other than packet headers" (POR at 27), which is contradicted by his actual testimony. In the cited testimony, Dr. Jeffay confirmed that "use of information in the headers is ***primarily*** what I'm relying on" but added that Copeland also "talk[s] about packet length," which is not included in certain types of packet headers. EX2007, 40:19-42:11. He also explained, however, that information contained in packet headers can provide "behavioral statistics," as a POSA would have recognized, and that, "at the end of the day, Copeland is really about the concept of extracting data from packets, either in headers or measures of packets, and computing an index that is some

11

Appx544

representation of the degree to which the packet is part of an undesirable flow." *Id.*, 42:12-43:8.

Copeland discloses collecting and using behavioral statistics based on non-header information (e.g., byte count, packet count) as well as statistics based on header information to identify suspicious behavior. As an example of the latter, Copeland's Figure 6 explains that a flow with "Multiple Packets from Same Source Port to Different Destination Ports" may indicate a "TCP Stealth Port Scan." EX1007, Fig. 6. Because port numbers are in packet headers (*id.*, 9:12-15), the behavior of a flow originating from one port and targeting multiple ports is a "behavioral statistic" based on header information.

At bottom, the distinction between header and non-header information is immaterial because—contrary to Patent Owner's implicit assertion—the term "behavioral statistics" does not exclude header information. Patent Owner certainly has not proposed such a claim construction here or in district court. EX1096 at 27-28. Thus, Patent Owner's attempt to draw a distinction between Yung, which itself collects flow data based on header information (*e.g.*, EX1005, 12:12-24), and Copeland merely because Copeland collects certain flow data from packet headers is not tied to the scope of the challenged claims. Further, Patent Owner's response itself notes that Yung collects "behavioral data" that includes "packet count [and] byte count" (POR at 27), which are also collected by Copeland (EX1007, 3:18-35,

16:65-17:2, Fig. 6), confirming that both references disclose collecting the same types of "behavioral statistics" without regard to the specific source.

Finally, Patent Owner argues that Copeland and Yung are directed to different inventions. POR at 27-28. Patent Owner does not specifically argue that either reference teaches away from the other. *See Meiresonne v. Google*, 849 F.3d 1379, 1382 (Fed. Cir. 2017) ("A reference teaches away 'when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken' in the claim."). Indeed, Patent Owner does not even explain how the purported differences would be relevant to a POSA.[8] In contrast, Petitioners' expert Dr. Jeffay explained in detail why and how a POSA would have modified Yung's bandwidth management device to incorporate Copeland's "concern index" teachings. EX1003 ¶¶196-205. His detailed and well-supported expert opinion that a POSA would have been motivated to combine Yung and Copeland stands unrebutted.

---

[8] Patent Owner's implicit argument that references addressing different problems cannot be combined was rejected in *KSR Int'l v. Teleflex*, 550 U.S. 398, 420 (2007).

13

## IV.    THE FOUR-STEPS WHITEPAPER WAS PUBLICLY ACCESSIBLE

Petitioner cited the Four-Steps Whitepaper (EX1006) for one limitation of claim 3.  Pet. at 61-62.  Patent Owner does not dispute that the whitepaper discloses the claim limitation or that a POSA would have been motivated to combine it with Yung.  Instead, Patent Owner argues only that the Four-Steps Whitepaper was not publicly accessible.  The Board found at institution that the whitepaper was on Packeteer's website as of March 17, 2003 (which Patent Owner does not dispute), but questioned whether it was publicly accessible and stated that the determination would be made "with the benefit of the full record."  ID at 49, 52.

The full record confirms that the Four-Steps Whitepaper was publicly accessible—indeed, the whitepaper itself suggests as much.  Contrary to Patent Owner's incorrect assertion, the Four-Steps Whitepaper *does not* state on the first page "that it may not be copied or downloaded without Packeteer's 'express written consent'…."  POR at 42.  The footer instead states that the document is copyrighted and prohibits such things as "photocopying" or "storing on a retrieval system"—common limitations for copyrighted works that are freely available to the public—and says nothing to prohibit "downloading" it.  EX1006, 1.  The copyright notice suggests that the document was publicly accessible to people who could otherwise make photocopies, store the document in a retrieval system, etc.;

14

otherwise the notice would be unnecessary.  *See Veeam Software v. Symantec*, IPR2013-00142, Paper 11 at 11-12 (PTAB Aug. 7, 2013) ("The prohibition against unauthorized copying (like a copyright notice) does not prove the document was not publicly available.  It indicates the opposite, as there would be no need for such a warning if the document were not disseminated.").[9]

Further, the Four-Steps Whitepaper is a promotional document describing Packeteer's PacketShaper product.  EX1006, 3 ("This paper … serves as a technical product overview for the PacketShaper product line."); *id.* ("Today's enterprises require performance, predictability, and consistency from their networks and the applications that traverse them.  And that's precisely what PacketShaper® from Packeteer delivers."); *id.* ("PacketShaper is available in a variety of models based on capacity and features.  For more detail, see *Deployment – When and Where* later in this paper."); *see also SRI Int'l v. Internet Sec. Sys.*, 511 F.3d 1186, 1196 (Fed. Cir. 2008) (an "intent to publicize" is a factor "involved in the public accessibility determination"); *GoPro v. Contour IP Holding*, 908 F.3d 690, 694 (Fed. Cir. 2018) (product catalog distributed at trade show was prior art because "a trade show is directed to individuals interested in the

---

[9]   In contrast to several cases cited by Patent Owner, Petitioner is not relying on the copyright date alone to establish that the whitepaper is prior art.

15

commercial and developmental aspects of products").  The Four-Steps Whitepaper "is intended for system and network administrators in organizations that manage their own applications and network performance."  EX1006 at 3.  And the whitepaper concludes with the following invitation, further confirming the public, promotional nature of the document:

> *If you'd like more information* about PacketShaper or to order
> PacketShaper, consult Packeteer's web site or call [Packeteer's local
> or toll free telephone number].

EX1006, 30.  "[W]here a publication's purpose is 'dialogue with the intended audience,' that purpose indicates public accessibility."  *Valve v. Ironburg Inventions*, 8 F.4th 1364, 1374 (Fed. Cir. 2021) (citing *Suffolk Techs. v. AOL*, 752 F.3d 1358, 1365 (Fed. Cir. 2014)).[10]

---

[10]  The author of the Four-Steps Whitepaper confirms that it was a promotional document that was on Packeteer's website as of October 2002 and was broadly distributed to potential PacketShaper customers.  EX1098, ¶¶6-10.  The Board should consider the author's declaration because it presents evidence that directly responds to evidence and arguments in Patent Owner's response.  *See, e.g.,* POR at 42; *see also Everstar Merch. v. Willis Elec.*, 2022 WL 1089909, at *4 (Fed. Cir. Apr. 12, 2022) ("Any ambiguity as to whether a reply constitutes a new argument is eliminated when the reply is a legitimate reply to arguments

16

Packeteer's PacketShaper product would have been of interest to a POSA implementing Yung's bandwidth management device because Yung explicitly identifies PacketShaper as an existing bandwidth management device capable of identifying different types of network traffic. EX1005, 4:47-51. A POSA would have been aware of Packeteer and its products. EX1003, ¶¶41-43; EX2007, 45:21-48:19, 52:17-54:7. Given Yung's suggestion, a POSA could simply visit the Packeteer website, locate product information about PacketShaper, and access the Four-Steps Whitepaper describing it. *See GoPro*, 908 F.3d at 693 ("We have interpreted § 102 broadly, finding that even relatively obscure documents qualify as prior art so long as the relevant public has a means of accessing them.") (citing *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1354–60 (Fed. Cir. 2018)); EX1098, ¶9 (confirming whitepaper was available without access control on the Packeteer website).

---

introduced in a patent owner's response or the Board's institution determination."); *Valve*, 8 F.4th at 1370 n. 6; *Grünenthal v. Antecip Bioventures II*, PGR2018-00092, Paper 24 at 3 (PTAB Feb. 24, 2020) ("The standard is not whether Petitioner could have raised the arguments or evidence in the Petition, but whether they respond to arguments raised by Patent Owner."). That said, Petitioners' evidence is sufficient even without it.

17

### A.     Petitioners' Supplemental Evidence Further Confirms That the Four-Steps Whitepaper Was Publicly Available

Following institution, Patent Owner filed objections to evidence arguing that the Four-Steps Whitepaper was not authenticated and not shown to be prior art. Paper 18 at 3.  Petitioner timely served supplemental evidence confirming both that the Four-Steps Whitepaper (EX1006)[11] is an authentic copy of a document on the Packeteer website in 2003 and that it qualifies as prior art.  EX1081-EX1095.

---

[11]  Patent Owner complains at some length about the Board's order permitting Petitioner to substitute a virtually identical Internet Archive authenticating declaration (Butler) for the original Internet Archive authenticating declaration (Rosenberg).  *See* Paper 23 at 2 ("[W]e authorize Petitioner to substitute Ms. Rosenberg's declaration with Mr. Butler's declaration, provided that Mr. Butler's declaration is identical in all relevant respects (i.e., other than the declarant's name, job title, and location).").  Patent Owner omits that after forcing the issue by demanding a deposition of the authenticating declarant, Patent Owner unilaterally canceled the deposition three days before its scheduled date.  EX1097 ¶20; EX1103.

18

Appx551

### 1.    The Four-Steps Whitepaper Was Publicly Accessible Via the Packeteer Website

Yung is a Packeteer patent and explicitly identifies the PacketShaper product described in the Four-Steps Whitepaper.  EX1005, 4:46-51.  Petitioners' expert Dr. Jeffay provided a supplemental declaration showing how a POSA could have located the Four-Steps Whitepaper using the Packeteer website in early 2003.  EX1093 ¶¶2-8; *see also* EX1081 (Internet Archive authenticating declaration).  Dr. Jeffay accessed an archived version of the Packeteer Home Page captured in February 2003.  The website had a menu-bar with a link to "Products."  EX1093 ¶3.



**EX1081, 5 (annotated)**

Dr. Jeffay clicked "Products" to access the Products Page, which had a link titled "PacketShaper."  EX1093 ¶5.[12]



**EX1081, 7 (annotated)**

Dr. Jeffay clicked "PacketShaper" to access the PacketShaper Page, which had several links under the heading "White Papers."  EX1093 ¶6.  First in that list was "Four Steps to Application Performance," which linked to the Four-Steps Whitepaper (EX1006).  *Id*. ¶¶6-7.

---

[12]  While Patent Owner questions whether Packeteer's website had a search feature, the archived version shows a search bar in the upper-right corner. EX1081, 5.



**EX1081, 9 (annotated)**

Dr. Jeffay confirmed that "a POSA using a web browser in early 2003 could have gone to the Packeteer Home Page, clicked on the 'Products' link, and then clicked the 'PacketShaper' link at which point he or she would see a link to the Four-Steps Whitepaper (EX1006)" and that "[i]t would have been a simple matter for a POSA to locate and review that whitepaper."  EX1093 ¶8.

In contrast to the decision in *Coalition for Affordable Drugs VIII v. Univ. Penn.*, IPR2015-01836, Paper 58 (PTAB Mar. 6, 2017) cited by Patent Owner, the evidence here shows not only the webpage with the relevant hyperlink but also that clicking on the link leads to the Four-Steps Whitepaper.  EX1093 ¶7.  Thus, unlike Patent Owner's cited case, the hyperlink is not "defunct" but instead links to the

21

relevant prior art reference.  *Cf.* IPR2015-01836, Paper 58 at 20.  The evidence

here also contrasts with the evidence considered in *Schlumberger Technology v.*

*Integrated Drive Systems*, IPR2018-00603, Paper 40 (PTAB Sept. 3, 2019), which

is also cited by Patent Owner.  In that case, the petitioner provided "no evidence of

any steps the skilled artisan could or would have taken to find [the reference]

where it was located on [the relevant] website…."  *Id.* at 17.  Here, Petitioner has

shown precisely how a POSA could and would have found the Four-Steps

Whitepaper on the Packeteer website in early 2003.

### 2.    The Four-Steps Whitepaper and the Packeteer Website Were Cited in Prior Art Patents and Publications

Petitioners' supplemental evidence also included a prior art IBM patent in

the same technical area of network traffic control that cited the Four-Steps

Whitepaper.  EX1088 at 3:33-36.  The patent was based on a PCT application filed

on October 28, 2003, and published on June 3, 2004.  EX1088; *see also* EX1089

(another IBM patent citing the Four-Steps Whitepaper); EX1097 ¶¶15-17

(declaration confirming that the cited version is the same whitepaper).  The fact

that the Four-Steps Whitepaper was cited in this patent application confirms that it

was publicly available to a POSA more than a year before the '593 Patent was filed

in December 2004.  *See, e.g.*, *Japan Radio v. Broadcom*, IPR2019-00816, Paper 34

at 42 (PTAB Aug. 28, 2020) (citation of a document in prior art patent supported

argument of public accessibility); *see also Valve*, 8 F.4th at 1376 ("If an examiner

could access the article before the priority date, so could the general public.");

EX1001.[13]

Petitioner also provided numerous prior art patents and publications

identifying Packeteer, the Packeteer website, and the PacketShaper product before

the '593 Patent priority date.  EX1082 (citing Packeteer's "Four Steps to

Application Performance Across the Network" from November 2001); EX1083

(citing several papers from Packeteer, Inc's "Packeteer Technical Forum");

EX1086 (citing generally the Packeteer "Technology" webpage); EX1087 (citing

"PacketShaper 4000 Getting Started" guide); EX1090 (conference paper

discussing PacketShaper and citing an earlier version of the whitepaper on the

PacketShaper website); EX1092 (research paper discussing PacketShaper and

citing an earlier version of the whitepaper on the PacketShaper website).  This

additional evidence further confirms that Packeteer was well-known in the industry

and that a POSA could find Packeteer's website and information about the

PacketShaper product such as the Four-Steps Whitepaper.

---

[13]  The IBM patents also act as a "research aid" directing a POSA to the Four-

Steps Whitepaper.  *See Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331,

1350 (Fed. Cir. 2016).

### 3. The Board Should Not Ignore Petitioners' Supplemental Evidence

Contrary to Patent Owner's argument that the Board should ignore any evidence not submitted with the petition, the Federal Circuit has confirmed that "[a] petitioner may provide evidence of public accessibility of a reference after the petition stage if the patent owner raises a challenge to public accessibility." *Valve*, 8 F.4th at 1370 n. 6 (citing *VidStream v. Twitter*, 981 F.3d 1060, 1064-65 (Fed. Cir. 2020)); *see also Fanduel v. Cg Tech. Dev.*, IPR2017-00902, Paper 45 at 82 (PTAB Oct. 4, 2018) (rejecting argument that supplemental evidence establishing public accessibility should be ignored where it was first served in response to an objection and later filed with petitioner's reply because "[t]he supplemental evidence was filed in accordance with our procedures for resolving issues concerning the admissibility of evidence"). Patent Owner raised a challenge to public accessibility in its response, so Petitioner "may provide evidence of public accessibility of a reference after the petition stage." *Valve*, 8 F.4th at 1370 n. 6.

24

### B.     Patent Owner's Attorney Declaration Does Not Dispute Petitioners' Evidence of Public Accessibility

Patent Owner submits an attorney declaration attempting to show that the Four-Steps Whitepaper was not archived after March 17, 2003.  EX2008.[14]  But Patent Owner's counsel did not use the Wayback Machine to access archived versions of the Packeteer website and then navigate to the Four-Steps Whitepaper as Dr. Jeffay explained in his supplemental declaration, though Patent Owner had the declaration and questioned Dr. Jeffay about it during his deposition.  EX2007, 68:13-69:17.  And counsel only attempted to view versions of the whitepaper from dates *after* March 17, 2003.  EX2008 ¶¶6-7.  The Four-Steps Whitepaper is dated September 2002, which at least suggests that it was available for months before March 2003.

In response to Patent Owner's attorney declaration, Cloudflare's counsel used the Wayback Machine to access the Packeteer website as it was archived on

---

[14]  A different version of the whitepaper was available later in 2003.  EX1097 ¶¶9-13.  The later version contains the same disclosure cited in the petition.  *Compare* Pet. at 66 (citing EX1006, 18) *with* EX1099, 10.  The fact that earlier and later versions of the cited whitepaper were publicly accessible further supports Petitioners' showing that the Four-Steps Whitepaper (EX1006) was also publicly accessible.

September 25, 2002, September 29, 2002, November 20, 2002, November 27, 2002, November 29, 2002, January 22, 2003, January 24, 2003, and February 16, 2003.  EX1097, ¶¶2-8.  In each case, counsel navigated to and clicked on the relevant hyperlink to access the Four-Steps Whitepaper.  *Id*.[15]  The whitepaper was available for more than five months between September 2002 and March 2003— more than enough to establish public accessibility.  *See, e.g.*, *Jazz Pharma.*, 895 F.3d at 1358 (documents publicly accessible where they "were available on a public FDA website for at least two months before the critical date of the patents in suit"); *In re Klopfenstein*, 380 F.3d 1345, 1351-52 (Fed. Cir. 2004) (slides presented for total of three days between two scientific meetings were publicly accessible).

## V.    CLAIMS 17, 18, 37, AND 38 ARE PART OF GROUND 2

In the Institution Decision, the Board correctly noted a typographical error in the petition, which inadvertently included the arguments addressing dependent claims 17, 18, 37, and 38 under Ground 1 (Yung alone) rather than Ground 2 (Yung and Copeland).  ID at 38-39.  As the Board recognized, Yung alone

---

[15] The Board should consider the additional declaration provided by Cloudflare's counsel because it presents evidence that directly responds to evidence and arguments in Patent Owner's response.  *See* note 10, above.

26

discloses the additional limitations added by these dependent claims, but the

underlying independent claims are addressed in Ground 2 based on the

combination of Yung and Copeland.  Because the dependent claims include all the

limitations of the underlying independent claims, they must also be part of

Ground 2.

To avoid any possible ambiguity, Cloudflare's counsel emailed Patent

Owner's counsel on December 2, 2021, confirming "that Sections VII.A.8

(addressing claims 17 and 37) and VII.A.9 (addressing claims 18 and 38) should

have been located in Section VII.B because they depend from claims addressed in

that section of the Petition (i.e., Ground 2 based on Yung and Copeland)."

EX1097 ¶19; EX1102.  The email further stated:  "If you have any questions about

our contentions regarding claims 17, 18, 37, and 38, please let me know."  *Id*.

Patent Owner did not respond.  EX1097 ¶19.

Patent Owner does not dispute the typo and does not suggest that it has

suffered any prejudice given that Cloudflare confirmed its contentions 3.5 months

before Patent Owner's response.  Instead, Patent Owner argues that the Board's

hands are tied based on decisions addressing a different issue.  Patent Owner's

cited cases merely hold that the Board cannot supply arguments not made by a

petitioner.  *See In re Magnum Oil Tools Int'l*, 829 F.3d 1364, 1379-81 (Fed. Cir.

2016); *Sirona Dental Systems v. Institut Straumann*, 892 F.3d 1349, 1355-56 (Fed.

27

Cir. 2018); *IBM v. Rigetti & Co.*, IPR2020-00494, Paper 13 at 33-34 (PTAB Aug.

11, 2020). But the petition here includes every argument necessary to show that

claims 17, 18, 37, and 38 are obvious over the combination of Yung and

Copeland—it shows that every limitation is disclosed either by Yung alone or by

the combination of Yung and Copeland and it establishes a motivation to combine

the two references.

 Contrary to Patent Owner's argument, the Board routinely relies on common

sense and logic to understand the contentions presented in a petition despite

typographical errors. *See, e.g.*, *Axonics v. Medtronic*, IPR2020-00713, Paper 42 at

14 fn. 10 (PTAB Sept. 22, 2021) (recognizing petition mistakenly failed to identify

two dependent claims as part of an asserted ground and including those claims in

that ground); *IBM v. Trusted Knight*, IPR2020-00323, Paper 37 at 62-63 (June 30,

2021) (noting error in petition mapping certain claim limitations to corresponding

limitations in other challenged claims and applying correct mapping); *Netapp v.

KOM Software*, IPR2019-00606, Paper 37 at 6 n.8, 39-41 (PTAB Sept. 23, 2020)

(finding claims invalid based on a three-reference combination though the petition

mistakenly listed the claims as invalid based on only two references); *Nippon

Suisan Kaisha v. Pronova Biopharma Norge*, PGR2017-00033, Paper 37 at 8 fn. 6,

8, and 12 (PTAB Jan. 16, 2019) (identifying and rectifying typographical errors in

petition); *Amperex Technology v. LG Chem.*, IPR2018-00783, Paper 8 at 5 fn. 2

(PTAB Sept. 19, 2018) (recognizing and rectifying typographical error incorrectly identifying the challenged claims).[16]

The Board recognized Petitioner's typographical error in its Institution Decision, and Patent Owner knew precisely what grounds were asserted in the petition no later than 3.5 months before filing its response. The Board can and should find claims 17, 18, 37, and 38 unpatentable based on the combination of Yung and Copeland.

## VI. CONCLUSION

Based on Petitioners' arguments and evidence, the challenged claims are unpatentable and should be canceled.

Dated:  June 6, 2022                    Respectfully submitted,

                                         _/s/ James L. Day_____
                                        James L. Day
                                        Registration No. 72,681
                                        *Attorney for Petitioner Cloudflare, Inc.*

---

[16] None of these Board decisions required a motion to correct the petition. Should the Board conclude that correction is required here, however, Cloudflare requests leave to file a motion to correct the petition to move the arguments regarding claims 17, 18, 37, and 38 into Ground 2.

29

## <u>CERTIFICATE OF COMPLIANCE</u>

This reply brief complies with the 5,600 word count limit under 37 C.F.R.

§ 42.24(c)(1).  The reply brief contains 5,591 words, excluding the parts exempted

by 37 C.F.R. § 42.24(c) (i.e., table of contents, table of authorities, mandatory

notices under § 42.8, certificate of service, word count certificate, and appendix of

exhibits), as determined by the word count feature of Microsoft Word, which was

used to prepare this reply brief.

*/s/ James L. Day*
James L. Day
Registration No. 72,681

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2022, I caused a complete and entire copy of Petitioners' Reply to Patent Owner's Response and all supporting exhibits to be served by electronic means to the following addresses:

weatherwax@lowensteinweatherwax.com,

Sable_IPRs@lowensteinweatherwax.com.


 */s/ James L. Day*
James L. Day
Registration No. 72,681
Farella Braun + Martel LLP
235 Montgomery Street; 17th Floor
San Francisco, CA  94104

| Exhibit | Description |
|---|---|
| | 6:21-cv-00261-ADA, Opposed Motion to Transfer Venue, dated September 1, 2021 |
| 1067 | *Sable Networks, Inc. and Sable IP, LLC v Cloudflare, Inc.*, Case 6:21-cv-00261-ADA, [Proposed] Scheduling Order, dated August 26, 2021 |
| 1068 | List of Judge Alan D. Albright Active Cases, generated using Lex Machina® on September 9, 2021 |
| 1069 | U.S. Court for Western District of Texas WACO Division, Second Amended Standing Order Regarding Motions For Inter-District Transfer, dated August 18, 2021 |
| 1070 | Bradner, S., "RFC 2026 – The Internet Standards Process – Revision 3" (1996) (Served Dec. 21, 2021) |
| 1071 | U.S. Patent No. 7,336,618 (Served on Dec. 21, 2021) |
| 1072 | U.S. Patent No. 7,336,619 (Served on Dec. 21, 2021) |
| 1073 | U.S. Patent No. 7,336,620 (Served on Dec. 21, 2021) |
| 1074 | U.S. Patent No. 7,336,621 (Served on Dec. 21, 2021) |
| 1075 | U.S. Patent No. 7,136,645 (Served on Dec. 21, 2021) |
| 1076 | U.S. Patent No. 7,310,356 (Served on Dec. 21, 2021) |
| 1077 | U.S. Patent No. 7,254,131 (Served on Dec. 21, 2021) |
| 1078 | U.S. Patent No. 5,251,205 (Served on Dec. 21, 2021) |
| 1079 | U.S. Patent No. 5,430,727 (Served on Dec. 21, 2021) |
| 1080 | U.S. Patent No. 7,072,323 (Served on Dec. 21, 2021) |
| 1081 | Declaration of Duncan Hill of the Internet Archive and Exhibit A, dated December 13, 2021 (Served on Dec. 21, 2021) |
| 1082 | U.S. Patent No. 7,039,715 (Served on Dec. 21, 2021) |

Appx581

| Exhibit | Description |
|---------|-------------|
| 1083 | U.S. Patent No. 7,079,548 (Served on Dec. 21, 2021) |
| 1084 | U.S. Patent No. 7,095,715 (Served on Dec. 21, 2021) |
| 1085 | U.S. Patent No. 7,114,008 (Served on Dec. 21, 2021) |
| 1086 | U.S. Patent No. 7,210,022 (Served on Dec. 21, 2021) |
| 1087 | U.S. Patent No. 7,353,538 (Served on Dec. 21, 2021) |
| 1088 | U.S. Patent No. 7,600,033 (Served on Dec. 21, 2021) |
| 1089 | U.S. Patent No. 8,139,483 (Served on Dec. 21, 2021) |
| 1090 | Murnan, Cynthia A., "Bridging the Bandwidth Gap: Measures to Maintain Bandwidth Availability," SIGUCCS, Portland, OR (Oct. 2001) (Served on Dec. 21, 2021) |
| 1091 | U.S. Patent No. 8,694,610 (Served on Dec. 21, 2021) |
| 1092 | Knoetze, Ronald, et al., "The Warehousing of Application Services Data to Facilitate Identification of Patterns of Network Usage," University of Port Elizabeth, Port Elizabeth (Aug. 2004) (Served on Dec. 21, 2021) |
| 1093 | Supplemental Declaration of Kevin Jeffay, Ph.D. (Served on Dec. 21, 2021) |
| 1094 | Declaration of Daniel Callaway (Served on Dec. 21, 2021) |

7

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2021, I caused a complete and entire copy of Exhibits 1070-1094 and Petitioner's Updated List of Exhibits to be served by electronic means to the Patent Owner's counsel at the following addresses identified in Patent Owner's Mandatory Notices (Paper 5):

weatherwax@lowensteinweatherwax.com,
Sable_IPRs@lowensteinweatherwax.com.

_/James L. Day/_
James L. Day
Registration No. 72,681
Farella Braun + Martel LLP
235 Montgomery Street; 17th Floor
San Francisco, CA 94104

8

UNITED STATES PATENT AND TRADEMARK OFFICE
——————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
——————————

CLOUDFLARE, INC. and
SPLUNK INC.,
Petitioner,

v.

SABLE NETWORKS, INC.,
Patent Owner

——————————

Case IPR2021-00909[1]
Patent 8,243,593

——————————

**PATENT OWNER'S SUR-REPLY**

——————————

[1] Splunk, Inc., which filed a petition in IPR2022-00228, has been joined as a petitioner in this proceeding.

Case IPR2021-00909
U.S. Pat. No. 8,243,593

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...............................................................................1

II.   PETITIONERS HAVE NOT SHOWN BY A PREPONDERANCE OF THE
      EVIDENCE THAT THE CLAIMS CHALLENGED IN GROUND 1 ARE
      OBVIOUS OVER YUNG (CLAIMS 17, 18, 37, 38, GROUND 1)..................3

III.  PETITIONERS FAIL TO SHOW BY A PREPONDERANCE OF THE
      EVIDENCE THAT YUNG IN VIEW OF COPELAND DISCLOSES OR
      RENDERS OBVIOUS THE CALCULATION OF A BADNESS FACTOR
      AS CLAIMED (CLAIMS 9-13, 19-24, 29-33, 39-44, GROUND 2). ..............15

      A.  Copeland Does Not Disclose The Claimed "Badness Factor."................15

      B.  The Claims Require Calculating A "Badness Factor" For Each Flow. ...17

      C.  The Petition Does Not Sufficiently Establish A Reason For The
          POSITA To Have Combined Yung And Copeland As Proposed............20

IV.   CONCLUSION ................................................................................24

i

Case IPR2021-00909
U.S. Pat. No. 8,243,593

## **TABLE OF AUTHORITIES**

**Page**

**COURT DECISIONS**

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
  849 F.3d 1034 (Fed. Cir. 2017)..............................................................8

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*,
  977 F.3d 1212 (Fed. Cir. 2020)............................................................18

*In re Magnum Oil Tools Int'l, Ltd.*,
  829 F.3d 1364 (Fed. Cir. 2016)............................................................15


**AGENCY DECISIONS**

*Amperex Tech. v. LG Chem.*,
  IPR2018-00783, Paper 8 (PTAB Sept. 19, 2018)................................12

*Axonics v. Medtronic*,
  IPR2020-00713, Paper 42 (PTAB Sept. 22, 2021)................................9

*IBM Corp. v. Rigetti & Co., Inc.*,
  IPR2020-00494, Paper 13 (Aug. 11, 2020) ..........................................4

*IBM v. Trusted Knight*,
  IPR2020-00323, Paper 37 (June 30, 2021)................................... 10, 11

*Kinetic Techs., Inc. v. Skyworks Sols., Inc.*,
  IPR2014-00529, Paper 8 (Sept. 23, 2014) ..........................................16

*Netapp v. KOM Software*,
  IPR2019-00606, Paper 37 (PTAB Sept. 23, 2020)..............................11

*Nippon Suisan Kaisha v. Pronova Biopharma Norge*,
  PGR2017-00033, Paper 37 (PTAB Jan. 16, 2019)..............................12

ii

*Unified Patents Inc. v. Uniloc 2017 LLC*,
   IPR2019-00480, Paper 10 (Aug. 16, 2019) ........................................................16

iii

| EXHIBIT LIST | |
|---|---|
| 2001 | Josh McHugh, "The *n*-Dimensional SuperSwitch," WIRED (May 1, 2001, 12:00 am) (available at *https://www.wired.com/2001/05/caspian/* (last visited Aug. 16, 2021)) |
| 2002 | Email from Jun Zheng, U.S. District Court for Western District of Texas staff, to counsel for parties, with Subject "Sable Networks, Inc., et al. v. Riverbed Technology, Inc., No. 6:21-cv-00175-ADA and Sable Networks, Inc., et al. v. Cloudflare, Inc., No. 6:21-cv-00261-ADA – Request for Telephone Conference" (Aug. 20, 2021, 9:04 am) |
| 2003 | Scheduling Order, Dkt. 21, *Sable Networks, Inc., et al. v. Cloudflare, Inc.*, No. 6:21-cv-00261-ADA (June 24, 2021) |
| 2004 | Declaration of Daniel P. Hipskind in Support of Motion for *Pro Hac Vice* Admission |
| 2005 | Declaration of Erin McCracken in Support of Motion for *Pro Hac Vice* Admission |
| 2006 | March 4, 2022 Disclaimer in U.S. Patent No. 8,243,593 Under 37 C.F.R. §1.321(a) |
| 2007 | Deposition Transcript of Kevin Jeffay, Ph.D. [Jeffay Transcript] |
| 2008 | Declaration of Erin McCracken [McCracken Declaration] |
| 2009 | Cloudflare, Inc. Opening Claim Construction Brief, Dkt. 29, *Sable Networks, Inc., et al. v. Cloudflare, Inc.*, No. 6:21-cv-00261-ADA (Nov. 12, 2021) [Cloudflare Opening Claim Construction Brief] |

iv

Appx588

# I.    INTRODUCTION

For at least the reasons that the Response to the Petition demonstrated, the grounds raised in the Petition should be rejected because Petitioners fail to demonstrate by a preponderance of the evidence that the challenged claims[2] are unpatentable.  Petitioners' Reply to the Response fails to disprove those reasons, and only confirms that the Board should find all challenged claims not unpatentable.

As to ground 1, alleged obvious over Yung alone, the Petition fails to show that claims 17, 18, 37, and 38 of the '593 patent are taught or suggested by Yung. Petitioners' only argument in their Reply to Patent Owner's Response ("Reply") is that the Petition contains a typographical error the Board should remedy.  The problem for Petitioners is that there is zero evidence of an alleged typographical error.  Instead, the record shows the Petition simply did not challenge claims 17,

---

[2] As explained in the Patent Owner Response (or "POR"), to streamline this proceeding, Patent Owner has filed a statutory disclaimer of originally challenged claims 1, 2, 4-8, 14-16, 25-28, and 34-36.  POR, 11-12.  Claims 3, 9-13, 17-24, 29-33, and 37-44 remain at trial, challenged by one or more of grounds 1, 2 or 3.

1

18, 37, and 38 under Yung in view of Copeland. The argument that the complete failure to do so is based on a typographical error is unsupported and insupportable.

As to ground 2, alleged obviousness over Yung and Copeland, Petitioners fail to show by a preponderance of evidence that Copeland and Yung teach the calculation of a "badness factor" for *each flow* as recited in claims 9–13, 19–24, 29–33, and 39–44. Petitioners' primary response is to argue (wrongly and without support) that claims 9 and 29 do not *require* calculating the claimed "badness factor" for each flow, but they clearly do. Alternatively, Petitioners argue based on one mischaracterized sentence in Copeland that Copeland's "concern index" is calculated for each flow, but Petitioners' assertion that this single sentence in Copeland is a death sentence for the claims does not withstand scrutiny either. Instead, that sentence only confirms that Copeland's "concern index" is only calculated for a suspicious flow, not each flow. Petitioners also fail to establish the POSITA would have been motivated to combine Yung and Copeland to meet the claims challenged by ground 2.

For at least these and other reasons provided herein and in the Patent Owner Response, Patent Owner respectfully requests that the Board deny the Petition and confirm the patentability of the claims.

Appx590

## II.    PETITIONERS HAVE NOT SHOWN BY A PREPONDERANCE OF THE EVIDENCE THAT THE CLAIMS CHALLENGED IN GROUND 1 ARE OBVIOUS OVER YUNG (CLAIMS 17, 18, 37, 38, GROUND 1).

It is undisputed that Yung does not teach or suggest all limitations of dependent claims 17, 18, 37, or 38 of the '593 patent.  The Board already concluded in the Institution Decision that "Petitioner has not demonstrated a reasonable likelihood it would prevail in establishing the unpatentability of any of dependent claims 17, 18, 37, or 38 as obvious over Yung alone."[3]  Institution Decision, 38 (citing Pet., 1 (table of grounds) and 42-43 (addressing these independent claims).  Because Yung is the only basis for ground 1 of the Petition, Petitioners have failed to carry their burden of proving by a preponderance of the evidence that dependent claims 17, 18, 37, and 38 are obvious in view of Yung.  Ground 1 of the Petition thus fails as to dependent claims 17, 18, 37, and 38.

In the Reply, Petitioners argue they made a "typographical error in the petition, which inadvertently included the arguments addressing dependent claims 17, 18, 37, and 38 under Ground 1 (Yung alone) rather than Ground 2 (Yung and Copeland)."  Reply, 26.  There is no factual or legal support for Petitioners'

_____

[3] As explained in the Response, with respect to ground 1, the challenged claims other than claims 17, 18, 37, and 38 have been statutorily disclaimed.

3

argument. This counterfactual assertion, based on a non-existent typographical error, was suggested as a possibility by the Board in the Institution Decision, and seized upon by Petitioners in the Reply. However, facts matter. While the Board is certainly empowered to suggest that parties may wish to present evidence as to whether particular facts exist when those facts would be relevant if they do exist, neither the Board nor the parties can manufacture facts that do not exist, or find that they exist when there is no evidence that they do. In other words, the Board could wonder aloud whether the Petitioner made a typographical error, but that is not evidence that there was, in fact, a typographical error, and the Board cannot find that there was such an error unless Petitioners shoulder their burden of proving that such an error occurred. Petitioners' self-serving assertion that the error did occur, while failing to present any evidence that it did, is the equivalent of telling a teacher that one's homework was not completed on time because it was eaten by one's dog, without presenting evidence of a completed assignment, a paper scrap, or a dog. And that is all the more true where, as here, the petitioners literally *copied their homework from someone else*. Because the Board cannot "remedy deficiencies in Petitions that fall short," this argument must fail at trial. *See IBM Corp. v. Rigetti & Co., Inc.*, IPR2020-00494, Paper 13, 34 (Aug. 11, 2020) (decision denying institution of *inter partes* review and explaining "our role is not to remedy the deficiencies in the Petition that fall short") (citation omitted).

<center>4</center>

To start, there is no evidence that the failure to challenge dependent claims 17, 18, 37, and 38 in ground 2 of the Petition based on the combination of Yung and Copeland was a typographical error.  On October 2, 2020, Palo Alto Networks, Inc., Dell Technologies Inc., VMware, Inc., Juniper Networks, Inc., Hewlett Packard Enterprise Company, and Aruba Networks, Inc. filed a Petition for *Inter Partes* Review of the '593 patent.  *See Palo Alto Networks et al. v. Sable Networks, Inc.*, IPR2020-01712, Paper 6 (filed Oct. 2, 2020).  These sophisticated technology companies were represented by sophisticated patent counsel.

Approximately seven months later, Cloudflare and SonicWall Inc. (no longer a party to this proceeding) filed the instant Petition.  These sophisticated technology companies, too, were represented by sophisticated and experienced patent counsel too.  What is more, Cloudflare and SonicWall did not even start from scratch to formulate their own grounds or write their own petitions.  Rather, they largely copied—*verbatim*—the arguments advanced by the prior petition, filed by the prior sophisticated technology company petitioners.[4]  As relevant here,

---

[4] *Palo Alto Networks et al. v. Sable Networks, Inc.*, IPR2020-01712, was terminated on February 11, 2021 pursuant to a Joint Motion of All Parties to Terminate Pursuant to 35 U.S.C. § 317 prior to any decision on the petition.

5

in the prior petition, the petitioners challenged dependent claims 17, 18, 37, and 38

under Yung alone, arguing: "For the reasons discussed above regarding claims 7

and 27 [also challenged under Yung alone], and because Yung's 'traffic

monitoring module 75' performs the same functions as the '593 patent's

'processors,' Yung discloses claims 17 and 37.  …  For the reasons discussed

above regarding claims 7 and 27 [also challenged under Yung alone], and because

Yung's 'traffic monitoring module 75' performs the same functions as the '593

patent's 'processors,' Yung discloses claims 18 and 38." *See Palo Alto Networks

et al. v. Sable Networks, Inc.*, IPR2020-01712, Paper 6, 45; *see also id.*, 8 (chart

listing Yung as the sole reference in ground 1, the only ground under which

dependent claims 17, 18, 37, and 38 of the '593 patent were challenged).  There is

*zero* evidence that this argument advanced by Palo Alto Networks, Inc., Dell

Technologies Inc., Vmware, Inc., Juniper Networks, Inc., Hewlett Packard

Enterprise Company, and Aruba Networks, Inc. contained any errors,

typographical or otherwise.

    After having seven months to review and analyze the prior petition,

including with their retained technical opinion declarant Dr. Jeffay, for any

supposed errors, typographical or otherwise, Cloudflare and SonicWall drafted,

checked over and re-read, and filed their Petition.  And as to this aspect of the

Ground, Cloudflare and SonicWall, by and through their sophisticated and

experienced counsel, made the exact same arguments in the Petition as the prior

petitioners had made.  The Petition makes no arguments under Yung in

combination with Copeland concerning dependent claims 17, 18, 37, and 38.

Instead, Petitioners copied the arguments previously advanced in *Palo Alto

Networks et al. v. Sable Networks, Inc.*, IPR2020-01712.  Like their predecessors,

Petitioners challenge dependent claims 17, 18, 37, and 38 under Yung alone,

arguing: "For the reasons discussed above regarding claims 7 and 27 [also

challenged under Yung alone], and because Yung's 'traffic monitoring module 75'

performs the same functions as the '593 Patent's 'processors,' Yung discloses

claims 17 and 37.  … For the reasons discussed above regarding claims 7 and 27

[also challenged under Yung alone], and because Yung's 'traffic monitoring

module 75' performs the same functions as the '593 Patent's 'processors,' Yung

discloses claims 18 and 38."  Pet., 42-43.

   Moreover, Petitioners cite the Declaration of their technical opinion

declarant, Dr. Jeffay, to support their argument that dependent claims 17, 18, 37,

and 38 are disclosed by Yung alone.  *Id.* (citing Ex. 1003 [Jeffay Decl.] ¶¶ 194,

195).  Dr. Jeffay parrots the language of the Petition but also states: "it is my

opinion that Yung discloses [17] and [37]," and "it is my opinion that Yung

discloses [18] and [38].  Therefore, in my opinion, a POSA would have understood

that Yung discloses [18] and [38]."  Ex. 1003 [Jeffay Decl.] ¶¶ 194, 195.  The

record is clear that Petitioners made no typographical error in challenging

dependent claims 17, 18, 37, and 38 under Yung alone.[5]

The *later* actions, separate from those of ***eight*** unrelated sophisticated

technology companies, of Splunk Inc. (now joined as a Petitioner to this

proceeding) confirm that there was no typographical error.  On November 24,

2021, ***five days after*** the Board issued its Institution Decision, Splunk filed its own

Petition for *Inter Partes* Review of the '593 patent.  *Splunk Inc. v. Sable Networks,*

*Inc.*, IPR2022-00228, Paper 2 (filed November 24, 2021).  In its petition, Splunk

———————————

[5] ***After*** the Institution Decision, one of Cloudflare's attorneys sent counsel

for Patent Owner a short self-serving email in which he simply parroted the

Board's reasoning, adopting the argument the Board had advanced on behalf of

Petitioners, and stating that "the Board identified a typo in the Petition."  Ex. 1102.

Cloudflare's attorney's self-serving statement is not competent evidence of a

typographical error in the Petition.  Had Petitioners introduced, either as

supplemental evidence or with their Reply, testimony or other evidence of a

typographical error, Patent Owner could have tested that evidence in deposition or

otherwise.  None was filed, and "[a]ttorney argument is not evidence."  *Icon*

*Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017).

challenged dependent claims 17, 18, 37, and 38 under Yung alone, making the

exact same arguments as those advanced by Cloudflare and the prior petitioners.

*See id.*, 1, 41-42.  Although Splunk was aware of the Institution Decision when it

filed its own Petition, it chose not to challenge dependent claims 17, 18, 37, and 38

under Yung in combination with Copeland.  Splunk did not assert there was a

typographical error, introduced no evidence that there was a typographical error,

and made no attempt to explain away the supposed typographical error in the prior

petitions.  The reason for this is simple.  There is no typographical error and the

Board is not empowered to consider arguments Petitioners or Patent Owners did

not make or evidence they did not submit.

Not surprisingly, the Board decisions on which Petitioners rely are readily

distinguishable; they in fact underscore why the Board should not, and indeed

cannot, advance arguments that could have been but were not made in the Petition.

In *Axonics v. Medtronic*, IPR2020-00713, Paper 42 (PTAB Sept. 22, 2021), the

Board "considered the omission of these claims [16 and 17] from this asserted

ground in the Petition's listing of the asserted grounds to be a typographical error"

because, ***unlike here***, the remainder of the petition confirmed that an error had

occurred because "[i]n the arguments for this asserted ground … ***Petitioner***

***addresse[d] these claims***." *Id.*, 14 n. 10 (emphasis added).  In other words, the

petition in *Axonics* was internally inconsistent, which was strong ***evidence of*** a

9

typographical error.  Although the petitioner failed to include the at-issue claims

under ground 5 in its abbreviated listing of asserted grounds, ***its arguments***

***regarding ground 5 addressed these claims***.  *Axonics*, IPR2020-00713, Paper 1,

18 (filed on Mar. 16, 2020) (listing of grounds referencing claims 16 and 17 in

grounds 3 and 7); 58, 72-73 (specifically arguing in ground 5 that claims 16 and 17

were disclosed by the ground 5 references).

Similarly, in *IBM v. Trusted Knight*, IPR2020-00323, Paper 37, 62-63 (June

30, 2021), the Board found the petitioner made a typographical mistake in mapping

certain claim limitations, because, once again, the remainder of the petition itself

"ma[de] clear" that there was an error in the text of the petition.  There, the

petitioner "inadvertently included a typo, mapping claim 26d (the 'identifying'

limitation) to claim 7" even though claim 7 was not even challenged.  *Id.*, 62.  The

Board found the petitioner made a correctable typographical error, reasoning that

the "disputed 'identifying' limitation of claim 26 is identical to the same limitation

in claim 22.  ***Petitioner makes clear its intention to apply the arguments made for***

***claim 22 to claim 26*** when it states that '[i]ndependent claim 11 contains

limitations similar to claim 1, and claim 26 contains limitations similar to claim

22' just before presenting the chart showing claim mappings.  Because claim 7 is

not even challenged, and because Petitioner makes clear that claim 22 and claim 26

are similar, it is readily apparent that Petitioner's chart contains an error when

referencing claim 7." *Id.* (emphasis added). Thus, as in *Axonics*, the Board did not

make arguments for the petitioner that were not in the petition. Instead, in

analyzing the arguments actually made in the petition, the Board determined the

petitioner had made a typographical error in a summary chart.

The next case Petitioners cite, *Netapp v. KOM Software*, IPR2019-00606,

Paper 37, 6 n.8, 39-41 (PTAB Sept. 23, 2020), is similarly distinguishable for

similar reasons. The Board found the "Petition's listing of claims 54-57 separately

under Vossen in view of Nagar appears to be a typographical error. Aspects of the

discussion of claim 54 rely on Denning, as well as on the prior discussion of claims

26 and 27, which also rely on Denning." *Id.*, 6 n.8. The petitioner's summary of

the asserted grounds listed claims 54-57 as being disclosed by Vossen in view of

Nagar. *Netapp*, IPR2019-00606, Paper 3, 12 (filed Jan. 25, 2019). However, that

summary was clearly inconsistent with the text in the remainder of the petition. ***In***

***the argument section of the petition***, the petitioner argued that the Denning

reference also taught certain limitations of the at-issue claims. *Id.*, 69. Because of

the internal inconsistency between the summary chart and the petitioner's

arguments, the Board determined the petitioner simply made a typographical error

in the summary chart. The Board did not advance arguments on behalf of the

petitioner that were not made in the petition, as Petitioners ask the Board to do

here.

11

In the next case Petitioners cite, *Nippon Suisan Kaisha v. Pronova Biopharma Norge*, PGR2017-00033, Paper 37 (PTAB Jan. 16, 2019), the Board determined that a petition requesting post-grant review of certain claims contained typographical errors. Again, that case is distinguishable, again for similar reasons. As in the Board decisions discussed above, typographical errors in summary charts and headings were made, which were clear in view of their inconsistency with the substantive arguments advanced in the petition. For example, the Board noted that "[p]age 2 of the Petition describes Ground 8 as 'Breivik in view of Doisaki and/or Young, Doisaki [sic] Martin, and/or Febrianto,' ***but in discussing the merits of this Ground***, refers to 'Breivik in view of Doisaki and/or Young and/or Martin and/or Febrianto ***and/or Bimbo***.' We consider the failure to include Bimbo in the statement of grounds on page 2 of the Petition a typographical error." *Id.*, 8 n. 12 (emphasis added). Similarly, the Board explained that "[p]age 2 of the Petition describes Ground 7 as 'Doisaki in view of Young, Martin, and/or Febrianto,' ***but in discussing the merits of this Ground***, refers to 'Doisaki ***in view of Breivik*** and/or Young and/or Martin and/or Febrianto.' We consider the failure to include Breivik on page 2 of the Petition a typographical error." *Id.* at 8 n. 8 (emphasis added).

Finally, in *Amperex Technology v. LG Chem.*, IPR2018-00783, Paper 8, 5 n. 2 (PTAB Sept. 19, 2018) (emphasis added), the Board explained that the

12

"Petition's header for the proposed ground based on Hennige **lists claims '24-39,'**

**rather than 24-29**, as subject to the proposed ground.  **The Petition's analysis,**

**however, ends at claim 29, and the '241 patent has only 36 claims**.  We

understand the listing of claims '24-39' in the Petition's header to be a

typographical error, and that the header should have listed claims 24-29."

In every Board decision Petitioners cite, the Board discerned and remedied

typographical errors in petitions, largely in headings and summary charts, that were

internally inconsistent with the substantive arguments the petitioners had advanced

regarding the alleged unpatentability of challenged claims.  In that regard, Patent

Owner agrees with Petitioners that the Board "relies on common sense and logic to

understand **the contentions presented in a petition** despite typographical errors."

Reply, 28 (emphasis added).  For example, if Petitioners had **substantively argued**

in the Petition that dependent claims 17, 18, 37, and 38 were described by Yung in

view of Copeland, then a failure to list claims 17, 18, 37, and 38 under ground 2 in

the Petition's summary chart possibly might be record evidence of a typographical

error.  But that is not what happened here.  Nowhere in the Petition do Petitioners

ever argue, mention, or reference that dependent claims 17, 18, 37, and 38 are

described by the Yung and Copeland combination.  Ever.  Nowhere in the

Declaration of Petitioner's technical opinion declarant expert, Dr. Jeffay, does Dr.

Jeffay ever opine that dependent claims 17, 18, 37, and 38 are described by the

13

Appx601

Yung and Copeland combination. To the contrary, the Petition's chart, substantive

arguments, and Dr. Jeffay's testimony are all consistent and point only to Yung

alone as allegedly teaching the limitations of dependent claims 17, 18, 37, and 38.

So far as the record reflects or Patent Owner is aware, this would be the first to

ever accept a petitioner's self-serving claim that the dog ate its homework without

any evidence that the dog did so.

And all that is without even mentioning the fact that the homework was

copied from that of other students—that Petition's ground and arguments are

literally copied from an earlier petition filed by other sophisticated and experienced

parties and counsel. They never said their petition contained a typographical error.

Those who copied the prior petition never came upon this text and viewed it as a

typographical error—even though this case would have been the perfect

opportunity to correct one if one existed. If there had been a typographical error,

Petitioners could have submitted competent evidence that it occurred, just as

parties seeking relief from filing petitions late due to computer errors submit

declarations from the personnel involved proving that the errors occurred. Here,

all we have is Petitioners' suggestion that the Board should find, in the absence of

any evidence of it, that such an error occurred, in three petitions: the original

petition, this copied petition, and Splunk's joinder petition—all without any of

them mentioning it.

14

For all these reasons, it would be clear error for the Board to correct the deficiencies in the Petition under the guise of a typographical error that does not exist. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) (finding the Board erred in making an obviousness argument on behalf of the petitioner that could have been, but was not, made in the petition). The policy of balancing patent quality with the rights of patent owners does not justify bending the truth to satisfy either goal.

The Petition must and should be taken at its word. Claims 17, 18, 37, and 38 are challenged in ground 1 under Yung alone, and ground 1 fails as to those claims.

## III.   PETITIONERS FAIL TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT YUNG IN VIEW OF COPELAND DISCLOSES OR RENDERS OBVIOUS THE CALCULATION OF A BADNESS FACTOR AS CLAIMED (CLAIMS 9-13, 19-24, 29-33, 39-44, GROUND 2).

### A.   Copeland Does Not Disclose The Claimed "Badness Factor."

Independent claims 9 and 29 each recite computing a "badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior." Ex. 1001 ['593 Patent] cls. 9.2, 29.2. Every challenged claim in ground 2 includes the limitations associated with computing this "badness factor." The Petition concedes Yung does not disclose these "badness factor" limitations. Pet., 49. The Petition relies on Copeland to try to fill this gap. *See id.* Although the Petition asserts that Copeland's "flow-based

15

'concern index' (or CI) value represents the claimed badness factor," it fails to substantiate this assertion.  *See id.* (citing Ex. 1003 [Jeffay Decl.] ¶ 210).

The Patent Owner Response explains that the Petition cites no evidence to support its assertion except *ipse dixit* in the accompanying declaration of Petitioner's technical opinion declarant, Dr. Jeffay, which asserts: "This concern index (CI) value represents the claimed *badness factor*."  Ex. 1003 [Jeffay Decl.] ¶ 210; POR, 17-21.  But the law is clear that "[m]erely repeating an argument from the Petition in the declaration of a proposed expert," as Petitioners have done, "does not give that argument enhanced probative value" even in the absence of opposing expert testimony.  *See Kinetic Techs., Inc. v. Skyworks Sols., Inc.*, IPR2014-00529, Paper 8, 15 (Sept. 23, 2014); *see also Unified Patents Inc. v. Uniloc 2017 LLC*, IPR2019-00480, Paper 10, 3 (Aug. 16, 2019) ("Just because an expert regurgitates attorney argument does not make the argument either persuasive or worthy of blind acceptance when counter testimony does not exist."). The Patent Owner Response further explains that Dr. Jeffay testified at his deposition that the POSITA would not even understand the term "badness factor." Ex. 2007 [Jeffay Transcript] 35:17-36:7; POR, 19.  Yet, at the same time, Dr. Jeffay contradictorily opines that "***whatever a badness factor is***, Copeland's recitation of what it refers to as suspicious activity … would certainly qualify as a badness factor." Ex. 2007 [Jeffay Transcript] 35:17-36:15 (emphasis added).  In

16

Reply, Petitioners simply sidestep this critical issue, arguing "it was unnecessary" for Dr. Jeffay to form an opinion regarding the meaning of the term "badness factor." Reply, 7. That argument is nonsensical, and should be rejected. Petitioners' statutory burden of persuasion prevents Petitioner from proving that the "badness factor" term is met without presenting competent evidence that it is so. Without evidentiary support for the contention that Copeland's "concern index" teaches or suggests the claimed badness factor, Petitioners have failed to carry their burden under the heightened preponderance standard with respect to ground 2.

**B.    The Claims Require Calculating A "Badness Factor" For Each Flow.**

In Patent Owner's Response to the Petition, Patent Owner showed that Copeland's "concern index," unlike claim 9 and 29's "badness factor," is not computed on a per-flow basis. POR, 22-23. Petitioners' response is to argue that claims 9 and 29 do not require calculating the claimed "badness factor" for each flow. Reply, 8-9. Petitioners are wrong.

Independent claims 9 and 29 of the '593 patent recite computing a "badness factor" for *each* flow. Ex. 1001 ['593 Patent] cls. 9.2, 29.2. As the patent explains in its description of the invention:

the MFM **210** determines (block **304**) whether the flow is exhibiting undesirable behavior. In one embodiment, this determination is made

> by computing a badness factor for the flow.  This badness factor is
> computed based on the behavioral statistics of the flow and provides an
> indication as to whether the flow is exhibiting undesirable behavior.

Ex. 1001 ['593 Patent] 6:25-31; *see also id.*, 7:51-52 ("[T]he MFM **210***d* also

computes a badness factor for the flow."); *id.*, 8:12-17 ("By taking these

components into account in the computation of the badness factor, it is possible to

derive a badness factor that provides an indication of whether a flow is

misbehaving.  In one embodiment, a badness factor larger than 1 indicates a

misbehaving flow.").  In every one of the embodiments, the '593 patent's "badness

factor" is calculated for each flow regardless of whether the flow is misbehaving,

and there is not a single embodiment hinting that the badness factor is computed

for only some flows.  Although Petitioners seem to fault Patent Owner for relying

on the '593 patent's specification, it is black letter law that claims are to be

interpreted "consistent with the specification, and claim language should be read in

light of the specification …." *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977

F.3d 1212, 1221 (Fed. Cir. 2020) (citation and internal quotation marks omitted).

In contrast to the '593 patent, in Copeland, "*[f]lows with suspicious activity

are assigned* a **predetermined concern index (CI)** value based upon a heuristically

predetermined assessment of the significance of the threat of the particular traffic

or flow or suspicious activity."  Ex. 1007 [Copeland] 7:57-61 (emphasis added);

18

*see also id.* at 8:1-5 ("By *assigning a value to each flow that appears suspicious*

and **adding that value to a total CI of the host responsible for the flow**, it is

possible to identify hosts that are engaged in intruder activities.") (emphasis

added).  In other words, as explained in detail in the Patent Owner Response,

Copeland only assigns "concern index" values to suspicious flows.  POR, 22-23.

    Although Petitioners primarily incorrectly argue that claims 9 and 29 do not

require calculating a "badness factor" on a per-flow basis, they also argue that

Copeland teaches, in one sentence, that Copeland's "concern index" is calculated

for each flow.  Reply, 8 (citing Ex. 1007 [Copeland] 18:15-19).  Again, Petitioners

are wrong.

    The portion of Copeland's specification on which Petitioners rely makes

clear that the "concern index" value is only calculated for ***each flow of a potential***

***probe***, defined as "a flow that appears to have one host (a possible intruder)

sending packets to gain information about another host (an intended victim)" as

opposed to a normal flow.  Ex. 1007 [Copeland] 18:4-19; *see also id.*, 17:55-61

("The flow collector thread **520** runs periodically (e.g., every five minutes) and

searches linearly through the entire flow data structure **162** to find flows that have

been inactive for a certain time period ….  These flows are considered as finished

and a logic-tree analysis is done to *classify them as either a normal flow, **or a***

***potential probe or other suspicious activity warranting assignment of a concern***

*index value*.") (emphasis added); *id.* At 18:14-19 ("In accordance with the

invention, ***some potential probes are much more likely to indicate probing than***

***others are.  To handle this, a value called the 'concern index' is calculated*** or

otherwise determined for each flow, and this value is added to the concern index

being accumulated in the host data structure **166**.") (emphasis added).  This

sentence, like the rest of Copeland, does not even suggest, and indeed forecloses,

calculating this "concern index" for all flows or indeed any flows that are not

subject to the potential probe.

Because independent claims 9 and 29 require that a "badness factor" be

computed on a per-flow basis and Copeland's "concern index" value is not

calculated on a per-flow basis, Petitioners have failed to carry their burden under

the heightened preponderance standard applicable to institution with respect to

ground 2.  Accordingly, for this independently sufficient reason, ground 2 of the

Petition fails.

> **C.    The Petition Does Not Sufficiently Establish A Reason For The
> POSITA To Have Combined Yung And Copeland As Proposed.**

As explained in the Patent Owner Response, ground 2 must be rejected at

trial for the additional reason that Petitioners fail to prove by a preponderance of

the evidence a rationale to combine the Yung and Copeland references to meet the

claimed invention.  POR, 24-28.

<div align="center">20</div>

The Petition asserts that claims 9-13, 19-24, 29-33, and 39-44 are obvious over Yung and Copeland.  Pet., 43.  The Petition argues that a "POSA would have been motivated to incorporate Copeland's flow-based CI value into Yung's bandwidth-management device *based on Yung's express disclosure*" that its "application behavior pattern can incorporate *other factors* as well."  *Id.*, 45 (emphasis added); Ex. 1005 [Yung] 11:59-60) (emphasis added).  On Reply, Petitioners double down on their argument, asserting that "Yung expressly contemplates incorporating 'other factors' into its process, and a POSA would have sought to classify traffic behaving suspiciously or disruptively."  Reply, 9.  But, as explained in the Patent Owner Response, this generic nondisclosure in Yung does not disclose a motivation to make the proposed combination.  POR, 24-28.

Indeed, Copeland's "concern index" value is not a behavioral attribute of a flow that there is any preponderant evidence that the POSITA would have been motivated to combine with Yung.  *Id.*, 26-27.  Copeland's "concern index" value is reflective of packet header information, not the behavior of a flow.  Ex. 1007 [Copeland] 3:45-54 (teaching that its mechanism "collects flow data *from packet headers* between two hosts or Internet Protocol (IP) addresses") (emphasis added).  Petitioners' technical opinion declarant, Dr. Jeffay, confirmed this at his

21

deposition, testifying that Copeland does not disclose collecting flow data from any source other than packet headers. Ex. 2007 [Jeffay Transcript] 40:19-41:10.

Petitioners' only response is that Dr. Jeffay added at deposition that "Copeland also 'talk[s] about packet length,'" which purportedly "is not included in certain types of packet headers." Reply, 11 (citing Ex. 2007 [Jeffay Transcript] 40:19-42:11). However, Dr. Jeffay's actual testimony was that "[t]he use of information in the headers is primarily what I'm relying on. I believe Copeland will, for example, also talk about packet lengths, and depending on the protocol, that could be – that may be a value carried in the header, or it may be that Copeland will have to just simply measure it. So it would be data about a packet that would have to be measured." Ex. 2007 [Jeffay Transcript] 41:5-17. When asked "how does Copeland measure that data," Dr. Jeffay stated: "I don't recall Copeland describing that in any detail." *Id.*, 41:18-22. And Dr. Jeffay is certainly correct in this statement. Copeland nowhere teaches that its "concern index" is calculated based on measurements of packet length obtained from a source other than packet headers, and Petitioners provide no citations to Copeland suggesting otherwise. *See* Reply, 11.

Moreover, Petitioners' reliance on Dr. Jeffay's muddled testimony that packet header information somehow represents behavioral statistics is not well taken either. *See* Reply, 11-12 (arguing that Dr. Jeffay "also explained, however,

22

that information contained in packet headers can provide 'behavioral statistics,' as a POSA would have recognized, and that, 'at the end of the day, Copeland is really about the concept of extracting data from packets, either in headers or measures of packets, and computing an index that is some representation of the degree to which the packet is part of an undesirable flow.'") (citations omitted).  Under cross-examination, Dr. Jeffay ultimately retreated from that initial position, testifying merely that "to the extent that someone felt that wasn't the case, I think a person of skill in the art would understand that there's nothing in Copeland to prevent you from using behavioral statistics." *Id.*, 42:12-43:3.  But absence of disclosure is not disclosure, and the fact that Copeland teaches nothing that forecloses using behavioral statistics is not evidence that Copeland teaches using behavioral statistics.  Even assuming that it were, which it is not, Petitioner must ***establish*** by a preponderance of the evidence that Copeland discloses the challenged limitation, not simply that "there's nothing in Copeland to ***prevent*** you from using behavioral statistics." (emphasis added).

For these reasons and those set forth in the Patent Owner Response, the Petition fails to demonstrate by a preponderance of the evidence a reason for the POSITA to combine Yung and Copeland to meet the claims.

23

## IV.    CONCLUSION

For at least the foregoing reasons and those set forth in the Patent Owner

Response, the Board should deny the Petition and confirm the patentability of the

challenged claims.


Respectfully submitted,


_____/ Kenneth J. Weatherwax /_____
Kenneth J. Weatherwax, Reg. No. 54,528
LOWENSTEIN & WEATHERWAX LLP
Date:  July 5, 2022


24

Case IPR2021-00909
U.S. Pat. No. 8,243,593

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS

This Patent Owner Sur-Reply consists of 5,422 words, excluding table of contents, table of authorities, certificate of service, this certificate, or table of exhibits.  The Sur-Reply complies with the type-volume limitation of 5,600 words as mandated in 37 C.F.R. § 42.24(c)(4).  In preparing this certificate, counsel has relied on the word count of the word-processing system used to prepare the paper (Microsoft Word).

Respectfully submitted,

/ Colette Woo /

_____

Date:  July 5, 2022

Case IPR2021-00909
U.S. Pat. No. 8,243,593

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the following documents were served

by electronic service, on the date signed below:

**PATENT OWNER'S SUR-REPLY**

The names and address of the parties being served are as follows:

| | |
|---|---|
| James L. Day | jday@fbm.com |
| Daniel Callaway | dcallaway@fbm.com |
| Winston Liaw | wliaw@fbm.com |
| | calendar@fbm.com |
| Alex S. Yap | ayap@mofo.com |
| Mehran Arjomand | marjomand@mofo.com |
| Rose S. Lee | roselee@mofo.com |
| | SPLUNK-SABLE-IPR@mofo.com |

Respectfully submitted,

/ Colette Woo /

_____

Date:  July 5, 2022

Trials@uspto.gov                                          Paper 41
571-272-7822                          Date: September 28, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

CLOUDFLARE, INC., and SPLUNK, INC.,
Petitioners,
v.
SABLE NETWORKS, INC.,
Patent Owner.

———————

IPR2021-00909
Patent 8,243,593 B2

———————

Record of Oral Hearing
Held: September 7, 2022

———————

Before STACEY G. WHITE, GARTH D. BAER, and
JULIET MITCHELL DIRBA, Administrative Patent Judges.

IPR2021-00909
Patent 8,243,593 B2

APPEARANCES:

ON BEHALF OF THE PETITIONER:

DANIEL CALLAWAY, ESQ.
JAMES L. DAY, ESQ.
of: Farella Braun & Martel, LLP
Russ Building
235 Montgomery Street
17th Floor
San Francisco, California 94104
(415) 954-4414
dcallaway@fbm.com
jday@fbm.com

MEHRAN ARJOMAND, ESQ.
ALEX S. YAP, ESQ.
of: Morrison & Foerster, LLP
707 Wilshire Boulevard
Los Angeles, California, 90017-3543
(213) 892-5200
ayap@mofo.com
marjomand@mofo.com

ON BEHALF OF THE PATENT OWNER:

DANIEL LOWENSTEIN, ESQ.
KENNETH J. WEATHERWAX, ESQ.
of: Lowenstein & Weatherwax, LLP
1016 Pico Boulevard
Santa Monica, California 90405
(310) 307-4500
dlowenstein@lowensteinweatherwax.com
kweatherwax@lowensteinweatherwax.com

The above-entitled matter came on for hearing Wednesday,
September 7, 2022, commencing at 10:00 a.m. EDT, via Videoconference.

2

Appx637

IPR2021-00909
Patent 8,243,593 B2

1                           P-R-O-C-E-E-D-I-N-G-S

2                                                              10:00 a.m.

3          JUDGE DIRBA:  Good morning.  This is the oral hearing for

4  IPR2021-00909, relating to U.S. Patent 8,243,593.  My name is Judge Dirba

5  and I'm joined today by my colleagues, Judges White and Baer.  We'll begin

6  with appearances.  Petitioner.

7          MR. DAY:  This is James Day on behalf of Petitioner, Cloudflare.

8  And I'd like to mention my colleague, Dan Callaway is here with me, also on

9  behalf of Cloudflare.  And I understand the Counsel for Splunk, Petitioner

10  Splunk, is on the public line.  And that is Alex Yap and Mehran Arjomand,

11  Morrison Foerster.

12          JUDGE DIRBA:  And Mr. Day, who will be presenting on

13  Petitioner's behalf, today?  Is that just you, or will that be your colleague,

14  Mr. Callaway as well?

15          MR. DAY:  Just me, Your Honor.

16          JUDGE DIRBA:  Okay.  And Patent Owner.

17          MR. WEATHERWAX:  Can you hear me, Your Honor?

18          JUDGE DIRBA:  I can, not very well.

19          MR. WEATHERWAX:  All right.  Just let me know if I'm too soft,

20  because I am hard of hearing.  And so, I do my best to modulate my own

21  volume.  But if I'm not, please remind me.  This is Kenneth Weatherwax, for

22  the Patent Owner.  Patent Owner is also appeared at this meeting, by Daniel

23  Epstein and Erin McCracken.

24          (Simultaneous speaking.)

25          JUDGE DIRBA:  And Mr. Weather -- I apologize.

26          MR. WEATHERWAX:  I will --

3

Appx638

IPR2021-00909
Patent 8,243,593 B2

1       JUDGE DIRBA:  Go ahead, Mr. Weatherwax.  I'll let you finish

2  your appearances.

3       MR. WEATHERWAX:  That was all my appearances, Your Honor.

4       JUDGE DIRBA:  Excellent, and Mr. Weatherwax, will anyone other

5  than you be presenting on Patent Owner's behalf today?

6       MR. WEATHERWAX:  No, Your Honor.

7       JUDGE DIRBA:  All right.  I'll begin with a few general reminders

8  for the hearing today.  The hearing order provided that each party will have

9  45 minutes of total argument time.  Petitioner will open the hearing by

10  presenting its arguments regarding the alleged unpatentability of the

11  challenged claims.  Petitioner may reserve rebuttal time, but no more than

12  half of its total argument time.

13       Thereafter, Patent Owner will response to Petitioner's arguments.

14  Patent Owner may reserve surrebuttal time of no more than half of its total

15  argument time to respond to Petitioner's rebuttal.  Each side's rebuttal must

16  respond to the arguments presented by the other side, but otherwise, each

17  side may use its allotted time to discuss the case as it chooses.

18       No new arguments may be presented at this hearing that have not

19  been argued in the briefs.  Counsel should hold any objections regarding the

20  other side's arguments until it is their turn to speak.  Also, I'll note that we've

21  received Petitioner's objection to Slide 12 of Patent Owner's demonstrative.

22  We will not rule on that objection at this time.  But if Patent Owner presents

23  that slide, we will ask Counsel to specifically identify where in the briefs the

24  objected to argument was made.

25       A few reminders for video.  Please mute your microphone when

26  you're not presenting.  We may have an unexpected interruption in the

<center>4</center>

IPR2021-00909
Patent 8,243,593 B2

1     connection.  If that happens to one of the video participants, or the Court

2     Reporter, we will pause the argument and resume once the connection can

3     be reestablished.

4           If it is your connection that is lost, please spend up to five or so

5     minutes attempting to reestablish the connection.  If attempts are

6     unsuccessful, at that point, please rejoin the hearing by audio, or reach out to

7     one of the hearing staff.

8           Are there any questions before we begin?  Petitioner?

9           MR. DAY:  No, Your Honor.

10          JUDGE DIRBA:  Patent Owner?

11          MR. WEATHERWAX:  No, Your Honor.

12          JUDGE DIRBA:  Very well.  We'll begin with Petitioner's

13    presentation.  Mr. Day, how long would you like to reserve for your

14    rebuttal?

15          MR. DAY:  I'd like to save 10 minutes for rebuttal, Your Honor.

16          JUDGE DIRBA:  And you may begin when you're ready.

17          MR. DAY:  Well, good morning, Your Honors.  We are here today

18    to discuss the 593 Patent.  I've provided a set of slides.  And I'd refer you to

19    Slide 2 to begin.  And you'll see that this 593 Patent is entitled, Mechanism

20    for Identifying and Penalizing Misbehaving Flows in a Network.

21          And what the patent is talking about, is you have these flows of data

22    packets going through a network.  And you want to identify the type of

23    traffic, so you can manage it.  And in some cases, you can drop some of the

24    packets.  You can discard the flow entirely.  And what the patent talks about

25    is, at the time, there were existing techniques that looked for signatures.  In

5

IPR2021-00909
Patent 8,243,593 B2

1    different techniques, but including looking for signatures in the data, in the

2    packets, or in the flow, and using that to identify the type of traffic.

3         But there were problems with that approach.  And so, the 593 Patent

4    says, what you should do to address those problems, is instead collect

5    behavioral statistics.  Look at the behavior of the flow.  Look at how it acts.

6    Look at what it does, and use that information to determine what type of

7    traffic it is.

8         Well, we filed our IPR petition.  I'm now going to look at Slide

9    Number 3.  Filed an IPR petition, it was based on a primary reference to the

10   patent, called Yung.  And Yung discloses and describes a bandwidth

11   management device that similarly analyzes flows of data packets through a

12   network.  Identifies the type of traffic and then, can applies things that Yung

13   called, polices, to the flow, including a discard policy that would allow you

14   to drop some or all of the packets in a flow.

15        And like the 593, Yung talks about how there were existing

16   techniques, including signature-based techniques.  And that there were

17   problems with those, they could, the signature changed.  The signature could

18   be encrypted.  And so, it's better to look at what Yung's called, behavior

19   patterns of the flow.  And use those behavior patterns, what the flow does,

20   how it acts, use that to identify the type of traffic.

21        It's -- the review was instituted, and the Patent Owner voluntarily

22   disclaims all the claims that we had challenged under Yung alone, plus some

23   others.  And what we're left with are the grounds on Slide 3.

24        Ground 2 addresses Independent Claim 9, and Independent Claim

25   29, and their dependents.  And then Ground 3, is limited just to Independent

6

IPR2021-00909
Patent 8,243,593 B2

1    Claim 3.  Of course, there is a dispute about a few of these dependent claims

2    that I show in Ground 2, and I will get to that dispute.

3        But first, and we can sort of skip over Slide 4, which just presents

4    the topics I want to talk about.  I want to start by talking about the Ground 2,

5    and the combination of Yung and Copeland.  And how Copeland discloses

6    the badness factor recited in Claim 9 and 29.

7        And Slides 5, 6, and 7, I'm going to move through very quickly,

8    because the point of those is just that Yung alone, discloses the preamble of

9    Claim 9 and the step of maintaining a set of behavioral statistics for the flow.

10   That's undisputed, so we can move quickly to Slide 8, which focuses on the

11   last step of Claim 9.  Computing, based at least partially upon that set of

12   behavioral statistics, a badness factor for the flow.

13       And we identified, in Copeland, in the secondary reference,

14   something that Copeland called a concern index, as disclosing what's recited

15   here in Claim 9, in the last, in the computing step.  And if you look on Slide

16   8, we pulled out a few of the quotes from Copeland.

17       On the upper right, it says, Copeland says, statistics are collected for

18   each determined flow.  And you analyze the flow.  If the flow is a value,

19   referred to as a concern index, it's assigned to each flow that appears

20   suspicious.  What Copeland is talking about, is identifying network probes,

21   and network attacks.  And so, we identified that.

22       In response, what the Patent Owner has said is, well, you don't have

23   any evidence supporting that.  You're just relying on the ipse dixit of your

24   expert.  So, if you look at Slide 9.  It shows some of our expert's declaration.

25   And I've underlined the sentence that Patent Owner points to, and says, that's

7

IPR2021-00909
Patent 8,243,593 B2

1    the only evidence you have, which of course ignores all of the other
2    evidence that we have.

3          So, our expert, Dr. Jeffay, talked about what the concern index is,
4    immediately after the sentence that they focus in on.  He compares the
5    concern index of Copeland to the disclosures in the 593 Patent, and what is
6    says about this badness factor.  If you move onto Slide 10, he, our expert
7    continues.  And he works with the Claim language, and I've highlighted and
8    underlined on the left here, on Slide 10, that the claim actually tells us
9    something about this badness factor.  And it says that the badness factor
10   provides an indication of whether the flow is exhibiting undesirable
11   behavior.

12         And our expert said, that's exactly what Copeland's concern index
13   value is doing.  Copeland identifies suspicious activity with the concern
14   index.  In other words, it provides an indication of whether the flow is
15   exhibiting undesirable behavior.  Our expert explains, that network probes
16   and network attacks are undesirable behavior.  He didn't just discern it.  He
17   explained why that is so.

18         On Slide 11, we just show a little more of his testimony, and I'll
19   move quickly ahead to Slide 12.  And the point really, of his testimony is,
20   that on Slide 12 we've got some of the language where the 593 Patent
21   describes a badness factor.  It's a factor that provides an indication of
22   undesirable behavior.  And then some quotes from Copeland on the right,
23   that describe the concern index that does the same thing.  It indicates
24   suspicious flows that may be undesirable behavior, network probes, and
25   network attacks.

8

IPR2021-00909
Patent 8,243,593 B2

1    But I want to address here, Patent Owner's argument that Cloudflare,
2    Petitioner, has taken the position in district court, that this term, badness
3    factor, is indefinite.  And we cited a number of cases in our reply brief,
4    explaining that, that issue is not before the Board.  That, you know, unless
5    it's impossible to apply Copeland to the claim language, it just doesn't come
6    up in this proceeding.  It's not an issue in this proceeding.
7    Theirs, was their response to that case law in the sur-reply, and really
8    the argument, is essentially that our expert, Professor Jeffay, doesn't know
9    what the term means.
10    Well, first of all, Professor Jeffay did not offer any opinion in the
11    district court.  So, it's not as though he has said at one time, this term is
12    indefinite, and now is not saying that.  His testimony has been clear.  And
13    you'll see in Patent Owner's slides, they quote him as saying two things
14    about the badness factor.  One, it's not a term of art.  It's not disputed.  And
15    two, that a person of ordinary skill reading the 593, would not understand
16    the bounds.  So, that the full scope, the outer bounds of the term.  And the
17    problem with this term is that at the outer bounds, there may be some
18    ambiguity in what is bad, and what is not bad.
19    But he also testified, that whatever, you know, there may be some
20    ambiguity at the margins, but Copeland describes exactly what the 593
21    Patent is talking about, when it describes both in the specification, and the
22    claims, that a badness factor is an indication of whether the flow is
23    exhibiting undesirable behavior.
24    That's exactly what the concern index is doing.  So, if there's a
25    question at the margins, we're not talking about the margins, we're right,
26    Copeland is dead center in the claim language.

9

IPR2021-00909
Patent 8,243,593 B2

1       Now, I want to ask you to look at Slide Number 13, which has
2   Figure 1 from Copeland.  And it's, there's a lot going on here, so I want to
3   take just a minute to orient you.  If you look, it's Figure 1 from Copeland,
4   Slide 13.  In the upper left there's a picture of a hacker.  So, this a guy sitting
5   at computer, doing bad things.  And directly below, is a legitimate user.
6   Both of them are sending flows across a network.  Not surprisingly the
7   legitimate user is sending legitimate normal packet flows.  And the hacker is
8   sending what Figure 1, what Copeland refers to as bad flows.  And he used
9   the concern index to identify those bad flows.
10      So, if there's some, again, if there is some ambiguity about what
11  someone might consider bad or not, Copeland is very clear, that the concern
12  index is about, intended to identify the bad flows.  It corresponds to the
13  badness factor.
14      When you look at Slide 14, Patent Owner tries to distinguish the
15  concern index by saying, well -- and I quoted on the left side of Slide 14,
16  some passages from the sur-reply.  Patent Owner says, the concern index
17  doesn't work because it's not, the calculation of a badness factor, it does not
18  calculate the badness factor for each flow, as recited in the claim.  So, the
19  argument is, the claims say you have to calculate the badness factor for each
20  flow, which is simply inconsistent with what the claims actually say.
21      And here on Slide 14, we've highlighted that Claim 9 is, recites a
22  method for processing a flow.  And down in the computing stuff, you
23  compute a badness factor for the flow.  This method is fully performed, as
24  soon as you operate on one flow.  There's nothing in the claim that says you
25  have to repeat it once.  There's certainly nothing that says you have to repeat
26  it for every flow you may come across.

10

IPR2021-00909
Patent 8,243,593 B2

1    Now, in the slides, in Patent Owner's slides, it invites while, that we
2    objected to, you see what I think, and what we said in the new argument, and
3    that is, they try to distinguish the concern index by saying that it's not stored,
4    as to individual flows.  So, we object to that, the new argument.

5    But in any event, if you look at Slide 16, which again, shows us the
6    language of Claim 9.  Claim 9 doesn't require storing the concern -- or the
7    badness factor.  It doesn't require that.  What is says is, in the first step
8    you're maintaining a set of behavioral statistics.  So, arguably, you store
9    those.  But then all you have to do is compute the badness factor.  Copeland
10   discloses computing a concern index.  And that matches the claim language.

11   And the next Slides, 17 and 18, simply make the point that Claims 9
12   and 29 are highly paralleled.  And so, the arguments regarding 9, also apply
13   to 29.  So, let's move ahead.  We can go to Slide 20 and talk a little bit about
14   the reasons for combining Yung and Copeland.  On Slide 20, I've underlined
15   some language that the Patent Owner focuses in on.

16   Patent Owner says, the entire basis for your motivation to combine,
17   comes from one quotation in Yung.  Where we cite Yung, as saying -- and
18   Yung provides a number of different exemplary patterns of behavior to look
19   for.  And then says, the application behavior pattern can incorporate other
20   factors as well.  And our expert, Dr. Jeffay said, yes, and a person that's
21   skilled in the art, would be motivated to look at the concern index in Yung,
22   and apply it as another factor.  He did, he does say that.

23   But the Patent Owner says, this is the entire basis, which again
24   requires you to ignore, in this case, five pages of detailed analysis from Dr.
25   Jeffay, explaining exactly how, and why a person of ordinary skill in the art,
26   would take the concern index from Copeland, and apply it in Yung's

11

IPR2021-00909
Patent 8,243,593 B2

1    bandwidth management device.  It would improve Yung.  It would make life
2    easier on network administrators.  Dr. Jeffay also explains just how you
3    could do that.  How this would work.
4            And I have a few slides here, 20 and 21, and 22, where we pull out
5    some of that language, but I think we can move ahead to the next argument
6    and look at Slide 23.
7            So, one of the arguments that Patent Owner makes, and if -- I've
8    quoted on Slide 23, on the left side, language from the sur-reply,   where it's
9    challenging our motivation to combine evidence.  And it says, Copeland
10   concern index value, is not a behavioral attribute of a flow that there is any
11   preponderant evidence that the POSITA would have been motivated to
12   combine with Yung.  Copeland's concern index value is reflective of packet
13   header information, not the behavior of a flow.
14           Kind of a mouthful, but there are a couple of points to make here.
15   Seems to be that Patent Owner is saying, Copeland only uses behavioral
16   statistics from packet headers.  And that, that somehow causes a problem
17   with motivation to combine.  Well, there's a few problems there.
18           One, if you look back at the language of Claim 9 and 29, there's no
19   mention anywhere of behavioral statistics excluding packet header data.  It
20   doesn't say, you know, maintain a set of behavioral statistics obtained, you
21   know, from some source other than packet headers.  It doesn't say that.
22   Patent Owner hasn't suggested any sort of a claim construction that would
23   require that.  So, the premise, the implicit premise here, is not supported by
24   the claim.  That's problem one.
25           Problem two, is this argument appears to presume that Copeland
26   only uses packet header data as behavioral statistics, which is not correct.

12

IPR2021-00909
Patent 8,243,593 B2

1    And again, if we're looking as Slide 23, our expert, Professor Jeffay, said,
2    Copeland computes the concern index based at least upon a set of behavioral
3    statistics.  He says how Copeland does that.
4         And then as highlighted at the bottom, on the right-hand side of Slide
5    23, one of the examples that he pulls from Copeland Figure 6.  And it is,
6    Copeland uses the number of packets in the flow as the concern index.  And
7    the packet header data, does not include a number that is the total number of
8    packets in a flow.  That is not packet header data.  That's data that's
9    aggregated as you analyze the flow and as you analyze the packet.
10        And we, so it's, Copeland is not using packet header data in this
11   instance.  And if you look at Slide 24, we know that this data, the number of
12   packets that Copeland is using for the concern index, qualifies as a
13   behavioral statistic, because the 593 Patent tells us it does.  So, on Slide 24,
14   we have two excerpts from the 593 Patent.  And in both cases, it says, the
15   number of packets in the flow is a behavioral statistic.  So, Copeland is not
16   limited merely to packet header data for its behavioral statistics.  That's
17   problem two with this argument.
18        Third, if the idea here, is that Copeland wants its packet header data,
19   but Yung does not, and so you wouldn't, you know, want to combine those
20   two.  That fails both because Copeland is not limited just to packet header
21   data.  But also, because Yung does not, does use packet header data, as well
22   as other behavioral data to analyze packets.
23        And on Slide 25, I cited one example where Yung explicitly says,
24   here's a pattern you can look for, and the information that will show you that
25   pattern, is in the header of packets.

13

IPR2021-00909
Patent 8,243,593 B2

1      And if we move ahead to Slide 28, I think the main point here is,
2  Yung and Copeland are both looking at the same types of data.  And with
3  regard to the packet count, the number of packets in a flow, and the total
4  bytes, so the full size of the flow, both Yung and Copeland are identifying
5  exactly the same thing.  And we know those are behavioral statistics
6  because, and if you look at the bottom of Slide 28, the 593 Patent tells us
7  they are.
8      So, wherever that data is coming from, the packet header or
9  somewhere else, those are behavioral statistics.  They're collected by Yung
10  and Copeland.  That this argument offers no reason why you would not
11  combine.  And I guess there's a final point, that I'll also note.  There's no
12  evidence behind any argument in response to our motivation to combine
13  evidence.  There's no contrary expletive or other evidence.
14      So now, I want to move ahead.  And if you look at Slide 29, I want
15  to move onto this Four-Steps Whitepaper.  And the question about whether it
16  was publicly accessible?  If you look at Slide 30, the point there is simply
17  that Yung discloses most of Claim 3.  So, we're now talking about Grounds
18  3.  It applies only to Claim 3.  Yung discloses most of the claim, that's
19  undisputed.
20      If you go to Slide 31, this Four-Steps Whitepaper discloses the one
21  limitation, the one other limitation, that's also undisputed.  If you look at
22  Slide 32, we put in evidence with our petition, from the Internet Archive.  A
23  declaration from the Archive, authenticating and showing that this document
24  was on the Packeteer website no later than, as of March 17th, 2003.  That's
25  undisputed.

14

IPR2021-00909
Patent 8,243,593 B2

1    If we move to Slide 33, now, we put in a fair amount of additional
2    evidence with our reply brief, and I'll get to that. But I want to start with just
3    the evidence that was submitted with our petition. And what do we know
4    about this Four-Steps Whitepaper, and whether it was publicly accessible?

5    Well, on Slide 33, we know that Yung, our primary reference, is a
6    Packeteer patent, and it explicitly identifies Packeteer and its PacketShaper
7    product. Now, the Whitepaper is a technical product overview of
8    Packeteer's PacketShaper product. And Yung not only identifies it, but says
9    this is exactly the type of device you can use to implement this invention I'm
10   describing to you.

11   What else do we know? On Slide 34, our expert explained that
12   Packeteer was known in the industry. That was based on his personal
13   experience in the 2000s. He at one time bought and used a PacketShaper in
14   his lab. He also cited a few documents to support the fact that Packeteer was
15   known, and that the PacketShaper product was on the market.

16   Now, if we move ahead to Slide 35, I want to talk about what
17   looking at the Four-Steps Whitepaper itself, tells us. And the point is, it tells
18   us it's a marketing document. This was a marketing document put on the
19   Packeteer website in order to promote the PacketShaper product. How do
20   we know that?

21   Well, if we read on Slide 35 it says, you know, if you have, or do
22   any of these problems sound familiar to you? And then it lists off a few
23   problems that network administrators might have. Says, if you do,
24   PacketShaper, you know, can solve these problems. And the paper has
25   underlined some language at the bottom, explicitly says, this paper is

15

Appx650

IPR2021-00909
Patent 8,243,593 B2

1  intended for system and network administrators.  It's intended for customers

2  who might want to buy this product.

3      If you look at Slide 36, there's more marketing language.  Ease of

4  deployment, you can deploy PacketShaper all at once, or you can do it in

5  phases.  There are a variety of models to choose from.  If there was any

6  question at all, on the last page it says, for more information, you know, call

7  us.  Or if you want to buy this product, call us or go to our website.  It's a

8  marketing piece that was on the website at least, well, well over a year

9  before the priority date.

10      Okay.  If you look at Slide 38, now, what happened is, after the

11  Institution Decision, the Patent Owner objected to the Four-Steps

12  Whitepaper, saying it was not authenticated.  And that it was, had not been

13  shown to be prior art.  So, we sent them a bunch of supplemental evidence,

14  authenticating and showing that in fact, it was publicly accessible.

15      One of the things we did, is we asked our expert, Dr. Jeffay, to use

16  the Internet Archives' Wayback machine, and go to an archive page from

17  early 2003 of the Packeteer website.  Go to the Home Page, and try to

18  navigate through the Home Page, to find this Whitepaper. And we've cited a

19  little, some snippets from his supplemental declaration here on Slide 38.  He

20  says, that's what I did.

21      On Slide 39, he walks through, first you click the link to the

22  Product's Page.  On Slide 40, he says, on the Product's Page there's a link

23  that takes you to the PacketShaper product.  Slide 41, he says on the

24  PacketShaper Product Page, under the heading, Whitepapers, the very first

25  thing you see is a link to the Four-Steps Whitepaper.  And when you click

16

IPR2021-00909
Patent 8,243,593 B2

1   that link, Slide 42, confirms that it is the same document we submitted as
2   Exhibit 1006.  All right.
3       JUDGE DIRBA:  Counsel, I have a tangential question about the
4   Whitepaper.  You mentioned that this evidence was provided to Patent
5   Owner shortly after the Institution Decision, after they objected to the
6   evidence, the Whitepaper itself, and before Patent Owner's response.  Is
7   there any evidence in the record about when that information was provided
8   to Patent Owner?
9       MR. DAY:  Yes, we included the service email evidencing when that
10   was sent.  I will have to look up the exhibit number, but I recall we put the
11   service email in with our reply brief.
12       JUDGE DIRBA:  I see, helpful.  If you could give me that, during
13   your reply presentation.
14       MR. DAY:  Will do.  Thank you, Your Honor.
15       Okay, if we move ahead to Slide 45.  The other thing we did is with
16   our, this supplemental evidence that we provided in December, months
17   before the Patent Owner deposed Dr. Jeffay, and months before the Patent
18   Owner's response, in addition to his supplemental declaration, we also gave
19   them a number of other documents, including what's shown on Slide 45.
20   Which is an IBM Patent based on an application that was filed back in 2003,
21   that cites to the same Four-Steps Whitepaper.
22       Again, in our reply brief, we gave them the supplemental evidence in
23   December.  We added it to the record in this proceeding with our reply brief.
24   At that time, we explained and we cited cases, saying that, that was timely.
25   There's been no response.  There was no response in the sur-reply.  There

17

IPR2021-00909
Patent 8,243,593 B2

1    was no mention of this evidence in Patent Owner's response.  So, it had it,

2    for months in advance.

3    So, if you go to Slide 46, we added a couple of other things with our

4    reply brief.

5    JUDGE DIRBA:  Counsel.

6    JUDGE BAER:  Mr. Day.

7    MR. DAY:  Yes.

8    JUDGE BAER:  Mr. Day, can you hear me?

9    MR. DAY:  Yes.

10    JUDGE BAER:  This is Judge Baer.  A question about your

11    statement that all of this was timely.  Is this an evidentiary issue, or is this an

12    issue that you needed to establish as part of your principal case?

13    MR. DAY:  Yes, I would -- well, the answer to that is the Federal

14    Circuit has told us that when the Patent Owner challenges public

15    acceptability, it is appropriate and timely for the Petitioner to add evidence

16    of public accessibility with their reply.  And I, so here I would refer you to

17    Slide 52.  First of all, we made, I think a wholesome presentation of this in

18    our reply brief.  And there's no response to that in the sur-reply.

19    But Slide 52, cites two Federal Circuit cases that are the dead-on

20    point.  The *Valve v. Ironburg* case says, you know, Petitioner may provide

21    evidence of public accessibility of a reference after the petition stage.  And

22    there it was put in with the reply.  And the Federal Circuit was okay in that.

23    Then cites to the *VidStream* case, where the exact same thing

24    happened.  A bunch of evidence comes in with the reply, and the Federal

25    Circuit says, yes, that's timely.  So, the Federal Circuit has told us, that this

18

IPR2021-00909
Patent 8,243,593 B2

1    is an appropriate way for us to bring in evidence, establishing public

2    accessibility.

3        JUDGE BAER:  And are those cases, do those cases stand for the

4    proposition that it is permissible that we allow it, or that it is mandatory that

5    we allow it?  In other words, is it error for us to hold otherwise, or is it just

6    permissive?  We could go either way?

7        MR. DAY:  I don't believe that the decisions draw a distinction.

8    They, in both cases, they reject the argument that it's untimely.  I suspect if

9    the question was presented, it could be an error, because the Federal Circuit

10   has rejected the argument, that the Board might be relying on.  But that, I

11   didn't read that distinction from these cases, Your Honor.

12       JUDGE BAER:  Thank you, that's helpful.

13       MR. DAY:  So, let me talk about just the last two pieces of evidence

14   that came in with our reply.  We do that by going back to Slide 46.  One of

15   the things that the Patent Owner did, is put in a declaration from Patent

16   Owner's Counsel, saying, if you look at the Internet Archives, using the

17   Wayback machine, looking for archived versions of the Four-Steps

18   Whitepaper, after March 17th, 2003, she got some error messages.  We think

19   what happened is if you, that Packeteer changed to a different version of this

20   document.  So, that was leading to some error messages.

21       What we did, in response, is instead of looking after March 17th,

22   2003, we looked from the period beginning in September 2002, which is the

23   date on the face of the document, through early 2003.  And my colleague,

24   Mr. Callaway, went to the -- he repeated the process that Dr. Jeffay had

25   employed in his supplemental declaration.  Start with an archive Home Page,

26   from Packeteer's Home Page and use that to click to the Product Page, the

19

IPR2021-00909
Patent 8,243,593 B2

1  PacketShaper Page, and then find a link to the Four-Steps Whitepaper.
2  Verify that when you click that link, it takes you to the Four-Steps
3  Whitepaper.
4         And if you look on Slide 47, he repeated that for each instance where
5  the Home Page for Packeteer had been archived, in eight different times
6  between September 2002, and early 2003.  And then finally, if you go to
7  Slide 48, we also got a declaration of the author of the Four-Steps
8  Whitepaper, who worked at Packeteer, wrote the document.  On Slide 49,
9  she confirms that beginning in September 2002, the date on the document, it
10  was available on the website.
11         On Slide 50, she says, it was available, and it could be accessed and
12  downloaded by anyone without credentials.  You didn't need a password,
13  you didn't need permission.  And she says, on Slide 50 here, she says, we
14  wanted people to download and read Packeteer's product literature, including
15  the Four-Steps Whitepaper. And then finally, she talks about how, if you
16  look at Slide 51, she talks about how the Four-Steps Whitepaper was a big
17  part of Packeteer's marketing of the PacketShaper product.
18         And I recite the language from the *Valve* decision, again.  I think it is
19  very close on point.  There, the Federal Circuit was talking about this
20  product review, that a company had put on their website.  Federal Circuit
21  says, that article was intended to reach the general public, so that the review
22  could promote the business.  And the Federal Circuit said that is strong
23  evidence that the online review is publicly accessible.
24         The author of the Four-Steps Whitepaper confirms that this was a
25  marketing document, and she talks about emailing it to customers, potential
26  customers.  That sales people took it to trade shows.  Frankly, just looking at

20

IPR2021-00909
Patent 8,243,593 B2

1    the Four-Steps Whitepaper itself, it's clear that it's a marketing document.

2    And because it was a marketing document, accessible by the general public,

3    on Packeteer's website, it intended to promote the PacketShaper product,

4    consistent with *Valve*, that is strong evidence of public accessibility.

5          Now, if we get to our -- well, before we go ahead, back to Judge

6    Baer's point.  If you look at Slide 52 again.  We've cited the *Valve* case.  And

7    again, we, in our reply brief, cited *Valve*, several other cases, Board

8    decisions, confirming that it was timely and appropriate for us to put in

9    evidence of public accessibility in our reply.  And there is no response to

10   that law.  There's no response to this evidence in the sur-reply.

11         So, if you hear any arguments today about *Valve*, or *VidStream*, or

12   anything specific to the evidence that was put in, those will be new

13   arguments.  And finally --

14         JUDGE DIRBA:  Counsel, before you turn to your last point, I'll

15   warn you, you have about, just over two minutes in your opening

16   presentation.

17         MR. DAY:  Very good.  Thank you, Your Honor.

18         Let me move kind of quickly, through the last point, which is the

19   typographical error.  And if you go to Slide 56, the point I wanted to make

20   here is, by taking some language from the sur-reply is, there doesn't appear

21   to by any legal dispute, that we and the Patent Owner agree, that the Board is

22   allowed to use logic and common sense to try to determine if there was a

23   typographical error.  If there was, the Board can use logic and common

24   sense to decide what we actually meant to contend, in our petition despite

25   the error.

21

IPR2021-00909
Patent 8,243,593 B2

1    Patent Owner at the bottom of this says, you know, that the petition
2    itself can be the evidence that shows there was an error.  And it says in
3    *Axionics*, internal inconsistency is strong evidence of a typographical error.
4    We have an internal inconsistency, and I want to show you what that is.

5    If you look at Slide 57, our analysis in the petition was that the
6    language added by dependent Claim 17 and 18 is disclosed by Yung alone.
7    And we cited to these other Claims 7 and 27, because the evidence related to
8    those limitations also applies to these dependent claims.

9    If you look at Slide 59, I pulled out some of that evidence, that
10   shows that the limitations added by 17 and 18, are in Yung alone.  And that's
11   undisputed.  But then, if you look at Slide 60, here is the inconsistency.
12   Slide 7 -- I'm sorry, Claim 17 depends from Claim 12, which depends from
13   Claim 11, which depends from Claim 9, which includes a badness factor
14   limitation that is met by Copeland.  That's the only argument about the
15   badness factor in the petition, is that you need to Copeland to disclose that.

16   And so, 17 as a matter of common sense and basic patent law, asks --
17   17 includes, through the legal language that we've highlighted on Slide 60,
18   all the limitations of 12, 11, 10, and 9.  Therefore, it must include the prior
19   art we cited.  It means the prior art we cited for those claims as well.  That is
20   the inconsistency.  There is no argument in the petition that Claim 12 is
21   disclosed by Yung alone.  So, there's no ambiguity here.

22   There's also, we don't need to change any of our arguments or
23   evidence.  The only change is that Claim 17 and 18, instead of being cut and
24   pasted into our petition, in section 7A, for Ground 1, should have been in
25   Section 7D.  With that change, there is no other requirement to change our
26   argument or evidence.  We're not suggesting that you need more prior art, or

22

IPR2021-00909
Patent 8,243,593 B2

1    that you have to read the prior art we cited, differently.  We did exactly as

2    we said.  You just need to consider these sections instead of being in Ground

3    1, they should have been in Ground 2.  And with that --

4         (Simultaneous speaking.)

5         JUDGE BAER:  Mr. Day.

6         MR. DAY:  Yes.

7         JUDGE BAER:  Does this issue turn on the drafter's intent and what

8    we can tell about the drafter's intent?  Or does this issue turn on what an

9    objective person, how an objective person would read the petition?  And or

10   both?  And does it matter?

11        MR. DAY:  Yes.  We cited a number of Board decisions, where the

12   Board found typographical errors, and sort of tried to divine what the

13   petition was intended to say.  It did not draw a distinction.  But in none of

14   those cases was there testimony from the drafter or anything that would

15   suggest the subjective intent is the standard.  They simply, in those

16   decisions, each one of them, they look at the petition.  They say, oh, based

17   on what I see in the petition, there's an inconsistency.  That tells me there's a

18   typo.  And I'm going to, you know, apply logic, and I'm going to apply

19   common sense.  And understand the petition as it clearly was intended,

20   despite this typographical error.

21        JUDGE BAER:  Would it be fair to characterize your position then,

22   to be that, although these cases sort of describe these as typographical errors,

23   it doesn't really matter whether it's an error or not.  The point is, what one

24   reading the petition would understand the argument to be, whether that was

25   someone's error or not?

23

IPR2021-00909
Patent 8,243,593 B2

1    MR. DAY:  I understand your question.  I believe that's right.  In
2    none of those cases, again, in none of those cases did they question the
3    Petitioner and try to get behind, you know, was this actually a typographical
4    error?  Or was it something else?  It's not, none of them go into the
5    subjective intent of how the problem got there.  They just recognize the
6    problem.  And they read what was clearly intended as opposed to what was
7    literally followed, from just a literal reading of the petition.
8        JUDGE BAER:  Thank you.
9        MR. DAY:  And with that, I'm happy to answer any other questions
10   or reserve the rest of my time.
11       JUDGE DIRBA:  Thank you, Counsel.
12       And Mr. Weatherwax, how long would you like to reserve for your
13   rebuttal?
14       MR. WEATHERWAX:  I think 15 minutes, Your Honor.  Can you
15   hear me, okay?
16       JUDGE DIRBA:  I can now, thank you.  Give me one second.
17       All right, you may begin when you're ready.
18       MR. WEATHERWAX:  Thank you, good morning, Your Honors.
19   I'm Kenneth Weatherwax, for Patent Owner, Sable Networks.  If I could
20   refer you to Slide 2 of my presentation.  We're here today about 27 claims,
21   as you see on Slide 2, seventeen challenged claims have been disclaimed,
22   before the hearing.
23       I want to, if I could, direct your attention here to something that kind
24   of jumps out about Petitioner's arguments before you today. Slide 2 of my
25   presentation, faithfully reflects Cloudflare's petition, and Spunk's petition,
26   and Palo Alto's petition that Cloudflare adapted its arguments from.

24

IPR2021-00909
Patent 8,243,593 B2

1    If you go back to Petitioner's Slide 3, it says, Petitioner's remaining
2    grounds, are just Grounds 2 and 3.  And that Claims 17, 18, 37 and 38 are
3    sort of in there somewhere in Ground 2.  What you're looking on Petitioner's
4    Slide 3 is fantasy.  This petition is fantasy, it's not what their petition said.
5    It's not what Cloudflare's petition said.  It's not what Splunk's petition said.
6    It isn't what Palo Alto's petition says, that Cloudflare adapted its argument
7    from.
8        This (audio interference), the petition, and it doesn't say that.  It
9    doesn't say that there's a dispute, which is (audio interference).  And it
10   doesn't mention that these claims were ever indicated in the Petitioner's new
11   charge under Ground 2, or in Ground 5.  So, I found that slide somewhat
12   remarkable.
13       The mad men of Madison Avenue actually had a name for this, and
14   they called it talking past the sale.  Talk to the (audio interference).
15       I don't think this gentleman should buy it.  But since we're in the
16   realm of imagination here, we're talking first about (audio interference).  I'd
17   like to ask the Panel to imagine if I took this book here (audio interference).
18       COURT REPORTER:  Mr. Weatherwax, pardon me.  I'm sorry to
19   interrupt you.  This is the Court Reporter.  I'm having a little bit of trouble
20   hearing you.  Your words are coming through, but it's coming through very
21   garbled and mumbled on my end.  I think it might be -- I'm not sure if you're
22   using a certain microphone, or your computer, but I think that might be part
23   of the issue.  I'm not sure.
24       MR. WEATHERWAX:  Well, let's pause then.  Can you hear what
25   I'm saying?

25

IPR2021-00909
Patent 8,243,593 B2

1    COURT REPORTER:  I can hear what you're saying, but there, it
2    goes into parts when you're speaking, and it sounds, it sounds like you're like
3    going through a tunnel or under water almost.  It's not consistent.  But it's
4    enough where I think we're going to be losing record if we were to continue
5    like this.
6    MR. WEATHERWAX:  All right. If you can hear me, let's do just a
7    slight experiment.  It seemed all right when I tested it, but I have a couple of
8    other things I can try to use.  And if necessary, I can dial in using my phone.
9    So, if you'll stand by for just a moment and let me try the other microphone
10   as a possibility.
11   COURT REPORTER:  Yes, absolutely, that sounds good.
12   MR. WEATHERWAX:  All right.  I'm trying another microphone
13   possibility.  Can you hear me?
14   COURT REPORTER: It sounds much better.
15   MR. WEATHERWAX:  That sounds much better?
16   COURT REPORTER:  Yes, sir.
17   MR. WEATHERWAX:  Does it sound acceptable then?
18   COURT REPORTER:  Yes, this one is acceptable.  I don't think
19   we're going to be losing any record like this.  Thank you.
20   MR. WEATHERWAX:  Okay, very good.  And I'm sorry about that.
21   JUDGE DIRBA:  Thank you, Counsel.  And just to clarify --
22   COURT REPORTER:  No worries.
23   JUDGE DIRBA:  I did pause your time during the discussion with
24   the Court Reporter.
25   MR. WEATHERWAX:  Much appreciated, Your Honor.  So, I'll,
26   I'm going to start over again, and you can start up the time again.

26

IPR2021-00909
Patent 8,243,593 B2

1        JUDGE DIRBA:  Certainly.

2        MR. WEATHERWAX:  So, back to the realm of imagination.  And

3  I'd like to ask the Panel to imagine if I told the Court that the patent in this

4  case was missing some disclosure, some teaching, some support, a word

5  that's critical to this case.  But only if it was there, because there was a typo.

6  Inadvertent, or the Patent Owner's response didn't address an argument, or

7  an argument as to one plan.  And the other side said, no, that's nonsense.

8  Well, maybe there's an error, but it's not a correctable error.

9        Even if common sense shows you there was an error, that's on the

10  Patent Owner.  And then suppose in that situation, I had a slide depicting the

11  patent, as if it included the disclosure.  Or the Patent Owner's response, as if

12  it included, the thing that was missing. I think this Panel would be on me

13  like a load of bricks.  What's the Board here to do?

14        Is it here to kill patents or to mutually adjudicate them?  Has the

15  court put in a time, looking for arguments the Patent Owner should have

16  made, had it only better apprehended the claims it was looking at?  Or the art

17  it was looking at?

18        I think that's not the Board's job.  And I don't think this is the Board's

19  job either.  But we'll get to more of that.  We'll look more at my roadmap.

20        JUDGE DIRBA:  Counsel, may I -- may I interrupt with a question

21  that plays off of the hypothetical that you asked?  Are you saying that there's

22  any -- so, if I understood your hypothetical, it was for example, if there was

23  a substantive argument that was missing from one of the party's briefs, that

24  might be an error.  It might be something that the party did not intend to do,

25  or that a rational party would not have done, but it's not a correctable error.

26  And I see the point that you're making there.

27

IPR2021-00909
Patent 8,243,593 B2

1    My question to you is, is there any substantive argument missing
2    from the petition?  In other words, if the petition or at least Petitioner's
3    contention is that they showed that Yung discloses the additionally recited
4    limitations of these claims.  And they showed that a combination of Yung
5    and Copeland disclosed the limitations of the claims from which they
6    depend.  And thus, Petitioners contention is that they have all of the
7    substantive contentions.  They have, if you will, all the pieces of the puzzle.
8    They just didn't correctly label the puzzle in the petition.
9        MR. WEATHERWAX:  That's their contention, Your Honor.  Our
10   contention, which is based on our impression of this error, when we noticed
11   it, and we were preparing the POPR -- and of course we had no occasion to
12   mention it in the POPR because of *SAS Institute* -- was that they had
13   misapprehended the arguments that they were presenting.  Well, excuse me.
14   No, they did not misapprehend the arguments, what they misapprehended
15   was the claims.
16       And furthermore, as we'll get to, they are not writing on any empty
17   slate.  They did not craft these arguments from scratch.  They were copying
18   another petition.  So, they'd have to argue that the error was theirs, and a
19   number of other sophisticated parties represented by sophisticated counsel.
20   None of whom ever said it was an error.
21       But we'll get to that, Your Honor, about the dividing line between a
22   substantive error and a non-substantive error.  All I'll say at this point, is that
23   an incorporation, by reference in an argument, without repeating the
24   argument again, is a substantive argument.  It's omission, a substantive
25   omission.

28

IPR2021-00909
Patent 8,243,593 B2

1      Now, you can say that it's an obvious typo in certain circumstances.
2    But it has to be a typo that is clearly, and pun intended, a typo.  And there's
3    also something that comes into this, which is, should it be corrected?  You
4    can call that diligence.  You can call that, whether it's ambiguous.  You can
5    call it whether it's timely.  But we can discuss that more, as I get a few more
6    slides up there.

7      JUDGE DIRBA:  And let me go back to my question, to make sure
8    that I understood the answer to my question.  My question fundamentally
9    was, do you contend the Petitioner is missing any substance from the
10    petition?  I understood your answer to be, yes, but I did not clearly
11    understand what substance you allege is missing.

12      MR. WEATHERWAX:  Sure.  My understanding is, that they are
13    missing a substantive argument, because they, knowing what Ground 1 was,
14    took these claims, and whether through lack of diligence, lack of
15    understanding correctly of what the disclosures are, they misunderstood.
16    And again, it's complicated by the fact that they're not writing on a clean
17    slate.

18      So, I don't want to summarize this in a way that makes you think
19    that's all there is.  But I think that this was a misapprehension.  Should a
20    misapprehension be corrected?  That's really what's before us today.  It
21    certainly, needn't be.

22      JUDGE DIRBA:  So, what, but what do you contend?  So, I
23    understand your point about: should we correct the error?  I understand your
24    points about that Petitioner misapprehended, in other words, that the nature
25    of this mistake is such that it shouldn't be corrected or correctable.  But
26    what, what is the, what is the substance of argument?  In other words, what

<div align="center">29</div>

IPR2021-00909
Patent 8,243,593 B2

1    would the petition needed to have said, that it didn't say?  What substantive

2    position would it needed to have advanced?  So, that it is not --

3         MR. WEATHERWAX:  Well, it's not an omission.  They didn't

4    forget Claims 17 and 18 and so forth.  They addressed it.  And they, from all

5    appearances, addressed them in a way they thought was complete.  They

6    said, Yung's enough.  Yung is enough.  Now, did they misunderstand Claim

7    17 and 18 and so on, with their substantive arguments?  Maybe.  I'm not

8    their keeper, so I don't know.

9         But again, it's complicated by the fact that they weren't writing on a

10   clean slate.  That their substantive argument was that Yung had the snap -- if

11   you go back to the POPR, since we're talking about the past here, I

12   mentioned POPR -- well, excuse me.  Sorry, we mentioned in the POPR that

13   it seemed that the petition was conceding that Yung didn't disclose the

14   badness factor.  But in truth, if you look at what the petition said that we

15   were citing, there's no sentence in the petition saying Yung doesn't disclose

16   the badness factor.

17        We just thought it was significant that when they talked about the

18   badness factor, they're talking about Copeland.  But that doesn't mean that

19   for certain, they thought that Yung wasn't, it was in their understanding of

20   these claims, that Yung wasn't enough.  And again, they have a duty to

21   diligently understand the claims, and do their best to understand them

22   correctly.

23        Here, they need the Board's help, as the Board recognizes it's an

24   Institution Decision.  The question is whether the Board should help?  Does

25   that answer your question sufficiently?  Again, I'll return to this issue more

26   in the next couple slides.

<div align="center">30</div>

IPR2021-00909
Patent 8,243,593 B2

1          JUDGE DIRBA:  I believe I understand your argument.

2          JUDGE BAER:  Mr. Weatherwax.

3          MR. WEATHERWAX:  Yes, Your Honor.

4          JUDGE BAER:  This is Judge Baer.  If you're saying that you

5    recognized that their position was that Yung was not enough to disclose the

6    badness factor, doesn't that actually support the Petitioner in showing that

7    you really knew what they were actually saying?

8          MR. WEATHERWAX:  No.  We didn't understand this to be a

9    typographical error, Your Honor.  We just thought that they didn't

10   understand the claims.  That is how we understood it.  Now, again, we didn't

11   have any occasion to mention this to them in the POPR, because if we had

12   shown something about these particular claims, that's irrelevant under *SAS*

13   *Institute*.

14         Now, if we had disclaimed a bunch of claims, it still would have

15   been irrelevant under *SAS Institute* unless we review all the grounds.  So, I'm

16   mentioning this, not to indicate -- I mean we looked at this petition hard.

17   And we thought that they had misunderstood the claims.  We didn't think

18   that they'd made a typo, or put it in the wrong section.  So, to the extent

19   that's relevant, I'm happy to discuss it.  Whether it is relevant or not, I think

20   is an interesting question under the standard, which, Your Honor, astutely

21   was asking about.

22         And if we can preface what we think the standard is.  I don't know if

23   it's a subjective or an objective standard.  I think that what it is, is it's a

24   discretionary standard.  Abuse of discretion, I think would be the applicable

25   standard of review.  But I think the question goes to whether it is an error

31

IPR2021-00909
Patent 8,243,593 B2

1    that should be corrected, or should be on the person who makes it, in the
2    circumstances.
3           And all the circumstances here are relevant, including the fact that
4    this was in three petitions in a row, which is a total of eight sophisticated
5    petitioners, represented all by sophisticated counsel.
6           JUDGE BAER:  It seems to me, Mr. Weatherwax, that your position
7    -- you've articulated that it is made more difficult by the fact that this was
8    repeated.  That seems to me to go to subjective intent, not what it shows
9    objectively.  Am I wrong on that?
10          MR. WEATHERWAX:  It depends.  First of all, the answer, I think
11   is, yes, because.  To the extent that the standard is subjective intent, this is
12   relevant.  But if the standard is something else, it is still relevant because the
13   question is, is it an error the Board should correct for the party?
14          That, I didn't say anything about subjective intent, I think this comes
15   to notions of diligence, and whether it is possible for a misunderstanding to
16   have occurred?  And also, whether there's a diligence to correcting the error?
17          I would note that if you look at the slides, of my friend on the other
18   side, about this issue, Judge Baer.  Many of them cite at the bottom, where
19   the arguments presented in those slides were in the party's briefing.  I don't
20   think they were.
21          This is something that they have, are telling you now, for the first
22   time, in these terms, at oral argument, after three petitions were filed over
23   the course of years, was an obvious typo.  And I think that that should weigh
24   in the equation of whether it should be corrected.

32

IPR2021-00909
Patent 8,243,593 B2

1    But again, I have some slides and observations which I was going to
2    mention in the slides.  I'll skip some of them now.  But if that answers your
3    question sufficiently for now, I'll proceed.
4         JUDGE WHITE:  Mr. Weatherwax, I --
5         JUDGE BAER:  Sufficient for now, thank you.
6         MR. WEATHERWAX:  Thank you.
7         JUDGE WHITE:  I had a question, and it goes to the idea of
8    prejudice.  Are you, is it your position that you are prejudiced by, you would
9    be prejudiced if we considered this as a typo?  When we look at the fact they
10   notified, Petitioner notified you that their position was that this was a
11   typographical error, I think, a week to 10 days or so, after the Decision on
12   Institution came out.  Would that email, that notification there, not be
13   sufficient to alleviate any prejudice you may have, as far as in any lack of
14   clarity about what they were saying in the petition?
15        MR. WEATHERWAX:  No, Your Honor, it has nothing to do with
16   whether the error should be corrected.  I would just like, Your Honor, to
17   consider the circumstances of that email.  Self-serving, doesn't begin to
18   cover it.  They don't present any evidence showing that it was an inadvertent
19   error.  They seize upon language, word for word, that was in the Board's
20   Institution Decision, where the Board said, well, we mused that this might be
21   a typo.
22        And out comes this email.  No evidence is presented, no details are
23   presented.  It is simply said, oh, yes, what the Board said.  We submit that's
24   not evidence.  As far as whether there's prejudice, I would direct, Your
25   Honor's attention to the cases that say, that it is for the petition for the case
26   to be made, and the petition's position defines what the case is.  And I have

33

IPR2021-00909
Patent 8,243,593 B2

1    some cases to mention on that, but I'll suffice it to say that I don't think this

2    is really so much a question of prejudice.

3         And I would mention, that the cases on this, Your Honor, that are

4    cited by either party, none of them talk about whether there was prejudice or

5    not.  So, as far as whether that's the standard, I suppose that in a common

6    sense vain, it's relevant.  But you don't, in other words, go back to the old

7    machine, before *SAS Institute*, Your Honor.  I think the Board had a more

8    expansive view of what it could do to change the case, at the Institution

9    stage.  They could add grounds for example, basic thing.  Like a

10   reexamination perspective.

11        But is that prejudicial?  I mean the Board scheduled lots of notice.

12   I'd say the answer is, no and yes.  No, because the Patent Owner has been

13   given warning.  But yes, because the thumb is placed on the scale.  This is

14   no longer the case of the Petitioner made, and had the duty to make.  And

15   *SAS Institute* overruled that practice to some extent.

16        So, I don't think prejudice is really the word to think about this here.

17   The question is, is this part of Petitioner's case, properly understood?

18   Because it's the Petitioner that makes its case and presents it to the Board.  If

19   that answers your question sufficiently, I do have some time left, so I think I

20   should proceed.

21        Thank you, Your Honor.

22        So, the road map in Slide 3, Your Honors, is -- I'll step through it.

23   For Slide 4, the claimed invention is from 2004.  It's a mechanism for

24   identifying and penalizing misbehaving flows.  It's a way they've -- it was

25   novel, for identifying that individual flows are exhibiting undesirable

26   behavior -- pre-calculation of a badness factor. And this is behavior that

34

IPR2021-00909
Patent 8,243,593 B2

1    might be perfectly legal in the networking question.  But it's behavior that's

2    desirable to reduce.

3         For example, peer-to-peer traffic.  Whatever one thinks of the

4    morality of Napster, it can burden networks disproportionately because it

5    uses a ton of bandwidth.  And the invention identifies such misbehavior by

6    identifying individual flows on the network, by observing the flow as it's

7    flowing.  And observing its behavior over time, and capturing behavioral

8    statistics.  Calculating badness factors for example, for individual flows.  It

9    can inflict a penalty to rehabilitate the flow, that if it can be rehabilitated, so

10   it doesn't misbehave.

11        Now, let's turn to Slide 5.  And what looks like, what set off the

12   alarm bells for Petitioner was the Institution Decision correctly observed,

13   that Claims 17, 18, 37 and 38 are in Ground 1, that alone.  But as the Board

14   correctly found, Ground 1 does not show unpatentability of Claims 17, 18,

15   37 and 38.  The Board did not hold there was a typo, and passed it to court.

16   The Board did not rewrite the petition, and it can't.  I guess the background

17   to this sua sponte suggestion, was the Board decided this was a flaw in

18   Ground 1, that the members of the panel, thought was so glaring, maybe it

19   wasn't real.  Maybe there's another explanation.

20        Now, we have not found cases that feature into Slide 6, that support

21   the proposition that the Board can change the petition based on an error like

22   this in these circumstances.  The Petitioners did their best.  They found cases

23   where the Board corrected petitions, the way the Board can correct a patent.

24   It's like a Certificate of Correction. That sort of thing.

25        In each of those cases, the evidence was clear to the party before the

26   Board, had made the typo.  The typo was usually in a heading or a table.

35

IPR2021-00909
Patent 8,243,593 B2

1    Now, you heard today, the Petitioner cites 57 to 66 new arguments, as I said.

2    Now, they're coming to the last minute with arguments that this typo is so

3    darn obvious, that the Petitioners couldn't find any evidence of it until, not

4    only Petitioner's right to submit evidence was over, but Petitioner's right to

5    submit briefing was over, until late last week.

6            So, think about whether that's an unambiguous error that should be

7    corrected.  Don't you think it's a little late to bring it up under these terms?

8            JUDGE DIRBA:  Counsel, I have a question about the points you

9    make about, or you argue that Petitioner hasn't provided any evidence that

10   this was an error of the type that could be corrected.  What sort of evidence

11   are you suggesting that they should have provided?  What would that

12   evidence have shown?  In other words, why would we look any further than

13   just at the petition itself?

14           MR. WEATHERWAX:  Well, Your Honor, there could be a

15   declaration.  I'll give you an example of an analogous situation. If you file

16   late, typically what you see is a motion to view the filing dates as being not

17   late.  And it's normally supported by a declaration.  Because otherwise

18   what's the evidence that it was actually late, that they actually tried to file it

19   on time?

20           I was discussing earlier with Judge Baer, whether subjective intent

21   matters?  I think that it doesn't have to be part of the equation.  But it

22   certainly would help, if someone said under oath, that they intended to do

23   the opposite of what the petition said.  Now, whether that is dispositive,

24   that's a different question. But I think it's very reasonable to suppose that if a

25   declaration could have been submitted here, it would have been.

36

IPR2021-00909
Patent 8,243,593 B2

1       But circumstances are such that it probably couldn't have been, as

2  we'll see in Slide 7, which we are at.  This error is not in the realm of a mere

3  typo by Petitioners.  This isn't a petition the Petitioners wrote from scratch.

4  It's based on someone else's.  A lot of sophisticated companies, led by Palo

5  Alto, filed the first petition.  And Cloudflare took that as a starting point,

6  they adapted it, they tweaked it.  But the Palo Alto petition has the same

7  things and the same grounds.  So, we argue it's undisputed.

8       Cloudflare didn't (audio interference) as an error.  Splunk copied

9  Cloudflare's petition.  This is even after the Institution decision mused that it

10  might be a typo.  Did Splunk say, oh yes, we think that is an error?  No.

11  Splunk just copied and pasted.

12       JUDGE DIRBA:  Counsel, let me ask you this question about,

13  because you've mentioned in your brief, and you've mentioned today, how

14  this was a, this petition was substantially similar to other petitions that have

15  been filed previously.  So, I think we can all agree, the petition includes an

16  error.  Whether that's a typographical error, or another error of the sort that

17  we could or should correct is the question that we're discussing.

18       But it's, you would agree with me, would you not, that the petition,

19  by alleging that, that by pointing to 17 and 18 as a patentable only under

20  Yung, that that at least is an error?

21       MR. WEATHERWAX:  Yes.  Let me put it this way, it's an error,

22  but is it an error of understanding of the claims?  Or is it an error of drafting

23  the petition, where's the correct understanding of the claims?  That's really

24  what we don't --

25       (Simultaneous speaking.)

26       JUDGE DIRBA:  Okay, so --

37

IPR2021-00909
Patent 8,243,593 B2

1    MR. WEATHERWAX:  -- have enough evidence of.

2    JUDGE DIRBA:  All right.  Is the Board to decide then, is this more

3 likely to have been an error of understanding on the part of this Petitioner,

4 and these other Petitioners?  Or is this more likely to have been a

5 typographical error, or similar to that?

6    MR. WEATHERWAX:  No, Your Honor.  I would disagree that that

7 is the standard.  I don't think it's a more likely than not standard.  I think this

8 should be more like a Certificate of Correction. Is it so unambiguous, that

9 they had the correct understanding, and they simply made a typo, just like

10 everyone else made a typo?  And if it's unambiguous, if it would be, it's

11 correctable, and the sort of thing that the Certificate of Correction -- then

12 yes, maybe that is the standard.

13    Again, we don't have a definitive statement by the Board or by the

14 Federal Circuit as to what the standard is.  But to me that would be the much

15 more logical standard.  You don't correct patents, on a more likely than not,

16 standard.  You don't correct briefs or anything that I'm aware of, on a more

17 likely than not, standard.  You usually have to make a pretty good showing,

18 in my experience.

19    JUDGE DIRBA:  And your position is that because this error existed

20 in all these petitions, that cuts against any argument by Petitioner that this

21 was a typographical or other similar error?

22    MR. WEATHERWAX:  Certainly, Your Honor.  And now, just

23 consider, what if there were 10 petitions, and they all had the error?  And

24 now they're arguing, it was obvious.  Really?  I think that the more petitions

25 had the error, the more evidence there is, that this was not an error that was

26 so obvious it is worthy of correction.

<center>38</center>

IPR2021-00909
Patent 8,243,593 B2

1    Again, I am just using the words that best capture what I think the
2    standard probably is.  But I don't have magic words from a case to use as the
3    standard.
4    (Simultaneous speaking.)
5    JUDGE DIRBA:  Thank you, that's helpful.
6    MR. WEATHERWAX:  Thank you.  So, if you turn to Slide 8.  It
7    used to be, as I said, in the early days of IPRs, the Board thought it had a bit
8    more expansive power to rescue parties from their mistakes.  But *SAS*
9    *Institute* said, no.  And *Magnum Tools International*, which is cited in our
10   briefs, said the Board can't even add arguments to one ground that were
11   made in another ground.
12   And that even if the Board thought that in common sense, the issue
13   should have been better made in this ground, not just the other ground.  The
14   Board in *Magnum Tools International* didn't even add claims to a ground.
15   It's just added arguments to one ground, though already in another ground.
16   And it didn't even rewrite which grounds are on which ground, and it was
17   reversed.
18   If Congress wanted to write a statute to create an after grant
19   proceeding empowering the Board to grant a request to review, and add
20   additional objections if it sees ones it thinks the challenger missed, Congress
21   could have written a statute granting that proceeding.  In fact, it did.  It's
22   called, reexamination.  I've been in many a reexamination.
23   And the Board, or the examiner is free to look at the patent forming
24   objections, and say, hey, I think you missed it.  And I'm going to act.  And if
25   that's the proceeding Cloudflare wanted, it could have filed one.  But they
26   didn't.  But the Board could correct this error.

39

IPR2021-00909
Patent 8,243,593 B2

1      We submit that the Federal Circuit's decision in *Magnum Tools*

2    *International*, whatever the standard is, would have come out the opposite

3    way.  If the Board could deviate from the grounds in the petition, the Federal

4    Circuit's decision in *Sirona Dental* on Slide 8, would have come out the

5    opposite way.

6      So, as far as the Board's power to rewrite the petition, in the

7    Institution Decision, I just wanted to direct the Board's attention to the latest

8    word on the subject, just three weeks ago.  The Federal Circuit's decision in

9    *Click-to-Call v. Ingenio*.

10      PARTICIPANT:  When?

11      MR. WEATHERWAX:  On August 17, it's a published decision.

12    And they said, it is the petition, not the Institution Decision that defines the

13    scope of the IPR.

14      JUDGE BAER:  Mr. Weatherwax.

15      MR. WEATHERWAX:  Sure.

16      JUDGE BAER:  Question for you.  I understood you earlier to say,

17    this was within our discretion.  And now, I'm sort of hearing you say, no,

18    this isn't within your discretion.  The Federal Circuit has held that it's error,

19    to do the kind of thing you're talking about.  Could you clarify your position

20    on that?

21      MR. WEATHERWAX:  I will -- yes, Your Honor.  I don't think that

22    I'm making a contradiction.  As far as I could tell, and maybe I'm wrong, but

23    I don't think so.  *Magnum Tools International* was reversing our interviews

24    of discretion standard.  So, I think it thought that you just can't do that under

25    *SAS Institute*.  You know, that's the case it cited.

40

IPR2021-00909
Patent 8,243,593 B2

1     JUDGE BAER:  So, in -- are you saying --I understand that that
2     could fall within abuse of discretion standard.  Is it your position, that it
3     would be an abuse of our discretion, to allow the Petitioner to correct the
4     petition?  Or are you saying, it would, it is within our discretion, and while it
5     would not be an abuse of discretion, it is ill advised for us to do so?
6          MR. WEATHERWAX:  Suffice it to say, the answer is, yes, Your
7     Honor.  It is our view, that if you look at *Magnum Tools* --
8          JUDGE BAER:  Right.
9          MR. WEATHERWAX:  -- *International*, on the circumstances of
10    this case, we think it would be an abuse of discretion, but if the Board
11    disagrees with me, then I would say that it should not exercise its discretion
12    to do this.  If that is in a sense, what I mentioned.
13         JUDGE BAER:  Yes, thank you.
14         MR. WEATHERWAX:  Now, if we could --
15         JUDGE DIRBA:  Counsel, I'll warn you that you're at about, just
16    about 30 minutes.  And so, if you wanted 15 minutes for rebuttal, you're
17    almost about to eat into it.
18         MR. WEATHERWAX:  Thank you, Your Honor.
19         And let me just turn to Slide 9, and so I've got the badness factor.
20    By the way, if you agree with me on this, then it would moot a decision, the
21    discussion we're talking about.
22         When the Petitioner argued that Copeland's concern index disclosed
23    the badness factor, what was its theory, if theory was basically its expert said
24    so?  Now, that's opinion.  Is it supported?  Is it testable?  Is it science?  Is it
25    what they call ipse dixit, instead?

41

IPR2021-00909
Patent 8,243,593 B2

1    It's a litigation inspired black box.  We asked him, in Slide 10, in

2    deposition.  He did not have the answers.  What interpretation of badness

3    factor are you relying on, Dr. Jeffay?  He didn't have one.  He says, I don't

4    know what it means to a POSITA, such that I can tell you the meaning.

5    Whatever a badness factor is, he said, I tell you it's met.  And you have to

6    take my word for it.

7        Now, Copeland asserts a suspicious activity, and says, oh, a POSITA

8    would have certainly said, that's a badness factor.  So, the claims are

9    obvious.  Now, what that is, Slide 11, that's an expert just mouthing

10   contradictory positions, and trying to ignore the contradictions.

11       Evidence that's not testable, isn't evidence.  And Dr. Jeffay gave us

12   nothing to test.  It's like a shell game, whatever cup you point to, the pea is

13   not under it.  It's an impenetrable argument.  Because of Petitioner's reliance

14   on Dr. Jeffay for this, I really think that should be it for that too.  But they

15   say they have more, evidence of the badness factor.  But we think it's

16   insufficient.

17       Slide 12, we think that, well, remember that the patent is quite clear

18   about the act that -- about the fact that its badness factor for each claim is

19   based on the behavioral statistics of each flow.  That's expressly recited in

20   the claim.

21       Now, what does Copeland calculating his concern index for a flow,

22   based on?  They say packet header information.  And that's what Dr. Jeffay,

23   said, as we said on Page 21 of the surreply.  Apposition has two comebacks.

24   First, Petitioner said, well, Dr. Jeffay testified, well packet length is one of

25   the things Copeland uses.  But he admitted Copeland doesn't describe

26   measuring packet length as behavior. Or doing anything but going to the

42

IPR2021-00909
Patent 8,243,593 B2

1    same place to get that information.  And it goes to draw the other

2    information from the concern index, which are the packet heads.

3         Now, second, Petitioner's pointed to Dr. Jeffay's testimony.  There's

4    nothing in Copeland to prevent you from using behavioral statistics.  That's

5    circular.  We already know Yung doesn't disclose the badness factor based

6    on behavioral statistics.  That's what the Board held in the Institution

7    Decision.  We think it's essentially undisputed.

8         That's why we brought in Copeland in the first place inter Petitioner.

9    Now, they're saying, well maybe Copeland doesn't disclose basing anything

10   on behavioral statistics, ever.  But it won't stop you.  Absence of disclosure

11   is not disclosure.

12        Now, there is a typo on Slide 12.  Surreply at the bottom, should end

13   at Page 23, not 28.  There is no Page 28.  But there's also an objection to this

14   slide, where we are supposedly making a new argument about the concern

15   index not sorted as individual flows.

16        First, we'll return to the flows' combination again, in Copeland.  But

17   we clearly argue on Page 27 of the POR, that no reason is given for the

18   POSITA, to modify Yung in view of Copeland, to store information from

19   the packet headers, which are not based on flow object behavioral data.

20        Copeland says, in the abstract, that a concern index value is assigned

21   to each flow that occurs suspicious.  As we clearly argued though, Copeland

22   does not even calculate the concern index on a behavioral basis.  It's

23   calculating it, as sort of a stack, or a host.  It's looking at what hosts.  It

24   doesn't calculate on a per flow basis.  It puts it together on a per host basis.

25   How can it store factors, it's not even calculating?

43

IPR2021-00909
Patent 8,243,593 B2

1    JUDGE DIRBA:  Counsel.  I'll interrupt you with a few questions
2    about this line of argument.  I understand that you're trying to go quickly.
3    And so, I'll compensate you for some of the time that I'm going to require by
4    asking these questions.  On this slide, I'm looking at your Slide 12.  You say
5    that the concern index in Copeland is calculated only by packer header
6    information.

7    Petitioner's argument is that you're assuming that the packet header
8    information, or whether or not packet header information is relevant to this
9    claim.  Where you haven't explained that.  Can you address that argument?
10   In other words, why do we care whether or not Copeland uses packet header
11   information, as part of its calculation of this concern index?

12   MR. WEATHERWAX:  Because, Your Honor, the claim requires
13   that the badness factor be based on behavioral statistics.  To have to show
14   that the, that Copeland and Yung are obviously calculating this concern
15   index based on behavioral statistics, if you're going to meet the language of
16   the claim.

17   Now, the fact is though, that the concern index is simply looking at
18   something different from the invention.  But now it's not seriously disputed,
19   that the concern index in Copeland is directed to identify suspicious hosts,
20   not probes.  Example, Copeland Column 7.

21   That makes perfect sense, if it's looking at packet headers, it really
22   makes sense.  And it would not be obvious if Copeland were looking to
23   behavioral statistics.  But there are other differences.

24   As we argue, on Page 20 of the POR, once Copeland tried to identify
25   suspicious flows, not legitimate flows that are doing something
26   disproportionate.  Suspicious flows, Copeland is looking for black hat.

44

1  Remember Petitioner's Slide 13, the suspicious host is virtually wearing
2  prison strips, and has a little eye mask.  Well, what does Copeland contrast it
3  with?  The nice young man in the suit, the legitimate user.  The patent is not
4  drawing that distinction.

5          What's the significance of the undisputed fact, that Copeland doesn't
6  calculate its concern index for all flows, only suspicious flows?  Why did
7  Copeland calculate the concern index?  Or better yet, how did Copeland
8  decide it was a suspicious flow?  Did it look at the concern index?  No, it
9  doesn't calculate the concern index, until after it decides, it's a suspicious
10  flow.  Well, how did it figure that out?

11          Well, it says, Column 7 of Copeland, when a particular flow seemed
12  unusual, looking how?  With flow statistics.  It appears to be packet
13  something, it doesn't really explain.  Notice the disconnect, in the patent, in
14  the claims, and the spec.  The badness factor is charactered with each flow,
15  using each flow's behavioral statistics, and then that factor is used to
16  determine whether each flow is misbehaving.

17          In Copeland, the concern index is not calculated for each flow, and
18  not calculated using behavioral statistics.  It is not used to determine whether
19  each flow is misbehaving.  It's calculated using packet header information.
20  It's calculated for flows on a priority, when picked out as suspicious.  And
21  it's used to determine if the host sending the flow appears to be illegitimate.

22          There's your reason the Petitioner is not relying on Copeland's use of
23  flow statistics.  Column 7 of Copeland took, identifies suspicious flows.
24  The reason they're not relying on that, is that Copeland doesn't use any flow
25  factor, like the badness factor to look for suspicious flows, like the patent
26  does, for looking for disproportionate behavior and misbehavior.

45

IPR2021-00909
Patent 8,243,593 B2

1    The closest thing the Petitioner can find, after looking the length and
2    the breadth of the prior art.  The best thing it could find, the closest thing it
3    could find to the badness factor is this concern index, which is not used to
4    determine whether individual flows are misbehaving.  If they're not based on
5    the flows' behavior statistics, can't be based on the flow's behavior over time,
6    which are not even calculated, and therefore not stored on a per flow basis.
7    Because they're not for identifying flows.
8        For example, on Slide 25 of Petitioner, they point -- if you remember
9    Slide 25 of Petitioner, they point to this use of what they call behavioral
10    statistics.  I don't think they're pointing to the calculation of the concern
11    index.  They're pointing to the determinations done by Copeland, first.  To
12    determine whether Copeland thinks it's a suspicious flow.
13        Remember what Copeland doesn't compute until after it determines
14    it's a suspicious flow?  Try the concern index.  Even if Copeland discloses a
15    badness factor as claimed though, it does it around, in that last few minutes.
16    There's no motivation to combine Yung with Copeland to get to the claims.
17        If you turn to Slide 14.  This Institution did find the reasonable
18    likelihood of motivation to combine.  But what was the premise of the
19    Institution Decision's finding?  The premise was, that the Patent Owner was
20    wrong, when the Patent Owner said, the Petitioner's motivation was
21    stemmed entirely from Yung's statement, quote, "application behavior
22    pattern can incorporate other factors as well."  What factors?  Hum, don't
23    know, doesn't say, doesn't disclose.  Absence of disclosure, is not disclosure.
24        Then we've got Dr. Jeffay on the stand.  He said, actually Patent
25    Owner was right.  The alleged motivation to combine does stem entirely
26    from that sentence in Yung.  He couldn't point to anything else.  The

46

IPR2021-00909
Patent 8,243,593 B2

1  Petitioner pointed to, in his slides today, to the idea that the, this statement in
2  Yung would have set off five pages of clever ideas.  It was all obvious,
3  nothing patentable here.
4      We don't deny his five pages of litigation, inspired hindsight.  That's
5  not in the prior art.  It's not in Copeland.  It's not in Yung.  It's not, there's no
6  convincing case that it was in the general knowledge, or common sense of
7  any ordinary artisan.  It looks more to me like something an extraordinary
8  artisan, could potentially come up with.  Additional sparks of genius, beyond
9  whatever was in Yung and Copeland.
10     JUDGE DIRBA:  Counsel, you have five minutes left.
11     MR. WEATHERWAX:  Thank you, Your Honor.
12     Petitioner's Slide 22 argued that it would have been obvious to
13  modify Yung, to integrate Copeland's CI value, into Yung, because that
14  would allow, quote, "Yung's administrator to apply a discard policy to flows
15  with high concern index values."  That's a perfect example.  That's hindsight.
16     There's an infinite number of different things they could have done,
17  different factors, additional factors, they could have used.  Why would it be
18  obvious to do this one in particular?  Remember what Copeland is doing.
19  It's not using this index to determine which flows are suspicious, the way the
20  badness factor is used.
21     Now, just I'll mention very briefly this Whitepaper issue.  What can
22  we say, except the evidence was untimely.  I want to address the submission
23  of Petitioner's additional evidence.  All of this, all of this first popped up
24  after evidence closed.  We cannot address supplemental evidence, unless,
25  and until it is put in the record by the party proffering it, which they haven't.
26  They submitted it as supposed an evidentiary issue.

47

IPR2021-00909
Patent 8,243,593 B2

1    What we can say they should have done, is put it in as supplemental

2    information.  Make a motion.  Get the motion granted.  Not put it in after our

3    evidence window had closed.  As Judge Baer, has astutely noted, this is

4    within the Board's discretion whether to allow.

5    JUDGE DIRBA:  Counsel, did you make that argument in your

6    brief?

7    MR. WEATHERWAX:  Your Honor, we argued as to whatever was

8    in the record for the POR.  But I would point that, this is, there's no

9    supplemental information in the record.  So, we had nothing to respond to,

10   until after that.

11   So, I would point out, that we did not address this precisely in the

12   sur-reply, but it is still within the Board's discretion.  And I would also point

13   out that if we are barred from making new arguments at oral argument, I

14   think the Board should additionally deny all the new arguments that my

15   friend on the other side is arguing.

16   And with that, Your Honor, I'd be happy to submit a case, which I'm

17   sure exists, I just can't remember what it is.  That denied a notice of

18   deposition, of a declarant, basically a declaration that was submitted as

19   supplemental evidence not yet in the record.  And the Board held that you

20   can't do that until supplemental evidence is put in the record by the

21   proffering party.  That's why it's different from supplemental information.

22   On that Your Honor, unless you have questions, we'll pause.

23   JUDGE DIRBA:  Thank you, Counsel.

24   To accommodate the number of questions that the panel has asked of

25   the parties, we'll give each party five additional minutes for their rebuttal

26   presentations.  So, Petitioner, that will mean that you'll have 12 minutes in

48

IPR2021-00909
Patent 8,243,593 B2

1    your rebuttal presentation.  And Patent Owner, you will have seven minutes
2    in your rebuttal presentation.
3            MR. WEATHERWAX:  Thank you, Your Honor.
4            MR. DAY:  Thank you, Your Honor.
5            JUDGE DIRBA:  And Petitioner, hold on one second, Mr. Day.  All
6    right, Mr. Day, you may begin when you are ready.
7            MR. DAY:  Thank you, Your Honor.
8            First, let me respond to one of your questions from earlier today.
9    Our service email with the supplemental evidence was sent December of
10   2021.  And it's Exhibit 1095.
11           And I'm just going to respond to a number of things that Counsel just
12   talked about, starting with this notion of supplemental information, that is a
13   new argument.  And we object to new arguments being brought up today.
14   Counsel suggested that we've raised some new arguments in our slides, with
15   no objections.  And so, this is the first time I'm hearing of that.  But with
16   regard to, I think he's talking about the section of our slides on typographical
17   errors.
18           The argument there tracked what we said in our reply brief, on Pages
19   26 through 29.  There's nothing new there.  And each slide cites, you know,
20   if there's an exhibit shown, it cites the exhibit number.  If there's a quote
21   from a paper, the paper is cited.
22           Now, I'd like to talk about a few of the slides.  First, there's Slide 7,
23   which is talking about, this on the typographical error.  And Counsel made a
24   number of arguments about, a number of arguments on this typographical
25   error.  And let me just offer a few responses.

49

IPR2021-00909
Patent 8,243,593 B2

1    One, all of the cases we cited, all of the Board decisions we cited in
2    our reply brief.  And all of the decisions cited by Patent Owner is his slides
3    are post-*SAS*.  So, they're not, these are not decisions that *SAS* could have
4    changed.  They are all post-*SAS*.  And none of them looked into the
5    subjective intent, or, you know, the background for an error.  They looked at
6    the petition, recognized that there was an error, and they considered the
7    grounds, as they were clearly intended.  As opposed to, sort of mindlessly,
8    applying the language as written, even though they recognized an error.
9    There is, Judge Dirba, you recognized, I think, there -- we are not
10   making any change to the substance of our argument.  The Federal Circuit
11   decisions cited by Patent Owner are not on point.  Because there the Federal
12   Circuit finds, well either there was a failure of proof, or the Board was trying
13   to modify an argument, how to read the prior art, or adding prior art.
14   That's not what's happening here.  The substance of our arguments
15   are unchanged.  Claims 9, 10, 11, and 12 all require Copeland, because those
16   claims have the badness factor limitations.  Claim 17 depends from Claim
17   12.  Basic patent law tells us that means Claim 17 includes all those
18   limitations.  Therefore, it needs Copeland.  It should have been in Ground 2.
19   Counsel has, for the first time, in the sur-reply, pointed back to this
20   IPR petition filed previously.  Today, he said a couple of times that we were
21   not writing on an empty slate.  I frankly think that, that's irrelevant.  But
22   also, I think the record needs to be clear that my firm and I, were counsel for
23   one of the petitioners in that prior IPR.  Not Palo Alto networks, one of the
24   other petitioners.
25   But to say that, that petition was filed, the case settled before there
26   was any response for the petition.  The Board never took any action.  Patent

50

IPR2021-00909
Patent 8,243,593 B2

1    Owner never responded.  There was an error in the petition that we've been
2    talking about today.  And when we filed, basically similar petition making,
3    you know, using the same grounds and making many of the same arguments.
4    We did not second guess the formatting, that we had seen previously.  And
5    that propagated an error.  That's what happened here.
6         Counsel for Patent Owner suggested there might be some ambiguity
7    in our contention.  That's not right.  You know, we haven't tried to have it
8    both ways.  As soon as the Board pointed out this error, we clarified within
9    days, what our contention was.  Offered to discuss it with them, to make sure
10   that everybody was on the same page with regard to our contention should
11   have been.  And there was no response to that.
12        JUDGE DIRBA:  Let me ask you a question about the clarity of your
13   original contention.  So, Mr. Weatherwax, argues that there's nothing in the
14   petition, that says, that Yung does not disclose the badness factor.  Can you
15   respond to that?
16        MR. DAY:  Well, Your Honor, I think he said, the lack of evidence
17   doesn't prove anything.  And I would say the same.  It, I mean, I don't think,
18   the only disclosure in the petition, of the badness factor, is from Copeland.
19   There's no argument anywhere in the petition saying that the badness factor
20   is disclosed by Yung.
21        And if you look at the way that the argument should have been, the
22   way the arguments work, Ground 1 was based on Yung alone.  And all of
23   the claims, other than the ones we're worried about right now, do not recite
24   the badness factor.  So, it didn't come up.
25        Then when we get to Claim 9, the first claim you see the badness
26   factor, it's very clear that we're saying it's the preamble, and the first

51

IPR2021-00909
Patent 8,243,593 B2

1   maintaining limitation are met by Yung.  And, but you need Copeland for

2   the badness factor.

3         So, there is just nothing you can point to, in the petition, to suggest

4   that there could be some ambiguity about the argument underlying Claim 17.

5   The only argument and we cited in our slides, language from the petition,

6   saying Claim 12, the claim that Claim 17 depends from, is disclosed by

7   Yung-Copeland.  There's just, there's no ambiguity on that point, Your

8   Honor.

9         JUDGE DIRBA:  Let me ask you another question.  And I'd like to

10   hear your response to another argument that Patent Owner's Counsel made.

11         Patent Owner's Counsel takes the position that we need to determine

12   that it's, that the error in the petition, or that the petition clearly contains a

13   typographical error.  Or that there needs to be some showing.  In other

14   words, they, Patent Owner's Counsel contends, that it's not a question of

15   which is the most likely, but instead that's there is a sort of heightened

16   obligation for Petitioner to show us that this is very clearly a typographical

17   error as evidenced by this, either other information in the petition, or in

18   Patent Owner's view, a declaration or something like that.  Like what we

19   might require for a motion to accept a late petition, or something like that.

20         Can you respond to those arguments?  And specifically, I'd like to

21   hear what you think the standard is that we need to apply when determining

22   whether or not this is a correctable error, or not.

23         MR. DAY:  Okay, Your Honor.  Well, on that, we cited five or six

24   different Board decisions.  Again, all post-*SAS*, where the Board does not

25   require a declaration or an explanation from the Petitioner, of how a

26   problem, how a typographical error got into a petition.

<div align="center">52</div>

IPR2021-00909
Patent 8,243,593 B2

1    What the Board does, is it looks at the paper, applies logic and
2    common sense, which both parties agree is permissible. And determines that
3    there is a typographical error, based on inconsistencies in the petition. And
4    we laid out, in our reply brief, we laid out what those inconsistencies were.
5    And also, what the inconsistency is here. And that is, there's only one theory
6    of how the prior art discloses Claim 12.
7    It's Yung and Copeland. Claim -- all the limitations of Claim 12, are
8    in Claim 17. Therefore, Claim 17 must include the prior art cited in Claim
9    12. That's the inconsistency, and I believe the standard is, that you look at
10   that, and you apply logic and common sense and recognize that there's not
11   another way, reasonably, to read the petition. Not, and that's based on the
12   decisions that we cited, that I think approach the problem in exactly the way
13   that we're suggesting.
14   Let me spend my last few minutes, on a few other topics. Slide 12
15   seems to raise a question about whether Copeland discloses behavioral
16   statistics. I want to note, that this point about packet headers, the behavioral
17   statistics and packet header information, only appears in Patent Owner's
18   paper, with regard to motivation to combine. They don't, they make the
19   argument that it somehow distinguishes Copeland.
20   And I would just refer you back to our slides 23, 24, 28, where we
21   quote language from Copeland about gathering statistics and analyzing the
22   behavior of flows. And I would add to that, there's several places where
23   Copeland says, you don't look at -- you don't look for signatures. Instead,
24   you gather statistics and use them to analyze both flow characteristics.
25   So, Copeland is clearly focused on the behavior of the flow. And I
26   would refer you for those, to the following, Column 4-26 through 33,

53

IPR2021-00909
Patent 8,243,593 B2

1    Column 8-33 through 39, Column 10-43 through 47.  The same point is
2    made multiple times.  The focus is on flow characteristics.  That's behavioral
3    information about the flow.
4        JUDGE DIRBA:  Counsel, you have two minutes left.
5        MR. DAY:  Very good, Your Honor.  Thank you.
6        On Slide 13, there's this discussion of the concern index, and how it's
7    identifying suspicious hosts, even though the claims talk about a badness
8    factor for individual flows.  I would refer the court to Slide 9, where we
9    quote Copeland talking about assigning a concern index to flows.
10       Also, look at Column 7-55 through 58, intrusion detection engine
11   analyzes the flow data to determine if the flow appears to be legitimate
12   traffic, or possible suspicious activity.  It's focused on the flows.  Figure 6 is
13   entitled, Flow-Based CI Values.  And, if, because this argument comes up in
14   the motivation to combine sections, that Copeland is using the concern index
15   also to identify hosts.  And I guess the suggestion is that Yung is doing
16   something different.
17       I would refer you to Yung, Column 5, Lines 59 through 64, where
18   Yung says, yes, you look at the behavior of flows, or in some embodiments,
19   you look at the behavior of the related host.  So, there's, I mean, Patent
20   Owner hasn't even suggest that there's teaching away.  But in fact, both
21   Copeland and Yung talked about identifying misbehaving hosts.
22       And my final point, in response to Slide 14, that Dr. Jeffay, you
23   know, admitted that this language from Yung, is the, you know, the entire
24   basis of our motivation to combine.  I would just implore you, to read his
25   deposition testimony.  It's Exhibit 2007, at 38, Lines 11 through 20, where
26   he does not say, that is the entire basis of his opinion.  And instead, says, it

54

IPR2021-00909
Patent 8,243,593 B2

1    relates to one paragraph, and of course my entire opinion is shown over the
2    following several pages.

3        With that, Your Honor, unless you have questions, which I'd
4    obviously be happy to answer, I will submit.

5        JUDGE DIRBA:  Thank you, Counsel.  Mr. Weatherwax, you have -
6    -

7        MR. WEATHERWAX:  Yes, Your Honor,

8        JUDGE DIRBA:  -- seven minutes, in your surrebuttal.  And you
9    may begin when you are ready.

10        MR. WEATHERWAX:  Thank you, Your Honor.  Obviously, I'll be
11    brief.  To the point that supposedly, there, whether there are new arguments
12    being made here?  I would implore the Board to read the area around Page
13    21 of the surreply, and compare it to all the slides you saw today, saying,
14    well, they're basing the -- the concern index is based on behavioral statistics.
15    Not just packet header information.

16        Their argument in the reply, pointed to one alleged thing coming out,
17    a behavioral statistic.  And that was packet length.  And this stuff was not
18    discussed, at least not presented the way the slides have been presenting it.

19        Now, my friend is also wrong, that the cases we cited about adding
20    arguments that weren't there, were all just finding that arguments were either
21    looking -- the question being whether they were missing, or whether they
22    were actually there.  And simply the typo is that they were pointed to the
23    wrong place.

24        I would direct you again, to *Magnum Oil Tools*, discussed in the
25    POR, where the Board did not add an argument.  This is the Board when it
26    was reversed.  The Board just moved an argument, into another.  And the

55

IPR2021-00909
Patent 8,243,593 B2

1    Federal Circuit reversed, and said, no.  You are helping the Petitioner in a

2    way you shouldn't do.  It's Petitioner's petition.  And if you thought this was

3    better, well, that's not a reason to correct the petition.

4        Now, they mention their self-serving email. where they offered to

5    discuss with us.  I ask the Board, to discuss what?  What could we say at that

6    point?  If they wanted to submit the supplemental information, well, should

7    we tell them they should?  I think again, it's not for us to give the Petitioner

8    helping hand, any more than it is for the Board to do so.

9        Now, they say, why it's very clear that this is typo.  If it's so clear,

10   why did it get missed so often, by so many, for so long?  That's not what

11   happened in the cases that they cite.  In the cases they cite, where the Board

12   found a typo, none of them had any evidence that an error had gone

13   unnoticed.  In fact, it was noticed the very first time the petition in question

14   was scrutinized.

15       So, there's no indication that there was anything difficult about

16   finding it.  And the only debate in those cases was whether the Board had

17   the power to correct this blatant mistake?  Not whether the Board should

18   have had the very broad power to improve the petition, if it looked like there

19   might be an error.

20       So, that might be the reason, Your Honors, that they don't state a

21   satisfying standard, that would apply here, which I think, much of the debate

22   today has been about what is the standard?

23       I think that one of the things that you should keep in mind, is that

24   those cases are not this case.  In this case, they had an error that was

25   propagated from another petition.  And it seemed like it was immune from

56

IPR2021-00909
Patent 8,243,593 B2

1    being noticed.  And sophisticated parties, sophisticated counsel, but nobody
2    noticed it.
3          And with that, unless there are further questions on my friend's
4    arguments, on reply, Patent Owner rests.
5          JUDGE DIRBA:  I do have an additional question.  And this relates
6    more to the earlier presentation.  But I failed to ask it earlier. Do you
7    propose a construction, or do you -- let me ask it this way.  Do you contend
8    that we should construe the term, badness factor, in any particular way,
9    including any particular requirements?
10         MR. WEATHERWAX:  Well, I'm at risk of making a new
11   argument, because the petition presented no claim construction, whatsoever.
12   And we don't have the burden in this proceeding to show unpatentability.
13   And the Board doesn't need to construe any more than it has to.
14         Our position would be, that it doesn't have to.  Also, that it's certainly
15   not on us to go first with construction, but I would say this.  Badness factor,
16   I think it's very clear from our arguments, is not about whether it is legal or
17   illegal in the network.
18         I think that is instead, disproportionate or undesirable, even though
19   legal is what you're talking about, when you're talking about the badness
20   factor.  So, as I said, I'm sort of stepping out, trying to give you an
21   encapsulated construction, maybe not with quotes around it.  That's based on
22   the arguments that we had presented.  And I'm trying to give you a fair sense
23   of it.
24         JUDGE DIRBA:  That's fair.  Thank you.  That's all my questions.
25   Do my colleagues have any additional questions?
26         JUDGE WHITE:  Nothing from me.

57

IPR2021-00909
Patent 8,243,593 B2

1    JUDGE DIRBA:  Thank you, Counsel for your time today.  We
2    appreciate the arguments that Counsel presented.  We are submitting the
3    case today.  Please remain on the line after we disconnect, so that the Court
4    Reporter may ask any questions about spelling.  And with that, we're
5    adjourned.
6         (Whereupon, the above-entitled matter went off the record at 11:47
7    a.m.)

58

Appx693

IPR2021-00909
Patent 8,243,593 B2

PETITIONER:

James L. Day
Daniel Callaway
Winston Liaw
FARELL BRAUM + MARTEL LLP
jday@fbm.com
dcallaway@fbm.com
wliaw@fbm.com

David C. Dotson
DUANE MORRIS LLP
dcdotson@duanemorris.com

Alex S. Yap
Mehran Arjomand
Rose S. Lee
MORRISON & FOERSTER LLP
ayap@mofo.com
marjomand@mofo.com
roselee@mofo.com

PATENT OWNER:

Kenneth Weatherwax
Parham Hendifar
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com

59

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

CLOUDFLARE, INC. and
SPLUNK INC.,
Petitioners,

v.

SABLE NETWORKS, INC.
Patent Owner.

_____

IPR2021-00909[1]
Patent 8,243,593 B2

_____

**PETITIONERS' REQUEST FOR REHEARING**

_____

[1]    Splunk, Inc., which filed a petition in IPR2022-00228, has been joined as a
petitioner in this proceeding.

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ...................................................................................1

II.   LEGAL STANDARD ...........................................................................1

III.  THE BOARD SHOULD FIND CLAIMS 17, 18, 37, AND 38
      OBVIOUS IN LIGHT OF YUNG AND COPELAND ...............................2

IV.   RELIEF REQUESTED ..........................................................................8

i

## I.    Introduction

Petitioners Cloudflare, Inc. and Splunk Inc. ("Petitioners") respectfully request that the Board grant this Request for Rehearing to reconsider the Final Written Decision (Paper 42) ("FWD"), in which the Board declined to consider whether dependent claims 17, 18, 37, and 38 are unpatentable as obvious based on the combination of Yung and Copeland recited in the petition (i.e., Ground 2).  The Board's decision rested on an apparent misapprehension of the fundamental difference between this case and the Federal Circuit decisions cited in the FWD. Thus, Petitioners request that the Board reconsider its decision and consider the obviousness of claims 17, 18, 37, and 38 based on the combination of Yung and Copeland presented in the petition.  Patent Owner has never disputed Petitioners' argument that these claims are obvious over the Yung-Copeland combination, and therefore the Board should conclude that they are unpatentable as obvious.

## II.    Legal Standard

A party dissatisfied with a decision may file a request for rehearing without prior authorization from the Board.  The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed.  *See* 37 C.F.R. § 42.71(d).  This request for rehearing is timely filed within 30 days after the final written decision (Paper 42).  37 C.F.R. § 42.71(d)(2).

1

### III. The Board Should Find Claims 17, 18, 37, and 38 Obvious in Light of Yung and Copeland

In the FWD, the Board refused to consider whether dependent claims 17, 18, 37, and 38 are obvious over Yung and Copeland (Ground 2). FWD at 35-38. The Board concluded that it could not consider Petitioners' argument on these claims based on two Federal Circuit decisions: *Koninklijke Philips N.V. v. Google LLC*, 948 F3d 1330 (Fed. Cir. 2020) and *Apple Inc. v. MPH Technologies Oy*, 2022 WL 4103286 (Fed. Cir. Sept. 8, 2022) (non-precedential).[2] *Id.* But the Board misapprehended the fundamental difference between those cases and this one. In both Federal Circuit decisions, the Board was asked to modify or create a new ground of unpatentability rather than applying the grounds as expressly recited. In contrast here, the Board is asked to correct a typographical error that was first raised in the institution decision and immediately acknowledged as such by Petitioners at the outset of the trial phase. The correction—reading the paragraphs

---

[2]    Petitioners addressed the Board's ability to consider claims 17, 18, 37, and 38 based on Yung and Copeland in their reply brief (Paper 33 at 26-29). Petitioners have not previously addressed the *Apple* decision because it issued after briefing was complete and after oral argument—it was cited for the first time in the FWD.

2

addressing claims 17, 18, 37 and 38 in the Ground 2 portion of the petition—simply conforms the sequence of arguments to the only sensible reading of the petition based on common sense and black-letter patent law.

As the *Koninklijke Philips* court recognized, the Board is not limited by the "exact language of the petition"; it simply cannot "depart from the petition and institute a different *inter partes* review ***of its own design***." 948 F.3d at 1336.[3] That means that the Board cannot change a ground of unpatentability (e.g., to add an additional reference) or create a ground of unpatentability not asserted in the petition. In *Koninklijke Philips*, Google's petition included two grounds: (1) anticipation based on Synchronized Multimedia Integration Language 1.0 Specification ("SMIL 1.0"), and (2) obviousness based on "SMIL 1.0 in light of the general knowledge of the [skilled artisan] regarding distributed multimedia presentation systems as of the priority date." *Id*. at 1333-34 (emphasis omitted). Google relied on a prior art reference referred to as "Hua" to demonstrate the state of the art. *Id*. at 1334. Though the petition asserted two grounds of unpatentability, the Board instituted review on ***three*** grounds: the two identified in Google's petition and a third ground of obviousness based on SMIL 1.0 ***and Hua***. *Id*. at 1334. The Federal Circuit held that the Board erred in instituting a ground

---

[3]    All emphasis is added unless otherwise indicated.

3

based on SMIL 1.0 and Hua "because Google did ***not advance such a combination of references in its petition*.***" *Id*. at 1337.  Here, Petitioners do not ask the Board to change the petition to create a new ground—they ask only that the Board resolve an obvious and admitted typographical error that placed two paragraphs in the wrong section of the petition.

In the *Apple* decision, the Federal Circuit again addressed a case in which the petitioner asked the Board to change the composition of grounds asserted in the petition.  There, Apple's petition recited three grounds of unpatentability based on different obviousness combinations.  Claim 5 was challenged based on a three-reference combination including a prior art reference called "Ahonen."  2022 WL 4103286, at *3.  Claims 6 and 7 depend from claim 5, but were challenged in a separate ground that did not include Ahonen.  *Id*.  Claim 8 also depends from claim 5 and was challenged in another separate four-reference combination that did not include Ahonen.  *Id*.  Apple argued that the Board should consider Ahonen to be part of the grounds challenging claims 6-7 (Ground 1) and claim 8 (Ground 3) though the petition did not include Ahonen in those grounds.  *Id*. at 6.  The Board refused to read the grounds challenging claims 6-8 as though they included

Ahonen. *Id*. at *3.[4]  The Federal Circuit agreed with the Board's decision because Apple only included Ahonen in Ground 2, which challenged claim 5, but did not include Ahonen in Ground 1 and Ground 3 challenging claims 6-8. *Id*. at *7. Thus, the Federal Circuit affirmed the Board's decision not to consider newly crafted grounds of unpatentability (i.e., Ground 1 ***plus Ahonen*** and Ground 3 ***plus Ahonen***). *Id*.

This case is fundamentally different than the *Koninklijke Philips* and *Apple* cases, in which the petitioners asked the Board to interpolate arguments not in the petition based on its own interpretive discretion. *See Koninklijke Philips*, 948 F.3d at 1336 (declining to use "the Board's discretion" to define the scope of review); *Apple*, 2022 WL 4103286, at *7-8 (summarizing Apple's legal arguments for invalidating dependent claims when their underlying independent claims are found to be invalid).  The parties in *Koninklijke Philips* and *Apple* never did what Petitioners did in this case, i.e., request resolution of an obvious typographical error in a manner that makes sense as a matter of logic and patent law based on the contentions recited in the petition itself.  Claim 17 (for example) depends from

---

[4]    *See also, id*. ("Because Apple ***did not include Ahonen*** in Ground 1 addressing claims 6 and 7 or Ground 3 addressing claim 8, the Board held that Apple did not carry its burden as to those claims.").

5

claim 12 and therefore includes every limitation of claim 12.  *See* 37 C.F.R.

§ 1.75(c).[5]  Logic dictates that because claim 17 includes every limitation of

claim 12, then the portion of the petition showing how the prior art discloses

claim 12 must also apply to claim 17.  Indeed, the section addressing claim 17

begins with the claim language, which itself begins by reciting "[t]he method of

claim 12…." thereby explicitly referring to the petition's argument addressing

claim 12.  There is only one argument for unpatentability of claim 12 in the

petition and that argument explicitly asserts that claim 12 is obvious over the

combination of "Yung-Copeland" (Paper 1 at 54), which therefore necessarily also

applies to claim 17.

The typographical error in the petition did not omit a ground or a prior art

reference; instead, it positioned the argument for claim 17 in the petition on a page

preceding the argument for claim 12, when it should have followed and built on the

argument addressing claim 12.  No other modification is required—the Board need

not craft a new or modified ground of obviousness "of its own design"; indeed, the

---

[5]  Claims 12 and 17 are used to illustrate the point, which applies equally to each

of claims 17, 18, 37, and 38.

Board need not add a single word that is not already recited in the petition.[6]  The Board need only read the arguments recited in the petition in a logical and legally sensible way that resolves a clear and admitted typographical error.

Both parties and the Board agree that the Board can apply logic and common sense to resolve the facially apparent error in the sequence of arguments in the petition.  FWD at 35 n.22; *see Koninklijke Philips*, 948 F.3d at 1336 ("the Board is not limited by the exact language of the petition").  The decisions in *Koninklijke Philips* and *Apple* do not prevent the Board from doing so, and indeed Patent Owner has cited no authority to suggest otherwise.  In contrast, Petitioners cited a number of decisions in which the Board read petitions in the most logical manner, even though not exactly as they were written.  Paper 33 at 28-29.  The Board can and should to the same here.

---

[6]  The Board denied Petitioners' request to file a motion to correct the petition because it would purportedly "add a contention to the Petition during a trial." FWD at 38 n.24.  But the contentions already exist in the petition—the text currently labeled as Sections VII.A.8 and VII.A.9 should have been labeled Sections VII.B.8 and VII.B.9 immediately after the section on claims 12 and 32.

7

## IV.    Relief Requested

Petitioners respectfully request rehearing to correct the issues discussed above.  Particularly, Petitioners respectfully request that the Board find Petitioners have shown that the combination of Yung and Copeland renders dependent claims 17, 18, 37, and 38 unpatentable as obvious.

Dated:  November 17, 2022                  Respectfully submitted,

　*/James L. Day/*　　　　　　　
James L. Day
Registration No. 72,681
*Attorney for Petitioner Cloudflare, Inc.*

8

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 17, 2022, I caused a complete and entire copy of Petitioners' Request for Rehearing to be served by electronic means to the following addresses:

<div align="center">
weatherwax@lowensteinweatherwax.com,

Sable_IPRs@lowensteinweatherwax.com.
</div>

 */James L. Day/* 
James L. Day
Registration No. 72,681
Farella Braun + Martel LLP
235 Montgomery Street; 17th Floor
San Francisco, CA  94104

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————————

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

————————

CLOUDFLARE, INC. AND SONICWALL INC.
Petitioners

v.

SABLE NETWORKS, INC.
Patent Owner

————————

U.S. Patent No. 8,243,593

————————

**DECLARATION OF DR. KEVIN JEFFAY IN SUPPORT OF PETITION
FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 8,243,593**

Cloudflare – Exhibit 1003, page cover

## TABLE OF CONTENTS

I.    BACKGROUND ............................................................................... 1

II.   SUMMARY OF GROUNDS ........................................................... 8

III.  QUALIFICATIONS AND EXPERTISE ........................................ 8

IV.   LEGAL UNDERSTANDING .......................................................... 13

    A.    My Understanding of Claim Construction ............................ 13

    B.    A Person Having Ordinary Skill in the Art ........................... 15

    C.    My Understanding of Obviousness ....................................... 15

V.    TECHNICAL BACKGROUND ...................................................... 17

    A.    Traffic on computer networks increased dramatically with the increase of publicly available content on networks. ........................... 17

    B.    Network administrators deployed traffic shaping to preserve network integrity and performance. ....................................... 19

    C.    It was widely recognized that better classification techniques were needed to identify misbehaving flows. ................................... 22

VI.   TECHNICAL ANALYSIS OF THE '593 PATENT ...................... 24

    A.    Overview of Patent Specification ......................................... 24

    B.    The Claims .......................................................................... 27

    C.    Claim Construction .............................................................. 42

        1.    "means for maintaining a set of behavioral statistics for the flow . . ." (claims 25 and 29) ........................................ 43

        2.    "means for determining . . . whether the flow is exhibiting undesirable behavior" (claim 25) .................................. 43

        3.    "means for enforcing . . . a penalty on the flow" (claims 25 and 32) .................................................................. 44

        4.    "means for computing . . . a badness factor for the flow" (claim 29) .................................................................. 44

        5.    "means for determining . . . a penalty to impose on the flow" (claim 31) ....................................................... 45

        6.    "means for determining an increased drop rate to impose on one or more information packets to belonging to the flow" (claim 37) .................................................................. 45

Appx1038

# TABLE OF CONTENTS
(continued)

7.  "means for imposing the increased drop rate on the flow" (claims 27 and 38) ...................................................... 46

8.  "means for receiving a particular information packet belonging to the flow" (claims 43 and 44) ................................ 47

9.  "means for determining whether to forward the particular information packet to a destination" (claim 43) ........................ 47

10. "means for updating . . . the set of behavioral statistics to reflect processing of the particular information packet" (claims 43 and 44) ...................................................... 48

VII.  TECHNICAL ANALYSIS OF THE PRIOR ART ............................ 49

A.  Yung ..................................................................... 49

B.  Copeland ................................................................ 54

C.  Four-Steps Whitepaper ................................................ 57

D.  Ye ....................................................................... 58

VIII. GROUNDS OF UNPATENTABILITY ...................................... 61

A.  Ground 1: Claims 1, 2, 4-7, 17, 18, 25-27, 37, and 38 are obvious over Yung ............................................................... 61

1.  Independent claim 1 .............................................. 61

a)  Yung discloses the preamble of claim 1 .......................... 61

b)  Yung discloses the creating limitation of claim 1. ............... 65

c)  Yung discloses the updating limitation of claim 1. ............... 77

d)  Yung discloses the determining limitation of claim 1 ...... 80

e)  Yung discloses the enforcing limitation of claim 1 .......... 83

f)  Yung discloses performing the steps on a router without requiring use of inter-router data ...................... 86

2.  Independent claim 2 .............................................. 88

a)  Yung discloses the preamble of claim 2 .......................... 88

b)  Yung discloses the limitations of claim 2 ........................ 89

3.  Independent claims 4 and 5 ...................................... 90

a)  Yung discloses the limitations of claims 4 and 5. ............... 90

Cloudflare – Exhibit 1003, page ii

Appx1039

**TABLE OF CONTENTS**
(continued)

| | | | |
|---|---|---|---|
| | 4. | Independent claim 25 | 92 |
| | | a) | Yung discloses the preamble of claim 25. | 92 |
| | | b) | Yung discloses the means for maintaining limitation. | 93 |
| | | c) | Yung discloses the determining limitation. | 94 |
| | | d) | Yung discloses the enforcing limitation. | 94 |
| | 5. | Dependent claims 6 and 26 | 95 |
| | 6. | Dependent claims 7 and 27 | 96 |
| | 7. | Dependent claims 17 and 37 | 97 |
| | 8. | Dependent claims 18 and 38 | 97 |
| B. | Ground 2: Claims 9-13, 19-24, 29-33, and 39-44 are obvious over Yung in view of Copeland. | 98 |
| | 1. | Motivation to Combine | 98 |
| | 2. | Independent claim 9 | 103 |
| | | a) | Yung discloses the preamble of claim 9. | 103 |
| | | b) | Yung discloses the maintaining limitation of claim 9. | 103 |
| | | c) | Yung in view of Copeland discloses the computing limitation of claim 9 | 103 |
| | 3. | Independent claim 29 | 106 |
| | | a) | Yung discloses the preamble of claim 29. | 106 |
| | | b) | Yung discloses the computing limitation of claim 29. | 107 |
| | 4. | Dependent claims 10 and 30. | 107 |
| | 5. | Dependent claims 11 and 31 | 108 |
| | 6. | Dependent claims 12 and 32 | 110 |
| | 7. | Dependent claims 13 and 33 | 110 |
| | 8. | Dependent claims 19 and 39 | 111 |
| | 9. | Dependent claims 20 and 40 | 113 |
| | 10. | Dependent claims 21 and 41 | 114 |
| | 11. | Dependent claims 22 and 42 | 116 |

Cloudflare – Exhibit 1003, page iii

**TABLE OF CONTENTS**
(continued)

12.    Dependent claims 23 and 43 ................................................ 117

13.    Dependent claims 24 and 44 ................................................ 120

C.    Ground 3: Claim 3 is obvious over Yung in view of Four-Steps Whitepaper. ................................................................................. 121

1.    Motivation to Combine ....................................................... 121

2.    Independent claim 3 ............................................................ 125

    a)    Yung discloses the preamble of claim 3. ..................... 125

    b)    Yung discloses a medium having stored thereon a data structure. ............................................................... 126

    c)    Yung discloses the first field. ...................................... 127

    d)    Yung in view of Four-Steps Whitepaper discloses the second field. ................................................................. 127

    e)    Yung discloses the third field. ..................................... 128

    f)    Yung discloses the fourth field. .................................... 129

    g)    Yung discloses the fifth field. ...................................... 129

D.    Ground 4: Claims 8, 14-16, 28 , and 34-36 are obvious over Yung in view of Copeland in view of Ye. ................................... 130

1.    Motivation to Combine ....................................................... 130

2.    Dependent claims 8, 14, 28, and 34 ..................................... 134

3.    Dependent claims 15 and 35 ................................................ 136

4.    Dependent claims 16 and 36 ................................................ 137

IX.    CONCLUSION .......................................................................... 138

Cloudflare – Exhibit 1003, page iv

Appx1041

I, Kevin Jeffay, Ph.D., declare as follows:

## I.    BACKGROUND

1.    I have been retained by Farella Braun + Martel LLP, which represents Cloudflare, Inc. ("Petitioner") in connection with the above-captioned *inter partes* review of U.S. Patent No. 8,243,593 to Natchu, titled *Mechanism For Identifying And Penalizing Misbehaving Flows In A Network*, (EX1001, "'593 patent"). I understand that the '593 patent is currently assigned to Sable Networks, Inc. ("Patent Owner").

2.    I have reviewed and am familiar with the '593 patent, which issued to Vishnu Natchu on August 14, 2012. I understand that the '593 patent includes 44 claims and that claims 1-5, 9, 25, and 29 are the independent claims. I also understand that the Petition for *inter partes* review that accompanies this Declaration seeks to cancel all 44 claims ("challenged claims") of the '593 patent. Thus, my analysis and opinions will focus on all of the challenged claims, 1-44, of the '593 patent. In this Declaration, I will cite to the specification of the '593 patent using a format like the following: EX1001, '593 patent, 1:1-10. This example citation points to the '593 patent specification at column 1, lines 1-10.

3.    In addition to the '593 patent, I have reviewed and am familiar with the following references:

Cloudflare – Exhibit 1003, page 1

- U.S. Patent No. 7,664,048 to Yung *et al.*, titled "Heuristic Behavior Pattern Matching Of Data Flows In Enhanced Network Traffic Classification" (EX1005, "Yung").

- "Four Steps to Application Performance Across the Network With Packeteer's PacketShaper®" (EX1006, "Four-Steps Whitepaper"), archived by web.archive.org on March 17, 2003 with Affidavit of Elizabeth Rosenberg attached.

- U.S. Patent No. 7,185,368 to Copeland III, titled "Flow-Based Detection Of Network Intrusions" (EX1007, "Copeland").

- U.S. Patent No. 7,295,516 to Ye, titled "Early Traffic Regulation Techniques To Protect Against Network Flooding" (EX1008, "Ye").

- U.S. Publication No. 2004/0090923 to Kan *et al.*, titled "Network Monitoring System Responsive To Changes In Packet Arrival Variance And Mean" (EX1009).

- "P2P, the Gorilla in the Cable," Gerber *et al.*, (EX1010).

- U.S. Patent No. 7,225,271 to DiBiasio *et al.*, titled "System and Method For Recognizing Application-Specific Flows And Assigning Them To Queues" (EX1011).

- U.S. Patent No. 7,561,515 to Ross, titled "Role-Based Network Traffic-Flow Rate Control" (EX1012).

Cloudflare – Exhibit 1003, page 2

- "Taming the Peer to Peer Monster Using Service Control," Ben-Nun (EX1013).

- U.S. Patent No. 6,839,321 to Chiruvolu, titled "Domain Based Congestion Management" (EX1014).

- U.S. Patent No. 7,088,678 to Freed *et al.*, titled "System and Method for Traffic Shaping Based on Generalized Congestion and Flow Control" (EX1015).

- "NetEnforcer™ – QoS/SLA Enforcement for Service Providers," (EX1016).

- "PacketShaper® Features (for PacketWise 5.2)" (EX1017).

- U.S. Patent No. 7,366,101 to Varier *et al.*, titled "Network Traffic Synchronization Mechanism" (EX1018).

- "Supporting Differentiated Service in MPLS Networks," Andrikopoulos *et al.* (EX1019).

- U.S. Patent No. 7,385,924 to Riddle, titled "Enhanced Flow Data Records Including Traffic Type Data" (EX1020).

- U.S. Patent No. 7,660,248 to Duffield, titled "Statistical, Signature-Based Approach To IP Traffic Classification" (EX1021).

- "Accurate, Scalable In-Network Identification of P2P Traffic Using Application Signatures," Sen *et al.* (EX1022).

Cloudflare – Exhibit 1003, page 3

- U.S. Patent No. 7,313,100 to Turner *et al.*, titled "Network Device Having Accounting Service Card" (EX1023).

- U.S. Publication No. 2002/0186661 to Santiago *et al.*, titled "System and Method For Hierarchical Policing of Flows and Subflows of a Datastream" (EX1024).

- U.S. Publication No. 2003/0118029 to Maher III *et al.*, titled "Method and Apparatus for Enforcing Service Level Agreements" (EX1025).

- U.S. Patent No. 7,296,288 to Hill *et al.*, titled "Methods, Apparatuses, and Systems Allowing for Bandwidth Management Schemes Responsive To Utilization Characteristics Associated With Individual Users" (EX1026).

- U.S. Patent No. 6,904,529 to Swander, titled "Method and System for Protecting a Security Parameter Negotiation Server Against Denial-Of-Service Attacks" (EX1027).

- U.S. Patent No. 6,385,170 to Chiu *et al.*, titled "Method and System for Dynamically Triggering Flow-Based Quality of Service Shortcuts Through a Router" (EX1028).

- U.S. Patent No. 6,934,256 to Van Jacobson *et al.*, titled "Method of Detecting Non-Responsive Network Flows" (EX1029).

Cloudflare – Exhibit 1003, page 4

- U.S. Patent No. 7,342,929 to Bremler-Barr *et al.*, titled "Weighted Fair Queuing-Based Methods and Apparatus For Protecting Against Overload Conditions on Nodes of a Distributed Network" (EX1030).

- "PacketShaper® - WAN Application Optimization Solutions" (EX1031).

- "Securing a University's Bandwidth with PacketShaper®," Boniforti (EX1032).

- "RFC 1009 – Requirements for Internet Gateways" Braden *et al.* (EX1033).

- "Class-of-Service Mapping for QoS: A Statistical Signature-based Approach to IP Traffic Classification," Roughan *et al.* (EX1034).

- U.S. Patent No. 7,027,393 to Cheriton, titled "TCP Optimized Single Rate Policer" (EX1035).

- U.S. Patent No. 7,433,304 to Galloway *et al.*, titled "Classification Data Structure Enabling Multi-Dimensional Network Traffic Classification and Control Schemes" (EX1036).

- U.S. Patent No. 6,115,357 to Packer *et al.*, titled "Method for Pacing Data Flow in a Packet-Based Network" (EX1037).

- "QoS Best Practices," Szigeti (EX1038).

- U.S. Patent No. 6,412,000 to Riddle *et al.*, titled "Method for Automatically Classifying Traffic in a Packet Communications Network" (EX1039).

Cloudflare – Exhibit 1003, page 5

- Le, L., *et al.*, "Differential Congestion Notification: Taming the Elephants," Proceedings of the 12th IEEE International Conference on Network Protocols (Oct. 2004) (EX1040).

- Parris M., *et al.*, "Lightweight Active Router-Queue Management for Multimedia Networking," Multimedia Computing and Networking (January 1999) (EX1041).

- U.S. Patent Publication No. 2002/0023168 ("Bass") (EX1042).

- U.S. Application Publication No. 2002/0097719 ("Chaskar") (EX1043).

- Bernaille, L., et al, "Traffic Classification on the Fly," ACM SIGCOMM Computer Communication Review (2006) ("Bernaille") (EX1044).

- U.S. Patent No. 7,782,793 ("Olesinski") (EX1045).

- U.S. Patent No. 8,693,348 ("Wei") (EX1046).

- Karagiannis, T., et al, "Transport Layer Identification of P2P Traffic," IMC 04: Proceedings of the 4th ACM SIGCOMM conference on Internet measurement, October 2004 ("Karagiannis") (EX1047).

- U.S. Patent No. 6,038,216 ("Packer-216") (EX1059).

4.     The '593 patent is generally directed to classifying network traffic. EX1001, Abstract. More specifically, the '593 patent describes using behavioral statistics of the observed behavior of flows to classify and penalize misbehaving flows. *Id.*, 1:53-1:67. The statistics depend only on the observed behavior of the

flow and do not depend on the contents (payloads) of the packets in the flow. *Id.*, 10:36-40, 10:56-58, 11:10-12. I am familiar with the technology described in the '593 patent both as of its earliest possible priority date and actual filing date of December 22, 2004.

5. I have been asked to consider how a person of ordinary skill in the art ("POSA") would have understood the challenged claims in light of the disclosure of the '593 patent. I also have been asked to consider how a POSA would have understood the prior art references Yung, Copeland, Four-Steps Whitepaper, and Ye. Further, I have been asked to consider and provide my technical review, analysis, insights, and opinions regarding whether a POSA would have understood: (1) the disclosure of Yung renders claims 1, 2, 4-7, 17, 18, 25-27, 37, and 38 obvious; (2) the disclosure of Yung in view of Copeland renders claims 9-13, 19-24, 29-33, 39-44 obvious; (3) the disclosure of Yung in view of Four-Steps Whitepaper renders claim 3 obvious; and (4) the disclosure of Yung in view of Copeland in view of Ye renders claims 8, 14-16, 28, 34-36 obvious

6. My compensation is not dependent on the outcome of this *inter partes* review and in no way affects the substance of my statements in this declaration.

7. I reside in Chapel Hill, NC, USA.

## II.    SUMMARY OF GROUNDS

8.    I understand that the Petition for *inter partes* review of the '593 patent

asserts the following grounds of unpatentability:

| Ground | '593 Patent Claims | Basis for Ground |
|--------|--------------------|------------------|
| 1 | 1, 2, 4-7, 17, 18, 25-27, 37, 38 | Yung |
| 2 | 9-13, 19-24, 29-33, 39-44 | Yung in view of Copeland |
| 3 | 3 | Yung in view of Four-Steps Whitepaper |
| 4 | 8, 14-16, 28, 34-36 | Yung in view of Copeland in view of Ye |

## III.    QUALIFICATIONS AND EXPERTISE

9.    In formulating my opinions, I have relied upon my knowledge,

training, and experience. My qualifications are stated more fully in my *curriculum

vitae*, which has been provided as Exhibit 1004. Here, I provide a brief summary of

my qualifications.

10.    Currently, I am a tenured professor in the Department of Computer

Science at the University of North Carolina ("UNC") at Chapel Hill, where I hold

the position of Gillian T. Cell Distinguished Professor of Computer Science. I also

currently serve as the Chairman of the Department. I have been a faculty member

at UNC since 1989.

11.    I received a Ph.D. in Computer Science from the University of

Washington in 1989. I received a M.Sc. degree in computer science from the

University of Toronto in 1984 and a B.S. degree with Highest Distinction in

mathematics from the University of Illinois at Urbana-Champaign in 1982.

12.     I have been involved in the research and development of computing systems for nearly 40 years. As a faculty member at UNC, I research and teach in the areas of computer networks, multimedia networking, distributed systems, real-time systems, and operating systems, among others. A major theme of my research has been the development of technology to improve the performance of data transfers on the Internet. My research has focused on network and operating system support for distributed real-time multimedia applications (such as audio and video streaming, voice-over-Internet protocol (VoIP), and Internet videoconferencing), congestion control mechanisms in network routers, measurements and analysis of network traffic to passively assess the performance of servers on the Internet, and other areas.

13.     For example, starting in the late 1980s, my research focused on the development of network and operating system technology to enable real-time transfer of streams of audio and video data across the Internet. This work culminated in my research group developing some of the first videoconferencing systems for the Internet. Several of the papers authored by myself and members of my research group on this project won awards for their technical contributions.

14.     The videoconferencing and adaptive streaming research attracted the attention of industry groups such as IBM®, Intel®, Digital Equipment Corporation, Cabletron/Aprisma, and AT&T® and Lucent Bell Laboratories. For

Cloudflare – Exhibit 1003, page 9

example, starting in 1991, IBM® supported aspects of my research at UNC. These efforts resulted in U.S. Patent No. 5,892,754 on adaptive media streaming being issued to IBM® and UNC. Beyond the aforementioned companies, I have also had collaborations with Hewlett Packard, Sun Microsystems, Cisco Systems®, and CloudShield™, among others.

15.    My research group developed other "data conferencing" systems, also known as "shared window systems," that could transfer desktop information from a PC to a remote PC in real-time. One system that we built, called XTV, was operational by 1991. The source code for XTV was made freely available and by 1993 had been downloaded by over 600 users and institutions. The system was functionally and visually equivalent to LogMeIn®'s GoToMeeting™ and Zoom's screen sharing products and services. In the XTV system, individual windows displayed on the desktop or the entire desktop could be shared with remote users. The XTV system also allowed remote users to control and manipulate the desktop being distributed and to remotely control applications.

16.    In my research I regularly build and use clusters of computers interconnected by network switches, bridges, and routers to form and evaluate experimental and production networks. For example, in the late 1990s and early 2000s, my research examined router-based mechanisms for controlling the performance of network traffic. My students and I built and instrumented network

Cloudflare – Exhibit 1003, page 10

routers and performed large scale experiments with this equipment to monitor and control packet flows. Such control involved detecting, classifying, and policing misbehaving or unresponsive flows and providing better-than-best-effort forwarding services to selected flows. The instrumentation included, for example, the development of network monitors that received copies of packets flowing on a network link and analyzed and stored packets or the results of analyses on these packets, all in real-time.

17. In 2003, the international networking research community recognized aspects of this research by awarding my group at UNC the most prestigious research award for original research in computer networking. These research efforts also resulted in US Patent Nos. 7,447,209 and 8,938,532 being issued to UNC. Other aspects of the research included a research collaboration with CloudShield$^{TM}$ Technologies to use deep packet inspection and processing devices to detect anomalous and/or malicious traffic in a high-speed network. More recently, my research group built a series of devices placed in-line between clients and servers in a network to passively monitor, analyze, and selectively log network traffic for purposes of understanding the performance of servers present in the network.

18. These projects, and others, took place in a networking lab that my students and I constructed at UNC over a number of years. The lab consists of

several hundred computers and networking devices. Managing this lab involved installing and configuring VLANS, monitors, firewalls and other security appliances to isolate the lab from the campus network (and vice versa).

19.    I have authored or co-authored over 100 articles in peer-reviewed journals, conference proceedings, texts, and monographs in the aforementioned areas of computer science and others. I have served as Editor-in-Chief for the journal *Multimedia Systems* and Associate Editor for the journal *Real-Time Systems*. In addition, I have edited and co-edited numerous published proceedings of technical conferences and have edited a book of readings in multimedia computing and networking (with Hong-Jiang Zhang) published by Morgan Kaufman. I am a co-author (with Long Le and F. Donelson Smith) of a monograph related to computer network protocols and a co-author (with Jay Aikat and F. Donelson Smith) of a second monograph related to experimental computer networking.

20.    I have served on numerous proposal review panels for the National Science Foundation and other international funding agencies in the aforementioned areas of computer science. I have also served as a program chair or member of the technical program committee for over 100 professional, international, and technical conferences, workshops, and symposia.

Cloudflare – Exhibit 1003, page 12

21.    I am a named inventor on four U.S. Patents. These patents are generally related to computer networking and service delivery over networks including audio and video transmission.

22.    I have developed and taught a wide variety of courses related to distributed systems, computer networking, multimedia networking, operating and file systems, and computer security.

23.    I have served as an expert witness and technical consultant in litigation and *inter partes* review matters concerning computer networks, distributed systems, operating systems, multimedia networking, cellular and wireline telephony, voice over IP (VoIP) telephony, datacenter networking, embedded systems and embedded software, and real-time systems, among others. I have testified in several trials, arbitrations, and claim construction hearings as an expert witness.

## IV.    LEGAL UNDERSTANDING

### A.    My Understanding of Claim Construction

24.    I have been advised and understand that, during an *inter partes* review, words in a claim are given their plain meaning, which is the meaning understood by a POSA at the time of the alleged invention after reading the entire patent. I also understand that this standard is sometimes referred to as the *Phillips* standard. I understand, however, that a claim term will not receive its plain

Cloudflare – Exhibit 1003, page 13

meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the claim term in the specification. In such a case, the claim term will receive the definition set forth in the patent.

25.    It is my understanding that, when a claim limitation recites a generic term (e.g., "means," "step") and associated functional language, it may invoke means-plus-function treatment under 35 U.S.C. §112(f) and/or pre-AIA 35 U.S.C. §112 paragraph 6. It is further my understanding that when a claim limitation uses the term "means" or "step" and functional language, a presumption arises that means-plus-function treatment applies. I also understand that generic "nonce" terms may also be substitutes for "means" or "step" and may thereby still invoke means-plus-function treatment. I further understand that the means-plus-function treatment is not appropriate where the terms have been modified by sufficient structure, material, or acts for performing the claimed function. I also understand that means-plus-function language typically begins with "means for" followed by functional language.

26.    I understand that when claim language invokes means-plus-function treatment, the specification must provide corresponding structure such that a POSA will understand the structure that performs the recited function. I also understand that the scope of means-plus-function terms will be construed to cover that corresponding structure and equivalents thereof. As such, I understand that

construction of means-plus-function terms requires identification of a function as well as corresponding structure for that function. I also understand that, for a reference to anticipate or render obvious a means-plus-function term, it must provide equivalent structure for performing an equivalent function.

### B.    A Person Having Ordinary Skill in the Art

27.    I have been advised and understand that a POSA is presumed to be aware of all pertinent art, thinks along conventional wisdom in the art, and is a person of ordinary creativity, not an automaton. With this understanding, a POSA at the time of the invention claimed in the '593 patent would have been a person holding a Bachelor of Science degree in Electrical Engineering, Computer Science, or an equivalent field and at least 3-5 years of academic or industry experience in computer networking, or comparable industry experience.

### C.    My Understanding of Obviousness

28.    I have been advised and understand that a claimed invention is unpatentable if the differences between the invention and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a POSA to which the subject matter pertains. This means that even if all of the requirements of the claim cannot be found in a single prior art reference that would anticipate the claim, the claim can still be invalid.

Cloudflare – Exhibit 1003, page 15

29.     It is my understanding that obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of skill in the art; and (4) objective considerations of non-obviousness. I understand that for a single reference or a combination of references to render the claimed invention obvious, a POSA must have been able to arrive at the claims by altering or combining the applied references.

30.     I also understand that prior art references can be combined under several different circumstances. For example, it is my understanding that one such circumstance is when a proposed combination of prior art references results in a system that represents a predictable variation, which is achieved using prior art elements according to their established functions.

31.     I also understand that when considering the obviousness of a patent claim, one should consider whether a teaching, suggestion, or motivation to combine the references exists so as to avoid impermissibly applying hindsight when considering the prior art. I understand this test should not be rigidly applied, but that the test can be important to avoiding such hindsight.

Cloudflare – Exhibit 1003, page 16

## V.    TECHNICAL BACKGROUND

### A.    Traffic on computer networks increased dramatically with the increase of publicly available content on networks.

32.    Prior to the filing of the '593 patent on December 22, 2004, a great deal of related work had been published describing systems that solved similar problems of identifying and penalizing so-called misbehaving flows in a network. Indeed, my own research group at UNC published on this topic. *See* EX1040; EX1041.

33.    Motivating this work was the fact that starting in the mid-1990s, web and multimedia content was becoming available on the Internet at an exponentially increasing rate such that many network links in the Internet became congested (saturated) carrying this content. A similar exponentially increasing number of users connecting to the Internet exacerbated this phenomena. As such, there was great interest in identifying and penalizing (reducing the effect of) the flows of packets generated by certain types or classes of applications. EX1009, ¶¶[0004]-[0006]; EX1042, ¶¶[0019]-[0020].

34.    Of particular interest was the widespread emergence, adoption, and deployment of peer-to-peer file-sharing technologies, which increased the volume of traffic generated by network users. EX1010, 1. For example, applications like Napster, KaZaA, Gnutella, and DirectConnect providing decentralized, self-organizing file sharing systems that allowed users to obtain and share files,

Cloudflare – Exhibit 1003, page 17

particularly media files such as MP3 and video files, across networks. *Id.* Such

tools skewed network usage toward "heavy-users," where 80% of the traffic was

generated by 20% of the users, with the "heavy-users" generating more peer-to-

peer traffic than their contemporaries. *Id.*, 12-13. I know from personal experience

that peer-to-peer file sharing traffic and its effect on our network was a major

concern at UNC starting in the late 1990s.

35.    A second factor was the growth of real-time applications such as

computer-based telephony including voice-over-IP (VoIP). EX1011, 1:62-2:21.

Such applications presented challenges for network operators because although the

traffic generated by these applications were often minimal, the traffic had stringent

latency requirements in order to support real-time interaction. *Id.*, 1:63-67, 2:1-21.

36.    A third factor was the increased proliferation of attacks against

network infrastructures. EX1012, 1:12-18. A particular concern were denial-of-

service attacks wherein one or more attackers would simultaneously flood a service

with traffic/requests so as to overload the server and/or network and render it

unable to function for its intended purpose. *Id.*, 1:16-18. Numerous other forms of

attacks emerged such as "spoofing" (imposter) attacks wherein a malicious entity

on the network masquerades as a legitimate entity to illicitly access a service or to

direct traffic to an unsuspecting user or server. EX1038, 21. The sophistication of

Cloudflare – Exhibit 1003, page 18

these threats evolved in the 1980s and 1990s, mandating the ability to rapidly respond to the attacks. *Id.*, 17-18.

37.    Many other factors, e.g., cultural and behavioral changes among computer users and new fields of application development, also contributed to the swelling volume of traffic on computer networks.

### B.    Network administrators deployed traffic shaping to preserve network integrity and performance.

38.    The exponential increases in the volume of network traffic created challenges for network administrators, who faced unique operational circumstances based on their networks, user-bases, and applications. EX1013, 1. The cost of replacing or upgrading network links was high and there arose a need to best manage scarce bandwidth resources. EX1039, 3:40-45.

39.    A key aspect of this management was to partition network traffic into equivalence classes and to provide different levels of forwarding service to traffic classes. At one extreme were efforts to guarantee a certain level of performance ("quality-of-service" (QoS)) for applications such as real-time applications such as VoIP. EX1009, ¶[0005]. Other efforts simply allowed network operators to provide varying levels of priority ("differentiated service") to traffic classes. *Id.*, EX1019. These efforts ensured that traffic network applications deemed important or critical performed at a high level despite the capacity constraints in the network. EX1021, 1:9-28.

Cloudflare – Exhibit 1003, page 19

40.    In employing these techniques, network administrators used traffic shaping/engineering—techniques wherein the throughput of a traffic class could be controlled—to maintain acceptable levels of application performance, in particular for mission-critical applications. EX1014, 1:6-8. One way to understand network traffic, in order to control it, was to identify (i.e., classify) network "flows." The concept of a flow would have been well-known to a POSA. A flow is essentially a sequence of related packets; for example, packets sent from the same application or packets sent on the same network connection. The '593 patent refers to network flows in this manner. EX1001, 5:15-19 (describing a flow as "a series of packets that are related in some manner" and stating that "packets are grouped into a flow if they share a sufficient amount of header information"). Network elements, such as routers, can track network flows using structures such as flow tables to record the existence of the flow and to capture information about it. EX1043, ¶¶[0002]-[0006], [0013].

41.    Numerous product-based solutions controlled network flows at the packet level. EX1015, 1:58-2:3; *see also* EX1016, EX1017. These policies typically shaped and managed traffic by dropping packets or applying other techniques for establishing levels of QoS such as packet scheduling. EX1020, 12:45-65; EX1029, 2:24-30. One commercially available traffic-shaping device was the PacketShaper®; an inline, transparent network monitoring product offered

Cloudflare – Exhibit 1003, page 20

by Packeteer. Among other features, the PacketShaper® provided QoS "to ensure that latency-sensitive, customer-critical applications get the bandwidth they need to perform at their peak." EX1031, 3.

42.     Packeteer was an industry leader. A data sheet from Packeteer notes that "seventy-four percent of the world's largest companies rely on Packeteer® innovation to solve their WAN application performance problems." EX1031, 1. One author describes techniques for using the PacketShaper® to secure a university's network. *See* EX1032.

43.     I have personally configured and deployed a PacketShaper® in a network environment. The PacketShaper® would have been known to a POSA in the relevant timeframe, though other similar products existed that provided similar functionality, e.g., Allot's Netforcer, Aponet. *See* EX1016; EX1039, 3:55-61. Other products offered analogous features in firewalls (e.g., CheckPoint FireWall-1") and other network devices. *See* EX1039, 3:55-61.

44.     Traffic shaping and QoS mechanisms were often provided in routers. EX1018, Abstract; EX1020, 16:37-40; EX1021, 3:19-24, 10:61-63; EX1023, 2:41-54; EX1028, Abstract; EX1030, 5:50-52, 20:9-12; EX1036, 21:1-7; EX1037, 5:3-6. For example, Cisco provided queueing and control mechanisms within its Cisco IOS, deployed in Cisco routers. *See* EX1038, 34. Cisco also provided routers and switches with AutoQoS functionality to further alleviate the burden on

administrators to manually configure the routers. *See id*., 64. Shortcuts optimized

flow-based QoS on routers. EX1028, Abstract. Indeed, in the late 1990s, I used

routers from a variety of vendors in my network laboratory to perform traffic

shaping and provide QoS services. *See* EX1040 and EX1041, *see also* EX1021,

10:61-63. In addition, my research group also constructed our own routers with

similar features.

### C. It was widely recognized that better classification techniques were needed to identify misbehaving flows.

45.     Prior to the filing of the '593 patent, it was widely recognized that

improved mechanisms for classifying flows were necessary for widespread

adoption of QoS-based traffic shaping.  Better classification would lead to better

identification of misbehaving flows and an enhanced ability to secure, protect, and

preserve network functions. The ability to accurately identify peer-to-peer traffic

was especially important in optimizing network operations because in the late

1990s and early 2000s, peer-to-peer traffic monopolized a large percentage of

available bandwidth. EX1022, 512.

46.     Some approaches to classifying traffic examined information (fields)

within the packet headers, such as the port number(s), or scanned packet payloads

(i.e., application data carried within the body of the packet) in an effort to identify

a "signature" for a particular class of traffic. *See* EX1022, 512; EX1024, Abstract;

EX1045, 1:31-42; EX1046, 1:42-50; EX1001, 1:7-49; EX1005, 4:51-55; EX1039,

4:6-17. However, these approaches proved ineffective at classifying all types of traffic because applications often sought to avoid detection through encryption, port hopping, and other signature-mutation techniques. *See* EX1034, 135-136. The rapid development of applications also led to a "knowledge gap" in accurately identifying malicious or ill-behaving applications using such approaches. *Id.* Furthermore, many peer-to-peer applications employed encryption, making it difficult to reverse engineer and monitor their behavior. EX1010, 11. Port-based classifications also were becoming less accurate. EX1034, 136.

47.    To overcome these issues, inventors and practitioners used behavioral statistics and empirically observable flow-data to classify traffic. EX1021, Abstract; EX1045, 2:51-3:30; EX1007, Abstract; EX1047, 121-122; EX1034, 139-140 §4.2; *see also* EX1005. This approach was implemented in the various commercially-available QoS solutions—e.g., the PacketShaper® allowed a user to "manually enter rules to match various traffic types for statistical tracking, i.e., counting by transaction, byte count, rates, etc." EX1039, 3:61-65. Because of the inherent uncertainty in traffic classification techniques, legacy systems classified flows using heuristic methods. It was also typical to calculate gradients, ranges, or other quantitative indicators of a degree of misbehavior. EX1030, 7:2-5.

48.    After identifying the class of the traffic as peer-to-peer, VoIP, etc., these approaches then employed packet-level policies to discard, prioritize, and

shape the classes. EX1025, ¶¶[0008]-[0010], [0059]; EX1005, 24:27-25:8. Packets belonging to the different classes would then be treated differentially from packets belonging to another. EX1019, 208. For example, the PacketShaper® provided rate policies, priority policies, discard policies, never-admit policies, ignore policies, etc. EX1017, 4.

## VI.    TECHNICAL ANALYSIS OF THE '593 PATENT

### A.    Overview of Patent Specification

49.    The '593 patent is titled "Mechanism For Identifying And Penalizing Misbehaving Flows In A Network." The '593 patent describes identifying misbehaving flows, e.g., peer-to-peer traffic, in a network based on behavioral statistics. EX1001, Abstract.

50.    As discussed above in the technical background section, various authors recognized that legacy systems were proving ineffective at classifying traffic as applications and their use grew more sophisticated and elusive. EX1021, 2:31-39; EX1022, 512; EX1034, 135. The '593 patent identifies a similar problem. EX1001, 1:7-49 ("Unless P2P traffic can be identified, it cannot be effectively controlled.") The '593 patent purports to solve this problem by identifying flows based on their observed behavior "because their observed behavior cannot be hidden [and] misbehaving flows cannot avoid detection." *Id.*, 1:61-64.

Cloudflare – Exhibit 1003, page 24

51.    The '593 patent maintains "behavioral statistics" reflecting a flow's observed behavior. EX1001, 2:1-3. As information packets are processed, "a set of behavioral statistics are maintained for the flow." *Id.*, 2:3-5. Specifically, the '593 patent tracks total byte count, life duration, flow rate, and average packet size and stores these statistics in a "flow block."  The '593 patent does not define the term "flow block" but describes it as a data structure that is used to store behavioral statistics associated with a flow.  *Id*. at 6:20-24.  A sample flow block is illustrated in Figure 4 reproduced below (with added color annotations). *Id.*, 7:16-18.



EX1001, FIG. 4 (annotated).

The "total byte count" (in red above) is the "sum of all of the bytes in all of the packets of the flow that have been processed up to the current time." *Id.*, 2:6-14. The "life duration" (in blue above) is "how long the flow has been in existence

Cloudflare – Exhibit 1003, page 25

Appx1066

since inception." *Id.* The flow rate (in green above) is "derived by dividing the total byte count by the life duration of the flow." *Id.* The "average packet size" (in orange above) is "derived by dividing the total byte count by the total number of packets in the flow that have been processed." *Id.*

52.    Like other systems that determined a degree of misbehavior, the '593 patent computes a "badness factor." EX1001, 2:18-26; *see also* EX1007, Abstract; EX1030, 7:2-5. The "badness factor" is calculated based on the above statistics and indicates a degree of misbehavior. EX1001, 2:18-26. Figure 5, reproduced below, illustrates one function for computing the badness factor considering weighted measures of flow rate, duration, total bytes, and average packet size as compared to thresholds. *Id.*, 7:51-67.



EX1001, FIG. 5 (annotated).

53.    After identifying an undesirable flow, a "misbehaving flow manager" applied standard techniques to control the flow such as subjecting packets of the

Cloudflare – Exhibit 1003, page 26

flow to a higher drop rate. EX1001, 2:28-29; 6:37-38; 9:7-9. "[An] increased drop rate causes the information packets belonging to the flow to have a higher probability of being dropped than information packets belonging to other flows." *Id.*, 6:38-43. When a flow has an increased drop rate, "more packets may be dropped from the flow than from other non-misbehaving flows." *Id.*, 2:36-37. Such a technique—dropping packets—was a widely deployed tactic in the relevant timeframe and relies on the fact that the most commonly used transport protocol in use on the Internet, TCP, slows down its rate of transmission when it determines that packets have been dropped or otherwise lost in the network.

54.    Like other systems seeking to control network attacks, the flow manager may enforce the penalty only if a "congestion condition" exists. *Id.*, 2:37-39; 8:62-64; *cf.* EX1008, Abstract. Thus, the penalty may only be applied when an attack commences or during periods of heavy network usage. EX1001, 2:36-41. However, the flow manager may enforce an increased drop rate on a misbehaving flow even when no congestion exists. *Id.*, 10:4-16.

**B.    The Claims**

55.    The '593 patent contains 44 claims, including 8 independent claims (i.e., 1-5, 9, 25, and 29).

56.    There is substantial similarity among many of the claims.  For instance, independent claims 1 and 2 are quite similar.  One difference worth

Cloudflare – Exhibit 1003, page 27

noting is that claim 2 is broader in that it refers to "behavioral statistics" without the modifier "payload-content-agnostic" recited in claim 1. The following chart compares claims 1 and 2 with differences in bold and underlined:

| Claim 1 | Claim 2 |
|---|---|
| A **machine-implemented** method **for processing** a single flow, the flow comprising a plurality of packets, and the method comprising: | A **non-transitory computer-readable medium having computer-executable instructions for performing a** method **to process** a single flow, the flow comprising a plurality of packets, and the method comprising: |
| creating a flow block as the first packet of a flow is processed by a single router; | creating a flow block as the first packet of a flow is processed by a single router; |
| said flow block being configured to store payload-content-agnostic behavioral statistics **pertaining to** said flow, regardless of the presence or absence of congestion; | said flow block being configured to store payload-content agnostic behavioral statistics **about** said flow, regardless of the presence or absence of congestion; |
| said router updating said flow block with the **payload-content-agnostic** behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by | said router updating said flow block with the **flow's** behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by said router, regardless of |

Cloudflare – Exhibit 1003, page 28

| Claim 1 | Claim 2 |
|---|---|
| said router, regardless of the presence or absence of congestion; | the presence or absence of congestion; |
| said router heuristically determining whether said flow **exhibits** undesirable behavior by comparing at least one of said **payload-content-agnostic** behavioral statistics to at least one pre-determined threshold value; and | said router heuristically determining whether said flow **is exhibiting** undesirable behavior by comparing at least one of said behavioral statistics to at least one pre-determined threshold value; and |
| upon determination by said router that said flow **exhibits** undesirable behavior, enforcing, relative to at least one packet, a penalty; | upon determination by said router that said flow **is exhibiting** undesirable behavior, enforcing, relative to at least one packet **belonging to said flow**, a penalty; |
| wherein the preceding steps are performed on said router without requiring use of inter-router data. | wherein the preceding steps are performed on said router without requiring use of inter-router data. |

57.    Independent claims 4 and 5 are also very similar as shown in the following chart:

| Claim 4 | Claim 5 |
|---|---|
| A machine implemented method for processing a flow, the flow comprising | A machine implemented method for processing a flow, the flow comprising |

Cloudflare – Exhibit 1003, page 29

| Claim 4 | Claim 5 |
|---|---|
| a series of information packets, the method comprising: | a series of information packets, the method comprising: |
| maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed; | maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, **regardless of the presence or absence of congestion**; |
| determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior**, regardless of the presence or absence of congestion**; and | determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior; and |
| in response to a determination that the flow is exhibiting undesirable behavior, enforcing a penalty on the flow. | in response to a determination that the flow is exhibiting undesirable behavior, enforcing a penalty on the flow. |

58.    Independent claims 4 and 5 are both similar to independent claim 25. The following chart shows claims 5 and 25 with the few differences in bold and underlined:

Cloudflare – Exhibit 1003, page 30

Appx1071

| Claim 5 | Claim 25 |
|---|---|
| A **machine implemented method** for processing a flow, the flow comprising a series of information packets, the **method** comprising: | A **misbehaving flow manager (MFM)** for processing a flow, the flow comprising a series of information packets, the **MFM** comprising: |
| maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; | **means for** maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; |
| determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior; and | **means for** determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior; and |
| in response to a determination that the flow is exhibiting undesirable behavior, **enforcing** a penalty on the flow. | **means for enforcing,** in response to a determination that the flow is exhibiting undesirable behavior, a penalty on the flow. |

59.    The following chart shows claims 9 and 29 with the few differences in bold and underlined:

Cloudflare – Exhibit 1003, page 31

Appx1072

| **Claim 9** | **Claim 29** |
|---|---|
| A **machine implemented method** for processing a flow, the flow comprising a series of information packets, the **method** comprising: | A **misbehaving flow manager (MFM)** for processing a flow, the flow comprising a series of information packets, the **MFM** comprising: |
| maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and | **means for** maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and |
| computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior. | **means for** computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior. |

60.    Independent claims 25 and 29 are similar. The primary differences are that (i) claim 29 adds the concept of a "badness factor for the flow"; and (ii) does not require "enforcing…a penalty on the flow" as in claim 25. The following chart shows claims 25 and 29 with differences in bold and underlined:

Cloudflare – Exhibit 1003, page 32

| Claim 25 | Claim 29 |
|---|---|
| A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising: | A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising: |
| means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; | means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; **and** |
| means for **determining**, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior**; and** | means for **computing**, based at least partially upon the set of behavioral statistics, **a badness factor for the flow, wherein the badness factor provides an indication of** whether the flow is exhibiting undesirable behavior. |
| **means for enforcing, in response to a determination that the flow is exhibiting undesirable behavior, a penalty on the flow.** | |

Cloudflare – Exhibit 1003, page 33

Appx1074

61.    Many of the dependent claims are also quite similar, as shown in the charts below.  The following chart shows claims 6 and 26 with differences in bold and underlined:

| Claim 6 | Claim 26 |
|---------|----------|
| The **method** of claim **1**, wherein enforcing the penalty has an effect of correcting the flow's behavior such that the flow exhibits less undesirable behavior. | 26. The **MFM** of claim **25**, wherein enforcing the penalty has an effect of correcting the flow's behavior such that the flow exhibits less undesirable behavior. |

62.    The following chart shows dependent claims 7 and 27 with differences in bold and underlined:

| Claim 7 | Claim 27 |
|---------|----------|
| The **method** of claim **1**, wherein enforcing the penalty comprises: imposing an increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior. | The **MFM** of claim **25**, wherein **the means for** enforcing the penalty comprises: **means for** imposing an increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior. |

Cloudflare – Exhibit 1003, page 34

63.     Dependent claim 8 recites a limitation that is similar to the limitations in dependent claims 14, 28, and 34.  The following chart shows the difference in language among these claims.

| Claim 8 | Claim 14 | Claim 28 | Claim 34 |
|---|---|---|---|
| The **method** of claim **1**, wherein the penalty is enforced when a congestion condition is encountered. | The **method** of claim **12**, wherein the penalty is enforced **on the flow** when a congestion condition is encountered. | The **MFM** of claim **25**, wherein the penalty is enforced when a congestion condition is encountered. | The **MFM** of claim **32**, wherein the penalty is enforced **on the flow** when a congestion condition is encountered. |

64.     The following chart shows dependent claims 10 and 30 with differences in bold and underlined:

| Claim 10 | Claim 30 |
|---|---|
| The **method** of claim **9**, wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably. | The **MFM** of claim **29**, wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably. |

65.     The following chart shows dependent claims 11 and 31 with differences in bold and underlined:

Cloudflare – Exhibit 1003, page 35

| Claim 11 | Claim 31 |
|---|---|
| The **method** of claim **10**, further comprising: determining, based at least partially upon the badness factor, a penalty to impose on the flow. | The **MFM** of claim **30**, further comprising: **means for** determining, based at least partially upon the badness factor, a penalty to impose on the flow. |

66.    The following chart shows dependent claims 12 and 32 with differences in bold and underlined:

| Claim 12 | Claim 32 |
|---|---|
| The **method** of claim **11**, further comprising: enforcing the penalty on the flow. | The **MFM** of claim **31**, further comprising: **means for** enforcing the penalty on the flow. |

67.    The following chart shows dependent claims 13 and 33 with differences in bold and underlined:

| Claim 13 | Claim 33 |
|---|---|
| The **method** of claim **12**, wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior, thereby, causing the badness factor of the flow to improve. | The **MFM** of claim **32**, wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior, thereby, causing the badness factor of the flow to improve. |

Cloudflare – Exhibit 1003, page 36

68.    The following chart shows dependent claims 15 and 35 with differences in bold and underlined:

| Claim 15 | Claim 35 |
|---|---|
| The **method** of claim **12**, wherein no penalty is enforced on the flow unless a congestion condition is encountered, regardless of how undesirably the flow is behaving. | The **MFM** of claim **32**, wherein no penalty is enforced on the flow unless a congestion condition is encountered, regardless of how undesirably the flow is behaving. |

69.    The following chart shows dependent claims 16 and 36 with differences in bold and underlined:

| Claim 16 | Claim 36 |
|---|---|
| The **method** of claim **12**, wherein the penalty is determined and enforced on the flow even when no congestion condition is encountered. | The **MFM** of claim **32**, wherein the penalty is determined and enforced on the flow even when no congestion condition is encountered. |

70.    The following chart shows dependent claims 17 and 37 with differences in bold and underlined:

| Claim 17 | Claim 37 |
|---|---|
| The **method** of claim **12**, wherein determining the penalty comprises: determining an increased drop rate to | The **MFM** of claim **32**, wherein **the means for** determining the penalty comprises: **means for** determining an |

Cloudflare – Exhibit 1003, page 37

Appx1078

| Claim 17 | Claim 37 |
|---|---|
| impose on one or more information packets belonging to the flow. | increased drop rate to impose on one or more information packets belonging to the flow. |

71.    The following chart shows dependent claims 18 and 38 with differences in bold and underlined:

| Claim 18 | Claim 38 |
|---|---|
| The **method** of claim **17**, wherein enforcing the penalty comprises: imposing the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior. | The **MFM** of claim **37**, wherein **the means for** enforcing the penalty comprises: **means for** imposing the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior. |

72.    The following chart shows dependent claims 19 and 39 with differences in bold and underlined:

| Claim 19 | Claim 39 |
|---|---|
| The **method** of claim **9**, wherein the set of behavioral statistics comprises a measure T of how much total | The **MFM** of claim **29**, wherein the set of behavioral statistics comprises a measure T of how much total |

Cloudflare – Exhibit 1003, page 38

| Claim 19 | Claim 39 |
|---|---|
| information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time. | information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time. |

73.    The following chart shows dependent claims 20 and 40 with

differences in bold and underlined:

| Claim 20 | Claim 40 |
|---|---|
| The **method** of claim **9**, wherein the set of behavioral statistics comprises a measure L of how long the flow has been in existence up to a current point in time. | The **MFM** of claim **29**, wherein the set of behavioral statistics comprises a measure L of how long the flow has been in existence up to a current point in time. |

74.    The following chart shows dependent claims 21 and 41 with

differences in bold and underlined:

| Claim 21 | Claim 41 |
|---|---|
| The **method** of claim **20**, wherein the set of behavioral statistics comprises a rate R of information transfer for the flow, wherein R is derived by dividing T by L. | The **MFM** of claim **40**, wherein the set of behavioral statistics comprises a rate R of information transfer for the flow, wherein R is derived by dividing T by L. |

Cloudflare – Exhibit 1003, page 39

Appx1080

75.    The following chart shows dependent claims 22 and 42 with differences in bold and underlined:

| Claim 22 | Claim 42 |
|---|---|
| The **method** of claim **9**, wherein the set of behavioral statistics comprises an average size for the information packets belonging to the flow. | The **MFM** of claim **29**, wherein the set of behavioral statistics comprises an average size for the information packets belonging to the flow. |

76.    The following chart shows dependent claims 23 and 43 with differences in bold and underlined:

| Claim 23 | Claim 43 |
|---|---|
| The **method** of claim **9**, wherein maintaining the set of behavioral statistics comprises: | The **MFM** of claim **29**, wherein **the means for** maintaining the set of behavioral statistics comprises: |
| receiving a particular information packet belonging to the flow; | **means for** receiving a particular information packet belonging to the flow; |
| determining whether to forward the particular information packet to a destination; and | **means for** determining whether to forward the particular information packet to a destination; and |
| in response to a determination to forward the particular information packet to the destination, **updating** the | **means for updating,** in response to a determination to forward the particular information packet to the destination, |

Cloudflare – Exhibit 1003, page 40

Appx1081

| Claim 23 | Claim 43 |
|---|---|
| set of behavioral statistics to reflect processing of the particular information packet. | the set of behavioral statistics to reflect processing of the particular information packet. |

77.    The following chart shows dependent claims 24 and 44 with differences in bold and underlined:

| Claim 24 | Claim 44 |
|---|---|
| The **method** of claim **9**, wherein maintaining the set of behavioral statistics comprises: | The **MFM** of claim **29**, wherein **the means for** maintaining the set of behavioral statistics comprises: |
| receiving a particular information packet belonging to the flow; and | **means for** receiving a particular information packet belonging to the flow; and |
| updating the set of behavioral statistics to reflect processing of the particular information packet, regardless of whether the particular information packet is discarded or forwarded to a destination. | **means for** updating the set of behavioral statistics to reflect processing of the particular information packet, regardless of whether the particular information packet is discarded or forwarded to a destination. |

Cloudflare – Exhibit 1003, page 41

Appx1082

**C.    Claim Construction**

78.    As I discuss above in Section IV.A, I understand that a claim element may be written as a means-plus-function element. I understand from counsel that USPTO regulations require that any means-plus-function claim elements be construed in *inter partes* review. I note that claims 25, 27, 29, 32, 37, 38, 43, and 44 include elements beginning with "means for," which I understand is a phrase that is presumed to recite means-plus-function claims. These elements are discussed below.

79.    I note that the '593 patent describes the behavior of a misbehaving flow manager (MFM 210) throughout its disclosure. The Specification further explains that the only structure that can perform the functions of the MFM 210 is one or more processors. For example, these "processors" can be (1) programmable general-purpose processors "on a line card 202 [that executes] one or more sets of instructions" or (2) "hardwired logic components (e.g., in the form of one or more ASIC's on a line card 202)." EX1001, 5:49-57. Therefore, in my opinion, the structures that the '593 patent describes as performing the functions of the MFM 210 are simply one or more processors such as an ASIC (Application Specific Integrated Circuit) or a programmable general-purpose processor.

Cloudflare – Exhibit 1003, page 42

1.   **"means for maintaining a set of behavioral statistics for the flow . . ." (claims 25 and 29)**

80.    This element recites "means for maintaining a set of behavioral statistics for the flow" without any corresponding structure. Thus, counsel has instructed me to analyze this claim element as a means-plus-function element. The Specification of the '593 patent discloses a misbehaving flow manager 210 that "receives and processes one or more packets belonging to a flow" and "[a]s the packets of a flow are processed, a set of behavioral statistics are maintained ... for the flow." *See* EX1001, 6:5-10. Based on this disclosure and the structures that can perform the functions of the MFM 210 noted above, in my opinion, the structure corresponding to this element would have been construed as one or more processors as described above. I have been informed by counsel that equivalents of these structures also fall within the scope of this claim term.

2.   **"means for determining . . . whether the flow is exhibiting undesirable behavior" (claim 25)**

81.    This element recites "means for determining . . . whether the flow is exhibiting undesirable behavior" without any corresponding structure. Thus, counsel has instructed me to analyze this claim element as a means-plus-function element. The Specification of the '593 patent discloses a misbehaving flow manager 210 that "determines whether the flow is exhibiting undesirable behavior." EX1001, 6:25-33. Based on this disclosure and the structures that can

perform the functions of the MFM 210 noted above, in my opinion, the structure corresponding to this element would have been construed as one or more processors as described above. I have been informed by counsel that equivalents of these structures also fall within the scope of this claim term.

### 3. "means for enforcing . . . a penalty on the flow" (claims 25 and 32)

82.    This element recites "means for enforcing . . . a penalty on the flow" without any corresponding structure. Thus, counsel has instructed me to analyze this claim element as a means-plus-function element. The Specification of the '593 patent discloses a misbehaving flow manager 210 that "enforces a penalty on the flow." *See* EX1001, 6:34-47. Based on this disclosure and the structures that can perform the functions of the MFM 210 noted above, in my opinion, the structure corresponding to this element would have been construed as one or more processors as described above. I have been informed by counsel that equivalents of these structures also fall within the scope of this claim term.

### 4. "means for computing . . . a badness factor for the flow" (claim 29)

83.    This element recites "means for computing . . . a badness factor for the flow" without any corresponding structure. Thus, counsel has instructed me to analyze this claim element as a means-plus-function element. The Specification of the '593 patent discloses a misbehaving flow manager 210 that "compute[s] a

Cloudflare – Exhibit 1003, page 44

badness factor for the flow." *See* EX1001, 6:25-34. Based on this disclosure and the structures that can perform the functions of the MFM 210 noted above, in my opinion, the structure corresponding to this element would have been construed as one or more processors as described above. I have been informed by counsel that equivalents of these structures also fall within the scope of this claim term.

### 5. "means for determining . . . a penalty to impose on the flow" (claim 31)

84. This element recites "means for determining . . . a penalty to impose on the flow" without any corresponding structure. Thus, counsel has instructed me to analyze this claim element as a means-plus-function element. The Specification of the '593 patent discloses a misbehaving flow manager 210 that determines a penalty to impose on the flow. *See* EX1001, 6:34-47 ("[T]he penalty to be enforced is determined based upon the badness factor.") Based on this disclosure and the structures that can perform the functions of the MFM 210 noted above, in my opinion, the structure corresponding to this element would have been construed as one or more processors as described above. I have been informed by counsel that equivalents of these structures also fall within the scope of this claim term.

### 6. "means for determining an increased drop rate to impose on one or more information packets to belonging to the flow" (claim 37)

85. This element recites "means for determining an increased drop rate to impose on one or more information packets to belonging to the flow" without any

Cloudflare – Exhibit 1003, page 45

corresponding structure. Thus, counsel has instructed me to analyze this claim element as a means-plus-function element. The Specification of the '593 patent discloses a misbehaving flow manager 210 that "enforces a penalty on the flow," notes that "the penalty to be enforced is determined," and notes that "[t]his penalty may be an increased drop rate." *See* EX1001, 6:37-48. Based on this disclosure and the structures that can perform the functions of the MFM 210 noted above, in my opinion, the structure corresponding to this element would have been construed as one or more processors as described above. I have been informed by counsel that equivalents of these structures also fall within the scope of this claim term.

### 7. "means for imposing the increased drop rate on the flow" (claims 27 and 38)

86.     This element recites "means for imposing the increased drop rate on the flow" without any corresponding structure. Thus, counsel has instructed me to analyze this claim element as a means-plus-function element. The Specification of the '593 patent discloses a misbehaving flow manager 210 that "enforces a penalty on the flow" and notes that "[t]his penalty may be an increased drop rate." *See* EX1001, 6:37-48. Based on this disclosure and the structures that can perform the functions of the MFM 210 noted above, in my opinion, the structure corresponding to this element would have been construed as one or more processors as described above. I have been informed by counsel that equivalents of these structures also fall within the scope of this claim term.

Cloudflare – Exhibit 1003, page 46

### 8.   "means for receiving a particular information packet belonging to the flow" (claims 43 and 44)

87.   This element recites "means for receiving a particular information packet belonging to the flow" without any corresponding structure. Thus, counsel has instructed me to analyze this claim element as a means-plus-function element. The Specification of the '593 patent discloses a misbehaving flow manager 210 that "receives and processes one or more packets belonging to a flow." *See* EX1001, 6:5-6. Based on this disclosure and the structures that can perform the functions of the MFM 210 noted above, in my opinion, the structure corresponding to this element would have been construed as one or more processors as described above. I have been informed by counsel that equivalents of these structures also fall within the scope of this claim term.

### 9.   "means for determining whether to forward the particular information packet to a destination" (claim 43)

88.   This element recites "means for determining whether to forward the particular information packet to a destination" without any corresponding structure. Thus, counsel has instructed me to analyze this claim element as a means-plus-function element. The Specification of the '593 patent discloses a misbehaving flow manager 210 that "determines whether to forward the packet to the router to which the egress line card 202*d* is coupled." *See* EX1001, 7:37-40. Based on this disclosure and the structures that can perform the functions of the

Cloudflare – Exhibit 1003, page 47

MFM 210 noted above, in my opinion, the structure corresponding to this element would have been construed as one or more processors as described above. I have been informed by counsel that equivalents of these structures also fall within the scope of this claim term.

### 10. "means for updating . . . the set of behavioral statistics to reflect processing of the particular information packet" (claims 43 and 44)

89.    This element recites "means for updating . . . the set of behavioral statistics to reflect processing of the particular information packet" without any corresponding structure. Thus, counsel has instructed me to analyze this claim element as a means-plus-function element. The Specification of the '593 patent discloses a misbehaving flow manager 210 that after processing the packet, "the MFM 210*d* updates the behavioral statistics to reflect the packet that was just forwarded." *See* EX1001, 7:37-50. Based on this disclosure and the structures that can perform the functions of the MFM 210*d* noted above, in my opinion, the structure corresponding to this element would have been construed as one or more processors as described above. I have been informed by counsel that equivalents of these structures also fall within the scope of this claim term.

90.    For the purpose of my opinion, I have used the plain and ordinary meanings for the remaining claim terms of the '593 patent.

Cloudflare – Exhibit 1003, page 48

## VII.   TECHNICAL ANALYSIS OF THE PRIOR ART

### A.   Yung

91.    Yung discloses methods, apparatuses, and systems for classifying network traffic via holistic methods that capture the behavior of end systems generating traffic to manage bandwidth usage in a network. EX1005, 5:53-6:11. Like the '593 patent, Yung recognized and disclosed techniques for classifying and controlling increasingly sophisticated traffic. *Id.*, 4:43-5:49.

92.    Yung confirms that "an increasing number of [] peer-to-peer applications . . . employ data compression, encryption technology, and/or proprietary protocols that obscure or prevent identification of various application-specific attributes, often leaving well-known port numbers as the only basis for classification." *Id.*, 4:55-60. Yung elaborates: "[T]raffic classification based solely on well-known port numbers can be problematic, especially where the application uses dynamic port number assignments or an application incorrectly uses a well-known port number." *Id.*, 4:66-5:4.

93.    Yung describes a need in the art for "systems that facilitate the classification of encrypted or compressed network traffic." *Id.*, 5:43-45. Yung notes another need for "systems that facilitate the classification of network traffic associated with a non-public, proprietary protocol or application." *Id.*, 5:45-49.

Cloudflare – Exhibit 1003, page 49

94.    In light of these problems, and like the '593 patent, Yung describes a mechanism for classifying network traffic that "extends beyond analysis of explicitly presented packet attributes and holistically analyzes data flows." *Id.*, Abstract, 5:59-64. This enhanced classification technique "analyzes the behavioral attributes of encrypted data flows against a knowledge base of known application behavior patterns to classify the data flows." *Id.*, 6:1-5. These additional techniques "operate seamlessly with other Layer 7 traffic classification mechanisms that operate on the attributes of the packets themselves." *Id.*, 6:5-8.

95.    Yung's Figure 1, annotated below, illustrates a basic network environment in which traffic monitoring device 30 (also referred to as bandwidth management device 130 and in green below) operates. *Id.*, 7:29-31.



EX1005, FIG. 1 (annotated).

Cloudflare – Exhibit 1003, page 50

In Figure 1, traffic monitoring device 30 connects to network devices (in red above) that can be hubs, switches, routers, and other suitable network devices. *Id.*, 6:45-50.

96.    Once connected, traffic monitoring device 30, similar to the '593 patent, "detect[s] or recognize[s] flows between end systems or hosts, and classif[ies] the data flows based on one or more flow and/or behavioral attributes." *Id.*, 7:46-49. The device "classif[ies] data flows based on a heuristic comparison of certain observed behavioral attributes of the data flows relative to a set of at least one known application behavior pattern." *Id.*, 7:7-11.

97.    Yung provides one example of such a heuristic comparison using "Packet Size Matching." *Id.*, 10:53-11:8. In this approach, Yung notes that a particular application (e.g., peer-to-peer traffic) may exhibit consistent packet sizes. *Id.*, 10:55-63. "For example, the peer-to-peer file sharing application, Winny, at startup attempts to discover one or more peers[, and] this discovery process results in a plurality of data flows where the first packet is a given size, or at least within a narrow size range." *Id.*, 10:57-61. "The second and subsequent packets exhibit the same patters as well." *Id.*, 10:61-62.

98.    Yung is open-ended with respect to the types of behaviors/statistics that can be used in the application behavior pattern. Yung notes that an application

Cloudflare – Exhibit 1003, page 51

behavior pattern can incorporate other factors, such as required time values or ranges for the timing between packets in a given flow. *Id.*, 11:61-63.

99.    Once flows are classified, Yung describes enforcing bandwidth utilization controls on packets of a flow. *Id.*, 19:52-20:18, 23:15-25:15. These "per-flow bandwidth utilization controls allow for control of individual data flows." *Id.*, 19:57-59. The device can support different control types, including: priority policies, rate policies, and discard policies. *Id.*, 19:58-61. "A priority policy determines how individual data flows associated with a traffic class are treated relative to data flows associated with other traffic classes." *Id.*, 19:61-64. "A rate policy controls the rate of data flows." *Id.*, 19:64-65. "A discard policy causes flow control module 132 to discard or drop data packets or flows associated with a particular traffic class." *Id.*, 20:13-15. Thus, Yung's device can control ("police") unruly, bandwidth-intensive applications, e.g., peer-to-peer applications, and optimize network-application performance. *Id.*, 4:43-50, 16:2-8.

100.   Yung incorporates several additional patents assigned to Packeteer by reference in their entirety, including:

(1) U.S. Patent No. 6,412,000 to Riddle *et al.*, titled "Method for Automatically Classifying Traffic in a Packet Communications Network" (EX1005, 1:43-47; *see also* EX1039);

Cloudflare – Exhibit 1003, page 52

(2) U.S. Patent No. 7,296,288 to Hill *et al.*, titled "Methods, Apparatuses, and Systems Allowing for Bandwidth Management Schemes Responsive to Utilization Characteristics Associated With Individual Users" (EX1005, 2:5-9; *see also* EX1026);

(3) U.S. Patent No. 7,366,101 to Varier *et al.*, titled "Network Traffic Synchronization Mechanism" (EX1005, 2:17-19, 7:37-42; *see also* EX1018);

(4) U.S. Patent No. 7,433,304 to Galloway *et al.*, titled "Classification Data Structure Enabling Multi-Dimensional Network Traffic Classification And Control Schemes" (EX1005, 2:1-5, 21:25-27; *see also* EX1036); and

(5) U.S. Patent No. 6,115,357 to Packer *et al.*, titled "Method for Pacing Data Flow in a Packet-based Network" (EX1005, 1:30-34; *see also* EX1037).

101.   Yung also notes that the functionality of traffic monitoring device 30 "can be integrated into a variety of network devices that classify network traffic, such as firewalls, gateways, proxies, packet capture devices [], network traffic monitoring, and/or bandwidth management devices, that are typically located at strategic points in computer networks." EX1005, 7:12-18; 6:9-12 ("Implementations of the present invention can be incorporated into a variety of network devices, such as traffic monitoring devices, packet capture devices,

firewalls, and bandwidth management devices."). U.S. Patent No. 7,366,101 to Varier *et al.*, incorporated by reference in Yung, includes routers in the network devices in which the invention can be applied, noting that "the network traffic synchronization mechanism can be applied to a variety of network devices, such as firewalls, gateways, network routers, and bandwidth management devices." EX1018, 4:43-47. U.S. Patent No. 7,443,304 to Galloway, also incorporated by reference in Yung, similarly includes routers in the variety of network devices, noting that "the present invention can be applied to a variety of network devices, such as routers, firewalls, caching mechanisms, or other network devices implementing traffic classification functionality." EX1036, 21:4-7.

### B. Copeland

102.    Like the '593 patent and Yung, Copeland analyzes flow statistics to identify flows behaving suspiciously. EX1007, Abstract. Copeland's "flow-based intrusion detection system efficiently and reliably monitors network traffic for possible intrusions" and "has applicability in the fields of network monitoring, network security, network devices, network communications, and similar fields." *Id.*, 22:64-23:2.

103.    Copeland tracks flow-based statistics and provides an exemplary flow data structure in the C Programming language. *Id.*, 7:40-54, 16:36-67. The flow

data structure includes the time that the flow started, the time the flow ended, bytes sent, packets sent, etc. *Id.*

104.    Copeland determines based on these statistics whether a flow is legitimate traffic or suspicious activity. *Id.*, 3:32-35. Towards this end, Copeland calculates a "concern index" (CI) value from flow data that indicates how normal the flow is. *Id.*, 3:50-52. "The collected flow data is analyzed to assign a concern index to the flow based upon a probability that the flow was not normal for data communications." *Id.* Copeland's CI value provides an "assessment of the significance of the threat of the particular traffic or flow." *Id.*, 10:45-47; 7:57-60.

105.    Copeland tallies an accumulated CI value for each host using the calculated flow-based CI values, and stores the accumulated CI value in a host data structure. *Id.*, 17:20-51. When the accumulated CI value exceeds a threshold value, an alert is issued and an appropriate action can be taken. *Id.*, 3:40-42. This allows the system to identify hosts that are engaged in intruder activity without generating false alarms. *Id.*, 3:35-40.

106.    Copeland's Figures 6 and 7 below illustrate approaches to calculating the CI value. EX1007, FIGs. 6 and 7.

Cloudflare – Exhibit 1003, page 55



EX1007, FIG. 6 (annotated).

For example, in Figure 6, in the context of a "Potential TCP Probe" (highlighted in red above), Copeland proposes using the "number of packets" (highlighted in green) as the CI value.



EX1007, FIG. 7 (annotated).

Or, in Figure 7, in the context of a "Port Scan" (highlighted in blue above), Copeland proposes using a value of "1010 per port over 4" (highlighted in orange) as the CI value.

Cloudflare – Exhibit 1003, page 56

### C.    Four-Steps Whitepaper

107.    Four-Steps Whitepaper describes the "PacketShaper$^{®}$," a bandwidth-management solution that "protects critical traffic, paces bandwidth-greedy traffic, and prevents any single type of traffic from monopolizing resources." EX1006, 3. As "enterprise networks [] are overwhelmed by increasing amounts of traffic, unmanaged congestion at WAN-access links and Internet links undermines application performance." *Id.* To tame this congestion, Four-Steps Whitepaper's bandwidth management solution "discovers and classifies applications, analyzes their performance, enforces policy-based bandwidth allocation, and generates reports on the results." *Id.*

108.    Four-Steps Whitepaper presents a four-step bandwidth-management strategy of: (1) classifying traffic; (2) analyzing behavior; (3) controlling performance; and (4) reporting results. *Id.*, 4-5. This four-step approach "safeguards application performance and maximizes return on network capacity," "bring[ing] predictable, efficient performance to applications running over enterprise wide-area networks (WANs) and the Internet." *Id.*, 3.

109.    With respect to classifying traffic, Four-Steps Whitepaper notes that "[i]dentifying and categorizing the types of network traffic that compete for limited bandwidth is the first step toward solving performance problems." *Id.*, 5. Four-Steps Whitepaper describes a variety of rich traffic classification techniques. *Id.*, 5-

6. Four-Steps Whitepaper specifically notes an ability to classify traffic from peer-to-peer file sharing applications. *Id.*, 7-8.

110.   With respect to controlling performance, Four-Steps Whitepaper notes that the bandwidth-management device can "protect, pace, or contain application performance by applying appropriate bandwidth controls . . . on a per-user, per-session, per-stream, or per-application basis." *Id.*, 19. Four-Steps Whitepaper also describes rate policies that can be applied to prevent jitter for VoIP traffic. *Id.*, 21. Other policies include priority policies, discard policies, never-admit policies, and ignore policies. *Id.*, 22.

111.   Four-Steps Whitepaper explains that the PacketShaper® tracks a "rich set of metrics" about flows that can be "viewed with PacketShaper's own tables and graphs" or "retrieved for use by other tools." *Id.*, 18. These metrics include: (1) "throughput in units of bytes, packets, transactions, connections;" (2) "counts and percentages of retransmitted, received, tossed, dropped, and good TCP packets;" and (3) "counts and percentages of TCP connections that were denied by a policy . . . ." *Id.*

**D.    Ye**

112.   Ye describes a mechanism for defending against denial-of-service attacks based on flooding. EX1008, Abstract. Ye notes that "it is common to monitor traffic flows and store flow statistics in a database" and that "[s]uch

Cloudflare – Exhibit 1003, page 58

detailed statistics . . . can be used to group traffic flows into a wide number of classes." *Id.*, 1:27-37. Ye then describes flooding attacks and their adverse impacts on legitimate users. *Id.*, 1:47-58. Ye notes that "[o]ne known technique for protecting against N-DoS attacks involves explicit signature capture and analysis" where "signatures can be communication port numbers, daemon names or commands, or contained in IP packet payload." *Id.*, 1:59-63. Ye recognizes the limitations of these approaches in their general ineffectiveness and the adverse impacts to legitimate users. *Id.*, 1:63-2:5. Accordingly, Ye notes a need to identify malicious traffic flows and a need to reduce the impact of such flows. *Id.*, 2:6-12.

113.   Towards this end, Ye "monitors, analyzes, and regulates traffic flows at network nodes, e.g., routers, based on the flow's behavior." *Id.*, 2:23-26. Ye compares data statistics about current flow rates to corresponding baseline flow rates to determine aggressive flow types. *Id.*, 2:53-61. In this manner, like the '593 patent, Ye's analysis is driven by observable flow behavior and not by examination of packet payloads. Based on Ye's comparison of flow statistics, "under certain circumstances, aggressive flows are targeted for forced data rate reductions." *Id.*, 2:57-59. Specifically, the system applies forced data rate reductions during periods of congestion. *Id.*, 3:15-18.

114.   This behavior is illustrated in Ye's Figure 5, which describes a packet "forwarding and flow rate control routine." *Id.*, 9:12-13. "Control step 504 [in red

Cloudflare – Exhibit 1003, page 59

Appx1100

below] involves making a determination as to whether the router is currently experiencing congestion sufficient to merit application of the AFFC [Anti-Flooding Flow-Control] mechanisms . . . ." *Id.*, 9:17-22. "[C]ongestion sufficient to merit application of the AFFC flow control mechanisms is declared when the router encounters a saturation condition which persists for a pre-selected period of time . . . ." *Id.*, 9:22-27.



EX1008, FIG. 5 (annotated).

115.  When congestion does not exist, received packets (in green above) are forwarded without processing. EX1008, 9:39-43. Where a saturation condition

Cloudflare – Exhibit 1003, page 60

exists, flow rate reduction is applied to aggressive traffic flows, and the remaining packets are forwarded (in blue above). *Id.*, 12:1-4.

## VIII.  GROUNDS OF UNPATENTABILITY

**A.**    <u>Ground 1:</u> **Claims 1, 2, 4-7, 17, 18, 25-27, 37, and 38 are obvious over Yung.**

116.    As detailed below, Yung teaches or suggests every limitation of claims 1, 2, 4-7, 17, 18, 25-27, 37, and 38, and in my opinion these claims would have been obvious in view of Yung.

### 1.    Independent claim 1

#### a)    Yung discloses the preamble of claim 1.

> [1.P] A machine-implemented method for processing a single flow, the flow comprising a plurality of packets, and the method comprising:

117.    To any extent that the preamble is limiting, it is my opinion that Yung discloses [1.P]. Yung discloses a *method for processing a single flow*[1] because Yung describes a "method directed to enforcing bandwidth utilization controls on data flows." EX1005, FIG. 7, 6:35-36. For example, Yung *processes* a single flow by determining whether or not a flow block exists corresponding to the flow. Yung also *processes* a flow by classifying the flow "based on a heuristic comparison of certain observed behavioral attributes of the data flows relative to a set of at least

---

[1] For ease of reference, I will identify claim language from the '593 patent using *italics*.

Cloudflare – Exhibit 1003, page 61

Appx1102

one known application behavior pattern." *Id.*, 7:7-11. Yung also *processes* a flow by imposing per-flow bandwidth utilization controls. *Id.*, 19:52-20:18.

118.   It is my opinion that Yung's method processes *a single flow* while classifying network traffic. While the network traffic consists of a plurality of flows, Yung processes each flow individually. For example, in Figure 7, Yung illustrates identifying "a traffic class corresponding to the flow (214) [in red below]" and "enforc[ing] . . . bandwidth utilization controls on the data packet flow [in blue below]." *Id*., 24:13-18, 24:63-25:1.

Cloudflare – Exhibit 1003, page 62



EX1005, FIG. 7 (annotated).

119. It is my opinion that Yung's method is *machine-implemented*. *See* EX1005, FIG. 3, 2:57-61. Yung's "bandwidth management device 130 [in red below]" employs "flow control module 132 [in blue below]" to "enforce bandwidth utilization controls on data flows [in green below] traversing [the device]." *Id.*, 16:11-19.

Cloudflare – Exhibit 1003, page 63



EX1005, FIG. 3 (annotated).

Yung's bandwidth management device is a machine. Yung discloses a *machine-implemented method for processing a single flow*.

120.   It is my opinion that Yung's *flow* contains a *plurality of packets*. Yung notes that "methods for determining new data flows and assigning packets to existing data flows are well known in the art and also depend on the particular transport layer protocol employed." EX1005, 8:24-27. Yung provides both TCP and UDP as non-limiting examples of flow types. *Id.*, 8:14-15. A POSA would have understood that the basic unit of information in such network flows is a packet. Yung also notes that "TCP is responsible for ensuring at the transmitting host that message data is divided into packets to be sent, and for reassembling, at the receiving host, the packets back into the complete message." *Id.*, 2:58-61. Yung's bandwidth management device 130 acts upon flows *comprising a plurality of packets*.

Cloudflare – Exhibit 1003, page 64

121.  Therefore, in my opinion, a POSA would have understood that Yung discloses [1.P].

**b)  Yung discloses the creating limitation of claim 1.**

[1.1] creating a flow block as the first packet of a flow is processed by a single router;

122.  It is my opinion that Yung discloses [1.1]. Yung includes a "packet processor 131 [in red below]" within bandwidth management device 130 that "is operative to detect new data flows and construct data structures including attributes characterizing the data flow." EX1005, 16:15-17. Yung refers to these data structures as both a "flow object" and a "control object." *Id.*, 16:66-17:1, 8:2-11. For example, Yung notes that "packet processor 131 [] constructs a control block (flow) object including attributes characterizing a specific flow between two end systems." *Id.*, 16:66-17:1.



EX1005, FIG. 3 (annotated).

Cloudflare – Exhibit 1003, page 65

123.   Yung creates the "flow object" or "control object" (i.e., the claimed *flow block*) for each flow when a first packet is received. In Figure 7, Yung illustrates a method of enforcing bandwidth utilization controls on data flows that includes constructing a control block. EX1005, 23:16-20.



EX1005, FIG. 7 (annotated).

124.   In step 202 (in red above), packet processor 131 "receives a data packet," and in step 204 (in blue above), packet processor 131 "determines whether flow database 135 contains an existing control block object corresponding to the data flow." EX1005, 23:23-26. "If no control block object corresponds to the data packet," then in step 212 (in green above), "packet processor 131 constructs a

Cloudflare – Exhibit 1003, page 66

Appx1107

[new] control block object" for the flow. *Id.*, 23:26-30. In this manner, Yung discloses *creating a flow block as the first packet of a flow is processed* because for each packet received by Yung, Yung *processes* that packet by determining whether or not a flow block exists (i.e., whether the packet is *the first packet of a flow*). *See id.*, 23:23-26. When no flow block exists, a flow block is created. *See id.*, 23:26-28.

125.    The result of the foregoing disclosure is that Yung creates a new control/flow object when it receives the first packet in a new flow. As subsequent packets are received, Yung refers to and updates the existing control/flow object without creating a new control/flow object. But for each first packet in a flow received, Yung creates a control/flow object. As Yung notes "methods for determining new data flows and assigning packets to existing data flows are well known in the art and also depend on the particular transport layer protocol employed." *Id.*, 8:24-27. Yung discloses *creating a flow block as the first packet of a flow is processed*.

126.    A POSA would also have understood that Yung performed these features as the first packet is processed *by a single router* based on Yung's express disclosures and the ubiquity of router-based, bandwidth-control systems.

127.    Yung describes implementing its classification techniques into "a variety of network devices that classify network traffic." *Id.*, 7:12-18. Yung lists

Cloudflare – Exhibit 1003, page 67

several such devices, including "firewalls, gateways, proxies, packet capture devices, . . . network traffic monitoring and/or bandwidth management devices that are typically located at strategic points in computer networks." *Id.* Yung states that the flow management functionality can be integrated in "bandwidth management devices" and confirms, as a POSA would have known, that routers were bandwidth management devices. EX1005, 3:27-28.

128.    Yung also confirms throughout its disclosure that a "router" is a "network device." *Id.*, 6:50-53 ("a second network device 22, such as a router"). Indeed, as a POSA would have known, routers are among the most common "network devices" and, by the time Yung was filed, they could "classify network traffic." Yung notes that "certain [] routers allow network administrators to specify aggregate bandwidth utilization controls." *Id.*, 4:2-5. Yung notes that "multiple traffic monitoring devices can be disposed at strategic points in a given network infrastructure to achieve various objectives." *Id.*, 7:32-34. When discussing routers, Yung notes that "routers support various queuing options to provide for some level of bandwidth management." *Id.*, 3:27-28.

129.    Various patents that Yung incorporates by reference correctly expand the types of devices falling under the umbrella of "common network devices." For instance, U.S. Patent No. 6,038,216 to Packer, which is a Packeteer patent like Yung, is incorporated by reference in Yung. EX1005, 20:2-6. This Packer patent

Cloudflare – Exhibit 1003, page 68

described, in 1996, an explicit data rate control technique that could be implemented in a programmable router. EX1059, 4:13-15. In addition, U.S. Patent No. 7,366,101 to Varier is incorporated by reference in Yung. EX1005, 2:17-19, 7:37-42. Varier describes a network traffic synchronization method in which a bandwidth management device classifies data flows and enforces bandwidth controls on the data flows. EX1018, 6:11-17. Varier includes routers in the network devices in which the invention can be applied, noting that "the network traffic synchronization mechanism can be applied to a variety of network devices, such as firewalls, gateways, network routers, and bandwidth management devices." *Id.,* 4:44-47.

130.   U.S. Patent No. 7,443,304 to Galloway is incorporated by reference in Yung. EX1005, 2:1-4, 21:25-27. Galloway describes a bandwidth management device that enforces bandwidth management controls on flows. EX1036, 6:57-60. Galloway also includes routers in the variety of network devices, noting that "the present invention can be applied to a variety of network devices, such as routers, firewalls, caching mechanisms, or other network devices implementing traffic classification functionality." *Id.,* 21:1-7.

131.   Yung also notes that its solution can be implemented on a "gateway." EX1005, 7:12-18. Historically, gateways on TCP/IP networks (such as those considered by Yung) are an "IP-level router." EX1033, 2. A gateway performs the

Cloudflare – Exhibit 1003, page 69

function of a router tying one network to another. Using Yung's words, gateways are routers (i.e., "network devices") that are "located at strategic points in computer networks." EX1005, 7:12-18. A POSA reading Yung's description of "gateway" as a network device capable of implementing its disclosures would have understood that this term covered a "router."

132. Thus, it is my opinion that Yung discloses implementing its techniques on a *single router*. To the extent this is not the case, a POSA would have found it to be an obvious design choice to implement Yung's classification techniques in a router given the express disclosures of routers, in Yung and its incorporated references, as traffic management devices. Indeed, a POSA would have known well that prior to 2004, routers contained mechanisms to monitor, classify, and shape flows transiting the router.

133. U.S. Patent 7,385,924 to Riddle (another Packeteer patent) describes a "flow-based, traffic-classification-aware data collection and reporting system." EX1020, Abstract. This patent notes that "if the traffic monitoring and flow data record functionality described herein were incorporated into a ***router***, the flow data records could also include such routing-related information." *Id.*, 16:37-40 (emphasis added).

134. U.S. Patent 7,660,248 to Duffield describes a "signature-based traffic classification method [that] maps traffic into preselected classes of service."

EX1021, Abstract. This patent notes that "for reasons of trust and scalability of administration and management, it is typically more practical to perform the CoS mapping within the network; for instance, at the ***router*** that connects the Local Area Network (LAN) to the Wide Area Network (WAN)." *Id.*, 3:19-24 (emphasis added).

135.   U.S. Patent No. 7,313,100 to Turner describes a "network device [that] integrates accounting functionality for generation of flow statistics with packet intercept functionality." EX1023, Abstract. This patent notes that "the flow analysis and packet intercept features may be readily integrated within a ***router*** for a packet-based network." *Id.*, 2:41-54 (emphasis added).

136.   U.S. Patent No. 6,385,170 to Chiu is titled "Method and System for Dynamically Triggering Flow-Based Quality of Service Shortcuts Through a Router." EX1028, Title. The patent describes a "technique for providing quality of service (QoS) for individual Internet Protocol (IP) data flows transferred via a ***router*** or other suitable switch." *Id.*, 1:7-10 (emphasis added).

137.   U.S. Patent No. 7,342,929 to Bremler-Barr describes an apparatus for protecting against attacks in a network. EX1030, 20:9-12. This patent notes that its "functions may be incorporated into a ***router***." *Id.*, 20:9-11 (emphasis added).

138.   I note that many routers in the relevant timeframe included traffic monitoring features by default. For example, Cisco describes the "QoS

Requirements for Branch Routers," while employing

"Queuing/Dropping/Shaping/Link-Efficiency Policies" at the "WAN Edge."

EX1038, 61-62, *see also id.*, 70-71 ("QoS policies at these bottlenecks [branch

routers] align expensive WAN/VPN bandwidth utilization with business

objectives."). The presentation notes that "AutoQoS features [are] automatically

configure Cisco-recommend[ed] QoS on Catalyst switches and IOS ***routers***." *Id.*,

64 (emphasis added). "WAN QoS policies need to be configured on the WAN

edges of WAN Aggregator (WAG) routers and Branch ***routers***[, and] WAN edge

QoS policies include queuing, shaping, selective dropping and link-specific

policies." *Id.*, 69 (emphasis added).

139.    Thus, it is my opinion that a POSA would have understood that traffic

classification and shaping was frequently implemented in routers at the time of the

claimed invention. It would have been obvious to a POSA to apply Yung's

improved classification techniques in a router to allow for a drop-in replacement of

the type of legacy routers that Yung suggests performs insufficient bandwidth

management. *See* EX1005, 3:20-47. This would have allowed these same routers

to perform the improved bandwidth-management techniques described in Yung

without any significant modification to the routers or the surrounding network

architectures.

Cloudflare – Exhibit 1003, page 72

140.    Accordingly, Yung's traffic-shaping features, including *creating a flow block as the first packet of a flow*, would be performed by *a single router*. Therefore, in my opinion, a POSA would have understood that Yung discloses [1.1].

[1.2] said flow block being configured to store payload-content-agnostic behavioral statistics pertaining to said flow regardless of the presence or absence of congestion;

141.    It is my opinion that Yung discloses [1.2]. As discussed in paragraphs 122-125, Yung's packet processor 131 creates a *flow block* in a data structure that Yung calls a "flow object." Yung's *flow block* stores behavioral attributes of flows. EX1005, 8:5-11. For example, Yung tracks "various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.)." *Id.*, 25:8-11. These measurement values represent the claimed *behavioral statistics*. To the extent these values are not considered statistics, Yung expressly discloses its packet processor maintaining statistics for flows. *Id.*, 6:64-7:5. Moreover, Yung's statistics are analogous to those described as behavioral statistics in the '593 patent, including a byte count and packet count. EX1001, 6:12-19.

142.    But independently, I note that these *statistics* are *behavioral* because they characterize flows' conduct using "measurement values . . . that characterize

Cloudflare – Exhibit 1003, page 73

the flow (e.g., last packet time, packet count, byte count, etc.)." EX1005, 25:8-11. The flow object may also include information about "inter-flow timing" and the "timing of last packets in the inbound and outbound directions, speed information, apparent round trip time, etc." *Id.*, 11:36-38, 17:42-49. Yung then holistically analyzes the *behavioral* statistics "against known behavioral patterns" to "classify the data flows based on one or more flow and/or behavioral attributes." *Id.*, 5:59-64, 7:46-49.

143.    I note that Yung's statistics are *payload-content-agnostic* because they are compiled without knowledge of or reference to packets' contents. While the '593 patent does not define the term *payload-content agnostic*, a POSA would have understood that an information packet comprises a header portion and a payload. The header portion "contains information that is used . . . to determine the next hop for [a] packet." EX1001, 4:61-62. For example, a "header portion" may include (1) a source address; (2) a source port number; (3) a destination address; (4) a destination port number; and (5) an indication of the routing protocol. *Id* 4:64-5:3. A payload comprises "the actual data that the source is trying to send to the destination." *Id.*, 5:9-10.

144.    Yung recognized that legacy systems used information in the payload to classify traffic—e.g., "an application-specific string of text in the payload of a packet." But Yung notes that simple changes to an application or the use of

Cloudflare – Exhibit 1003, page 74

encryption may allow the application to evade proper classification and bandwidth utilization controls/policies. EX1005, 4:33-42. Thus, Yung does not examine the actual data in the payload when attempting to classify traffic using the behavioral statistics.

145.    Instead, Yung uses observable qualities beyond the content of the packet payload. *Id.*, 4:59-64. These observable qualities are reflected in the statistics tracked by Yung, e.g., byte count, packet count, first packet time, last packet time, etc. Such statistics are *agnostic* with respect to any content in the payloads of packets. As Yung describes classifying encrypted traffic and traffic with obfuscated application signatures, Yung cannot base its analysis on the content of the payload. Thus, the statistics that Yung tracks and uses to classify traffic are *payload-content-agnostic*.

146.    Yung contrasts its approach with traffic-classification mechanisms that examine packet data, such as Layer 7 traffic classification methods. However, Yung notes that "the enhanced classification mechanisms described herein operate seamlessly with other Layer 7 traffic classification mechanisms that operate on attributes of the packets themselves." EX1005, 6:5-8. So while Yung describes a system that can additionally classify based on a legacy technique that examines packet payloads, the behavioral statistics tracked and analyzed in Yung remain *payload-content agnostic*.

Cloudflare – Exhibit 1003, page 75

147.    Finally, I note that Yung maintains statistics *regardless of the presence or absence of congestion*. Yung discloses a traffic-classification system that stores statistics about flows and imposes policies upon those flows. EX1005, Abstract. To this end, Yung notes that "traffic discovery module 84 can monitor data flows in real time to discover traffic classes." *Id.*, 9:21-25. Yung does not track statistics only within certain times, periods, or upon certain conditions, and Yung's Figure 7 includes no conditional logic restricting the statistics. *Id.*, FIG. 7. Instead, Yung's measurement engine "records data associated with the packet to allow for analysis of bandwidth utilization and other networks statistics on a traffic class, access link, and/or partition level." *Id.*, 25:11-15.

148.    Having this detailed statistical information would have been a desirable feature to a POSA. Being able to analyze statistics such as byte count and packet count by flow and by class would provide a POSA with a valuable analysis tool. *See also* EX1006, 9-17. To provide such statistics, Yung does not and cannot store the statistics only when congestion arises, otherwise the statistics would be inaccurate. To achieve this feature, Yung tracks its statistics continuously and *regardless of any presence or absence of congestion*.

149.    Therefore, in my opinion, a POSA would have understood that Yung discloses [1.2].

Cloudflare – Exhibit 1003, page 76

### c) Yung discloses the updating limitation of claim 1.

[1.3] said router updating said flow block with the payload-content-agnostic behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by said router, regardless of the presence or absence of congestion;

150.   It is my opinion that Yung discloses [1.3]. Yung discloses *updating said flow block with the payload-content-agnostic behavioral statistics of each packet belonging to said flow.* As shown in Figure 7, reproduced below, in step 202, packet processor 131 receives a data packet [in blue below], and constructs a new flow block (in red below) or retrieves an existing (in orange below) flow block. After passing the packet to the flow control module in step 222 (in purple below), in step 224 (in green below) packet processor 131 then "updates various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.)." EX1005, 25:8-11

Cloudflare – Exhibit 1003, page 77



Fig._7

EX1005, FIG. 7 (annotated).

151.   Yung updates the statistics *as each packet belonging to said flow is processed*—as Yung updates measurement values in a control block for every packet in the flow. Specifically, Yung notes that "measurement engine 140 . . . records data associated with the packet to allow for analysis of bandwidth utilization and other network statistics on a traffic class, access link, and/or partition level." EX1005, 25:11-15. Updating the statistics *for each packet* is necessary, and Yung cannot skip or sample packets in forming these metrics

Cloudflare – Exhibit 1003, page 78

because Yung would not be able to leverage/provide the aggregate statistics (e.g., total byte count, total packet count) if the statistics were not updated *as each packet belonging to said flow is processed*.

152.   As I discuss above, Yung does not track statistics only within certain times, periods, or upon certain conditions, and Yung's Figure 7 includes no conditional logic restricting the statistics. *Id.*, FIG. 7. Instead, Yung's measurement engine "records data associated with the packet to allow for analysis of bandwidth utilization and other networks statistics on a traffic class, access link, and/or partition level." *Id.*, 25:11-15. Yung does not store the statistics only when congestion arises.

153.   For the same reasons discussed above in paragraphs 147-148, Yung updates the statistics in its control block *regardless of the presence or absence of congestion*. Yung does not restrict its updating of statistics to occur within certain times, periods, or upon certain conditions—as needed to maintain accurate network statistics. *Id.*, FIG. 7, 25:11-15. For the reasons discussed above in paragraphs 126-140, Yung discloses *said router* performing the *updating said flow block* as *said flow is processed by said router*.

154.   Therefore, in my opinion, a POSA would have understood that Yung discloses [1.3].

Cloudflare – Exhibit 1003, page 79

### d)    Yung discloses the determining limitation of claim 1.

[1.4] said router heuristically determining whether said flow exhibits undesirable behavior by comparing at least one of said payload-content-agnostic behavioral statistics to at least one pre-determined threshold value**;** and

155.   It is my opinion that Yung discloses [1.4]. Yung is titled "Heuristic Behavior Pattern Matching Of Data Flows In Enhanced Network Traffic Classification." EX1005, Title. Yung discloses that it classifies data flows "based on a *heuristic* comparison of certain observed behavioral attributes of the data flows relative to a set of at least one known application behavior pattern." *Id.*, 7:7-11. Thus, Yung discloses *heuristically determining*.

156.   Yung also applies its heuristic traffic-classification techniques to determine *whether said flow exhibits undesirable behavior*. Yung allows administrators to enforce per-flow, bandwidth-utilization controls based on traffic class. EX1005, 19:53-58. A traffic class is defined by a set of matching rules that group data flows having shared characteristics. *Id.*, 20:20-24. For example, Yung describes controlling peer-to-peer, "unruly, bandwidth-intensive" applications that consume excessive bandwidth (i.e., *undesirable behavior*). Yung notes that such policing is frequently performed: "a common use of bandwidth management devices is to limit the bandwidth being consumed by unruly, bandwidth-intensive applications, such as peer-to-peer applications." *Id.*, 4:43-47.

Cloudflare – Exhibit 1003, page 80

157.  A POSA would have recognized that Yung's description of "unruly, bandwidth-intensive applications" equates to applications exhibiting "*undesirable behavior.*" As I described in the technical background section, bandwidth had become a valuable commodity in the relevant timeframe, and network administrators employed a variety of solutions to stop certain traffic-types from monopolizing available bandwidth.

158.  Yung performs its heuristic classification techniques *by comparing at least one of said payload-content-agnostic behavioral statistics to at least one pre-determined threshold value*. As discussed above, Yung stores p*ayload-content-agnostic behavioral statistics* used to classify data flows. *Id.*, 7:46-49. Yung's traffic classification "uses a variety of threshold values . . . to classify flows." *Id.*, 15:23-26. Yung further notes that "a traffic class has at least one attribute defining the criterion(ia) against which data flow attributes are analyzed for the purpose of determining a matching traffic class." *Id.*, 9:54-57. These "criter[ia]" are the claimed *at least one threshold value*.

159.  As a specific example, Yung describes one classification technique of "Packet Size Matching." *Id.*, 10:53-57. Here, Yung leverages a tendency of peer-to-peer applications to exhibit a consistent packet-size pattern—i.e., "where the first packet is a given size or at least within a narrow size range." *Id.*, 10:57-61. "By observing this behavior, a knowledge base including these heuristic findings

can be used to compile one or more application behavior pattern(s) for use in classifying data flows." *Id.*, 10:62-65. Yung's Figure 5D illustrates a method of analyzing flows' packets against suspected application patterns using a single criterion of packet size by comparing "the size of the current packet" to the "packet size or size range in the suspected application behavior pattern." *Id.*, 14:60-15:5.

160.    In Yung's example of packet size matching, an administrator can set a "packet size" representing the *threshold value*. The administrator can also specify a "size range," and such a range would require a lower value and an upper value (i.e., *thresholds*) defining the boundaries of the size range.

161.    As another example, Yung describes an application classification technique in which the "application behavior pattern may include required time values or ranges for the timing between packets in a given flow." *Id.*, 11:60-62. As Yung stores a "time of last packet" in the control block (*id.*, 23:58-60), such an application behavior pattern includes a difference between the "time of last packet" retrieved from the control block and the current time to the "required time values or ranges." The *threshold* would be the value representing an acceptable amount of time or the upper and lower values in a range if a range is configured. Thus, it is my opinion that Yung describes *comparing at least one of said payload-content-agnostic behavioral statistics to at least one threshold value.*

Cloudflare – Exhibit 1003, page 82

162.    Yung's thresholds are also *pre-determined*. Yung provides an administrator interface that "allows a network administrator to view and configure one or more parameters associated with the behavior pattern matching functionality." *Id.*, 16:55-58. Examples of such configurable parameters, i.e., *pre-determined threshold values*, would be packet size, time values or ranges, number of packets, etc. Additionally, Yung's device could also determine the parameters/thresholds for particular traffic classes/policies without requiring a user to configure the values, for example using a default traffic class/policy. However, the thresholds would remain *pre-determined* for such traffic classes/policies—as they would need to be determined by the system before being used in the traffic classification algorithm.

163.    As I discussed above in paragraphs 126-140, a POSA would have understood that Yung's heuristic methodology for *determining whether said flow exhibits undesirable behavior* would be performed by *said router*. Therefore, in my opinion, a POSA would have understood that Yung discloses [1.4].

### e)    Yung discloses the enforcing limitation of claim 1.

[1.5] upon determination by said router that said flow exhibits undesirable behavior, enforcing, relative to at least one packet, a penalty;

164.    It is my opinion that Yung discloses [1.5]. As discussed above in paragraphs 155-156, Yung discloses a *determination by said router that said flow*

Cloudflare – Exhibit 1003, page 83

*exhibits undesirable behavior.* Yung further discloses upon making this determination, *enforcing, relative to at least one packet, a penalty.*

165.    The '593 patent frequently refers to an exemplary *penalty* that is simply an increased drop rate. EX1001, 2:31-32, 6:37-38, 8:65-66, 9:9-10. Such a drop/discard penalty was frequently employed in traffic shaping systems during the relevant timeframe. Similarly, Yung's "[b]andwidth management device 130 is operative to classify data flows and, depending on the classification, enforce respective bandwidth utilization controls on the data flows to control bandwidth utilization across and optimize network application performance across access link 21." EX1005, 16:2-7. The particular bandwidth utilization controls to apply may be specified via administrator interface 150, which allows a network administrator to configure "per-flow bandwidth utilization controls." *Id.*, 19:52-61.

166.    A configured policy imposes a control mechanism, i.e., a *penalty*, upon packets of classified flows. *Id.* Akin to the '593 patent's "increased drop rate," a discard policy causes flow control module 132 to discard or drop data packets of flows associated with a particular traffic class. *Id.*, 20:13-15. I note again that this tactic was used ubiquitously in traffic-shaping techniques during the relevant timeframe.

167.    In addition to discard policies, Yung provides other policy options as well. For example, a priority policy that "determines how individual data flows

associated with a traffic class are treated relative to data flows associated with other traffic classes;" a rate policy that "controls the rate of data flows, for example, to smooth bursty traffic;" and "other controls/policies (e.g., redirection, security, access control, etc.)" *Id.*, 19:61-20:2, 20:39-50.

168.   It is my opinion that a discard policy is a *penalty* enforced against a flow that *exhibits undesirable behavior*. As Yung sought to limit the bandwidth consumed by unruly, bandwidth-intensive applications and other unauthorized applications, the discard policy provides a mechanism by which these applications exhibiting the undesirable behavior can be policed. By dropping the packet, the packet does not reach its destination, and thus suffers a *penalty*.

169.   This *penalty* is enforced *relative to at least one packet* because the policy only acts upon a particular packet (or packets) that satisfy the policy as opposed to all packets. Claim 1 describes "*relative to at least one packet*." Claim 1 is silent as to whether the "*at least one packet*" in "*relative to at least one packet*" is a packet belong to the claimed "*said flow*." *Cf.* EX1001, 11:1-3 ("relative to at least one packet belonging to said flow."). Thus, it is not clear whether the claim limitation *at least one* packet is a packet in the flow being processed or a packet in another flow. However, Yung describes *relative to at least one packet* in either interpretation. Yung's penalty is enforced *relative to at least one packet* because the drop policy is enforced upon a packet of a classified flow. Whereas the drop

Cloudflare – Exhibit 1003, page 85

policy would not be enforced against packets of a flow not matching that classification/policy. Therefore, in my opinion, a POSA would have understood that Yung discloses [1.5].

###### f) Yung discloses performing the steps on a router without requiring use of inter-router data.

[1.6] wherein the preceding steps are performed on said router without requiring use of inter-router data.

170.    It is my opinion that Yung discloses [1.6]. "*Inter-router data*" is not a term of art and the '593 patent does not provide a definition, explain, or even use the term outside of the claims. A POSA would have understood that the term suggests data that was exchanged between routers, possibly including, for example, routing information. Nonetheless, as discussed above in paragraphs 126-140, a POSA would have understood that the above steps would be performed by *said router*.

171.    Yung's *payload-content-agnostic behavioral statistics* do not require any *inter-router data*. Yung's traffic classification occurs based on only observable properties of packets and flows and this occurs *without requiring use of inter-router data*. Indeed, Yung contains no disclosure of any data communicated between routers. As illustrated in Figure 2, Yung's bandwidth management device 130 may connect to a single router, i.e., router 22. EX1005, 7:29-32.

Cloudflare – Exhibit 1003, page 86



EX1005, FIG. 2 (annotated).

In such an arrangement, Yung's bandwidth management device 130 operates *without requiring use of inter-router data* by classifying and enforcing controls upon the packets of flows without using any data communicated between routers. Moreover, if Yung's classification and control techniques are implemented on a router, then the functions would similarly be performed *without requiring use of inter-router data*, as the functions would be traffic classification, would occur on the router and, again, would not rely on any data shared between routers to classify the flows being processed by the router.

172.   Therefore, in my opinion, a POSA would have understood that Yung discloses [1.6].

Cloudflare – Exhibit 1003, page 87

### 2.    Independent claim 2

173.   In my opinion, claim 2 recites a non-transitory, computer-readable medium having computer-executable instructions that performs a method that is substantially similar to claim 1's method—i.e., for processing a flow comprising steps of maintaining behavioral flow statistics while processing a packet on a router; determining whether the flow exhibits undesirable behavior by comparing the tracked statistics to thresholds; and enforcing a penalty when the flow exhibits undesirable behavior. Claim 2 presents subtle distinctions that are limited to: (1) differences in the preamble; (2) claim 1 reads "pertaining to said flow" while claim 2 reads "about said flow;" (3) claim 1 reads "exhibits" while claim 2 reads "is exhibiting"; and (4) claim 1 reads "packet" while claim 2 reads "packet belonging to said flow." However, for the reasons discussed above with respect to claim 1, these are known techniques, as indicated by Yung.

#### a)    Yung discloses the preamble of claim 2.

[2.P] A non-transitory computer-readable medium having computer-executable instructions for performing a method to process a single flow, the flow comprising a plurality of packets, and the method comprising:

174.   To any extent that the preamble is limiting, it is my opinion that Yung discloses [2.P]. Yung discloses a "traffic monitoring device 30 [in red below]" that "includes persistent memory 76, such as a hard disk drive or other suitable memory device, such [as] writable CD, DVD, or tape drives." EX1005, 7:25-28.

Cloudflare – Exhibit 1003, page 88



EX1005, FIG. 1 (annotated).

This traffic monitoring device "enforc[es] bandwidth utilization controls on data flows." *Id.*, 6:35-36. Yung thus describes a *non-transitory computer-readable medium having computer-executable instructions for performing a method*.

175.   For the reasons described above in paragraphs 117-121, Yung discloses processing a single flow, the flow comprising a plurality of packets.

176.   Therefore, in my opinion, a POSA would have understood that Yung discloses [2.P].

**b)    Yung discloses the limitations of claim 2.**

[2.1] creating a flow block as the first packet of a flow is processed by a single router;

[2.2] said flow block being configured to store payload-content agnostic behavioral statistics about said flow, regardless of the presence or absence of congestion;

Cloudflare – Exhibit 1003, page 89

[2.3] said router updating said flow block with the flow's behavioral statistics of each packet belonging to said flow, as each packet belonging to said flow is processed by said router, regardless of the presence or absence of congestion;

[2.4] said router heuristically determining whether said flow is exhibiting undesirable behavior by comparing at least one of said behavioral statistics to at least one pre-determined threshold value; and

[2.5] upon determination by said router that said flow is exhibiting undesirable behavior, enforcing, relative to at least one packet belonging to said flow, a penalty;

[2.6] wherein the preceding steps are performed on said router without requiring use of inter-router data.

177.    It is my opinion that Yung discloses [2.1]-[2.6]. For the reasons discussed above in [1.1]-[1.6], respectively, Yung discloses all of the limitations of claim 2.

178.    Therefore, in my opinion, a POSA would have understood that claim 2 is obvious in view of Yung.

### 3.    Independent claims 4 and 5

#### a)    Yung discloses the limitations of claims 4 and 5.

[4.P/5.P] A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

[4.1/5.1] maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet

belonging to the flow, as each information packet belonging to the flow is processed [regardless of the presence or absence of congestion];

[4.2/5.2] determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior, [regardless of the presence or absence of congestion]; and

[4.3/5.3] in response to a determination that the flow is exhibiting undesirable behavior, enforcing a penalty on the flow.

179.    It is my opinion that Yung discloses [4.P]-[4.3] and [5.P]-[5.3]. For at least the reasons discussed above in [1.P] and [1.1]-[1.5], Yung discloses the limitations of claims 4 and 5.

180.    The preambles of claims 4 and 5 are quite similar to the preamble of claim 1 and are disclosed for the reasons discussed above regarding [1.P].

181.    As discussed above in [1.1] and [1.3], Yung also discloses *maintaining a set of behavioral statistics for the flow* in a control block object (flow object) and further discloses that the statistic are *updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed* as in [4.1] and [5.1].  As discussed above in [1.4], Yung discloses *determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior* as in [4.2] and [5.2].

182.    Further, as discussed above in [1.2] and [1.3], Yung discloses analyzing each incoming packet to classify its flow (*determining whether the flow*

Cloudflare – Exhibit 1003, page 91

*is exhibiting undesirable behavior* as in [4.2]) and updating the control block object with behavioral statistics for the flow (*maintaining a set of behavioral statistics for the flow* as in [5.1]) *regardless of the presence or absence of congestion*. Yung classifies packets and tracks statistics continually, not only within certain times, periods, or upon certain conditions, and Yung's Figure 7 includes no conditional logic restricting its classification and management functionality. EX1005, 23:23-26, 25:8-11, Fig. 7.

183. Finally, as discussed above in [1.5], Yung discloses *enforcing a penalty on the flow* when it is determined *that the flow is exhibiting undesirable behavior*.

184. In my opinion, Yung discloses the limitations of claims 4 and 5, and a POSA would have understood that claims 4 and 5 are obvious in view of Yung.

### 4.    Independent claim 25

#### a)    Yung discloses the preamble of claim 25.

[25.P] A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising:

185. To any extent that the preamble is limiting, it is my opinion that Yung discloses [25.P]. Yung discloses "traffic monitoring module 75" (including "packet processor 82") that "generally refers to the functionality implemented by traffic monitoring device 30." EX1005, 6:58-59, 6:64-66. The bandwidth management

Cloudflare – Exhibit 1003, page 92

device allows an administrator to "limit the bandwidth being consumed by unruly,

bandwidth-intensive applications, such as peer-to-peer applications," i.e.,

"*misbehaving flows*." *Id.*, 4:43-47.

186.   For the reasons, described above in paragraphs 117-120, Yung

discloses processing a flow, the flow comprising a series of information packets.

Therefore, in my opinion, a POSA would have understood that Yung discloses

[25.P].

### b)      Yung discloses the means for maintaining limitation.

[25.1] means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion;

187.   It is my opinion that Yung discloses [25.1]. Yung discloses a *means

for maintaining a set of behavioral statistics for the flow.* The '593 patent refers

only to MFM 210 as the *means* of maintaining behavioral statistics. MFM 210

"may be implemented in any desired manner [and] may be realized by having one

or more processors on a line card 202 execute one or more sets of instructions."

EX1001, 5:49-53. Yung's "traffic monitoring module 75" includes "packet

processor 82" and is analogous to MFM 210 because it "is a combination of

hardware and software, such as a central processing unit, memory, a system bus, an

operating system and one or more software modules implementing the

Cloudflare – Exhibit 1003, page 93

functionality described herein." EX1005, 6:60-66. For the reasons discussed above in paragraphs 122-154, Yung's traffic monitoring module 75 *maintain[s] a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion.*

188.   Therefore, in my opinion, a POSA would have understood that Yung discloses [25.1].

### c)    Yung discloses the determining limitation.

[25.2] means for determining, based at least partially upon the set of behavioral statistics, whether the flow is exhibiting undesirable behavior; and

189.   For the reasons discussed above in paragraphs 155-163, and because Yung's "traffic monitoring module 75" performs the same functions as the '593 patent's "processors," it is my opinion that Yung discloses [25.2].

### d)    Yung discloses the enforcing limitation.

[25.3] means for enforcing, in response to a determination that the flow is exhibiting undesirable behavior, a penalty on the flow.

190.   For the reasons discussed above in paragraphs 164-169 and because Yung's "traffic monitoring module 75" performs the same functions as the '593

Cloudflare – Exhibit 1003, page 94

patent's "processors," it is my opinion that Yung discloses [25.3]. Therefore, in my

opinion, a POSA would have understood that Yung discloses [25.3].

### 5.    Dependent claims 6 and 26

[6] The method of claim 1, wherein enforcing the penalty has an effect of
correcting the flow's behavior such that the flow exhibits less undesirable
behavior.

[26] The MFM of claim 25, wherein enforcing the penalty has an effect of
correcting the flow's behavior such that the flow exhibits less undesirable
behavior.

191.    It is my opinion that Yung discloses [6] and [26]. The only disclosures

in the '593 patent of correcting a flow's behavior relate to enforcing the penalty

imposed upon a flow such that the "badness factor" of the flow improves

(decreases). EX1001, 2:42-45, 6:48-51. For the reasons discussed above regarding

paragraphs 164-169, Yung discloses *enforcing the penalty*. Moreover, Yung's flow

control techniques have *an effect of correcting the flow's behavior such that the

flow exhibits less undesirable behavior*. EX1005, 19:53-20:18. For example, Yung

describes a rate policy that can "set limits on total bandwidth that [a] flow can

consume." *Id.*, 20:10-13.

192.    A POSA would recognize that such a rate policy would be employed

to return a *flow's behavior* to a *less undesirable* level. For example, for a flow

exceeding a configured threshold, e.g., byte count, number of packets, etc., the rate

Cloudflare – Exhibit 1003, page 95

policy could be used to "control the rate of data flow" and return the flow to a *less undesirable* level of behavior. Therefore, in my opinion, a POSA would have understood that Yung discloses claims [6] and [26].

### 6. Dependent claims 7 and 27

[7] The method of claim 1, wherein enforcing the penalty comprises: imposing an increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

[27] The MFM of claim 25, wherein the means for enforcing the penalty comprises: means for imposing an increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

193.    It is my opinion that Yung discloses [7] and [27]. Yung describes a "discard policy" that "causes flow control module 132 to discard or drop data packets or flows associated with a particular traffic class." EX1005, 20:13-15. The "discard policy" can be "per-flow bandwidth utilization controls [that] allow for control of individual data flows." *Id.*, 19:55-58. A flow having a "discard policy" applied to it will have *a higher probability of being dropped* than *information packets belonging to other flows* that do not have a discard policy applied.

Cloudflare – Exhibit 1003, page 96

Therefore, in my opinion, a POSA would have understood that Yung discloses claims [7] and [27].

### 7.    Dependent claims 17 and 37

[17] The method of claim 12, wherein determining the penalty comprises: determining an increased drop rate to impose on one or more information packets belonging to the flow.

[37] The MFM of claim 32, wherein the means for determining the penalty comprises: means for determining an increased drop rate to impose on one or more information packets belonging to the flow.

194.    For the reasons discussed above, and because Yung's "traffic monitoring module 75" performs the same functions as the '593 patent's "processors," it is my opinion that Yung discloses [17] and [37].

### 8.    Dependent claims 18 and 38

[18] The method of claim 17, wherein enforcing the penalty comprises: imposing the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

[38] The MFM of claim 37, wherein the means for enforcing the penalty comprises: means for imposing the increased drop rate on the flow such that the information packets belonging to the flow have a higher probability of being dropped than information packets belonging to other flows that do not exhibit undesirable behavior.

195.   For the reasons discussed above, and because Yung's "traffic monitoring module 75" performs the same functions as the '593 patent's "processors," it is my opinion that Yung discloses [18] and [38]. Therefore, in my opinion, a POSA would have understood that Yung discloses [18] and [38].

**B.    Ground 2: Claims 9-13, 19-24, 29-33, and 39-44 are obvious over Yung in view of Copeland.**

**1.    Motivation to Combine**

196.   It is my opinion that a POSA would have been motivated to incorporate Copeland's flow-based concern index (CI) value into Yung's bandwidth-management device based on Yung's express disclosure of application-behavior pattern matching techniques. Yung provides exemplary application-behavior-pattern-matching techniques but also notes that "the application behavior pattern can incorporate other factors as well." EX1005, 10:42-58, 11:59-60. This would have motivated a POSA to seek out these "other factors."

197.   Copeland's flow-based CI value provides one such "other factor" that would be considered by Yung's device when classifying traffic. Copeland calculates the CI value based on "flow statistics" that are analyzed "to determine if the flow appears to be legitimate traffic or possible suspicious activity." EX1007, 3:32-34. This CI value would be used as an "other factor" in Yung's traffic classification engine 86 when classifying data flows.

Cloudflare – Exhibit 1003, page 98

198.   A POSA would have recognized that incorporating Copeland's flow-based CI value would enhance Yung's bandwidth-management device's ability to identify and control traffic having characteristics of network attacks and probes. *See id.*, 8:33-43. Yung notes that "a common use of bandwidth management devices is to limit the bandwidth consumed by unruly, bandwidth-intensive applications . . . and/or other ***unauthorized*** applications." EX1005, 4:43-47 (emphasis added).

199.   It is my opinion that network attacks such as the flooding attacks considered by Copeland would have concerned a POSA because such attacks could potentially render network infrastructure inoperable and severely impact the performance of network applications. I note that this concern is present in the materials documenting the PacketShaper®, a device similar to the bandwidth management device described in Yung. EX1031, 3 ("Contain the impact of worms, viruses and broadcast storms."); EX1017, 5 ("Detect and stop SYN floods or similar DoS attacks."); EX1006, 24 ("Detecting and Avoiding Attacks . . . Block traffic carrying the telltale signs of current worms."). Accordingly, the ability to identify such attacks was a noted feature of the PacketShaper® and similar devices.

200.   Network attacks and intrusions were a recognized problem during the relevant time frame. EX1030, 1:35-48. The sophistication of these threats developed rapidly during the 1980s and 1990s. EX1038, 17-20. The impact of such

Cloudflare – Exhibit 1003, page 99

attacks on network infrastructure was a concern for network administrators. *Id.*, 23. As Yung sought to preserve an efficient allocation of network resources, such as bandwidth (EX1005, 2:31-34), a POSA would have recognized that controlling network attacks and recognizing probes related to such attacks would help network administrators to maintain network viability and application performance.

201.   By integrating Copeland's flow-based CI value into Yung's system, a POSA would have recognized that an administrator would be able to apply a discard policy as disclosed in Yung to flows with high CI values. EX1005, 19:58-61. As I discussed above, a discard policy was a widely used bandwidth-enforcement mechanism that discards or drops packets associated with a particular traffic class. *Id.*, 20:13-15. A POSA would have recognized that by allowing the administrator to configure a discard policy in Yung's system based on a CI value, it would obviate the need for the administrator to understand the intricate nature of network attacks. Instead, a network administrator would set a threshold value reflecting an intolerable CI value (as taught in Copeland), and when a flow exceeded that threshold, a drop policy would be applied. Such behavior would be policed and eliminated.

202.   This would have been a desirable feature for administrators because the attack patterns were dynamic and evolving. Given this changing nature, Yung's system could adapt through software updates to recognize new threats and types of

Cloudflare – Exhibit 1003, page 100

behavior and incorporate these into the CI value calculation. Thus, a POSA would recognize that a network administrator would not have to keep up with the latest attack patterns. Such a feature would increase the utility of Yung's traffic-classification methods and expand the types of behavior controllable within Yung to include probing related to network attacks. *Compare* EX1005, 4:43-47 *with* EX1007, 8:33-37.

203.   Yung and Copeland are in the same field and both directly concern analyzing and classifying network traffic. A POSA would have had a reasonable expectation of success in combining Copeland with Yung because both systems classify traffic using flow-based statistics. *Compare* EX1005, FIG. 2 *with* EX1007, FIG. 1; *compare* EX1005, FIG. 3 *with* EX1007, FIG. 2. A POSA would have achieved the combination with an update to the statistic-tracking and analysis infrastructure described in Yung. For example, the software deployed in traffic classification engine 86 (a module of traffic monitoring module 75, which is a combination of hardware and software) would be updated to consider the additional factor of a CI value when classifying data flows. Yung notes that the behavior-pattern-matching functionality can be implemented into the bandwidth management device in a variety of ways—e.g., "as an extension (e.g., provided by a plug-in, etc.) to traffic classification engine 137 in . . . subroutines" or "as a separate software module." EX1005, 22:20-30. A POSA would have understood

Cloudflare – Exhibit 1003, page 101

that this software could be readily updated or a new plug-in created from scratch (and easily integrated with the bandwidth-management device's existing component) to implement the CI value calculation with the traffic-classification algorithm.

204. Such an update would have been well within the level of skill of a skilled artisan as traffic classification engine 86 already "is operative to classify data flows based on one or more attributes associated with the data flows," so the framework was already in place to store various attributes and classify based on those attributes. *Id.*, 7:5-7. By calculating a flow-based CI value as a quantitative or qualitative value using the statistics already available in Yung, a POSA would have further leveraged Yung's administrator interface to allow an administrator to specify the CI-value-based threshold. This would allow the administrator to tailor-create policies to operate when this threshold is exceeded. Yung notes that "the implementation described above uses a variety of threshold values" and that the "threshold values may be configurable parameters, which a network administrator can adjust." *Id.*, 15:23-40. Thus, a POSA would have recognized that a simple addition in the software of administrator interface 150 would allow a network administrator to further configure this field.

205. Accordingly, a POSA would have been motivated to combine Yung and Copeland.

Cloudflare – Exhibit 1003, page 102

### 2.    Independent claim 9

#### a)    Yung discloses the preamble of claim 9.

[9.P] A machine implemented method for processing a flow, the flow comprising a series of information packets, the method comprising:

206.    To any extent that the preamble is limiting, for the reasons discussed above regarding [1.P], it is my opinion that Yung discloses [9.P].

#### b)    Yung discloses the maintaining limitation of claim 9.

[9.1] maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and

207.    For the reasons discussed in [1.1]-[1.3], it is my opinion that Yung discloses [9.1].

#### c)    Yung in view of Copeland discloses the computing limitation of claim 9

[9.2] computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

208.    It is my opinion that Yung discloses [9.2]. The '593 patent does not define the term "badness factor" but notes that the badness factor is "computed based upon the behavioral statistics of the flow" and "provides an indication as to whether the flow is exhibiting undesirable behavior." EX1001, 6:28-32. The '593

Cloudflare – Exhibit 1003, page 103

gives an example of a badness factor in Figure 5 that is computed as the minimum of a set of ratios of simple flow measures such as byte count or flow duration.

209.    Copeland discloses *computing* a *badness factor for the flow*. Like Yung, Copeland tracks behavioral statistics about network flows, e.g., start time, end time, number of bytes, and packet count. EX1007, 16:44-63. Copeland then describes analyzing "the flow statistics [] to determine if the flow appears to be legitimate traffic or possible suspicious activity [and a] value, referred to as a 'concern index' is assigned to each flow that appears suspicious." *Id.*, 3:3135, 18:16-17, 26:24-26.

210.    This concern index (CI) value represents the claimed *badness factor*. Just as the *badness factor* in the '593 patent is a calculated value that indicates a level of misbehavior attributable to a flow, Copeland's CI value is assigned to the flow based on the behavior recognized by the system. For example, Copeland's Figures 6 and 7 illustrate approaches to calculating the CI values based on an analysis of flow statistics. EX1007, FIGs. 6 and 7. Copeland discloses *computing a badness factor for the flow*.

211.    Moreover, Copeland's CI value *provides an indication of whether the flow is exhibiting undesirable behavior*. For example, Copeland notes that its CI value indicates whether the flow exhibits "suspicious activity" (i.e., *undesirable behavior*). EX1007, 7:55-61. Indeed, Copeland contrasts "suspicious activity" with

Cloudflare – Exhibit 1003, page 104

"legitimate traffic" and notes that a "probe is a flow that appears to have one host (a possible intruder) sending packets to gain information." *Id.*, 7:55-61; 18:4-13. Copeland's CI value *provides an indication of whether the flow is exhibiting undesirable behavior.*

212. A POSA would have understood that probing and network attacks are examples of *undesirable behavior* within the context of managing network infrastructure. Such attacks could hinder application performance or cause applications to fail entirely. And generally, a POSA would have understood that certain behaviors were more problematic and/or more indicative of network attacks than others. Thus, generally speaking using a gradient, range, or quantitative factor to describe a level of the malfeasance would have been recognizable to a POSA as being a useful tactic.

213. Finally, Copeland computes its CI value *based at least partially upon the set of behavioral statistics.* Copeland "collects information about and statistics associated with each flow and stores this information and statistics in a database." EX1007, 7:40-42. Copeland provides an exemplary flow data structure. *Id.*, 16:44-63. Copeland then calculates the CI value based on these statistics. *Id.*, 10:45-47 ("[T]he engine 155 associates all packets with a flow[,] analyzes certain statistical data and assigns a concern index value to abnormal activity.") For example, in Figures 6 and 7, the "CI value" is determined in part *based at least partially upon*

Cloudflare – Exhibit 1003, page 105

on tracked statistics. *Id.*, FIGs. 6 and 7. For example, in Figure 6, in the context of a "Potential TCP Probe" (highlighted in red below), Copeland proposes using the "number of packets" (highlighted in green) as the CI value.



EX1007, FIG. 6 (annotated).

214.    Copeland computes its CI value *based at least partially upon the set of behavioral statistics* and thus discloses [9.2]. Thus, claim 9 is obvious over Yung-Copeland.

### 3.    Independent claim 29

#### a)    Yung discloses the preamble of claim 29.

[29.P] A misbehaving flow manager (MFM) for processing a flow, the flow comprising a series of information packets, the MFM comprising:

215.    To any extent that the preamble is limiting, for the reasons discussed above in [25.P], it is my opinion that Yung discloses [29.P].

[29.1] means for maintaining a set of behavioral statistics for the flow, wherein the set of behavioral statistics is updated based on each information

Cloudflare – Exhibit 1003, page 106

> packet belonging to the flow, as each information packet belonging to the flow is processed, regardless of the presence or absence of congestion; and

216.    For the reasons discussed in paragraphs 122-154 and because Yung's "traffic monitoring module 75" (which includes a "central processing unit") performs the same functions as the '593 patent's "processors," it is my opinion that Yung discloses [29.1].

### b)    Yung discloses the computing limitation of claim 29.

> [29.2] means for computing, based at least partially upon the set of behavioral statistics, a badness factor for the flow, wherein the badness factor provides an indication of whether the flow is exhibiting undesirable behavior.

217.    For the reasons discussed above in paragraphs 208-214 and because Yung's "traffic monitoring module 75" performs the same functions as the '593 patent's "processors," it is my opinion that Yung discloses [29.2].

### 4.    Dependent claims 10 and 30.

> [10] The method of claim 9, wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably.
>
> [30] The MFM of claim 29, wherein the badness factor also provides an indication of a degree to which the flow is behaving undesirably.

218.    It is my opinion that Yung-Copeland discloses [10] and [30]. Copeland's CI value *indicates a degree to which the flow is behaving undesirably*.

Cloudflare – Exhibit 1003, page 107

For example, in step 945, Copeland calculates "a CI value that corresponds to the detected activity." EX1007, 21:50-51. Copeland notes that "some types of communications and packet activities and packet activities are much more likely to indicate probing than others" and accordingly, "[a]n appropriate CI [i.e., concern index] amount for the determined activity is determined [for the flow]." *Id.*, 21:50-58, FIG. 6 (listing higher CI value for "TCP Stealth Port" than "Half-Open Attack").

219.    Just as the *badness factor* in the '593 patent is a calculated value that indicates a *degree to which the flow is behaving undesirably*, Copeland calculates a higher CI value for certain types of activities than others. Thus, Copeland's CI value attributes to the flow a level (i.e., a *degree*) of misbehavior. Within the context of Copeland's "accumulated CI value," certain behaviors will result in an alarm being triggered for a host more quickly than other activities. Thus, it is my opinion that Copeland discloses *an indication of a degree to which the flow is behaving undesirably*.

### 5.    Dependent claims 11 and 31

[11] The method of claim 10, further comprising: determining, based at least partially upon the badness factor, a penalty to impose on the flow.

[31] The MFM of claim 30, further comprising: means for determining, based at least partially upon the badness factor, a penalty to impose on the flow.

Cloudflare – Exhibit 1003, page 108

220.   It is my opinion that Yung discloses [11] and [31]. As discussed above in paragraphs 164-169, Yung discloses *determining . . . a penalty to impose on the flow*.

221.   Yung-Copeland discloses determining the penalty *based at least partially upon the badness factor*. Yung's traffic shaping device allows administrators to configure policies (e.g., increased drop rate) applicable to classified packets. EX1005, 19:53-20:18. Copeland also describes dropping packets from a host when the hosts' cumulative CI value (which is totaled based on one or more flows' CI values) exceeds a threshold value. EX1007, 19:15-30.

222.   When combined, Yung-Copeland would allow an administrator to configure an appropriate flow-based *penalty* to apply to flows having a CI value that exceeds a specified threshold. A POSA would have recognized this feature as useful to a network administrator, who would not have to be concerned with the actual detection methods relating to probes and network attacks or the specific statistics used in the determination. Instead, the network administrator could simply apply a drop policy based on an entered CI value. The network administrator might think of this as a confidence interval reflecting how clearly the matched behavioral profile was indicative of probing, an authorized intrusion, or other network attack. In this configuration, the *penalty* (associated with the policy)

Cloudflare – Exhibit 1003, page 109

would be determined *based at least partially upon the badness factor* (i.e., the CI value).

### 6.    Dependent claims 12 and 32

[12] The method of claim 11, further comprising: enforcing the penalty on the flow.

[32] The MFM of claim 31, further comprising: means for enforcing the penalty on the flow.

223.    For the reasons discussed above in paragraphs 164-169 and 220-223 and because Yung's "traffic monitoring module 75" performs the same functions as the '593 patent's "processors," it is my opinion that Yung discloses [12] and [32].

### 7.    Dependent claims 13 and 33

[13] The method of claim 12, wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior, thereby, causing the badness factor of the flow to improve.

[33] The MFM of claim 32, wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior, thereby, causing the badness factor of the flow to improve.

224.    It is my opinion that Yung discloses [13] and [33]. As discussed above in paragraphs 191-194, Yung-Copeland discloses *wherein enforcing the penalty on the flow causes the flow to exhibit less undesirable behavior*.

Cloudflare – Exhibit 1003, page 110

225.    Moreover, Yung-Copeland discloses *thereby causing the badness factor of the flow to improve* upon imposition of the penalty. Yung mentions various ways that "flow control module 132 can . . . enforce bandwidth utilization controls," including dropping packets entirely. EX1005, 18:56-60; 20:13-15.

226.    For example, a POSA would have recognized that imposing a penalty would improve the observed behavior of flows. For example, Copeland tracks and considers "average byte rate over the last time interval." EX1007, 18:65-67. For a CI value calculated using this factor, if the flow exceeded a threshold and a policy was applied, as time progressed, the flow's byte rate would drop. In such a scenario, the calculated CI value for the flow would also drop because the metric used to generate the CI value was improving, thus *causing the badness factor of the flow to improve*.

### 8.    Dependent claims 19 and 39

[19] The method of claim 9, wherein the set of behavioral statistics comprises a measure T of how much total information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time.

[39] The MFM of claim 29, wherein the set of behavioral statistics comprises a measure T of how much total information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time.

Cloudflare – Exhibit 1003, page 111

227.   The term "total information" only appears in the claims of the '593 patent, and the patent does not otherwise define or explain the bounds of the "total information" contained in information packets.  At most, the '593 patent only contains disclosures of tracking the total number of bytes in a flow. EX1001, 2:6-8, 6:12-14, 7:20-24. Nonetheless, it is my opinion that Yung discloses [19] and [39]. Yung tracks in the control block object a byte count reflecting the total information contained in all of the packets belonging to the flow that have been forwarded up to a current point in time. Specifically, Yung notes that "a flow object can also include other attributes, such as packet count, ***byte count***, first packet time, last packet time, etc." EX1005, 8:9-12 (emphasis added). The byte count would represent how much total information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time. Yung updates this information in the control block unconditionally, i.e., regardless of the enforcement of a penalty. Thus, provided no drop policy was enforced upon the flow, the byte count would reflect how much total information has been contained in all of the information packets belonging to the flow that have been forwarded up to a current point in time. Additionally, Copeland includes in its flow data structure fields "unsigned long bytes[2]" and "unsigned long pkts[2]" which represent the "***bytes sent***" and the "packets sent." EX1007, 16:56-57 (emphasis added).

Cloudflare – Exhibit 1003, page 112

### 9.     Dependent claims 20 and 40

[20] The method of claim 9, wherein the set of behavioral statistics comprises a measure L of how long the flow has been in existence up to a current point in time.

[40] The MFM of claim 29, wherein the set of behavioral statistics comprises a measure L of how long the flow has been in existence up to a current point in time.

228.   It is my opinion that Yung discloses [20] and [40]. Yung tracks in the control block object a first packet time. For example, Yung notes "a flow object can also include other attributes, such as packet count, byte count, first packet time, last packet time, etc." *See* EX1005, 8:9-12. Yung would not actually store the current time in the control block (as time is fluid). However, programming languages and operating systems provide simple mechanisms via which the current time is tracked and that information is readily available within software and other interfaces—e.g., localtime() in PERL, time() in C++, date() in linux, etc, variables "%date%" and "%time%" in Windows. Given the availability of the requisite values, it would have been obvious to a POSA that *how long the flow has been in existence up to a current point in time* would be determined by subtracting the stored first packet time from the accessible current time. This simple calculation would allow the system to know *how long the flow has been in existence up to a*

Cloudflare – Exhibit 1003, page 113

*current point in time*. Such a calculation would also be desirable, if not required, to assess a flow's transmission rate—a concept disclosed in Yung.

### 10.    Dependent claims 21 and 41

[21] The method of claim 20, wherein the set of behavioral statistics comprises a rate R of information transfer for the flow, wherein R is derived by dividing T by L.

[41] The MFM of claim 40, wherein the set of behavioral statistics comprises a rate R of information transfer for the flow, wherein R is derived by dividing T by L.

229.   It is my opinion that Yung discloses [21] and [41]. Yung-Copeland discloses a *rate R of information transfer for the flow, wherein R is derived by dividing T by L*. While Yung does not explicitly describe calculating and storing a *rate of information transfer for a* flow in the set of behavioral statistics, Yung applies "rate policy controls [that control] the rate of data flows, for example, to smooth bursty traffic." EX1005, 19:64-66. Yung also notes that "[f]low control module 132 may incorporate any or a subset of the TCP rate control functionality described in the cross-referenced U.S. patents and/or patent application set forth above for controlling the rate of data flows." *Id.*, 18:60-64.

230.   For instance, Yung lists a "leaky bucket technique" among the various ways that "flow control module 132 can . . . enforce bandwidth utilization controls." *Id.*, 18:56-60. This "leaky bucket technique" was a commonly deployed

Cloudflare – Exhibit 1003, page 114

mechanism for enforcing bandwidth controls that consider the flow rate of a flow. The leaky bucket approach uses a *rate of information traffic* for a flow. *See* EX1035, 1:19-42 ("[P]olicers are used to hold a packet flow to a target rate in the presence of burst traffic.") Leaky bucket mechanisms were well-known approaches to policing packet streams. *Id.*, 1:28-30.

231.    More generally, a POSA would have understood that flow rate was a commonly tracked metric about flows. Such a metric (flow rate) provides an indicator of the degree to which a particular flow is bursting or consuming excessive bandwidth. A POSA would further have understood that the rate of flow would be beneficial when incorporated into Yung's traffic classification techniques.

232.    Thus, given that Yung employs the leaky-bucket technique, which requires flow rate, and that Yung tracks both T (i.e., "byte count") and L (i.e., "first packet time" from the "current time"), a POSA would have found it obvious to implement the leaky-bucket technique by calculating a *rate R of information transfer for the flow* by dividing T by L. Yung discloses a *rate R of information transfer for the flow, wherein R is derived by dividing T by L.*

Cloudflare – Exhibit 1003, page 115

### 11.    Dependent claims 22 and 42

[22] The method of claim 9, wherein the set of behavioral statistics comprises an average size for the information packets belonging to the flow.

[42] The MFM of claim 29, wherein the set of behavioral statistics comprises an average size for the information packets belonging to the flow.

233.    It is my opinion that Yung discloses [22] and [42]. Yung notes that "packet size matching" may occur when analyzing flows' behavior patterns. EX1005, 10:53-11:8. Yung observes first, second, and subsequent packets, determines whether the packets are within a narrow size range, and compiles an application behavior pattern using this information. *Id.*, 10:59-65. While Yung does not expressly use the word "*average*," Yung's packet count and byte count collectively comprise the *average size* claimed by the '593 patent. *Id.*, 25:8-11. Yung describes its behavioral statistics in open-ended terms, and a POSA would have understood that the *average size for the information packets* in a flow would be calculated simply by dividing the byte count by the packet count. *See Id.*, 7:60-65; 8:9-11; 14:64-66; 17:44-48; 23:26-30; 25:8-11.

234.    A POSA also would have known that averaging the "size of the packets" would reduce falsely identifying outliers as unruly traffic. Depending on traffic type, some degree of variance is expected in the size of the packets, with that variance increasing for certain traffic types. In a heuristic behavioral pattern

Cloudflare – Exhibit 1003, page 116

matching like Yung's, averaging of the packet sizes would avoid detecting a single large packet as undesirable behavior when the remaining packets in the flow (and the flow as a whole) has packet sizes falling within expected levels.

### 12.    Dependent claims 23 and 43

[23.P] The method of claim 9, wherein maintaining the set of behavioral statistics comprises:

[43.P] The MFM of claim 29, wherein the means for maintaining the set of behavioral statistics comprises:

235.    To any extent that the preamble is limiting, for the reasons discussed above in paragraphs 122-154, it is my opinion that Yung discloses [23.P] and [43.P].

[23.1] receiving a particular information packet belonging to the flow;

[43.1] means for receiving a particular information packet belonging to the flow;

236.    It is my opinion that Yung discloses [23.1] and [43.1]. Yung discloses *receiving a particular information packet belonging to the flow. See* EX1005, 23:23-26. Because Yung's "traffic monitoring module 75" performs the same functions as the '593 patent's "processors," Yung also discloses the *means* for performing this function.

Cloudflare – Exhibit 1003, page 117

[23.2] determining whether to forward the particular information packet to a destination; and

[43.2] means for determining whether to forward the particular information packet to a destination; and

237.   It is my opinion that Yung discloses [23.2] and [43.2]. Yung discloses *determining whether to forward the particular information packet to a destination*. Yung describes retrieving "utilization or other controls (e.g., partition, policy, security controls, etc.) associated with the traffic class" and "enforc[ing] the bandwidth utilization controls on the data packet flow." EX1005, 24:63-25:1. One such policy available in Yung is a "discard policy" that "causes flow control module 132 to discard or drop data packets." *Id.*, 20:13-15. When such a policy is in place Yung's bandwidth controls determine *whether to forward the particular packet to a destination*, dropping the packet when the policy is in place. When no such policy is in place, Yung's bandwidth control forwards the packet to its destination. Thus, in the absence of a particular policy imposing a control, traffic is forwarded to the appropriate destination. Because Yung's "traffic monitoring module 75" performs the same functions as the '593 patent's "processors," Yung also discloses the *means* for performing this function. Thus, Yung discloses [23.2] and [43.2].

Cloudflare – Exhibit 1003, page 118

Appx1159

[23.3] in response to a determination to forward the particular information packet to the destination, updating the set of behavioral statistics to reflect processing of the particular information packet.

[43.3] means for updating, in response to a determination to forward the particular information packet to the destination, the set of behavioral statistics to reflect processing of the particular information packet.

238.   It is my opinion that Yung discloses [23.3] and [43.3]. Yung discloses *updating the set of behavioral statistics to reflect processing of the particular information packet*. Specifically, Yung describes "updat[ing] various measurement values in the control block object that characterize the flow" and "record[ing] data associated with the packet to allow for analysis of bandwidth utilization and other network statistics." EX1005, 25:8-15, FIG. 7. This step occurs after *processing* the packet—i.e., after receiving the packet, classifying the packet, and enforcing (or not enforcing) bandwidth controls upon the packet. Because Yung's "traffic monitoring module 75" performs the same functions as the '593 patent's "processors," Yung also discloses the *means* for performing this function. Yung discloses [23.3] and [43.3].

Cloudflare – Exhibit 1003, page 119

### 13.    Dependent claims 24 and 44

> [24.P] The method of claim 9, wherein maintaining the set of behavioral statistics comprises:
>
> [44.P] The MFM of claim 29, wherein the means for maintaining the set of behavioral statistics comprises:

239.    To any extent that the preamble is limiting, for the reasons discussed above, it is my opinion that Yung discloses [24.P] and [44.P].

> [24.1] receiving a particular information packet belonging to the flow; and
>
> [44.1] means for receiving a particular information packet belonging to the flow; and

240.    For the reasons discussed above, it is my opinion that Yung discloses [21.1] and [44.1].  Yung discloses *receiving a particular information packet belonging to the flow. See* EX1005, 23:23-26 ("[P]acket processor 131 receives a data packet."). Because Yung's "traffic monitoring module 75" performs the same functions as the '593 patent's "processors," Yung also discloses the *means* for performing this function. Yung discloses [24.1] and [44.1].

> [24.2] updating the set of behavioral statistics to reflect processing of the particular information packet, regardless of whether the particular information packet is discarded or forwarded to a destination.

Cloudflare – Exhibit 1003, page 120

[44.2] means for updating the set of behavioral statistics to reflect processing of the particular information packet, regardless of whether the particular information packet is discarded or forwarded to a destination.

241.  It is my opinion that Yung discloses [24.2] and [44.2].  Yung discloses *updating the set of behavioral statistics to reflect processing of the particular information packet*.  EX1005, 25:61-26:16.  Yung also performs the updating *regardless of whether the particular information packet is discarded or forwarded to a destination*.  Yung updates its statistics whether or not the *particular information packet is discarded or forwarded to a destination*.  Yung's measurement engine "records data associated with the packet to allow for analysis of bandwidth utilization and other network statistics on a traffic class, access link, and/or partition level."  EX1005, 25:11-15.  Yung does not restrict its gathering of statistics to certain times, periods, or conditions, and Yung's Figure 7 includes no conditional logic that would restrict statistical maintenance.  EX1005, Fig. 7.

C.    <u>Ground 3:</u> **Claim 3 is obvious over Yung in view of Four-Steps Whitepaper.**

1.    <u>Motivation to Combine</u>

242.  A POSA would have been motivated to combine Yung with Four-Steps Whitepaper because both describe bandwidth-management devices that classify and shape traffic. Disclosures in Four-Steps Whitepaper could be used to

Cloudflare – Exhibit 1003, page 121

improve Yung. In addition, Yung expressly suggests that it would be combined with Four-Steps Whitepaper.

243.   PacketShaper®, mentioned in Four-Steps Whitepaper, was a product of Packeteer known to POSAs during the relevant timeframe, and Packeteer is the Assignee of Yung. *See* EX1031, 1; EX1032, 6-7. Yung expressly notes that its teachings can be integrated with the PacketShaper®. *See* EX1005, 4:47-51 ("[T]he rich Layer 7 classification functionality of PacketShaper® bandwidth management devices offered by Packeteer, Inc. of Cupertino, Calif. is an attractive feature for [a] network administrator, as it allows for accurate identification of a variety of application types."); 6:5-11 ("[T]he enhanced classification mechanisms described herein operate seamlessly with other Layer 7 traffic classification mechanisms that operate on attributes of the packets themselves.").

244.   I note that Four-Steps Whitepaper solves the same problem as Yung. For example, Four-Steps Whitepaper notes that "[s]luggish mission-critical applications are bad for business." EX1006, 3. Four-Steps Whitepaper further describes among the causes of bandwidth issues: "[m]usic enthusiasts' MP3 downloads [that] cause more urgent, interactive applications to struggle." *Id.* Four-Steps Whitepaper further notes that peer-to-peer applications "have taken a heavy toll on network performance." *Id.*, 7. As I discussed above, Yung notes that peer-to-peer applications are "unruly, bandwidth intensive applications" whose

Cloudflare – Exhibit 1003, page 122

bandwidth usage is commonly limited by bandwidth management devices. EX1005, 4:43-47.

245.   Yung provides "apparatuses . . . facilitating enhanced classification of network traffic" using a "bandwidth management device." EX1005, 5:53-6:11. Four-Steps Whitepaper describes a "bandwidth-management solution that brings predictable, efficient performance to applications running over enterprise wide-area networks." EX1006, 3.

246.   A POSA would have been motivated to incorporate Four-Steps Whitepaper's metrics into Yung's bandwidth-management device to expand the classification techniques available to the administrator of Yung's bandwidth-management device. This expansion would then incorporate information about dropped and non-dropped packets and would be used to more accurately classify traffic. Yung's administrator would set thresholds and other policies to shape traffic using information about dropped packets—e.g., an administrator would set a policy for Voice-over-IP (VoIP) traffic to ensure that packet loss does not disrupt service. EX1006, 21. These additional metrics would provide additional details on the nature of traffic within the network while providing a manner of reporting on the effectiveness of imposed rate controls. *Id.*, 23.

247.   Additionally, a POSA would have understood that the teachings of Four-Steps Whitepaper merely fill in obvious details not disclosed in Yung. Yung

Cloudflare – Exhibit 1003, page 123

frequently describes its statistics in an open-ended fashion and already incorporates a variety of similar statistics for use when categorizing, monitoring, and controlling flows. For example, Yung notes that measurement variables include "total throughput, peak or average bandwidth usage, *etc.*" EX1005, 7:60-65 (emphasis added). Yung notes that "a flow object can also include other attributes, such as packet count, byte count, first packet time last packet time, *etc.*" *Id.*, 8:9-11 (emphasis added). Yung notes that the control block object includes "other flow state parameters, such as TCP connection status, timing of last packets in the inbound and outbound directions, speed information, apparent round trip time, *etc.*" Yung notes that "a control block object include[s] attributes characterizing the data flow, such as source address, destination address, service type, *etc.*" *Id.*, 17:44-48; 23:28-30 (emphasis added).

248.  A POSA would have understood that the teachings of Four-Steps Whitepaper further describe the capabilities of a bandwidth management device. A POSA would have understood that the software integrated in Yung's traffic classification engine 86 (a module of traffic monitoring module 75) would be updated to track and examine the additional metrics of dropped and non-dropped packets described in Four-Steps Whitepaper.

249.  Finally, the proposed combination of Yung in view of Four-Steps Whitepaper would involve nothing more than incorporating a well-known feature

(i.e., the metrics described in Four-Steps Whitepaper) into Yung's system that already tracks various metrics. Yung's device already includes the infrastructure to make such a modification. Yung notes that the behavior pattern matching functionality can be implemented into the bandwidth management device in a variety of ways—e.g., "as an extension (e.g., provided by a plug-in, etc.) to traffic classification engine 137 in [] subroutines" or "as a separate software module." EX1005, 22:20-30. A POSA would have understood that this software would be readily updated and the modification would be well within the skill of such a person. Similarly, a new plug-in could be written, built, and integrated into Yung that considers the additional metrics, and again the modification would be straightforward and well within the skill of a POSA.

250.    A POSA would have been motivated to combine Yung and Four-Steps Whitepaper.

### 2.    Independent claim 3

### a)    Yung discloses the preamble of claim 3.

An article of manufacture comprising:

251.    To any extent the preamble is limiting, it is my opinion that Yung discloses [3.P]. Yung discloses a "traffic monitoring device 30" (in red below), also referred as "bandwidth management device 130." Yung's bandwidth management device is a tangible commodity, i.e., an *article of manufacture*.

Cloudflare – Exhibit 1003, page 125

      **b)**    **Yung discloses a medium having stored thereon a data structure.**

[3.1] a non-transitory computer-readable medium having stored thereon a data structure;

252.   It is my opinion that Yung discloses [3.1]. Yung notes that traffic monitoring device 30 (in red below) "includes persistent memory 76 [in blue below], such as a hard disk drive or other suitable memory device, such writable CD, DVD, or tape drives." EX1005, 7:25-28.



EX1005, FIG. 1 (annotated).

Yung discloses a *non-transitory computer-readable medium*.

253.   Moreover, Yung stores *a data structure* in persistent memory 76. Specifically, Yung "stores control block objects corresponding to data flows in flow database 135." *Id.*, 17:42-45. These control/flow objects are "a data structure

Cloudflare – Exhibit 1003, page 126

including fields whose values characterize various attributes of the flow." *Id.*, 8:5-9; 16:6667.

### c)    Yung discloses the first field.

[3.2] a first field containing data representing a flow block;

254.    It is my opinion that Yung discloses [3.2]. As an initial matter, the enumerated fields of claim 3, i.e., *first field*, *second field*, *third field*, *fourth field*, and *fifth field*, are not tied to the claimed *data structure*. Instead, claim 3 integrates these fields via the "article of manufacture comprising" limitation. In other words, the fields do not need to co-exist in the same data structure. Regardless, Yung's control block object discloses the fields.

255.    Yung describes a "control block (flow) object" that "includes attributes characterizing a specific flow between two end systems." EX1005, 16:66-17:1. Yung's "control block object" includes "attributes characterizing the data flow, such as source address, destination address, service type, etc." *Id.*, 23:26-30. Yung stores a *first field containing data representing a flow block*.

### d)    Yung in view of Four-Steps Whitepaper discloses the second field.

[3.3] a second field containing data representing payload-content-agnostic behavioral statistics about dropped and non-dropped packets of a flow;

256.    It is my opinion that Yung in view of Four-Steps Whitepaper discloses [3.3]. As discussed above in paragraphs 141-149, Yung stores *data*

*representing payload-content-agnostic behavioral statistics. See* EX1005, 18:2-6; *supra*, [1.2]. To any extent that Yung does not teach *statistics about dropped and non-dropped packets of a flow*, Four-Steps Whitepaper discloses this limitation.

257.    Four-Steps Whitepaper notes that the PacketShaper® tracks "[c]ounts and percentages of retransmitted, received, tossed, dropped, and good TCP packets." EX1006, 18. As discussed above, a POSA would have been motivated to incorporate these additional metrics into the Yung to classify traffic across a wider spectrum of application behaviors, provide additional control when configuring policies, and provide enhanced reporting capabilities on applied policies.

### e)    Yung discloses the third field.

[3.4] a third field containing data representing pre-determined behavior threshold values;

258.    It is my opinion that Yung discloses [3.4]. For the reasons discussed above in [1.4], Yung discloses *pre-determined behavior threshold values*.

259.    Regarding a *third field containing data representing* these thresholds, Yung notes that "the traffic classification engine 137 stores in the control block object the policy parameters (e.g., bandwidth utilization control parameters)." EX1005, 24:41-45. The policy parameters "correspond[] to the identified traffic class" (*Id.*, 17:49-52) and are used by the traffic classification engine in performing the "behavior patter matching functionality." *Id.*, 10:39-46. As explained above

Cloudflare – Exhibit 1003, page 128

regarding [1.4], these policy parameters are *threshold values* set by an administrator (i.e., *pre-determined*).

### f)    Yung discloses the fourth field.

[3.5] a fourth field containing data representing the results of a heuristic determination of whether said flow exhibits undesirable behavior determined by comparing said behavioral statistics to said pre-determined threshold values;

260.    It is my opinion that Yung discloses [3.5]. For the reasons discussed above in [1.5], Yung discloses a heuristic determination of whether said flow exhibits undesirable behavior determined by comparing said behavioral statistics to said pre-determined threshold values.

261.    Yung's heuristic determination results in a traffic-class being identified for a particular flow. EX1005, 7:7-11. Furthermore, with respect to a *fourth field containing data representing the results* of this heuristic determination, Yung notes that "the control block object in flow database 135 includes a pointer to the identified traffic classes." *Id.*, 24:38-41.

### g)    Yung discloses the fifth field.

[3.6] a fifth field containing data representing at least one penalty to be enforced against at least one packet upon determination that said flow exhibits undesirable behavior.

Cloudflare – Exhibit 1003, page 129

262.   It is my opinion that Yung in view of Four-Steps Whitepaper discloses [3.6]. For the reasons discussed above in [1.6], Yung discloses *at least one penalty to be enforced against at least one packet upon determination that said flow exhibits undesirable behavior*.

263.   Regarding a *fifth field containing data representing* the penalty, Yung notes that the control block object stores the security policies associated with the identified traffic classes. EX1005, 24:38-45. When the rate control module imposes a penalty, it "accesses the control block object corresponding to the data flow to retrieve the bandwidth utilization or other controls (e.g., partition, policy, security controls, etc.) associated with the traffic class and enforces the bandwidth utilization controls on the data packet flow." *Id.*, 24:64-25:1. These control mechanisms impose various *penalties* upon flows to control their behavior. *Id.*, 19:53-20:18. Yung discloses this limitation.

**D.   Ground 4: Claims 8, 14-16, 28 , and 34-36 are obvious over Yung in view of Copeland in view of Ye.**

### 1.   Motivation to Combine

264.   A POSA would have been motivated to combine Yung-Copeland-Ye because these systems collect flow-based statistics and classify traffic using those statistics. For example, as I discussed above, Yung describes mechanism for classifying network traffic that "extends beyond analysis of explicitly presented packet attributes and holistically analyzes data flows." EX1005, Abstract, 5:59-64.

And as I discussed above, Copeland calculates a concern index (CI) value based on "flow statistics" that are analyzed "to determine if the flow appears to be legitimate traffic or possible suspicious activity." EX1007, Abstract, 3:32-35. Similarly, Ye describes generating "[b]aseline statistics on the flow rates for flows of data corresponding to different classes of packets." EX1008, Abstract. Ye then describes applying "forced reductions in data flow rates . . . at a node in response to the presence of congestion." *Id.*, 2:62-65.

265. A POSA would have been motivated to incorporate Ye's determination that the device is currently experiencing congestion into Yung's bandwidth-management device to further optimize Yung's traffic controls. Specifically, by limiting the enforcement of particular policies to periods in which congestion was occurring, it would ensure that the policies were being enforced during periods where the policies were unnecessary for the purposes of ensuring application performance, as enforcement of these policies would carry a cost in terms of memory and CPU utilization on the device. As Yung was concerned with efficiently allocating bandwidth, such an additional improvement to the efficiency of Yung's system would have been desirable to a POSA. *See* EX1005, 3:48-52.

266. The feature would afford the administrator enhanced control over the device's shaping functions—by incorporating the congestion condition, a POSA would be able to configure discard policies to act only during heavy

Cloudflare – Exhibit 1003, page 131

traffic/congestion. This would afford a network administrator an additional mechanism for prioritizing the policies and their impact upon traffic classes. For example, Yung could have a policy discarding the packets of all traffic matching a particular class, e.g., peer-to-peer traffic. The policy would only be enforced when the router experiences congestion, which would allow users to continue using peer-to-peer services at times when the router was performing well, but then drop this type of traffic when congestion occurs and mission-critical application performance suffers.

267.    A POSA would have understood that applying policies only during periods of congestion would be useful for certain types of traffic, such as online games, etc. *See* EX1032, 5-6. Such traffic classes would not be necessarily outlawed from the applications that can use network resources, but would need to be sacrificed in favor of more mission-critical applications during periods of congestion or heavy load. Such traffic types would be permissible during non-peak hours when bandwidth is less limited, but would need to be sacrificed during periods when less bandwidth is available. *See Id.*, 27; EX1013, 8.

268.    Additionally, a POSA would have understood that the teachings of Ye merely fill in obvious details not disclosed in Yung. Yung describes its statistics, parameters, and thresholds in open-ended terms, to which Ye's congestion condition would be integrated. *See* EX1005, 7:60-65; 8:9-11; 14:64-66; 17:44-48;

Cloudflare – Exhibit 1003, page 132

23:26-30; 25:8-11. For example, Yung notes that measurement variables include "total throughput, peak or average bandwidth usage, *etc.*" *Id.*, 7:60-65 (emphasis added). Yung notes that "a flow object can also include other attributes, such as packet count, byte count, first packet time, last packet time, *etc.*" *Id.*, 8:9-11 (emphasis added). Yung notes that the control block object includes "other flow state parameters, such as TCP connection status, timing of last packets in the inbound and outbound directions, speed information, apparent round trip time, *etc.*" Yung notes that "a control block object include[s] attributes characterizing the data flow, such as source address, destination address, service type, *etc.*" *Id.*, 17:44-48; 23:26-30 (emphasis added).

269.   A POSA would have combined Yung-Copeland-Ye with a minimal update to the infrastructure described in Yung. The software deployed in Yung would be updated to consider an additional factor of congestion. For example, a POSA would have understood that the software integrated in Yung's packet processor 131 and/or rate control module 132 would be updated to examine a congestion condition prior to enforcement. Such a change could be implemented by incorporating a simple if statement or other conditional logic that considers the congestion condition. When the congestion condition is satisfied, the enforcement would occur and when unsatisfied, enforcement would not occur.

Cloudflare – Exhibit 1003, page 133

270.   The software would be updated to determine whether congestion is being experienced on the router. For example, the software could examine readily available system metrics such as memory utilization, CPU usage, and other suitable performance indicators. Or the congestion condition would be determined by examining the number of connections, packet counts, bytes, etc., information which was also readily available in the stored statistics.

271.   A POSA would have been motivated to combine Yung-Copeland-Ye.

### 2.    Dependent claims 8, 14, 28, and 34

[8] The method of claim 1, wherein the penalty is enforced when a congestion condition is encountered.

[14] The method of claim 12, wherein the penalty is enforced on the flow when a congestion condition is encountered.

[28] The MFM of claim 25, wherein the penalty is enforced when a congestion condition is encountered.

[34] The MFM of claim 32, wherein the penalty is enforced on the flow when a congestion condition is encountered.

272.   It is my opinion that claims 8, 14, 28, and 34 are obvious over Yung-Copeland-Ye. Ye determines (in red below) "whether the router is currently experiencing congestion sufficient to merit the application of the AFFC [Anti-Flooding Flow-Control] mechanisms." EX1008, 9:17-22. When the "saturation

Cloudflare – Exhibit 1003, page 134

condition" is encountered, Ye performs control steps 506, 508, etc. (in green below).



EX1008, FIG. 5 (annotated).

273. In Yung-Copeland-Ye, Yung's policies would be configured to enforce a penalty (e.g., dropping packets) when a sufficient level of congestion is reached (*when a congestion condition is encountered*). For example, an administrator would configure a policy that discards all packets related to online gaming. The administrator could select to enforce the policy only when the network device is experiencing congestion. This would allow users to generally

Cloudflare – Exhibit 1003, page 135

play online games. But the capability would be sacrificed when congestion occurs

and mission-critical application performance suffers.

### 3.     Dependent claims 15 and 35

[15] The method of claim 12, wherein no penalty is enforced on the flow
unless a congestion condition is encountered, regardless of how undesirably
the flow is behaving.

[35] The MFM of claim 32, wherein no penalty is enforced on the flow
unless a congestion condition is encountered, regardless of how undesirably
the flow is behaving.

274.   It is my opinion that claims 15 and 35 are obvious over Yung-

Copeland-Ye. Yung-Ye discloses enforcing *no penalty on the flow unless a*

*congestion condition is encountered, regardless of how undesirably the flow is*

*behaving*. Notably, although claim 1 includes a limitation *regardless of the*

*presence or absence of congestion*, this is applicable only to *storing* and *updating*

statistics, which Yung discloses. Claims 15 and 35 relate to conditional *enforcing*

of a *penalty*—i.e., *unless a congestion condition is encountered*. Specifically, Ye

discloses avoiding subjecting a packet to a penalty when no congestion is detected:

"[w]hen control step 504 determines that congestion does not exist, operation

proceeds directly to step 527 with the received packets being forwarded without

being subject to processing." EX1008, 9:39-43. With Ye's congestion condition

integrated into Yung for the purposes of enforcement, Yung-Copeland-Ye would

Cloudflare – Exhibit 1003, page 136

continue to track flow statistics regardless of congestion and would impose a configured penalty only when a "congestion condition" occurs. Such a policy would not enforce the penalty (e.g., dropping packets) *unless a congestion condition is encountered*. For example, as described above, enforcement of traffic for online games may be configured to only occur during periods of congestion.

### 4. Dependent claims 16 and 36

[16] The method of claim 12, wherein the penalty is determined and enforced on the flow even when no congestion condition is encountered.

[36] The MFM of claim 32, wherein the penalty is determined and enforced on the flow even when no congestion condition is encountered.

275.   Yung discloses determining and enforcing a penalty *on the flow even when no congestion condition is encountered.*

276.   Yung's default behavior is to enforce bandwidth management controls in accordance with specified policies. For example, Yung notes that "[p]acket processor 131 then passes the packet to rate control module 132 (222) which . . . enforces the bandwidth utilization controls on the data packet flow." EX1005, 24:63-25:1. Yung does not itself condition the application of these mechanisms or limit its application to particular circumstances. *Id.*, 19:52-20:18. While Ye offers a congestion condition configuration option to Yung, the default behavior of Yung would be retained in the combination, with the congestion condition limitation

Cloudflare – Exhibit 1003, page 137

Appx1178

only applying for traffic classes that a user selects, limiting of enforcement to congestion scenarios would only apply if specifically configured. For example, as described above, enforcement of traffic for online games may be configured to only occur during periods of congestion. However, other traffic classes, e.g., peer-to-peer traffic, could be configured to always have their packets dropped, even during periods of no congestion. Thus, claims 16 and 36 are obvious over Yung-Copeland-Ye.

## IX.    CONCLUSION

277.   I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed this 6th day of May, 2021 in Chapel Hill, North Carolina.

Respectfully submitted,

Kevin Jeffay, Ph.D.

Cloudflare – Exhibit 1003, page 138



US007664048B1

(12) **United States Patent**
Yung et al.

(10) Patent No.: **US 7,664,048 B1**
(45) Date of Patent: **Feb. 16, 2010**

(54) **HEURISTIC BEHAVIOR PATTERN MATCHING OF DATA FLOWS IN ENHANCED NETWORK TRAFFIC CLASSIFICATION**

(75) Inventors: **Weng-Chin Yung**, Folsom, CA (US); **Mark Hill**, Los Altos, CA (US); **Anne Cesa Klein**, Cupertino, CA (US)

(73) Assignee: **Packeteer, Inc.**, Cupertino, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 870 days.

(21) Appl. No.: **10/720,329**

(22) Filed: **Nov. 24, 2003**

(51) **Int. Cl.**
*H04L 12/26* (2006.01)

(52) **U.S. Cl.** ...................... **370/253**; 370/235; 370/252; 709/224

(58) **Field of Classification Search** ................ 370/223, 370/224, 229, 230, 231, 236.1, 238, 235, 370/253, 252; 709/224, 226, 233, 235, 246
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,914,650 A | | 4/1990 | Sriram |
| 5,828,846 A | | 10/1998 | Kirby |
| 6,003,077 A | | 12/1999 | Bawden |
| 6,023,456 A | | 2/2000 | Chapman |
| 6,038,216 A | * | 3/2000 | Packer ...................... 370/231 |
| 6,046,980 A | * | 4/2000 | Packer ...................... 370/230 |
| 6,122,670 A | * | 9/2000 | Bennett et al. .............. 709/236 |
| 6,144,636 A | * | 11/2000 | Aimoto et al. .............. 370/229 |
| 6,219,050 B1 | | 4/2001 | Schaffer |
| 6,285,660 B1 | | 9/2001 | Ronen |
| 6,363,056 B1 | | 3/2002 | Beigi |
| 6,397,359 B1 | | 5/2002 | Chandra |
| 6,584,467 B1 | | 6/2003 | Haught |
| 6,591,299 B2 | * | 7/2003 | Riddle et al. ................ 709/224 |
| 6,625,648 B1 | | 9/2003 | Schwaller |
| 6,628,938 B1 | | 9/2003 | Rachabathuni |

| | | | |
|---|---|---|---|
| 6,681,232 B1 | | 1/2004 | Sistanizadeh |
| 6,690,918 B2 | | 2/2004 | Evans |
| 6,701,359 B1 | | 3/2004 | Calabrez |
| 6,738,352 B1 | | 5/2004 | Yamada |
| 6,798,763 B1 | | 9/2004 | Kimura |
| 6,894,972 B1 | | 5/2005 | Phaal |
| 7,010,611 B1 | * | 3/2006 | Wiryaman et al. .......... 709/232 |
| 7,120,931 B1 | | 10/2006 | Cheriton |
| 7,154,416 B1 | | 12/2006 | Savage |
| 7,155,502 B1 | | 12/2006 | Galloway |
| 7,193,968 B1 | | 3/2007 | Kapoor |
| 7,215,637 B1 | | 5/2007 | Ferguson |
| 7,224,679 B2 | | 5/2007 | Solomon |

(Continued)

OTHER PUBLICATIONS

Pazos, C.M. et al., "Flow Control and Bandwidth Management in Next Generation Internets" IEEE, Jun. 22, 1998, pp. 123-132.*

(Continued)

*Primary Examiner*—Donald L Mills
(74) *Attorney, Agent, or Firm*—Baker Botts L.L.P.

(57) **ABSTRACT**

Methods, apparatuses and systems facilitating enhanced classification of network traffic that extends beyond analysis of explicitly presented packet attributes and holistically analyzes data flows, and in some implementations, related data flows against known application behavior patterns to classify the data flows. Implementations of the present invention facilitate the classification of encrypted or compressed network traffic, or where the higher layer information in the data flows are formatted according to a non-public or proprietary protocol.

**31 Claims, 11 Drawing Sheets**



Cloudflare - Exhibit 1005, page 1

Appx1209

**US 7,664,048 B1**

Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 7,292,531 B1 | 11/2007 | Hill |
| 7,296,288 B1 | 11/2007 | Hill |
| 7,324,447 B1 | 1/2008 | Morford |
| 7,385,924 B1 | 6/2008 | Riddle |
| 7,554,983 B1 | 6/2009 | Muppala |
| 2002/0122427 A1 | 9/2002 | Kamentsky |
| 2002/0143901 A1 | 10/2002 | Lupo |
| 2003/0035385 A1 | 2/2003 | Walsh |
| 2003/0112764 A1 | 6/2003 | Gaspard |
| 2003/0185210 A1 | 10/2003 | McCormack |
| 2004/0125815 A1 | 7/2004 | Shimazu |
| 2006/0045014 A1 | 3/2006 | Charzinski |

OTHER PUBLICATIONS

Ye, Guanhua et al., "Using explicit congestion notification in stream control transmisson provided in networks", IEEE, May 19-22, 2003, pp. 704-709.*

Yung, U.S. Appl. No. 10/917,952, entitled: Examination of connection handshake to enhance classification of encrypted network traffic, Aug. 2004.

* cited by examiner

Cloudflare - Exhibit 1005, page 2

Appx1210



Fig._1

Cloudflare - Exhibit 1005, page 3



Fig._2

Cloudflare - Exhibit 1005, page 4

Appx1212



Fig._3

Appx1213



Fig._4



Fig._5A

Cloudflare - Exhibit 1005, page 7



Fig._5B

Appx1216



Fig._5C

Cloudflare - Exhibit 1005, page 9



Fig._5D

Cloudflare - Exhibit 1005, page 10

Appx1218



Fig._6

Cloudflare - Exhibit 1005, page 11

Appx1219



Fig._7

Appx1220



Fig._8

Cloudflare - Exhibit 1005, page 13

Appx1221

US 7,664,048 B1

1

# HEURISTIC BEHAVIOR PATTERN MATCHING OF DATA FLOWS IN ENHANCED NETWORK TRAFFIC CLASSIFICATION

## CROSS-REFERENCE TO RELATED APPLICATIONS AND PATENTS

This application makes reference to the following commonly owned U.S. patent applications and patents, which are incorporated herein by reference in their entirety for all purposes:

U.S. patent application Ser. No. 08/762,828 now U.S. Pat. No. 5,802,106 in the name of Robert L. Packer, entitled "Method for Rapid Data Rate Detection in a Packet Communication Environment Without Data Rate Supervision;"

U.S. patent application Ser. No. 08/970,693 now U.S. Pat. No. 6,018,516, in the name of Robert L. Packer, entitled "Method for Minimizing Unneeded Retransmission of Packets in a Packet Communication Environment Supporting a Plurality of Data Link Rates;"

U.S. patent application Ser. No. 08/742,994 now U.S. Pat. No. 6,038,216, in the name of Robert L. Packer, entitled "Method for Explicit Data Rate Control in a Packet Communication Environment without Data Rate Supervision;"

U.S. patent application Ser. No. 09/977,642 now U.S. Pat. No. 6,046,980, in the name of Robert L. Packer, entitled "System for Managing Flow Bandwidth Utilization at Network, Transport and Application Layers in Store and Forward Network;"

U.S. patent application Ser. No. 09/106,924 now U.S. Pat. No. 6,115,357, in the name of Robert L. Packer and Brett D. Galloway, entitled "Method for Pacing Data Flow in a Packet-based Network;"

U.S. patent application Ser. No. 09/046,776 now U.S. Pat. No. 6,205,120, in the name of Robert L. Packer and Guy Riddle, entitled "Method for Transparently Determining and Setting an Optimal Minimum Required TCP Window Size;"

U.S. patent application Ser. No. 09/479,356 now U.S. Pat. No. 6,285,658, in the name of Robert L. Packer, entitled "System for Managing Flow Bandwidth Utilization at network, Transport and Application Layers in Store and Forward Network;"

U.S. patent application Ser. No. 09/198,090 now U.S. Pat. No. 6,412,000, in the name of Guy Riddle and Robert L. Packer, entitled "Method for Automatically Classifying Traffic in a Packet Communications Network;"

U.S. patent application Ser. No. 09/198,051, in the name of Guy Riddle, entitled "Method for Automatically Determining a Traffic Policy in a Packet Communications Network;"

U.S. patent application Ser. No. 09/206,772, in the name of Robert L. Packer, Brett D. Galloway and Ted Thi, entitled "Method for Data Rate Control for Heterogenous or Peer Internetworking;"

U.S. patent application Ser. No. 10/039,992, in the name of Michael J. Quinn and Mary L. Laier, entitled "Method and Apparatus for Fast Lookup of Related Classification Entities in a Tree-Ordered Classification Hierarchy;"

U.S. patent application Ser. No. 10/108,085, in the name of Wei-Lung Lai, Jon Eric Okholm, and Michael J. Quinn, entitled "Output Scheduling Data Structure Facilitating Hierarchical Network Resource Allocation Scheme;"

U.S. patent application Ser. No. 10/155,936 now U.S. Pat. No. 6,591,299, in the name of Guy Riddle, Robert L. Packer, and Mark Hill, entitled "Method For Automatically Classifying Traffic With Enhanced Hierarchy In A Packet Communications Network;"

2

U.S. patent application Ser. No. 10/236,149, in the name of Brett Galloway and George Powers, entitled "Classification Data Structure enabling Multi-Dimensional Network Traffic Classification and Control Schemes;"

U.S. patent application Ser. No. 10/295,391, in the name of Mark Hill, Guy Riddle and Robert Purvy, entitled "Methods, Apparatuses, and Systems Allowing for Bandwidth Management Schemes Responsive to Utilization Characteristics Associated with Individual Users;"

U.S. patent application Ser. No. 10/334,467, in the name of Mark Hilt, entitled "Methods, Apparatuses and Systems Facilitating Analysis of the Performance of Network Traffic Classification Configurations;"

U.S. patent application Ser. No. 10/453,345, in the name of Scott Hankins, Michael R. Morford, and Michael J. Quinn, entitled "Flow-Based Packet Capture;" and

U.S. patent application Ser. No. 10/611,573, in the name of Roopesh Varier, David Jacobson, and Guy Riddle, entitled "Network Traffic Synchronization Mechanism."

## FIELD OF THE INVENTION

The present invention relates to computer networks and, more particularly, to enhanced network traffic classification mechanisms that allow for identification of encrypted data flows, or data flows where attributes necessary to proper classification are otherwise obscured or unknown.

## BACKGROUND OF THE INVENTION

Efficient allocation of network resources, such as available network bandwidth, has become critical as enterprises increase reliance on distributed computing environments and wide area computer networks to accomplish critical tasks. The widely-used Transport Control Protocol (TCP)/Internet Protocol (IP) protocol suite, which implements the world-wide data communications network environment called the Internet and is employed in many local area networks, omits any explicit supervisory function over the rate of data transport over the various devices that comprise the network. While there are certain perceived advantages, this characteristic has the consequence of juxtaposing very high-speed packets and very low-speed packets in potential conflict and produces certain inefficiencies. Certain loading conditions degrade performance of networked applications and can even cause instabilities which could lead to overloads that could stop data transfer temporarily.

In order to understand the context of certain embodiments of the invention, the following provides an explanation of certain technical aspects of a packet based telecommunications network environment. Internet/Intranet technology is based largely on the TCP/IP protocol suite. At the network level, IP provides a "datagram" delivery service—that is, IP is a protocol allowing for delivery of a datagram or packet between two hosts. By contrast, TCP provides a transport level service on top of the datagram service allowing for guaranteed delivery of a byte stream between two IP hosts. In other words, TCP is responsible for ensuring at the transmitting host that message data is divided into packets to be sent, and for reassembling, at the receiving host, the packets back into the complete message.

TCP has "flow control" mechanisms operative at the end stations only to limit the rate at which a TCP endpoint will emit data, but it does not employ explicit data rate control. The basic flow control mechanism is a "sliding window", a window which by its sliding operation essentially limits the amount of unacknowledged transmit data that a transmitter is

Cloudflare - Exhibit 1005, page 14

US 7,664,048 B1

3

allowed to emit. Another flow control mechanism is a congestion window, which is a refinement of the sliding window scheme involving a conservative expansion to make use of the full, allowable window.

The sliding window flow control mechanism works in conjunction with the Retransmit Timeout Mechanism (RTO), which is a timeout to prompt a retransmission of unacknowledged data. The timeout length is based on a running average of the Round Trip Time (RTT) for acknowledgment receipt, i.e. if an acknowledgment is not received within (typically) the smoothed RTT+4*mean deviation, then packet loss is inferred and the data pending acknowledgment is re-transmitted. Data rate flow control mechanisms which are operative end-to-end without explicit data rate control draw a strong inference of congestion from packet loss (inferred, typically, by RTO). TCP end systems, for example, will "back-off,"—i.e., inhibit transmission in increasing multiples of the base RTT average as a reaction to consecutive packet loss.

A crude form of bandwidth management in TCP/IP networks (that is, policies operable to allocate available bandwidth from a single logical link to network flows) is accomplished by a combination of TCP end systems and routers which queue packets and discard packets when some congestion threshold is exceeded. The discarded and therefore unacknowledged packet serves as a feedback mechanism to the TCP transmitter. Routers support various queuing options to provide for some level of bandwidth management. These options generally provide a rough ability to partition and prioritize separate classes of traffic. However, configuring these queuing options with any precision or without side effects is in fact very difficult, and in some cases, not possible. Seemingly simple things, such as the length of the queue, have a profound effect on traffic characteristics. Discarding packets as a feedback mechanism to TCP end systems may cause large, uneven delays perceptible to interactive users. Moreover, while routers can slow down inbound network traffic by dropping packets as a feedback mechanism to a TCP transmitter, this method often results in retransmission of data packets, wasting network traffic and, especially, inbound capacity of a Wide Area Network (WAN) link. In addition, routers can only explicitly control outbound traffic and cannot prevent inbound traffic from over-utilizing a WAN link. A 5% load or less on outbound traffic can correspond to a 100% load on inbound traffic, due to the typical imbalance between an outbound stream of acknowledgments and an inbound stream of data.

In response, certain data flow rate control mechanisms have been developed to provide a means to control and optimize efficiency of data transfer as well as allocate available bandwidth among a variety of business enterprise functionalities. For example, U.S. Pat. No. 6,038,216 discloses a method for explicit data rate control in a packet-based network environment without data rate supervision. Data rate control directly moderates the rate of data transmission from a sending host, resulting in just-in-time data transmission to control inbound traffic and reduce the inefficiencies associated with dropped packets. Bandwidth management devices allow for explicit data rate control for flows associated with a particular traffic classification. For example, U.S. Pat. No. 6,412,000, above, discloses automatic classification of network traffic for use in connection with bandwidth allocation mechanisms. U.S. Pat. No. 6,046,980 discloses systems and methods allowing for application layer control of bandwidth utilization in packet-based computer networks. For example, bandwidth management devices allow network administrators to specify policies operative to control and/or prioritize

4

the bandwidth allocated to individual data lows according to traffic classifications. In addition, certain bandwidth management devices, as well as certain routers, allow network administrators to specify aggregate bandwidth utilization controls to divide available bandwidth into partitions. With some network devices, these partitions can be configured to ensure a minimum bandwidth and/or cap bandwidth as to a particular class of traffic. An administrator specifies a traffic class (such as File Transfer Protocol (FTP) data, or data flows involving a specific user) and the size of the reserved virtual link—i.e., minimum guaranteed bandwidth and/or maximum bandwidth. Such partitions can be applied on a per-application basis (protecting and/or capping bandwidth for all traffic associated with an application) or a per-user basis (controlling, prioritizing, protecting and/or capping bandwidth for a particular user). In addition, certain bandwidth management devices allow administrators to define a partition hierarchy by configuring one or more partitions dividing the access link and further dividing the parent partitions into one or more child partitions. While the systems and methods discussed above that allow for traffic classification and application of bandwidth utilization controls on a per-traffic-classification basis operate effectively for their intended purposes, they possess certain limitations. As discussed more fully below, identification of traffic types associated with data flows traversing an access link involves the application of matching criteria or rules to explicitly presented or readily discoverable attributes of individual packets against an application signature which may comprise a protocol identifier (e.g., TCP, HyperText Transport Protocol (HTTP), User Datagram Protocol (UDP), Multipurpose Internet Mail Extensions (MIME) types, etc.), a port number, and even an application-specific string of text in the payload of a packet. After identification of a traffic type corresponding to a data flow, a bandwidth management device associates and subsequently applies bandwidth utilization controls (e.g., a policy or partition) to the data flow corresponding to the identified traffic classification or type. Accordingly, simple changes to an application, such as a string of text appearing in the payload or the use of encryption text may allow the application to evade proper classification and corresponding bandwidth utilization controls or admission policies.

Indeed, a common use of bandwidth management devices is to limit the bandwidth being consumed by unruly, bandwidth-intensive applications, such as peer-to-peer applications (e.g., Kazaa, Napster, etc.), and/or other unauthorized applications. Indeed, the rich Layer 7 classification functionality of Packetshaper® bandwidth management devices offered by Packeteer®, Inc. of Cupertino, Calif. is an attractive feature for network administrator, as it allows for accurate identification of a variety of application types. This traffic classification functionality, in many instances, uses a combination of known protocol types, port numbers and application-specific attributes to differentiate between various application traffic traversing the network. An increasing number of such peer-to-peer applications, however, employ data compression, encryption technology, and/or proprietary protocols that obscure or prevent identification of various application-specific attributes, often leaving well-known port numbers as the only basis for classification. In fact, as networked applications get increasingly complicated, data encryption has become a touted feature. Indeed, encryption addresses the concern of security and privacy issues, but it also makes it much more difficult to identify unauthorized applications using encryption, such as the peer-to-peer applications "Earthstation 5" and "Winny." In addition, traffic classification based solely on well-known port numbers can be prob-

Cloudflare - Exhibit 1005, page 15

US 7,664,048 B1

5

lematic, especially where the application uses dynamic port number assignments or an application incorrectly uses a well-known port number, leading to misclassification of the data flows. In addition, classifying such encrypted network traffic as "unknown" and applying a particular rate or admission policy to unknown traffic classes undermines the granular control otherwise provided by bandwidth management devices and, further, may cause legitimate, encrypted traffic to suffer as a result.

In addition, network savvy users (such as students in a campus or university environment) have also become aware that bandwidth management devices have been deployed to limit or restrict unauthorized peer-to-peer application traffic. As a result, users often attempt to bypass or thwart the bandwidth management scheme effected by such bandwidth management devices by creating communications tunnels (proxy tunnels) through which unauthorized or restricted network traffic is sent. The attributes discernible from the content of these tunneled data flows, however, often reveal little information about its true nature. For example, commercial HTTP tunnel services (such as loopholesoftware.com, TotalRc.net, and http-tunnel.com, etc.) allow users to send all network traffic in the form of HTTP traffic through a HTTP tunnel between a tunnel client and an HTTP proxy server maintained by the tunnel services provider. FIG. 6 illustrates the functionality and operation of a typical HTTP proxy tunnel. Client device 42 includes a client application (such as a peer-to-peer application 71) and a tunnel client 72. The client application sends data to the tunnel client 72 which tunnels the data over HTTP to a tunnel proxy server 74. The tunnel proxy server 74 then forwards the data to the intended destination (here, network resource 75), and vice versa. Such HTTP tunnels typically feature encryption; accordingly, a bandwidth management device 30, encountering the tunneled traffic in this form, may not detect the exact nature of the traffic and, in fact, classify such data flows as legitimate or regular HTTP traffic. Accordingly, these tunneling mechanisms and other techniques for evading bandwidth utilization controls implemented by bandwidth management devices present new challenges to network administrators and bandwidth management device manufacturers desiring to effectively control unauthorized or restricted network traffic.

In light of the foregoing, a need in the art exists for methods, apparatuses and systems that facilitate the classification of encrypted or compressed network traffic. A need further exists for methods, apparatuses and systems that facilitate the classification of network traffic associated with a non-public, proprietary protocol or application. Embodiments of the present invention substantially fulfill these needs.

SUMMARY OF THE INVENTION

The present invention provides methods, apparatuses and systems facilitating enhanced classification of network traffic. As discussed above, typical mechanisms that classify network traffic analyze explicitly presented or readily discoverable attributes of individual packets against an application signature, such as a combination of protocol identifiers, port numbers and text strings. The present invention extends beyond analysis of such explicitly presented packet attributes and holistically analyzes the data flows, and in some implementations, the behavior of host or end systems as expressed in related data flows against known application behavior patterns to classify the data flows. Implementations of the present invention facilitate the classification of encrypted or compressed network traffic, or where the higher layer information in the data flows are formatted according to a non-

6

public or proprietary protocol. In one embodiment, the enhanced classification functionality analyzes the behavioral attributes of encrypted data flows against a knowledge base of known application behavior patterns to classify the data flows. In one embodiment, the enhanced classification mechanisms described herein operate seamlessly with other Layer 7 traffic classification mechanisms that operate on attributes of the packets themselves. Implementations of the present invention can be incorporated into a variety of network devices, such as traffic monitoring devices, packet capture devices, firewalls, and bandwidth management devices.

DESCRIPTION OF THE DRAWINGS

FIG. 1 is a functional block diagram showing a traffic monitoring device according to an embodiment of the present invention.

FIG. 2 is a functional block diagram illustrating a computer network environment including a bandwidth management device according to an embodiment of the present invention.

FIG. 3 is a functional block diagram setting forth the functionality in a bandwidth management device according to an embodiment of the present invention.

FIG. 4 is a flow chart diagram providing a method, according to an embodiment of the present invention, directed to the processing of packets in a traffic monitoring device.

FIGS. 5A thru 5D are flow chart diagrams illustrating methods, according to an embodiment of the present invention, directed to classifying data flows based on one or more observed behavioral attributes.

FIG. 6 is a functional block diagram illustrating a proxy tunnel which may be used in attempts to evade appropriate classification and circumvent the bandwidth utilization controls implemented by bandwidth management devices.

FIG. 7 is a flow chart diagram providing a method directed to enforcing bandwidth utilization controls on data flows.

FIG. 8 is a flow chart diagram showing how the application behavior pattern matching functionality can be applied in combination with other network traffic classification processes.

DESCRIPTION OF PREFERRED
EMBODIMENT(S)

FIG. 1 illustrates a basic network environment in which an embodiment of the present invention operates. FIG. 1 shows a first network device 40 (such as a hub, switch, router, and/or a variety of combinations of such devices implementing a LAN or WAN) interconnecting two end-systems (here, client computer 42 and server 44). FIG. 1 also provides a second network device 22, such as a router, operably connected to network cloud 50, which in one implementation could be an open, wide-area network. As FIG. 1 shows, traffic monitoring device 30 comprises traffic monitoring module 75, and first and second network interfaces 71, 72, which operably connect traffic monitoring device 30 to the communications path between first network device 40 and second network device 22. Traffic monitoring module 75 generally refers to the functionality implemented by traffic monitoring device 30. In one embodiment, traffic monitoring module 75 is a combination of hardware and software, such as a central processing unit, memory, a system bus, an operating system and one or more software modules implementing the functionality described herein. In one embodiment, traffic monitoring module 75 includes a packet processor 82, and a traffic classification engine 86. In one embodiment, the packet processor 82 is operative to process data packets, such as storing packets in a

Cloudflare - Exhibit 1005, page 16

US 7,664,048 B1

7

buffer structure, detecting new data flows, and parsing the data packets for various attributes (such as source and destination addresses, and the Like) and maintaining one or more measurement variables or statistics in connection with the flows. The traffic classification engine **86**, as discussed more fully below, is operative to classify data flows based on one or more attributes associated with the data flows. Traffic classification engine **86** is also operative to classify data flows based on a heuristic comparison of certain observed behavioral attributes of the data flows relative to a set of at least one known application behavior pattern.

The functionality of traffic monitoring device **30** can be integrated into a variety of network devices that classify network traffic, such as firewalls, gateways, proxies, packet capture devices (see U.S. application Ser. No. 10/453,345), network traffic monitoring and/or bandwidth management devices, that are typically located at strategic points in computer networks. In one embodiment, first and second network interfaces **71**, **72** are implemented as a combination of hardware and software, such as network interface cards and associated software drivers. In addition, the first and second network interfaces **71**, **72** can be wired network interfaces, such as Ethernet interfaces, and/or wireless network interfaces, such as 802.11, BlueTooth, satellite-based interfaces, and the like. As FIG. 1 illustrates, traffic monitoring device **30**, in one embodiment, includes persistent memory **76**, such as a hard disk drive or other suitable memory device, such writable CD, DVD, or tape drives.

As FIGS. 1 and 2 show, the traffic monitoring device **30** (or bandwidth management device **130**), in one embodiment, is disposed on the link between a local area network **40** and router **22**. In other embodiments, multiple traffic monitoring devices can be disposed at strategic points in a given network infrastructure to achieve various objectives. In addition, traffic monitoring device **30** need not be directly connected to the link between two network devices, but may also be connected to a mirror port. In addition, the traffic monitoring functionality described herein may be deployed in multiple network devices and used in redundant network topologies by integrating the network traffic synchronization functionality described in U.S. application Ser. No. 10/611,573, incorporated by reference above.

A. Network Traffic Monitoring and Enhanced Traffic Classification

As discussed herein, traffic monitoring device **30** is operative to detect or recognize flows between end systems or hosts, and classify the data flows based on one or more flow and/or behavioral attributes. Traffic monitoring device **30** may also monitor and store one or more measurement variables on an aggregate and/or per-traffic-class basis. As discussed below, traffic monitoring device **30** may also be operative to identify or discover the traffic classes corresponding to data flows traversing an access link and add them to the configuration of traffic classification engine **86**. As discussed above, traffic discovery allows network administrators to determine the nature of the data flows encountered on a given network. U.S. Pat. Nos. 6,412,000 and 6,457,051 disclose methods and systems that automatically classify network traffic according to a set of classification attributes. In addition, the tracking of measurement variables (such as total throughput, peak or average bandwidth usage, etc.) allows the network administrator to determine the relative significance of the existing traffic classes, as well as newly-discovered traffic, on bandwidth utilization across the access link.

FIG. 4 illustrates a method, according to an embodiment of the present invention, directed to a flow-aware process that

8

classifies flows and maintains one or more measurement variables based on the identified traffic class. As FIG. 4 illustrates, a packet processor **82** receives a data packet (**102**) and determines whether a flow object has already been created for the flow to which the data packet is a part (**104**). A flow object, in one implementation, is a data structure including fields whose values characterize various attributes of the flow, including source and destination IP addresses, port numbers, traffic class identifiers and the like. A flow object can also include other attributes, such as packet count, byte count, first packet time, last packet time, etc. If a flow object is not found, packet processor **82** constructs a new flow object (**106**). Packet processor **82** then determines whether the received packet is part of an existing flow or a new data flow (**108**). In one embodiment, flows are generally TCP and UDP flows. However, any suitable transport layer flow can be recognized and detected. In one embodiment, flows are identified based on the following flow attributes: 1) source IP address, 2) destination IP address, 3) source port number, 4) destination port number, and 5) protocol (derived from the "protocol" field in IPv4 headers, and the "NextHeader" field in IPv6 headers). One skilled in the art will recognize that flows can be identified in relation to a variety of attributes and combinations of attributes. In addition, methods for determining new data flows and assigning packets to existing data flows are well known in the art and also depend on the particular transport layer protocol employed. For a TCP flow, packet processor **82** can determine a new data flow by detecting SYN and/or SYN/ACK packets. However, a new data flow can simply be a data flow for which there is no corresponding flow object. For example, with UDP and GRE flows (where there is no explicit connection mechanism, such as SYN packets), a new flow is recognized by associating the source and destination addresses and port numbers to the flow and the flow type (e.g., UDP, GRE, etc.). Accordingly, when a UDP packet identifies a new address/port pair, the attributes discussed above are stored in a data structure along with the time of last packet. A new UDP flow between the same address/port pairs can be determined by comparing the last packet time to a threshold value (e.g., 2 minutes). If the difference between the time of the latest packet and the time of the last packet is greater than the threshold, the new packet is deemed part of a new flow. In another implementation, a background and/or separate process can periodically compare the Last packet times associated with a flow to a threshold period of time and deem the flow terminated if the last packet time is beyond the threshold period of time.

If the packet is part of an existing flow, the packet processor **82** associates the packet with the corresponding flow object and updates flow object attributes as required (**110**). For example, the packet processor **82**, in one embodiment, increments the packet count associated with the flow (**116**). If the packet represents a new data flow, traffic classification engine **86** operates on the flow object and, potentially, attributes of the packet and other packets associated with the flow to determine a traffic type and/or traffic class associated with the flow (**114**). In one embodiment, the packet (or a pointer to the packet stored in a buffer structure) and the flow object (or a pointer thereto) is passed to the traffic classification engine **86** to determine a traffic class. As discussed in more detail below, identification of a traffic class or type can employ information gleaned from Layers 2 thru 7 of the OSI reference model. The determination of traffic classes is discussed in more detail below at Sections B.1. and B.3. Similarly, if the packet represents a change to the data flow (**112**), packet processor **82** passes the packet and flow object to the traffic classification engine **86** to determine the traffic class. As FIG. 4 shows, if the

Cloudflare - Exhibit 1005, page 17

US 7,664,048 B1

9

data flow does not match an existing traffic class (**115**), packet processor **82** or traffic classification engine **86** flags the packet for traffic discovery (**116**). In one embodiment, a data flow that does not match an existing traffic class is classified in the default traffic class. Packet processor **82** or another module then records or updates various measurement variables, such as packet count, byte count, last packet time and the like (**118**). As discussed above, traffic monitoring device **30** may perform other operations, such as firewall or gateway operations, packet capture operations, and/or bandwidth management functions.

Traffic discovery module **84**, in one implementation, operates concurrently with the processing of data flows as described above to discover new traffic classes and add the newly discovered traffic classes to traffic classification engine **86**. Traffic discovery module **84**, in one implementation operates on packets that have been flagged or otherwise associated with a default traffic class. In one implementation, traffic discovery module **84** automatically discovers traffic classes based on the methods and systems described in U.S. Pat. Nos. 6,412,000, 6,457,051, and 6,591,299 (see above). For example, traffic discovery module **84** can monitor data flows in real time to discover traffic classes in the data flows, or store flagged packets and process the stored packets periodically to discover new traffic classes. As discussed in the above-identified patents, traffic discovery module **84** applies one or more discovery thresholds, such as a minimum byte count, flow count, packet count and the like with or without respect to a fixed or sliding time window in determining whether to add a newly discovered traffic class to traffic classification engine **86**.

A.1. Traffic Classification and Flow Behavior Pattern Matching

Traffic classification engine **86**, in one implementation, is operative to classify data flows on two different frameworks. That is, traffic classification engine **86** is operative to classify traffic, according to a first framework, based on attributes of individual packets of the data flows that are readily discoverable or unconcealed by encryption or compression. If a data flow is not classified applying this first framework, traffic classification engine **86** applies a second traffic classification framework that, as discussed herein, involves a heuristic matching of the behavioral attributes of data flows to one or more known application behavior patterns. Of course, other arrangements are possible. For example, the second traffic classification framework could be applied exclusively, or at least before the first classification framework. The arrangement described above is preferred, in certain implementations, as the majority of network traffic is non-encrypted or can otherwise be classified based on non-concealed data flow attributes. Accordingly, the heuristic behavior pattern matching described below is applied only in cases where the extra processing is required.

According to this first framework, a traffic class has at least one attribute defining the criterion(ia) against which data flow attributes are analyzed for the purpose of determining a matching traffic class. For example, a traffic class can be defined by configuring an attribute defining a particular well-known port number in combination with other attributes. Of course, a particular traffic class can be defined in relation to a variety of related and/or orthogonal data flow attributes. U.S. Pat. No. 6,412,000 and U.S. patent application Ser. No. 10/039,992 describe some of the data flow attributes that may be used to define a traffic class, as well as the use of hierarchical classification structures to associate traffic classes to data flows. In one embodiment, traffic classification engine **86** includes functionality allowing for classification of net-

10

work traffic based on information from layers 2 to 7 of the OSI reference model. Traffic classification engine **86**, in one embodiment, stores the traffic classes and corresponding data (e.g., matching rules, policies, etc.) related to each traffic class in a hierarchical tree. This tree is organized to show parent-child relationships—that is, a particular traffic class may have one or more subordinate child traffic classes with more specific characteristics (matching rules) than the parent class. For example, at one level a traffic class may be configured to define a particular user group or subnet, while additional child traffic classes can be configured to identify specific application traffic associated with the user group or subnet. In one embodiment, the root traffic classifications are "/inbound/" and "/outbound/" data flows. As discussed in U.S. application Ser. No. 10/334,467, traffic classification engine **86**, in one implementation, is configured to traverse the hierarchical traffic classification tree, applying the matching rules associated with each traffic class node, in the order in which they are configured. In one embodiment, traffic classification engine **86** attempts to match to a leaf traffic class node before proceeding to remaining traffic class nodes in the hierarchical configuration. If a traffic class is found, the traffic classification database **137** stops the instant search process and returns the identified traffic classification. Any data flow not explicitly classified is classified as "/inbound/default/" or "/outbound/default/". Of course, one skilled in the art will recognize that alternative ways for traversing the hierarchical traffic class configuration can be implemented.

In one implementation, traffic classification engine **86** applies the heuristic behavior pattern matching functionality described herein to data flows classified as /inbound/default/ or /outbound/default/. With the content of data packets beyond the transport layer being obscured by encryption or compression algorithms, analyzing data flows against an application profile is almost impossible without knowledge of the cryptographic keys; however, data flows may nevertheless be classified by observing the behavior of an application residing on a given host, such as how the host behaves at startup and how the host exchanges packets with its peers. Of course, the behavior of an application at other phases (such as data transfer, peer discovery, registration, etc.) can also be modeled and used for purposes of classification. In one implementation, the behavior pattern matching functionality employs a selection of one to a combination of the following techniques or factors to classify compressed or encrypted data flows:

1) Discoverable Protocol Type—In one implementation, discoverable attributes of the packets associated with a data flow are first used to identify or rule out possible applications or traffic classes. For example, that the data flow is a TCP flow or a UDP flow can be used to identify or rule out a pool of suspected applications or traffic classes.

2) Packet Size Matching—In one implementation, when studying the behavior of a given application it can sometimes be determined that the host application emits or receives data flows where the size of the packets exhibits a consistent pattern. For example, the peer-to-peer file sharing application, Winny, at startup attempts to discover one or more peers. This discovery process results in a plurality of data flows where the first packet is a given size, or at least within a narrow size range. The second and subsequent packets exhibit the same patterns as well. By observing this behavior, a knowledge base including these heuristic findings can be used to compile one or more application behavior pattern(s) for use in classifying data flows. For example, an application behavior pattern may specify the expected size of the first n (e.g., 3) packets in a data flow. To avoid the packet size pattern match-

Cloudflare - Exhibit 1005, page 18

US 7,664,048 B1

11

ing become immediately obsolete when new application releases introduced, minor size variations may be allowed when determining a matching pattern. In addition, as the following flow charts address, packets in a flow may arrive out of order at traffic monitoring device 30, implementations of the behavior pattern functionality adapt to these situations by looking to subsequent the packet sizes in the behavior pattern.

3) Entropy Calculation—The observed entropy of a data flow or portion thereof can also be used for traffic classification. An entropy value, in one implementation, is a parameter used to evaluate the information density of a file or chunk of binary data, such as a packet. A very high information density (e.g., an entropy value exceeding a threshold) can indicate that the information is essentially random or encrypted. Several well-known algorithms can be used to compute an entropy value for a given packet or group of packets, such as Entropy algorithm1, Chi-square Test2, Monte Carlo Value for Pi3, Arithmetic Mean4, and Serial Correlation Coflieient5. Of course, any suitable algorithm for computing the information density of a block of binary data can be used. As discussed below, in one implementation, the information density for the first packet in the flow is analyzed. However, in other implementations, the information density of subsequent packets can be analyzed in addition to, or in lieu of, the first packet. Still further, the entropy value computation may be a composite value or set of values, resulting from the application of a plurality of algorithms. For example, the application behavior pattern may include entropy values or ranges for two different algorithms, since the algorithms are unique and will produce different values. Accordingly, a data flow can be classified, at least in part, by how closely one or more packets track the values in the application behavior pattern. Still further, the entropy value can be computed with respect to portions of individual packets, such as the first n bytes.

4) Inter flow Timing—The timing between a current flow and a previous flow, both associated with a given host can also be used to classify the current flow. For example, a Winny peer at start up typically attempts to discover multiple peers, resulting in multiple data flows spaced closely in time. Accordingly, if the interval between a current flow and a previous flow suspected as Winny traffic exceeds a maximum interval time, these two flows will not be deemed concurrent or part of the same application traffic.

5) Related Flow Characterization—In one implementation, the number of related data flows associated with a suspected application can also be used in behavior pattern matching. In one implementation, a minimum number of suspected application flows must be encountered before traffic classification engine 86 decides to classify the otherwise unknown flows as the suspected application. In one implementation, traffic classification engine 86 keeps track of the total number of suspected application flows associated with a given host. While keeping track of this number, traffic classification engine 86 resets this total if the 'inter flow timing' (above) exceeds the limit associated with the behavior pattern of the suspected application.

Of course, the application behavior pattern can incorporate other factors as well. For example, the application behavior pattern may include required time values or ranges for the timing between packets in a given flow. Still further, the entropy computation discussed above can be applied to an entire data flow, or in the aggregate, to a group of related flows. In addition, the application behavior pattern may specify size requirements for a group of related data flows. For example, an application behavior pattern may specify a

12

first size range (e.g., in bytes) for a first suspected application flow, and a second size range for a second related flow, and so on.

Still further, the application behavior pattern may include a specification of the sequence, direction, and/or timing of various protocol identifiers or flags. For example, an application behavior pattern may include a sequence and timing specification of certain TCP flags (such as SYNs, ACKs, FINs, RSTs, etc.) that should be encountered during a data flow or sequence of data flows in order to match a suspected traffic class.

In addition, the application behavior pattern may also indicate whether one or more packets in a data flow include invalid checksum values. It has been found that certain peer-to-peer applications include invalid checksum values in the headers, such as TCP headers, or other higher layer headers, such as the application layer. Accordingly, the traffic classification engine 137 can be configured for selected packets in a data flow to verify the validity of the corresponding checksum value and use the determined validity or invalidity to match the data flow against an application behavior pattern. In addition, an application behavior pattern can be configured to specify which packets in a data flow (e.g., the first, fifth, etc.) should contain a valid or invalid checksum value.

FIGS. 5A thru 5D illustrate methods directed to the classification of data flows using heuristic application behavior pattern matching according to an embodiment of the present invention. One skilled in the art will recognize that the methods described below represent only one of a variety of possible embodiments. As the Figures illustrate, the application behavior pattern matching, according to one implementation, identifies a suspected application (i.e., traffic class) based on examination of the first packet and analyzes subsequent packets in the data flow, as welt as related data flows, to ultimately make a traffic classification determination. In other implementations, a pool of suspected applications can be identified from the first packet with examination of subsequent packets and the relationship between other suspected flows gradually narrowing the pool until a suspected application is confirmed or alt suspected applications are ruled out.

Specifically, as FIG. 5A illustrates, if the packet is the first packet received for a flow (302), traffic classification engine 86 processes the packet to identify a suspected application based on one or more attributes of the packet (306) (see also FIG. 5B, and discussion below). If from the first packet, a suspected application is not identified (308), the data flow is classified as unknown (318). In one implementation, traffic classification engine 86 writes the "default" traffic class identifier into the flow object. Otherwise, if a suspected application is identified, traffic classification engine 86 processes the flow for purposes of performing pattern matching on subsequent packets associated with the flow, as well as tracking the flow relative to other suspected application flows (310) (see FIG. 3C).

As FIG. 3C illustrates, if a suspected application is identified, traffic classification engine 86 records the arrival time of the first packet in association with an identifier for the suspected application and an identifier for the host associated with the flow (350). Other variables stored in association with the host address/suspected application pair include the last flow time and a related flow count. In one implementation, the pattern matching functionality described herein has a reserved memory space in a buffer structure for recording required data, such as flow state data, to track data flow behavior in suitable data structures, such as tables, hash tables and the like. In some instances, conventional traffic classification may often require observation of several packets in a

Cloudflare - Exhibit 1005, page 19

US 7,664,048 B1

13

flow to fully classify the data flow. According to certain implementations described herein, the pattern matching functionality would also be invoked at the beginning of such flows. Accordingly, in some implementations, the classification of a flow according to the first framework, above, triggers clean up of the data structures maintained by the pattern matching functionality described above. Other memory management techniques are also possible, such as over-writing the least-recently used memory space when available memory becomes depleted.

In one implementation, the IP address of the host is used to identify the host of interest. The host can either be the source or destination host depending on the suspected application type and the type of activity after which the pattern is modeled. For example, for an application behavior pattern modeling the startup phase of a peer-to-peer application residing on an "inside" host (see FIG. 2) where multiple discovery requests are transmitted, the source address is used. Of course, the destination address of flows responsive to the discovery requests can be used in other patterns. For other application types, both the source and destination address may be used. The suspected application identifier can be a unique number or arbitrary string that maps to a particular application name, or can simply be the application name itself.

In any event, traffic classification engine **86** then determines whether the host address/suspected application pair has been previously recorded in the buffer structure (**352**). If the host address/suspected application pair is new, traffic classification engine **86** sets a related flow count variable to zero and a last flow time to the arrival time of the first packet. Otherwise, if the host address/suspected application pair has been previously recorded, traffic classification engine **86** compares the difference between the last flow time (set as a result of the previous flow) and the arrival time of the 1st packet in the current flow (**354**). If the difference is beyond a threshold value, the related flow count is reset and the last flow time is set to the arrival time of the 1st packet in the current flow.

As FIG. **5A** illustrates, subsequent packets in a suspected application flow meet decisional step **304** according to which traffic classification engine **86** decides whether pattern matching for the flow should continue. In the implementation described in the Figures, traffic classification engine **86** bases this decision on whether the flow object corresponding to the flow includes a traffic class identifier, such as default. This indicates that a traffic class has been identified according to another process, or that the pattern matching functionality has identified a traffic class or determined that it cannot identify a traffic class (which causes it to write the "default" class identifier into the flow object). In either case further analysis of the data flow is useless and the previous traffic classification is returned (**305**). If pattern matching for a data flow continues, traffic classification engine **86** determines whether pattern matching for the flow has been exhausted, in one implementation, based on the packet count of the flow (**312**). For example, a pattern for a particular application may include packet size ranges and/or other attributes for the first n (e.g., 3 or 4) packets of a flow. If the first n packets of a flow match the criterion, no further analysis is necessary. If the packet count indicates that pattern matching has not been exhausted, traffic classification engine **86** determines whether the current packet matches the pattern associated with the suspected application (**314**) (see also FIG. **5D** and discussion below). If the subsequent packet does not match the behavior pattern associated with the suspected application (**316**), the data flow is classified as unknown (**318**) which, as discussed

14

above, terminates further pattern matching as to the current flow. Otherwise, processing of the data flow continues with receipt of the next packet in the flow.

If the current flow has exhausted the entire behavior pattern (**312**), traffic classification engine **86** then determines whether the related flow count exceeds a threshold value (**324**). As discussed above, an implementation of the present invention uses the related flow count to determine whether the transmitting host is behaving pursuant to a peer-to-peer application. As to suspected applications that do not behave in a similar manner, the threshold can be set to one. If the related flow count does not exceed the threshold value (e.g., the current flow may be the first suspected application data flow), traffic classification engine **86** classifies the data flow as unknown (or, in some implementations, as "default") (**320**) and increments the related flow count (**322**). If the related flow count exceeds the threshold, traffic classification engine **86** then classifies the data flow as the suspected application (**326**). As the foregoing illustrates, according to one pattern, traffic classification engine **86** must observe a minimum number or related application data flows that otherwise meet the suspected application pattern, before it classifies subsequent data flows as the suspected application. Accordingly, by adjusting the inter-flow timing and related flow threshold parameters (in conjunction with other pattern attributes or parameters), a variety of different application behavior patterns may be modeled.

FIG. **5B** illustrates a method applied to the first packet of a flow, according to an implementation of the present invention, to initially identify a suspected application. As FIG. **5B** illustrates, traffic classification engine **86**, in one implementation, processes the first packet in a flow against various criteria sets for each application until a suspected application has been identified. In such an implementation, the order in which the application patterns are traversed becomes important. Of course, in other embodiments, traffic classification engine **86** can process the first packet against all application patterns to identify a pool of suspected applications with the pool being narrowed or entirely eliminated with analysis of subsequent packets in the pool. However, in the method shown in FIG. **5B**, traffic classification engine **86**, starting with a first application pattern (**330**), determines whether a protocol explicitly identified in the first packet matches the application pattern (**332**). As discussed above, the protocol type may be a transport layer protocol identifier, such as TCP or UDP, or other explicitly identifiable protocols. Traffic classification engine **86** then determines whether the first packet matches the size or falls within an allowable size range for the first packet in the pattern (**334**). If there is a match, traffic classification engine **86** then computes an entropy value to determine the information density of the packet (**336**) and compares the computed entropy value to a threshold value or allowable entropy range (**338**). If the first packet matches all pattern attributes, the suspected application is returned (**340**) and recorded in association with one or more host addresses (see above). Otherwise, traffic classification engine **86** processes the packet against other applications until a suspected application is identified (**342**, **344**), or no suspected application is identified (**346**).

FIG. **5D** illustrates a method for analyzing subsequent packets in a given data flow against a suspected application pattern. As FIG. **5D** illustrates, the suspected application pattern includes a single criterion-packet size in the illustrated embodiment. However, other attributes, such as entropy, protocol types, etc. may be included in the analysis as well. In the illustrated implementation, traffic classification engine **86** determines whether the size of the current packet

Cloudflare - Exhibit 1005, page 20

US 7,664,048 B1

| 15 | 16 |

matches the packet size or size range in the suspected application behavior pattern (360). For example, if the current packet is the second received packet, traffic classification engine 86 compares the packet size entry for the second packet in the behavior pattern to the size of the current packet. In one implementation packet count can be maintained in the memory space dedicated to traffic classification engine 86, or can be resolved by simply checking the corresponding packet count attribute in the flow object. As FIG. 5D illustrates, one implementation of the invention compensates for receiving packets out of order. For example, if the current packet size does not match the corresponding entry, traffic classification engine 86 compares the current packet to the requirements of the next entry, if any, in the suspected application pattern (362). In another implementation, traffic classification engine 86 can compare the attributes of the current packet to the adjacent entries in the pattern (i.e., the previous and subsequent entries). As FIG. 5D illustrates, if the current packet satisfies either pattern entry (360, 362), a match is returned (364); otherwise, traffic classification engine 86 returns a "no match" value (366), which, in one implementation, ends further pattern matching for the flow (see above).

As one skilled in the art will recognize, the implementation described above uses a variety of threshold values, such as inter-flow timing, related flow counts, and the like to classify flows. The actual threshold values used, such as minimum related flow count, essentially affects the sensitivity of the traffic classification mechanism. For example, increasing the minimum related flow count requires a larger number of suspected application flows. Increasing the inter-flow timing threshold will increase the sensitivity of the pattern matching implementation described above. In one implementation, these threshold values may be configurable parameters, which a network administrator can adjust based on the behavior of the pattern matching classification mechanisms described herein. For example, if the network administrator feels that the thresholds relating to the pattern matching mechanism are generating false positives or false negatives, he or she can adjust one or more thresholds to alter the behavior of the pattern matching mechanism.

B. Integration of Behavior Pattern Matching into Bandwidth Management Devices

As discussed above, the enhanced traffic classification functionality described above, in one embodiment, can be integrated into a bandwidth management device 130 operative to manage data flows traversing access link 21. The above-identified, commonly-owned patents and patent applications disclose the general functionality and operation of bandwidth management devices. FIG. 2 sets forth a packet-based computer network environment including a bandwidth management device 130. As FIG. 2 shows, local area computer network 40 interconnects several TCP/IP end systems, including client devices 42 and server device 44, and provides access to resources operably connected to computer network 50 via router 22 and access link 21. Access link 21 is a physical and/or logical connection between two networks, such as computer network 50 and local area network 40. Server 28 is a TCP end system connected to computer network 50 through router 26 and access link 25. Client devices 24 are additional TCP end systems operably connected to computer network 50 by any suitable means, such as through an Internet Services Provider (ISP). The computer network environment, including computer network 50 is a packet-based communications environment, employing TCP/IP protocols, and/or other suitable protocols, and has a plurality of interconnected digital packet transmission stations or routing

nodes. Bandwidth management device 130 is provided between router 22 and local area computer network 40. Bandwidth management device 130 is operative to classify data flows and, depending on the classification, enforce respective bandwidth utilization controls on the data flows to control bandwidth utilization across and optimize network application performance across access link 21.

FIG. 3 is a block diagram illustrating functionality, according to one embodiment of the present invention, included in bandwidth management device 130. In one embodiment, bandwidth management device 130 comprises packet processor 131, flow control module 132, measurement engine 140, traffic classification engine 137, management information base (MIB) 138, traffic discovery module 139, and administrator interface 150. Packet processor 131 is operative to detect new data flows and construct data structures including attributes characterizing the data flow. Flow control module 132 is operative to enforce bandwidth utilization controls on data flows traversing bandwidth management device 130. Traffic classification engine 137 is operative to analyze data flow attributes and identify traffic classes corresponding to the data flows, as discussed more fully below. In one embodiment, traffic classification engine 137, in one implementation, stores traffic classes associated with data flows encountered during operation of bandwidth management device 130, as well as manually created traffic classes and a hierarchical traffic class structure, if any, configured by a network administrator. In one embodiment, traffic classification engine 137 stores traffic classes, in association with pointers to bandwidth utilization controls or pointers to data structures defining such bandwidth utilization controls. Management information base 138 is a database of standard and extended network objects related to the operation of bandwidth management device 130. Traffic discovery module 139 is operative to automatically discover traffic classes based on examination of one or more attributes of the data flows traversing bandwidth management device 130. Measurement engine 140 maintains measurement data relating to operation of bandwidth management device 130 to allow for monitoring of bandwidth utilization across access link 21 with respect to a plurality of bandwidth utilization and other network statistics on an aggregate and/or per-traffic-class level. Bandwidth management device 130, in one embodiment, further includes a persistent data store (not shown), such as a hard disk drive, for non-volatile storage of data.

Administrator interface 150 facilitates the configuration of bandwidth management device 130 to adjust or change operational and configuration parameters associated with the device. For example, administrator interface 150 allows administrators to select identified traffic classes and associate them with bandwidth utilization controls (e.g., a partition, a policy, etc.). Administrator interface 150 also displays various views associated with a hierarchical traffic classification scheme and allows administrators to configure or revise the hierarchical traffic classification scheme. Administrator interface 150 also allows a network administrator to view and configure one or more parameters associated with the behavior pattern matching functionality described herein. Administrator interface 150 can be a command line interface or a graphical user interface accessible, for example, through a conventional browser on client device 42.

B.1. Packet Processing

In one embodiment, when packet processor 131 encounters a new data flow it stores the source and destination IP addresses contained in the packet headers in host database 134. Packet processor 131 further constructs a control block (flow) object including attributes characterizing a specific

Cloudflare - Exhibit 1005, page 21

Appx1229

**17**

flow between two end systems. In one embodiment, packet processor **131** writes data flow attributes having variably-sized strings (e.g., URLs, host names, etc.) to a dynamic memory pool. The flow specification object attributes contain attribute identifiers having fixed sizes (e.g., IP addresses, port numbers, service IDs, protocol IDs, etc.), as well as the pointers to the corresponding attributes stored in the dynamic memory pool. Other flow attributes may include application specific attributes gleaned from layers above the TCP layer, such as codec identifiers for Voice over IP calls, Citrix database identifiers, and the like. Packet processor **131**, in one embodiment, reserves memory space in the dynamic memory pool for storing such variably-sized attribute information as flows traverse bandwidth management device **130**. Packet processor **131** also stores received packets in a buffer structure for processing. In one embodiment, the packets are stored in the buffer structure with a wrapper including various information fields, such as the time the packet was received, the packet flow direction (inbound or outbound), and a pointer to the control block object corresponding to the flow of which the packet is a part.

In one embodiment, a control block object contains a flow specification object including such attributes as pointers to the "inside" and "outside" IP addresses in host database **134**, as well as other flow specification parameters, such as inside and outside port numbers, service type (see below), protocol type and other parameters characterizing the data flow. In one embodiment, such parameters can include information gleaned from examination of data within layers 2 through 7 of the OSI reference model. U.S. Pat. No. 6,046,980 and U.S. Pat. No. 6,591,299, as well as others incorporated by reference herein, disclose classification of data flows for use in a packet-based communications environment. FIG. **2** illustrates the concept associated with inside and outside addresses. As discussed above, in one embodiment, a flow specification object includes an "inside" and "outside" address relative to bandwidth management device **130**. See FIG. **2**. For a TCP/IP packet, packet processor **131** can compute the inside and outside addresses based on the source and destination addresses of the packet and the direction of the packet flow.

In one embodiment, packet processor **131** creates and stores control block objects corresponding to data flows in flow database **135**. In one embodiment, control block object attributes include a pointer to a corresponding flow specification object, as well as other flow state parameters, such as TCP connection status, timing of last packets in the inbound and outbound directions, speed information, apparent round trip time, etc. Control block object attributes further include at least one traffic class identifier (or pointer(s) thereto) associated with the data flow, as well as policy parameters (or pointers thereto) corresponding to the identified traffic class. In one embodiment, control block objects further include a list of traffic classes for which measurement data (maintained by measurement engine **140**) associated with the data flow should be logged. In one embodiment, to facilitate association of an existing control block object to subsequent packets associated with a data flow or connection, flow database **135** further maintains a control block hash table including a key comprising a hashed value computed from a string comprising the inside IP address, outside IP address, inside port number, outside port number, and protocol type (e.g., TCP, UDP, etc.) associated with a pointer to the corresponding control block object. According to this embodiment, to identify whether a control block object exists for a given data flow, packet processor **131** hashes the values identified above and scans the hash table for a matching entry. If one exists, packet

**18**

processor **131** associates the pointer to the corresponding control block object with the data flow. As discussed above, in one embodiment, the control block object attributes further include a packet count corresponding to the number of packets associated with the flow to allow for such operations as the application of policies based on packet counts.

To allow for identification of service types (e.g., FTP, HTTP, etc.), packet processor **131**, in one embodiment, is supported by one to a plurality of service identification tables in a relational database that allow for identification of a particular service type (e.g., application, protocol, etc.) based on the attributes of a particular data flow. In one embodiment, a services table including the following fields: 1) service ID, 2) service aggregate (if any), 3) name of service, 4) service attributes (e.g., port number, outside IP address, etc.), and 5) default bandwidth management policy. A service aggregate encompasses a combination of individual services (each including different matching criteria, such as different port numbers, etc.) corresponding to the service aggregate. When bandwidth management device **130** encounters a new flow, packet processor **131** analyzes the data flow against the service attributes in the services table to identify a service ID corresponding to the flow. In one embodiment, packet processor **131** may identify more than one service ID associated with the flow. In this instance, packet processor **131** associates the more/most specific service ID to the flow. For example, network traffic associated with a peer-to-peer file sharing service may be identified as TCP or HTTP traffic, as well as higher level traffic types such as the actual file sharing application itself (e.g., Napster, Morpheus, etc.). In this instance, packet processor associates the flow with the most specific service ID. A traffic class may be configured to include matching rules based on the service IDs in the services table. For example, a matching rule directed to HTTP traffic may simply refer to the corresponding service ID, as opposed to the individual attributes that packet processor **131** uses to initially identify the service.

In one embodiment, when packet processor **131** inspects a flow it may detect information relating to a second, subsequent flow (e.g., an initial FTP command connection being the harbinger of a subsequent data connection, etc.). Packet processor **131**, in response to such flows populates a remembrance table with attributes gleaned from the first flow, such as IP addresses of the connection end points, port numbers, and the like. Packet processor **131** scans attributes of subsequent flows against the remembrance table to potentially associate the subsequent flow with the first flow and to assist in identification of the second flow.

B.2. Flow Control Module

As discussed above, flow control module **132** enforces bandwidth utilization controls (and, in some embodiments, other policies) on data flows traversing access link **21**. A bandwidth utilization control for a particular data flow can comprise an aggregate control bandwidth utilization control, a per-flow bandwidth utilization control, or a combination of the two. Flow control module **132** can use any suitable functionality to enforce bandwidth utilization controls known in the art, including, but not limited to weighted fair queuing, class-based weighted fair queuing, Committed Access Rate (CAR) and "leaky bucket" techniques. Flow control module **132** may incorporate any or a subset of the TCP rate control functionality described in the cross-referenced U.S. patents and/or patent applications set forth above for controlling the rate of data flows. Bandwidth management device **130**, however, can also be configured to implement a variety of different policy types, such as security policies, admission control policies, marking (diffserv, VLAN, etc.) policies, redirection

Cloudflare - Exhibit 1005, page 22

US 7,664,048 B1

**19**

policies, caching policies, transcoding policies, and network address translation (NAT) policies. Of course, one of ordinary skill in the art will recognize that other policy types can be incorporated into embodiments of the present invention.

B.2.a. Aggregate Bandwidth Utilization Control

An aggregate bandwidth utilization control operates to manage bandwidth for aggregate data flows associated with a traffic class. An aggregate bandwidth utilization control can be configured to essentially partition the available bandwidth corresponding to a given access link. For example, a partition can be configured to protect a network traffic class by guaranteeing a defined amount of bandwidth and/or Limit a network traffic class by placing a cap on the amount of bandwidth a traffic class can consume. Such partitions can be fixed or "burstable." A fixed partition allows a traffic class to use in the aggregate a defined amount of bandwidth. A fixed partition not only ensures that a specific amount of bandwidth will be available, but it also limits data flows associated with that traffic class to that same level. A burstable partition allows an aggregate traffic class to use a defined amount of bandwidth, and also allows that traffic class to access additional unused bandwidth, if needed. A cap may be placed on a burstable partition, allowing the traffic class to access up to a maximum amount of bandwidth, or the burstable partition may be allowed to potentially consume all available bandwidth across the access link. Partitions can be arranged in a hierarchy—that is, partitions can contain partitions. For example, the bandwidth, or a portion of the bandwidth, available under a parent partition can be allocated among multiple child partitions. In one embodiment, at the highest level, a partition exists for all available outbound bandwidth, while another partition exists for all available inbound bandwidth across the particular access link. These partitions are then sub-dividable to form a hierarchical tree. For example, an enterprise employing static partitions may define a static partition for a PeopleSoft software application traffic class, and sub-divide this parent partition into a large burstable child partition for its human resources department and a smaller burstable child partition for the accounting department. U.S. patent application Ser. No. 10/108,085 includes a discussion of methods for implementing partitions, as well as a novel solution for implementing partitions arranged in a hierarchical allocation scheme.

In one embodiment, a partition is created by selecting a traffic class and configuring a partition for it. As discussed above, configurable partition parameters include 1) minimum partition size (in bits per second); 2) whether it is burstable (that is, when this option is selected, it allows the partition to use available excess bandwidth; when the option is not selected the partition has a fixed size); and 3) maximum bandwidth to be used when the partition bursts.

B.2.b. Per-Flow Bandwidth Utilization Controls

Flow control module 132 is also operative to enforce per-flow bandwidth utilization controls on traffic across access link 21. Whereas aggregate bandwidth utilization controls (e.g., partitions, above) allow for control of aggregate data flows associated with a traffic class, per-flow bandwidth utilization controls allow for control of individual data flows. In one embodiment, flow control module 132 supports different bandwidth utilization control types, including, but not limited to, priority policies, rate policies, and discard policies. A priority policy determines how individual data flows associated with a traffic class are treated relative to data flows associated with other traffic classes. A rate policy controls the rate of data flows, for example, to smooth bursty traffic, such as HTTP traffic, in order to prevent a TCP end system from sending data packets at rates higher than access link 21

**20**

allows, thereby reducing queuing in router buffers and improving overall efficiency. U.S. patent application Ser. No. 08/742,994 now U.S. Pat. No. 6,038,216, incorporated by reference above, discloses methods and systems allowing for explicit data rate control in a packet-based network environment to improve the efficiency of data transfers. Similarly, U.S. Pat. No. 6,018,516, incorporated by reference above, methods and systems directed to minimizing unneeded retransmission of packets in a packet-based network environment. A rate policy can be configured to establish a minimum rate for each flow, allow for prioritized access to excess available bandwidth, and/or set limits on total bandwidth that the flow can consume. A discard policy causes flow control module 132 to discard or drop packets or flows associated with a particular traffic class. Other policy types include redirection policies where an inbound request designating a particular resource, for example, is redirected to another server.

B.3. Traffic Classification

A traffic class comprises a set of matching rules or attributes allowing for logical grouping of data flows that share the same characteristic or set of characteristics—e.g., a service ID or type (see Section B.1., above), a specific application, protocol, IP address, MAC address, port, subnet, etc. In one embodiment, each traffic class has at least one attribute defining the criterion(ia) used for identifying a specific traffic class. For example, a traffic class can be defined by configuring an attribute defining a particular IP address or subnet. Of course, a particular traffic class can be defined in relation to a plurality of related and/or orthogonal data flow attributes. U.S. Pat. Nos. 6,412,000 and 6,591,299, and U.S. patent application Ser. No. 10/039,992 describe some of the data flow attributes that may be used to define a traffic class, as well as the use of hierarchical classification structures to associate traffic classes to data flows. In one embodiment, bandwidth management device 130 includes functionality allowing for classification of network traffic based on information from layers 2 to 7 of the OSI reference model.

In one implementation, bandwidth management device 130 allows a network administrator to select from a set of pre-configured traffic classes corresponding to known network applications and add them to the configuration of traffic classification engine 137. Bandwidth management device 130, in one embodiment, allows an administrator to manually create a traffic class by specifying a set of matching attributes. Administrator interface 150, in one embodiment, allows for selection of a traffic class and the configuration of bandwidth utilization (e.g., partition, policy, etc.) and/or other controls/policies (e.g., redirection, security, access control, etc.) for the selected traffic class. Administrator interface 150, in one embodiment, also allows for the selection and arrangement of traffic classes into hierarchical reference trees. In one embodiment, traffic classification engine 137 also stores traffic classes added by traffic discovery module 139.

Traffic classification engine 137 stores traffic classes associated with data flows that traverse access link 21. Traffic classification engine 137, in one embodiment, stores the traffic classes and corresponding data (e.g., matching rules, policies, partition pointers, etc.) related to each traffic class in a hierarchical tree. This tree is organized to show parent-child relationships—that is, a particular traffic class may have one or more subordinate child traffic classes with more specific characteristics (matching rules) than the parent class. For example, at one level a traffic class may be configured to define a particular user group or subnet, while additional child traffic classes can be configured to identify specific application traffic associated with the user group or subnet.

Cloudflare - Exhibit 1005, page 23

US 7,664,048 B1

21                                                            22

In one embodiment, the root traffic classifications are "/In-bound" and "/Outbound" data flows. Any data flow not explicitly classified is classified as "/Inbound/Default" or "/Outbound/Default". In one embodiment, administrator interface **150** displays the traffic class tree and allows for selection of a traffic class and the configuration of bandwidth utilization controls for that traffic class, such as a partition, a policy, or a combination thereof. Administrator interface **150** also allows for the arrangement of traffic classes into a hier-archical classification tree. Bandwidth management device **130** further allows an administrator to manually create a traffic class by specifying a set of matching rules and, as discussed below, also automatically creates traffic classes by monitoring network traffic across access link **21** and classi-fying data flows according to a set of criteria to create match-ing rules for each traffic type. In one embodiment, each traffic class node includes a traffic class identifier; at Least one traffic class (matching) attribute; at least one policy parameter (e.g., a bandwidth utilization control parameter, a security policy parameter, etc.), a pointer field reserved for pointers to one to a plurality of child traffic classes. In one embodiment, traffic classification engine **137** implements a reference tree classification model wherein separate traffic classification trees can be embedded in traffic class nodes of a given traffic classification tree. U.S. application Ser. No. 10/236,149, incorporated by reference herein, discloses the use and imple-mentation of embeddable reference trees.

B.3.a. Automatic Traffic Classification

As discussed above, traffic discovery module **139**, in one implementation, analyzes data flows for which no matching traffic class was found in traffic classification engine **137**. Traffic discovery module **139**, in one embodiment, is opera-tive to apply predefined sets of matching rules to identify a traffic class corresponding to non-matching data flows. In one implementation, traffic discovery module **139** operates on data flows classified as either /Inbound/Default or Outbound/Default. In one embodiment, traffic discovery module **139** is configured to include a predefined set of traffic classes based upon a knowledge base gleaned from observation of common or known traffic types on current networks. In one embodi-ment, traffic discovery module **139** creates traffic classes automatically in response to data flows traversing bandwidth management device **130** and stores such traffic classes in traffic classification engine **137**. Automatic traffic classifica-tion is disclosed in U.S. Pat. Nos. 6,412,000, 6,457,051, and 6,591,299, which are incorporated herein by reference.

As discussed above, traffic discovery module **139** applies one or more traffic discovery thresholds when deciding whether to present or add newly discovered traffic classes. In one embodiment, traffic discovery module **139** must detect a minimum number of data flows within a predefined period for a given traffic type before it creates a traffic class in traffic classification engine **137**. In one embodiment, such discov-ered traffic classes are, by default, attached to or associated with either the "/inbound/autodiscovered/" or "/outbound/autodiscovered" bandwidth control category, as appropriate. As discussed below, administrator interface **150** allows for configuration of bandwidth controls for auto-discovered traf-fic classes. In one embodiment, auto-discovered traffic classes are automatically assigned predefined bandwidth uti-lization controls. U.S. patent application Ser. No. 09/198,051, incorporated by reference herein, discloses automatic assign-ment of bandwidth utilization controls for discovered traffic classes. Furthermore, as discussed above, traffic discovery module **139** is operative to dynamically adjust one or more traffic discovery thresholds depending on at least one observed parameter or attribute, such as the rate of discover-ing new traffic classes relative to the number of data flows.

In one implementation, traffic discovery module **139** auto-matically adds newly discovered traffic classes to traffic clas-sification engine **137**, which are presented to the network administrator with manually configured and/or previously discovered traffic classes. In an alternative embodiment, traf-fic discovery module **139** may save the newly discovered traffic classes in a separate data structure and display them separately to a network administrator. The list may be sorted by any well-known criteria such as: 1) most "hits" during a recent interval, 2) most recently-seen (most recent time first), 3) most data transferred (bytes/second) during some interval, or a moving average. The user may choose an interval length or display cutoff point (how many items, how recent, at Least B bytes per second, or other thresholds). The Network man-ager may then take some action (e.g. pushing a button) to select the traffic types she wishes to add to the classification tree.

B.3.b. Application Behavior Pattern Matching

The application behavior pattern matching functionality described above can be integrated into bandwidth manage-ment device **130** in a variety of ways. For example, in one implementation, the application behavior pattern matching functionality can be implemented as an extension (e.g., pro-vided by a plug-in, etc.) to traffic classification engine **137** in one to a plurality of subroutines. In another implementation, the application behavior pattern matching functionality of the present invention may also be implemented as a separate software module.

Furthermore, as discussed above, the application behavior pattern matching functionality essentially classifies other-wise unknown traffic into one to a plurality of applications or traffic classes. In one implementation, a network administra-tor may explicitly add one or more of these traffic classes to the configuration of traffic classification engine **137**, or simi-lar to automatic traffic discovery, allow such traffic classes to be added to the configuration of traffic classification engine **137** when data flows associated with a given traffic class is encountered. In one implementation, traffic classes which use pattern matching are added at the end of the traffic classifica-tion configuration such that they are applied if no other traffic class is found to match the data flows. In addition, the pattern matching functionality can operate similarly to the traffic discovery module **139** by adding traffic classes to the con-figuration of traffic classification engine **137** upon detection of a sufficient number of data flows from a given host, and/or a threshold number of hosts. In another implementation, the pattern matching classification functionality is applied only if traffic discovery module **139** also fails to identify a traffic class. In another implementation, the enhanced behavior pat-tern matching functionality described herein can be applied only to data flows associated with suspicious activities, as disclosed in U.S. application Ser. No. 10/295,391. As the foregoing illustrates, one skilled in the art will recognize that a variety of configurations are possible with the various con-figurations presenting tradeoffs between each other.

FIG. **8** illustrates how, according to one implementation of the present invention, the pattern matching classification functionality can be applied relative to other traffic classifi-cation processes, such as traffic classification involving appli-cation of basic matching rules to packet attributes, and auto-matic traffic discovery. In one implementation, a packet is passed to traffic classification engine **137** (**402**), which attempts to classify the data flow based on inspection of one or more packet attributes (**404**). If a traffic class is explicitly identified, classification of the data flow ends. Otherwise, the

Cloudflare - Exhibit 1005, page 24

US 7,664,048 B1

23

packet is flagged (**406**), or otherwise passed, to traffic discovery module **139**, which attempts to identify a traffic class, as discussed above. If a traffic class is identified by traffic discovery module **139**, classification of the data flow ends. However, if traffic discovery module **139** is not capable of classifying the data flow, the packet is passed to the application behavior pattern matching functionality described herein (**410**). In one implementation, if a traffic class is discovered using application behavior pattern matching, it can be added to the traffic classification configuration as other newly discovered traffic classes similar to the processes described above relating to automatic traffic discovery. As discussed above, this process flow is one of a variety of possible process flows.

B.4. Enforcement of Bandwidth Utilization Controls

FIG. **7** illustrates a method, according to one embodiment of the present invention, directed to the enforcement of bandwidth utilization controls on data flows transmitted across access Link **21** and, therefore, traversing bandwidth management device **130**. The method for enforcing bandwidth utilization controls, however, is not critical to the present invention; any suitable method can be employed.

In one embodiment, packet processor **131** receives a data packet (FIG. **7**, **202**) and determines whether flow database **135** contains an existing control block object corresponding to the data flow (**204**) (see Section B.1., supra). If no control block object corresponds to the data packet, packet processor **131** constructs a control block object including attributes characterizing the data flow, such as source address, destination address, service type, etc. (**212**) (see above). In one embodiment, packet processor **131** analyzes the source and destination IP addresses in the packet header and scans host database **134** for matching entries. If no matching entries exist, packet processor **131** creates new entries for the source and destination IP addresses. As discussed above, in one embodiment, a control block object contains a flow specification object including such attributes as pointers to the "inside" and "outside" IP addresses in host database **134**, as well as other flow specification parameters, such as inside and outside port numbers, service type, protocol type, pointers to variable-length information in the dynamic memory pool, and other parameters characterizing the data flow.

If a control block object is found, as FIG. **7** illustrates, packet processor **131** then determines whether the received packet is part of a new data flow (**208**) or represents a change to an existing data flow (see **218** and **220**). Methods for determining new data flows and assigning packets to existing data flows are well known in the art and also depend on the particular transport layer protocol employed. For a TCP packet, packet processor **131** can determine a new data flow by detecting SYN and/or SYN/ACK packets. However, a new data flow can simply be a data flow for which there is no corresponding control block object in flow database **135**. In addition, with UDP and GRE flows (where there is no explicit connection mechanism, such as SYN packets), a new flow is recognized by associating the source and destination addresses and port numbers to the flow and the flow type (e.g., UDP, GRE, etc.). Accordingly, when a UDP packet identifies a new address/port pair, the attributes discussed above are stored in a data structure along with the time of last packet. A new UDP flow between the same address/port pairs can be determined by comparing the last packet time to a threshold value (e.g., 2 minutes). If the difference between the time of the latest packet and the time of the last packet is greater than the threshold, the new packet is deemed part of a new flow. In one embodiment, if the last packet time does exceed a threshold, this signals to the packet processor **131** that the previous

24

flow has terminated, causing the packet processor **131** to notify FDR emitter **139**. In another embodiment, a separate process monitors the last packet times associated with UDP, GRE and similar flow types to detect termination of a given flow. In some embodiments, packet processor **131** may have to encounter multiple packets to identify and fully characterize a new data flow (e.g., identify a service type, traffic class, etc.). For example, U.S. Pat. No. 6,046,980 and U.S. Pat. No. 6,591,299, identified above, discloses methods for classifying packet network flows.

If the data packet does not signify a new data flow, packet processor **131** retrieves the control block object, and associates the packet with the control block object (**218**). If elements of the data packet represent a change to the traffic type associated with the data flow (**220**), packet processor **131** passes the flow specification object to traffic classification engine **137** to identify a traffic class corresponding to the flow (**214**). Methods for determining changes to data flows are also well known in the art. For example, an email may include an attached digital image file. Accordingly, while the initial packets in the data flow may include simple text data, subsequent packets may contain image data. Packet processor **131**, in one embodiment, is operative to detect such changes in the characteristics of the data flow by examining data encapsulated in upper layers of each packet, such as the detection of MIME types, etc.

As discussed above, to identify a traffic class associated with the data flow, packet processor **131** passes the control block object (or a pointer to the control block object) to traffic classification engine **137**. In one embodiment, the control block object or a copy of it is stored in association with the packet and in the same buffer structure to facilitate access to the control block object by traffic classification engine **137**. As discussed in more detail below, traffic classification engine **137** operates on attributes of the control block object and/or flow specification object, (and potentially on the packet stored in the buffer structure) to identify traffic class (es) associated with the data flow (**214**). In one embodiment, the control block object in flow database **135** includes a pointer to the identified traffic class(es) in the traffic classification engine **137**. In one embodiment, the traffic classification engine **137** stores in the control block object the policy parameters (e.g., bandwidth utilization control parameters, security policies, etc.) associated with the identified traffic classes (**216**). As discussed above, if the data flow does not match an existing traffic class (**219**), packet processor **82** or traffic classification engine **137** flags the packet for traffic discovery module **139** (**220**). In one embodiment, a data flow that does not match an existing traffic class is classified in the default traffic class. Traffic discovery module **139** operates on attributes of the data flow to classify it as discussed above. If the identified traffic class exceeds a discovery threshold, traffic discovery module **139**, in one implementation, adds the discovered traffic class to traffic classification engine **137**. In one implementation, traffic discovery module **139** also writes default bandwidth utilization controls and/or other policies (such as security or redirection policies) into traffic classification engine **137**. In another embodiment, newly discovered traffic classes can be added to a separate list, or other data structure, from which a network administrator may elect to add to the traffic classification configuration maintained by traffic classification engine **137**.

Packet processor **131** then passes the packet to rate control module **132** (**222**) which accesses the control block object corresponding to the data flow to retrieve the bandwidth utilization or other controls (e.g., partition, policy, security controls, etc.) associated with the traffic class and enforces the

Cloudflare - Exhibit 1005, page 25

Appx1233

US 7,664,048 B1

25

bandwidth utilization controls on the data packet flow. As discussed above, the particular packet flow control mechanism employed is not critical to the present invention. A variety of flow control technologies can be used, such as the flow control technologies disclosed in co-pending and commonly owned application Ser. No. 10/108,085, incorporated herein by reference above, as well as other rate control technologies. As FIG. 7 illustrates, packet processor 131 also records or updates various measurement values in the control block object that characterize the flow (e.g., last packet time, packet count, byte count, etc.) (224). In addition, measurement engine 140, in one embodiment, records data associated with the packet to allow for analysis of bandwidth utilization and other network statistics on a traffic class, access link, and/or partition level.

Lastly, although the present invention has been described as operating in connection with end systems and networks primarily employing the HTTP, TCP and IP protocols, the present invention has application in computer network environments employing any suitable session layer, transport layer and network layer protocols. Moreover, one skilled in the art will recognize that the present invention can be used in connection with application behavior patterns incorporating a variety of behavior attribute combinations described above. Accordingly, the present invention has been described with reference to specific embodiments. Other embodiments of the present invention will be apparent to one of ordinary skill in the art. It is, therefore, intended that the claims set forth below not be limited to the embodiments described above.

What is claimed is:

1. A method facilitating classification of data flows, comprising monitoring, by a network device, a data flow associated with a host relative to at least one behavioral attribute;

comparing the at least one behavioral attribute observed in the monitoring step to a knowledge base of at least one known application behavior pattern, wherein the at least one known application behavior pattern corresponds to a network application classification and comprises one or more behavioral attribute parameter values indicating a pattern of expected packet sizes for one or more packets of a data flow corresponding to the network application classification; and

classifying the data flow into the network application classification by matching packet sizes of packets of the data flow to the pattern of expected packet sizes.

2. The method of claim 1 wherein the pattern of expected packet sizes includes a packet size of the first packet in the data flow corresponding to the network application classification.

3. The method of claim 1 wherein the pattern of expected packet sizes includes a packet size of the second packet in the data flow corresponding to the network application classification.

4. The method of claim 1 wherein the pattern of expected packet sizes includes packet sizes for a plurality of packets in the data flow corresponding to the network application classification.

5. A method facilitating classification of data flows, comprising monitoring, by a network device, a data flow associated with a host relative to at least one behavioral attribute;

comparing the at least one behavioral attribute observed in the monitoring step to a knowledge base of at least one known application behavior pattern, wherein the at least one known application behavior pattern corresponds to a network application classification and comprises one or more behavioral attribute parameter values indicating a pattern of expected information density associated with

26

at least one packet in the data flow corresponding to the network application classification, wherein the information density corresponds to a level of randomness of data of the at least one packet; and

classifying the data flow into the network application classification by matching information density of packets of the data flow to the pattern of expected information density.

6. The method of claim 5 wherein the pattern of expected information density comprises the information density associated with the first packet in the data flow.

7. The method of claim 1 wherein at least one behavioral attribute parameter value of the one or more behavioral attribute parameter values indicates the timing of the data flow relative to at least one similar data flow associated with the host.

8. The method of claim 1 wherein at least one behavioral attribute parameter value of the one or more behavioral attribute parameter values indicates the number of related data flows associated with the host.

9. The method of claim 1 wherein at least one behavioral attribute parameter value of the one or more behavioral attribute parameter values indicates the timing between at least two packets in the data flow.

10. The method of claim 1 wherein at least one behavioral attribute parameter values of the one or more behavioral attribute parameter values indicates a sequence of protocol flags contained in packets of the data flow.

11. The method of claim 1 wherein at least one behavioral attribute parameter values of the one or more behavioral attribute parameter values indicates a timing of protocol flags contained in packets of the data flow.

12. The method of claim 1 wherein at least one behavioral attribute parameter values of the one or more behavioral attribute parameter values indicates a timing and sequence protocol flags contained in packets of the data flow.

13. The method of claim 1 wherein the application behavior pattern comprises at least one instance of any one of the following: a packet size pattern, a threshold information density value, a threshold inter-flow timing value, or a threshold number of related application data flows.

14. The method of claim 1 wherein the application behavior pattern characterizes the first group of packets of a data flow associated with a traffic class.

15. The method of claim 13 wherein the application behavior pattern characterizes the first group of packets of a data flow associated with a traffic class, and wherein the first group of packets are characterized in relation to at least one instance of any one of the following: a packet size pattern, a threshold information density value, a threshold inter-flow timing value, or a threshold number of related application data flows.

16. A method facilitating classification of data flows, comprising

modeling behavior of a network application to generate an application behavior pattern corresponding to the network application; and

configuring a network traffic monitoring device to monitor data flows relative to at least one behavioral attribute and classify the data flows into a traffic class of a plurality of traffic classes by comparing one or more of the data flows against the application behavior pattern; wherein the application behavior pattern comprises at least one instance of any one of the following: a pattern of expected packet sizes for one or more packets of a data flow corresponding to the network application, a pattern of expected threshold information density values for one or more packets of a data flow corresponding to the

Cloudflare - Exhibit 1005, page 26

US 7,664,048 B1

27

network application, a threshold inter-flow timing value between data flows corresponding to a host, or a threshold number of related application data flows corresponding to a host.

**17**. The method of claim **16** wherein the application behavior pattern further comprises at least one instance of any one of the following: an inter-packet timing value between a plurality of a data flow corresponding to the network application, a sequence of protocol flags in a plurality of packets of a data flow corresponding to the network application, an inter-packet protocol flag timing value corresponding to a plurality of packets of a data flow corresponding to the network application.

**18**. The method of claim **17** wherein the protocol flags are Transport Control Protocol (TCP) protocol flags.

**19**. A method facilitating classification of data flows, comprising

monitoring, by a network device, the data flows associated with a host relative to at least one application behavior model corresponding to a traffic class;

matching, by the network device, at least one of the data flows associated with the host to a traffic class, if a threshold number of the data flows match a corresponding application behavior model; wherein the application behavior model comprises at least one instance of any one of the following: a pattern of expected packet sizes for one or more packets of a data flow corresponding to the network application, a pattern of expected threshold information density values for one or more packets of a data flow corresponding to the network application, a threshold inter-flow timing value between data flows corresponding to a host, a threshold number of related application data flows corresponding to a host, an inter-packet timing value between a plurality of packets of a data flow corresponding to the network application, a sequence of protocol flags in a plurality of packets of a data flow corresponding to the network application, an inter-packet protocol flag timing value corresponding to a plurality of packets of a data flow corresponding to the network application.

**20**. An apparatus comprising

a packet processor operative to

detect data flows in network traffic traversing a communications path, the data flows each comprising at least one packet;

parse at least one packet associated with a data flow into a flow specification, a traffic classification engine operative to

match the data flow to a plurality of traffic classes, wherein at least one of the plurality of traffic classes is defined by one or more matching attributes, wherein said matching attributes are explicitly presented in the packets associated with the data flows, and wherein at least one other of the traffic classes is defined by one or more application behavior patterns, wherein the application behavior patterns each comprise at least one instance of any one of the following: a pattern of expected packet sizes for one or more packets of a data flow corresponding to a traffic class, a pattern of expected threshold information density values for one or more packets of a data flow corresponding to a traffic class, a threshold inter-flow timing value between data flows corresponding to a host, a threshold number of related application data flows corresponding to a host, an inter-packet timing value between a plurality of packets of a data flow, a sequence of protocol flags in a plurality of packets of

28

a data flow, or an inter-packet protocol flag timing value between a plurality of packets of a data flow;

having found a matching traffic class in the matching step, associate the flow specification corresponding to the data flow with a traffic class from the plurality of traffic classes.

**21**. The apparatus of claim **20** wherein said flow specification contains at least one instance of any one of the following: a protocol family designation, a direction of packet flow designation, a protocol type designation, a pair of hosts, a pair of ports, a pointer to a multipurpose internet mail extensions (MIME) type, and a pointer to an application-specific attribute.

**22**. The apparatus of claim **20** wherein the flow specification contains, and wherein the one or more matching attributes include, at least one instance of any one of the following: a protocol family designation, a direction of packet flow designation, a protocol type designation, a pair of hosts, a pair of ports, a pointer to a multipurpose internet mail extensions (MIME) type, and a pointer to an application-specific attribute.

**23**. The apparatus of claim **20** further comprising

a flow control module operative to apply bandwidth utilization controls to the data flows based on the traffic class associated with the data flows.

**24**. A method facilitating classification of data flows, comprising

detecting, by a network device, a data flow in network traffic traversing a communications path, the data flow each comprising at least one packet;

parsing, by the network device, explicit attributes of at least one packet associated with the data flow into a flow specification,

matching, by the network device, the flow specification to a first plurality of traffic classes, wherein the first plurality of traffic classes are each defined by one or more matching attributes,

having found a matching traffic class in the matching step, associating, by the network device, the flow specification corresponding to the data flow with a traffic class from the first plurality of traffic classes,

not having found a matching traffic class in the first plurality of traffic classes, matching, by the network device, the data flow to at least one additional traffic class, the additional traffic class defined by an application behavior pattern, the application behavior pattern comprising comprises at least one instance of: a pattern of expected packet sizes for one or more packets of a data flow, a pattern of expected threshold information density values for one or more packets of a data flow, a threshold inter-flow timing value between data flows corresponding to a host, or a threshold number of related application data flows corresponding to a host.

**25**. The method of claim **24** wherein the flow specification contains at least one instance of any one of the following: a protocol family designation, a direction of packet flow designation, a protocol type designation, a pair of hosts, a pair of ports, a pointer to a multipurpose internet mail extensions (MIME) type, and a pointer to an application-specific attribute.

**26**. The method of claim **24** wherein said flow specification contains, and wherein the one or more matching attributes include, at least one instance of any one of the following: a protocol family designation, a direction of packet flow designation, a protocol type designation, a pair of hosts, a pair of

Cloudflare - Exhibit 1005, page 27

Appx1235

US 7,664,048 B1

29

ports, a pointer to a multipurpose internet mail extensions (MIME) type, and a pointer to an application-specific attribute.

**27**. A method facilitating the classification of network traffic, comprising

detecting, by a network device, a data flow in network traffic traversing a communications path, the data flow comprising at least one packet;

classifying, by the network device, the data flow into a network application of a plurality of network applications by

applying a mathematical function to at least one packet in the data flow to derive a computed value that characterizes entropy of information contained in the at least one packet, wherein the entropy information corresponds to a level of randomness of data of the at least one packet; and

comparing the computed value to at least one traffic class corresponding to the network application, said traffic class defined, at least in part, by a required computed entropy value.

**28**. The method of claim **27** wherein the required computed value is determined by applying the mathematical function to data flows known to be of the traffic class.

30

**29**. The method of claim **27** wherein the mathematical function computes a value indicating the information density of at least one packet.

**30**. The method of claim **27** wherein the required computed value is a range of values.

**31**. A method facilitating the classification of network traffic, comprising

detecting, by a network device, a data flow in network traffic traversing a communications path, the data flow comprising at least one packet containing a first checksum;

applying, by the network device, a mathematical function to at least one packet in the data flow to derive a second checksum;

comparing, by the network device, the computed second checksum to the first checksum contained in the at least one packet;

matching, by the network device, the data flow to a traffic class, wherein the traffic class is defined at least in part by whether the computed second checksum should match the first checksum in the at least one packet.

* * * * *

Cloudflare - Exhibit 1005, page 28



www.archive.org
415.561.6767
415.840-0391 e-fax

Internet Archive
300 Funston Avenue
San Francisco, CA 94118

# AFFIDAVIT OF CHRISTOPHER BUTLER

1. I am the Office Manager at the Internet Archive, located in San Francisco, California. I make this declaration of my own personal knowledge.

2. The Internet Archive is a website that provides access to a digital library of Internet sites and other cultural artifacts in digital form. Like a paper library, we provide free access to researchers, historians, scholars, and the general public. The Internet Archive has partnered with and receives support from various institutions, including the Library of Congress.

3. The Internet Archive has created a service known as the Wayback Machine. The Wayback Machine makes it possible to browse more than 450 billion pages stored in the Internet Archive's web archive. Visitors to the Wayback Machine can search archives by URL (i.e., a website address). If archived records for a URL are available, the visitor will be presented with a display of available dates. The visitor may select one of those dates, and begin browsing an archived version of the Web. Links on archived files in the Wayback Machine point to other archived files (whether HTML pages or other file types), if any are found for the URL indicated by a given link. For instance, the Wayback Machine is designed such that when a visitor clicks on a hyperlink on an archived page that points to another URL, the visitor will be served the archived file found for the hyperlink's URL with the closest available date to the initial file containing the hyperlink.

4. The archived data made viewable and browseable by the Wayback Machine is obtained by use of web archiving software that automatically stores copies of files available via the Internet, each file preserved as it existed at a particular point in time.

5. The Internet Archive assigns a URL on its site to the archived files in the format http://web.archive.org/web/[Year in yyyy][Month in mm][Day in dd][Time code in hh:mm:ss]/[Archived URL] aka an "extended URL". Thus, the extended URL http://web.archive.org/web/19970126045828/http://www.archive.org/ would be the URL for the record of the Internet Archive home page HTML file (http://www.archive.org/) archived on January 26, 1997 at 4:58 a.m. and 28 seconds (1997/01/26 at 04:58:28). A web browser may be set such that a printout from it will display the URL of a web page in the printout's footer. The date indicated by an extended URL applies to a preserved instance of a file for a given URL, but not necessarily to any other files linked therein. Thus, in the case of a page constituted by a primary HTML file and other separate files (e.g., files with images, audio, multimedia, design elements, or other embedded content) linked within that primary HTML file, the primary HTML file and the other files will each have their own respective extended URLs and may not have been archived on the same dates.

6. Attached hereto as Exhibit A are true and accurate copies of browser printouts of the Internet Archive's records of the archived files for the URLs and the dates



specified in the footer of the printout or an attached coversheet (in the case of records for which a browser does not provide a ready option to print a URL in the footer, e.g., in the case of a PDF file).

7. I declare under penalty of perjury that the foregoing is true and correct.

DATE:  01/24/2022

_Christopher Butler_
Christopher Butler

# Exhibit A

https://web.archive.org/web/20030317051910/http:/packeteer.com/PDF_files/4steps.pdf

**Technical Product Overview**

# Four Steps to Application Performance Across the Network



With Packeteer's PacketShaper®

*September 2002*

**Packeteer, Inc.**
Cupertino, CA 95014
408.873.4400
*info@packeteer.com*
*www.packeteer.com*



Company and product names are trademarks or registered trademarks of their respective companies. Copyright 2002 Packeteer, Inc. All rights reserved. No part of this publication may be reproduced, photocopied, stored on a retrieval system, transmitted, or translated into another language without the express written consent of Packeteer, Inc.

P/N 1600.B



US007185368B2

| (12) **United States Patent** | (10) Patent No.: **US 7,185,368 B2** |
|---|---|
| Copeland, III | (45) Date of Patent: **Feb. 27, 2007** |

(54) **FLOW-BASED DETECTION OF NETWORK INTRUSIONS**

(75) Inventor: **John A. Copeland, III**, Atlanta, GA (US)

(73) Assignee: **Lancope, Inc.**, Atlanta, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 887 days.

(21) Appl. No.: **10/000,396**

(22) Filed: **Nov. 30, 2001**

(65) **Prior Publication Data**

US 2003/0105976 A1     Jun. 5, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/265,194, filed on Jan. 31, 2001, provisional application No. 60/250,261, filed on Nov. 30, 2000.

(51) **Int. Cl.**
*G06F 11/30*     (2006.01)

(52) **U.S. Cl.** ........................... **726/25**; 726/22; 726/23; 726/26; 713/151; 709/203; 709/224; 709/227; 705/51

(58) **Field of Classification Search** ................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 5,437,244 A | * | 8/1995 | Van Gilst | .................... | 119/73 |
|---|---|---|---|---|---|
| 5,557,686 A | * | 9/1996 | Brown et al. | ............... | 382/115 |
| 5,557,742 A | | 9/1996 | Smaha et al. | | |
| 5,621,889 A | | 4/1997 | Lermuzeaux et al. | | |
| 5,796,942 A | * | 8/1998 | Esbensen | ................... | 713/201 |
| 5,825,750 A | * | 10/1998 | Thompson | ................. | 370/244 |
| 5,970,227 A | | 10/1999 | Dayan et al. | | |

(Continued)

FOREIGN PATENT DOCUMENTS

WO     PCT/US99/29080     6/2000

(Continued)

OTHER PUBLICATIONS

Javitz H S et al.: "The SRI IDES Statistical Anomaly Detector", Proceedings of the Symposium on Research in Security and Privacy US Los Alamitos, IEEE Comp. Soc. Press, v. Symp. 12, pp. 316-326 XP000208031SBN; 0-8186-2168-0, p. 316, col. 1, line 1, p. 318, col. 1, line 3.*

(Continued)

*Primary Examiner*—Nasser Moazzami
*Assistant Examiner*—Ronald Baum
(74) *Attorney, Agent, or Firm*—Morris, Manning & Martin, LLP

(57)     **ABSTRACT**

A flow-based intrusion detection system for detecting intrusions in computer communication networks. Data packets representing communications between hosts in a computer-to-computer communication network are processed and assigned to various client/server flows. Statistics are collected for each flow. Then, the flow statistics are analyzed to determine if the flow appears to be legitimate traffic or possible suspicious activity. A concern index value is assigned to each flow that appears suspicious. By assigning a value to each flow that appears suspicious and adding that value to the total concern index of the responsible host, it is possible to identify hosts that are engaged in intrusion activity. When the concern index value of a host exceeds a preset alarm value, an alert is issued and appropriate action can be taken.

**37 Claims, 9 Drawing Sheets**



Cloudflare - Exhibit 1007, page 1

Appx1272

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,991,881 A | 11/1999 | Conklin et al. | |
| 6,119,236 A * | 9/2000 | Shipley | 713/201 |
| 6,182,226 B1 | 1/2001 | Reid et al. | |
| 6,275,942 B1 | 8/2001 | Bernhard et al. | |
| 6,321,338 B1 | 11/2001 | Porras et al. | |
| 6,363,489 B1 * | 3/2002 | Comay et al. | 726/22 |
| 6,453,345 B2 * | 9/2002 | Trcka et al. | 709/224 |
| 6,502,131 B1 * | 12/2002 | Vaid et al. | 709/224 |
| 6,628,654 B1 * | 9/2003 | Albert et al. | 370/389 |
| 6,853,619 B1 * | 2/2005 | Grenot | 370/232 |
| 6,891,839 B2 * | 5/2005 | Albert et al. | 370/401 |
| 2002/0104017 A1 * | 8/2002 | Stefan | 713/201 |
| 2002/0133586 A1 * | 9/2002 | Shanklin et al. | 709/224 |
| 2004/0187032 A1 * | 9/2004 | Gels et al. | 713/201 |
| 2004/0237098 A1 * | 11/2004 | Watson et al. | 725/25 |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | PCT/US00/29490 | 5/2001 |

## OTHER PUBLICATIONS

Lunt T F et al: "Knowledge-based Intrusion Detection", Proceedings of the Annual Artificial Intelligence Systems in Government Conf. US, Washington, IEEE Comp. Soc. Press, vol. Conf. 4, pp. 102-107 XP000040018 p. 102, col. 1, line 1, p. 105, col. 2, line 21.*

Mahoney, M., "Network Traffic Anomaly Detection Based on Packet Bytes", ACM, 2003, Fl. Institute of Technology, entire document, http://www.cs.fit.edu/~mmahoney/paper6.pdf.*

Copeland, John A., et. al., "IP Flow Identification for IP Traffic Carried Over Switched Networks," The International Journal of Computer Telecommunications Networking Computer Networks 31 (1999), pp. 493-504.

Cooper, Mark "An Overview of Intrusion Detection Systems," Zinetica White Paper, (www.xinetica.com) Nov. 19, 2001.

Newman, P., et. al. "RFC 1953: Ipsilon Flow Management Protocol Specification for IPv4 Version 1.0" (www.xyweb.com/rfc/rfc1953.html) May 19, 1999.

Paxson, Vern, "Bro: A System for Detecting Network Intruders in Real-Time," 7th USENIX Security Symposium, Lawrence Berkkeley National Laboratory, San Antonio, TX Jan. 26-29, 1998.

Mukherjee, Biswanath, et. al., "Network Intrusion Detection," IEEE Network, May/Jun. 1994.

"Network-vs Host-Based Intrusion Detection: A Guide to Intrusion Detection," ISS Internet Security Systems, Oct. 2, 1998, Atlanta, GA.

Barford, Paul, et. al. "Characteristics of Network Traffic Flow Anomalies," ACM SIGCOMM Internet Measurement Workshop 2001 (http://www.cs.wisc.edu/pb/ublications.html) Jul. 2001.

Frincke, Deborah, et. al., "A Framework for Cooperative Intrusion Detection" 21st National Information Systems Security Conference, Oct. 1998, Crystal City, VA.

Phrack Magazine, vol. 8, Issue 53, Jul. 8, 1998, Article 11 of 15.

"LANSleuth Fact Sheet," LANSleuth LAN Analyzer for Ethernet and Token Ring Networks, (www.lansleuth.com/features.html), Aurora, Illinois.

"LANSleuth General Features," (www.lansleuth.com/features.html), Aurora, Illinois.

Copeland, John A., et al, "IP Flow Identification for IP Traffic Carried Over Switched Networks," The International Journal of Computer and Telecommunications Networking Computer Networks 31 (1999), pp. 493-504.

Cooper, Mark "An Overview of Instrusion Detection Systems," Xinetica White Paper, (www.xinetica.com) Nov. 19, 2001.

Newman, P., et al. "RFC 1953: Ipsilon Flow Management Protocol Specificaiton for IPv4 Version 1.0" (www.xyweb.com/rfc/rfc1953.html) May 19, 1999.

* cited by examiner

Cloudflare - Exhibit 1007, page 2

Cloudflare - Exhibit 1007, page 3



FIG. 1

FLOW-BASED INTRUSION DETECTION



PACKET HEADERS

*FIG. 2*

Cloudflare - Exhibit 1007, page 4

TCP/IP SESSION
300



*FIG. 3*

Cloudflare - Exhibit 1007, page 5

Appx1276

Cloudflare - Exhibit 1007, page 6



*FIG. 4*

FLOW BASED ENGINE
155



PROGRAM THREADS: SQUARES

DATA STRUCTURES: OVALS

DATA INPUT/OUTPUT: CIRCLES

**FIG. 5**

Cloudflare - Exhibit 1007, page 7

Appx1278

**TABLE I**

| NAME | POTENTIAL INTRUDER | RESPONSE | CI VALUE |
|---|---|---|---|
| POTENTIAL TCP PROBE | TCP PACKETS | RESET PACKETS | NUMBER OF PACKETS |
| POTENTIAL UDP PROBE | UDP PACKEST | ICMP PORT UNAVAILABLEPCKETS | NUMBER OF ICMP PORT UNAVAILABLE PACKETS |
| HALF-OPEN ATTACK | HIGH NUMBER AND RATE OF SYNS | SYN-ACKS | 5000+501 PER SYN-ACK |
| TCP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | RESETS | 8000+1010 PER PORT OVER 4 |
| UDP STEALTH PORT SCAN | MULTIPLE PACKETS FROM SAME SOURCE PORT TO DIFFERENT DESTINATION PORTS | NOTHING OR ICMP PORT UNAVAILABLE | 8000+1010 PER PORT OVER 4 |

**FLOW-BASED CI VALUES**

***FIG. 6***

Cloudflare - Exhibit 1007, page 8

**TABLE II**

| NAME | POTENTIAL INTRUDER | RESPONSE | CI VALUE |
|---|---|---|---|
| BAD FLAGS | TCP PACKET WITH UNDEFINED FLAGS | | 200 |
| SHORT UDP | UDP PACKET LESS 2 DATA BYTES | | 200 |
| ADDRESS SCAN | PACKETS TO MORE THAN 8 HOSTS ON SAME SUBNET | NOTHING OR RESETS | 3000 PER DETECT |
| PORT SCAN | PACKETS TO MORE THAN 4 PORTS | RESETS | 1010 PER PORT OVER 4 |

**CI EVENT VALUES**

*FIG. 7*

Cloudflare - Exhibit 1007, page 9



FIG. 8

Cloudflare - Exhibit 1007, page 10



**FIG. 9A**

**FIG. 9B**

**FIG. 9C**

Cloudflare - Exhibit 1007, page 11

Appx1282

US 7,185,368 B2

**1**

# FLOW-BASED DETECTION OF NETWORK INTRUSIONS

## CROSS REFERENCE To RELATED APPLICATIONS

This Patent Application claims priority to the U.S. provisional patent application Ser. No. 60/250,261 entitled "System and Method for Monitoring Network Traffic" filed Nov. 30, 2000 and U.S. provisional patent application Ser. No. 60/265,194 entitled "The Use of Flows to Analyze Network Traffic" filed on Jan. 31, 2001, both of which are incorporated in their entirety by reference and made a part hereof.

## REFERENCE TO COMPUTER PROGRAM LISTING SUBMITTED ON CD

This application incorporates by reference the computer program listing appendix submitted on (1) CD-ROM entitled "Flow-Based Engine Computer Program Listing" in accordance with 37 C.F.R. §1.52(e). Pursuant to 37 C.F.R. §1.77(b)(4), the material on said CD-ROM is incorporated by reference herein, said material being identified as follows:

| Sizein Bytes | Date of Creation | File Name |
|---|---|---|
| 154,450 | Nov. 30, 2001 | LANcope Code.txt |

A portion of the disclosure of this patent document including said computer code contains material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

## TECHNICAL FIELD

The invention relates generally to the field of network monitoring and, more particularly, to an intrusion detection system that inspects all inbound and outbound network activity and identifies suspicious patterns that may indicate a network or system attack or intrusion.

## BACKGROUND ART

As the world proceeds into the 21st century, the Internet continues to grow without bounds. Networks have become indispensable for conducting all forms of business and personal communications. Networked systems allow one to access needed information rapidly, collaborate with partners, and conduct electronic commerce. The benefits offered by Internet technologies are too great to ignore. However, as with all technology advances, a trade-off ensues. While computer networks revolutionize the way one does business, the risks introduced can be substantial. Attacks on networks can lead to lost money, time, reputation, and confidential information.

One primary danger to avoid is having outside intruders gaining control of a host on a network. Once control is achieved, private company files can be downloaded, the controlled host can be used to attack other computers inside

**2**

the firewall, or the controlled host can scan or attack computers anywhere in the world. Many organizations have pursued protecting their borders by the implementation of firewalls and intrusion detection systems (IDS).

Firewalls merely limit access between networks. Firewalls are typically designed to filter network traffic based on attributes such as source or destination addresses, port numbers, or transport layer protocols. Firewalls are susceptible to maliciously crafted traffic designed bypass the blocking rules established. Additionally, almost all commercially available IDS are signature based detection systems or anomaly based systems.

Signature based detection systems piece together the packets in a connection to collect a stream of bytes being transmitted. The stream is then analyzed for certain strings of characters in the data commonly referred to as "signatures." These signatures are particular strings that have been discovered in known exploits. The more signatures that are stored in a database, the longer it takes to do on exhaustive search on each data stream. For larger networks with massive amounts of data transferred, a string comparison approach is unfeasible. Substantial computing resources are needed to analyze all of the communication traffic.

Besides, even if a known exploit signature has been discovered, the signature is not useful until it is has been installed and is available to the network. In addition, signature analysis only protects a system from known attacks. Yet, new attacks are being implemented all the time. Unfortunately, a signature based detection system would not detect these new attacks and leave the network vulnerable.

Another approach to intrusion detection includes detection of unusual deviation from normal data traffic commonly referred to as "anomalies." Like signature-based detection systems, many current anomaly based intrusion detection systems only detect known methods of attacks. Some of these known anomaly based attacks include TCP/IP stack fingerprinting, half-open attacks, and port scanning. However, systems relying on known attacks are easy to circumnavigate and leave the system vulnerable. In addition, some abnormal network traffic happens routinely, often non-maliciously, in normal network traffic. For example, an incorrectly entered address could be sent to an unauthorized port and be interpreted as an abnormality. Consequently, known anomaly based systems tend to generate an undesirable number of false alarms which creates a tendency to have all alarms generated to become ignored.

Some known intrusion detection systems have tried to detect statistical anomalies. The approach is to measure a baseline and then trigger an alarm when deviation is detected. For example, if a system typically has no traffic from individual workstations at 2 am, activity during this time frame would be considered suspicious. However, baseline systems have typically been ineffective because the small amount of malicious activity is masked by the large amounts of highly variable normal activity. On the aggregate, it is extremely difficult to detect the potential attacks.

Other intrusion detection systems compare long term profiled data streams to short term profiled data streams. One such system is described in U.S. Pat. No. 6,321,338 to Porras et al. entitled "Network Surveillance." The system described in this patent does not necessarily analyze all the network traffic, but instead focus on narrow data streams. The system filters data packet into various data streams and compares short term profiles to profiles collected over a long period. However, data traffic is typically too varied to meaningfully compare short term profiles to long term profiles. For example, merely because the average FTP streams may be 3

Cloudflare - Exhibit 1007, page 12

US 7,185,368 B2

3

megabytes over the long term does not indicate that a 20 megabyte stream is an anomaly. Consequently, these systems generate a significant amount of false alarms or the malicious activity can be masked by not analyzing the proper data streams.

Consequently, a scalable intrusion detection system that effectively tracks characterized and tracks network activity to differentiate abnormal behavior. Due to the impracticality of analyzing all the data flowing through the network, the system cannot rely on signature based methods. The detection system must be able to function even with the data traffic of larger networks. In addition, the system needs to quickly and efficiently determine if the network has undergone an attack without an excessive amount of false alarms.

### DISCLOSURE OF THE INVENTION

The present invention provides a more accurate and reliable method for detecting network attacks based in large part on "flows" as opposed to signatures or anomalies. This novel detection system does not require an updated database of signatures. Instead, the intrusion detection system inspects all inbound and outbound activity and identifies suspicious patterns that denote non-normal flows and may indicate an attack. The computational simplicity of the technique allows for operation at much higher speeds than is possible with a signature-based system on comparable hardware.

According to one aspect of the invention, the detection system works by assigning data packets to various client/server (C/S) flows. Statistics are collected for each determined flow. Then, the flow statistics are analyzed to determine if the flow appears to be legitimate traffic or possible suspicious activity. A value, referred to as a "concern index," is assigned to each flow that appears suspicious. By assigning a value to each flow that appears suspicious and adding that value to an accumulated concern index associated with the responsible host, it is possible to identify hosts that are engaged in intruder activity without generation of significant unwarranted false alarms. When the concern index value of a host exceeds a preset alarm value, an alert is issued and appropriate action can be taken.

Generally speaking, the intrusion detection system analyzes network communication traffic for potential detrimental activity. The system collects flow data from packet headers between two hosts or Internet Protocol (IP) addresses. Collecting flow data from packet headers associated with a single service where at least one port remains constant allows for more efficient analysis of the flow data. The collected flow data is analyzed to assign a concern index value to the flow based upon a probability that the flow was not normal for data communications. A host list is maintained containing an accumulated concern index derived from the flows associated with the host. Once the accumulated concern index has exceeded an alarm threshold value, an alarm signal is generated.

### BRIEF DESCRIPTION OF THE DRAWINGS

Benefits and further features of the present invention will be apparent from a detailed description of preferred embodiment thereof taken in conjunction with the following drawings, wherein like elements are referred to with like reference numbers, and wherein:

FIG. **1** is a functional block diagram illustrating a flow-based intrusion detection system constructed in accordance with a preferred embodiment of the present invention.

4

FIG. **2** is a diagram illustrating headers of datagrams.

FIG. **3** is a functional block diagram illustrating an exemplary normal TCP communication.

FIG. **4** is a functional block diagram illustrating C/S flows.

FIG. **5** is a functional block illustrating a flow-based intrusion detection engine.

FIG. **6** is a table illustrating concern index value for C/S flows.

FIG. **7** is a table illustrating concern index values for other host activities.

FIG. **8** is a functional block diagram illustrating hardware architecture.

FIG. **9**, consisting of FIGS. **9**A through **9**C, are flow charts of the program threads in an exemplary embodiment of the invention.

### BEST MODE

The described embodiment discloses a system that provides an efficient, reliable and scalable method of detecting network intrusions by analyzing communication flow statistics. The network intrusions are detected by a flow-based engine that characterizes and tracks network activities to differentiate between abnormal activity and normal communications. Flow-based detection does not rely on analyzing the data of packets for signatures of known attacks. Analyzing character strings for known attacks is extremely resource intensive and does not protect against new unknown attacks. Instead, the present intruder detection is accomplished by analyzing communication flows to determine if the communication has the flow characteristics of probes or attacks. Those skilled in the art will readily appreciate that numerous communications in addition to those explicitly described may indicate intrusion activity. By analyzing communications for flow abnormal flow characteristics, attacks can be determined without the need for resource intensive packet data analysis.

However, it is useful to discuss the basics of Internet communications to gain an understanding of the operation of the flow-based engine. Consequently, initially an overview of a flow-based detection system will be discussed. Following the overview, discussions on various aspects of Internet communications will follow. A detailed functionality of the flow-based engine of the present invention is described in detail in reference to FIG. **5** through FIG. **9**.

Overview

Turning to the figures, in which like numerals indicate like elements throughout the several figures, FIG. **1** provides an overview of a flow-based intrusion detection system or engine **155** in accordance with an exemplary embodiment of the present invention. The flow-based intrusion detection system **155** monitors network computer communications. The network computer communications are routed via a known global computer network commonly known as the Internet **199**. In accordance with an aspect of the invention, the intrusion detection engine **155** is incorporated into a monitoring appliance **150**, together with a database **160** that stores information utilized in the intrusion detection methodology.

The operating environment of the intrusion detection system **155** is contemplated to have numerous hosts connected by the Internet **199**, e.g. Host #**1**, Host #**2**, Host #**3** (also referred to as H1–H3 respectively). Hosts are any computers that have full two-way access to other computers on the Internet **199** and have their own unique IP address.

Cloudflare - Exhibit 1007, page 13

US 7,185,368 B2

5

For example Host #**1** has an exemplary IP address of 208.60.239.19. The Internet **199** connects clients **110** with a host server **130** in known client/server relationship.

In a typical configuration, some computers are referred to as "servers", while others are referred to as "clients." A server computer such as Host #**2 130** typically provides responses to requests from client computers and provides services, data, resources, and the like. While a client computer such as Host #**1 110** typically requests and utilizes the services, data, resources, and the like provided by the server.

It is known in the art to send communications between hosts via the Internet **199**. The Internet Protocol (IP) is the method by which data is sent from one host computer to another on the Internet **199**. Each host on the Internet **199** has an IP address that uniquely identifies it from all other computers. When data is transmitted, the message gets divided into packets **101**. Packets **101** are discussed in more detail in reference to FIG. **2**.

Each IP packet **101** includes a header that contains both the sender's Internet address and receiver's Internet address. The packets **101** are forwarded to the computer whose address is specified. Illustrated is a legitimate user/client **110**, host #**1** (H1), with an IP address of 208.60.239.19 and a server, host #**2** (H2), with an IP address of 128.0.0.1.

As shown, a client **110** communications with a server **130** by sending packets **101** of data. A packet **101** is a unit of data that is routed between an origin and destination. As illustrated, messages are segmented into numerous packets **101** and routed via the Internet **199** to the receiving host. The receiving host reassembles the stream of packets **101** to recreate the original message, which is then handled by application programs running on the receiving computer system.

However, some of the hosts may be intruders **120**, commonly referred to as hackers or crackers. Intruders **120** exploit vulnerable computers. As shown, the intruder **120** is a host with its own IP address of 110.5.47.224. The intruder **120** also communicates by sending packets **101** via the Internet **199**. As previously stated, the packets **101** contain the IP address of the originator and destination to ensure proper routing. As shown, the stream of packets **101** sent by the intruder **120** can be interleaved with the packets **101** sent by other hosts. The packets **101** contain header information that enables the receiving host to reassemble the interleaved stream of packets into the original messages as sent.

Normal client/server (C/S) communication activity includes sending e-mails, Web traffic, file transfers, and the like. Communications via the Internet **199** need to be sent to a specific IP address and to a specific service contact port. A "port" is known to those skilled in the art as an arbitrarily assigned number to which a particular type of computing service is assigned in conventional Internet computer-to-computer communications, e.g. web traffic is conventionally on port **80**, FTP traffic on ports **20** and **21**, etc. The IP address specifies a specific host while the service contact port number identifies a particular server program or service that the host computer may provide. Present day port numbers range from **0** to 65,535. As shown in FIG. **1**, a number of frequently-used services or processes have conventionally assigned service contact port numbers and are referred to as well-known port numbers maintained by the Internet Assigned Number Authority (IANA). These assigned port numbers are well known in the art and are typically the low numbered ports between 0 and 1023. Currently, certain higher numbered ports have also been assigned.

A service port chart in FIG. **1** lists some common services that present day Internet-based computer systems may pro-

6

vide. Outgoing email typically utilizes the known Simple Mail Transfer Protocol (SMTP) which is implemented over the service contact port **25**. For the Hypertext Transfer Protocol (HTTP) communications, Web browsers open an ephemeral high port number to initiate Web traffic that is sent to the host server port **80**. File Transfer Protocol (FTP) control communications are sent to the server port **21**, while FTP data transfer originates from port **20**. The FINGER service utilizes service contact port **79**, the domain name service (DNS) utilizes service contact port **53**, and Telnet communications utilize service contact port **23**. As illustrated, common services are typically associated with specific predetermined service contact ports.

Also illustrated in FIG. **1** are four flows, F**1** through F**4**, between by client host #**1 110** and service host #**2 130**. Flow F**1** is a file transfer utilizing the File Transfer Protocol (FTP). As shown, the file transfer (flow F**1**) is delivered by a stream of packets **101** (P**1**-P**3**) that will be reassembled by the receiving host **110**.

After the file transfer is completed, the client **110** initiates an HTTP Web session (flow F**2**) with server **120**. Those skilled in the art understand that a Web session typically occurs when an Internet browser computer program such as MICROSOFT INTERNET EXPLORER or NETSCAPE NAVIGATOR requests a web page from a World Wide Web (WWW) service on port **80**. Packets P**4**, P**5**, P**6**, and P**9** are associated with the Web traffic of flow F**2**. These packets may contain data such as a JPG format picture to be displayed, text, a JAVA program, or other informational materials to be displayed or handled by the client's Internet browser program.

Continuing the example of FIG. **1**, while the web session of flow F**2** is still open, the client **110** sent an email illustrated by flow F**3**. As shown, the email packets of flow F**3** may be interleaved with the previously opened Web session of flow F**2**. As illustrated, packets P**7**, P**8**, and P**12** contain the e-mail message.

Finally, the client **110** requests another web page from the server **120**, initiating yet another HTTP flow F**4**. Packets P**9**, P**10**, P**11**, P**12**, and P**14** represent the new Web traffic.

In accordance with an aspect of the invention, a flow is considered terminated after a predetermined period of time has elapsed on a particular connection or port. For example, if HTTP Web traffic on port **80** ceases for a predetermined period of time, but other traffic begins to occur on port **80** after the expiration of that predetermined time period, it is considered that a new flow has begun, and the system responds accordingly to assign a new flow number and track the statistics and characteristics thereof. In the disclosed embodiment, the predetermined time period is 330 seconds, but those skilled in the art will understand that this time is arbitrary and may be heuristically adjusted.

Although the preferred embodiment utilizes the elapse of a predetermined period of time to delimit flows, those skilled in the art will understand and appreciate that other events, indicators, or information may be used to delimit flows, for example, predetermined characteristics of traffic on a given port, or the occurrence of a FIN flag in a packet in traffic, etc. Other such events or indicators will occur to those skilled in the art.

In the example of FIG. **1**, because a period of time (330 seconds in this example) has elapsed since the server last processed any Web traffic, the new Web traffic with packets P**9**, P**10**, P**11**, P**12**, and P**14** is considered a new flow (F**4**). If the new Web page was requested within the predetermined time period that defines the end of a flow, the new traffic would be included as part of flow F**3**.

Cloudflare - Exhibit 1007, page 14

US 7,185,368 B2

7

Intruders **120** send data over the network intending to do harm or to scout details about the hosts on the network that will let them do harm in future. Because intruders **120** have different objectives, intruders **120** typically send communications that are not normal for client/server communications.

For example, intruders may scan numerous high level ports which would not happen in normal client/server communications or an intruder may send a User Datagram Protocol (UDP) packet, which is commonly used with streaming media, with no data attached. An intruder may attempt to identify which operating system a host is utilizing by sending a packet with undefined set of TCP flags. A high number of TCP packets **101** to a single host from another host may indicate a half open attack trying to tie up the target's resources. Each of these suspicious activities is not normally seen in normal network traffic.

In accordance with an aspect of the invention, a variable denominated as "concern index" (CI) is provided in association with each host identified by the intrusion detection engine **155**. This concern index CI variable is used to accumulate values associated with various abnormal events occurring on the network, e.g. when a particular flow is deemed unusual or when particular types of anomalous events occur. At such time as the cumulated value of the CI variable for a particular host exceeds a predetermined threshold value, that host may be considered a sufficient threat to warrant generating an alert or alarm and action taken.

Consequently, abnormal flows and/or events identified by the intrusion detection engine **155** will raise the concern index (CI) for the associated host. The intrusion detection engine **155** analyzes the data flow between IP devices. However, different types of services have different flow characteristics associated with that service. Therefore, a C/S flow can be determined by the packets exchanged between the two hosts dealing with the same service.

In accordance with an aspect of the invention, the intrusion detection engine **155** works by assigning data packets **101** to various flows. The engine **155** collects information about and statistics associated with each flow and stores this information and statistics in a database **160**. The flow database **160** comprises a flow data structure **162** and a host data structure **166**. The flow data structure **162** stores collected flow information such as the IP addresses. The engine determines which host has a lower IP address and assigns that host IP0. The other host is assigned IP1. Port0 is associated with IP0 and port1 is the service connection port for host1. The flow data structure **162** also stores time and other related packet information derived from the packet header. In the disclosed embodiment, this time information (e.g. time of the first packet, time of the last packet) is utilized to measure the elapse of time for purposes of flow delimiting, as described above.

The intrusion detection engine **155** analyzes the flow data **160** to determine if the flow appears to be legitimate traffic or possible suspicious activity. Flows with suspicious activity are assigned a predetermined concern index (CI) value based upon a heuristically predetermined assessment of the significance of the threat of the particular traffic or flow or suspicious activity. The flow concern index values have been derived heuristically from extensive network traffic analysis. Concern index values are associated with particular hosts and stored in the host data structure **166** (FIG. **1**). Exemplary concern index values for various exemplary flow-based events and other types of events are illustrated in connection with FIGS. **6** and **7**.

8

By assigning a value to each flow that appears suspicious and adding that value to a total CI of the host responsible for the flow, it is possible to identify hosts that are engaged in intruder activities. When the CI of a host exceeds a preset alarm threshold, a alarm signal may be generated. In the example of FIG. **1**, host H3 has an accumulated CI of 3,980. This exceeds the preset threshold of 3,500 for that network and a system administrator (SYS ADMIN) may be notified by alert message, dialog box, pager, email, telephone, or other alarm means.

The host servers **130** are coupled to one or more network devices **135** such as routers, switches, or hubs. In a typical preferred configuration for the present invention, a monitoring appliance **150** operating a flow-based intrusion detection engine **155** is coupled to one of the network devices **135** or to a tap in a Internet backbone link. The monitoring appliance **150** monitors the communications between the host server **130** and other hosts **120**, **110** in the attempt to detect intrusion activity.

Those skilled in the art understand that many networks utilize firewalls to limit unwanted network traffic. A monitoring appliance **150** can be connected before a firewall to detect intrusions directed at the network. Conversely, the monitoring appliance **150** may be installed behind a firewall to detect intrusions that bypass the firewall. Some systems install two firewalls with web and e-mails servers in the so-called "demilitarized zone" or "DMZ" between firewalls. One common placement of the monitoring appliance **150** is in this demilitarized zone. Of course, those skilled in the art will appreciate that the flow-based intrusion detection system **155** or appliance **150** can operate without the existence of any firewalls.

It will now be appreciated that the disclosed methodology of intrusion detection is accomplished at least in part by analyzing communication flows to determine if such communications have the flow characteristics of probes or attacks. By analyzing communications for abnormal flow characteristics, attacks can be determined without the need for resource-intensive packet data analysis. A flow can be determined from the packets **101** that are transmitted between two hosts utilizing a single service. The addresses and port numbers of communications are easily discerned by analysis of the header information in a datagram.

Packet

Referring now to FIG. **2**, and inasmuch as an understanding of Internet data packets is helpful for constructing embodiments of the present invention, a description of such packets, also called "datagrams", will next be provided as an aid to understanding. A packet or datagram **101** is a self-contained, independent entity or unit of data carrying sufficient information to be routed from a source to a destination computer without reliance on earlier exchanges between the source and destination computer. Packets **101** have a header and a data segment as illustrated by FIG. **2**. The term "packet" in present-day parlance has generally replaced the term "datagram".

Restated, a packet **101** is the unit of data that is routed between an origin and destination on a packet-switched network such as the Internet **199**. A packet-switching scheme is an efficient method of handling transmissions on a connectionless network. However, connection-oriented protocols can be utilized to create a session. A session is a series of interactions between two communication end points that occur during the span of a single connection. A detailed discussion of a TCP/IP session is described in reference to FIG. **3**. However, a host can send a message

Cloudflare - Exhibit 1007, page 15

US 7,185,368 B2

9

without establishing a connection with the recipient. That is, the host simply sends a packet **101** onto the network **199** with the destination address and hopes that it arrives.

FIG. **2** illustrates an exemplary TCP/IP packet or datagram **210** and an exemplary UDP datagram **240**. In a typical TCP/IP packet like **210**, each packet typically includes a header portion comprising an IP header **220** and a TCP header **230**, followed by a data portion that contains the information to be communicated in the packet. The information in the IP header **220** contained in a TCP/IP packet **210**, or any other IP packet, contains the IP addresses and assures that the packet is delivered to the right host. The transport layer protocol (TCP) header follows the Internet protocol header and specifies the port numbers for the associated service.

The header portion in the typical TCP/IP datagram **210** is 40 bytes including 20 bytes of IP header **220** information and 20 bytes of TCP header **230** information. The data portion or segment associated with the packet **210** follows the header information.

In regards to a typical IP packet **210**, the first 4 bits of the IP header **220** identify the Internet protocol (IP) version. The following 4 bits identify the IP header length in 32 bit words. The next 8 bits differentiate the type of service by describing how the packet should be handled in transit. The following 16 bits convey the total packet length.

Large packets tend to be fragmented by networks that cannot handle a large packet size. A 16-bit packet identification is used to reassemble fragmented packets. Three one-bit set of fragmentation flags control whether a packet is or may be fragmented. The 13-bit fragment offset is a sequence number for the 4-byte words in the packet when reassembled. In a series of fragments, the first offset will be zero.

After the fragmentation information, an 8-bit time to live field specifies the remaining life of a packet and is decremented each time the packet is relayed. If this field is 0, the packet is destroyed. Next is an 8-bit protocol field that specifies the transport protocol used in the data portion. The following 16-bit field is a header checksum on the header only. Finally, the last two fields illustrated contain the 32-bit source address and 32-bit destination address. IP packet data follows the address information.

In a TCP/IP datagram **210**, the initial data of the IP datagram is the TCP header **230** information. The initial TCP header **230** information includes the 16-bit source and 16-bit destination port numbers. A 32-bit sequence number for the data in the packet follows the port numbers. Following the sequence number is a 32-bit acknowledgement number. If an ACK flag (discussed below) is set, this number is the next sequence number the sender of the packet expects to receive. Next is a 4-bit data offset, which is the number of 32-bit words in the TCP header. A 6-bit reserved field follows.

Following the reserved field, the next 6 bits are a series of one-bit flags, shown in FIG. **2** as flags U, A, P, R, S, F. The first flag is the urgent flag (U). If the U flag is set, it indicates that the urgent pointer is valid and points to urgent data that should be acted upon as soon as possible. The next flag is the A (or ACK or "acknowledgment") flag. The ACK flag indicates that an acknowledgment number is valid, and acknowledges that data has been received. The next flag, the push (P) flag, tells the receiving end to push all buffered data to the receiving application. The reset (R) flag is the following flag, which terminates both ends of the TCP connection. Next, the S (or SYN for "synchronize") flag is set in the initial packet of a TCP connection where both ends have to synchronize their TCP buffers. Following the SYN

10

flag is the F (for FIN or "finish") flag. This flag signifies that the sending end of the communication and the host will not send any more data but still may acknowledge data that is received.

Following the TCP flag bits is a 16-bit receive window size field that specifies the amount of space available in the receive buffer for the TCP connection. The checksum of the TCP header is a 16-bit field. Following the checksum is a 16 bit urgent pointer that points to the urgent data. The TCP/IP datagram data follows the TCP header.

Still referring to FIG. **2**, a typical User Datagram Protocol (UDP) packet **240** provides a procedure for application programs to send messages to other programs with a minimal of protocol mechanisms. The IP protocol previously described is used as the underlying protocol. The UDP protocol is transaction oriented and delivery protection is not guaranteed. Applications requiring reliable delivery of data typically use the previously described Transmission Control Protocol (TCP).

The 16-bit UDP source port is a field to which port a reply, when meaningful, should be addressed. The 16-bit UDP destination port specifies the server program on the receiving host to execute the packet. Next, the 16-bit UDP message length field is the length in bytes of the user datagram including header and any data. Following the length field is the 16-bit checksum of the UDP header, the UDP pseudo header information **250** from an IP header **220**, and the data.

As will be understood by those skilled in the art, the fundamental Internet service consists of a packet delivery system. Internet service is typically considered "connectionless" because each packet is treated independently of all others. Some transport protocols such as UDP provide unreliable service because the delivery of the packet is not guaranteed. Other transport protocols such as TCP provide a mechanism to ensure delivery of a packet and therefore can be used to establish computer-to-computer "sessions" in the conventional sense of the term. FIG. **3** illustrates a typical TCP/IP session and the guaranteed packet delivery mechanism.

As previously stated, the flow-based engine **155** does not analyze the data segments of packets for signature identification. Instead, the engine **155** associates all packets with a flow. It analyzes certain statistical data and assigns a concern index value to abnormal activity. The engine **155** builds a concern index for suspicious hosts by detecting suspicious activities on the network. An alarm is generated when those hosts build enough concern (in the form of a cumulated CI value) to cross the network administrator's predetermined threshold.

Session

Turning next to FIG. **3**, a TCP session **300** is a full duplex connection that allows concurrent transfer of data in both directions. Before the transfer can start, both the sending and receiving application programs interact with their respective operating systems, informing them of the impending stream transfer. Protocol software communicates by sending messages across, verifying that the transfer is authorized, and indicating that both sides are ready to receive data.

FIG. **3** illustrates an exemplary TCP/IP session **300**. As discussed in reference to FIG. **2**, the SYN flag is set whenever one host initiates a session with another host. In the initial packet, host **1** sends a message with only the SYN flag set. The SYN flag is designed to establish a TCP

Cloudflare - Exhibit 1007, page 16

US 7,185,368 B2

11

connection and allow both ends to synchronize their TCP buffers. Host**1** provides the sequence of the first data packet it will send.

Host**2** responds with a SYN-ACK packet. In this message, both the SYN flag and the ACK flag is set. Host**2** provides the initial sequence number for its data to Host**1**. Host**2** also sends to Host**1** the acknowledgment number which is the next sequence number Host**2** expects to receive from host **1**. In the SYN-ACK packet sent by Host **2**, the acknowledgment number is the initial sequence number of Host **1** plus 1, which should be the next sequence number received.

Host **1** responds to the SYN-ACK with a packet with just the ACK flag set. Host **1** acknowledges that the next packet of information received from Host **2** will be Host **2**'s initial sequence number plus 1. The three-way handshake is complete and data is transferred.

Host**2** responds to ACK packet with its own ACK packet. Host**2** acknowledges the data it has received from Host**1** by sending an acknowledgment number one greater than its last received data sequence number. Both hosts send packets with the ACK flag set until the session is to end although the P and U flags may also be set, if warranted.

As illustrated, when host**1** terminates its end of the session, it sends a packet with the FIN and ACK flags set. The FIN flag informs Host**2** that no more data will be sent by Host**1**. The ACK flag acknowledges the last data received by Host**1** by informing Host**2** of the next sequence number it expects to receive.

Host**2** acknowledges the FIN packet by sending its own ACK packet. The ACK packet has the acknowledgment number one greater than the sequence number of Host**1**'s FIN-ACK packet. ACK packets are still delivered between the two hosts, except that HOST**1**'s packets have no data appended to the TCP/IP end of the headers.

When Host **2** is ready to terminate the session, it sends its own packet with the FIN and ACK flags set. Host**1** responds that it has received the final packet with an ACK packet providing to Host**2** an acknowledgment number one greater than the sequence number provided in the FIN-ACK packet of Host**2**.

Alternatively, a host may desire to keep a session active even after if has finished sending its current data. If more data is to be sent in the near future, it is more efficient to keep a session open than it is to open multiple sessions. A session wherein the connection is kept open in case future data is to be communicated is typically referred to as a "persistent" session. In this scenario, a session is closed by sending a packet with the reset flag (R) set (also called a "reset packet") after no data is delivered after a period of time. Many browser applications provide a 300-second window of inactivity before closing a session with an R packet (reset).

The described TCP session **300** of FIG. **3** is a generic TCP session in which a network might engage. In accordance with the invention, flow data is collected about the session to help determine if the communication is abnormal. In the preferred embodiment, information such as the total number of packets sent, the total amount of data sent, the session start time and duration, and the TCP flags set in all of the packets, are collected, stored in the database **160**, and analyzed to determine if the communication was suspicious. If a communication is deemed suspicious, i.e. it meets predetermined criteria, a predetermined concern index value associated with a determined category of suspicious activity is added to the cumulated CI value associated with the host that made the communication.

For example, a TCP/IP packet with both the SYN flag and the FIN flag set would not exist in a normal communication.

12

Because a packet with both the SYN and FIN flags set is undefined, each operating system handles this packet in different methods. An operating system may send an ICMP message, a reset, or possibly just ignore it and send nothing. Consequently, an intruder may send a SYN-FIN packet specifically to help identify the operating system of the targeted host.

As another example, if a particular host sends a large number of SYN packets to a target host and in response receives numerous R packets from the targeted host, a potential TCP probe is indicated. Likewise, numerous UDP packets sent from one host to a targeted host and numerous ICMP "port unavailable" packets received from the targeted host indicates a potential UDP probe. A stealth probe is indicated by multiple packets from the same source port number sent to different port numbers on a targeted host.

As has been described elsewhere, UDP packets are often used in connection with streaming media and other applications that provide data to many hosts. A UDP packet with no appended data does not occur in normal communications. In fact, a flow with numerous SYN packets with numerous SYN-ACK responses may indicate a half-open attack designed to tie up the targeted host's ports and resources. From the foregoing, it will be understood and appreciated that an analysis of the flow of communications can identify attacks on a system.

Some typical abnormal communications that indicate intrusion activity are listed in reference to FIGS. **6** and **7**. However, each type of service has its own profile of normal activity. Consequently, it is desirable to analyze each type of service and ascertain the characteristics of a "normal" flow, including the normal sequence of flags and the like.

Flow

In accordance with an exemplary aspect of the invention, a "flow" can be determined by the packets exchanged between two hosts associated with a single service. A single service, it will be recalled, is typically associated with a particular port on a server, and is also associated with an assigned port on a client machine; port numbers are typically fixed in server machines such as host #2 server **130** (FIG. **1**) but typically vary in client machines such as host#1 client **110**. As previously described, in the preferred embodiment as described herein, a flow ends when no packets are exchanged between the hosts for a predetermined duration of time such as 330 seconds for HTTP flows.

FIG. **4** illustrates some common flows. As is known, each host has its own unique IP address. IP addresses are typically referred to by four sets of numbers separated by periods, e.g. N.N.N.N, where N varies between 0 and 255. Also as described, assigned port numbers of the server delineate the services provided by that server; port numbers in present-day systems vary between 0 and 65,536.

The client is illustrated with an IP address of ADDRESS 1 while the server is illustrated with IP address ADDRESS0. As illustrated, three separate services—HTTP, SMTP, and FTP—are being invoked by the client. A Web browser application (not shown) running on the client machine utilizes the Hypertext Transfer Protocol (HTTP), an email application (also not shown) utilizes the Simple Mail Transfer Protocol (SMTP), and a file transfer application program (not shown) utilizes the File Transfer Protocol (FTP).

Communications utilizing each of these protocols provide differing flow characteristics. Consequently, it is desirable to determine flows in which each of the services is analyzed separately. Therefore, as defined, the illustrated communications represent three distinct flows.

Cloudflare - Exhibit 1007, page 17

US 7,185,368 B2

13

The first flow illustrated would be Web traffic (HTTP protocol) between the client at IP ADDRESS1 and the server at IP ADDRESS0. The client Web browser opens a random ephemeral high port (**51,132**) as illustrated in the example. A high port is utilized because the low port numbers less than 1024 are preassigned for designated services. One these designated services is port **80** for HTTP, which transfers displayable Web pages and related files in the known manner. The Web browser sends the request to the server's port **80**. The server responds by sending the requested Web page data in packets wherein the port number in the packets transmitted to the client sets the destination port to **51,132** of the client. All communications by clients utilizing HTTP is sent to port **80** of the server. One C/S flow would be the HTTP communications between port **51,132** of ADDRESS1 and port **80** of ADDRESS0.

A flow is terminated if no communications occur between the two IP addresses and the one low port (e.g. port **80**) for 330 seconds. Most Web browsers or a TCP connection send a reset packet (i.e. a packet with the R flag set) if no communications are sent or received for 5 minutes. An analysis can determine if the flow is abnormal or not for HTTP communications.

The next flow illustrated is email traffic between the client and server utilizing port **25**. The client email application opens a random high ephemeral port, e.g. port **49,948** as illustrated in FIG. **4**. The client's email application sends the email utilizing the Simple Mail Transfer Protocol (SMTP) to the server's port **25**. Port **25** is conventionally designated for SMTP communications. A flow is terminated if no communications are delivered between the two IP addresses and the low port for 330 seconds. If the client sends another SMTP email packet or packets within 330 seconds of the end of the first email to the server, only one flow would exist.

For example, as shown in FIG. **4**, if a second email packet originating from the ephemeral port **35,620** is sent within 330 seconds, only one flow would exist. If the second email packet was later than 330 seconds from the first sent email, it would be classified as another flow for analysis purposes. An analysis can determine if the flow is abnormal or not for SMTP communications.

The File Transfer Protocol (FTP) is the simplest method to exchange files between hosts on the Internet. A client begins a session by sending a request to communicate to port **21** of designated server machine. The client also includes a second port number to be used when data is exchanged. The server initiates the exchange from its own port **20** (FTP DATA) to the port designated by the client, port **4993** as illustrated in FIG. **4**. Although two ports on the server were utilized, port **20** and port **21**, this unique case will be classified as one C/S flow. Preferably, embodiments of the present invention of a flow-based intrusion detection engine will have the ability to associate the FTP communications on both ports as one flow.

As shown, a flow can be determined by the packets exchanged between two hosts associated with a single service. A port number designates a service application that is associated with the particular port. Communications utilizing differing protocols or services provide differing flow characteristics. Consequently, each of the services are analyzed separately by the flow engine **155**.

Flow-Based Engine

FIG. **5** illustrates a logical software architecture of a flow-based intrusion detection engine **155** constructed in accordance with an embodiment of the present invention. As will be understood by those skilled in the art, the system is

14

constructed utilizing Internet-enabled computer systems with computer programs designed to carry out the functions described herein. Preferably, the various computing functions are implemented as different but related processes known as "threads" which executed concurrently on modern day multi-threaded, multitasking computer systems.

The computer programs or threads are executed on a computer system **800** constructed as described in reference to FIG. **8**, which illustrates a suitable exemplary computer system that may be utilized to construct a monitoring appliance **150** including an intrusion detection engine **155**, or a separately implemented intrusion detection engine. Although the described embodiments are generally described in reference to an Internet-accessible computer system that is dedicated to implementing the engine **155**, those skilled in the art will recognize that the present invention can be implemented in computer program code that can execute in conjunction with other program modules in various types of general purpose, special purpose, or dedicated computers. Accordingly, it will be understood that the terms "computer," "operating system," and "application program" include all types of computers and the program modules designed to be implemented by the computers.

The discussion of methods that follow, especially in the software architecture, is represented largely in terms of processes and symbolic representations of operations by conventional computer components, including a central processing unit (CPU), memory storage devices for the CPU, network communication interfaces, connected display devices, and input devices. Furthermore, these processes and operations may utilize conventional computer components in a heterogeneous distributed computing environment, including remote file servers, remote computer servers, and remote memory storage devices. Each of these conventional distributed computing components is accessible by the CPU via a communication network.

The processes and operations performed by the computer include the manipulation of signals by a CPU, or remote server such as an Internet Web site, and the maintenance of these signals within data structures reside in one or more of the local or remote memory storage devices. Such data structures impose a physical organization upon the collection of data stored within a memory storage device and represent specific electrical, optical, or magnetic elements. These symbolic representations are the means used by those skilled in the art of computer programming and computer construction to effectively convey teachings and discoveries to others skilled in the art. For the purposes of this discussion, a process is understood to include a sequence of computer-executed steps leading to a concrete, useful, and tangible result, namely, the detection of intruders based upon C/S flows and other activity deemed heuristically to be a threat substantial enough to warrant assignment of a concern index value.

These steps generally require manipulations of quantities such as IP addresses, packet length, header length, start times, end times, port numbers, and other packet related information. Usually, though not necessarily, these quantities take the form of electrical, magnetic, or optical signals capable of being stored, transferred, combined, compared, or otherwise manipulated. It is conventional for those skilled in the art to refer to these signals as bits, bytes, words, values, elements, symbols, characters, terms, numbers, points, records, objects, images, files or the like. It should be kept in mind, however, that these and similar terms should be associated with appropriate quantities for computer opera-

Cloudflare - Exhibit 1007, page 18

US 7,185,368 B2

15                                    16

tions, and that these terms are merely conventional labels applied to quantities that exist within and during operation of the computer.

It should also be understood that manipulations within the computer are often referred to in terms such as displaying, deciding, storing, adding, comparing, moving, positioning, placing, and altering which are often associated with manual operations performed by a human operator. The operations described herein include machine operations performed in conjunction with various input provided by a human operator or user that interacts with the computer. In addition, it will be understood that the programs, processes, routines and methods described herein are not related or limited to any particular computer or apparatus, nor are they related or limited to any particular communication network or computer architectures. Rather, various types of general-purpose machines may be used with program modules constructed in accordance with the teachings described herein. Similarly, it may prove advantageous to construct a specialized apparatus to perform the method steps described herein by way of dedicated computer systems in a specific network architecture with hard-wired logic or programs stored in nonvolatile memory, such as read only memory.

With the foregoing in mind, the drawing figures starting with FIG. **5**, and the accompanying appendix of computer program code, illustrate various functions, processes, or routines carried out by an embodiment of the present invention. It will also be understood that the processes and methods presented here may be arranged differently, or steps taken in a different order. In other words, some processes and methods may be deleted, repeated, re-ordered, combined, or blended to form similar processes and methods.

FIG. **5** illustrates the operation of the preferred flow-based engine **155**. The engine stores data from its operations in a database **160**, which in the disclosed embodiment comprises two data structures, one used to collect statistics on data flows (flow data structure **162**) in progress, and another to accumulate date on the host computers (host data structure **166**) involved in those flows. It has three main threads or processes that read and write these data structures to identify possible intruders, which are identified as high concern index hosts or high CI hosts. These threads are a packet classifier thread **510**, a flow collector thread **520**, and an alert manager thread **530**. The threads also identify the client and server network applications that are being operating by the hosts that are observed participating in the flows observed (port profiling).

Packet Classifier

The header data is read by the packet classifier thread **510**. The packet classifier thread **510** runs whenever new packet information is available. Based on the source and destination IP addresses, the thread **510** searches for an existing flow in the flow data structure **162**. To facilitate searching and record insertion, a symmetric hash of the two IP addresses is generated and used as the index of an array that points to the beginning of a two-way linked list of all flows with that hash value. As known to those skilled in the art, a symmetric hash is a mathematical process that creates a probabilistically unique number that facilitates rapid indexing and sorting within a data structure such as flow data structure **162**.

Flow processing is done for TCP and UDP packets, and the port numbers in the transport layer header are used to identify the flow record to be updated. For ICMP packets that constitute rejections of a packet, the copy of the rejected

packet in the ICMP data field is used to identify the IP addresses and port numbers of the corresponding flow.

For purposes of the description which follows, the IP address with the lower value, when considered as a 32-bit unsigned integer, is designated ip[0] and the corresponding port number is designated pt[0]. The higher IP address is designated ip[1] and the corresponding TCP or UDP port number is designated pt[1]. At some point, either pt[0] or pt[1] may be designated the "server" port by setting an appropriate bit in a bit map that is part of the flow record (record "state", bit **1** or **2** is set).

If a particular packet **101** being processed by the packet classifier **510** matches a particular entry or record in the flow data structure **162**, data from that particular packet **101** is used to update the statistics in the corresponding flow data structure record. A packet **101** is considered to match to a flow data structure record if both IP numbers match and:

a) both port numbers match and no port is marked as the "server" port, or

b) the port number previously marked as the "server" port matches, or

c) one of the port numbers matches, but the other does not, and the neither port number has been marked as the server port (in this case the matching port number is marked as the "server" port).

If no prior data record exists in the flow data structure **162** that matches the current packet, a new flow data record is created in the flow data structure **162** using the IP addresses and port numbers from the current packet, and is linked to the end of the appropriate linked list of flow records. The time that the flow started, i.e. the first packets capture time, is written into the record as the "start" time, in a predetermined field of the data record.

The time of each packet is written into the record "last", overwriting the previous value.

Flow Data Structure

The preferred flow data structure **162** has a plurality of different fields in each record. The preferred flow data structure (in the known C programming language) is as follows, where the index shown as [2] (0 or 1) is "0" if the packet source is the host ip[0], "1" otherwise (e.g. if the packet source is ip[1], then the packet bytes are added to bytes[1], pkts[1] is incremented, etc.):

```
#define SLOTS 131073//no. flows in data table
struct flow_db {
    unsigned long ip[2]; // ip[0]—lower ip address—ip[1]—
higher ip address
    unsigned short pt[2]; //tcp or udp ports, pt[0] and pt[1]
    unsigned short service; // port number of server
    unsigned long down; // linked list index
    unsigned long up; // linked list index
    unsigned long start // time Flow started
    unsigned long last; // time Flow ended
    unsigned long state; // Server=0, 2 or 4, UDP=1 (Server
Port Marked)
    unsigned long bytes[2]; // bytes sent by ip[0] and ip[1]
    unsigned long pkts[2]; // packets sent by ip[0] and ip[1]
    unsigned long flgs[2]; // bitmap of all TCP flags seen
    unsigned char flag[2][7];//0 bad, 1 reset, 2 urgent, 3 syn,
4 syn-ack, 5 fin, 6 fragments, // (counts of packets seen with
various TCP flag combinations)—7 UDP rejects
    unsigned short scans; // max number ports seen for ip pair,
detects "Port Scans"} flow[SLOTS];
```

Notice that many of the fields are counters for each host, e.g., the number of packets and bytes sent, the number of packets with various TCP flag-bit combinations sent for TCP

Cloudflare - Exhibit 1007, page 19

US 7,185,368 B2

17

18

flows, the number of ICMP "port-unavailables" for a UDP flow. Also bitmaps can be filled in, such as the bitmap of all TCP flags seen which has been bitwise OR'ed with the TCP flag field of each TCP packet. Data is filled in for the source (originating) host.

The packet classifier thread **510** also adds some data directly to the host data structure **166**. Most of this data could be added later by the flow collector thread **520** (such as bytes sent by each host), but adding it on a packet by packet basis allows collection of real time rate information (such as bytes sent in each time interval). These records are indicated in the host data structure **166** below.

Host Data Structure

The host data structure **166** accumulates data on all hosts that are observed participating in a flow. A description of this data structure in C language format follows:

```
#define HOST_SLOTS 65537 // number Host slots
struct host_db {
    // data added by the Packet Classifier Thread
    unsigned long ip ;        //ip address
    unsigned long down ;    // linked list index
    unsigned long up;        // linked list index
    unsigned long start ; // time host record started
    unsigned long last ; // time of last packet from this host
    unsigned long udp_bytes ; // UDP bytes sent and received
    unsigned long bytes_in ; // bytes received
    unsigned long bytes_in_pp ; // Bytes over last 5 min interval
    unsigned long bytes_in_mx ; // max bytes all day
    unsigned long pkts_in ; // packets received
    unsigned long bytes_ot ;  // for Web_alert period
    unsigned long bytes_ot_pp  ; // Bytes sent over 5 min interval
    unsigned long bytes_ot_mx ; // max bytes in 5-min interval all day
    unsigned long pkts_ot ; // packets sent
    unsigned long resets  ; // TCP Reset packets received
    unsigned long rejects  ; // icmp 'port unavailable' packets received
    unsigned long bad_pkts ; // SYN-ACK, and any other non-standard
        combination // data added by the Host Collector Thread
    unsigned long server  ; // 32 common server ports-provided (in
        profile)
    unsigned long client    ; // 32 common server ports-used today
    unsigned long s_profile   ; // 32 common server ports - provided (in
        profile)
    unsigned long c_profile   ; // 32 common server ports-used today
    unsigned short s_list[ODD MAX] ; // list of uncommon (odd) serv-
ers
    unsigned short c_list[ODD MAX] ; // list of uncommon (odd) clients
    unsigned long s_flows  ; // Server in this many flows
    unsigned long c_flows  ; // Client in this many flows
    unsigned long pings ; // ping
    unsigned long traces ; // traceroutes run
    unsigned long concern ; // accumulated CI
        // bits set by both threads to record "Alert Messages" such as "Bad
        TCP Flags".
    unsigned long alerts; // bit map of alert conditions
    } host[ HOST_SLOTS ]
```

Flow Collector Thread

The flow collector thread **520** runs periodically (e.g., every five minutes) and searches linearly through the entire flow data structure **162** to find flows that have been inactive for a certain time period (e.g., 6 minutes). These flows are considered as finished and a logic-tree analysis is done to classify them as either a normal flow, or a potential probe or other suspicious activity warranting assignment of a concern index value.

Normal flows are those for which the corresponding statistics indicate a normal exchange of information between two hosts. The host that initiated the flow is considered the client (i.e. the computer that sent TCP SYN packets or sent an initial UDP packet). The other host is considered the

server (i.e. the computer that sent TCP SYN-ACK packets or responded to a UDP packet). Some data is exchanged during a normal flow.

A potential probe is a flow that appears to have one host (a possible intruder) sending packets to gain information about another host (an intended victim). An example of a potential probe is a flow that has TCP packets of any sort sent by one host (the intruder) and approximately the same number of TCP reset packets sent by the other. Another example is a flow which has UDP packets answered by ICMP "port unavailable" packets. A flow with ICMP "destination unreachable" packets sent by one host would be considered a potential probe being done by the other host.

In accordance with the invention, some potential probes are much more likely to indicate probing than others are. To handle this, a value called the "concern index" is calculated or otherwise determined for each flow, and this value is added to the concern index value being accumulated in the host data structure **166**. Table I of FIG. 6 shows one scheme for assigning concern index values due to the flow analysis. After the flow is analyzed, the flow record is written to the flow log file and then cleared from the flow data structure.

Other Concern Index Increments

Concern index (CI) values calculated from packet anomalies also add to a host's accumulated concern index value. Table II of FIG. **7** shows one scheme for assigning concern index values due to other events revealed by the flow analysis. For example, there are many combinations of TCP flag bits that are rarely or never seen in valid TCP connections. When one of these combinations is recognized by the packet classifier thread **510**, it directly adds a predetermined value to the sending host's accumulated concern index value. When the packet classifier thread **510** searches along the flow linked-list (i.e. flow data **162**) for a match to the current packet **101**, it keeps count of the number of flows active with matching IP addresses but no matching port number. If this number exceeds a predetermined threshold value (e.g., 4) and is greater than the previous number noticed, CI is added for an amount corresponding to a "port scan." A bit in the host record is set to indicate that the host has received CI for "port scanning."

A list IP of addresses contacted or probed by each host can be maintained. When this list indicates that more than a threshold number of other hosts (e.g., 8) have been contacted in the same subnet, CI is added to the to the host and a bit in the host record is set to indicate that the host has received CI for "address scanning."

These and other values of concern index are shown for non-flow based events in FIG. **7**.

Alert Manager Thread

The alert manager thread **530** runs periodically (e.g., following the flow manager thread **520**) and does a linear search through the host data structure **166**. As it does so, it compiles a number of lists that are written to various output files for use by user interface programs, i.e. programs that report information from the operation of the intrusion detection system or appliance **150**.

For example, the alert manager thread **530** preferably generates an alert list **546** of hosts with CI above a certain threshold. This threshold is adjusted so that the list is about 100 host records long. In accordance with the preferred embodiment of the invention, a user interface program (not shown) will sort this list and display, in order of descending CI value, the top 60 hosts with high CI values. A similar list based on average byte rate over the last time interval (e.g., 5 minutes) is also generated. If a range, or set of ranges, of

Cloudflare - Exhibit 1007, page 20

US 7,185,368 B2

19

IP addresses have been defined by the network administrator as "inside addresses," separate lists can be generated for "inside" and "outside" hosts. Numerous other queries and reports **548** can be generated for review and analysis by a network system administrator (SYS ADMIN).

The packet classifier **510** thread collects information on network operations such as packets and bytes on a per-second, per-minute, and per-hour basis. This information is collected on all packets and on certain categories of packets such as TCP and UDP and subsets of these based on port number. Histograms of packet size and TCP or UDP port numbers are also collected. The alert manager thread **530** writes the updated data to various output files for use by the user interface, or for later off-line analysis.

The alert manager **530** also looks for hosts whose CI or traffic (byte rate) exceeds preset alarm thresholds and which have not been handled on previous runs. The new alarm conditions can cause immediate operator notification by an operator notification process **542**. These conditions can be highlighted on the user interface, and cause SNMP trap messages to be sent to a network monitor such as HP Openview, and/or email messages to the network administrator which in turn may cause messages to be sent to beepers or cell phones. Messages can also be sent to cause automated devices such as a firewall manager **544** to drop packets going to or from an offending host. It will thus be appreciated that the present invention advantageously operates in conjunction with firewalls and other network security devices and processes to provide additional protection for an entity's computer network and computer resources.

Hardware

A preferred hardware configuration **800** of an embodiment that executes the functions of the above described flow-based engine is described in reference to FIG. **8**. FIG. **8** illustrates a typically hardware configuration **800** for a network intrusion detection system. A monitoring appliance **150** serves as a pass-by filter of network traffic. A network device **135**, such as a router, switch, hub, tap, or the like, provides the location for connecting the monitoring appliance **150** to the network **899** for monitoring the network traffic.

As illustrated, the monitoring appliance **150** is preferably configured with two network interface cards (NIC) **830** such as 3COM brand model **932** 10/100 MHz Ethernet adapters or other adapters to match the network. However, it should be apparent to one skilled in the art that one or more cards can be utilized to accomplish the functions of the presently described dual card system. The monitor NIC **834** is typically set to a promiscuous mode or a similar function. The promiscuous mode is a mode of operation in which every data packet passing through the network device **135** will be received and read. An admin NIC **838** allows network interfacing and handles commands sent from the monitoring appliance **135**. A NIC driver **820** enables the network traffic data to be exchanged with the processor **850**. Other drivers **825** are utilized to interface or communicate with other devices including peripherals. These peripherals include keyboards, monitors, printers, storage devices, and other input/output devices. As one skilled in the art will appreciate, such drivers are typically packaged with the system.

The operating system **810** for the computer **800** preferably needs to be compatible with the hardware of the monitoring appliance **150**. One operating system **810** that can be utilized is the operating system referred to as LINUX. One skilled in the art will appreciate that other operating systems may be readily substituted. As is known to those skilled in the art,

20

the operating system of a computer controls the operation of the processor **850**. The processor **850** interfaces with the memory **805** to execute programs. Preferably, the monitoring appliance will have 128 megabytes or more of memory.

As discussed in reference to FIG. **5**, the processor **850** executes the packet classifier thread **510**, the flow collector thread **520**, and the alert manager thread **530**. These threads interact with flow data structure **162** and the host data structure **166**, as described. The data structures provide temporary storage of information. As discussed in reference to FIG. **5**, a log file is maintained on the hard drive **840** for forensic analysis, if desired.

Flow Charts

Refer now to FIG. **9** for a discussion of the steps of the preferred packet classifier, flow collector, and alert or alarm manager threads. As previously discussed in reference to FIG. **5**, the preferred flow-based intrusion detection engine **155** comprises three operational threads or processes that execute within a system or appliance that implements an embodiment of the invention. The packet classifier thread **510** (FIG. **9**A) classifies packets into their associated flow and updates the flow records. The flow collector thread (FIG. **9**B) **520** determines a termination of a flow, performs a logic tree analysis to classify the flow, and assigns a corresponding CI value in response to detection of activity warranting an increase in the CI. Finally, the alert or alarm manager thread **530** (FIG. **9**C) generates reports and alarm signals if an alarm threshold is exceeded.

In FIG. **9**A, the packet classifier thread **510** begins with step **912**. In step **912**, the thread **510** determines if a new packet is available. If a new packet is not available, the no branch of step **912** is followed to step **912**, in which the thread **510** awaits a new packet. If a new packet is available, the yes branch of step **912** is followed to step **914**, in which the thread determines if the packet belongs to a new flow.

As discussed previously, the header data if each packet processed is read by the packet classifier thread **510**. Based on the source and destination IP addresses, the thread **510** searches for an existing flow in the flow data structure **162**, which is embodied as a data array in memory. A symmetric hash of the two IP addresses is used as the index into the array that points to the beginning of a two-way linked list of all flows with that hash value.

Flow processing is done for TCP and UDP packets, and the port numbers in the transport layer header are used to identify the flow record to be updated. For ICMP packets that constitute rejections of a packet, the copy of the rejected packet in the ICMP data field is used to identify the IP addresses and port numbers of the corresponding flow.

A packet **101** is considered to match to a flow data structure record if both IP numbers match and:

a) both port numbers match and no port is marked as the "server" port, or

b) the port number previously marked as the "server" port matches, or

c) one of the port numbers matches, but the other does not, and the neither port number has been marked as the server port (in this case the matching port number is marked as the "server" port).

If a new flow is determined, the yes branch of step **914** is followed by step **916**. In step **916**, a new flow record is created. If no flow exists that matches the current packet, a new flow record is started using the IP addresses and port numbers from the current packet, and is linked to the end of the appropriate linked list of flow records.

Cloudflare - Exhibit 1007, page 21

US 7,185,368 B2

21

The IP address with the lower value, when considered as a 32-bit unsigned integer, is designated ip[0] and the corresponding port number is designated pt[0]. The higher IP address is designated ip[1] and the corresponding TCP or UDP port number is designated pt[1]. At some point, either pt[0] or pt[1] may be designated the "server" port by setting a the appropriate bit in a bit map that is part of the flow record (record "state", bits **1** or **2** set).

Step **916** is followed by step **918**, in which the flow records in the flow data structure **162** are updated. The time that the flow started, the packet capture time, is written into the record "start." The flow data structures updated by the packet classifier thread is discussed in detail in reference to FIG. **5**. Step **918** is returned to step **912**, in which the thread **510** determines if a new packet is available.

Referring next to FIG. 9B, the flow collector thread **520** begins with step **942**. In step **942**, the thread **520** determines if a periodic time has elapsed, e.g. 5 minutes in the disclosed embodiment. If the requisite time period has not elapsed, the no branch of step **942** is followed to step **942**, in which the thread **520** awaits the time to elapse.

If the time has elapsed, the yes branch of step **942** is followed to step **943**, in which the thread **520** performs an inactivity search. The flow collector thread **520** runs periodically (e.g., every five minutes) and searches linearly through the entire flow data structure **162** to find flows that have been inactive for a certain time period (e.g., 6 minutes, although this time is arbitrary and may be heuristically determined). These flows are considered finished.

Step **943** is followed by step **944**, a logic-tree analysis is done to classify them as either a normal flow or as a potential probe. Normal flows are those whose statistics indicate a normal exchange of information between two hosts. Preferably, the host that initiated the flow is considered the client (sent TCP SYN packets or sent the initial UDP packet). The other host is considered the server (sent TCP SYN-ACK packets or responded to a UDP packet). Some data is exchanged during a normal flow.

As will be recalled, one exemplary indication of a potential probe is a flow that appears to have one host (the intruder) sending packets to gain information about another host (the victim). An example of a potential probe is a flow that has TCP packets of any sort sent by one host (the intruder) and approximately the same number of TCP reset packets sent by the other. Another example is a flow which has UDP packets answered by ICMP "port unavailable" packets. A flow with ICMP "destination unreachable" packets sent by one host would be considered a potential probe being done by the other host.

Step **944** is followed by step **945**, in which a CI value that corresponds to the detected activity is assigned. As previously discussed, some types of communications and packet activities are much more likely to indicate probing than others. An appropriate CI amount for the determined activity is determined, e.g. by reference to a table such as shown in FIG. **7**. The corresponding CI value for the determined activity is added to the concern index value being accumulated in the host data structure **166**. Table I of FIG. **6** and Table II of FIG. **7** shows one scheme for assigning concern index values due to the flow analysis.

Step **945** is followed by step **946**. In step **946**, the flow record is written to the flow log file. Step **946** is followed by step **947**, the flow record is cleared from the flow data structure. After step **947**, the thread is returned to step **942**, in which the thread awaits for the requisite time.

Referring next to FIG. 9C, the alarm manager thread **530** begins with step **972**. In step **972**, the thread **530** determines

22

if a periodic time has elapsed. If the requisite time period has not elapsed, the no branch of step **972** is followed to step **972**, in which the thread **530** awaits the time to elapse.

If the time has elapsed, the yes branch of step **972** is followed to step **973**, in which the thread **530** performs concern index search. The alert manager thread **530** runs periodically (e.g., following the flow manager thread **520**) and does a linear search through the host data structure **166**.

Step **973** is followed by step **974**. In step **974**, it compiles a number of lists that are written to various output files for use by the user interface programs. For example, it collects an alert list of hosts with CI above a certain threshold. This threshold may be adjusted so that the list is about 100 host records long. A user interface program will preferably sort this list and display, in order of descending CI value, the top 60 hosts with high CI values. A similar list based on average byte rate over the last time interval (e.g., 5 minutes) is also generated. If a range, or set of ranges, of IP addresses have been defined by the network administrator as "inside addresses," separate lists can be generated for "inside" and "outside" hosts. Numerous other queries and reports **548** can be generated for review and analysis by the network administrator. The alert manager thread **530** writes the updated data to various output files for use by the user interface, or for later off-line analysis.

Step **974** is followed by step **975**, in which the thread **530** determines if an alarm threshold has been exceeded. If the alarm threshold has not been exceeded, the no branch of step **975** is returned to perform step **972**. In step **972**, the thread **530** determines if a requisite time period has elapsed.

If an alarm threshold has been exceeded, the yes branch of step **975** is followed to step **976**. In step **976**, the alert manager thread generates certain predetermined signals designed to drawn the attention of a system administrator or other interested person. The alert manager **530** looks for hosts whose CI or traffic (byte rate) exceeds preset alarm thresholds and have not been handled on previous runs. The new alarm conditions can cause immediate operator notification. These conditions can be highlighted on the user interface, and cause SNMP trap messages to be sent to a network monitor such as HP Openview, and/or email messages to the network administrator which in turn may cause messages to be sent to beepers or cell phones. Messages can also be sent to cause automated devices such as a firewall manager to drop packets going to or from an offending host. Step **976** is followed by step **972**, in which the thread **530** awaits the requisite amount of time.

In view of the foregoing, it will be appreciated that the present invention provides an intrusion detection system that is robust, scalable, efficient, and overcomes various problems with conventional signature-based or pure anomaly-based intrusion detection. It should be understood that the foregoing relates only to the exemplary embodiments of the present invention, and that numerous changes may be made therein without departing from the spirit and scope of the invention as defined by the following claims. Accordingly, it is the claims set forth below, and not merely the foregoing illustration, which are intended to define the exclusive rights of the invention.

INDUSTRIAL APPLICATIONS

A flow-based intrusion detection system efficiently and reliably monitors network traffic for possible intrusions with the ability to be scaled to large traffic flows. Consequently, the flow-based engine has applicability in the fields of

Cloudflare - Exhibit 1007, page 22

US 7,185,368 B2

23

network monitoring, network security, network devices, network communications, and similar fields.

What is claimed is:

**1**. A method of analyzing network communication traffic on a data communication network for determining whether the traffic is legitimate or potential suspicious activity, comprising the steps of:

monitoring packet headers of packets exchanged between two hosts on the data communication network;

based on the packet headers, determining the existence of a client/server (C/S) flow as corresponding to a predetermined plurality of packets exchanged between the two hosts that relate to a single service and is characterized by a predetermined C/S flow characteristic;

assigning a concern index value to a determined C/S flow based upon a predetermined concern index characteristic of the C/S flow;

maintaining an accumulated concern index comprising concern index values for one or more determined C/S flows associated with a host; and

issuing an alarm signal in the event that the accumulated concern index for a host exceeds an alarm threshold value.

**2**. The method of claim **1**, wherein the predetermined C/S flow characteristic of a C/S flow is selected from the group comprising: the elapse of a predetermined period of time wherein no packets are exchanged between two hosts, the occurrence of a FiN flag, predetermined characteristics of traffic on a given port, and the occurrence of a RESET packet.

**3**. The method of claim **1**, further comprising the step of communicating a message to a firewall to drop packets going to or from the particular host in response to the alarm signal.

**4**. The method of claim **1**, wherein the alarm signal generates a notification to a network administrator.

**5**. The method of claim **1**, wherein each concern index value associated with a predetermined concern index characteristic is a predetermined fixed value.

**6**. The method of claim **1**, wherein the single service comprises a port number remaining constant for a plurality of packets.

**7**. The method of claim **1**, wherein the suspicious activity is from an inside address or from an outside address.

**8**. The method of claim **1**, wherein the concern index for a suspicious activity is derived by reference to a table of predetermined suspicious activities each having a predetermined concern index value.

**9**. The method of claim **1**, wherein the host for which the concern index is accumulated is an inside host.

**10**. The method of claim **1**, wherein the host for which the concern index is accumulated is an outside host.

**11**. The method of claim **1**, wherein the steps are carried out in a monitoring appliance.

**12**. The method of claim **11**, wherein the monitoring appliance is installed behind a firewall.

**13**. The method of claim **11**, wherein the monitoring appliance is connected before a firewall.

**14**. The method of claim **11**, wherein the monitoring appliance is connected in a DMZ.

**15**. The method of claim **11**, wherein the monitoring appliance is configured to operate as a pass-by filter.

**16**. The method of claim **11**, wherein the monitoring appliance is coupled to a network device.

**17**. The method of claim **16**, wherein the network device is selected from group comprising: router, switch, hub, tap.

24

**18**. The method of claim **16**, wherein the network device is a network security device.

**19**. The method of claim **1**, wherein the monitoring of packets comprises monitoring on packet header information only.

**20**. The method of claim **1**, wherein the monitoring of packets is carried out in a device operating in a promiscuous mode.

**21**. The method of claim **1**, wherein the alarm signal is provided to a utilization component.

**22**. The method of claim **21**, wherein the utilization component is selected from the group comprising: network security device, email, SNMP trap message, beeper, cell-phone, firewall, network monitor, user interface display to an operator.

**23**. The method of claim **1**, wherein the predetermined concern index characteristic comprises a characteristic selected from a table comprising a plurality of prestored second predetermined characteristics each having a predetermined concern index (CI) value.

**24**. The method of claim **1**, wherein the predetermined concern index characteristic comprises one or more of the following characteristics: potential TCP probe, potential UDP probe, half-open attack, TCP stealth port scan, UDP stealth port scan, bad flags, short UDP, address scan, port scan.

**25**. A method of analyzing network communication traffic on a data communication network for determining whether the traffic is legitimate or potential suspicious activity, comprising the steps of:

monitoring packet headers of packets exchanged between two hosts that are associated with a single service on the data communications network;

based on the packet headers, determining the existence of a client/server (C/S) flow as corresponding to a predetermined plurality of packets exchanged between the two hosts;

collecting C/S flow data from packet headers of the packets in the determined flow;

based on the collected C/S flow data, assigning a concern index value to a determined C/S flow based on a predetermined concern index characteristic of the C/S flow;

maintaining an accumulated concern index from C/S flows that are associated with a particular host;

issuing an alarm signal in the event that the accumulated concern index for the particular host exceeds an alarm threshold value; and

in response to the alarm signal, sending a message to a utilization component.

**26**. The method of claim **25**, wherein the utilization component is selected from the group comprising: network security device, email, SNMP trap message, beeper, cell-phone, firewall, network monitor, user interface display to an operator.

**27**. The method of claim **6**, wherein a C/S flow is characterized by a predetermined C/S flow characteristic selected from the group comprising: the elapse of predetermined period of time where no packets are exchanged between two hosts, the occurrence of a FiN flag, predetermined characteristics of traffic on a given port, and the occurrence of a RESET packet.

**28**. The method of claim **25**, wherein the predetermined concern index characteristic comprises a characteristic selected from a table comprising a plurality of prestored second predetermined characteristics each having a predetermined concern index (CI) value.

Cloudflare - Exhibit 1007, page 23

Appx1294

US 7,185,368 B2

25

29. The method of claim 25, wherein the predetermined concern index characteristic comprises one or more of the following characteristics:

potential TCP probe,
potential UDP probe,
half-open attack,
TCP stealth port scan,
UDP stealth port scan,
bad flags,
short UDP,
address scan,
port scan.

30. A method of analyzing network communication traffic on a data communication network for determining whether the traffic is legitimate or potential suspicious activity, comprising the steps of:

monitoring the packet headers from an exchange of packets between two hosts each having a particular Internet Protocol (IP) address;

based on monitored packet headers, determining the existence of a client/server (C/S) flow as corresponding to a predetermined plurality of packets exchanged between a particular port of one of the hosts that remains constant the plurality of packets;

collecting C/S flow data from packet headers of the packets in a determined C/S flow;

based on the collected C/S flow data, assigning a concern index value to a determined C/S flow;

maintaining a host data structure containing accumulated concern index values from a plurality of determined C/S flows that are associated with the particular host; and

issuing an alarm in the event that the accumulated concern index value for the particular host has exceeded an alarm threshold value.

31. The method of claim 30, wherein each concern index value associated with a respective potential suspicious activity is a predetermined fixed value.

32. The method of claim 30, wherein a C/S flow is characterized by a predetermined C/S flow characteristic selected from the group comprising: the elapse of a predetermined period of time wherein no packets are exchanged between two hosts, the occurrence of a FiN flag, predetermined characteristics of traffic on a given port, and the occurrence of a RESET packet.

33. A system for analyzing network communication traffic and determining potential suspicious activity, comprising:

a computer system operative to:

a) monitor packet headers resulting from the communication of packets on a data communication network;

b) based on monitored packet headers, classify the monitored packets into client/server (C/S) flows, wherein a C/S flow corresponds to a predetermined plurality of packets exchanged between two hosts that are associated with a single service on the network;

c) analyze the C/S flows in order to assign a concern index value to a C/S flow that may signify potential suspicious activity, wherein each concern index value associated with a respective potential suspicious activity is of a predetermined fixed value;

d) generate an alarm signal in response to cumulated concern index values; and

a communication system coupled to the computer system operative to receive packets communicated between hosts on the network.

26

34. The system of claim 33, wherein a C/S flow is characterized by a predetermined C/S flow characteristic selected from the group comprising: the elapse of a predetermined period of time wherein no packets are exchanged between two hosts, the occurrence of a FiN flag, predetermined characteristics of traffic on a given port, and the occurrence of a RESET packet.

35. A system for analyzing network communication traffic and determining potential suspicious activity, comprising:

a processor operative to:

a) monitor packet headers resulting from the communication of packets on a data communication network;

b) classify the monitored packets into client/server (C/S) flows, wherein a C/S flow corresponds to a predetermined plurality of packets exchanged between two hosts that are associated with a single service on the network;

c) maintain a flow data structure for storing data corresponding to a plurality of C/S flows;

d) analyze the C/S flows in the flow data structure in order to assign a concern index value to a C/S flow that may signify potential suspicious activity, wherein each concern index value associated with a respective potential suspicious activity is of a predetermined fixed value;

e) cumulate assigned concern index values of one or more C/S flows associated with a particular host;

f) maintain a host data structure for storing data associating a cumulated concern index value with each one of a plurality of hosts; and

g) generate an alarm signal in response to cumulated concern index values in the host data structure;

a memory coupled to the processor and operative to store the flow data structure and the host data structure; and

a network interface coupled to the processor operative to receive packets on the data communication network.

36. The system of claim 35, wherein a C/S flow is characterized by a predetermined C/S flow characteristic selected from the group comprising: the elapse of a predetermined period of time wherein no packets are exchanged between two hosts, the occurrence of a FiN flag, predetermined characteristics of traffic on a given port, and the occurrence of a RESET packet.

37. A method of analyzing network communication traffic on a data communication network for potential suspicious activity, comprising the steps of:

monitoring packets exchanged between two hosts on the data communication network;

identifying packets provided by one of the two hosts that have a transport level protocol specifying a packet format that includes a data segment;

in response to determination that the transport level protocol is a User Datagram Protocol (UDP) packet and the data segment associated with the UDP packet contains two bytes or less of data, storing a concern index value of a predetermined amount in a memory in association with information identifying the host that issued the UDP packet; and

issuing an alarm when the cumulated concern index value associated with the host exceeds a predetermined threshold level.

* * * * *

Cloudflare - Exhibit 1007, page 24

Appx1295



US007295516B1

(12) **United States Patent**        (10) **Patent No.:**    **US 7,295,516 B1**
    Ye                                (45) **Date of Patent:**      **Nov. 13, 2007**

(54) **EARLY TRAFFIC REGULATION TECHNIQUES TO PROTECT AGAINST NETWORK FLOODING**

(75) Inventor: **Baoqing Ye**, Nashua, NH (US)

(73) Assignee: **Verizon Services Corp.**, Waltham, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1068 days.

(21) Appl. No.: **10/010,774**

(22) Filed: **Nov. 13, 2001**

(51) **Int. Cl.**
    *H04J 1/16*        (2006.01)
    *H04J 3/16*        (2006.01)
    *G06F 11/00*       (2006.01)

(52) **U.S. Cl.** ..................... **370/232**; 370/236; 370/468; 726/22

(58) **Field of Classification Search** ..... 370/229–236.1, 370/395.1, 465
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,769,811 A | * | 9/1988 | Eckberg et al. | 370/236 |
| 5,090,011 A | * | 2/1992 | Fukuta et al. | 370/230 |
| 5,309,431 A | * | 5/1994 | Tominaga et al. | 370/235 |
| 5,457,687 A | * | 10/1995 | Newman | 370/232 |
| 5,706,279 A | * | 1/1998 | Teraslinna | 370/232 |
| 5,835,484 A | * | 11/1998 | Yamato et al. | 370/230 |
| 5,901,140 A | * | 5/1999 | Van As et al. | 370/236 |
| 5,914,936 A | * | 6/1999 | Hatono et al. | 370/230 |
| 6,028,842 A | * | 2/2000 | Chapman et al. | 370/235 |
| 6,144,714 A | * | 11/2000 | Bleiweiss et al. | 375/376 |
| 6,208,653 B1 | * | 3/2001 | Ogawa et al. | 370/395.52 |
| 6,424,620 B1 | * | 7/2002 | Nishihara | 370/229 |
| 6,463,036 B2 | * | 10/2002 | Nakamura et al. | 370/236.1 |
| 6,657,961 B1 | * | 12/2003 | Lauffenburger et al. | 370/231 |
| 6,724,721 B1 | * | 4/2004 | Cheriton | 370/229 |
| 6,735,702 B1 | * | 5/2004 | Yavatkar et al. | 726/13 |

| | | | | |
|---|---|---|---|---|
| 6,865,185 B1 | * | 3/2005 | Patel et al. | 370/412 |
| 7,058,015 B1 | * | 6/2006 | Wetherall et al. | 370/236 |
| 7,062,782 B1 | * | 6/2006 | Stone et al. | 726/22 |
| 7,092,357 B1 | * | 8/2006 | Ye | 370/230 |
| 7,188,366 B2 | * | 3/2007 | Chen et al. | 726/23 |
| 2002/0101819 A1 | * | 8/2002 | Goldstone | 370/229 |
| 2003/0172289 A1 | * | 9/2003 | Soppera | 713/200 |

OTHER PUBLICATIONS

H-Y Chang S. F. Wu, C. Sargor, and X. Wu, "Towards Tracing Hidden Attackers on Untrusted IP Networks", pp. 1-19.
S. Savage, D. Wetherall, A. Karlin and T. Anderson, "Practical Network Support for IP Traceback", Technical Report UW-CSE-00-02-01, University of Washington, 6 pgs.

(Continued)

*Primary Examiner*—Chau Nguyen
*Assistant Examiner*—Nittaya Juntima

(57)            **ABSTRACT**

Methods and apparatus for providing an Anti-Flooding Flow-Control (AFFC) mechanism suitable for use in defending against flooding network Denial-of-Service (N-DoS) attacks is described. Features of the AFFC mechanism include (1) traffic baseline generation, (2) dynamic buffer management, (3) packet scheduling, and (4) optional early traffic regulation. Baseline statistics on the flow rates for flows of data corresponding to different classes of packets are generated. When a router senses congestion, it activates the AFFC mechanism of the present invention. Traffic flows are classified. Elastic traffic is examined to determine if it is responsive to flow control signals. Flows of non-responsive elastic traffic is dropped. The remaining flows are compared to corresponding class baseline flow rates. Flows exceeding the baseline flow rates are subject to forced flow rate reductions, e.g., dropping of packets.

**11 Claims, 10 Drawing Sheets**



Appx1296

**US 7,295,516 B1**

Page 2

OTHER PUBLICATIONS

"Characterizing and Tracing Packet Floods Using Cisco Routers", downloaded from: wysiwyg://23/http://www.cisco.com/warp/public/707/22.html, 5 pgs.

"Cert® Advisory CA-1996-26 Denial-of-Service Attack via ping", downloaded from: http://www.cert.org/advisories/CA-1996-26.html, 4 pgs., last revised Dec. 5, 1997.

"Cert® Advisory CA-1996-21 TCP SYN Flooding and IP Spoofing Attacks", downloaded from: http://www.cert.org/advisories/CA-1996-21.html on Mar. 14, 2002, pp. 1-8, last revised Nov. 29, 2000.

S. Blake, D. Black, M. Carlson, E. Davies, Z. Wang, W. Weiss, "An Architecture for Differentiated Services", Network Working Group Request For Comments: 2475, downloaded from: ftp://ftp.isi.edu/in-notes/rfc2475.txt on Mar. 14, 2002, Dec. 1998, pp. 1-32.

L. Houvinen and J. Hursti, "Denial of Service Attacks: Teardrop and Land", Department of Computer Science Helsinki University of Technology, downloaded from: http://www.hut.fi/~ilhuovine/hacker/dos.html on Mar. 14, 2002, pp. 1-12.

SecurityFocus home mailing list: BugTraq "The "mstream" distributed denial of service attack tool", downloaded from: http://online.securityfocus.com/archive/1/57854 on Mar. 14, 2002, May 1, 2000, pp. 1-22.

Bellovin and Leech AT&T Labs Research, "ICMP Traceback Messages", Network Working Group Internet Draft, downloaded from: http://www.ietf.org/internet-drafts/draft-ietf-itrace-00.txt on Jul. 9, 2001, Mar. 2001, pp. 1-9.

S. Floyd and V. Paxson, "Why We Don't Know How To Simulate The Internet", AT&T Center for Internet Research, Oct. 11, 1999, pp. 1-13.

S. Floyd and K. Fall, "Promoting the Use of End-to-End Congestion Control in the Internet", May 3, 1999, pp. 1-16.

K. Thompson, G. J. Miller, and R. Wilder, "Wide-Area Internet Traffic Patterns and Characteristics", IEEE Network, Nov./Dec. 1997, pp. 10-23.

S. Floyd and V. Jacobson, "Link-sharing and Resource Management Models for Packet Networks", IEEE/ACM Transactions on Networking, vol. 3, No. 4, Aug. 1995, 22 pgs.

S. Floyd and V. Jacobson, "Random Early Detection Gateways for Congestion Avoidance", Lawrence Berkeley Laboratory University of California, 1993, pp. 1-22.

* cited by examiner

Cloudflare - Exhibit 1008, page 2



FIGURE 1

Cloudflare - Exhibit 1008, page 3

Appx1298



200
NETWORK NODE
210
MEMORY
216
TRAFFIC MONITORING ROUTINE
218
TRAFFIC CLASSIFIER
220
FORWARDING AND FLOW CONTROL ROUTINE
202
CPU
214
RECYCLING TABLE
222
TRAFFIC BASELINE GENERATING MODULE
224
DYNAMIC BUFFER MANAGER MODULE
206
226
PACKET SCHEDULER MODULE
228
EARLY-TRAFFIC REGULATOR MODULE
232
TRAFFIC BASELINES
204
PACKET FORWARDING ENGINE
230
CURRENT TRAFFIC STATISTICS
235
237
239
MAX BITS
TOTAL BITS
MIN BITS
234
MULTIPLE CLASS BASED PACKET QUEUES
231
LONG TERM TRAFFIC STATISTICS
233
I/O INTERFACE
208
TO/FROM ROUTERS AND/OR HOST DEVICES

FIGURE 2



START
301
300
INCOMING PACKET STREAM FOR TIME PERIOD ΔT
325
RECEIVE PACKETS
302
CLASSIFY PACKETS INTO CLASSES, EACH CLASS BEIING DEFINED BY DESTINATION ADDRESS, PROTOCOL TYPE, AND APPLICATION TYPE
303
FOR EACH CLASS DO:
306
GENERATE SUM OF MAXIMUM NUMBER OF BITS RECEIVED FROM ANY ONE FLOW DURING EACH SECOND OF TIME PERIOD ΔT
304
GENERATE SUM OF TOTAL BITS RECEIVED DURING TIME ΔT FOR ALL FLOWS IN CLASS
305
GENERATE SUM OF MINIMUM NUMBER OF BITS RECEIVED FROM ANY ONE FLOW DURING EACH SECOND OF TIME PERIOD ΔT
SUBTRACT MAX AND MIN SUMS FROM TOTAL SUM TO GENERATE MODIFIED SUM
307
DIVIDE MODIFIED SUM BY SECONDS IN TIME PERIOD ΔT AND NUMBER OF FLOWS IN CLASS MINUS 2 TO GENERATE CURRENT AVERAGE FLOW DATA RATE
308
STORE CURRENT AVERAGE FLOW DATA RATE
310
RETRIEVE STORED AVERAGE FLOW DATA RATES FOR TIME PERIOD ΔT FROM STORED STATISTICS FOR PRECEDING WEEKS
312
EXCLUDE FROM SET OF AVERAGE FLOW RATES, INCLUDING PRECEDING WEEKS AND CURRENT WEEK, MIN AND MAX AVERAGE FLOW RATE
314
GENERATE AVERAGE FLOW RATE BASELINE, FOR GIVEN CLASS , BY AVERAGING REMAINING FLOW RATES
316
STORE GENERATED CLASS FLOW RATE BASELINE
318
STOP
320

FIGURE 3



**FIGURE 4**

Class Flow Baseline Table For Destination D2 — 400

| | 402 | 404 | 406 | 408 |
|---|---|---|---|---|
| Protocol Type | TCP | | UDP | |
| Application Type | Web | FTP | Echo | DNS |
| Average Baseline (Arrival Rate bit/sec) | 1000 | 500 | 200 | 100 |
| | Class 1 | Class 2 | Class 3 | Class 4 |

**FIGURE 6**

Flow Statistics Before Processing — 600

| | Elastic | | | | | Best-Effort | | | |
|---|---|---|---|---|---|---|---|---|---|
| Traffic Type | Elastic | | | | | Best-Effort | | | |
| Protocol Type | TCP | | | | | UDP | | | |
| Application Type | Web | | | FTP | | Echo | | DNS | |
| Arrival Rate | 3500 | | | 1100 | | 780 | | 290 | |
| Flow (s) | F1 | F2 | F3 | F4 | F5 | F6 | F7 | F8 | F9 |
| Arrival Rate Per Flow | 800 | 1200 | 1500 | 700 | 400 | 180 | 500 | 200 | 90 |
| | Class 1 | | | Class 2 | | Class 3 | | Class 4 | |

**FIGURE 7**

Traffic Throughput After Processing — 700

| | Elastic | | | | | Best-Effort | | | |
|---|---|---|---|---|---|---|---|---|---|
| Traffic Type | Elastic | | | | | Best-Effort | | | |
| Protocol Type | TCP | | | | | UDP | | | |
| Application Type | Web | | | FTP | | Echo | | DNS | |
| Throughput (bit/sec) | 1800 | | | 400 | | 380 | | 200 | |
| Flow (s) | F1 | F2 | F3 | F4 | F5 | F6 | F7 | F8 | F9 |
| Responsiveness | YES | YES | YES | NO | YES | N/A | N/A | N/A | N/A |
| Aggressiveness | NO | YES | YES | YES | NO | NO | YES | YES | NO |
| Throughput | 800 | 1000 | 0 | 0 | 400 | 180 | 200 | 100 | 90 |
| | Class 1 | | | Class 2 | | Class 3 | | Class 4 | |

FIGURE 5

Cloudflare - Exhibit 1008, page 7

Appx1302



FIGURE 8

Cloudflare - Exhibit 1008, page 8



START ETR
902
900
DETECT POTENTIAL CONGESTION COLLAPESE AT CURRENT NODE (BOTTLENECK NODE)
904
SEND MESSAGE FROM BOTTLENECK NODE TO DESTINATION NODE TO INITIATE A BACKTRACING OPERATION
906
DESTINATION NODE DETERMINES PATH OF PACKET(s) CORRESPONDING TO FLOW(S) CAUSING BOTTLENECK
908
DESTINATION NODE TRANSMITS PATH INFORMATION TO BOTTLENECK NODE
910
BOTTLENCK NODE SENDS AN ETR SIGNAL INCLUDING, E.G., DESTINATION ADDRESS, TO UPSTREAM NODE(s) INDICATED IN RECEIVED PATH INFORMATION
912
IN RESPONSE TO CONGESTION CONTROL METHOD, UPSTREAM NODE APPLIES FORCED REDUCTION TO FLOW(S) DIRECTED TO DESTINATION INDICATED IN ETR SIGNAL
914
STOP
916

FIGURE 9



FIGURE 10A



FIGURE 10B

Cloudflare - Exhibit 1008, page 10

Appx1305



# FIGURE 11

Cloudflare - Exhibit 1008, page 11



FIGURE 12

Cloudflare - Exhibit 1008, page 12

Appx1307

US 7,295,516 B1

**1**

## EARLY TRAFFIC REGULATION TECHNIQUES TO PROTECT AGAINST NETWORK FLOODING

### FIELD OF THE INVENTION

The present invention is directed to communication systems, and more particularly, to flow control methods and apparatus suitable for use in network congestion control, especially when systems are under flooding Denial-of-service attacks.

### BACKGROUND OF THE INVENTION

Data networks are used today to transmit vast amounts of data. Such networks comprise elements sometimes called nodes. Nodes may be, e.g., routers, switches, and/or end-hosts. Among those nodes, routers or switches are called network nodes. End-hosts can serve as the source or destination of data transmitted through a network. In many packet networks, data is transmitted between a source and destination device as a flow of packets. Flows of packets can be categorized by a wide range of factors including, e.g., the type of protocol used to form and/or transmit the packet and/or the specific type of application to which the packet corresponds.

As known in the art, it is common to monitor traffic flows and store flow statistics in a database, e.g., for purposes of load balancing and traffic route determination. Gathered traffic information for a node typically includes information such as packet flow rates and, for each flow, protocol type, application type, source IP address, source port number, destination IP address, destination port number, etc. Such detailed statistics along with information about the time periods in which such statistics are gathered can be used to group traffic flows into a wide number of classes depending on the intended purpose of grouping the traffic.

Flooding Network DoS (N-DoS) attacks occur in a network when one or more sources send large amounts of data to a destination node, e.g., web page server, in an attempt to interfere with the normal servicing of traffic at the destination node. Flows of traffic used to implement N-DoS attack can be considered malicious since their purpose is to interfere with the communication and servicing of legitimate network traffic.

Malicious flows associated with an flooding N-DoS attack often create congestion at certain nodes located prior to, i.e., upstream from, the flow's destination node. The nodes at which congestion occurs are sometimes referred to as bottleneck nodes.

As a result of malicious sources flooding a bottleneck node with traffic, legitimate traffic passing through the bottleneck node may be subject to dropping of packets thereby preventing legitimate communications. Thus, N-DoS attacks negatively effect legitimate users, and/or even cause its victim's services (e.g. web sites) to crash due to excessive loading.

One known technique for protecting against N-DoS attacks involves explicit signature capture and analysis. For example, those signatures can be communication port numbers, daemon names or commands, or contained in IP packet payload. Unfortunately these approaches can be ineffective and may result in negative consequences for legitimate users, because the signatures can change over time making a captured signature useless in identifying a malicious source during a subsequent attack.

**2**

Another disadvantage of the signature capture system is that the signature collection methods are an aftermath defense approach. Thus, such an approach helps in preventing future attacks with known signatures, but is of limited use during initial attacks.

In view of the above discussion, it is apparent that there is a need for methods of effectively identifying malicious traffic flows, e.g., traffic flows from individuals and/or sources involved in launching an N-DoS attack. There is also a need for methods and apparatus for reducing and/or eliminating the effects of malicious traffic flows associated with N-DoS attacks. It is desirable that at least some congestion control methods be capable of limiting malicious traffic prior to a significant collapse or restriction on legitimate network traffic occurs.

### SUMMARY OF THE INVENTION

The present invention is directed to congestion control methods and apparatus. Various methods and apparatus of the invention are well suited for defending against flooding network Denial-of-Service (N-DoS) attacks.

An Anti-Flooding Flow-Control (AFFC) mechanism of the present invention monitors, analyzes, and regulates traffic flows at network nodes, e.g., routers, based on the flow's behavior. In a node, the AFFC mechanism of the invention, utilizes a traffic baseline generating module, a dynamic buffer manager module, a packet scheduler module, and optionally, an early traffic regulator (ETR) module. Each module may be implemented using software and/or hardware.

In some embodiments traffic baselines are generated external to a node using traffic information for the particular node. The generated baselines are then supplied to the dynamic buffer manager and packet scheduler in the node. In such embodiments, the traffic baseline module may be implemented as a stand-alone device separate from packet forwarding nodes. This can reduce the processing burden placed on such nodes by the AFFC methods of the invention.

While the AFFC mechanism can be implemented in a single node, for more effective network protection it can be implemented in multiple network nodes. AFFC modules, e.g., ETR modules, of different nodes may, and in various embodiments do, interact with one another to perform a multi-node approach to congestion control.

The traffic baseline generating module receives and analyzes traffic statistics to generate baseline flow statistics, e.g., diurnal flow statistics, for individual periods of time, e.g., hours or minutes of a day in a week. The traffic baselines are generated for each node based on the traffic through the node over an extended period of time, e.g., multiple weeks.

As part of the flow control method, the current data flow rates are compared to the corresponding baseline flow rate for the same period of time and type of traffic. Flows are determined to be aggressive if they have an arrival rate that is higher than the baseline for flow of its type. In accordance with the present invention, under certain circumstances aggressive flows are targeted for forced data rate reductions. In addition to aggressive flows, unresponsive elastic flows may be blocked independently of traffic baselines.

The dynamic buffer manager module $224$ and packet scheduler module $226$ are the mechanisms by which forced reductions in data flow rates are implemented at a node in response to the presence of congestion. In accordance with the invention the forced data flow reduction functionality of the buffer manager and packet scheduler normally remain

Cloudflare - Exhibit 1008, page 13

US 7,295,516 B1

**3**

inactive. However, when congestion is detected or a control message is received from another network node as part of the ETR method of the invention, the forced data flow reduction functionality in a node is activated. An ETR message triggering activation of the buffer manager and packet scheduler functionality may be received from, e.g., a downstream node confronting a potential collapse due to congestion.

The dynamic buffer manager module **224** of the invention determines packet dropping rates to be applied to different data flows, e.g., those flows identified as being allowable but aggressive. The packet scheduler module **226** determines current packet forwarding rates, e.g., flow rates.

During periods of congestion during which the forced data flow reduction is applied, incoming data flows are processed based on their traffic types, elastic traffic and best effort traffic. Elastic traffic, which is not responsive to congestion signaling, e.g., ECN (Explicit Congestion Notification) or packet dropping, is considered malicious and dropped.

Elastic traffic that is responsive to congestion signals is considered allowable.

For both elastic traffic and best-effort traffic, allowable traffic flows are determined to be aggressive if the flow rate of the allowable flow exceeds a corresponding baseline flow rate. Allowable non aggressive flows, e.g., flows having a flow rate equal to or lower than a corresponding baseline flow rate are forwarded without being subject to flow rate reduction. Allowable flows that are found to be aggressive, are subject to forced reductions in their flow rates during periods of congestion. The applied flow rate reduction may, e.g., reduce the flow rate of an aggressive flow, to or below the corresponding baseline flow baseline.

To support different packet drop rates for each allowable aggressive flow, packets from different allowable aggressive flows are stored in different packet forwarding queues. e.g., one per allowable aggressive flow. In some embodiments, e.g., where sufficient memory is not available to support one queue per flow, a group of flows (e.g. from the same domain) may be processed per queue.

The dynamic buffer manager module **224** of the invention determines packet dropping rates to be applied to different data flows, e.g., those flows identified as being allowable but aggressive. The packet scheduler module **226** determines current packet forwarding rates, e.g., flow rates. As mentioned above, the current flow rates are compared to the baseline flow rates and packets are dropped, e.g., when the current flow rate exceeds the baseline flow rate. Accordingly, incoming flows are subject to different reductions in their flow rates as a function of their normal baselines and their current arrival rates. In the case of malicious traffic flows, such forced data rate reductions may be interpreted as punishing of the malicious flows.

ETR is a mechanism by which congestion control, and forced data rate reductions can be triggered in nodes upstream of a bottleneck node where the congestion occurs. ETR messages are used to activate flow reduction in the upstream nodes. Thus ETR offers protection for downstream nodes facing potential collapse due to congestion by reducing the flow of traffic directed to the node suffering from congestion.

Numerous additional features and advantages of the invention are discussed in the detailed description which follows.

**4**

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a communications system incorporating nodes that implement the present invention.

FIG. **2** illustrates an exemplary router implemented in accordance with the present invention that may be used as one of the routers shown in FIG. **1**.

FIG. **3** illustrates the steps of an exemplary traffic baseline generation routine of the invention.

FIG. **4** illustrates an exemplary flow baseline table generated and used in accordance with an embodiment of the present invention.

FIG. **5** illustrates the steps of an Anti-Flooding Flow-Control (AFFC) method implemented in accordance with an exemplary embodiment of the present invention.

FIG. **6** illustrates an exemplary set of internet traffic statistics measured right during a period of potential congestion collapse at a bottleneck node.

FIG. **7** illustrates an exemplary set of router throughput statistics resulting from the AFFC method of the invention being applied at a bottleneck node to the flows listed in FIG. **6**.

FIG. **8** illustrates the dropping of packets from a queue in accordance with the invention.

FIG. **9** illustrates an early traffic regulation method of the invention.

FIGS. **10A** and **10B** illustrate early traffic regulation modules implemented in accordance with the invention.

FIGS. **11** and **12** illustrate signaling between various nodes performed in accordance with the invention.

## DETAILED DESCRIPTION

The present invention is directed to congestion control methods and apparatus. The methods and apparatus of the present invention are well suited for defending against network Denial-of-Service (N-DoS) attacks.

FIG. **1** illustrates a communications system **100** implemented in accordance with the present invention. The system **100** comprises a plurality of sources **102**, **104**, **106**, an internet **108** and a plurality of destination nodes **110**, **112**, **114**. The internet **108** may be a corporate internet or the world wide Internet. The internet **108** comprises a plurality of nodes R1 through R10 **116**, **118**, **120**, **122**, **124**, **126**, **127**, **128**, **130**, **132** connected together as shown in FIG. **1** by the use of solid lines. Each of the nodes may be, e.g., a router or a switch. Arrows are used in FIG. **1** to indicate the flow of packets, e.g., between source devices S1, S2, . . . , SN, **102**, **104**, **106** and destination device **112**. While FIG. **1** shows flows of packets to destination device D2 **112** from sources S1, S2, . . . , SN, **102**, **104**, **106** the communications paths in the system **100** between the routers and devices are bi-directional allowing for responses, e.g., packets and messages, to be transmitted in the reverse direction as well. In the FIG. **1** embodiment source S1 **102** is coupled to the internet **108** by router R1 **116**. In addition, source S2 is coupled to the internet **108** by router R4 **122**, while source SN **106** is coupled to the internet **108** by router R8 **128**. Router R7 **127** couples each of the three destination devices, D1 **110**, D2 **112**, and D3 **114**, to the internet **108**. As a result packets from any one of the sources **102**, **104**, **106** will pass through router R7 prior to reaching one of the destination devices **110**, **112**, **114**.

Since traffic directed to a destination device, e.g., device D2 **112**, will pass through the router R7 **127** regardless of the source of the traffic, router R7 **127** represents a potential congestion point. For purposes of explaining the invention,

Cloudflare - Exhibit 1008, page 14

5

router R7 127 will be referred to as a "bottleneck" node since it is the point in system 100 where traffic bottlenecks may occur when excessive amounts of traffic are directed to one of the destination devices D1, D2, D3 110, 112, 114. Relative to the bottleneck node 127, system elements, e.g., routers and sources located to the left of bottleneck node 127, are upstream nodes. System elements, e.g., devices D1, D2, D3 110, 112, 114 to the right of the bottleneck node 127, are downstream nodes since they follow bottleneck node 127 in terms of the exemplary traffic flows shown in FIG. 1.

A flooding N-DoS attack works by transmitting a large amount of traffic from one or more sources to a particular destination, e.g., a web page server, which is the target of the N-DoS attack. For purposes of explaining the invention, when discussing an exemplary N-DoS attack it will be assumed that destination device D2 112 is the target of the exemplary attack. The exemplary N-DoS attack will result in bottleneck node 127 being flooded with useless information, corresponding to malicious data flows associated with the N-DoS attack.

FIG. 2 illustrates an exemplary router 200 implemented according to one embodiment of the present invention. The router 200 may be used as, any one of the routers shown in FIG. 1 including edge router 127 which serves for discussion purposes as the exemplary bottleneck node. Router 200 comprises of a CPU 202, a packet forwarding engine 204, an I/O interface 208 and a memory 210. These elements are coupled together by bus 206.

The CPU 202 controls operation of the router 200 under direction of various routines stored in memory 210. The packet forwarding engine 204 is responsible for controlling the forwarding of packets under direction of various routines executed by the CPU 202. As part of the forwarding process packet forwarding engine 204 may store received packets corresponding to different flows and/or classes in different queues. In accordance with the congestion control mechanisms of the present invention some received packets may be dropped by the packet forwarding engine, e.g., when the router 200 is incapable of forwarding packets at the rate at which they are received. The I/O interface 208 couples the router to other routers and/or host devices, e.g., source and/or destination devices. Thus, via I/O interface 208 the router 200 receives and transmits packets.

Memory 210 includes a traffic monitoring routine 216, traffic classifier 218, forwarding and flow control routine 220, traffic baseline generating module 222, dynamic buffer manage module 224, packet schedule module 226, early traffic regulator (ETR) module 228, traffic statistics 230, traffic baselines 232, a Recycling table 214, and a plurality of class based packet queues 234. The traffic statistics 230 include current traffic statistics 231 and long term, e.g., weekly traffic statistics 233. The various modules 222, 224, 226, 228 may be implemented as, e.g., software routines. Alternatively, the modules could be implemented in hardware, e.g., in the router 200, to enhance processing speed.

The traffic monitoring routine 216 monitors to detect when the rate at which packets are received exceeds the maximum forwarding packet rate of the router 200 for a period of time corresponding to the buffering capacity of the router 200. This condition corresponds to saturation at the router 200 necessitating the dropping of some received packets. The traffic monitoring routine 216 notifies the forwarding and flow control routine 220 when saturation occurs and the length of the period of saturation.

The traffic classifier 218 is used to classify packets into different classes and/or flows of traffic based on such factors as source address, destination address, protocol type, and

6

application type. The application type is determined from the port number or message type information included in a packet. The level, e.g., resolution, of traffic classification applied by the classifier 218 may depend on the application for which the classifier is being used. The traffic classifier can be called by the traffic baseline generating module 222 and/or the forwarding and flow control routine 220 during normal operation.

Forwarding and flow control routine 220 is responsible for controlling the forwarding and flow control of packets in accordance with the present invention. The forwarding and flow control routine 220 is responsible for activating the dynamic buffer manager module 224, packet scheduler module 226 and early traffic regulator module 228 used to implemented forced reductions in flow data rates in accordance with the present invention when the router 200 is saturated by packet traffic, e.g., for a preselected period of time. By limiting implementation of all or some of the flow reduction features of the present invention until saturation of a node has occurred for a period of time, application of the anti-flooding flow reduction techniques can be limited to cases where flooding is likely to be occurring or to cases where a traffic collapse at the node is likely to occur if steps are not taken to avoid the collapse. In addition, false alarms of which can be induced by occasional short-term traffic spikes can be reduced or eliminated.

Traffic baseline generating module 222 operates in parallel with the forwarding and flow control routine 220 to generate traffic baselines for various traffic flows at preselected intervals. As will be discussed below, the traffic baselines 232 are generated from the traffic statistics 230 which are produced over an extend period of time, e.g., days or weeks. Traffic baselines 232 are stored in memory for use in forced traffic flow reduction operations implemented in the router 200 in accordance with the invention.

The dynamic buffer manager module 224 and packet scheduler module 226 implement in accordance with the invention are responsible for performing forced reductions in the rate of packet flows through the router 200. The amount of the flow reduction applied to individual flows or flow groups is determined as a function of the traffic baselines 232.

Early traffic regulator module 228 is used to send early traffic regulation (ETR) signals, e.g., messages, to upstream nodes to trigger the congestion control and forced packet flow reductions techniques of the present invention to be implemented in the upstream node. In the case of a node receiving an ETR message, the ETR module 228 is responsible for responding to the ETR message by implementing forced packet flow rate reductions. In some embodiments the forced packet flow rate reductions in response to an ETR message are on flows directed to the node which was the source of the ETR message while in other embodiments, the forced packet flow rate reductions are limited to flows destined for target IP address(es) identified in the received ETR message.

An exemplary traffic baseline generating routine 300, which can be used as the traffic base line generating module 222, is shown in FIG. 3.

Traffic baseline generation involves removing spikes in a time window corresponding to a daily period of time and removing short-term abnormal traffic patterns which may be encountered over a period of weeks. Furthermore, depending on the implementation, traffic classification for baseline generation purposes need not be limited to simply protocol

Cloudflare - Exhibit 1008, page 15

US 7,295,516 B1

**7**

types and IP addresses but may also be based on the application type and/or port numbers associated with packets.

The routine **300** starts in step **301** wherein the routine is executed by the CPU **202**. Then in step **302**, packets **325** for a current time period ΔT are received. The time period ΔT may be fixed or any desired length depending on the environment and specific traffic patterns and/or time of week for which the flow rate baseline is being generated. The packets **325** correspond to multiple destination addresses and sources. Accordingly, many flows of traffic are represented in the received packet stream **325**. Each packet includes source IP addresses, destination IP addresses, protocol type information, port number and/or message type information. As discussed above, port number and/or message type information can be used to identify an application to which the packet corresponds. ΔT in the exemplary embodiment is a time segment, e.g., 30 minute time segment, from a 24 hour time period. ΔT can be either constant through the day, e.g., 30 minutes, or vary at different time of the day, e.g., 120 minutes from 2 A.M. to 4 A.M. vs. 30 minutes for other busier times of the day. Holidays may be treated as special cases for purposes of data collection and baseline generation if desired, e.g., due to very different traffic patterns on those days.

In step **303**, each packet is classified based on destination address, protocol type and application type. The resulting sets of data correspond to individual classes of traffic.

Some exemplary protocol types are TCP and UDP, while some exemplary applications that use TCP are web traffic and FTP traffic. An exemplary application that uses UDP is Echo traffic. Accordingly, the first exemplary traffic class might include TCP packets for an FTP application directed to a first destination. A second exemplary traffic class might include TCP packets for a web application directed to the same destination. Numerous other traffic classes are possible with the granularity of the class being a matter of design choice.

Each class will normally include multiple flows with the number of bits received in each flow varying as a function of time. The number of bits received in each second by each flow in a class is used in steps **304**, **305**, and **306**, which operate in parallel.

In step **304**, a sum of the maximum number of bits received from any one flow during each second of time period ΔT is generated. The running maximum sum, tends to be larger than the number of bits received in any one of the flows since it may be generated from values obtained from different flows.

In step **305**, a sum of the total bits received by the node for all the flows in the class being processed during time ΔT is generated.

In step **306**, a sum of the minimum number of bits received from any one flow during each second of time period ΔT is generated. This running minimum sum tends to be smaller than the minimum number of bits received in any one of the flows since it may be generated from values obtained from different flows.

The running sums of max, min and total bits received are stored in memory elements **235**, **237**, **239** during processing.

Once the maximum, total, and minimum number of bits are determined for time period ΔT in steps **304**, **305**, **306** operation proceeds to step **307**. In step **307**, the max and min sums are subtracted from the total number of bits to generate a smoothed total sum.

In step **308**, the smoothed total sum is divided by the number of seconds in the time period ΔT and the number of

**8**

flows in the class being processed minus 2. The subtraction of 2 from the total number of flows represents the elimination of bits corresponding to the composite min and max data flows used to reduce the impact of transient or abnormal flow characteristics. The result of the division operation is a smoothed average value, the current average flow data rate.

The current average flow data rate is then stored in step **310** thereby updating the set of long term, e.g., multi-week, traffic statistics **233**.

The traffic baseline generating method **300** continues in step **312** by retrieving stored average flow data rates for the corresponding time periods ΔT generated from statistics **233** for the preceding weeks. For example, average flow rates may be retrieved in step **312** from the long term traffic statistics **233** for the four weeks preceding the current time period.

Once again, to reduce the risk of flow rate anomalies having a large impact on a class baseline, in step **314**, the minimum and maximum average flow rates, from the set of average flow rates including the average flow rates for the preceding weeks and the current week, are excluded from the set of data used for generating the class flow rate baseline. Assuming the flow rates for 4 preceding weeks were retrieved in step **312**, excluding the minimum and maximum average weekly flow rates will result in 3 average weekly flow rates remaining for the traffic class being processed.

In step **316** the flow rate baseline for the class of traffic being processed is generated by averaging the remaining average weekly flow rates. Next, in step **318** the generated flow rate baseline for the traffic class being processed is stored, e.g., in the set of baseline statistics **232**. The most recent class flow baseline for a particular time period may replace a previously generated baseline for the same time period thereby ensuring that the set of traffic baselines **232** includes the most recently generated baseline flow rates for the various classes of traffic and time periods of interest.

In the above described manner, flow rate baselines are generated for a class based on packet arrival rates. Alternatively, such baselines could be generated from other flow statistics, e.g., packet forwarding rates.

After flow rate baselines are generated for each class of traffic for which flow rate information is received, the flow rate baseline generation process stops in step **320** pending receipt of another set of flow packets for processing in the next time period ΔT'.

While baselines are described as being generated in the above described manner for classes defined by destination address, protocol type, and application type, classes may be defined with less granularity, e.g., without considering application type or port number. In such cases, flow rate baselines for the classes can be generated by applying steps **304**, through **318** to the traffic corresponding to each class as defined for the particular application.

FIG. **4** illustrates an exemplary flow baseline table **400** for a single destination address. The traffic baselines **232** include information of the type shown in FIG. **4**, for each destination address of interest, e.g., each downstream web server likely to be the target of a N-Dos attack.

The table **400** includes base lines for four different classes of packet traffic corresponding to a single destination address D2. In FIG. **4**, each column **402**, **404**, **406**, **408** corresponds to a different traffic class as defined, for the given destination address, by the protocol type (TCP or UDP) and application type (Web, FTP, Echo, or DNS), as determined by port number and/or message type. The second from the last line of the table **400** indicates the baseline flow

Cloudflare - Exhibit 1008, page 16

US 7,295,516 B1

9

rate for each class. Directly below each baseline flow rate is listed the class to which it applies.

In the FIG. 4 example, class 1 which corresponds to Web traffic has a baseline flow rate of 1000 bits/s per flow. Class 2 which corresponds to FTP traffic has a baseline flow rate of 500 bits/s. In addition class 3 which corresponds to Echo traffic has a baseline flow rate of 200 bits/s while class 4 which corresponds to DNS traffic has a baseline flow rate of 100 bits/sec.

The packet forwarding and flow rate control routine of the present invention will now be described with reference to FIG. 5. FIG. 5 illustrates an exemplary forwarding and flow rate control routine.

The routine 220 begins in step 502 when the router which includes the routine is activated and the routine is executed. Once the routine 220 is activated, control step 504 is performed on an ongoing basis. Control step 504 involves making a determination as to whether the router is currently experiencing congestion sufficient to merit the application of the AFFC mechanisms supported by the dynamic buffer manager module 224, packet scheduler module 226 and, optionally, the early traffic regulator module 228. In step 504, congestion sufficient to merit application of the AFFC flow control mechanisms is declared when the router encounters a saturation condition which persists for a pre-selected period of time, e.g., a period of time indicative of persistent and potentially hostile volumes of traffic.

In one particular embodiment, the congestion decision of step 504 is made based on two conditions to reduce false positives, the first condition is that the summation of total bandwidth shares at the node must saturate the node and second, the saturation condition must persist for a window period after the saturation condition initially occurs. In such an embodiment, congestion is declared in step 504 when the two conditions are met. Congestion is no longer found to be present when the saturation condition ceases to be encountered for the set period of time in which it was required to occur before congestion was declared.

When control step 504 determines that congestion does not exist, operation proceeds directly to step 527 with the received packets being forwarded without being subject to processing in accordance with the invention to reduce the flow rates of specific identified traffic flows.

However, when control step 504 detects the presence of congestion, e.g., the two conditions above are satisfied, traffic is processed along the path which proceeds to step 508 via optional step 506.

In optional step 506, ETR signaling is initiated. Such signaling will, as discussed below, trigger traffic regulation and flow control to be applied at an upstream node thereby reducing the traffic burden on the current node. When ETR is not used traffic flow processing proceeds directly from step 504 to step 508.

In step 508, the traffic classifier 218 is used to classify the individual incoming traffic flows to corresponding classes. The classes correspond to either elastic traffic, e.g., TCP traffic, or best effort traffic, e.g., UDP traffic. Processing then proceeds to step 510 which represents a fork for the processing of flows falling into either elastic or best effort classes.

Individual elastic flows, e.g., TCP flows, proceed from processing fork 510 to step 512 wherein each individual elastic flow is analyzed to determine if it is responsive to congestion signals, e.g., ECN or packet dropping.

Due to the congestion control avoidance scheme implemented in elastic protocol such as TCP, elastic traffic will normally decrease its packet send rate in response to con-

10

gestion signals. This responsiveness will be reflected, and can be detected, by a decrease in the arrival rate of packets from the source at the nodes through which the traffic flows.

In the case of N-Dos attacks, due to the use of spoofed IP addresses, some malicious sources may not respond to congestion signals. Other malicious sources without IP-spoofing may intentionally ignore congestion signals despite an ever increasing number of dropped packets. Such traffic flows are identified in step 512 as non-responsive, e.g., from their arrival rates which are higher than expected decreasing rate.

In one exemplary embodiment detection of responsiveness of a flow is derived from a specific TCP-friendly-traffic behavior, which is bound to a definite end-to-end congestion control and avoidance scheme—

$$T \le \frac{1.5\sqrt{2/3} * B}{R * \sqrt{p}};$$

where T is the maximum sending rate, B is the number of packet sent, R is the round-trip-time, and p is the packet dropping-rate.

In the exemplary embodiment the above behavior is checked in step 512 by measuring the relationship of packet-dropping rate p and packet arrival rate T. In the case of responsive TCP traffic when a packet dropping rate increases to a factor of $\sqrt{x}$, the packet arrival rates should decrease by a factor of $a * \sqrt{x}$; where a is an adjusting argument in considering link saturation situation and where a is usually $a \le 1$. Failure to detect the expected decrease in packet arrival rates results in a determination that a flow is non-responsive.

The recycling table 214 is used to record responsive elastic flow information for each class. The information includes data such as <source IP address>, <time-stamp>. Oldest flow records may be replaced by the newest record when the table is full. The table size may be restricted the amount of memory the network node can afford to allocate to this use. The responsiveness of an elastic flow in the table may be checked every time the next packet of the same flow arrives.

Processing of non-responsive flows proceeds from step 512 to step 520 wherein the non-responsive flows are blocked. The processing of the received packets corresponding to a non-responsive flow then stops in step 530.

If in step 512, an elastic traffic flow is determined to be responsive to congestion signaling, the flow is considered allowable and flow processing operation proceeds to step 516.

Best effort traffic is not expected to vary its data rate in response to the dropping of packets. For this reason, best effort traffic is not analyzed for responsiveness and is considered to be allowable traffic. Accordingly, for flows determined to correspond to best effort traffic, operation proceeds directly from step 510 to step 516.

Each of the allowable traffic flows or flow-groups is compared to the corresponding baseline for a flow of the same class and time, e.g., as indicated by the time and day of the week.

Allowable flows, i.e., best effort and responsive elastic traffic flows, having a flow rate equal to, or less than the corresponding baseline flow rate to which they are com-

Cloudflare - Exhibit 1008, page 17

US 7,295,516 B1

| 11 | 12 |

pared, are categorized as non-aggressive. Processing of non-aggressive flows proceeds to step 527 wherein the packets are forwarded.

However, allowable flows which have current flow rates exceeding the corresponding baseline flow rates are categorized as aggressive and identified for forced reductions in their flow rates. Processing of aggressive allowable flows proceeds from step 516 to step 518 wherein the forwarding rates of the aggressive flows are regulated, e.g., by dropping packets from the aggressive flows.

In step 518, the packet forwarding rates of each aggressive flow is regulated separately as a function of the flow's determined current flow rate and the corresponding baseline flow rate. Forced reduction in a flow's forwarding rate is implemented by adjusting the maximum threshold 802 of the queue 800 of a flow or flow group as shown in FIG. 8. The forced flow forwarding rate reduction is achieved, in one embodiment of the invention, by dropping the required number of received packets from the aggressive flows' packet forwarding queue. The drop rate, e.g., penalization severity, for each aggressive flow is affected by the packet arrival rate of the flow. The higher the packet arrival rate of the flow above the baseline flow rate, the higher the applied packet drop rate will be.

FIG. 8 illustrates a flow rate reduction technique which can be applied in step 518 to allowable aggressive flows in accordance with the invention to control packet drop rates as applied to a packet queue 800. As discussed above the packets corresponding to individual aggressive flows are stored in different packet queues. In FIG. 8 an exemplary flow rate reduction technique uses two different thresholds, which are queue fullness thresholds to control packet drop rates, a min threshold 804 and max threshold 802.

In the FIG. 8 example, the packet dropping-rate $v$ is affected by the packet forwarding-rate $\lambda_{out}$, which in turn is bound to the class baselines.

The relationship of the packet dropping rate and the maximum threshold is presented in Formula 1.

$$new\ max\ Thresh(t) = \qquad\qquad (1)$$
$$\frac{[x(t) - 1] * min\ Thresh(t - \Delta t) + max\ Thresh(t - \Delta t)}{x(t)}$$

Where the $x(t)$ is the change factor of packet dropping rate $v(t)$ within time frame $\Delta t$:

$$x(t) = \frac{v(t)}{v(t - \Delta t)}.$$

In step 518, the forwarding rates are regulated by a penalty factor $k$, which may be preset, e.g., to two—

$$\lambda(t) = \frac{\lambda(t - \Delta t)}{k}.$$

This calculation can be implemented using a shift operation with little cost. In the above equation $\lambda(t)$ is the packet forwarding rate at time (t) while $\lambda(t-\Delta t)$ is the forwarding rate at time (t-$\Delta t$).

After flow rate reduction is applied to the aggressive traffic flows, the remaining packets are forwarded in step 529. Processing of a set of received packets then steps in step 530.

Thus, in accordance with the present invention, packets corresponding to elastic non-responsive traffic will be blocked, i.e., it will not be forwarded. In addition, packets corresponding to elastic responsive flows and best effort flows will be passed subject to forced reductions in their flow rates when the flows exceed the baseline flow rates for flows of the same class of traffic.

Notably, in accordance with the invention the more aggressive the traffic flow, the greater the applied reduction in flow forwarding rate. Accordingly, while flows having flow rates within the normal baseline will be forwarded with less constraint during periods of congestion, flows with higher flow rates will be subjected to higher forwarding rate reduction. Thus, the flows corresponding to a N-DoS attack are more likely to be penalized as do its distinct traffic behavior which differs from that of legitimate normal flows.

FIG. 6 illustrates a set of flow statistics corresponding to nine different flows (F1 through F9) received by a node implementing the AFFC mechanism of the present invention. The nine flows correspond to four classes Class 1 through Class 4. For purposes of explaining the invention, it will be assumed that the baselines shown in FIG. 4 represent the current flow rate baselines for the four classes.

FIG. 7 illustrates the exemplary results of applying the flow control methods of the invention to the nine flows illustrated in FIG. 6. The second from last row of FIG. 7 shows the flow throughputs for each of the nine flows after AFFC processing. Notice that if the congestion still continues, the AFFC flow regulation will continue with the penalty ratio k on flow forwarding rates—

$$\lambda(t) = \frac{\lambda(t - \Delta t)}{k}.$$

In the case where the node is still saturated after application of the flow reduction techniques of the invention, additional packets may be dropped until the total volume of the flows equals the node's forwarding capacity. The dropping of such additional packets occurs in forwarding step 527 when necessary.

Flows F1 through F3 correspond to Class 1 traffic, i.e., TCP/Web traffic directed to destination D2. From FIG. 4 it can be seen that the baseline flow rate for Class 1 traffic in the example is 1000 bits/s.

Flow F1 is found to be elastic responsive traffic having a flow arrival rate (800 bits/s) which is less than the baseline flow rate (1000 bits/s) for class 1 traffic. Accordingly, no reduction is applied to the forwarding rate of flow F1.

Flow F2 is found to be elastic responsive traffic having a received flow rate (1200 bits/s) which is higher than the baseline flow rate (1000 bits/s) for class 1 traffic. Accordingly, forced flow rate reduction, e.g., dropping of packets, is applied to flow F2 to reduce its forwarding flow rate to the baseline of 1000 bits/s.

Flow F3 is found to be elastic non-responsive traffic. Accordingly, the packets of Flow F3 are dropped, i.e., they are not forward.

Flows F4 and F5 correspond to Class 2 traffic, i.e., TCP/FTP traffic directed to destination D2. From FIG. 4 it can be seen that the baseline flow rate for Class 2 traffic in the example is 500 bits/s.

Cloudflare - Exhibit 1008, page 18

US 7,295,516 B1

13

Flow F4 is found to be elastic non-responsive traffic. Accordingly, the packets of Flow F4 are dropped, i.e., they are not forward.

Flow F5 is found to be elastic responsive traffic having a received flow rate (400 bits/s) which is lower than the applicable baseline flow rate (500 bits/s) for class 2 traffic. Accordingly, no reduction is applied to the flow rate of flow F5.

Flows F6 thorough F9 correspond to best effort traffic, which does not have congestion control/avoidance scheme implemented in the protocol. Accordingly, responsiveness to congestion signals is not an issue with regard to these flows. Flows F6 and F7 correspond to Class 3 traffic, i.e., UDP/ Echo traffic directed to destination D2. From FIG. 4 it can be seen that the baseline flow rate for Class 3 traffic in the example is 200 bits/sec. Flows F8 and F9 correspond to Class 4 traffic, i.e., UDP/DNS traffic directed to destination D2. From FIG. 4 it can be seen that the baseline flow rate for Class 4 traffic in the example is 100 bits/sec.

Flow F6 is found to be best effort traffic having a received flow rate (180 bits/s) which is lower than the applicable baseline flow rate (200 bits/s) for class 3 traffic. Accordingly, no reduction is applied to the flow rate of flow F6.

Flow F7 is found to be best effort traffic having an arrival rate (500 bits/s) which is higher than the baseline flow rate (200 bits/s) for class 3 traffic. Accordingly, forced flow rate reduction, e.g., dropping of packets, is applied to flow F7 to reduce its flow rate to the baseline flow rate of 200 bits/s.

Flow F8 is found to be best effort traffic having an arrival rate (200 bits/s) which is higher than the baseline flow rate (100 bits/s) for class 4 traffic. Accordingly, forced flow rate reduction, e.g., dropping of packets, is applied to flow F8 to reduce its flow rate to the applicable baseline flow rate of 100 bits/s.

Flow F9 is found to be best effort traffic having an arrival rate (90 bits/s) which is lower than the applicable baseline flow rate (100 bits/s) for class 4 traffic. Accordingly, no reduction is applied to the flow rate of flow F9.

Altogether, in the FIG. 7 example 2890 out of 5670 bits of data were dropped. The benefits of the AFFC method can be seen from this example.

As will now be discussed further benefits can be obtained by implementing Early Traffic Regulation (ETR) in accordance with the invention.

The ultimate purpose of ETR is to regulate flows which are responsible for congestion upstream of the node, e.g., a bottleneck node, where congestion is detected. By providing congestion control upstream of the point of congestion, greater protection against a collapse at the bottleneck due to congestion is provided than when congestion control is implemented solely at the bottleneck node.

FIG. 9 illustrates the steps of the ETR method 900 of the present invention. The ETR method begins in step 902 with the execution of the ETR modules 228 in a plurality of network nodes including a destination node, bottleneck node and a node upstream of the point of congestion, e.g., the bottleneck node.

For purposes of explaining the ETR method of the present invention, consider the system of FIG. 1 in which the method 900 may be implemented. It will be assumed for purposes of explanation that destination device D1 110, node R7 127, and node R3 120 each include and implement the ETR module 228 of the present invention or at least a subset of the components thereof as will be discussed further below. It will also be assumed that source device S1 102 is one of a plurality of source devices being used to flood device D1 110 with traffic. It will further be assumed that the

14

flooding causes congestion at node R7 127, the bottleneck node thereby saturating the node for an extended period of time sufficient to trigger ETR. From FIG. 1 it can be seen that node R3 is an upstream node relative to bottleneck node R7 127 on the path leading between source S1 102 and destination device D2.

Referring once again to the ETR method shown in FIG. 9, operation proceeds to step 904, wherein a node, e.g., the bottleneck node 127, detects congestion sufficient to trigger the ETR signaling to initiate flow control at an upstream node.

In response to detecting congestion at the bottleneck node 127 in step 904, operation proceeds to step 906 wherein the bottleneck node 127 sends a message to the destination node 110. The destination node 110 is the node to which one or more of the packet flows that are causing the congestion, e.g., the non-responsive TCP flows and/or the aggressive allowable flows, are directed.

The receipt of the ETR message causes, in step 908, the destination node 110 to initiate a path back-tracing operation and to determine from a back-tracing operation the path of the packet flow or flows causing the congestion. The back tracing is performed using any one of a plurality of known techniques, which will not be discussed in any detail.

With the path of the flow or flows causing the congestion determined, in step 910 the destination node 110 sends the determined path information to the bottleneck node 127.

The path information obtained from the destination node 110 is used by the bottleneck node 127 in step 912. In step 912, the bottleneck node 127 sends an ETR signal, e.g., control message, to the upstream node 120 using the supplied path information. The ETR control message indicates whether flow control is to be applied (started) or discontinued (stopped) and includes information such as victims', e.g., targeted destination device IP address(es).

In step 914, in response to the ETR control message, the upstream node 120 implements flow rate control on the flow or flows identified in the ETR signaling message, e.g., the flows directed to the destination address indicated in the received ETR signaling message. The flow control techniques applied may include, e.g., blocking of non-responsive elastic flows and limiting other flows as a function of the upstream node's baselines for flows of the type being subjected to flow control. Accordingly, aggressive flows subject to flow control will undergo forced reductions in their flow rates at the upstream node, e.g., they will be subject to having packets dropped.

The upstream node will continue to provide flow control until receiving an ETR message from the bottleneck node 127 indicating that the congestion problem is no longer present.

The ETR method 900 of the invention stops in step 916 when the nodes implementing the method are turned off.

The various subroutines and messaging used to implement the ETR method of the present invention will now be discussed in further detail with reference to FIGS. 10-12.

FIG. 10A illustrates an exemplary network node ETR module 228 which is implemented in software. The ETR module 228 includes a main ETR control routine 1030, and a plurality of subroutines. The subroutines include a Route-Receive subroutine (Rt-R) 1038, a Back-tracing message Send (Bt-S) subroutine 1034, an ETR Send (ETR-S) subroutine 1036, and an ETR Receive (ETR-R) subroutine 1042.

FIG. 10B illustrates an exemplary ETR module 228' suitable for use in an end-host device, e.g., device 110. The

Cloudflare - Exhibit 1008, page 19

Appx1314

US 7,295,516 B1

15

module **228'** includes Route-Send (Rt-S) subroutine **1032**, and a Back-tracing message Receive (Bt-R) subroutine **1040**.

Some or all of the sub-routines **1034**, **1036**, **1038**, **1042** may be implemented in a network node. The purpose and various messages generated and/or processed by the various sub-routines will now be discussed with regard to FIG. **11**. It also illustrates the sub-routines at each node **110**, **127**, **120** used to receive and/or send the messages communication between the illustrated nodes.

FIG. **11** illustrates messaging passed between destination node **110**, bottleneck node **127** and upstream node **120** as part of the ETR method shown in FIG. **9**.

In the destination node **110**, two ETR subroutines are used for messaging. These are: (1) the Bt-R subroutine **1040**, and (2) the Rt-S subroutine **1032**. The Bt-R subroutine **1040** receives back tracing messages **1112** from upstream nodes requesting back tracing path reconstructed. In response to back tracking request messages **1112**, the BT-R subroutine **1040** reconstructs back tracing path The Bt-R subroutine **1040**, also receives back tracing path messages **1110** sent from network node **127** with certain probability (e.g. 1/20, 000, which corresponds to one path being determined for every 20,000 packets of a given flow that are received).

The back tracing path message **1110** indicates information relating to the network node which sent it. The information may include the network node's IP address, the IP address for the previous network node in the path, and next network node's IP address. From the received back tracing path message **1110** the Bt-R subroutine **1040** estimates Round Trip Time (RTT) based on a timestamp record "timestamp$_i$" located in the back tracing path message **1110**.

The timestamp record marks the time the backtracing path message leaves each node identified in the backtracking path message. For example, the back tracing path message **1110** provides a reconstructed network-node chain originating from the node **127**.

Similarly, **1126** is generated by node **120** sent to destination **110**, **1124** is generated by an upstream network node. Combining n such messages received by the end-host **110**, the following timestamp info can be collected: {R$_1$(timestamp$_1$), R$_2$(timestamp$_2$), . . . , R$_i$(timestamp$_i$), . . . , R$_n$(timestamp$_n$)}.

The RTT$_i$ from anyone of the routers listed in the message **1110** will be:

$$RTT_i=2\times(\text{TheTimeTheMessageWasReceived}-\text{timestamp}_i),$$

then the RTT of the network-node chain path can be estimated by RTT=max{RTT$_i$|ie[1,n]}. Then the RTT from the sender, source **102**, to the receiver, destination device **110**, RTT0, is estimated by RTT0=k×RTT. The factor k may be preset or can be determined and/or estimated by the destination node.

The relationship between RTT **1205**, back tracing path messages and the estimated round trip time period RTT0 **1207** can be seen in FIG. **12** for an exemplary communications path having a source **1202** and destination device **1214**. In FIG. **12**, the exemplary network node path-chain comprises, in addition to source and destination nodes **1202**, **1214**, respectively, nodes **1204**, **1206**, **1208**, **1210** and **1212**.

In accordance with one feature of the present invention estimated RTT0 time **1207** is conveyed to upstream nodes and is used to determine ETR signaling frequency. TCP-adaptive flows need at least one RTT0 time period **1207** to respond to congestion signals. Accordingly, in some

16

embodiments the period between ETR control signals is made as long or longer than one RTT0 time period **1207** so that the impact of TCP adaptive flow control mechanism, alone or in conjunction with applied flow control, can be properly gauged.

Referring once again to the FIG. **11** example, the Rt-S subroutine **1032** in the destination node **110** receives path information **1110**, **1126**, **1124** and so forth by the Bt-R subroutine **1040** which reconstructs the tracing path. The reconstructed path is then sent as a message **1114** to the bottleneck node **127**.

In the bottleneck node **127**, there are three subroutines in addition to the main ETR routine **1030**. As discussed above, the bottleneck node **127** requests route information from end hosts when potential flooding N-DoS congestion collapse is detected. In the bottleneck node, when congestion sufficient to merit early traffic regulation is detected, the main ETR control routine **1030** is responsible for triggering, via control signal **1135**, the sending of a backtracking request message.

Three sub-routines used in the bottleneck node **127** are: (1) the Bt-S sub-routine **1034**, (2) the Rt-R subroutine **1038**, and (3) the ETR-S subroutine **1036**.

The Bt-S subroutine **1034** sends path tracing information, e.g., path messages **1110**, to downstream nodes. The path tracing messages may include path and timing information received by the Bt-S subroutine **1034** from upstream nodes. The Bt-S **1034** is also responsible for sending back tracing initiation request messages **1112** to the destination to request the reconstructed back tracing path when triggered by the control routine **1030** via the signal **1135**.

The Rt-R subroutine **1038** receives reconstructed tracing-path information **1114** from one or more end hosts, e.g., destination node **110**. This information identifies upstream nodes to which ETR control messages may be sent. The path information is supplied to the ETR-S subroutine **1036**. The ETR-S subroutine **1036** sends ETR control messages used to trigger flow control operations to one or more prior, i.e., upstream, network nodes along the reconstructed tracing path. The ETR control messages may include, e.g., upstream path information, and information identifying flows to be subject to flow control. Flows which are to be subject to flow control may be identified in an ETR control message by destination and/or one or more other identifiers.

As mentioned above, ETR control message sending rates, e.g., to enable/disable flow control in upstream nodes are bound to RTT estimated in end hosts based on the timestamp data attached in back tracing messages. Thus, time spacing between ETR control messages will be equal to, or greater than, the estimated RTT0 time period.

In the upstream node **120**, in addition to the main ETR control routine **1030**, there are three subroutines: (1) the Bt-S subroutine **1034**, (2) the ETR-R **1042**, and (3) the ETR-S subroutine **1036**.

The Bt-S subroutine **1034** sends path tracing information in the form of message **1126** to the destination end-node.

The ETR-R subroutine **1042** in the upstream node **120** responds to ETR control messages received from downstream nodes, e.g., node **127**. As part of the response to an ETR signal the main ETR control routine **1030** is triggered to initiate flow control on the flow or flows identified by information in the received ETR control message. In addition to initiating flow control in the current node, the main ETR control routine **1030** passes an ETR control message to the next upstream node, if any, identified in the received ETR message. The passed ETR control message is transmitted via the ETR-S subroutine **1036** which is responsible for transmitting ETR signals **1118** and **1122** to the nodes **120**

Cloudflare - Exhibit 1008, page 20

US 7,295,516 B1

17

and **127**. As a result of ETR signal passing, flow control may be triggered on the identified flows in multiple upstream nodes.

In the above described manner AFFC flow control may be activated in one or more nodes preceding a bottleneck node, thereby eliminating some of the traffic directed to the bottleneck node. This upstream protection reduces the risk of congestion collapse at the bottleneck node.

Numerous variations on the above described methods and apparatus are possible without departing from the scope of the invention.

What is claimed is:

**1**. A packet flow control method comprising the steps of: detecting congestion in a first node along a packet flow path between a source device and a destination device; identifying a node in said path preceding said first node, wherein said step of identifying a node in said path includes the step of transmitting a signal to said destination device requesting path information; and transmitting to said preceding node a traffic regulation signal used to initiate flow rate control on flows identified from information included in said traffic regulation signal, wherein said information included in said traffic regulation signal includes a destination address.

**2**. A packet flow control method comprising the steps of: detecting congestion in a first node along a packet flow path between a source device and a destination device, including the step of monitoring to detect when said first node is saturated with packet traffic for a preselected period of time;

identifying a node in said path preceding said first node, wherein said step of identifying a node in said path includes the step of transmitting a signal to said destination device requesting path information, and

transmitting to said preceding node a traffic regulation signal used to initiate flow rate control on flows identified from information included in said traffic regulation signal, wherein said information included in said traffic regulation signal includes a destination address.

**3**. The method of claim **2**, wherein said traffic regulation signal further includes packet flow path information.

**4**. The method of claim **3**, further comprising the steps of: operating said preceding node to transmit an additional traffic regulation signal to an additional preceding node to cause the additional preceding node to initiate flow rate control on flows directed to a destination address identified in said additional traffic regulation signal.

**5**. A method of implementing flow control in a communications network including a first node, a second node and a destination device, the first node being located upstream of the second node on a communications path to said destination device, the method comprising the steps of:

operating the second node to detect when the second node is saturated with traffic for a period of time, and in response to detecting such saturation, said second node performs the step of initiating a path determination operation to determine at least a portion of a path of a flow causing congestion at said second node;

operating said second node to receive path information identifying said first node as part of said path of the flow causing congestion;

in response to detecting that said second node is saturated with traffic for said period of time, operating the second node to send a first traffic regulation signal to the first node to trigger said first node to perform traffic regulation of flow rates on flows of packets directed to said destination device;

18

operating the first node, in response to said first traffic regulation message, to perform forced flow rate reduction operations on at least some flows directed to said destination node wherein operating the first node to perform forced flow rate reduction operations includes comparing packet flow rates of packet flows directed to said destination to at least one flow rate baseline for said first node and dropping packets from packet flows directed to said destination which have flow rates exceeding the flow rate base line to which the particular flow rate is compared;

further comprising, in said first node,

distinguishing, for traffic flow control purposes, between packet flows corresponding to protocol types which are responsive to congestion control signals and packet flows corresponding to protocol types which are not responsive to congestion control signals.

**6**. A communications system for communicating information as flows of packets, the system comprising:

a first network node including:

i. congestion control means for detecting congestion at said first network node;

ii. traffic flow path determination means for determining the path of at least one packet flow causing congestion at said first network node, wherein said step of determining the path includes the step of transmitting a signal to said destination device requesting path information; and

iii. early traffic regulation signaling means for transmitting a traffic regulation signal to initiate traffic regulation at an upstream network node; and

an upstream network node, the upstream network node being coupled to the first network node, the upstream network node including:

i. means for receiving traffic regulation signals from said first network node; and

ii. flow control means for performing flow rate reduction operations on one or more traffic flows identified from information included in received traffic regulation signals.

**7**. A communications system for communicating information as flows of packets, the system comprising:

a first network node including:

i. congestion control means for detecting congestion at said first network node;

ii. traffic flow path determination means for determining the path of at least one packet flow causing congestion at said first network node; and

iii. early traffic regulation signaling means for transmitting a traffic regulation signal to initiate traffic regulation at an upstream network node; and

an upstream network node, the upstream network node being coupled to the first network node, the upstream network node including:

a. means for receiving traffic regulation signals from said first network node; and

b. flow control means for performing flow rate reduction operations on one or more traffic flows identified from information included in received traffic regulation signals; and

a destination node coupled to said first network node for serving as the destination of at least some of the packet flows passing through the first network node, the destination node including:

i) means for reconstructing packet flow path from received information; and

Cloudflare - Exhibit 1008, page 21

Appx1316

US 7,295,516 B1

19

ii) means for transmitting reconstructed packet flow path information to the first network node in response to a request for path information from said traffic flow path determination means.

**8**. The communication system of claim **7**, wherein the traffic regulation signal generated by the early traffic regulation signaling means of the first network node includes a destination address corresponding to said destination node.

**9**. The communication system of claim **8**,

wherein the first network node includes traffic flow rate baselines generated from traffic flowing through the first network node over a period of time; and

wherein the upstream network node includes traffic flow rate baselines generated from traffic flowing through the upstream network node over a period of time.

20

**10**. The communication system of claim **9**,

wherein the first network node further comprises flow control means for performing a flow control operation including the dropping of packets from at least one packet flow as a function of at least one of the first network node traffic flow rate baselines.

**11**. The communication system of claim **10**, wherein the first network node further comprises:

a plurality of packet queues, one packet queue being used to store packets corresponding to a single or each group of flows to which are to be subject to different flow rate reduction operations are part of the processing by said flow control means.

* * * * *

Cloudflare - Exhibit 1008, page 22

Appx1317

**Callaway, Daniel (19) x4924**

| | |
|---|---|
| **From:** | Day, Jim (19) x4414 |
| **Sent:** | Thursday, December 2, 2021 11:43 AM |
| **To:** | Kenneth Weatherwax; Nathan Lowenstein; Parham Hendifar; Patrick Maloney; Jason Linger; Daniel Hipskind; eem@bergerhipskind.com |
| **Cc:** | Callaway, Daniel (19) x4924; Liaw, Winston (19) x4497 |
| **Subject:** | Cloudflare, Inc. v. Sable Networks, Inc., IPR2021-00909 (USP 8,243,593) |

Counsel:

You will have noticed in the recent Institution Decision in this matter (on pages 38 and 39) the Board identified a typo in the Petition.  To avoid ambiguity, I can confirm that Sections VII.A.8 (addressing claims 17 and 37) and VII.A.9 (addressing claims 18 and 38) should have been located in Section VII.B because they depend from claims addressed in that section of the Petition (i.e., Ground 2 based on Yung and Copeland).

If you have any questions about our contentions regarding claims 17, 18, 37, and 38, please let me know.

-Jim


**Jim Day**
*Partner*
jday@fbm.com
D. 415.954.4414


FARELLA
BRAUN + MARTEL
235 Montgomery Street 17th FL
San Francisco, CA 94104
www.fbm.com

Cloudflare - Exhibit 1102

Appx2940

according to Roberts, is the Apeiro's ability to scale up without requiring a whole new system.

Roberts says the Apeiro will also create new revenue streams for the carriers by solving the "voice and video problem." IP voice and video, unlike email and static Web pages, breaks down dramatically if there's a delay - as little as a few milliseconds - in getting packets from host to recipient. To guard against delays, Roberts and his team designed and programmed the Apeiro to examine incoming packets (about 4 million at any given instant) and decide when to put them through. As a result, once the lead packet in a videostream has been identified, examined, and assigned a priority, the rest of the packets in the session need only a cursory identification to be assigned to the "flow" that Caspian's switch has designated.

While Caspian competitors attempt to similarly separate packets by priority, with a method called DiffServ, Roberts says DiffServ works only if a router has lots of excess capacity. The Apeiro technique is based on a standard called multi-protocol label switching, which Roberts has tweaked and renamed D/MPLS - the $D$ is for dynamic. It's one of seven Caspian-related patents that Roberts has applied for. The result will be that carriers can assign higher priorities not just to types of traffic, but to traffic coming from a specific customer - allowing them to offer varying levels of service at a range of prices. Such differentiated service could be a boon for the carriers. "This is a revolution in routing," says David Yedwab, a former Bell Labs engineer who works as a consultant to carriers. "It's a technical breakthrough."

Inside the Caspian switch, Roberts has created a mini Internet. Between the main switching cards lies a switching fabric, a local fiber-optic network containing a group of processors that act like tiny routers, finding the optimal path for each packet. Avici and Pluris also feature switching fabrics, but Caspian's design sets Apeiro apart. Roberts says the competition's use of hypercube and hypertoroid designs - internal wiring schemes for moving bits through the router - limits them to three dimensions. "They probably saw that in some book and figured that was as far as they could go," he scoffs.

Roberts realized that, in theory, there's no limit to the number of dimensions along which packets can be routed, assuming the chips can keep track. For now, the $n$ in his $n$-dimensional design is 24 - but only because that's as much sophistication as the first round of processors and software can handle.

---

␣␣Little surprise carriers call Apeiro "a revolution": Prioritized packets means preferential treatment - and differentiated service at a range of prices. ␣␣

Sable Networks, Inc., Exhibit 2001
Page 2001 - 6        6/11
IPR2021-00909, Cloudflare, Inc. et al. v. Sable Networks, Inc.

Appx3019

IPR2022-00228
Patent 8,243,593 B2

petition and Patent Owner's preliminary response in the 909 IPR, we
determined that Cloudflare had demonstrated a reasonable likelihood of
showing that claims 1, 2, 4–7, and 25–27 would have been obvious over
Yung and that claims 9–13, 19–24, 29–33, and 39–44 would have been
obvious over Yung and Copeland.  *See* IPR2021-00909, Paper 16 at 24–48
(PTAB Nov. 19, 2021) ("909 Institution Decision").  In the 909 Institution
Decision, we also queried whether dependent claims 17, 18, 37, and 38
should be included in the Yung-Copeland ground (rather than the Yung
ground) (*see id.* at 3, 38–39), and we provided our initial assessment of other
disputed issues (*see id.* at 48–57).  Ultimately, in the 909 IPR, we instituted
trial on all grounds of unpatentability specified in that petition.  *Id.* at 57.

## *D. Statutory Disclaimer*

On March 11, 2022, in the 909 IPR, Patent Owner filed an updated
mandatory notice stating that it had filed and recorded "a statutory
disclaimer disclaiming claims 1, 2, 4–8, 14–16, 25–28, 34–36 from
challenged U.S. Patent No. 8,243,593 . . . under 35 U.S.C. § 253(a) and 37
C.F.R. § 1.321(a)."  IPR2021-00909, Paper 29; *see also* IPR2021-00909,
Ex. 2006 (statutory disclaimer of the '593 patent).

Based on our review of Exhibit 2006 in the 909 IPR and the Office's
public records, we are persuaded that claims 1, 2, 4–8, 14–16, 25–28, 34–36
have been disclaimed under 35 U.S.C. § 253(a) in compliance with
37 C.F.R. § 1.321(a).  Consequently, for purposes of determining whether to
institute review, we consider only claims 3, 9–13, 17–24, 29–33, and 37–44.
*See* 37 C.F.R. § 42.107(e) ("No *inter partes review* will be instituted based
on disclaimed claims.").

4